Page 61

1  Plaintiffs' Fifth Discovery Requests," which is Exhibit
2  No. 6-A herein, and subsequent to that there has been a
3  second supplement, which is Exhibit No. 6-B, and under
4  the representations of Counsel and we have talked about
5  it, there will be a clarification, so there will be a
6  third supplement.
7       It asks about where Unocal said they don't know
8  the whereabouts of the work platform and identity of the
9  persons who removed it. Can you read off under the
10 answer the third line where it starts "until"?
11      MR. THORSNESS: Object to the form of the
12 question and move to strike it.
13 Q. Well, where it starts off "Until Paul Crapps."
14 A. I am lost here. Where are you at?
15 Q. On page two, the answer.
16 A. The answer here?
17 Q. Right.
18 A. "Until Paul Crapps was interviewed, no current
19 Unocal employee was identified as possessing the
20 information requested."
21 Q. Do you know when you were interviewed?
22 A. I don't know the date, no.
23 Q. Was it 2006?
24 A. This has been going on so long. I couldn't tell
25 you.

Page 62

1  Q. Well, in the response to the third discovery
2  requests, it indicated that you had been conferred with
3  in the discovery answers to that date.
4       Do you have any recollection of that having been
5  done, getting your input into the answers?
6  A. No.
7       MR. COHN: Can we just take a short break.
8       VIDEOGRAPHER: Off record 12:52 p.m.
9       (There was a short break.)
10      VIDEOGRAPHER: On record 12:57 p.m.
11 Q. Mr. Crapps, I thank you for taking the time here
12 and I'll try and make this as quick as possible, but
13 when lawyers say that, then it keeps going, but I'm
14 going to try and be quick.
15      (Exhibit No. 8 marked.)
16 Q. I'm going to show you what's been marked as
17 Exhibit No. 8, and this is a document that was provided
18 to the plaintiffs in -- I'm going to represent it was --
19 the same document you have in front of you, John.
20      That it was provided to the plaintiffs in initial
21 disclosures by the defendants and it is marked DEF00027
22 Grove versus Unocal. Have you ever seen that document
23 before?
24 A. Yes.
25 Q. When did you see that document?

Page 63

1  A. Earlier today.
2  Q. Have you ever seen that document before today?
3  A. No.
4  Q. I want to ask you a few questions about that
5  document.
6  A. Okay.
7  Q. Now, these -- it's titled Notes Concerning Visit
8  by State of Alaska OSHA Inspection as Compiled by Ken
9  Burns, Drilling Safety Advisor.
10      Did you have any role at all in preparing these
11 notes?
12 A. No.
13 Q. It's dated -- at the top it says, "03/03/03,
14 Monday," which I take it to mean March 3, 2003. Your
15 name is in this document, which is why I am questioning
16 you about this.
17      It says -- the first sentence says, "State OSHA
18 inspectors came to reception desk asking for Siemens.
19 OSHA was advised that Siemens was not at this building.
20 Both inspectors departed."
21      Were you the person that provided that
22 information to the inspectors?
23 A. I think so, yes.
24 Q. And then the second sentence says, "After lunch,
25 Paul Crapps received a call from Tome Lake, Siemens

Page 64

1  supervisor, that state OSHA was at their office
2  investigating a complaint from one of the employees
3  regarding condition (scaffolding) here at Unocal. Lake
4  further advised that OSHA was on their way to Unocal."
5       Is that correct that you received a call from
6  Tome Lake?
7  A. Yes.
8       MR. THORSNESS: Excuse me. Just to
9  interpose again an objection concerning the
10 admissibility of any reference to OSHA or OSHA
11 inspections. Thank you.
12      MR. COHN: I understand. We can take that
13 up later.
14      MR. THORSNESS: Okay.
15 Q. Now, it says on the fourth paragraph, "At
16 approximately 1440 hours, I was notified by Paul Crapps
17 that state OSHA was at the reception desk to conduct a
18 complaint inspection."
19      Were you the person that was -- how did you
20 happen to be at the front desk when the OSHA people came
21 in?
22 A. My office at that point was behind the front desk
23 or someone called me down there.
24 Q. Do you recall that at that time you went up to
25 the penthouse with the OSHA people?

