Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3    _____
 4    LAWRENCE H. GROVE, ET AL.,       )
                                       )
 5              Plaintiffs,            )
                                       )
 6       vs.                           )
                                       )
 7    UNOCAL CORPORATION,              )
                                       )
 8              Defendant.             )
 9    _____
10    Case No. A-04-0096 CV (JKS)
11
12
13                _____
14             VIDEOTAPED DEPOSITION OF PAUL CRAPPS
15                _____
16                      March 3, 2006
                         11:00 a.m.
17
18              Taken by Counsel for Plaintiffs
                              at
19                 330 L Street, Suite 200
                      Anchorage, Alaska
20
21
22
23
24
25
```

### Page 2

```
 1          A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiffs:
 4     Michael Cohn, Esq.
       PHILIP PAUL WEIDNER & ASSOCIATES
 5     330 L Street, Suite 200
       Anchorage, Alaska 99501
 6     (907) 276-1200
 7
 8   For Defendant:
 9     John B. Thorsness, Esq.
       CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
10     711 H Street, Suite 620
       Anchorage, Alaska 99501
11     (907) 272-9273
12
13   Also Present:
14     Lawrence H. Grove
15
16   Videographer:
17     Martha Enslow, CLVS
       MEDIA IMPRESSION LEGAL VIDEO SERVICES
18     P.O. Box 112081
       Anchorage, Alaska 99511
19     (907) 276-3473
20
21   Court Reporter:
22     Sonja L. Reeves, RPR
       PACIFIC RIM REPORTING
23     711 M Street, Suite 4
       Anchorage, Alaska 99501
24
25
```

### Page 3

```
 1                I-N-D-E-X
 2
 3   EXAMINATION BY                        PAGE
 4     Mr. Cohn            4
 5     Mr. Thorsness     115
 6   FURTHER EXAMINATION BY
 7     Mr. Cohn          117
 8   EXHIBITS
 9   1   Second Re-Notice of Deposition (2 pgs.)    42
10   2   Defendant's Responses to Plaintiffs'       44
         First Discovery Requests (5 pgs.)
11
     3   Responses to Plaintiffs' Second            46
12       Discovery Requests (4 pgs.)
13   4   Responses to Plaintiffs' Third             47
         Discovery Requests (14 pgs.)
14
     5   Defendant's Responses to Plaintiffs'       50
15       Third (sic) Discovery Requests (12 pgs.)
16   6   Defendant's Responses to Plaintiffs'       52
         Fifth Discovery Requests (4 pgs.)
17
     6-A Defendant's Supplemental Responses         53
18       To Plaintiffs' Fifth Discovery
         Requests (4 pgs.)
19
     6-B Defendant's Second Supplemental            56
20       Responses to Plaintiffs' Fifth
         Discovery Requests (5 pgs.)
21
     7   Defendant's Responses to Plaintiffs'       59
22       Ninth Discovery Requests (22 pgs.)
23   8   Notes by Ken Burns (1 pg.)                 61
24   9   Affidavit of Paul Crapps (1 pg.)           67
25
```

### Page 4

```
 1   EXHIBITS CONTINUED
 2
 3   10   Photographs (6 pgs.)                      71
 4   11   Defendant's Responses to Plaintiffs'      87
          Seventh Discovery Requests (6 pgs.)
 5
 6   12   Copies of Photographs (17 pgs.)
 7   13   Diagram (1 pg.)                           99
 8   14   Schematic (1 pg.)                        100
```

### Page 5

                        ANCHORAGE, ALASKA; MARCH 3, 2006
                                11:00 A.M.
             VIDEOGRAPHER: My name is Martha Enslow of
    Media Impressions, P.O. Box 112181, Anchorage, Alaska
    99511. I am the videographer representing Pacific Rim
    Reporting.
             It is the 3rd day of March the year 2006.
    We're on record 11:08 a.m. We're at the offices of Phil
    Weidner in Anchorage, Alaska to take the deposition of
    Paul Crapps in Case Number 04-0096 Civil, Lawrence H.
    Grove, et al. versus Unocal Corporation.
             This deposition is being taken on behalf of
    the plaintiff. At this time, I would like everyone in
    the room to identify themselves verbally.
             MR. COHN: My name is Michael Cohn. I am an
    attorney with the law firm of Phillip Paul Weidner &
    Associates. I'm here representing the plaintiffs, Larry
    Grove; his wife, Cynthia Grove; his children, Michael
    Grove and Sarah Grove. And alongside me is plaintiff,
    Larry Grove.
             MR. THORSNESS: John Thorsness here for the
    defendant, Unocal, and representing the witness.
             MR. CRAPPS: My name is Paul Crapps.
             MR. WEIDNER: The record should reflect, my
    name is Phillip Weidner. I am here with Mr. Cohn. I am

Page 6

1  also here on behalf of the plaintiffs. I'll be here for
2  portions of the deposition.
3       VIDEOGRAPHER: Are there any stipulations?
4       MR. COHN: None.
5       MR. THORSNESS: No.
6                    -o0o-
7                 PAUL CRAPPS,
8       deponent herein, being sworn on oath,
9       was examined and testified as follows:
10                EXAMINATION
11 BY MR. COHN:
12   Q. Good morning, Mr. Crapps.
13   A. Good morning.
14   Q. You understand that we're here to take your
15 deposition?
16   A. Yes.
17   Q. And you understand that this deposition is being
18 videotaped?
19   A. Yes.
20   Q. And you understand that we're taking your
21 deposition in a lawsuit against Unocal filed by the
22 plaintiffs?
23   A. Yes.
24   Q. Do you understand that anything you say here can
25 be used -- may be used in court?

Page 7

1    A. Yes.
2    Q. And you understand this is a formal proceeding?
3    A. Yes.
4    Q. And you understand that in certain instances this
5  deposition may be used instead of your live testimony at
6  trial if appropriate?
7    A. Yes.
8    Q. Are you taking any medication?
9    A. No.
10   Q. So there is nothing that would affect your
11 ability to understand the questions that I ask you other
12 than the way I phrase my questions?
13   A. No.
14       MR. THORSNESS: Paul, if there is anything
15 you don't understand about Mr. Cohn's questions, just
16 ask him to rephrase it. He'll be happy to do that.
17   Q. If for some reason you need to take a break, and
18 sometimes deponents don't realize that they are allowed
19 to take a potty break if they need one and they don't
20 have to wait for the lawyers to say, "Time for a break,"
21 just let us know and I will be happy to accommodate you.
22       And another thing which is a lot of times
23 deponents sometimes do not answer "yes" or "no" and they
24 go "uh-huh," but even though we're on videotape, if you
25 can, instead of shaking your head, give us a "yes" or a

Page 8

1  "no" if that's the appropriate response.
2    A. Okay.
3    Q. That will make a more complete and better record
4  to follow. Even though it is videotaped, there is also
5  a transcript that will be made.
6       Have you done anything to prepare for this
7  deposition today?
8    A. Yes.
9    Q. What did you do?
10   A. We met earlier.
11   Q. When you say "we" --
12   A. My lawyer or Unocal's lawyer, Mr. -- I'm sorry.
13       MR. THORSNESS: Thorsness.
14   Q. Have you talked to anyone else besides Mr.
15 Thorsness about your deposition today?
16   A. Yes, Tracy Howard.
17   Q. Who is Tracy Howard?
18   A. She is our legal department of Unocal.
19   Q. Did you review any papers or notes?
20   A. Yes.
21   Q. And what did you review?
22   A. I reviewed the OSHA inspections, some photos and
23 some of the questions. I don't know what the legal term
24 is for them.
