Page 62

1  Q. Well, in the response to the third discovery
2  requests, it indicated that you had been conferred with
3  in the discovery answers to that date.
4     Do you have any recollection of that having been
5  done, getting your input into the answers?
6  A. No.
7     MR. COHN: Can we just take a short break.
8     VIDEOGRAPHER: Off record 12:52 p.m.
9     (There was a short break.)
10    VIDEOGRAPHER: On record 12:57 p.m.
11 Q. Mr. Crapps, I thank you for taking the time here
12 and I'll try and make this as quick as possible, but
13 when lawyers say that, then it keeps going, but I'm
14 going to try and be quick.
15    (Exhibit No. 8 marked.)
16 Q. I'm going to show you what's been marked as
17 Exhibit No. 8, and this is a document that was provided
18 to the plaintiffs in -- I'm going to represent it was --
19 the same document you have in front of you, John.
20    That it was provided to the plaintiffs in initial
21 disclosures by the defendants and it is marked DEF00027
22 Grove versus Unocal. Have you ever seen that document
23 before?
24 A. Yes.
25 Q. When did you see that document?

Page 63

1  A. Earlier today.
2  Q. Have you ever seen that document before today?
3  A. No.
4  Q. I want to ask you a few questions about that
5  document.
6  A. Okay.
7  Q. Now, these -- it's titled Notes Concerning Visit
8  by State of Alaska OSHA Inspection as Compiled by Ken
9  Burns, Drilling Safety Advisor.
10    Did you have any role at all in preparing these
11 notes?
12 A. No.
13 Q. It's dated -- at the top it says, "03/03/03,
14 Monday," which I take it to mean March 3, 2003. Your
15 name is in this document, which is why I am questioning
16 you about this.
17    It says -- the first sentence says, "State OSHA
18 inspectors came to reception desk asking for Siemens.
19 OSHA was advised that Siemens was not at this building.
20 Both inspectors departed."
21    Were you the person that provided that
22 information to the inspectors?
23 A. I think so, yes.
24 Q. And then the second sentence says, "After lunch,
25 Paul Crapps received a call from Tome Lake, Siemens

Page 64

1  supervisor, that state OSHA was at their office
2  investigating a complaint from one of the employees
3  regarding condition (scaffolding) here at Unocal. Lake
4  further advised that OSHA was on their way to Unocal."
5     Is that correct that you received a call from
6  Tome Lake?
7  A. Yes.
8     MR. THORSNESS: Excuse me. Just to
9  interpose again an objection concerning the
10 admissibility of any reference to OSHA or OSHA
11 inspections. Thank you.
12    MR. COHN: I understand. We can take that
13 up later.
14    MR. THORSNESS: Okay.
15 Q. Now, it says on the fourth paragraph, "At
16 approximately 1440 hours, I was notified by Paul Crapps
17 that state OSHA was at the reception desk to conduct a
18 complaint inspection."
19    Were you the person that was -- how did you
20 happen to be at the front desk when the OSHA people came
21 in?
22 A. My office at that point was behind the front desk
23 or someone called me down there.
24 Q. Do you recall that at that time you went up to
25 the penthouse with the OSHA people?

Page 65

1  A. Yes.
2  Q. And does this help recollect your memory as to
3  who was there with you?
4  A. No. I mean, I know that Ken Burns went up there
5  with me and there was some OSHA inspectors, but I
6  couldn't put a name to a face.
7  Q. It says here -- now, previously you indicated
8  that the platform had been removed before OSHA conducted
9  their inspection. Do you recall that testimony?
10 A. Yes.
11 Q. Now, if you look at the last paragraph here it
12 says, "Both Tom Scanlon and Lee Zhao climbed the ladder
13 and exposed themselves to the open-sided platform."
14    Does that refresh your memory that the platform
15 had not yet been removed at the time of the inspection
16 by OSHA?
17    MR. THORSNESS: Object to the form of the
18 question.
19 A. No. Where exactly --
20    MR. THORSNESS: Where are you reading from,
21 Mike?
22 Q. Take a look at the next to the last paragraph.
23    MR. THORSNESS: Beginning with "Tom Scanlon
24 and Lee Zhao"?
25    MR. COHN: Yeah.

Page 66

1    MR. THORSNESS: Where are you reading from
2  again, just so I am clear, Mike?
3    MR. COHN: It is about -- starting --
4    MR. THORSNESS: "Both Tom Scanlon"?
5    MR. COHN: Yes.
6  A. That's just how he worded it. The platform was
7  no longer there.
8  Q. So when it says, "Exposed themselves to the
9  open-sided platform," do you have any idea what that
10 refers to?
11 A. There is a pony wall that was constructed and I
12 think what he was referring to is that they crawled up a
13 ladder exposing themselves to that, the wall that it was
14 attached to.
15 Q. Are you talking about the wall opposite the
16 filter wall?
17 A. Yes.
18 Q. And then can you read the next sentence as to
19 about the open-sided platform?
20 A. "One significant question was asked. Who erected
21 the scaffolding? No one knew the answer. It was
22 obvious from the structure that it had been erected many
23 years ago.
24 Q. So you are saying that this structure that they
25 are talking about and that they are referring to -- that

Page 67

1  Mr. Burns is referring to in these notes wasn't even
2  there at the time of that inspection?
3    MR. THORSNESS: Objection; foundation. The
4  witness has testified he didn't write this document.
5    MR. COHN: Well, he was present in the room
6  at the time.
7  A. No, I wasn't.
8    MR. COHN: Well, I have written a letter. I
9  do want to depose Mr. Burns.
10   MR. THORSNESS: Sure, of course, but
11 Mr. Burns is not here today.
12 Q. Tom Scanlon, Lee Zhao, Tome Lake, Paul Crapps,
13 and I, which I am assuming the author went to the
14 penthouse. Did you stay outside the room at that time?
15 A. I escorted them to the penthouse and then I left.
16 Q. So you don't have any explanation as to why they
17 are referring to scaffolding that is not there?
18 A. I was just going on knowing the area itself. I
19 escorted them and then I left.
20 Q. It looks like the date of this inspection is
21 March 3rd, 2003; is that correct?
22 A. If that's what the date says on top of the paper.
23   MR. COHN: Can we go off record one second?
24 I want to make a copy of an exhibit. I don't want to
25 look through the papers to find it.

Page 68

1    VIDEOGRAPHER: Off record 1:05 p.m.
2    (There was a short break.)
3    VIDEOGRAPHER: On record 1:07 p.m.
4    (Exhibit No. 9 marked.)
5  Q. Mr. Crapps, I want to show you what's been marked
6  as Exhibit No. 9. And, first, do you recognize that
7  document?
8  A. I must have. I signed it, but not off the top of
9  my head, but yeah.
10 Q. So that is your signature on the document?
11 A. Yes.
12   MR. THORSNESS: What's the Bates number at
13 the bottom here?
14   MR. COHN: It's LG00739. That's Larry
15 Grove. That will be supplemental --
16   MR. THORSNESS: Has been this been produced
17 yet?
18   MR. COHN: It is going to be produced, but
19 this is a document that I would assume that Unocal would
20 have possession of.
21   MR. THORSNESS: Right, but you have not
22 produced it yet?
23   MR. COHN: No, but it is coming.
24 Q. Now, does this refresh your memory as to when the
25 platform was dismantled?

