GROVE, ET AL. v. UNOCAL

ARCHIE COOK
3/15/2006

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    _____

4    LAWRENCE H. GROVE, ET AL.,          ) COPY

5              Plaintiffs,               )
                                         )
6       vs.                              )
                                         )
7    UNOCAL CORPORATION,                 )
                                         )
8              Defendant.                )

9    _____

10   Case No. A-04-0096 CV (JKS)

11

12

13   _____

14        TELEPHONIC DEPOSITION OF ARCHIE COOK

15   _____

16

17                   March 15, 2006
                       7:30 a.m.

18

19         Taken by Counsel for Plaintiffs
                        at
20         330 L Street, Suite 200
               Anchorage, Alaska

21

22

23

24                          **Exhibit 16, pg. 1**

25

GROVE, ET AL. v. UNOCAL

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3    For Plaintiffs:

 4       Michael Cohn, Esq.
         PHILIP PAUL WEIDNER & ASSOCIATES
 5       330 L Street, Suite 200
         Anchorage, Alaska 99501
 6       (907) 276-1200

 7

 8    For Defendant:

 9       John B. Thorsness, Esq.
         (via speaker phone)
10       CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
         711 H Street, Suite 620
11       Anchorage, Alaska 99501
         (907) 272-9273

12

13

14    Court Reporter:

15       Sonja L. Reeves, RPR
         PACIFIC RIM REPORTING
16       711 M Street, Suite 4
         Anchorage, Alaska 99501

