```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3

 4   LAWRENCE H. GROVE, CYNTHIA
     GROVE, SARAH GROVE, and
 5   MICHAEL GROVE (DOB 1/21/88)
     by and through his father
 6   LAWRENCE H. GROVE,

 7            Plaintiffs,

 8      vs.

 9   UNOCAL CORPORATION,

10            Defendant.
     _____/
11   Case No. A04-0096 CV(JKS)

12

13

14       VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE,

15   taken on behalf of the Defendant, pursuant to notice,

16   at the offices of Lane Powell Spears Lubersky, 301 West

17   Northern Lights Boulevard, Suite 301, Anchorage, Alaska,

18   before Gary Brooking, Registered Professional Reporter

19   for Alaska Stenotype Reporters and Notary Public for the

20   State of Alaska.

21

22

23                                      Exhibit 17, pg. 1

24

25
```

Page 2

**Page 129**

1  Q. And when did you first tell them about it?
2  Was -- was --
3  A. The next morning you're required to report
4  any injuries.
5  Q. September 10th?
6  A. Yes.
7  Q. Is the -- this report of occupational injury
8  or illness, would that be the document that you filled
9  out for the first time to report this incident?
10  A. Yes. That's my handwriting.
11  Q. And that's dated September 10th, '02?
12  A. Tenth, right.
13  Q. And this -- under description of how injury
14  or illness happened -- says, changing filters at
15  customer building site. Center support gave way.
16  Fell seven feet to concrete floor. Landed on right
17  foot.
18     That's consistent with what you testified to
19  today?
20  A. Yes.
21  Q. When you got to the site on September 10th,
22  was that -- was the planking still on the floor?
23  A. The way I got out of there is the way it was
24  left.
25  Q. It was left that way?

**Page 130**

1  A. Yes. After OSHA inspected it, it all
2  disappeared.
3  Q. After they inspected it?
4  A. Well, after OSHA showed up, it was all gone
5  after that.
6  Q. Okay. We -- do we know whether it was left
7  the way it was when OSHA looked at it?
8  A. I'm -- I wasn't there when OSHA was there.
9  I'm assuming it was just the way it was after the
10  accident.
11  Q. Okay. Did you tell your employer that --
12  either Mr. Sietz or Mr. Leverette (sic), did you tell
13  them that this -- this scaffolding had busted, gave
14  way?
15  A. Yeah. They had -- they read the report.
16  They --
17  Q. This is what you wrote --
18  A. Yeah.
19  Q. -- but did you have conversations with them
20  about that?
21  A. Nothing in any real depth, no.
22  Q. No. Did they follow up with you after you
23  had -- I mean, did they -- to your knowledge, do you
24  know if they followed up with Unocal at all?
25  A. I have no idea what happens between

**Page 131**

1  management and -- and the customers. That's
2  privileged information, though.
3  Q. If you go on a job site and determine that a
4  piece of equipment is necessary to perform duties, do
5  you fill out a purchase order or request for money
6  to -- to buy a piece of equipment?
7  A. Yes. You're required to do that. To buy
8  anything, you must fill out a purchase order.
9  Q. And would you be the guy, as a lead man, or
10  can any other field union guy fill out a purchase
11  order request?
12  A. I would request one from the office. They
13  would give me a purchase order number, ask me what
14  vendor it was, what the item was and what the cost of
15  the item was. And they would give us the purchase
16  order number. We would give it to the vendor. We
17  would just bring the paperwork back to the office and
18  file it.
19  Q. And so Siemens would -- Siemens would --
20  would purchase the equipment under those
21  circumstances, and then you would take the equipment
22  and bring it to the job site? Is that the way it
23  would work?
24  A. Yes.
25  Q. Okay. And are there cases where you would

**Page 132**

1  take equipment and -- and actually install it at the
2  job site?
3  A. Motors, belts, replacements, yes.
4  Q. Okay. You ever installed anything else at a
5  job site, other than motors and belts and
6  replacements?
7  A. Yes. But I mean --
8  Q. Have you installed -- have you installed,
9  like, temporary stairs, for example?
10  A. No. That's not our -- that's not our
11  expertise. We don't get involved in that.
12  Q. Would you ever install anything to aid or
13  assist you in performing HVAC services?
14  A. As specifically what?
15     MR. COHN: Object.
16  BY MR. MARTIN:
17  Q. Well, like stairs, like scaffolding.
18  A. No.
19  Q. You have never done that?
20  A. I have never done that. In general, we get
21  on the job. When I worked for CR Lewis, they already
22  had -- the contractor already had scaffolding to it.
23  I have used scissor lifts. But scaffolding is
24  generally put up by a scaffolding contractor on a
25  project.

Exhibit 17, pg. 2