Page 24

1  answer. I'm sorry.
2  Q. Well, who would be the person that a contractor
3  would need to go to to get permission to do work?
4  A. For something like that, it would go to our
5  engineering department.
6  Q. The engineering department. And there was an
7  engineering department in the building?
8  A. Yes.
9  Q. Do you know who was in charge of the engineering
10 department?
11 A. Yes. Scott Hanson was his name. He wasn't all
12 the time, but he was for at least a couple of the years
13 he was the engineering manager. There was another one
14 before him, but I can't remember his name. I'm sorry.
15 Q. Why did you indicate that they would have to go
16 through the engineering department?
17 A. If we were going to be doing structural -- well,
18 if we were doing structural alterations to the building,
19 then we would have had to go through a procedure of
20 getting appropriate designs and quotes and all of that
21 kind of stuff.
22     I certainly would not be qualified to say whether
23 something was structurally sound or not. But generally
24 speaking, if we were employing contractors to do work,
25 then they would be qualified to do that kind of work.

Page 25

1  Q. Well, I understand you say "qualified." You mean
2  qualified to do that kind of work you mean erecting like
3  an elevated work platform?
4  A. Sure. I would expect, for example, if we were
5  employing painters, let's say, I would expect the
6  painters to bring along appropriate equipment with which
7  to access the workplace.
8  Q. Well, let me ask you this: If the painters would
9  have to bolt a platform to the wall, then that includes
10 screws or bolts into the wall, would they need to get
11 authorization or approval from Unocal?
12     MR. THORSNESS: Objection; foundation.
13 Q. If you have personal knowledge of it or if you
14 don't, who would have, do you know, who would have the
15 knowledge of that answer?
16 A. I don't. I'm sorry. Could you rephrase the
17 question?
18 Q. That's fair enough. You indicated that you would
19 assume or expect that the painters would bring what they
20 need to do their job.
21 A. Yes. I mean I would think. If we were -- I
22 know. I mean, if we were asking decorators, let's say,
23 to come into the building to do work, we would expect
24 them to bring their equipment with them.
25     If an electrician was coming in to do some

Page 26

1  wiring, we would expect that person to bring his
2  equipment with him.
3  Q. Did you have the opportunity to see the
4  contracts, let's say, between the electricians and
5  Unocal -- I mean to the contractors -- let me start
6  over.
7      For contractors that came into the Unocal
8  building to do work in the building, would the contracts
9  be something that you would get a copy of or review?
10 A. Yeah. I mean there was kind of a safety review,
11 I think, as I recall, where contractors had to provide
12 safety certificates. And let's see.
13     There was a procedure that we had to go through
14 indicating whether the work was giving a level of risk
15 for the worker that had to be carried out, and it went
16 past the safety department. And the contractors had to
17 provide certificates of insurance, so there was a
18 procedure for new contractors, yes.
19 Q. And I think earlier you indicated that the job
20 specifications would be -- there would be job
21 specifications for the contractors?
22 A. It would depend. Certainly, I mean if we were
23 bringing in a contract, let's say, petroleum engineer to
24 work on a prospect, then there would certainly be a
25 detailed job description. Certainly coming in to do

Page 27

1  painting and decorating, there wouldn't be, no.
2  Q. In terms of a contract, do you have personal
3  knowledge -- well, you have dealt with contracts, is
4  that correct, between -- you have seen contracts at
5  least between Unocal and contractors?
6  A. Yes.
7  Q. Would you expect that in the contract the
8  responsibility for providing certain equipment would be
9  laid out in the contract?
10     MR. THORSNESS: Objection; speculation and
11 lack of foundation.
12 Q. To the best of your personal knowledge?
13     MR. THORSNESS: Same.
14 Q. You may answer, if you can.
15 A. Well, I won't answer because of the objection.
16 Q. The objection doesn't mean that you don't answer.
17 It means he is preserving it for the record.
18     MR. THORSNESS: Archie, the objection is for
19 the record; however, you cannot be compelled to guess or
20 to speculate about something you don't know about, so if
21 you know the answer to the question, then, of course,
22 answer the question.
23 A. I would be speculating, but it would be an
24 informed guess. Then I won't speculate.
25     MR. THORSNESS: Okay. Because you cannot be