19 (Pages 61 to 64)

### Page 65

1   A. Yes.
2   Q. And does this help recollect your memory as to
3   who was there with you?
4   A. No. I mean, I know that Ken Burns went up there
5   with me and there was some OSHA inspectors, but I
6   couldn't put a name to a face.
7   Q. It says here -- now, previously you indicated
8   that the platform had been removed before OSHA conducted
9   their inspection. Do you recall that testimony?
10  A. Yes.
11  Q. Now, if you look at the last paragraph here it
12  says, "Both Tom Scanlon and Lee Zhao climbed the ladder
13  and exposed themselves to the open-sided platform."
14      Does that refresh your memory that the platform
15  had not yet been removed at the time of the inspection
16  by OSHA?
17      MR. THORSNESS: Object to the form of the
18  question.
19  A. No. Where exactly --
20      MR. THORSNESS: Where are you reading from,
21  Mike?
22  Q. Take a look at the next to the last paragraph.
23      MR. THORSNESS: Beginning with "Tom Scanlon
24  and Lee Zhao"?
25      MR. COHN: Yeah.

### Page 66

1       MR. THORSNESS: Where are you reading from
2   again, just so I am clear, Mike?
3       MR. COHN: It is about -- starting --
4       MR. THORSNESS: "Both Tom Scanlon"?
5       MR. COHN: Yes.
6   A. That's just how he worded it. The platform was
7   no longer there.
8   Q. So when it says, "Exposed themselves to the
9   open-sided platform," do you have any idea what that
10  refers to?
11  A. There is a pony wall that was constructed and I
12  think what he was referring to is that they crawled up a
13  ladder exposing themselves to that, the wall that it was
14  attached to.
15  Q. Are you talking about the wall opposite the
16  filter wall?
17  A. Yes.
18  Q. And then can you read the next sentence as to
19  about the open-sided platform?
20  A. "One significant question was asked. Who erected
21  the scaffolding? No one knew the answer. It was
22  obvious from the structure that it had been erected many
23  years ago.
24  Q. So you are saying that this structure that they
25  are talking about and that they are referring to -- that

### Page 67

1   Mr. Burns is referring to in these notes wasn't even
2   there at the time of that inspection?
3       MR. THORSNESS: Objection; foundation. The
4   witness has testified he didn't write this document.
5       MR. COHN: Well, he was present in the room
6   at the time.
7   A. No, I wasn't.
8       MR. COHN: Well, I have written a letter. I
9   do want to depose Mr. Burns.
10      MR. THORSNESS: Sure, of course, but
11  Mr. Burns is not here today.
12  Q. Tom Scanlon, Lee Zhao, Tome Lake, Paul Crapps,
13  and I, which I am assuming the author went to the
14  penthouse. Did you stay outside the room at that time?
15  A. I escorted them to the penthouse and then I left.
16  Q. So you don't have any explanation as to why they
17  are referring to scaffolding that is not there?
18  A. I was just going on knowing the area itself. I
19  escorted them and then I left.
20  Q. It looks like the date of this inspection is
21  March 3rd, 2003; is that correct?
22  A. If that's what the date says on top of the paper.
23      MR. COHN: Can we go off record one second?
24  I want to make a copy of an exhibit. I don't want to
25  look through the papers to find it.

### Page 68

1       VIDEOGRAPHER: Off record 1:05 p.m.
2           (There was a short break.)
3       VIDEOGRAPHER: On record 1:07 p.m.
4           (Exhibit No. 9 marked.)
5   Q. Mr. Crapps, I want to show you what's been marked
6   as Exhibit No. 9. And, first, do you recognize that
7   document?
8   A. I must have. I signed it, but not off the top of
9   my head, but yeah.
10  Q. So that is your signature on the document?
11  A. Yes.
12      MR. THORSNESS: What's the Bates number at
13  the bottom here?
14      MR. COHN: It's LG00739. That's Larry
15  Grove. That will be supplemental --
16      MR. THORSNESS: Has been this been produced
17  yet?
18      MR. COHN: It is going to be produced, but
19  this is a document that I would assume that Unocal would
20  have possession of.
21      MR. THORSNESS: Right, but you have not
22  produced it yet?
23      MR. COHN: No, but it is coming.
24  Q. Now, does this refresh your memory as to when the
25  platform was dismantled?