25   Q. Questions, are you talking about discovery

Page 9

1  answers?
2       MR. THORSNESS: He is, Mike.
3  Interrogatories and responses to interrogatories.
4    Q. Did you bring those with you, the documents you
5  refreshed your memory with?
6    A. I didn't.
7    Q. Was it your idea to review these documents before
8  you testified?
9    A. No.
10   Q. To start with, are you presently employed?
11   A. Yes.
12   Q. Who are you employed with?
13   A. Unocal/Chevron. We were just purchased by --
14   Q. Unocal was purchased by Chevron?
15   A. Yes.
16   Q. And how long have you been employed by Unocal?
17   A. June 13, 2003 would be my hire date.
18   Q. And where do you work for Unocal? Where is your
19 physical location?
20   A. Granite Point Platform.
21   Q. Where is Granite Point Platform?
22   A. In the middle of Cook Inlet.
23   Q. What do you do there?
24   A. I'm a utility rotational operations --
25   Q. Operations?

### Page 10

1  A. That's just the position. I am in operations.
2  Q. What does that entail? That sounds technical.
3  A. We're just operations of pulling oil out of the
4  ground.
5  Q. How long have you worked at that platform?
6  A. Almost a year now.
7  Q. And where did you work since you have been -- it
8  looks like you have been employed almost three years
9  with Unocal?
10  A. Yes.
11  Q. So that was a year. Where did you work before
12  you were at that platform?
13  A. The Anchorage office.
14  Q. By the "Anchorage office," do you mean 909 West
15  Ninth Avenue?
16  A. Yes.
17  Q. And what did you do at 909 West Ninth Avenue?
18  A. Building services.
19  Q. Did you have a title, a job title?
20  A. Job title, as an employee there, I was building
21  services coordinator.
22      MR. THORSNESS: Excuse me, Mike. Could you
23  be a little more specific as to what time frame we're
24  talking about at the building?
25      MR. COHN: I asked him the previous job to

### Page 11

1  working at the platform.
2      MR. THORSNESS: All right.
3      MR. COHN: Then I'll ask how long he was
4  there.
5      MR. THORSNESS: I apologize for the
6  interruption.
7  Q. How long did you work as a building service
8  coordinator?
9  A. Two years.
10  Q. Was that from the time that you were hired by
11  Unocal?
12  A. Yes.
13  Q. And what is the -- as the building service
14  coordinator, what were your job responsibilities?
15  A. Just to oversee anywhere between fire inspections
16  to delivering paper to the different departments.
17  Q. Did that also include maintenance and repairs on
18  the building?
19  A. Not -- no major -- yes, I would have to say.
20      MR. THORSNESS: Did you understand the
21  question?
22      THE WITNESS: Yeah, I understood.
23  Q. Well, in other words, if there -- well, when I
24  said "oversee," so if there was some repair work to be
25  done, would you do it directly or have someone else do

### Page 12

1  it under you?
2  A. Depending on the work.
3  Q. And would any -- depending on the work, would you
4  have to get prior authorization to do that work?
5  A. That would depend on the work too.
6  Q. When would you have to have prior authorization
7  to do work on the building?
8  A. Anything that was not regularly-scheduled
9  maintenance.
10  Q. So regularly-scheduled maintenance, you didn't
11  have to get prior authorization to do?
12  A. No.
13  Q. And by "regularly-scheduled maintenance," what
14  would that entail?
15  A. Anywhere from yearly inspections to a monthly
16  inspection.
17  Q. Monthly -- yearly inspection of what?
18  A. Fire systems, HVAC systems.
19  Q. I take it, as your job as a building service
20  coordinator, would you end up having to travel via every
21  floor of the building?
22  A. Yes.
23  Q. And the HVAC system, which floor would that be
24  on?
25  A. The top floor.

### Page 13

1  Q. Did the top floor have a name? I want to use the
2  same terminology so we're not crossing. Did it have a
3  term for it, the penthouse?
4  A. Yes, we called it the penthouse.
5  Q. And how often -- during this time while you were
6  building service coordinator from when you first were
7  hired, how often would you have to be up in the
8  penthouse?
9  A. Pretty infrequently.
10  Q. Well, let me ask you this: Would you go up there
11  every week?
12  A. Once a week, I would say.
13  Q. Did you also on occasion -- now, you recognize
14  that this case arises out of an accident that occurred
15  in the penthouse?
16  A. Yes.
17  Q. Specifically there is a room in the penthouse
18  where the accident occurred, and I have been referring
19  to it -- we have been referring to it as the filter
20  room. Is there a specific name that you use to refer to
21  that?
22  A. The filter room.
23  Q. The filter room? Have you had -- how often --
24  would you go into the filter room on occasion?
25  A. Maybe once every three months, once a quarter.

Page 14

1   Q. Why would you go into the filter room?
2   A. To see how clogged the filters were, how dirty
3   they were.
4   Q. And what was the purpose of the filters?
5   A. The pre-filters caught the larger particulates
6   out of the air going into the intake system.
7   Q. And would you check it periodically because
8   eventually particles would clog up the filters and the
9   filters need to be replaced?
10  A. Yes.
11  Q. And when they needed to be replaced, what would
12  you do?
13  A. We would have someone come do it.
14  Q. And who did you have come do it since you have
15  been building -- at the time, you were the building
16  service coordinator?
17  A. Siemens.
18  Q. Did there come a time when the contract was
19  replaced or was Siemens still doing that at the time you
20  left?
21  A. At the time I left, my recollection is Siemens
22  was still doing it.
23  Q. From the time you started working there as a
24  building service coordinator on June 13th '03, how --
25  the filters -- can you describe the wall where the

Page 15

1   filters were? Did they go from the floor up to the
2   ceiling?
3   A. No. There is about probably three- or four-foot
4   pony wall before they start.
5   Q. Then how high up do they go approximately?
6   A. To the ceiling, I would say.
7   Q. How high up is the ceiling? Ten feet? Fifteen?
8   A. Fifteen.
9   Q. In other words, high enough that you couldn't
10  reach it if you are standing on the ground?
11  A. Yes.
12      MR. THORSNESS: Paul, it's fine if you want
13  to estimate a distance such as a height, and it is a
14  good idea to say -- to qualify that. If you need to
15  qualify it, feel free to qualify it as an estimate, but,
16  of course, we don't want you to speculate.
17      Feel free to estimate distances, and say
18  that. If you are just estimating, go ahead and say,
19  "I'm estimating such and such," a distance or number.
20  Thank you.
21  Q. Now, you said you, yourself, would inspect the
22  filters. Would you inspect the filters only on the
23  ground level or --
24  A. Yes.
25  Q. So you didn't go up and inspect the filters near

Page 16

1   the ceiling?
2   A. No.
3   Q. Do you know how the filters would be -- how would
4   the filters close to the ceiling be replaced? Would
5   there have to be some device for the people to get up to
6   do it?
7   A. Yes.
8   Q. What was used, do you know?
9   A. Ladder.
10  Q. A ladder? Did you assist at all or bring the
11  filters into the filter room to assist the Siemens
12  technician?
13  A. No.
14  Q. Prior to June 13th '03, when you said you were
15  hired --
16  A. Yes.
17  Q. -- by Unocal, who did you work for?
18  A. Kelly Services.
19  Q. And what is Kelly Services?
20  A. It is a temporary service.
21  Q. Does it specialize in a certain type of
22  employment?