Page 69

1  A. No. This is just saying that I put the
2  notification up.
3  Q. Well, I direct you to paragraph two. It says --
4  the first paragraph says you work at Union Oil Company
5  of California at 909 as a building maintenance
6  specialist. Is that true that at that time you worked
7  as a building maintenance specialist? The date of this
8  is May 9, 2003.
9  A. It was June 13, 2003 that I was hired.
10 Q. So it would be -- that was not a correct title
11 for you, building maintenance --
12 A. I think it was in the works.
13 Q. You say you have -- it says, "Had personal
14 knowledge of the following," and then paragraph two, can
15 you read what that says?
16 A. "On about March 8, 2003, the platform, which is
17 the subject matter of inspection number 305757577 was
18 dismantled."
19 Q. And it says you had personal knowledge of that,
20 that it was dismantled on March 8, 2003. How would you
21 have personal knowledge?
22 A. That it was dismantled?
23 Q. Right?
24 A. Because I dismantled it.
25 Q. It says it was dismantled on March 8, 2003,

Page 70

1  according to this affidavit?
2      MR. THORSNESS: You are asking him what the
3  document says? What's your question?
4   Q. Does the document say that?
5   A. Yes.
6   Q. Did you swear under oath in this document that
7  that was the date it was removed, dismantled?
8   A. I signed it, yes.
9   Q. Is that date, March 8, 2003, later than the date
10 of the OSHA inspection, which if you look at the
11 previous exhibit, which is Exhibit No. 8, indicates,
12 according to the notes of Ken Burns, that the inspection
13 occurred around March 3rd?
14  A. Yes, the date is later.
15  Q. So is it possible that it was March 8, 2003 that
16 you dismantled the platform and threw the metal brackets
17 and the bolts and nuts into the garbage and stored the
18 plank?
19  A. No.
20  Q. That isn't possible?
21  A. No. I did it a couple of days after the
22 incident.
23  Q. So do you have any explanation as to why you
24 signed an affidavit saying it was dismantled on March 8,
25 2003?

Page 71

1   A. No. Other than it might be a typo.
2   Q. A typo which you didn't review?
3   A. I must not have, no.
4   Q. Do you recall if you were told by -- who told you
5  at Unocal to remove the platform?
6   A. Charles Arnett.
7   Q. Did Roseanne Sinz provide you any direction to
8  remove the platform?
9   A. No.
10  Q. Did Ken Burns ask you to remove it?
11  A. No.
12  Q. It was just strictly Charles Arnett?
13  A. Yes.
14  Q. Do you recall if you were interviewed by OSHA
15 people?
16  A. No, I was not.
17  Q. Did you have any discussion with any of the
18 individuals, Unocal people after the OSHA inspection
19 regarding the OSHA investigation?
20  A. Yes.
21  Q. Who did you have discussions with regarding that?
22  A. Roxanne, and I might have been -- the safety
23 specialist, Ken Burns.
24  Q. And do you recall when you would have had these
25 discussions with Roxanne Sinz?

Page 72

1   A. Probably when all the citations and stuff came
2  about.
3   Q. So -- and what was the discussion -- can you
4  recall the discussion at all, what she said to you or --
5   A. That we had the citation and asked me to post the
6  citations.
7   Q. What about the safety individual, was that Ken
8  Burns did you say?
9   A. Yes.
10  Q. Did you have a discussion with him about it?
11  A. I might have had a discussion and it might have
12 -- it probably was just based on that they had taken
13 some pictures up there and that we were probably going
14 to be fined about it.
15  Q. Did anyone indicate that there would be a
16 possibility of a lawsuit?
17  A. No.
18  Q. Have you ever been involved -- have you ever been
19 deposed before?
20  A. Deposed before?
21  Q. Yes.
22  A. No.
23  Q. Have you ever been involved in a lawsuit before?
24  A. No.
25  Q. Do you know that the statute of limitations is

Page 73

1  two years following an injury to file a lawsuit?
2   A. No.
3   Q. And you have no idea what happened to the plank
4  after it was in the storage area?
5      MR. THORSNESS: Asked and answered. Move to
6  strike.
7   Q. You can still answer.
8   A. No, I don't.
9   Q. Now, you said you work on -- do you know if there
10 is any reason why the plank could not have been bolted
11 to both sides of the wall in the filter room?
12  A. No.
13     MR. THORSNESS: Objection to foundation.
14  Q. Did you know that Larry Grove was injured in the
15 filter room?
16  A. After the fact, yes.
17  Q. Do you know that he was seriously injured?
18  A. After the fact. I don't know seriously. What do
19 you mean by that? Define. He was not dead.
20     I mean he wasn't in the hospital, that I know of,
21 but I knew that he had hurt himself.
22  Q. You realize that -- do you know that the platform
23 and the hardware to it would be evidence in any lawsuit?
24  A. No.
25  Q. Now, have you had occasion to affix things to the

19 (Pages 70 to 73)

Page 74
1  walls in the Unocal building like structures or anything
2  in your repairs?
3      A. You would have to be a little more specific.
4      Q. Let me ask you this: If somebody -- you saw the
5  scaffolding that was there -- the platform that you
6  removed.
7          Do you have any personal knowledge as to, as you
8  were working for Kelly Services at the time, but now
9  Unocal, you worked in the building, as to whether -- who
10 you would have to get authorization from to erect a
11 structure like that?
12     A. Currently, yes.
13     Q. Currently, who would that be?
14     A. Currently, I would talk to my supervisor.
15     Q. Your supervisor, what's the title, name and title
16 of your supervisor?
17     A. My current supervisor?
18     Q. Yes.
19     A. Goodness. I have a brain block here.
20     Q. I am not going to tell that you didn't remember
21 his name.
22     A. I have got a brain block. My foreman for my
23 platform.
24     Q. I see. Where you work right now?
25     A. Yeah. I said "current" and you were saying yes.

Page 75
1      Q. What about when you were working in the building
2  at 909 West Ninth?
3      A. As a contractor or as an employee?
4      Q. First, as a contractor.
5      A. As a contractor, no, because I wasn't -- I
6  wouldn't have had to construct anything like that. As
7  an employee, yes, I would go through my supervisor.
8      Q. Well, as a contractor, did you have occasion
9  where you had to submit an approval slip to someone
10 else, a supervisor to do any work in the building?
11     A. No. As a contractor, I was told, "You need to go
12 shovel a driveway or go shovel the sidewalks or go take
13 paper up here and go do that," and I went and did it.
14     Q. So you didn't have anything to do with a
15 situation that might require an authorization?
16     A. No.
17     Q. Let's go and show you the actual photos.
18     A. Okay.
19     Q. Why don't we mark these as Exhibit No. 10.
20         (Exhibit No. 10 marked.)
21         MR. COHN: Here is a black and white for
22 you, John. I have a black and white also.
23     Q. I want to point out on the back, to make it
24 easier so we don't mix up the pages, they will have
25 numbers, LG numbers on it. I'll refer to the photo and

Page 76
1  the LG numbers so that we're clear on which photo we're
2  looking at.
3          I am going to show you Exhibit No. 10, which are
4  photographs that were taken in the filter room. And
5  does that look to you like the bracketing that you have
6  been referring to?
7      A. Yes.
8      Q. And when I say that, I'm referring to the first
9  page of Exhibit No. 10, which on the back is LG00517 and
10 LG00518. The same thing with the next two pictures,
11 LG00519 and 520. That's the same bracketing that you
12 recall seeing?
13     A. Yes.
14     Q. And the third set of pictures, can you tell from
15 which direction this picture would be taken, these two
16 pictures would be taken from, LG00521 and 522.
17         MR. THORSNESS: Assuming they are both taken
18 from the same direction.
19     Q. Let's start with the top one. That's right.
20 They are two different ones.
21     A. The top one would be going toward the door going
22 out of the filter room.
23     Q. And the other one?
24     A. The bottom one going away from the door towards
25 the other end of the filter room away from the door.