17

18

19

20

21

22

23

24                                    Exhibit 16, pg. 2

25
```

GROVE, ET AL. v. UNOCAL

Page 3

```
 1                        I-N-D-E-X

 2

 3    EXAMINATION BY                        PAGE

 4      Mr. Cohn                             4

 5

 6    EXHIBITS

 7    1      Notice of Deposition (2 pgs.)      --
             (Marked off record.)
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                               Exhibit 16, pg. 3
25
```

GROVE, ET AL. v. UNOCAL

ARCHIE COOK
3/15/2006

Page 4

1      ANCHORAGE, ALASKA; MARCH 15, 2006
2         7:30 A.M.
3         -o0o-
4        ARCHIE COOK,
5    deponent herein, being sworn on oath,
6    was examined and testified as follows:
7       EXAMINATION
8 BY MR. COHN:
9   Q. Good morning, or I should say "good afternoon"
10 for you, Mr. Cook.
11   **A. Yes. Am I speaking to Michael Cohn?**
12   Q. Right. I am an attorney and I represent the
13 plaintiffs, and it is not just Lawrence Grove. It is
14 his wife and children are additional plaintiffs in this
15 action.
16    And this case arises out of an accident that
17 occurred at the Unocal building at 909 West Ninth
18 Avenue, Anchorage, Alaska on September 9, 2002. Are you
19 aware of that?
20   **A. Yes.**
21   Q. I just want to start with some preliminary
22 questions. And you did answer "yes". In some
23 depositions, people have a tendency to nod, and,
24 obviously, since we're on the telephone, we'll need an
25 audible response "yes" or "no".

Page 5

1   **A. I'll try to remember that.**
2   Q. And in addition, your testimony is going to be
3 transcribed by a court reporter, and, in appropriate
4 circumstances, may be used in court either in
5 questioning you or in the event that you are not
6 available it could possibly be used in court according
7 to the rules of civil -- federal procedure.
8    Have you had an opportunity to talk with
9 Mr. Thorsness before this deposition?
10   **A. Yes.**
11   Q. And --
12    MR. THORSNESS: Excuse me, Michael. This is
13 John. I'm sorry. Maybe I missed it. Has the witness
14 been put under oath yet?
15    MR. COHN: Yes.
16    MR. THORSNESS: I missed that.
17    MR. COHN: It's pretty early in the morning,
18 and I know, John, you have got young children, and I
19 know how, for me, keeping me up at night just one child
20 let alone the several that you have.
21   Q. Mr. Cook, where is your present location? Where
22 are you located?
23   **A. I live in Banchory in Scotland.**
24   Q. Are you presently employee?
25   **A. No, I am retired.**

Page 6

1   Q. When did you retire?
2   **A. I retired from Unocal, for whom I was working in**
3 **Alaska, on the 30th of April 2003. That was my last day**
4 **in the office. I didn't actually finish working with**
5 **them -- at least my employment and date, given accrued**
6 **vacation and so on, was some three months later.**
7   Q. How long did you work for Unocal?
8   **A. For 24 years approximately.**
9   Q. And how long -- how long did you work in Alaska
10 for Unocal?
11   **A. I worked in Alaska for four years.**
12   Q. So was that from 1999 to 2003?
13   **A. Yes. As I recall, it was from -- I don't carry a**
14 **resume anymore, but I recall it was from May the 1st,**
15 **1999 is when I was assigned to Alaska.**
16   Q. Where was your job location in Alaska?
17   **A. In Anchorage, Alaska, the Unocal office, 909 West**
18 **Ninth Avenue.**
19   Q. What was your position in that building?
20   **A. My title was HR consultant.**
21   Q. And what does "HR" stand for?
22   **A. Human resources consultant.**
23   Q. Did you remain a human resources consultant until
24 you left?
25   **A. Yes, I did. Actually, in all my time with**

Page 7

1 Unocal, although I always had a title of human resources
2 something, for some reason, Unocal attaches, at least in
3 the places I worked, attached an office administration
4 to that function.
5   Q. You know, I didn't start with some preliminaries.
6 Have you ever had your deposition taken before?
7   **A. No, I have not.**
8   Q. Has Mr. Thorsness explained to you what a
9 deposition is?
10   **A. Yes.**
11   Q. Is that the only contact you have had with
12 Mr. Thorsness?
13   **A. We spoke, I think, in the summer of last year on**
14 **the same matter when I expected to be deposed.**
15    MR. COHN: John, are you claiming
16 attorney-client as to this witness?
17    MR. THORSNESS: Yes.
18   Q. Did you have a conversation with anyone else from
19 Mr. Thorsness's office?
20   **A. There was somebody else present at the time. It**
21 **was a paralegal, I think, or more junior counsel. I**
22 **can't remember.**
23   Q. Was that a telephone contact or in person?
24   **A. It was a telephone contact.**