Page 28

1 compelled to speculate, and so that's the nature of my
2 objection. Thank you.
3   Q. Well, you indicated an informed -- let me ask you
4 what you mean by an "informed guess"?
5   A. Well, what I would say is that it would be an
6 exception, you know, if Unocal would have to provide
7 something for contractors.
8      Generally speaking, contractors would provide the
9 necessary equipment. Now, if there was an exception to
10 that, it would be in the contract. That would be my
11 understanding.
12  Q. What is the basis of your understanding?
13  A. Well, like I said, because generally speaking --
14 well, in the nature of the contract, it would bring
15 somebody in to do work and they would provide their own
16 materials generally. That is what contractors do.
17  Q. Well, let me ask you this: When a painter comes
18 in and maybe puts up scaffolding to paint the building,
19 is it your understanding that the scaffolding doesn't
20 stay affixed to the building permanently?
21  A. That would be correct, yes.
22       MR. THORSNESS: Objection to form of the
23 question and, again, speculation and lack of foundation.
24  Q. Now, would you agree that the contract is the
25 primary document that would control the responsibility

Page 29

1 of the contractor in Unocal over who would have the duty
2 to provide certain equipment?
3       MR. THORSNESS: Objection; lack of
4 foundation, and calls for a legal conclusion from this
5 witness.
6   Q. You can answer, if you can.
7   A. No. This question is taking an awful long time.
8 I don't know where it is leading.
9   Q. Well, I'm not trying to trick you and it is not
10 meant to lead anywhere. I'm just trying to find out
11 what you know or don't know because that's what the
12 purpose of the deposition is to find out --
13  A. I am trying to answer as fully and, obviously,
14 truthfully as I can.
15       MR. THORSNESS: Mr. Cohn, please do not
16 argue with the witness. Ask him a question. He'll
17 answer it if he can.
18       MR. COHN: John, I haven't been arguing and
19 I have allowed you fair leeway to --
20       MR. THORSNESS: If he doesn't understand the
21 question, he will ask you to rephrase it.
22       MR. COHN: I have been giving you leeway to
23 discuss certain items in terms of the questions that
24 might be leading him to the answer that he is going to
25 give, but so be it. Let's go on.

Page 30

1   Q. So you don't have any knowledge of how long that
2 work platform was in the filter room; is that correct?
3   A. That's correct. I have no knowledge of it
4 whatsoever.
5   Q. You first learned about the accident from Roxanne
6 Sinz?
7   A. Yes.
8   Q. And what did Roxanne Sinz tell you?
9   A. She called me from her office to say that, I
10 believe, two OSHA inspectors were in her office and they
11 had come to see her about unsafe equipment within the
12 filter room.
13      And that was the main thing that she mentioned,
14 as I recall. There was unsafe equipment, I think is
15 what she talked to me about.
16      As I recall what happened was that a Siemens
17 employee had come in to do some work and had complained
18 to OSHA about unsafe equipment in that particular room
19 and that was the reason that they had come to the
20 office. That was my recollection of it.
21  Q. Who gave you that information, do you recall?
22  A. I got that -- Roxanne Sinz called me. That's
23 what she said that the OSHA inspectors were there for.
24  Q. Did you, yourself, ever talk to any of the OSHA
25 inspectors?

Page 31

1   A. No, I did not. I did not talk to them, to answer
2 your question, no.
3   Q. Did you provide any information to OSHA in regard
4 to their investigation of the accident?
5   A. None whatsoever.
6   Q. Are you aware as to whether or not Unocal
7 conducted safety meetings for the office or maintenance
8 staff prior -- from the time that you came on in 1999
9 through 2002?
10  A. Specific safety meetings?
11  Q. For the office or management staff.
12  A. What I would say is -- the answer to that is no,
13 we didn't have specific safety meetings because most of
14 the time, for most of my four years there, there was
15 myself, Charles Arnett, two of us.
16      And we met almost on a daily basis, so I would
17 say the answer to your question is no, we didn't have
18 specific safety meetings, time set aside to discuss
19 safety and only safety, but we met almost on a daily
20 basis.
21  Q. When you say "on a daily basis," you and Charles
22 Arnett?
23  A. Yes. Shortly after I was there, there was a
24 round of cost cutting within Unocal and we let Eddie
25 Barrett go.