### Page 69

1  A. No. This is just saying that I put the
2  notification up.
3  Q. Well, I direct you to paragraph two. It says --
4  the first paragraph says you work at Union Oil Company
5  of California at 909 as a building maintenance
6  specialist. Is that true that at that time you worked
7  as a building maintenance specialist? The date of this
8  is May 9, 2003.
9  A. It was June 13, 2003 that I was hired.
10 Q. So it would be -- that was not a correct title
11 for you, building maintenance --
12 A. I think it was in the works.
13 Q. You say you have -- it says, "Had personal
14 knowledge of the following," and then paragraph two, can
15 you read what that says?
16 A. "On about March 8, 2003, the platform, which is
17 the subject matter of inspection number 305757577 was
18 dismantled."
19 Q. And it says you had personal knowledge of that,
20 that it was dismantled on March 8, 2003. How would you
21 have personal knowledge?
22 A. That it was dismantled?
23 Q. Right?
24 A. Because I dismantled it.
25 Q. It says it was dismantled on March 8, 2003,

### Page 70

1  according to this affidavit?
2       MR. THORSNESS: You are asking him what the
3  document says? What's your question?
4  Q. Does the document say that?
5  A. Yes.
6  Q. Did you swear under oath in this document that
7  that was the date it was removed, dismantled?
8  A. I signed it, yes.
9  Q. Is that date, March 8, 2003, later than the date
10 of the OSHA inspection, which if you look at the
11 previous exhibit, which is Exhibit No. 8, indicates,
12 according to the notes of Ken Burns, that the inspection
13 occurred around March 3rd?
14 A. Yes, the date is later.
15 Q. So is it possible that it was March 8, 2003 that
16 you dismantled the platform and threw the metal brackets
17 and the bolts and nuts into the garbage and stored the
18 plank?
19 A. No.
20 Q. That isn't possible?
21 A. No. I did it a couple of days after the
22 incident.
23 Q. So do you have any explanation as to why you
24 signed an affidavit saying it was dismantled on March 8,
25 2003?

### Page 71

1  A. No. Other than it might be a typo.
2  Q. A typo which you didn't review?
3  A. I must not have, no.
4  Q. Do you recall if you were told by -- who told you
5  at Unocal to remove the platform?
6  A. Charles Arnett.
7  Q. Did Roseanne Sinz provide you any direction to
8  remove the platform?
9  A. No.
10 Q. Did Ken Burns ask you to remove it?
11 A. No.
12 Q. It was just strictly Charles Arnett?
13 A. Yes.
14 Q. Do you recall if you were interviewed by OSHA
15 people?
16 A. No, I was not.
17 Q. Did you have any discussion with any of the
18 individuals, Unocal people after the OSHA inspection
19 regarding the OSHA investigation?
20 A. Yes.
21 Q. Who did you have discussions with regarding that?
22 A. Roxanne, and I might have been -- the safety
23 specialist, Ken Burns.
24 Q. And do you recall when you would have had these
25 discussions with Roxanne Sinz?