23  A. More admin, office.
24  Q. How long did you work for Kelly Services?
25  A. About a year and a half.

Page 17

1   Q. And did you work in one location for Kelly
2   services?
3   A. Yes.
4   Q. What location was that?
5   A. The Unocal building.
6   Q. At 909 West Ninth Avenue?
7   A. Yes.
8   Q. Did you have any job title at the building?
9   A. No.
10  Q. What was your job functions at the Unocal
11  building at 909 West Ninth Avenue?
12  A. I was more of a laborer, moving heavy boxes,
13  delivering paper.
14  Q. Do you recall when you started working at the
15  building, at the Unocal building for Kelly Services?
16  A. Do I recall?
17  Q. What year?
18  A. No, not off the top of my --
19  Q. Was it before the injury to Larry Grove?
20  A. Yes.
21  Q. And when you first went to work for Unocal, the
22  first day you went into the building, were you given any
23  sort of orientation tour or safety materials?
24  A. No.
25      MR. THORSNESS: Object to the question as

Page 18

1  compound. A couple of questions in there, Mike.
2  Q. I think the "no" was in answer to both, unless I
3  need to break it down.
4        MR. THORSNESS: I would like that.
5  A. Yeah.
6  Q. When you first went into the building, how did
7  you know where to go?
8  A. I was shown by Charles Arnett.
9  Q. And to the best of your knowledge, what was
10 Charles Arnett's job?
11 A. Building services contractor.
12 Q. Do you know if he was an employee of Unocal?
13 A. No, he was not.
14 Q. You know he wasn't?
15 A. I knew he wasn't.
16 Q. Do you know who he worked for?
17 A. Peak.
18 Q. Is that Peak Oilfield?
19 A. Yes.
20 Q. While you worked at the building, did you attend
21 any safety meetings?
22 A. Are you talking at that time frame?
23 Q. At the time frame you worked at Kelly Services.
24 A. Kelly Services, no.
25 Q. Were you provided any material from Unocal when

Page 19

1  you started working there in regard to the policies,
2  procedures at the building?
3  A. No.
4  Q. And you indicated -- did you have to do any
5  repair work or maintenance work while you were working
6  for Kelly Services at the building?
7  A. No.
8  Q. So you said your job was to move heavy boxes and
9  deliver paper. Anything else that you had to do?
10 A. Anywhere from cleaning to, you know, unclogging
11 the toilet, organization.
12 Q. Well, can you explain "organization"? What does
13 that mean?
14 A. Organization of rooms in the basement, more of a
15 cleaning I would say.
16 Q. What's in the basement?
17 A. Just a lot of -- they had some storage down
18 there.
19 Q. Were there like archives and records?
20 A. Yes.
21 Q. Were you ever asked to go look in the archives
22 and records in regard to this lawsuit?
23 A. No.
24 Q. Did you ever have any time when you worked for
25 Kelly Services that you went up into the penthouse?

Page 20

1  A. No. Let me rephrase that. Prior to the incident
2  or after the incident?
3  Q. Let's start with before the incident.
4  A. No.
5  Q. So you never went into the penthouse room --
6        MR. THORSNESS: Excuse me.
7  Q. -- before the incident?
8        MR. THORSNESS: Just so the record is clear,
9  the penthouse room --
10 Q. The penthouse floor. The penthouse is a floor.
11       MR. THORSNESS: Because you understand the
12 penthouse includes areas in addition to the fan room.
13       MR. COHN: But I'm assuming if he didn't go
14 into the penthouse, that means he didn't go into the fan
15 room, the filter room either.
16 A. Yeah.
17 Q. Let me take a little detour before that. Could
18 you just give me some general background about yourself
19 when you were born, where you went to school, your
20 education and your work history up until the work
21 history you just described to us here?
22 A. Okay.
23       MR. THORSNESS: Object to the question as a
24 little overbroad, but go ahead, Mr. Crapps, if you can
25 tackle that. Go ahead. If you want him to be more

Page 21

1  specific --
2        MR. COHN: If you want me to ask him
3  specifically about elementary school and first grade --
4        MR. THORSNESS: I don't want you to ask him
5  anything, Mike.
6  Q. When were you born?
7  A. Born 1974.
8  Q. And were you born in Alaska?
9  A. Anchorage, Alaska.
10 Q. And did you graduate high school?
11 A. Yes.
12 Q. Which high school did you go to?
13 A. Robert Service High.
14 Q. Did you go to college?
15 A. A couple of years, but never got a full degree.
16 Q. What college did you attend?
17 A. UAA.
18 Q. Did you take any particular courses there?
19 A. Generals and welding.
20 Q. You said "generals"?
21 A. Generals, math, English, stuff you need for a
22 degree.
23 Q. And welding?
24 A. Yes.
25 Q. Were you a member of any union?

Page 22

1   A. No.
2   Q. Did you work -- have you worked as a welder?
3   A. No.
4   Q. Can you tell me about the -- your job history?
5   What's the first job you had?
6   A. I worked in a warehouse in high school, Ben
7   Franklin's had a warehouse.
8   Q. Ben Franklin was the name of the company?
9   A. Yes.
10  Q. That was when you were in high school?
11  A. Yes.
12  Q. Was it just basically stacking boxes?
13  A. Checking in freight, moving of boxes.
14  Q. And what is the next job you had?
15  A. I went from that warehouse to a delivery company,
16  delivery/warehouse.
17  Q. Who was that for?
18  A. Creme-de-la-Creme, which was after that turned
19  into Greatland or sold to Greatland Foods.
20  Q. How long did you work for Creme-de-la-Creme?
21  A. Oh, I would estimate two or three years.
22  Q. And then after that?
23  A. Let's see. After that, I got a mind block here.
24  I went to work for Insulfoam.
25  Q. Did you say "Insul"?

Page 23

1   A. Insulfoam.
2   Q. What did you do for them?
3   A. Everything. Anywhere between forklift driving to
4   maintenance.
5   Q. How long did you work for that company?
6   A. I would estimate three or four years.
7   Q. So we're getting pretty close to Kelly Services?
8   A. Yeah.
9   Q. Where did you go after Insulfoam?
10  A. Insulfoam. I worked for a sign shop, Shayman's
11  Sign.
12  Q. A sign shop?
13  A. Shayman. They do road closures.
14  Q. So they would put up signs?
15  A. Yes.
16  Q. Were these ground-level signs?
17  A. Yes.
18  Q. You didn't have to go on any platform?
19  A. No.
20  Q. Then after that?
21  A. I worked -- started as a Kelly contractor with --
22  Q. As a Kelly contractor, how did you get that job?
23  A. How did I get that job?
24  Q. Yeah, for Kelly. Did you see an advertisement?
25  A. You have to sign up with them. I had talked to

Page 24

1   Archie Cook prior to signing up with them, and he said
2   he needed someone to help around the building.
3   Q. And who is Archie Cook?
4   A. He was the HR manager at that point.
5   Q. HR, what does HR stand for?
6   A. Human resources.
7   Q. Manager for who?
8   A. Unocal.
9   Q. And how did you happen to meet Mr. Cook?
10  A. My wife was currently employed there.
11  Q. Currently employed with Unocal?
12  A. Unocal.
13  Q. What is your wife's name?
14  A. Karen.
15  Q. How long has she been employed for Unocal?
16  A. I would estimate eight years now.
17  Q. So did she tell you that there was work available
18  and to contact Mr. Cook?