Page 77
1      Q. Looking at the next page, which is LG00523, does
2  that appear to be a picture from the door facing into
3  the filter room?
4      A. Yes.
5      Q. Does that appear to be the bracket that one side
6  had fallen from? You indicated there were two sets of
7  brackets and that one of them was off.
8      A. That looks like one of the brackets, yes.
9      Q. And the bottom -- can you tell me what the bottom
10 picture, LG00524 describes, shows?
11     A. It looks like where it was tied into the wall and
12 then tied into the upper piece.
13     Q. Does that look like it is tied in at the top of
14 the wall? That's the wall opposite the filter room?
15     A. Yes.
16     Q. The filter wall, I mean. So was it your
17 understanding the plank was on top of that?
18     A. Yes. My understanding was the plank was down
19 only hanging off of one when I got into the room.
20     Q. Right. I mean I know you didn't see it when it
21 was attached at the time you came in after it had
22 collapsed, but if that bracket was back up, it looks --
23 does it appear to you that the plank would be on top of
24 the bracket, which would be at the top of the wall?
25     A. Yes.

Page 78

1  Q. To make it clear, the opposite wall doesn't go up
2  to the ceiling, the wall opposite the filter room?
3  A. No.
4  Q. What's behind that wall, do you know, the
5  opposite wall to the filters?
6  A. The opposite wall to the filters, that's large
7  ducting for the HVAC system. That's return air.
8  Q. And turning the page, which is LG00525 and
9  LG00526, does that also appear to be -- the top one,
10 does that appear to be some of the bracketing that you
11 were referring to that you saw when you went into the
12 filter room?
13 A. Yes, that would be.
14 Q. And the same, the picture at the bottom of 526,
15 would that also be the fallen bracket, the bracket
16 that's not attached anymore from --
17     MR. THORSNESS: Objection; foundation.
18 A. Yes.
19     MR. THORSNESS: Go ahead and answer if you.
20 A. Does that appear to be what I pulled down?
21 Q. Is that a picture of what you saw when you came
22 into the filter room that first time after the accident?
23 A. I don't remember that bracket hanging down in the
24 middle of the filter room. I don't recall it hanging
25 down in the middle of the filter room when I went and

Page 79

1  pulled it off the walls.
2  Q. What position was it in?
3  A. I don't know. I don't know if it was there or if
4  it was off or -- yeah, I can't recall that piece hanging
5  right there when I stepped into the room.
6  Q. Could it have been pulled back up and just left
7  hanging on the opposite wall?
8      MR. THORSNESS: Objection; asking him to
9  speculate.
10 A. It could have been.
11 Q. But you don't have any personal recollection now
12 how that bracket was, if it was down all the way or
13 halfway down or up at this time?
14 A. No.
15 Q. And the last two sets of pictures, the top one is
16 LG00527?
17 A. Yes.
18 Q. Now, what does that depict? Does it appear to be
19 a photo in the direction facing the door?
20 A. No. You would be standing at the door taking a
21 picture towards the back wall.
22 Q. That's what it looks like?
23 A. Yes.
24 Q. And does that appear to show the -- is that the
25 ladder -- was that ladder in the room when you came in?

Page 80

1  A. Yes.
2  Q. That appears to be the bracket that collapsed or
3  -- by the way, when you went into the room, did you look
4  to see if there were any bolts and nuts on the floor?
5  A. No.
6  Q. The next picture, LG00528, can you tell me what
7  that, based on your personal knowledge, what that shows?
8  A. Looks like the piece bolted up to the wall
9  opposite of the filters.
10 Q. Do you recall if the room was narrow when you --
11     MR. COHN: You know what, how much time do
12 we have left? Why don't we just stop now and then
13 change tapes.
14     VIDEOGRAPHER: Off record 1:27 p.m. This is
15 end of tape number two.
16     (There was a short break.)
17     VIDEOGRAPHER: On record 1:32 p.m. Start of
18 tape number three.
19 Q. Now, you said you have been on platforms at your
20 present location?
21 A. Yes.
22 Q. So you understand what a platform -- that
23 platforms are important? If you are standing on a
24 platform you want it to not fail?
25 A. Yes.

Page 81

1  Q. Would you agree or disagree that if the platform
2  fails while someone is on the platform that that person
3  could be injured?
4  A. Yes.
5  Q. Was it foreseeable that someone, a service person
6  from Siemens or someone else would access the platform
7  in order to change the filters --
8      MR. THORSNESS: Objection to form.
9  Q. -- in the filter room?
10     MR. THORSNESS: Objection to form and
11 foundation, and legal conclusion.
12 A. You are asking me to assume that someone would do
13 that?
14 Q. How would somebody change the filters that is
15 close to the ceiling?
16 A. Ladder.
17 Q. Do you have any idea why that platform was
18 erected then if all you needed was a ladder?
19 A. No.
20     MR. THORSNESS: Foundation.
21 Q. Would it be easier to use a platform and not have
22 to continually move a ladder to change filters?
23     MR. THORSNESS: Form and foundation.
24 A. Yes.
25 Q. Well, you use work platforms at your job site; is

21 (Pages 78 to 81)

Page 82

1  that correct?
2  A. Where I'm working now?
3  Q. Yes.
4  A. Yes.
5  Q. Do you check the bolts and nuts on the platform
6  each time you go up there?
7  A. We have a certified personnel put them in.
8  Q. Certified personnel?
9  A. Yes.
10 Q. So you are relying on a person that is certified
11 to put them in that they put it in correctly?
12 A. Yes.
13 Q. With the sufficient strength to hold the person
14 that is on the platform?
15 A. Yes. There is a whole code book of that out
16 there.
17 Q. The scaffolding that you saw a few days after the
18 accident, does that scaffold comply with reasonable
19 safety --
20     MR. THORSNESS: Form and foundation.
21 A. I'm not certified to say yes or no. I am not a
22 certified platform --
23 Q. So you are saying that only a certified platform
24 builder could issue that opinion?
25     MR. THORSNESS: Same objection.

Page 83

1  A. You are saying that only certified --
2     MR. THORSNESS: Excuse me for a second.
3  Mike, you need to ask him questions about this building,
4  this accident. I am giving you some leeway here.
5     But the man is not here as an expert. The
6  man is not here as a 30(b)(6) witness. He is here as an
7  individual. You are entitled to ask him his knowledge
8  about this accident or what happened before or what
9  happened afterwards.
10     MR. COHN: He is a building maintenance
11 individual when he was at that building. I'm just
12 asking him if that platform, building maintenance guy,
13 was reasonably safe for use.
14     MR. THORSNESS: If you want to ask him those
15 kinds of expert opinions, then you need to pay him to do
16 that. He is not going to sit here and answer your
17 expert -- questions you should put to an expert witness.
18     MR. COHN: I'm just asking him as an
19 individual with knowledge of maintenance in a building
20 about these safety -- about whether or not the platform
21 is reasonably safe.
22     MR. THORSNESS: To cut to the chase, what
23 I'm saying is he is not going to answer any more
24 questions about work platform regulations and
25 construction.