25    MR. THORSNESS: Michael, for your

4 (Pages 4 to 7)

**Exhibit 16, pg. 4**

Page 8

1  information, those two people would be Vickie Holman,
2  our paralegal possibly, and I believe Mr. Cook did also
3  speak with Linda Johnson.
4       MR. COHN:  Thank you, John.
5   Q.  Were you shown any papers at that time last
6  summer?
7   A.  I received from Linda Johnson a copy of a safety
8  narrative prepared by OSHA.  I think three pages of
9  that.
10   Q.  Yes.  Anything else?
11   A.  That was it.
12   Q.  Prior to the contact from Mr. Thorsness and
13  Ms. Johnson, have you had contact with any previous
14  counsel for Unocal?
15   A.  Somebody from another legal company called me
16  previously.  I'm sorry.  I can't remember his name.  He
17  used to work for Unocal.
18       I can't remember his name, but he called me just
19  wondering what I knew about this incident.  He was a
20  lawyer.
21   Q.  Right.
22   A.  I can't remember his name.
23   Q.  I don't want to mislead you or anything.  We do
24  have some responses to discovery requests, and this is
25  from a previous counsel for Unocal in which they

Page 9

1  indicated your name as one of the people that they had
2  conferred with, and that was in a response to third
3  discovery requests.
4       And in regard to they asked you what you knew
5  about the case, I don't want to ask you about what you
6  told them, but can you just tell me briefly, first of
7  all, were you working in the building at the time
8  that --
9   A.  I had left.  I had long gone.
10       MR. THORSNESS:  This is John Thorsness.  I
11  don't think Mr. Cohn was finished with his question.
12   A.  I'm sorry.
13       MR. THORSNESS:  That's okay.  And so just be
14  sure he has finished and then answer the question.
15   Q.  Let me just explain that.  If you don't
16  understand my question, you can always ask me to
17  rephrase it.  I was finished, but I didn't explain it
18  well.  Let me start over.
19       You indicated -- Mr. Grove's accident was
20  September 9, 2002?
21   A.  That is my understanding.
22   Q.  And you indicated that you retired from Unocal
23  April 13, 2003?
24   A.  April the 30th.
25   Q.  But when was the last time -- when did you stop

Page 10

1  working at the building at 909 West Ninth Avenue?
2   A.  April the 30th.
3   Q.  Of 2003?
4   A.  Yes.
5   Q.  Okay.  So that's the reason why -- my question
6  before was were you working -- well --
7   A.  Sorry.  Please finish your question.
8   Q.  Mr. Grove was injured on September 9, 2002.
9  First, let me ask you, were you working that day, if you
10  recall?
11   A.  What day was it?
12   Q.  September 9, 2002.
13   A.  Yes, I know that.  Was it a weekday?
14   Q.  I would have to look at a calendar to see, but --
15  well, let me put it this way:  When did you first become
16  aware of Mr. Grove's accident?
17   A.  When I received a from Roxanne Sinz when
18  an OSHA inspector visited our office.  That would be in,
19  I guess, February.  I think February of 2003.
20   Q.  You know, I won't -- I won't hold you to specific
21  dates.  I understand this is now we're talking about
22  four years ago, and so, I mean, there is some paperwork
23  that OSHA came out and inspected the premises in March.
24       They may have been out in February also.  But I
25  understand that if you are just recalling to the best of

Page 11

1  your recollection that's okay too.  I don't --
2   A.  I do certainly recall Roxanne Sinz calling me to
3  say that there were a couple of OSHA inspectors in her
4  office and asked me if I knew about, as I recall, she
5  said a ladder, a broken ladder.  That is my recollection
6  of it.
7       A ladder had broken and somebody had been hurt.
8  I was asked by Roxanne, Roxanne Sinz if I knew anything
9  about it, and I didn't.
10   Q.  Who is Roxanne Sinz?
11   A.  Roxanne was the public relations consultant for
12  Unocal.  And I think maybe a week or so before the
13  inspectors visited the office, she was given
14  responsibility for managing the office.
15   Q.  And as the building manager, would she be the
16  individual that you reported to as the human resources
17  manager?
18   A.  No.  I reported to the vice-president of the
19  company in Alaska.
20   Q.  Who would that be?
21   A.  A guy called Chuck Pierce.  He was vice-president
22  of Unocal Alaska.
23   Q.  Did he work in the building also?
24   A.  Yes.
25   Q.  Now, can you tell me what a human resources

5 (Pages 8 to 11)

GROVE, ET AL. v. UNOCAL

Page 12

1  consultant or manager's responsibilities would be in
2  your position when you started at the 909 West Ninth
3  Avenue? What were your job duties? What does that