Page 32

1   Q. That's shortly after you arrived?
2   A. Maybe -- I can't remember the exact time. It
3   seemed like maybe six months, six to nine months
4   possibly.
5   Q. Do you recall if there were any periodic safety
6   inspections of the building at 909 --
7   A. Yes, there were.
8   Q. I'm sorry. Just please let me finish the
9   question first.
10  A. Okay.
11  Q. I mean, I was almost done. Were there periodic
12  safety inspections --
13  A. Yes.
14  Q. -- of the building from the time that you arrived
15  in 1999 through 2002?
16  A. Yes.
17  Q. What did these periodic safety inspections
18  entail?
19  A. Involved one of our safety technicians going
20  around the office looking for safety hazards.
21  Q. Were you the person that oversaw or supervised
22  the safety technicians?
23  A. No. We had a health and safety and environment
24  manager.
25  Q. Who was the health and safety environment

Page 33

1   manager?
2   A. Well, that's a complicated question because it
3   changed.
4   Q. Well, I guess if there were several, to the best
5   of your recollection.
6   A. First of all, the environmental department was
7   the safety -- was a separate department. Anyway, I mean
8   it was a person called Harry Eaton who was in charge of
9   safety, health and environment.
10  Q. Was he there when you got to Unocal?
11  A. He was based in Kenai when I first got to Alaska.
12  Q. Do you recall if he worked in the building at 909
13  West Ninth at any time between '99 and when you left?
14  A. He had an office there, but I think his normal
15  place of work was the Kenai office.
16  Q. But to the best of your understanding, if safety
17  technicians did periodic checks in the building, that
18  would be under the authorization of the health and
19  safety environment manager?
20  A. Yes. The safety technicians were based in Kenai,
21  but at least on two occasions that I can recall, one of
22  them came to Anchorage, to the Anchorage office and did
23  a safety inspection.
24  Q. Did you observe the safety inspection at all?
25  A. I didn't observe the inspection. I saw the

Page 34

1   report.
2   Q. You saw the report?
3   A. Yes.
4   Q. And can you tell me how detailed the report would
5   be?
6   A. I mean it was basically telling us what things
7   were hazardous or potentially hazardous and potentially
8   needed fixing.
9   Q. Do you recall if that report encompassed the
10  entire building from -- I am not sure. Is there a
11  basement in the building?
12  A. Yes, there is.
13  Q. From the basement all the way to the top level of
14  the building?
15  A. Yes. Well, I'm sorry. I mean, I can't remember.
16  Q. That's okay if you can't remember completely.
17  A. I can't remember whether it covered -- the safety
18  inspection from a qualified inspector, that's about as
19  much as I can remember. Sorry.
20      I mean what he did was he focused on things that
21  we had to fix.
22  Q. Well, is it your understanding -- I mean to the
23  best of your personal knowledge, would that individual
24  go and check each room in the building?
25  A. Yes, to the best of my understanding.

Page 35

1       MR. THORSNESS: Objection; foundation and
2   speculation.
3   Q. That's okay. What is the basis of your
4   understanding? Can you tell me? Would it be from
5   review of the report?
6   A. Say it again, please.
7   Q. What would be the basis of your understanding
8   that the safety technician would check each of the rooms
9   in the building?
10  A. My understanding is that he was brought up to do
11  a safety inspection. I would expect him -- it's an
12  expectation rather than knowledge -- that he did check
13  every nook and cranny within the office.
14  Q. And do you know how frequently -- how many of
15  these inspections are you aware of occurring during your
16  period of time at the building?
17  A. I am aware of two, to the best of my
18  recollection.
19  Q. And do you recall the name of the safety
20  technician that would have done this report?
21  A. I think Ken Burns did at least one of them.
22  Q. Who is Ken Burns?
23  A. Ken Burns is a safety technician.
24  Q. And this safety report, do you recall --
25  A. Well, I can tell what we wanted from the report