### Page 72

1  A. Probably when all the citations and stuff came
2  about.
3  Q. So -- and what was the discussion -- can you
4  recall the discussion at all, what she said to you or --
5  A. That we had the citation and asked me to post the
6  citations.
7  Q. What about the safety individual, was that Ken
8  Burns did you say?
9  A. Yes.
10 Q. Did you have a discussion with him about it?
11 A. I might have had a discussion and it might have
12 -- it probably was just based on that they had taken
13 some pictures up there and that we were probably going
14 to be fined about it.
15 Q. Did anyone indicate that there would be a
16 possibility of a lawsuit?
17 A. No.
18 Q. Have you ever been involved -- have you ever been
19 deposed before?
20 A. Deposed before?
21 Q. Yes.
22 A. No.
23 Q. Have you ever been involved in a lawsuit before?
24 A. No.
25 Q. Do you know that the statute of limitations is

21 (Pages 69 to 72)

Page 85

1 the court.
2 　　　MR. THORSNESS: We can. I just instructed
3 him not to answer, so do with it what you will.
4 　　　MR. COHN: That's fine. Let's go on to the
5 next question.
6 　　　MR. THORSNESS: I'll restate my foundational
7 objection.
8 Q. When you took the bolts off, did you examine the
9 bolts at all?
10 A. No.
11 Q. Did you observe if they were rusty?
12 A. No.
13 Q. You didn't look at them?
14 A. No.
15 Q. And do you know how many you took off?
16 A. Half a dozen.
17 Q. Are you estimating now?
18 A. Yes, I'm estimating.
19 Q. I know you indicated you took photos. Did you
20 observe anyone else take any photos?
21 A. No.
22 Q. Other than Charles Arnett and Roseanne Sinz and
23 Ken Burns, did you talk with anyone else about the
24 platform other than counsel?
25 A. No. Not to my recollection, no.

Page 86

1 Q. I think I did ask you this here: But you
2 indicated you didn't really look at the bolts, but did
3 you -- do you know, could you tell what grade bolts they
4 were?
5 A. No.
6 Q. You said they were about quarter inch; is that
7 correct?
8 A. Yes.
9 Q. Do you know if it is quarter inch bolts that are
10 used in the platforms where you are working now?
11 A. Quarter inch. There is all types of bolts being
12 used in the platform. We have got bolts up to one-inch,
13 two-inch thick.
14 Q. I mean to hold up the work platform.
15 A. No. I don't know exactly what the specs are for
16 the platforms.
17 Q. Now, did you do measurements when you were there
18 as to the distance between the brackets?
19 A. No.
20 Q. So do you have any knowledge of how far in from
21 the door -- do you recall how far in from the door the
22 first bracket was?
23 A. Probably like, I would estimate maybe a foot,
24 maybe less.
25 Q. And do you recall -- but you don't know how far

Page 87

1 the second bracket was from the first bracket?
2 A. No.
3 Q. Do you have any understanding of how far the
4 plank extended over beyond the scaffold at the end?
5 A. No, because it was laying on the floor when I got
6 in there.
7 Q. Do you know how long the room is?
8 A. No.
9 Q. Now, you can correct me if I'm wrong. Did you
10 indicate the plank was about 12 feet?
11 A. Yes. That's what I estimated, yes.
12 Q. Do you have any idea how long the actual filter
13 room is?
14 A. No.
15 Q. Would the plank have extended from one end of the
16 filter room from the door all the way to the back wall?
17 A. No.
18 Q. Do you know how much space there would be left
19 between those two?
20 A. No. I mean, I could estimate maybe another 12,
21 another 12 to 16 foot past that, but that's all I could
22 give you.
23 　　　(Exhibit No. 11 marked.)
24 Q. This is Defendant's Responses to Plaintiffs'
25 Seventh Discovery Requests, and I'm going to ask you if

Page 88

1 you have seen those responses before.
2 　　　MR. THORSNESS: I have got a copy, Michael.
3 A. Yes, I have seen them.
4 Q. When did you see these?
5 A. Earlier today.
6 Q. Is that the first time you have seen these?
7 A. Yes.
8 Q. So prior to today, you had not seen the discovery
9 responses from Unocal?
10 A. No, I have not seen them.
11 Q. So interrogatory number one on page two asks
12 about Unocal employees or other persons who went into
13 the room at the time of the accident from the time of
14 the accident until it was removed, and then it says
15 here, "Defendant believes that Paul Crapps removed the
16 scaffolding from inside the filter room several days
17 after the incident."
18 　　　MR. THORSNESS: Go to page three.
19 Q. That's page three.
20 A. Okay.
21 Q. You testified that's what you did; is that
22 correct?
23 A. Yes.
24 Q. "It is believed the metal pieces were placed in
25 the trash can located outside the filter room." Is that