19  A. At one point I had, recollection or remember, I
20  had sat in for Charles Arnett when he was on vacation,
21  and that was through Kelly's. I had sat in while he was
22  on vacation, so I kind of filled in for him.
23  Q. So you filled in for Charles Arnett. Was this
24  before you met Mr. Cook?
25  A. Yes. You were asking about --

Page 25

1   Q. How you got --
2      MR. THORSNESS: Excuse me, Mike. Go ahead
3   and explain. Say what you were just going to say.
4   A. I am recollecting all of this, and you are asking
5   how I found out about the job and everything. I had
6   filled in for Charles Arnett prior to me being hired on
7   there while he was on vacation, and it kind of got me in
8   the door.
9      I mean with going to Christmas parties and
10  picnics, summer picnics and stuff, I had met Archie
11  through them and met a lot of the people that my wife
12  worked with.
13  Q. When you said you filled in for Charles Arnett,
14  does that mean that when he was on vacation, you would
15  then be acting building services contractor?
16  A. Sure, yes.
17  Q. And while he was away, what responsibilities
18  would you have as acting building services contractor?
19  A. Pretty much the same as I had when I was hired
20  on. Not when I was hired on. When I was working for
21  Kelly.
22  Q. But they still didn't go up into the penthouse?
23  A. No.
24  Q. Does your wife work in 909 West Ninth or did she
25  work at 909 West Ninth at the time?

7 (Pages 22 to 25)

Page 26

1   A. She did.
2   Q. Does she still work there?
3   A. She is employed by Unocal, but she does not
4   currently work in the same location.
5   Q. Now, at some point you said you didn't go into
6   the filter room in the penthouse before Mr. Grove's
7   accident. When is the first time you went into the
8   filter room?
9   A. Mr. Grove's accident.
10  Q. When you say "Mr. Grove's accident," how soon
11  after his accident did you go into the filter room?
12  A. I was called up to assist up there and that's
13  when I went in there.
14  Q. Who called you to assist up there?
15  A. Charles Arnett.
16  Q. And do you know if that was the same day of the
17  accident?
18  A. I was never told that that is what had happened
19  at that point, so I couldn't say yes on that.
20  Q. Did you go up to the filter room after Mr. Arnett
21  called you?
22  A. Yes, I went up with Charles.
23  Q. And what did you do? Did you open the door to
24  the filter room?
25  A. No. Charles was in front of me and he opened the

Page 27

1   door.
2   Q. And what did you see -- did you go into the room?
3   A. No.
4   Q. Did you look into the room?
5   A. Yes.
6   Q. What did you see when you looked into the room?
7   A. Just Charles and a tool bag.
8   Q. Did you see anything else in the room?
9   A. No.
10  Q. You didn't see any work platform?
11  A. Not that I recollect.
12  Q. Is there a reason you didn't go into the room?
13  A. I wasn't asked to.
14  Q. What did you do besides -- did you do anything to
15  assist Mr. Arnett when he went into the room?
16  A. No.
17  Q. So you just stood outside the room and he went
18  in?
19  A. Yes.
20  Q. So you didn't do anything at all other than stand
21  in front of the room? Did you hand him any tools?
22  A. No.
23  Q. How long did you stand in front of the room at
24  that time?
25  A. Just for a little bit.

Page 28

1   Q. Then what happened? Did Mr. Arnett come out of
2   the room?
3   A. Charles handed me a tool bag.
4   Q. How big a tool bag was that?
5   A. I would say gym bag size.
6   Q. When you say "gym bag size," you mean like a bag
7   you take if you are taking your sweats and your shoes to
8   the gym?
9   A. Yes.
10  Q. Do you know what tools were in the tool bag?
11  A. Just miscellaneous hand tools.
12  Q. Do you know if Mr. Arnett did any work while he
13  was in the room while you were standing outside the
14  room?
15  A. No.
16  Q. Do you know if Mr. -- did Mr. Arnett hand you
17  anything from the room besides the tool bag?
18  A. No.
19  Q. And do you recall -- do you have any recollection
20  of when that time you went to the filter room was, on
21  what date?
22  A. No.
23  Q. Did you have an occasion to go back to the filter
24  room after that?
25  A. Did I occasionally go back?

Page 29

1   Q. Did you ever go back to the filter room after
2   that time?
3   A. Yes.
4   Q. When was the next time you went to the filter
5   room?
6   A. A couple of days after that.
7   Q. And did somebody ask you to go to the filter room
8   on that occasion?
9   A. Yes.
10  Q. Who was that?
11  A. Charles Arnett.
12  Q. And did Mr. Arnett give you any instructions?
13  A. Yes.
14  Q. What did he tell you?
15  A. He asked me to remove the platform.
16  Q. Did you know at that time that there was a
17  platform in that room before he told you to remove the
18  platform?
19  A. No.
20  Q. Was this in a telephone call or face-to-face?
21  A. Face-to-face.
22  Q. Did you immediately go up to the filter room
23  then?
24  A. Yes.
25  Q. Did you have a tool box with you?

Page 30

1   A. No, I didn't actually have a tool box. I had a
2   few hand tools.
3   Q. How did you know -- did he give you the hand
4   tools?
5   A. I can't recall actually what I had with me, if it
6   was -- if I went up and came back down for the tools or
7   if I went up with them.
8   Q. So now you go up to the filter room and you have
9   hand tools?
10  A. Okay.
11  Q. Do you open the door -- are you by yourself at
12  this time?
13  A. Yes.
14  Q. You open the door?
15  A. Uh-huh.
16  Q. You walk in?
17  A. Yes.
18  Q. And what do you see?
19  A. Two -- excuse me. One wood plank partially
20  laying on the floor and two metal brackets mounted on
21  the wall.
22  Q. Two metal brackets?
23  A. Yes.
24  Q. Was the wood plank completely on the floor?
25  A. Partially on the floor.

Page 31

1   Q. One part was on the floor and where was the other
2   part?
3   A. Laying on one of the brackets.
4   Q. Can you estimate the length of that wooden plank?
5   A. I would estimate 10, 12 feet.
6   Q. And how thick -- can you estimate how thick the
7   plank was?
8   A. Probably two-inch.
9   Q. Where was the -- so I take it the bracket -- one
10  end of the bracket was still affixed to something; is
11  that correct?
12  A. Yes.
13  Q. Was it affixed to the wall where the filters were
14  or was it affixed to the other wall?
15  A. Both.
16  Q. So there were two brackets facing each other on
17  -- the bracket spanned the wall to the two walls?
18  A. Yes.
19  Q. And there were two of these brackets?
20  A. Yes.
21  Q. So both of them were still connected to the wall
22  on both sides?
23  A. One was connected to the wall on both sides. One
24  was connected just to one wall.
25  Q. And which one was only connected to one wall, was

Page 32

1   that the one further from the door or closest to the
2   door?
3   A. Further from the door.
4   Q. And which wall was it still connected to?
5   A. The opposite side of the filters.
6   Q. How would you describe the wall opposite side of
7   the filter? Was that sheet metal?
8   A. Yes. It's sheet metal with a steel skeleton.
9   Q. Now, what did you do -- by the way, what was the
10  lighting like in the room?