Page 84

1     MR. COHN: I didn't ask him about platform
2  regulations or construction.
3  Q. Have you ever climbed on that platform, the one
4  at the 909 West Ninth Avenue before the accident?
5  A. No.
6  Q. Do you admit or deny that the platform was
7  dangerous the way it was designed?
8     MR. THORSNESS: Objection; foundation.
9  A. It wasn't constructed when I found it, so I can't
10 tell you if it was dangerous or not.
11 Q. Well, you saw the bracketing and you saw -- you
12 could tell how it was put together; is that true?
13     MR. THORSNESS: Is that a question?
14     MR. COHN: Yes.
15 A. Yes, I saw how -- I took down the stuff, so, yes,
16 I saw how it was constructed.
17 Q. Do you admit or deny that it was dangerous the
18 way it was constructed?
19     MR. THORSNESS: I am going to instruct the
20 witness not to answer that question. You are asking him
21 for an expert opinion. He is not going to give you
22 expert opinions today.
23     MR. COHN: A lay person can give an opinion.
24     MR. THORSNESS: Not expert opinions.
25     MR. COHN: John, we can take this up with

Page 85

1  the court.
2     MR. THORSNESS: We can. I just instructed
3  him not to answer, so do with it what you will.
4     MR. COHN: That's fine. Let's go on to the
5  next question.
6     MR. THORSNESS: I'll restate my foundational
7  objection.
8  Q. When you took the bolts off, did you examine the
9  bolts at all?
10 A. No.
11 Q. Did you observe if they were rusty?
12 A. No.
13 Q. You didn't look at them?
14 A. No.
15 Q. And do you know how many you took off?
16 A. Half a dozen.
17 Q. Are you estimating now?
18 A. Yes, I'm estimating.
19 Q. I know you indicated you took photos. Did you
20 observe anyone else take any photos?
21 A. No.
22 Q. Other than Charles Arnett and Roseanne Sinz and
23 Ken Burns, did you talk with anyone else about the
24 platform other than counsel?
25 A. No. Not to my recollection, no.

22 (Pages 82 to 85)

Page 86

1  Q. I think I did ask you this here: But you
2  indicated you didn't really look at the bolts, but did
3  you -- do you know, could you tell what grade bolts they
4  were?
5  A. No.
6  Q. You said they were about quarter inch; is that
7  correct?
8  A. Yes.
9  Q. Do you know if it is quarter inch bolts that are
10 used in the platforms where you are working now?
11 A. Quarter inch. There is all types of bolts being
12 used in the platform. We have got bolts up to one-inch,
13 two-inch thick.
14 Q. I mean to hold up the work platform.
15 A. No. I don't know exactly what the specs are for
16 the platforms.
17 Q. Now, did you do measurements when you were there
18 as to the distance between the brackets?
19 A. No.
20 Q. So do you have any knowledge of how far in from
21 the door -- do you recall how far in from the door the
22 first bracket was?
23 A. Probably like, I would estimate maybe a foot,
24 maybe less.
25 Q. And do you recall -- but you don't know how far

Page 87

1  the second bracket was from the first bracket?
2  A. No.
3  Q. Do you have any understanding of how far the
4  plank extended over beyond the scaffold at the end?
5  A. No, because it was laying on the floor when I got
6  in there.
7  Q. Do you know how long the room is?
8  A. No.
9  Q. Now, you can correct me if I'm wrong. Did you
10 indicate the plank was about 12 feet?
11 A. Yes. That's what I estimated, yes.
12 Q. Do you have any idea how long the actual filter
13 room is?
14 A. No.
15 Q. Would the plank have extended from one end of the
16 filter room from the door all the way to the back wall?
17 A. No.
18 Q. Do you know how much space there would be left
19 between those two?
20 A. No. I mean, I could estimate maybe another 12,
21 another 12 to 16 foot past that, but that's all I could
22 give you.
23       (Exhibit No. 11 marked.)
24 Q. This is Defendant's Responses to Plaintiffs'
25 Seventh Discovery Requests, and I'm going to ask you if

Page 88

1  you have seen those responses before.
2       MR. THORSNESS: I have got a copy, Michael.
3  A. Yes, I have seen them.
4  Q. When did you see these?
5  A. Earlier today.
6  Q. Is that the first time you have seen these?
7  A. Yes.
8  Q. So prior to today, you had not seen the discovery
9  responses from Unocal?
10 A. No, I have not seen them.
11 Q. So interrogatory number one on page two asks
12 about Unocal employees or other persons who went into
13 the room at the time of the accident from the time of
14 the accident until it was removed, and then it says
15 here, "Defendant believes that Paul Crapps removed the
16 scaffolding from inside the filter room several days
17 after the incident."
18      MR. THORSNESS: Go to page three.
19 Q. That's page three.
20 A. Okay.
21 Q. You testified that's what you did; is that
22 correct?
23 A. Yes.
24 Q. "It is believed the metal pieces were placed in
25 the trash can located outside the filter room." Is that

Page 89

1  correct?
2  A. Yes.
3  Q. And you did that?
4  A. Yes.
5  Q. And then on September 9, 2002, you were a
6  contract employee working for Kelly Services?
7  A. Yes.
8  Q. Did you have a specific written contract for
9  working in the Unocal building?
10 A. No.
11 Q. Did you have like a timesheet that you had to
12 fill out?
13 A. Yeah, I had weekly timesheets.
14 Q. And in those timesheets, did you have to put down
15 -- was it just -- did you have to put down what you did
16 during the days?
17 A. No.
18 Q. Did you keep any diaries or notes about what you
19 did?
20 A. Nope.
21 Q. So there would be no -- they wouldn't have any
22 record at Kelly or Unocal as to what you were doing on
23 specific days?
24 A. No. It was just a general 8:00 to 5:00 type job.
25 Q. And in the last paragraph in answer to

23 (Pages 86 to 89)

Page 90

1  interrogatory number one, which is, I believe it is
2  Exhibit No. 11, "Defendant is not aware of any
3  photographs, videotaping or documentation during the
4  specified time period except for the photographs
5  produced by plaintiff."
6      We have already talked about that. That answer
7  isn't correct, am I right?
8      MR. THORSNESS: Objection to form.
9  Q. That would be wrong?
10     MR. THORSNESS: Objection to form.
11 A. "Defendant is not aware of any photographs,
12 videotapes or documents --" I don't know what
13 photographs were produced. Oh, the plaintiff?
14 Q. There is a specified time period. The time
15 period of the accident until the scaffolding was
16 removed.
17 A. No, there was no pictures and video.
18 Q. You indicated earlier you took photographs
19 though.
20 A. I took photographs of the -- after the OSHA
21 investigation.
22 Q. After the OSHA investigation?
23 A. Yes.
24 Q. And not before the OSHA investigation?
25 A. Yes.

Page 91

1  Q. So you took the photos after the scaffolding was
2  removed?
3  A. Yes.
4      MR. COHN: I am going to want copies of
5  those photographs because I don't believe they have been
6  produced.
7      MR. THORSNESS: Counsel, they have been
8  produced. I can give you Bates numbers. This is on
9  information and belief. They are Bates numbers
10 defendant 00047 through defendant 00063.
11     I believe they have been produced, and check
12 on that. If they haven't, we'll get them right to you.
13     MR. COHN: Can we go off record?
14     VIDEOGRAPHER: Off record 1:47 p.m.
15     (There was a short break.)
16     VIDEOGRAPHER: On record 1:51 p.m.
17     (Exhibit No. 12 marked.)
18 Q. I'm showing you what's marked as Exhibit No. 12.
19 Do you recognize the photographs?
20 A. Yes.
21 Q. The black and whites anyway?
22 A. Yes.
23 Q. And do you recognize these as photographs that
24 you took?
25 A. Yes.