4  mean, human resources consultant?
5      A. We can break it into two things generally. One
6  is getting people into the job, making sure that they
7  have the necessary skills to do the job correctly. My
8  responsibility was to assist my management to do these
9  things well, so I was a consultant advising my
10  management how to do these things well.
11      So recruitment, performance management, making
12  sure that we had good people doing the jobs well, and
13  then, on the other hand, this is my shorthand way of
14  looking at this, you had a responsibility to keep your
15  workforce as a viable unit.
16      So compensation and benefits, things like that, I
17  was involved in generally. Again, providing
18  information, points of view to my management with which
19  to make decisions. There was also a training component.
20      Q. What was the training component?
21      A. Making sure that people are up to speed in their
22  jobs. And also there were certain statutory
23  requirements, you know, for people who worked in
24  safety-sensitive jobs.
25      Q. Well, when you say "worked in safety-sensitive

Page 13

1  jobs," would that entail handouts, lectures?
2      A. The people who worked offshore in our production
3  facilities.
4      Q. When you were human resources consultant, it was
5  not limited to just the building at 909 West Ninth?
6      A. No.
7      Q. Well, were you the human resources consultant for
8  the entire operations in Alaska?
9      A. Yes. That's correct.
10      Q. When you talked about part of the responsibility
11  getting people into the jobs, making sure they had the
12  necessary --
13      A. Recruitment practices.
14      Q. Was that just limited to Unocal employees or did
15  that also involve contractors?
16      A. What we would do with contractors, we would give
17  the companies that employed the contractors a
18  specification saying we were looking at people with
19  these particular -- with a particular background, with
20  particular skills, particular experience,
21  qualifications, because we would be taking these people
22  on for a specific purpose, not core positions identified
23  by Unocal.
24      Q. In terms of the specifications for the
25  contractors, would you also provide them with

Page 14

1  information about how to perform their job --
2      A. Yeah. Generally speaking, there would be job
3  descriptions. Typically, we hired people for specific
4  purposes for a specific project, generally speaking, or
5  for seasonal work, things like that, generally speaking.
6  Or purely on a temporary basis.
7      Q. Well, did you ever have the occasion to hire
8  people to work, say, at the building at 909 West Ninth
9  Avenue?
10      A. Yeah, we hired -- specifically, we hired
11  technicians, engineers, public relations professionals,
12  quite a number of people. And we also hired people to
13  work offshore, in our production platform offshore in
14  Cook Inlet.
15      Q. Here is what I want to know: Let's say you are
16  going to hire some technician to work at 909 West Ninth
17  Avenue. Is there some sort of orientation process they
18  go through to know what they are supposed to do in the
19  building, including checking in, getting keys, where
20  they --
21      A. Yes, there is a safety orientation and then there
22  is a job orientation, yeah.
23      Q. Does the safety orientation include written
24  materials?
25      A. Yeah, there were written materials in terms of

Page 15

1  office evacuation, position of the fire extinguishers,
2  safety zones, procedures in the event of the fire,
3  procedures in the event of an earthquake. I recall
4  these things were all done, the initial introduction to
5  people working in the office. Then there was a more
6  job-based orientation.
7      Q. A job-based, you mean job-based, are you talking
8  about what specifically they are supposed to do?
9      A. What they were required to do, yeah, who else
10  within the department did what.
11      Q. Now, would there ever come an occasion where you
12  have technicians or contractors in the building and they
13  are going to perform some work where they might have to
14  get authorization to do certain work before they did it?
15      A. Yes. Particularly -- are you talking about
16  Unocal employees or contractors?
17      Q. Actually, I was talking about contractors.
18      A. Well, if we were bringing in people to do, say,
19  painting, decorating, electricians coming in to run
20  wiring, yeah.
21      We had asbestos in the building and so we had to
22  be very careful that they didn't disturb any of the
23  asbestos, so there was certainly safety issues. I mean