### Page 36

1  was an indication of any violations of standards or an
2  indication of any hazards, actual or potential. That's
3  what we would expect from a report.
4      Q. Now, would these reports be, to the best of your
5  knowledge, would these reports be retained by Unocal for
6  a period of time?
7      A. Yes.
8      Q. Do you know if there is any like record retention
9  policy in regard to --
10     A. Yes, there was a records management program.
11     Q. A records management program in terms of how long
12  records would be stored or kept?
13     A. Yes, there was a Unocal standard. I believe
14  there was a Unocal standard, and we had a group of
15  people working on that during my time there.
16     Q. Well, do you recall how long the records would be
17  kept?
18     A. No.
19     Q. Would records like, for example, let's take for
20  example the safety report. To the best of your
21  knowledge, would that record still be in existence today
22  if it was done during your tenure?
23     A. I don't know.
24          MR. THORSNESS: Objection; speculation.
25     Q. Now, who would know about the -- who would I ask

### Page 37

1  if I needed to find out about the record retention
2  policy?
3      A. I don't know. Oh, the policy? It's a written
4  policy. But the person who was running the project was
5  a contractor and when the project ended, she left the
6  company. She moved on to something else.
7      Q. Well, when this project, ended left the company,
8  but are you saying that after that person would leave
9  there would be nobody --
10     A. Well, that's when I left, so I don't know who
11  looks after that now.
12     Q. That's fair enough. Did you ever have any
13  discussions with any other Unocal personnel regarding
14  the OSHA investigation, besides the initial one you told
15  me about with Roxanne Sinz?
16     A. Yes. I mean I knew about it because after the
17  OSHA inspectors arrived at the -- there was a management
18  meeting every week and the first item on the agenda was
19  a safety item, and any incident, no matter how minor,
20  was reported at that meeting.
21          And Roxanne Sinz reported that the OSHA
22  inspectors had been in her office and that there was a
23  problem with, what I understood, to be a ladder. From
24  reading the report, seems a work platform.
25     Q. Do you recall if there was any -- it sounds like

### Page 38

1  you might not, but I'll ask you anyway. Do you have any
2  knowledge of what happened to that work platform?
3      A. No.
4      Q. Did you hear from any individual in regard to
5  what happened to that work platform?
6      A. It was reported, I think, because there had been
7  an incident. And as I recall at the following meeting
8  there was a follow-up.
9           And my recollection from the meeting was that
10  whatever it was, the ladder or the platform or whatever,
11  had been made safe. That was my understanding.
12     Q. In the follow-up meeting, they indicated the
13  platform had been made safe?
14     A. Well --
15     Q. I'm just asking. If I misstated what you said --
16     A. I really can't remember. When you asked me if I
17  had ever discussed it with anybody, I was present at a
18  management meeting in which the issue was discussed.
19          Roxanne Sinz would have been the responsible
20  party to take appropriate action to square things away.
21     Q. Do you recall who else would have been at this
22  management meeting?
23     A. Oh, there would be the operations manager.
24     Q. Did you say "operations"?
25     A. Yes. The operations manager, the legal counsel,

### Page 39

1  Roxanne Sinz. There would have been the asset managers.
2      Q. Did you say "asset"?
3      A. Asset managers, the safety managers, the
4  accountant, and business development.
5      Q. When you said "safety manager," would that be
6  what would be referred to as the health, safety and
7  environmental manager?
8      A. Safety, health and environment.
9      Q. Do you recall if Ken Burns was at that meeting?
10     A. No, he would not be at that management meeting,
11  no.
12     Q. Would Harry Eaton have been at that meeting?
13     A. Yes, he would have been.
14     Q. Mark Bond?
15     A. I mean, I can't remember if they were all there,
16  but they were regular attendees.
17     Q. Would Charles Arnett have been at that meeting?
18     A. No.
19     Q. Was Charles Arnett a Unocal employee?
20     A. No. He came to us from Peak. I think it was
21  Peak, so he was a contractor.
22     Q. What was Charles Arnett's duties?
23     A. He was the -- what we called the coordinator, the
24  maintenance coordinator, so his job basically was to
25  bring in contractors on a certain maintenance schedule