Page 89

1  correct?
2  A. Yes.
3  Q. And you did that?
4  A. Yes.
5  Q. And then on September 9, 2002, you were a
6  contract employee working for Kelly Services?
7  A. Yes.
8  Q. Did you have a specific written contract for
9  working in the Unocal building?
10 A. No.
11 Q. Did you have like a timesheet that you had to
12 fill out?
13 A. Yeah, I had weekly timesheets.
14 Q. And in those timesheets, did you have to put down
15 -- was it just -- did you have to put down what you did
16 during the days?
17 A. No.
18 Q. Did you keep any diaries or notes about what you
19 did?
20 A. Nope.
21 Q. So there would be no -- they wouldn't have any
22 record at Kelly or Unocal as to what you were doing on
23 specific days?
24 A. No. It was just a general 8:00 to 5:00 type job.
25 Q. And in the last paragraph in answer to

Page 90

1  interrogatory number one, which is, I believe it is
2  Exhibit No. 11, "Defendant is not aware of any
3  photographs, videotaping or documentation during the
4  specified time period except for the photographs
5  produced by plaintiff."
6      We have already talked about that. That answer
7  isn't correct, am I right?
8      MR. THORSNESS: Objection to form.
9  Q. That would be wrong?
10     MR. THORSNESS: Objection to form.
11 A. "Defendant is not aware of any photographs,
12 videotapes or documents --" I don't know what
13 photographs were produced. Oh, the plaintiff?
14 Q. There is a specified time period. The time
15 period of the accident until the scaffolding was
16 removed.
17 A. No, there was no pictures and video.
18 Q. You indicated earlier you took photographs
19 though.
20 A. I took photographs of the -- after the OSHA
21 investigation.
22 Q. After the OSHA investigation?
23 A. Yes.
24 Q. And not before the OSHA investigation?
25 A. Yes.

Page 91

1  Q. So you took the photos after the scaffolding was
2  removed?
3  A. Yes.
4      MR. COHN: I am going to want copies of
5  those photographs because I don't believe they have been
6  produced.
7      MR. THORSNESS: Counsel, they have been
8  produced. I can give you Bates numbers. This is on
9  information and belief. They are Bates numbers
10 defendant 00047 through defendant 00063.
11     I believe they have been produced, and check
12 on that. If they haven't, we'll get them right to you.
13     MR. COHN: Can we go off record?
14     VIDEOGRAPHER: Off record 1:47 p.m.
15     (There was a short break.)
16     VIDEOGRAPHER: On record 1:51 p.m.
17     (Exhibit No. 12 marked.)
18 Q. I'm showing you what's marked as Exhibit No. 12.
19 Do you recognize the photographs?
20 A. Yes.
21 Q. The black and whites anyway?
22 A. Yes.
23 Q. And do you recognize these as photographs that
24 you took?
25 A. Yes.

Page 92

1  Q. For the record, these photos are identified as
2  DEF00047 to 00063, and they were attached in the
3  defendant's initial disclosures.
4      The initial disclosures indicated these are
5  photos in their possession without indicating, however,
6  who took them or when they were taken.
7      But you recall these as the photos that you took
8  after the OSHA inspection?
9  A. Yes.
10 Q. Do you recall how soon after the OSHA inspection
11 you took these photographs in the filter room?
12 A. Within probably a day or two.
13     MR. COHN: And if the color or the negatives
14 of these are -- I want the negatives and the color
15 photos of these photographs.
16     MR. THORSNESS: Write me a letter, please.
17 Q. And the first, 0047 to 51 are photos of the
18 mechanical room, the filter room; is that correct?
19 A. Yes.
20 Q. What were you trying to show -- were you trying
21 to show anything in these photos?
22 A. I was just asked to take photos of where it was
23 -- the platform was located.
24 Q. Can you identify on DEF00047 using this red pen
25 where the platform was located?

EXHIBIT 14