11  A. There is one or two light bulbs in the room.
12  Q. Are they dim bulbs or bright bulbs?
13  A. Light bulbs.
14  Q. Describe the lighting in the room. Was it well
15  lit?
16  A. I wouldn't say well lit. I would say dimly lit.
17  Q. Now, what did you do when you got into the room
18  and you saw the plank and you saw the brackets? What
19  was the next thing you did?
20  A. I pulled the plank and took it outside the filter
21  room.
22  Q. Now, at the time that you -- just to back up. At
23  the time you went into this room, have you talked to
24  anyone else about the filter room other than Charles
25  Arnett?

Page 33

1   A. No.
2   Q. So you pulled the plank outside the filter room,
3   and then what did you proceed to do? Did you proceed to
4   unscrew any of the nuts?
5   A. I removed the two metal brackets.
6   Q. And what did you do with the hardware that was
7   used to attach the brackets to the wall?
8   A. I put it in the trash can.
9   Q. Was the trash can in the filter room or right
10  outside the filter room?
11  A. It was as you entered the penthouse.
12  Q. Do you recall how many nuts and bolts you had to
13  remove?
14  A. No.
15  Q. Do you recall what the size of the bolts were?
16  A. I would estimate like a quarter inch.
17  Q. Do you know the strength of those bolts?
18  A. No.
19  Q. How long did it take you to remove the brackets?
20  A. I would say -- I would estimate maybe 15 or
21  20 minutes.
22  Q. Did you observe any debris on the floor of the
23  filter room while you were working?
24  A. No.
25  Q. And when you removed the bolts, did you catch

**Page 34**

1  them in your hand or did you have like a baggy you were
2  putting them in?
3      A. No. I just removed them and whatever I pulled
4  out, I put in my hand, or whatever. It landed where it
5  landed.
6      Q. Did you say it went where it landed?
7      A. Yeah.
8      Q. So did some fall on the floor?
9      A. They could have, yes.
10     Q. And did you go and pick up the ones that fell on
11 the floor?
12     A. No.
13     Q. How soon was this second visit to the filter room
14 from the first time that you went in -- not that you
15 went in, that you went up there with Charles the first
16 time and now the second time you went in to remove it.
17 Do you have any idea how much time had passed?
18     A. A couple of days.
19     Q. Now, can you describe the hardware that you
20 removed? Was it just bolts or what else was there?
21     A. I removed the two metal brackets and the bolts
22 holding it on.
23     Q. Well, were there like washers attached to the
24 bolts?
25     A. I don't recall. There could have been.

**Page 35**

1      Q. Were there nuts at the end of the bolt?
2      A. Yes.
3      Q. Can you describe the shape of the nuts? Round?
4  Square?
5      A. The nuts themselves were square.
6      Q. Now, you said you threw the nuts and bolts away.
7  Did somebody tell you to do that?
8      A. No. I was just told to remove it.
9      Q. By Charles?
10     A. Yes.
11     Q. Do you know if -- did you put anything up in its
12 place after you removed it?
13     A. No.
14        MR. THORSNESS: By "it," you would mean the
15 brackets and that sort of stuff?
16        MR. COHN: Yeah.
17        MR. THORSNESS: Thank you. That's how you
18 understood the question?
19        THE WITNESS: Yes.
20     Q. Do you know if you removed the plank and the
21 bracket and the nuts and the bolts after OSHA inspected
22 the room, the filter room?
23     A. What do you mean?
24     Q. Are you aware that OSHA came out and inspected
25 the filter room?

**Page 36**

1      A. Yes.
2      Q. And the removal of the brackets and the nuts and
3  the bolts -- we didn't actually talk about what you did
4  with the plank yet. Did that occur after OSHA came in?
5      A. No, that was before.
6      Q. Now, you have this plank that you estimated,
7  what, about 12 feet long?
8      A. Yeah.
9      Q. What did you do with the plank?
10     A. I put it up in a long storage area as you come
11 into the penthouse. I placed it up in that.
12     Q. And do you know how long the plank was in that
13 area?
14     A. No.
15     Q. Do you know what happened to the plank after you
16 placed it there?
17     A. No.
18     Q. Now, the brackets that you removed, the metal --
19 they were metal brackets?
20     A. Yes.
21     Q. So there were four of them? Was it like a
22 bracket on each wall or was it one?
23     A. There was two brackets.
24     Q. But when you are referring to the bracket, you
25 are talking about just -- well, I can show you. Well,

**Page 37**

1  we'll get to that afterwards, but we'll talk about the
2  brackets what they looked like after, but what did you
3  do with the brackets?
4      A. What did I do with them?
5      Q. Yes.
6      A. I discarded them in the trash with the nuts and
7  bolts.
8      Q. Now, did you ever go back into the room after
9  that day that you removed it?
10     A. What time period? As a contractor or since I
11 worked there?
12     Q. Let's talk about first as a contractor.
13     A. Yes.
14     Q. When did you -- actually, I should just go in
15 order. You removed all of these things from the room?
16     A. Yes.
17     Q. Then when is the next time you came back into the
18 room?
19     A. I couldn't recollect that. The last time I could
20 recollect going back up there and going physically in
21 that room would be the OSHA inspection.
22     Q. Well, if the planks had been removed and the nuts
23 and bolts had been removed and the brackets removed,
24 what did they have to look at?
25        MR. THORSNESS: Objection; foundation.

**Page 38**

1  Q. Well --
2     MR. THORSNESS: You are asking him what OSHA
3  had to look at?
4     MR. COHN: No speaking objection, please,
5  John. He says he is in the room with them.
6  Q. You are in the room?
7  A. With who?
8  Q. With the OSHA people?
9  A. No.
10 Q. You didn't go in the room. I asked you the next
11 time you went into the room.
12    MR. THORSNESS: You say "the room."
13    MR. COHN: The filter room. When we are
14 talking about "the room," we are talking about the
15 filter room unless otherwise specified.
16 A. The filter room, I would have to say I didn't set
17 foot in that filter room when the OSHA inspectors came.
18 I let them into that room.
19 Q. Was the door open and you standing outside the
20 room?
21 A. Yes.
22 Q. But when they went into the room to inspect, the
23 platform wasn't there?
24 A. No.
25 Q. And do you know who went into that room?

**Page 39**

1  A. The OSHA inspector and our safety person, Ken
2  Burns.
3  Q. And was Charles Arnett -- did Charles Arnett go
4  into the room?
5  A. No.
6  Q. What about Roseanne Sinz?
7  A. No.
8  Q. Did you have any -- did Roseanne Sinz direct you
9  to do anything in the filter room?
10 A. No.
11    MR. THORSNESS: Are you talking on the day
12 of the OSHA inspection or any time?
13 Q. I guess that was at any time.
14 A. At any time, I would say no. Actually, I would
15 say no, not from Roxanne, no.
16 Q. Well, not from Roxanne, then, okay. Who, besides
17 Charles Arnett, who has directed you to do anything in
18 connection with the filter room?
19 A. I took pictures after the OSHA inspection of the
20 filter room.
21 Q. How many pictures did you take?
22 A. Half a dozen, I would estimate.
23 Q. Well, why did you take these pictures?
24 A. After the OSHA inspection, we just figured it
25 would be good to have our own pictures.

**Page 40**

1  Q. When you said "we thought it would be good," you
2  are talking more than just you? Did anybody direct you
3  to take these pictures?
4  A. Ken Burns.
5  Q. Did you see anyone else taking pictures?
6  A. No.
7  Q. What type of camera did you use?
8  A. Digital.
9  Q. And what areas of the room did he have you take
10 pictures of?