Page 92

1  Q. For the record, these photos are identified as
2  DEF00047 to 00063, and they were attached in the
3  defendant's initial disclosures.
4      The initial disclosures indicated these are
5  photos in their possession without indicating, however,
6  who took them or when they were taken.
7      But you recall these as the photos that you took
8  after the OSHA inspection?
9  A. Yes.
10 Q. Do you recall how soon after the OSHA inspection
11 you took these photographs in the filter room?
12 A. Within probably a day or two.
13     MR. COHN: And if the color or the negatives
14 of these are -- I want the negatives and the color
15 photos of these photographs.
16     MR. THORSNESS: Write me a letter, please.
17 Q. And the first, 0047 to 51 are photos of the
18 mechanical room, the filter room; is that correct?
19 A. Yes.
20 Q. What were you trying to show -- were you trying
21 to show anything in these photos?
22 A. I was just asked to take photos of where it was
23 -- the platform was located.
24 Q. Can you identify on DEF00047 using this red pen
25 where the platform was located?

Page 93

1  A. Yeah, it was located along this stretch right
2  here.
3  Q. Can you put an "X" at the end? Is it coming
4  through?
5  A. Not really. I mean, red on black?
6  Q. Well --
7  A. There is the door, so close to the door to
8  roughly somewhere around here.
9  Q. Well, maybe a blue or black pen might be better.
10 Can I take a look at that?
11 A. Yeah. We're looking at a picture.
12     MR. THORSNESS: Object to foundation.
13 Q. Where you put the "X", is that where the brackets
14 were, to the best of your recollection?
15 A. From that picture. I don't know if it's on that
16 actual skeleton bar or the next one, so I wouldn't be
17 able to tell you without looking at a color picture or
18 the actual unit. I mean this is kind of out of
19 proportion of physically being there.
20 Q. Would there be any other pictures that -- can you
21 take a look to see if there is any other pictures that
22 will give you a better view for you to actually indicate
23 where the platform was located?
24 A. I don't know if it was on the third or fourth run
25 where it was actually bolted up, so I couldn't tell you.

Page 94

1  I wouldn't be able to tell you.
2      It could be bolted on this one. It could be
3  bolted on the next skeleton.
4      Q. It would be easier to tell if we had color copies
5  of these?
6      A. It might be.
7      Q. So where you have drawn now, is that the best of
8  your recollection?
9      A. That's the best of my recollection.
10     Q. Can you just show that for the camera? Can the
11 camera zoom in on that? Understanding that that's the
12 best of your recollection now based on it being a black
13 and white and not a color photo.
14     A. Yes.
15     Q. Okay. What do the next set of pictures depict,
16 that's DEF0052 onward?
17     A. That is the citation from OSHA posting.
18     Q. And is this one for each floor in the building?
19 Is that what you did?
20     A. Yes.
21     Q. Was this a requirement that you actually take a
22 photo to show that you actually posted that?
23     A. I think so. I was told to. I don't know if it
24 was an actual requirement. I was told to, so I did.
25     Q. And these -- okay. Well, there is actually --

Page 95

1  after we get these photos --
2      A. The picture of the actual citation.
3      Q. Does Roxanne Sinz's name on DEF00062 --
4      A. Yes.
5      Q. Do you know why her name -- do you have any idea
6  why her name is on the document?
7      A. Probably just saying that that's a stamp that
8  they use. It is just a received stamp saying that she
9  received it that date.
10     Q. Did somebody direct you to put the citation up?
11     A. Yes.
12     Q. Was that Roxanne Sinz?
13     A. Yes.
14     Q. It looks like DEF00063, is that the outside of
15 the -- right outside --
16     A. That's the door going into the filter room.
17     Q. So you were required to put a citation up on that
18 particular door also?
19     A. Yes.
20     Q. And there is a ladder outside?
21         MR. THORSNESS: Be sure and wait for him to
22 finish his question.
23     Q. There is a ladder outside the door. Is that the
24 ladder -- is that the ladder that had been inside the
25 filter room, do you recall?

Page 96

1      A. It was in the filter room at some point. I don't
2  know if it was in the filter room as of when the
3  incident happened.
4      Q. Do you recall who -- you worked for Charles
5  Arnett at the time that you came from Kelly Services?
6      A. Right.
7      Q. He was your supervisor?
8      A. Yes.
9      Q. Do you know who would be responsible for
10 maintenance in the building at the time that you were
11 working in the Unocal building, first when you started
12 with Kelly Services?
13     A. Maintenance as in that area or maintenance in
14 general?
15     Q. First, let's start with maintenance in general.
16     A. Charles Arnett.
17     Q. How do you know that?
18     A. That was just kind of his position or what he
19 did.
20     Q. Because when you said "maintenance in general or
21 maintenance in that area," what do you mean by "that
22 area"?
23     A. He oversaw the maintenance of the building, HVAC
24 stuff like that, contractors coming in and doing it.
25     Q. So would you have any personal knowledge of who

Page 97

1  did the actual maintenance or inspection, if any, of the
2  filter room?
3      A. When I came on? No. When I started?
4      Q. Well, did there come a time when you became aware
5  of that?
6      A. Yes, as I became an employee and took over more
7  of it, I knew the contract was with Siemens and stuff
8  like that, that they were --
9      Q. They were what?
10     A. They did the maintenance of the filters.
11     Q. Maintenance of the filters, but -- okay. So you
12 saw the contract with Siemens?
13     A. Yes.
14     Q. And that was only after you became an employee?
15     A. Yes.
16     Q. How detailed did you review the contract?
17     A. I looked over it just to see what they were -- we
18 were paying for and what they were actually doing.
19     Q. Do you recall if the contract required them to
20 erect any scaffolding that they might use?
21     A. No.
22     Q. I think that was maybe a bad question. Was there
23 any section in the contract that indicated that if
24 Siemens needed scaffold or work platform that they would
25 be the ones to provide it?

Page 98

1   A. No.
2   Q. And how detailed did you look through that
3   contract?
4   A. I looked over it.
5   Q. You didn't see anything in there that said
6   Siemens was responsible for that?
7       MR. THORSNESS: Objection; asked and
8   answered.
9   A. No.
10  Q. Now, you said that the work platform where you
11  work, there is some certified -- what did you call it?
12  Certified --
13  A. Yes.
14  Q. -- work platform?
15  A. Scaffolding, yes. Someone that is certified to
16  put up scaffolding.
17  Q. Do you recall, out where you work now, how often
18  the work platform would be inspected?
19  A. We would use it for a specific job and then take
20  it down.
21  Q. When you say "take it down," would that be the
22  certified scaffold guy take it down?
23  A. Yes.
24  Q. Now, I know we looked at the photos and the
25  photos aren't really clear. And we'll be done --

Page 99

1       MR. COHN: What time do you have, John?
2       MR. THORSNESS: About 2:00.
3       MR. COHN: 2:30 we'll be finished for sure.
4   You will be getting off easy.
5   Q. Could you draw a diagram as you remember the
6   filter room, what it looked like from the door to the
7   back wall and then put Xs where the best of your
8   recollection the brackets would be for the platform?
9   A. Okay. You are looking for Xs where the brackets
10  were?
11  Q. First, let's go where the brackets would have
12  been located.
13  A. My recollection it is either on the third or
14  fourth run of the skeleton. I couldn't -- I can't tell
15  you without kind of going back.
16  Q. When you say "the third or fourth run," you are
17  talking about the bracket furthest from the door?
18  A. Yes.
19  Q. Do you know how far apart each one of the runs
20  were?
21  A. No.
22  Q. And they were -- were there four runs that you
23  recall? Do you recall there were four runs in the
24  filter room?
25  A. I'm saying I don't know if it was on the third or

Page 100

1   fourth of the skeleton -- it's a sheet metal box and
2   this is kind of angle iron running down, and the
3   brackets were bolted to one of those sets of angle
4   irons. I don't know if it was on the third or the
5   fourth of it.
6   Q. That's the far one. Do you know where the first
7   bracket was bolted?
8   A. On the first one.
9   Q. On the first one?
10  A. Closest to the door.
11  Q. And can you just show that --
12      MR. COHN: Let's mark that as Exhibit
13  No. 13.
14      (Exhibit No. 13 marked.)
15  Q. Can you show the videographer where you marked
16  it? Understanding that you have located it at the
17  fourth rung. Is that the fourth or the --
18  A. I would say the third. From there to there, I
19  would say three.
20  Q. You don't know if it is on the third or might
21  have been the fourth? The first one looks like it is
22  fairly close to as soon as you entered the doorway.
23  A. The first bracket is right there.
24  Q. And you don't know the distance between the two
25  brackets?