24  we didn't go through a full-blown Unocal safety
25  orientation, but certainly if there was any safety

6 (Pages 12 to 15)

**Exhibit 16, pg. 6**

GROVE, ET AL. v. UNOCAL

Page 16

1  issues in the area of work, then it would have been
2  pointed out to them.  The main one I can remember is
3  asbestos.
4      Q.  Was there asbestos in the building?
5      A.  Yes.  So you couldn't go tearing up floor tiles
6  and tearing out walls and ceilings and stuff because
7  there was asbestos in there.  So we had to be very
8  careful as to how we would proceed if it involved moving
9  the floor tiles or panels that had asbestos there.
10      Q.  You know, one thing I didn't ask you before, you
11  said you started in '99 as a human resources person at
12  the Unocal building.
13          Could you just briefly give me a background of
14  your education and experience and the jobs you had with
15  Unocal up until --
16      A.  With Unocal?  My education?  I have a degree in
17  psychology that I got in 1966 at the University of
18  Aberdeen.  I worked for the British Steel Corporation
19  for ten years, during which I picked up a diploma in
20  management studies at the University of Strethclyde.
21  That was a four-year part-time course in the evenings.
22          I picked up the diploma in personnel
23  administration from the College of Commerce in Glasgow
24  in 1971 I think it was.  I subsequently became a member
25  of the Institute of People and Development through

Page 17

1  examination and experience.  I joined Unocal in 1976
2  after ten years with British Steel.
3      Q.  And did you always work in like the human
4  relations area?
5      A.  When I worked with British Steel, I actually
6  worked in operations for a while, but with Unocal, it
7  has always been in human resources, yeah.
8      Q.  When you say "Unocal," what was the name of the
9  entity that you were actually working for?
10      A.  When I started, I was working for Union Oil
11  Company of Great Britain.  That was the original
12  company.
13      Q.  And then --
14      A.  Then I think we had all the -- that was Union Oil
15  Company was the parent company.  Then we had the raid on
16  the company by T. Boone Pickens back in the early
17  eighties maybe, and they changed the name to Unocal.
18      Q.  I think the court reporter didn't hear that, and
19  I didn't hear it completely, the name that raided the
20  company?
21      A.  I forgot there was a recorder.  T. Boone Pickens.
22  And this is in the early eighties, and Union Oil Company
23  changed its name to Unocal at that time.  And the
24  company that I worked for became Unocal U.K.
25      Q.  Unocal U.K.  Okay.  What was the name -- so at

Page 18

1  some point you transferred from Great Britain to
2  America?
3      A.  No.  Well, first of all in 1991, I transferred to
4  Unocal Thailand.
5      Q.  Uh-huh.
6      A.  Where I spent eight years.
7      Q.  So that would get you to '99.  Is that when you
8  transferred to Alaska?
9      A.  Yes, May the 1st of 1999.
10      Q.  What was the name -- do you recall what the
11  entity was that you were working for in Alaska?
12      A.  Unocal Alaska, part of the Unocal Corporation.
13      Q.  Do you know where an entity called Unocal 76,
14  Inc. is?
15      A.  That sounds like the holding company that's
16  probably based in Delaware, or maybe I should not say
17  based.  Registered in Delaware.
18      Q.  Have you heard of an entity called Unocal Alaska
19  Resources, Inc.?
20      A.  No, I have not.  Well, I have to say I have not
21  heard that name, no.
22      Q.  When you first went to work at 909 West Ninth
23  Avenue, did you have an orientation in the building?
24      A.  Yes, I was given a safety orientation by the then
25  office manager.

Page 19

1      Q.  Who was that?
2      A.  I am struggling with his surname.  His first name
3  was Eddie.  I think his sir name was Barrett, but I may
4  be --
5      Q.  There was an individual named Eddie Barrett.
6  Does that ring a bell?
7      A.  Yes, that would be the man, yes.  He was the
8  office manager and he had working for him at the time
9  Charles Arnett.
10      Q.  Did either -- so did Charles Arnett report to
11  Mr. Barrett or report --
12      A.  He reported to Eddie Barrett, yes.
13      Q.  When you had the safety orientation, did they
14  take you around the --
15      A.  They took me around the building.
16      Q.  Did they take you --
17      A.  Showed me how to get out, where the fire
18  extinguishers were.  In fact, they were friendly with me
19  because we would talk about the safety systems in the
20  office, the damage system and also the dial-up system,