Page 40

1  to do work.
2      So I mean Unocal's strategy was that these kinds
3  of tasks were not part of our core business, so whenever
4  we had building maintenance work to be performed such as
5  elevators, such as fire extinguishers, such as the HVAC
6  system, we would bring in specialist contractors to do
7  that work.
8      And Charles was responsible for coordinating the
9  maintenance work. So he didn't do the work himself. He
10 would oversee what was going on with particular
11 reference to asbestos because he was a trained asbestos
12 technician.
13 Q. Okay. Would the -- he was the coordinator for
14 maintenance. What would be the involvement -- would
15 there be any involvement of the health and safety and
16 environmental manager when these contractors were
17 brought in?
18 A. Well, I mean at the initial stage, if we were
19 bringing in a new contractor, all the contractors had to
20 go through a screening process that we talked about in
21 the beginning of our interview.
22 Q. Did you hear anything about the resolution of the
23 OSHA investigation?
24 A. No. I have no information.
25 Q. You are not aware if any citation was issued?

Page 41

1  A. I don't know. No, I'm not aware of it. No.
2  Q. Are you aware as to whether any Unocal individual
3  directed Paul Crapps to remove the work platform?
4  A. No, I am not aware of that.
5  Q. Did you know Paul Crapps?
6  A. Yes.
7  Q. What was Paul Crapps' position at the time you
8  were there?
9  A. Paul was what we called a temp, shorthand for
10 temporary worker. Because we were going through a
11 fairly major reorganization of the business unit,
12 involving the closure of the Kenai office, moving people
13 from Kenai up to Anchorage, reorganizing the functions,
14 we had to move people around.
15     I mean, we had previously given notice to the
16 tenants that used to occupy the fifth floor and we made
17 provision for Cook Inlet Pipelines to come and occupy at
18 least part of the fifth floor.
19     And so we felt that between Charles and myself,
20 Charles Arnett and myself, we could handle most of
21 routine stuff that went on in normal circumstances
22 because of all of the stuff going on, that we had to
23 bring in somebody to give Charles some help, because he
24 had other duties, supplying paper to the photocopiers
25 and toner and stuff like that.

Page 42

1      And so Paul Crapps was a temp. We had used him
2  several times. He would come in for special projects,
3  come in as a laborer. And we were impressed by what we
4  saw, a very able guy and, you know, so if we see
5  somebody working well, showing a good attitude, then
6  it's a very good recruitment tool. It is possibly the
7  best recruitment tool you can find.
8      So he worked for us for a few times. And then
9  generally he would be our temp of choice to help
10 Charles.
11 Q. Now, in terms of what help he provided to
12 Charles, would Charles be the person that could best
13 answer that question?
14 A. Yes, I think so.
15 Q. In terms of the work platform, do you have any
16 understanding of what knowledge Charles would have of
17 the work platform?
18     MR. THORSNESS: Objection; speculation and
19 foundation. You are asking him to surmise what another
20 person knows.
21     MR. COHN: Well, I'm asking him if has any
22 personal knowledge as to whether Charles was aware of
23 the work platform before the accident involving
24 Mr. Grove.
25     MR. THORSNESS: That's a different question,

Page 43

1  and I have no objection to it.
2      MR. COHN: I did rephrase it. I'm sorry.
3  This is clearer.
4  A. Would Charles have known about the work platform?
5  Well, I mean, I don't know. It is my deduction he would
6  know because I think, I mean, a lot of the work that
7  Siemens did for us on the HVAC site, that was done after
8  hours because, obviously, when people were working we
9  wanted our building to be properly ventilated and
10 heated, so any work that the Siemens maintenance people
11 did for us would be after hours, after normal office
12 hours, you know, as a matter of safety.
13     And unless there were two of them from the same
14 company, then Charles Arnett would be present. Bear in
15 mind, he was a qualified asbestos technician, so I mean
16 he was always there making sure that nothing containing
17 asbestos gets damaged or moved.
18     MR. THORSNESS: Michael, excuse me. Archie,
19 excuse me. Archie, we have been going a little over an
20 hour and it's sort of our custom and practice to take a
21 break every hour.
22     MR. COHN: Sure, that's fine. We can take a
23 break. I'm not going to go too much longer with
24 Mr. Cook.
25     THE WITNESS: I would just as soon keep