11 A. Where the platform existed.
12 Q. When you say where -- did you do any close-up
13 shots or zoom in to where the brackets were located?
14 A. From knowledge of where I pulled them down.
15 Q. So did you take pictures at both sides of the
16 wall or just the sheetrock side?
17 A. It's not real sheetrock. Just the opposite side
18 of the filters.
19 Q. Do you know what happened to those pictures after
20 you took them?
21 A. I sent them off to, I think, Ken Burns and
22 Roxanne Sinz.
23 Q. Have you, yourself, ever had to work on a --
24 stand on a work platform?
25 A. At my present job or at that point?

**Page 41**

1  Q. Well, let's take at that point in time.
2  A. No.
3  Q. At your present job, do you have to use work
4  platforms?
5  A. Yes.
6  Q. Now, after that -- did you ever take any more
7  pictures of the filter room other than on that one
8  occasion?
9  A. Not in the filter room, no.
10 Q. Not in the filter room, so can you clarify? Did
11 you take pictures outside the filter room?
12 A. We had an OSHA posting that I took a picture of
13 the door going into the filter room with the OSHA
14 posting on it.
15 Q. Why did you have to put an OSHA posting on the
16 door?
17 A. From what I know, it was required to be posted
18 after the incident was --
19 Q. Did somebody tell you to post --
20 A. Yes.
21 Q. Who was that?
22 A. Roxanne.
23    MR. THORSNESS: Excuse me. I am just going
24 to make an objection as to the admissibility of any
25 reference to OSHA examination, inspections, this kind of

Page 42

1  thing. I don't want anyone to say that I waived my
2  objections concerning admissibility of any of this
3  information.
4       MR. COHN: Well, that can be taken up at the
5  appropriate time.
6       MR. THORSNESS: I learned this from
7  Mr. Weidner that I am well advised to preserve my
8  record, so that's why I am doing it.
9    Q. Where did you have to put the OSHA posting? Was
10 this on the door to the filter room?
11   A. No, we posted it on every floor.
12   Q. On every floor? And do you recall what that
13 posting said?
14   A. I wouldn't recall word for word, but just saying
15 that we had an OSHA incident and we were, under whatever
16 OSHA code, we were being fined.
17   Q. We being?
18   A. As the company.
19   Q. Unocal?
20   A. Yes.
21   Q. The --
22      MR. THORSNESS: Mike, when it's a good
23 time --
24      MR. COHN: Why don't we just take a break?
25 Off record.

Page 43

1       VIDEOGRAPHER: Off record 12:00 p.m. This is
2  the end of tape number one.
3       (There was a short break.)
4       VIDEOGRAPHER: On record 12:14 p.m. This is
5  the start of tape number two.
6  BY MR. COHN:
7    Q. Good afternoon, Mr. Crapps. I want to show you a
8  document. There is some writing on it because this is a
9  copy the court reporter had, and this is going to be
10 marked as Exhibit No. 1 to your deposition. This is the
11 renotice of taking video deposition of Paul Crapps.
12 Have you seen this document before, ignoring the writing
13 on there?
14   A. Yes.
15      (Exhibit No. 1 marked.)
16   Q. And you are here pursuant to this deposition
17 notice?
18   A. Yes.
19   Q. Before the accident involving Mr. Grove, had you
20 had any occasion to come up to the penthouse and observe
21 Siemens employees working?
22   A. No.
23   Q. You never did?
24   A. No.
25      MR. COHN: You know what? I'll give you

Page 44

1  this full stack, John. Actually, this is a better
2  stack.
3       MR. THORSNESS: Give this one back?
4       MR. COHN: Right.
5       MR. THORSNESS: Is this your note, pal?
6       MR. COHN: Yeah. Let's go off record for a
7  second.
8       VIDEOGRAPHER: Off record 12:16.
9       (There was a short break.)
10      VIDEOGRAPHER: On record 12:22.
11   Q. Do you have any personal knowledge of who first
12 erected that work platform in the filter room?
13   A. No.
14   Q. Do you have any personal knowledge of any
15 modifications made to that work platform in the filter
16 room before the accident?
17   A. No.
18   Q. Do you have any personal knowledge of any
19 maintenance on the work platform in the filter room
20 before the accident?
21   A. No.
22      MR. THORSNESS: Paul, be sure and let
23 Mr. Cohn finish his question before you answer. Thank
24 you.
25   Q. Have you heard any information about who erected

Page 45

1  the work platform in the filter room?
2    A. No.
3       MR. THORSNESS: I would just caution the
4  witness, anything he has been told by his lawyers he is
5  not to reveal.
6       (Exhibit No. 2 marked.)
7    Q. Other than anything that's attorney-client. I
8  want to show you -- now, you have indicated earlier that
9  you reviewed some material before the deposition, but
10 you weren't sure exactly what it was or how to phrase
11 it.
12      Would a document like this refresh your
13 recollection if you looked at any discovery responses by
14 Unocal?
15   A. I would have to read it.
16      MR. THORSNESS: That's Exhibit No. 2, for
17 the record?
18   Q. This is -- it would have been better to do it the
19 same number, but this is Defendant's Responses to
20 Plaintiffs' First Discovery Requests, and this has been
21 marked as Exhibit No. 2 to the deposition of Mr. Crapps.
22      First, excuse me, it's Defendant's Responses to
23 Plaintiffs' First Discovery Requests. Did I say
24 "second"?
25      MR. THORSNESS: You said "first". This is

Page 46

1  first, but mine are a lot thicker than that.
2      MR. COHN: What I did is I left out the
3  attachments. I didn't think that they were necessary.
4   Q. So this is Exhibit No. 2. Do you recall if you
5  reviewed this document?
6   A. No, I don't recall.
7   Q. Well --
8   A. They all look the same, so I would have to read
9  it all.
10  Q. But there were documents similar to this? It may
11 just not be this particular response that you reviewed?
12  A. Yes.
13  Q. Looking at page two of Exhibit No. 2,
14 interrogatory number two, which says, "Please identify
15 the owner of the work platform/scaffold involved in the
16 accident."
17     The answer, "Upon information and belief, Siemens
18 Building Technology, Inc. is the owner of the described
19 platform/scaffold." That information did not come from
20 you?
21  A. No.
22  Q. And you have no information one way or the other
23 who owns the work platform?
24  A. No, I don't.
25  Q. Now, when you looked at the platform, it was

Page 47

1  affixed to the wall, is that correct, at least three
2  sides?
3   A. The brackets were affixed to the wall.
4   Q. Was the plank just laying on the -- was the plank
5  itself affixed to the brackets or just laying on the
6  brackets?
7   A. One end of the plank was on one bracket. One end
8  of the plank was on the floor.
9   Q. But the plank itself was not -- as far as you
10 could see, it wasn't attached with screws or any means
11 other than just laying -- if the bracket was up, it was
12 your understanding it was just laying on the brackets?
13  A. Yes.
14     (Exhibit No. 3 marked.)
15  Q. I want to show you what's been marked as Exhibit
16 No. 3, which is Responses to Plaintiffs' Second
17 Discovery Requests. Have you ever seen that document
18 before?
19     MR. THORSNESS: Take your time, Paul. Look
20 through it.