Page 101

1   A. No.
2   Q. Where was the storage area that the plank was
3   stored in?
4   A. As you come into the entrance of the penthouse,
5   there is a big open shaft. I would almost -- it is
6   like, almost like a crawl space, and I just slid it in
7   there.
8   Q. Have you ever seen this document?
9   A. Yes.
10  Q. And what is this?
11  A. This is a schematic from the penthouse of the
12  Unocal building.
13      MR. COHN: Can we mark this as the next
14  exhibit?
15      (Exhibit No. 14 marked.)
16  Q. Could you first identify where the filter room
17  is?
18  A. I would say access door -- access door would be
19  right here. That's the door going into the filter room.
20  So that would be the filter room.
21  Q. Could you put just a one next to it?
22  A. Right here? Just a one?
23  Q. Yeah. So where you placed the one, that would be
24  right where the door is inside the filter room?
25  A. Yes.

Page 102

1  Q. And could you indicate on here where, first of
2  all, where the plank was stored?
3  A. Probably there is an empty room. It is either
4  here -- it's in this area right here. There is a
5  concrete kind of pad here. This is showing
6  mechanical --
7  Q. Just put a big circle there and write a number
8  two. That would be the approximate area where the plank
9  was stored?
10  A. Yes.
11  Q. And you indicated there was a trash can -- well,
12  before we get to that. How difficult is it to move that
13  12-foot plank from the filter room to the storage area,
14  because you have been up there. Is it like --
15  A. It's a little bit of a maze, yeah.
16  Q. You have to maneuver around corners?
17  A. Yeah, but I mean it is not impossible.
18  Q. Did you carry it yourself or did you have
19  somebody else help you?
20  A. No, I carried it myself.
21  Q. Where was the trash can that the brackets and
22  remaining pieces were thrown away?
23  A. Right inside the door as you come in. There is
24  two doors, so right here.
25  Q. So can you just put a three there. So that would

Page 103

1  be the area -- where you marked the three is where the
2  brackets and the nuts and bolts, and if there were any
3  washers, were thrown away?
4  A. Yes.
5  Q. And that's fairly close to where the plank was
6  stored?
7  A. Yes.
8  Q. And when did you have an opportunity to review
9  this particular document?
10  A. When I started as the building services
11  coordinator.
12  Q. That's after you became a Unocal employee?
13  A. Yes.
14  Q. So before that, you wouldn't have had --
15  A. Access, no.
16  Q. I just want to blow this up just to identify for
17  the videographer exactly where you indicated. If you
18  can point out number one where the filter room is. And
19  number two, where the plank was stored. You got number
20  two. And that also probably has number three in the
21  picture where the trash can was where the parts were
22  discarded.
23   Do you know if the trash can was just thrown into
24  regular garbage afterwards?
25  A. Yeah.

Page 104

1  Q. Now, have you had discussions with anyone about
2  the Larry Grove accident other than your attorneys?
3  A. Discussions? Legal or just -- there was mention
4  of what had happened with other -- the other Siemens
5  employees, the other maintenance guys that came on, but
6  nothing legal, but just that he was hurt and stuff like
7  that.
8  Q. You mean you had discussions with other Siemens
9  people who came to service the filter room after?
10  A. Yes.
11  Q. Did you have discussions with Mr. Tabler, for
12  example, Kevin Tabler?
13  A. Not that I can recall, no.
14  Q. And how many -- did you talk to Roseanne Sinz
15  about this? How many conversations have you had with
16  Roseanne Sinz regarding the accident?
17  A. I don't know. She was my supervisor at that
18  point, so I couldn't put a number on it. It was, you
19  know, it was quite an issue after OSHA came of what had
20  happened, so it was probably a lot of meetings or
21  discussions about it.
22  Q. There were meetings or discussions about the
23  accident?
24  A. Just about everything leading up to -- everything
25  that -- with the OSHA investigation.

Page 105

1  Q. What type of meetings? Were you saying it was
2  just you and Roseanne or other people involved?
3  A. Mostly just Roxanne and I.
4  Q. What was discussed at these meetings?
5  A. Just what -- just the investigation and, you
6  know, things like that.
7  Q. Did either of you bring up the possibility that
8  there might be a lawsuit out of this accident?
9  A. No, not at the beginning. I think there was
10  rumors that there was one, so I don't think it was
11  brought up, but there was rumors that there might be
12  one.
13  Q. Rumors. Where did you hear those rumors from?
14  A. Just that anywhere between some of the Siemens
15  guys to that there might be, from maybe Roxanne, that
16  there might be some -- not a --
17   I mean, Roxanne, there might be legal things that
18  are happening with it. Not that there was an actual --
19  the word escapes me.
20  Q. That's okay. Do you recall when that
21  conversation -- would that conversation with Roxanne --
22  A. No.
23  Q. I'm sorry. Well, when you talked about -- you
24  mentioned Roxanne Sinz in regard to a conversation about
25  some legal matters.

27 (Pages 102 to 105)

Page 106

1  A. No. I'm sorry. Keep going.
2  Q. Well, you said "no." No about what? I don't
3  want to --
4  A. No. I'm a little flustered, so I'm answering.
5  Q. When were there these rumors you heard about
6  legal matters? Were they before or after the OSHA
7  inspection?
8  A. I recall after.
9  Q. And you recall -- and you heard that from
10 different sources?
11 A. Yes.
12 Q. Was Roxanne one of the sources?
13 A. Yes.
14 Q. And Siemens employees other sources?
15 A. Yes.
16 Q. Did you ever have any conversations with
17 Mr. Grove after the accident?
18 A. Yes, we had some conversations.
19 Q. And do you recall when those occurred?
20 A. No. He had stopped by the office at one point.
21 Q. Do you recall when that was?
22 A. No.
23 Q. Do you recall what you talked about?
24 A. No.
25 Q. Was that just one time that you talked with him

Page 107

1  then?
2  A. That I recollect, maybe once or twice.
3  Q. And you have no recollection of what you talked
4  about?
5  A. Actually, I do recall talking a little bit about
6  how his ankle was.
7  Q. Did you ask him how his ankle was or did he just
8  tell you?
9  A. I don't recall how exactly the conversation went.
10 Q. Do you recall if this was after you were a Unocal
11 employee or before you were an Unocal employee?
12 A. No, I don't know.
13    MR. COHN: Let's go off record.
14    VIDEOGRAPHER: Off record 2:15 p.m.
15    (There was a short break.)
16    VIDEOGRAPHER: On record 2:20 p.m.
17 Q. Showing you again Exhibit No. 9, which is your
18 affidavit.
19 A. Uh-huh.
20 Q. We talked about when the platform was dismantled
21 and removed?
22 A. Yes.
23 Q. And on or about March 8, 2003, the platform,
24 which is the subject matter of inspection number
25 305757577, was dismantled, what did you mean by that?