21  so if there was an alarm, then there was also dial-up to
22  Eddie Barrett and also a dial-up to the fire.
23      Q.  During your orientation, did they take you up to
24  what they call the penthouse?
25      A.  Yes.

Exhibit 16, pg. 7

GROVE, ET AL. v. UNOCAL

Page 20

1  Q. Did you go through the penthouse?
2  A. Yes, I went through -- they showed me -- what do
3  you call it -- the big tunnel with switches on it, and
4  they showed me the boilers for the heating system.
5      They showed me where there was an air intake,
6  where the fan was that made sure there was proper
7  ventilation within the office.
8  Q. When you said "they" showed me, do you recall --
9  A. Probably only Eddie. It wouldn't be two of them.
10 I can't remember, to be honest, but I can't remember.
11 But it would almost certainly be Eddie Barrett.
12     MR. THORSNESS: This is John Thorsness.
13 Excuse the interruption here. Just a reminder to wait
14 until Mr. Cohn finishes his question, and that also will
15 help you focus on the question itself and answering the
16 question as put to you.
17     I'm sure Mr. Cohn will appreciate if you
18 limit your answer to the question, and, like I said,
19 make sure to let him finish. Thanks.
20     THE WITNESS: All right, John. Thank you.
21 Q. Mr. Cook, when you talked about the orientation
22 up in the penthouse, did they show you the various rooms
23 in the penthouse?
24 A. Yes.
25 Q. Did you have any opportunity -- are you familiar

Page 21

1  with the room that's called the filter room where the
2  air filters are against one wall?
3  A. Yes, I'm familiar with it, yes.
4  Q. Did you have an opportunity to see that room
5  during your orientation in 1999?
6  A. Yes.
7  Q. And when you saw that room during your
8  orientation, can you describe what you saw in that room?
9  A. Well, yes, I think I can. To the right as you go
10 in the door there was -- what would you call it -- bulk
11 head, and then above that I could see louvers, which
12 opened and closed. On the left were filters. That's as
13 I recall that room.
14     I'm trying to think if there was a shaft at the
15 far end of the room. I just can't remember. I think
16 there was a shaft at the far end of the room.
17 Q. Well, when you talk about the wall to the right,
18 did that appear to be sheet metal?
19 A. I'm sorry. I can't remember. I remember it was
20 about eye level for me.
21 Q. Do you recall if there was any sort of a
22 structure affixed to the wall to the right?
23 A. To the right, no, I don't recall that.
24 Q. You don't recall if there was a work platform?
25 A. No. No. I mean, I was able to look up at an

Page 22

1  angle over, I would call it bulk head or whatever, and I
2  could see the louvers. That's my recollection of what
3  was in that room.
4  Q. Levers?
5  A. L-o-u-v-e-r-s.
6  Q. And what are those?
7  A. Well, these are essentially slats of plastic or
8  wood that swivel so that at one point they can be
9  completely closed so that no air is coming in or they
10 can be at right angles to that so that as much air as
11 possible is coming in.
12 Q. When I refer to the filter room, is it your
13 understanding that that's the room where Mr. Grove had
14 his accident?
15 A. If he was changing the filters, my understanding
16 is, yes, that's where he would have had his accident.
17 Q. So have you at any time ever seen the elevated
18 work platform that was in the filter room?
19 A. I have not.
20 Q. Have you had any knowledge of that work platform?
21 A. No, I have no knowledge of it.
22 Q. Do you have any knowledge of who owned that work
23 platform?
24 A. No.
25 Q. Or who built that?

Page 23

1  A. No, I have no knowledge.
2  Q. Previously we were asking -- I was asking you
3  questions regarding what contractors could do in the
4  building.
5  A. Correct.
6  Q. In terms of building an elevated work platform,
7  when you were human resource consultant or manager from
8  '99 to 2003, would the contractor have to get
9  authorization or approval from Unocal to construct such
10 an apparatus?
11 A. To construct such an apparatus? Let me see.
12 Need approval from Unocal?
13 Q. What was that?
14 A. I'm trying to formulate an answer. I'm sorry.
15 The question is would they require permission from
16 Unocal?
17 Q. To erect a work platform in the Unocal building
18 that includes brackets with nuts and bolts and affixing
19 it to the wall.
20     MR. THORSNESS: Objection here to foundation
21 and calls for speculation. Thank you.
22 Q. Mr. Thorsness may object from time to time, but
23 you can still answer the question. He is just
24 preserving objections for the record.
25 A. I don't know the answer. I don't know the

8 (Pages 20 to 23)

**Exhibit 16, pg. 8**