Page 44

1  going. I'm going out tonight playing bridge, so I would
2  like to get this done.
3       MR. THORSNESS: Archie, that was my next
4  question, and so we'll continue. I just wanted to give
5  you a chance to take a potty break. You don't need one,
6  so let's continue. If you do need a break --
7       THE WITNESS: I will let you know.
8       MR. THORSNESS: Very good.
9  BY MR. COHN:
10     Q. Let me ask you, just to be sure, how soon do you
11 need to leave? I don't want to impinge upon your time.
12     A. I am not -- I am playing bridge at 7:00. I have
13 got plenty of time.
14     Q. If we take a break, it will be only a couple of
15 minutes. I don't mean by that question to try and find
16 out so that I can make sure that I use up every second
17 even if I don't need to.
18        Let me just go through a few names here. I have
19 seen in some discovery responses the name of
20 Mr. Congail. Are you familiar with him?
21     A. He was my predecessor, a wider responsibility
22 than I had because he was also responsible for the
23 chemical plant in Kenai, but he was my Unocal
24 predecessor.
25     Q. Did Mr. --

Page 45

1      A. Subsequently, I reported to him functionally. He
2  was based in Houston and I reported to him for human
3  resources issues.
4      Q. Did Mr. Congail, did he give you any orientation
5  when you replaced him in the job responsibilities as
6  human resources manager?
7      A. By telephone. He was based in Los Angeles at the
8  time. So when we spoke by telephone -- and there was
9  actually a contractor in place who showed me what he had
10 been doing. I can't remember his name. I'm sorry.
11     Q. So you mean a contractor at the building that
12 showed you --
13     A. There was a contractor who was filling the HR
14 role.
15     Q. Was there any sort of a written description of
16 what your job duties would be as the HR manager?
17     A. Yes, I had a job description. Yeah, I mean in
18 fact I was asked -- I was given it and asked to comment
19 and make suggestions for change. I don't still have it,
20 but, yes, I remember that.
21     Q. To make suggestions for change?
22     A. For the job description, whether I thought that
23 they were hitting the right priorities.
24     Q. Did you ever have any contact with Mr. Don Acres?
25     A. No. Well, hold on.

Page 46

1      Q. Let me just describe it.
2      A. Only socially.
3      Q. Because I am not sure -- he may have been --
4  because it indicates in response that he was a building
5  service manager during the eighties and nineties, but
6  that might be well before you came on.
7      A. Yeah, I have met him, but only socially. At
8  least I think I met him.
9      Q. Do you know an individual named Tim Brandenberg?
10     A. Yes.
11     Q. Who is Tim Brandenberg?
12     A. Who is he? Tim was a coordinator and then in the
13 office -- the reorganization of the business unit in the
14 first quarter of 2003, he became the logistics manager.
15 He would be responsible for purchasing, procurement for
16 the helicopter contract and for the contract with the
17 boats. And other duties I don't know about them.
18     Q. Contract with who?
19     A. With the vessels, the ships.
20     Q. Was he --
21     A. The supply vessels.
22     Q. Was he based in the building at 909 West Ninth
23 Avenue?
24     A. Yes.
25     Q. You said he was involved in purchasing. If there

Page 47

1  was any supplies or anything needed for the building --
2      A. No, there are different things. I mean, he would
3  be -- his main job would be for the procurement of heavy
4  equipment used in operations for the drilling program.
5         We had it set up, as I recall, so that
6  departmental secretaries could order in their own
7  stationery and stuff like that or blanket purchase
8  orders.
9         But you have an overall procurement manager. And
10 Tim Brandenberg got that job. I can't remember exactly
11 when, but in the first quarter of 2003.
12     Q. Well, in regard to procurement, let's say, for
13 the building at 909 West Ninth Avenue, and I'm talking
14 about not something like stationery, if you are
15 ordering, let's say, hypothetically if a work platform
16 was to be built in the building, would there be some
17 procurement --
18     A. The way that would work is that there would be a
19 purchase requisition from whoever wanted to initiate the
20 process, whoever wanted to buy something. There would
21 be a purchase requisition, and then that would be
22 translated into a purchase order.
23        Now, if it was office-based materials and I was
24 the manager responsible, then I would sign that -- I
25 would sign that purchase requisition, because I would