21  A. No.
22  Q. In request for admission number one, in the
23 response on page one, which asks them -- Unocal to admit
24 that the work platform had never been evaluated to
25 determine if it was safe, part of the response was,

Page 48

1  "Upon information and belief, Plaintiffs' employer,
2  Siemens Building Technology, Inc. erected the subject
3  platform in connection with performance of HVAC
4  services."
5      As you indicated before, you don't have any
6  knowledge one way or the other about the truth or the
7  veracity of that statement?
8   A. No.
9      (Exhibit No. 4 marked.)
10  Q. I want to show you what's been marked as Exhibit
11 No. 4 and this is Responses to Plaintiffs' Third
12 Discovery Requests. Have you seen that document before?
13  A. No.
14  Q. In regard to that previous partial response that
15 I gave you in which it was indicated that upon
16 information and belief the platform had been -- that
17 Siemens Building Technology, Inc. is the owner of the
18 described platform/scaffold, which is one of the answers
19 to the interrogatories in exhibit --
20  A. This is No. 4.
21  Q. -- Exhibit No. 3, we then asked where did they
22 get the information and belief that Siemens Building
23 Technology erected the platform or owned the platform.
24     And the answer is, in part, if you look at page
25 two of exhibit -- is that Exhibit No. 4?

Page 49

1   A. Yes.
2   Q. Exhibit No. 4, it says partly -- and the answer
3  stated, "In addition, upon information and belief in
4  response to Unocal's response to Plaintiffs' First
5  Discovery Requests specifically answers, C(c) to
6  interrogatory number one states, "Upon information and
7  belief, plaintiff and his employer, Siemens Building
8  Technology, Inc. are the most knowledgeable concerning
9  the subject work platform/scaffold."
10     And answer to interrogatory number two states,
11 "Upon information and belief, Siemens Building
12 Technology, Inc. is the owner of the described
13 platform/scaffold.
14     And in the defendant Unocal's Response to
15 Plaintiffs' Second Discovery Requests, specifically
16 request for admission number one states, "Upon
17 information and belief, Siemens Building Technology,
18 Inc. erected the subject platform in connection with the
19 performance of HVAC services."
20     It's asked to identify each person supplying
21 these answers and the basis of information and belief.
22 Do you see that? Have you been following me?
23  A. I see.
24  Q. It says, the answer, the second sentence,
25 "Without waiving the foregoing, defendant Unocal, by and

Page 50

1  through counsel, has conferred with the following
2  individuals in connection with its discovery responses."
3  Do you see down on number two whose name is that?  Is
4  that your name?
5     A.  Yes, it is.
6     Q.  It says Mr. Paul Crapps?
7     A.  Yes.
8     Q.  It says, "Mr. Crapps is a current Unocal
9  employee.  His position is associate coordinator
10 building services."
11        Would that be correct at the time, which the
12 responses are dated November 20, 2004?
13    A.  Yes.
14    Q.  Now, though Unocal indicates it has conferred
15 with you in regard to these responses, you don't have
16 any personal knowledge that any of the -- that Siemens
17 Building Technology erected or maintained or built that
18 scaffold; is that correct?
19        MR. THORSNESS:  Objection; form and vague.
20    Q.  You may answer.
21        MR. THORSNESS:  And asked and answered about
22 four times now.
23    A.  Yeah.  I mean, we deferred that.  No one went up
24 into that filter room prior to the incident other than
25 Siemens.

Page 51

1     Q.  And when did you start working at the building?
2     A.  I mean when I came on as a Kelly Services
3  contractor.
4     Q.  And do you know if the platform was erected after
5  you came on as a contractor with Kelly Services?
6         MR. THORSNESS:  Objection; foundation, asked
7  and answered.
8     A.  No, I don't.
9     Q.  You don't have any personal knowledge?
10    A.  No.
11    Q.  You don't have any personal knowledge as to when
12 that platform was erected?
13    A.  No.
14    Q.  Do you have any explanation as to how your name
15 is on this answer as one of the people that's provided
16 the information which forms the basis of the responses
17 to the discovery requests one and two?
18        MR. THORSNESS:  Objection; form and
19 foundation.
20    A.  No.
21        (Exhibit No. 5 marked.)
22    Q.  I want to show you Defendant's Responses to
23 Plaintiffs' Third (sic) Discovery Requests.  The reason
24 for that, there was already a third, so this should have
25 been labeled fourth discovery request.  This is listed

Page 52

1  as Exhibit No. 5.  Have you seen that document before?
2         MR. THORSNESS:  You are asking him if he has
3  ever seen this document before?  That's your question?
4     A.  No.  Not that I know of, no.
5         MR. THORSNESS:  Thank you.
6     Q.  Which document are you looking at?
7     A.  No. 5.
8     Q.  Now, the reason I'm asking you this is in
9  response to -- Defendant's Response to Plaintiffs' Third
10 Discovery Requests, which is Exhibit No. 4, it is
11 indicated you have been conferred with at least in
12 regard to the previous discovery answers.
13        Were you conferred with in regard to the answers
14 in these discovery requests, to the best of your
15 knowledge?
16    A.  I don't know exactly what you are asking.
17    Q.  Did anybody ask you for information that became
18 the basis of any of the answers in this response, to the
19 best of your personal knowledge at this time?
20        MR. THORSNESS:  You are referring to Exhibit
21 No. 5, Michael?
22        MR. COHN:  Yeah.
23    A.  So you are asking then did anyone ask me for
24 input into these answers?  Input in this?  No, not that
25 I can recollect.

Page 53

1         (Exhibit No. 6 marked.)
2     Q.  I want to show you Defendant's Response to
3  Plaintiffs' Fifth Discovery Requests, which is Exhibit
4  No. 6.  And I want to ask you specifically on page two,
5  interrogatory number one, the interrogatory asks,
6  "Please explain what happened to the work platform in
7  the mechanical room -- "
8         When I say "mechanical room," I am referring to
9  the filter room.  "-- of the Unocal building following
10 the accident."
11        And we asked specifically where the work platform
12 and its parts, including bolts, who took down and
13 removed the platform, what happened to the platform.
14        And the answer is, "Unocal reserves the right to
15 respond to this interrogatory when the court rules on
16 the outstanding motions."  That's dated June 27, 2005.
17    A.  Okay.
18        MR. THORSNESS:  Wait a second.  What are you
19 referring to?
20        MR. COHN:  That's Exhibit No. 6, which is
21 Defendant's Responses to Plaintiffs' Fifth Discovery
22 Requests.
23    Q.  Now, at the time, were you conferred with in
24 regard to the answer to interrogatory number one to the
25 fifth discovery requests?  Have you seen this document

Page 54

1  before?
2     A. No.
3     Q. Now, in previous answers you have indicated you
4  are the one who took down the work platform or removed
5  it from the room; is that correct?
6     A. Yes.
7     Q. Then after you took it down, the nuts, the bolts,
8  the washers, if any, and the brackets were thrown in the
9  trash; is that correct?
10    A. Yes.
11    Q. And that the plank was stored, but you don't know
12 what happened after the plank was stored in the
13 penthouse?
14    A. Yes.
15       MR. THORSNESS: Object to these questions.
16 They have already been asked several times.
17       (Exhibit No. 6-A marked.)
18    Q. And I want to show you what's been marked as
19 Exhibit No. 6-A, and that's Defendant's Supplemental
20 Responses to Plaintiffs' Fifth Discovery Requests, which
21 is a supplemental answer to interrogatory number one.
22    And it is signed by one of Unocal's counsel,
23 December 16, 2005, the same question about what happened
24 to the work platform and its parts.