Page 108

1     MR. THORSNESS: Excuse me, Counsel. There
2  is no evidence that he wrote anything on this document
3  except his signature. That's not been established. You
4  haven't asked him about that, so mischaracterization.
5  Q. You can answer the question. Then I'll go into
6  detail.
7  A. You are asking me what again?
8  Q. What paragraph two means.
9  A. That I removed the -- on or about March 8th, that
10 I removed the platform from the inspection number.
11 Q. If that inspection number refers to the platform
12 in the filter room in the penthouse --
13 A. Yes.
14 Q. -- that refers to the platform at issue in this
15 case?
16 A. Yes.
17 Q. And March 8th is approximately six months after
18 the accident involving Mr. Grove on September 9, 2002;
19 is that correct?
20 A. Sure. Yes.
21 Q. Did you hand write anything before this
22 affidavit?
23 A. No.
24 Q. Who -- did you talk to anybody -- how did this
25 affidavit come into being?

Page 109

1     MR. THORSNESS: Foundation.
2     MR. COHN: Well, he signed it.
3  A. It came into being because of the citation.
4  Q. But did you talk to -- do you have any idea who
5  typed up the affidavit?
6  A. It was so long ago, no.
7  Q. Was it an OSHA inspector that you were talking to
8  -- was it typed up in your presence?
9  A. No.
10 Q. Now, there is some information on here that
11 appears to come from you. How did -- the person that
12 typed up this information, would he have gotten that
13 information from you?
14 A. I don't know.
15 Q. Well, who did you talk to in regard to what
16 happened following the inspection and in regard to the
17 citation?
18 A. Who did I talk to? I talked to Roxanne Sinz and
19 to Ken Burns.
20 Q. Did you talk to any of the OSHA people?
21 A. No.
22 Q. Who handed you this affidavit to sign?
23 A. I don't recall.
24 Q. Do you recognize the name of the notary
25 underneath?

Page 110
1   A. No, I don't.
2   Q. Do you recall if this affidavit was signed at the
3   Unocal building?
4   A. No, I don't recall.
5   Q. Well, this is dated May 9, 2003. Would there be
6   a way to check and see if you were working on that day?
7   A. There might be, yeah.
8   Q. And if you were working on that day, would you
9   have been in the -- at the building at 909 West Ninth at
10  the time the affidavit was signed?
11  A. I could have, yes.
12  Q. Well, where else could you have been? Did you go
13  down to state OSHA offices and sign an affidavit?
14  A. Not that I recall, no.
15  Q. When you got this affidavit, did you simply sign
16  without looking at it?
17  A. No. I probably scanned over it, yes.
18  Q. When you say you scanned over it, did you read
19  each line?
20  A. No. I probably just scanned over it.
21  Q. Would you have made any corrections if you found
22  an error?
23  A. If I would have seen it, probably, yes.
24  Q. And you didn't? Was this the first version --
25  did you make any corrections to your affidavit?

Page 111
1   A. No.
2   Q. So this is the document you were provided, you
3   scanned it and then signed it?
4   A. Yes.
5   Q. Do you know what happened to the document
6   thereafter?
7   A. No.
8   Q. Was anybody with you at the time that you looked
9   at this affidavit?
10  A. Not that I can recall, no.
11  Q. Would there have been -- not that you can recall.
12  Is it possible Ken Burns was there?
13  A. There is a possibility, yeah.
14  Q. Is there a possibility Roxanne Sinz was there?
15  A. There is a possibility.
16  Q. Is there a possibility Mark Vaughan was there?
17      MR. THORSNESS: Objection; asking him to
18  speculate.
19  A. There is a possibility they were there, too.
20  Q. Well, so you have no recollection if you were
21  alone when you saw this affidavit?
22  A. I don't recollect who was in the office with me.
23  Q. But there were other people in the office with
24  you?
25  A. Yes.

Page 112
1   Q. Do you recall if anyone else reviewed this
2   affidavit before you signed it?
3   A. No.
4   Q. Are you saying nobody else reviewed it or you
5   don't recall if somebody --
6   A. You asked me if I recalled and I said I don't
7   recall anyone reviewing it.
8   Q. So it is possible someone reviewed the affidavit
9   before you signed it?
10      MR. THORSNESS: Objection; speculation.
11  A. It is possible, yeah.
12  Q. You don't have any recollection of even signing
13  this affidavit at the present time?
14  A. Yeah. Other than seeing my signature down there,
15  no.
16  Q. Would your memory be better when you signed the
17  affidavit back on May 9, 2003 about what had transpired
18  than it is today?
19  A. Yeah.
20  Q. Okay. In regard to -- now, you presently work
21  for Unocal?
22  A. Yes.
23  Q. And your wife still works for Unocal?
24  A. Yes.
25  Q. And are you loyal to Unocal?

Page 113
1   A. Yes.
2   Q. And would you not want to do anything that would
3   hurt Unocal?
4   A. Yeah.
5   Q. If this 12-foot plank gets removed from the
6   building, that's too big to fit in the garbage bin in
7   the back. Have you ever moved something that big from
8   909 West Ninth?
9   A. No. Not that I can recall, no.
10  Q. Well, if you were to do it, would you probably
11  break it up into pieces so you can put it into the
12  garbage?
13  A. Yes.
14  Q. Your recollection is it was about 12 feet long
15  and about two inches thick?
16  A. Yes.
17  Q. And do you know how wide it was?
18  A. I would say 12, 16-inch. Probably 2 by 12 or 16.
19  Q. And looking at where the top -- can you tell me
20  how high up the top of that wall opposite the filter
21  room is?
22  A. I would estimate maybe eight feet.
23  Q. And so where the platform -- where the bracket
24  was, the plank would be placed about eight feet off the
25  floor?

### Page 114

1   A. Yes.
2   Q. And as far as you can see with the plank, there
3   were no toe holes or toe guards?
4   A. Not that I recall, no.
5   Q. You didn't see any side rails?
6   A. No.
7   Q. And based on your knowledge as a layman, would
8   this conform to the accepted requirements for a work
9   platform?
10      MR. THORSNESS: Objection. He is not going
11  to answer that question. You are asking for an expert
12  opinion. I am instructing him not to answer.
13  Q. Are you going take the advice of Mr. Thorsness
14  and not answer this question?
15  A. Yes.
16  Q. Would that be a platform -- would you be
17  comfortable going up on a platform that was constructed
18  like that?
19  A. Yeah.
20  Q. You would have no problem going up on that type
21  of platform with open sides, open rails?
22      MR. THORSNESS: Objection; argumentative.
23  A. At my house, I would probably build something and
24  go on it, yes.
25  Q. You would build -- have you built something like

### Page 115

1   that at your house?
2   A. No.
3   Q. Would you use the same type of nuts or bolts?
4   Would you do something to test the strength of the bolts
5   before you -- to ensure that it was strong enough to
6   hold your weight?
7   A. No.
8   Q. Would you periodically inspect it if it has been
9   up there for years?
10  A. Probably not.
11      MR. THORSNESS: Same objections here to
12  questions.
13  Q. So you work for Unocal, correct?
14  A. Yes.
15  Q. Your wife works for Unocal?
16  A. Correct.
17  Q. You are a loyal Unocal employee?
18      MR. THORSNESS: Objection; asked and
19  answered.
20  A. Yes.
21      MR. COHN: I have no further questions at
22  this time.
23      MR. THORSNESS: I have a couple.
24          EXAMINATION
25  BY MR. THORSNESS:

### Page 116

1   Q. Put Exhibit No. 9 in front of you there,
2   Mr. Crapps, will you, please? When did you tell us that
3   you were instructed by Mr. Arnett to dismantle the
4   scaffolding in the fan room?
5   A. Recently after the incident.
6   Q. Less than a week?
7       MR. COHN: Objection; leading.
8   A. Yes.
9   Q. So within a few days after the accident?
10      MR. COHN: Objection; leading.
11  A. Yes.
12  Q. And if I told you the accident occurred on the
13  9th of September 2002, does that comport with your
14  recollection?
15  A. Yes.
16  Q. So is it your testimony that you dismantled the
17  scaffolding within a week of September 9, 2002?
18  A. Yes.
19      MR. COHN: Objection; leading.
20  Q. And if your affidavit sitting here before you
21  says that you dismantled the scaffolding 11 months later
22  on --
23      MR. COHN: Misstates the evidence.
24      MR. THORSNESS: Let me finish my question,
25  Counsel.