Page 48

1  have budgeted for maintenance costs.
2     Q. So if that was like -- if it was considered under
3  maintenance, then that would be -- if it happened during
4  your time period, it would be -- you would be the one
5  that would sign off on it?
6     A. I would sign the purchase order, yes.
7     Q. And that's because that would be the
8  responsibility of the human resources manager?
9     A. Yeah. There were two budgets basically that I
10 was responsible for. One was the human resources budget
11 that included things like training costs, training
12 software, that kind of thing, and the staff costs,
13 Unocal staff.
14      But then that was rolled into Rick's budget
15 because he had become the head of HR domestic. He was
16 based in Houston, so I would send him my budget to be
17 approved down in Houston.
18      And then I had another budget, which was the
19 office budget, so we budgeted for ongoing maintenance,
20 for special projects, just anything connected with the
21 office.
22    Q. And if there were like requisition, purchase
23 requisition forms and purchase orders, where would that
24 paperwork eventually be stored, if you know?
25    A. Well, I mean, I think it would depend. Let's say

Page 49

1  we were -- if it was something for the office and if it
2  was not something that was of a serious contract, if it
3  was a special thing, then I would have to sign the
4  purchase order that would go to the supplier.
5     Q. But is there --
6     A. And the copy order, I mean I could sign it, but I
7  tried to keep my paperwork to a minimum, and it would
8  have been kept within the office, within the maintenance
9  office by Charles Arnett actually.
10       MR. THORSNESS: Excuse me, gentlemen. I
11 object to this whole line of questioning based on lack
12 of foundation and calling for speculation with regard to
13 this specific work platform. Thank you.
14       MR. COHN: Well, John, I understand that the
15 platform was not constructed, or my understanding,
16 during Mr. Cook's tenure, so it is not obviously
17 specific to that.
18       I'm just trying to find out where records
19 would be kept for special projects. We can find out
20 later if records are available for this platform. This
21 is a discovery deposition.
22    Q. So you said there is a maintenance office in the
23 building at 909 West Ninth?
24    A. Yes, Charles Arnett. He was the maintenance
25 coordinator and he maintained like the records, the

Page 50

1  maintenance records. When maintenance work had been
2  carried out, when maintenance work was required to be
3  carried out, that kind of thing, for which we had long
4  running contracts, so that was fairly routine.
5        But Charles, as a contractor, could not sign
6  documents on behalf of Unocal, so if it involved any
7  kind of expenditure, other than expenditure that was
8  already covered by contract, then I would have to sign
9  that.
10    Q. Now, you indicated the maintenance records would
11 be kept in the maintenance office, but let's say after a
12 certain period of time, would records from the
13 maintenance office be, after a certain number of years
14 be moved into another archive?
15    A. Certainly there was a central conglometry of all
16 contracts.
17    Q. Would that be within the building?
18    A. Yes.
19    Q. And would that be -- do you know how far back
20 this central repository would go in terms of records?
21    A. I can tell you that it was fairly late in my time
22 there that we decided to do this. The records at one
23 time had been kept down in various places, were kept
24 down in Kenai, they were in departments, they were in
25 Anchorage.

Page 51

1        And we hired a paralegal. Well, I mean her job
2  had been a paralegal. We hired someone to take
3  responsibility for centralizing all of our contracts.
4  So this was part of a fairly major reorganization of the
5  business unit.
6     Q. So who made the decision to centralize all of
7  these contracts?
8     A. A decision had been made to close the Kenai
9  office and we knew that they maintained contracts down
10 there, so that function was moved up to Anchorage, and
11 so they centralized in Anchorage.
12    Q. Would the contracts -- if one was to look in the
13 archives, how could one find a specific contract? How
14 were they indexed or cataloged, do you know?
15    A. I don't know.
16    Q. Do you know the name of the paralegal that did
17 this work of organizing the documents? I know these
18 questions -- I mean, if you know.
19    A. Tracy, as I recall. Tracy somebody. I'm sorry.
20 I can't remember her second name.
21    Q. You think her first name was Tracy?
22    A. I think so.
23       MR. COHN: Can we just take a two-minute
24 break? And I'm almost done, Mr. Cook. Thank you for
25 your patience.