25    Its answer is, "Unocal does not currently know

Page 55

1  the whereabouts of the work platform or the identity of
2  the person or persons who removed it."
3     That statement is incorrect, isn't it?
4        MR. THORSNESS: Just a second, Michael. You
5  are really confusing things here. You are referring to
6  6-A.
7        MR. COHN: Which is Defendant's Supplemental
8  Responses to Plaintiffs' Fifth Discovery Requests.
9        MR. THORSNESS: Don't interrupt me, please.
10 The language you read doesn't appear on 6-A, unless you
11 can direct me to it. 6-A is the supplemental response,
12 right?
13       MR. COHN: Right. Look at page two,
14 interrogatory number one, the answer.
15       THE WITNESS: You are on a different
16 document, because this is --
17       MR. THORSNESS: You are right. Thanks for
18 clearing that up. That's Defendant's --
19       MR. COHN: This is Defendant's Supplemental
20 Responses to Plaintiffs' Fifth Discovery Requests dated
21 by counsel December 16, 2005.
22    Q. And the answer in regard to what happened to the
23 work platform is -- can you read the first sentence of
24 that answer?
25    A. "Unocal does not currently know the whereabouts

Page 56

1  of the work platform or identification of the person or
2  persons who removed it."
3     Q. Now, that's incorrect, isn't that? You are the
4  person who removed it; is that correct? Do you have any
5  explanation as to why that answer was given?
6     A. No.
7        MR. THORSNESS: I'll object to this
8  disingenuous line of questioning. Counsel knows that
9  there is a supplemental that makes that clear.
10       MR. COHN: We'll go to the supplemental.
11       MR. THORSNESS: Let me finish. Stop
12 interrupting me. I don't interrupt you. Don't
13 interrupt me, please.
14       MR. COHN: Keep going, John.
15       MR. THORSNESS: This is a waste of time. So
16 I'll object on that basis.
17       MR. COHN: For completeness of the record, I
18 am providing --
19       MR. THORSNESS: You are harassing this
20 witness. I object to it.
21       MR. COHN: Well, the record will show my
22 tone of voice and whether I'm screaming at the witness
23 or not, which I am not. I am talking in a calm tone of
24 voice.
25       MR. THORSNESS: You are harassing him

Page 57

1  though. Let's continue.
2        MR. COHN: The problem with the answers is
3  that they have been misrepresenting the facts all along,
4  which is why there is now a second supplement. And Mr.
5  Thorsness has told me there will be a third supplement,
6  which isn't here yet.
7        MR. THORSNESS: You know, I object to your
8  allegation of misrepresentation. There is no basis for
9  that. I object to it, Counsel. I object to it.
10       MR. COHN: That's fine. You can make
11 whatever you objections you want, John.
12       MR. THORSNESS: Let's continue, please.
13       (Exhibit No. 6-B marked.)
14    Q. Defendant's Second Supplemental Response to
15 Plaintiffs' Fifth Discovery Requests, which is Exhibit
16 No. 6-B, and I'm going to show you that document. This
17 is a supplement to the supplement.
18       MR. THORSNESS: Object to characterization.
19 Ask your question, Counsel. And move to strike.
20       MR. COHN: Objection to that as proposed.
21    Q. I just want to -- and the same question about
22 what happened to the work platform.
23       MR. THORSNESS: Object to foundation. You
24 haven't laid a foundation.
25    Q. Exhibit No. 6-B, have you seen this exhibit

Page 58

1  before?
2  A. Yes.
3  Q. When did you see that exhibit?
4  A. Earlier today.
5  Q. Were you -- did you provide information that went
6  into this exhibit?
7  A. Yes.
8  Q. And when were you contacted in regard to this
9  information that's provided here?
10 A. I don't know.
11 Q. Could you read the answers into the record,
12 number two and three, and then I want to ask you if
13 that's information that you provided?
14 A. "Defendant believes that Paul Crapps removed the
15 scaffolding from inside the filter room within a few
16 days of the alleged incident. At that time, Paul
17 Crapps' title was building services coordinator.
18     He provided services to Union Oil Company of
19 California through Kelly Services. Mr. Crapps' contact
20 information has been previously provided.
21     Upon information and belief, Paul Crapps placed
22 metal pieces of the platform in a trash can located
23 outside the filter room. Subsequent to removing the
24 platform from the filter room, Mr. Crapps has attempted
25 to locate boards at part of the platform, but has been

Page 59

1  unable to do so. Defendant does not know the current
2  location of the boards."
3  Q. What information in number two and number three
4  did you provide?
5  A. All of it.
6  Q. Have you gone back and checked to see if the
7  plank is still in the location that you stored it?
8  A. Yes.
9  Q. Is it there?
10 A. No.
11 Q. Do you know who removed it?
12 A. No.
13     MR. THORSNESS: I want to state for the
14 record that there is an error in answer number two that
15 was explained to Counsel before the deposition today.
16     And if he doesn't clear it up, I'm going to
17 clear it up on cross examination.
18     MR. COHN: You are right. We did talk about
19 that previously, and I would appreciate it if counsel
20 would explain what the changes are.
21     MR. THORSNESS: We're going to file another
22 supplemental here. Mr. Crapps was not building services
23 coordinator at the time the scaffolding was removed.
24 That job title and duties came after that event.
25     MR. THORSNESS: I'll ask the witness right

Page 60

1  now, have I just made a correct statement of the fact,
2  Mr. Crapps?
3      THE WITNESS: Yes.
4      MR. THORSNESS: Anything you wish to add to
5  that?
6      THE WITNESS: No.
7      MR. THORSNESS: Thank you.
8  Q. I would like to mark as the next exhibit in
9  order, which would be Exhibit No. 7, Defendant's
10 Responses to Plaintiffs' Ninth Discovery Requests. If
11 you can hold on one moment, I might get a --
12     (Exhibit No. 7 marked.)
13 Q. I'm showing deponent Defendant's Response to
14 Plaintiffs' Ninth Discovery Requests. Have you seen
15 this document before?
16     The "MC," that's just a notation here at the
17 office, so that's not part of the response on the cover.
18 A. Yes.
19 Q. You have seen that document before?
20 A. Yes.
21 Q. When have you seen that document?
22 A. Earlier today.
23 Q. In that interrogatory number one, "Identify any
24 and all persons who provided information that became the
25 basis of Defendant's Supplemental Responses to

Page 61

1  Plaintiffs' Fifth Discovery Requests," which is Exhibit
2  No. 6-A herein, and subsequent to that there has been a
3  second supplement, which is Exhibit No. 6-B, and under
4  the representations of Counsel and we have talked about
5  it, there will be a clarification, so there will be a
6  third supplement.
7      It asks about where Unocal said they don't know
8  the whereabouts of the work platform and identity of the
9  persons who removed it. Can you read off under the
10 answer the third line where it starts "until"?
11     MR. THORSNESS: Object to the form of the
12 question and move to strike it.
13 Q. Well, where it starts off "Until Paul Crapps."
14 A. I am lost here. Where are you at?
15 Q. On page two, the answer.
16 A. The answer here?
17 Q. Right.
18 A. "Until Paul Crapps was interviewed, no current
19 Unocal employee was identified as possessing the
20 information requested."
21 Q. Do you know when you were interviewed?
22 A. I don't know the date, no.
23 Q. Was it 2006?
24 A. This has been going on so long. I couldn't tell
25 you.