### Page 117

1   Q. If your affidavit says that you dismantled the
2   scaffolding about 11 months later on August 8, 2003, is
3   that affidavit correct?
4   A. No.
5       MR. COHN: Objection; misstates the
6   evidence. It doesn't say August 8, 2003.
7       MR. THORSNESS: Correct. It says March 8.
8   My error.
9   Q. If your affidavit says March 8, 2003 --
10  A. Yes.
11  Q. -- which would be more like about six months
12  later, is your affidavit correct?
13  A. No.
14  Q. At the beginning of today's deposition you raised
15  your right hand and swore an oath to tell the truth; is
16  that right?
17  A. Yes.
18  Q. And to the best of your recollection and ability,
19  have you told the truth today during this deposition?
20  A. Yes.
21      MR. COHN: Objection to the form of the
22  question.
23  Q. Mr. Cohn asked you several times if you are loyal
24  to Unocal, correct?
25  A. Yes.

**Page 118**

1  Q. And I believe you said yes you are loyal to
2  Unocal; is that right?
3  A. Yes.
4  Q. And they are your current employer?
5  A. Yes.
6  Q. Would you ever under any circumstances for any
7  reason lie under oath because you are loyal to your
8  employer, Unocal?
9       MR. COHN: Objection to the form of the
10 question.
11 A. No.
12      MR. COHN: Objection; leading.
13 Q. Your answer is no?
14 A. No.
15      MR. THORSNESS: Thank you. That's all the
16 questions I have.
17           RE-EXAMINATION
18 BY MR. COHN:
19 Q. Now, Mr. Thorsness asked you some questions about
20 putting up your right hand and swearing under oath.
21     Now when you signed this affidavit, which is
22 Exhibit No. 9, does it not say "Paul Crapps, being first
23 duly sworn under oath, deposes and states"; is that
24 correct?
25 A. That's what it says.

**Page 119**

1  Q. And I take it when you signed -- have you ever
2  signed -- when you sign something under oath, you try,
3  to the best of your ability, to tell the truth?
4  A. Yes.
5  Q. Now, you indicated that while Mr. Arnett may have
6  told you to remove the platform, you don't recall the
7  specific date when that happened?
8  A. No.
9  Q. And other than -- did you even have a
10 recollection before today of the date of the accident
11 involving Mr. Grove?
12 A. Some, yes.
13 Q. What was that recollection?
14 A. That it was sometime in 2002.
15 Q. But you didn't remember when in 2002?
16 A. No.
17 Q. Did you ever discuss any of the situation
18 regarding the work platform with your wife?
19 A. No, not that I can recall.
20 Q. You never told her like when you removed it or
21 anything?
22 A. No.
23 Q. If other individuals -- if other individuals
24 indicate that the platform was still there in March of
25 2003, would they be lying?

**Page 120**

1  A. Yes.
2  Q. So when you said that the platform was still
3  there on March 8, 2003, then you weren't telling the
4  truth in your affidavit; is that correct?
5       MR. THORSNESS: Objection. Don't answer
6  that question.
7  Q. Are you taking the advice of counsel?
8       MR. THORSNESS: You are just harassing him,
9  Mike, and I am not going to let you do it.
10      MR. COHN: I'm not harassing him.
11      MR. THORSNESS: You have already asked him
12 if that was the truth. You have already asked him all
13 about his affidavit. You are not going to harass him
14 like this.
15      MR. COHN: I just want the truth, John, and
16 I haven't gotten it.
17      MR. THORSNESS: We're done. The deposition
18 is over. Let's go. I am not going to sit here and
19 listen to this.
20      MR. COHN: I know that you need to go to
21 your cabin.
22      MR. THORSNESS: This is outrageous. You ask
23 him a real question and he'll answer it.
24      MR. COHN: You were asking nice leading
25 questions.

**Page 121**

1       MR. THORSNESS: We are not going to sit here
2  and listen to you accuse him of this.
3       MR. COHN: I'm not accusing him of anything.
4       MR. THORSNESS: Let's go. We're out of
5  here.
6       MR. COHN: Good-bye, John. Would you like
7  your witness to sign his affidavit -- sign his
8  deposition or not, John? Good-bye, John.
9       VIDEOGRAPHER: Off record?
10      MR. COHN: No, we're not off record yet.
11 Mr. Thorsness has decided to leave the deposition and
12 abruptly get up and walk out with the witness before
13 this deposition has been concluded.
14      I am taking the position that I have not
15 finished this deposition and have the right to redepose
16 Mr. Crapps at a later date.
17      Mr. Thorsness's actions were uncalled for
18 and, therefore, this deposition is not yet concluded.
19      I would like a copy of the transcript myself
20 and the videotape. And I thank you. And that's it.
21      VIDEOGRAPHER: Off record 2:37 p.m.
22      (Proceedings concluded at 2:37 p.m.)
23      (Signature reserved.)
24
25

Page 122

```
 1              CERTIFICATE
 2
 3     I, SONJA L. REEVES, Registered Professional Reporter
 4  and Notary Public in and for the State of Alaska, do
 5  hereby certify that the witness in the foregoing
 6  proceedings was duly sworn; that the proceedings were
 7  then taken before me at the time and place herein set
 8  forth; that the testimony and proceedings were reported
 9  stenographically by me and later transcribed by computer
10  transcription; that the foregoing is a true record of
11  the testimony and proceedings taken at that time; and
12  that I am not a party to nor have I any interest in the
13  outcome of the action herein contained.
14     IN WITNESS WHEREOF, I have hereunto set my hand and
15  affixed my seal this 17th day of March 2006.
16
17
18     _____
19        SONJA L. REEVES, RPR
20        My Commission Expires 8/7/07
21
22
23
24
25
```

Page 123

```
 1            WITNESS CERTIFICATE
 2  RE: GROVE, ET AL. V. UNOCAL
    CASE NO. A04-0096 CV (JKS)
 3  DEPOSITION OF: PAUL CRAPPS
    DATE TAKEN: MARCH 3, 2006
 4
 5     I hereby certify that I have read the foregoing
    deposition and accept it as true and correct, with the
 6  following exceptions:
    =====================================================
 7  Page  Line    Description/Reason for Change
    =====================================================
 8  ____  ____    _____
 9  ____  ____    _____
10  ____  ____    _____
11  ____  ____    _____
12  ____  ____    _____
13  ____  ____    _____
14  ____  ____    _____
15  ____  ____    _____
16  ____  ____    _____
17  ____  ____    _____
18  ____  ____    _____
19  ____  ____    _____
20  ____  ____    _____
21  ____  ____    _____
22          _____
            SIGNATURE       DATE
23
    Please sign your name and date it on the above line. As
24  needed, use additional paper to note corrections, dating
    and signing each page.
25            (SLR)
```

Exhibit 11
Page 32 of 32