Page 52

1  (There was a short break.)
2  Q. First, I think I had marked the notice of the
3  deposition as Exhibit No. 1, but I haven't actually
4  entered it into the record. I marked as Exhibit No. 1
5  to Mr. Cook's deposition a notice of taking telephonic
6  deposition of Archie Cook, and that's Exhibit No. 1.
7     Have you seen the notice of taking your
8  deposition, Mr. Cook?
9  A. Notice of taking of deposition. I received an
10 e-mail from Linda Johnson, as I recall, saying that I
11 would be deposed, yes.
12    I'm looking through my e-mails here. A note from
13 Linda Johnson on the 7th of March.
14 Q. When you looked at the safety narrative, you said
15 that was the one -- was it the one document that you --
16 I don't know if it was the only document.
17 A. This is the only documentation I have seen about
18 the incident.
19 Q. And I'm just trying to see --
20 A. A safety narrative by OSHA.
21 Q. Okay. And do you have that in front of you?
22 A. Yes.
23 Q. Does that say -- I just want to make sure I have
24 the right document. On the top it says "Safety
25 Narrative" and above that it says "April 3rd, 2003"?

Page 53

1  A. April the 9th, 2003.
2  Q. April 9th?
3  A. I mean right in the top corner?
4  Q. Yeah.
5  A. It says, "Wednesday, April the 9th, 2003, 8:29
6  a.m."
7  Q. There might be a couple of different safety
8  narratives then.
9  A. The other one says, "Thursday, April the 10th."
10 There is two narratives.
11 Q. I'm just --
12 A. Because I have three pages basically.
13    MR. THORSNESS: Michael, your Bates numbers
14 are on the bottom of these.
15    MR. COHN: But would he have the Bates
16 numbers on his?
17    MR. THORSNESS: Archie, look at the very
18 bottom of these three pages, in bold there should be a
19 number.
20    THE WITNESS: I'll read the numbers out. Is
21 that what you want?
22    MR. THORSNESS: LG --
23    THE WITNESS: LG00749, LG00755, LG00756.
24    MR. THORSNESS: Thank you.
25 Q. Thank you. That actually makes it a lot easier.

Page 54

1  I want to direct you just to the safety narrative, which
2  is LG00749.
3  A. Yes.
4  Q. And at the bottom of it it says there is, about
5  the fourth paragraph from the bottom, it starts off,
6  "The following individuals were interviewed during the
7  inspection process."
8  A. Yes.
9  Q. And it looks like it says -- the last name is
10 Archie Cook, Unocal human resources manager with
11 responsibility for building maintenance for the previous
12 three and a half years.
13 A. Yes.
14 Q. Does that refresh your memory as to whether you
15 were interviewed or not?
16 A. I mean I am sure I wasn't interviewed.
17 Q. But you don't have any recollection of what they
18 asked you or what you told them?
19 A. They did not interview me.
20 Q. Excuse me?
21 A. They did not interview me.
22 Q. Well, were you talked to?
23 A. I got a call from Roxanne Sinz when the OSHA
24 inspectors were in her office. That was the extent of
25 my involvement with them. I suppose they could hear

Page 55

1  what Roxanne Sinz was saying to me. I was not
2  interviewed by the OSHA inspectors. They didn't talk to
3  me.
4  Q. But you said they could maybe hear what Roxanne
5  was saying to you? Were they in the office when she was
6  talking to you?
7  A. Yes, my recollection is that they were in Roxanne
8  Sinz's office when she called me.
9  Q. And her call to you was just to tell you about
10 that there had been an accident?
11 A. It was to ask me if I knew anything about it.
12 Q. Okay. Now, there is a lot of information on
13 here, but I believe you indicated you don't have any
14 personal knowledge of the information that's on LG00749
15 in regard to the removal of the platform?
16 A. No, I have no knowledge, other than what we
17 talked about, that it might have been raised at the
18 management committee that there had been an incident
19 that the OSHA inspectors were involved, so certainly I
20 was aware of it, yeah.
21 Q. Going to LG00755.
22 A. Yes.
23 Q. Do you see under number 23?
24 A. 23.
25 Q. It says, "Employer knowledge: Yes, Unocal

16 (Pages 52 to 55)