Page 58

16:19:30
1  out of hunting. Yeah.
2      Q. Okay. Do those same people show that sort
3  of willingness to go back to work and work? If
4  they're willing to hunt, do they normally go back to
5  work, in your estimation?
6      MR. WEIDNER: Objection: Form of the
7  question.
8      THE WITNESS: You know, that's -- it
9  depends on the -- it depends on the injury and the
10 person. It's too broad of a question. Yeah.
11 BY MS. JOHNSON:
12     Q. But if he's -- if he's able to go hunting,
13 he's able to walk on the foot; is that correct?
14     A. He's able to, yeah. He's able to walk
16:19:56
15 around, actually, yeah.
16     Q. Okay.
17     A. Yeah.
18     Q. And if he was out hunting for seven to ten
19 days, what would you assess his level of activity as?
20     MR. WEIDNER: Objection: Form of the
21 question; foundation --
22     THE WITNESS: Well, you know --
23     MR. WEIDNER: -- incomplete hypothetical
24     THE WITNESS: If he had an in -- so did he
25 go hunting? Right?

Page 59

16:20:18
1      I gave him the injection. It sounds like
2  he went hunting after I gave him the injection.
3  BY MS. JOHNSON:
4      Q. Right before.
5      A. I gave him the injection right before he
6  went hunting.
7      Q. It looks like he went hunting and killed
8  a -- killed a caribou on 8/30/05.
9      A. 8/30/05.
10     Q. Correct.
11     A. Okay. And I --
12     Q. And you saw him 9/2/05.
13     MR. WEIDNER: Objection: Form of the
14 question.
16:20:41
15     THE WITNESS: And I gave him an injection
16 actually on 7/8/05. So I gave him an injection
17 before he went hunting.
18 BY MS. JOHNSON:
19     Q. Okay.
20     A. So he probably benefited from the
21 injection. That probably helped him a little bit,
22 hunting.
23     Q. But it would have been a month later,
24 right?
25     MR. WEIDNER: Objection: Form of the

Page 60

16:20:58
1  question; argumentative.
2      THE WITNESS: Well, yeah, it would have
3  been a month later.
4  BY MS. JOHNSON:
5      Q. How long does a cortisone injection last?
6      A. It can last up to six months. But, you
7  know, based on his previous history, it lasted him
8  only about three or four weeks, I believe. That was
9  before the surgery, though.
10     Q. Okay. So he came back in, he was
11 complaining of a lot of pain --
12     A. Uh-huh.
13     Q. -- and you gave him another injection at
14 that time or not?
16:21:22
15     A. On 7/8/05.
16     Q. Okay. But in September, did you give him
17 another injection?
18     A. September? Let's see.
19     No. I gave him a prescription for some
20 Valium for spasms and also recommended a brace.
21     Q. What kind of a brace?
22     A. AFO brace, rigid ankle brace.
23     Q. And how do you wear a rigid ankle brace?
24     A. Velcro. It's custom-made and uses Velcro
25 to strap it on.

Page 61

16:21:54
1      Q. You wear it inside your boot?
2      A. Inside your boot, yup, or shoe.
3      Q. Okay. Did you recommend that he use any
4  sort of special boots or footwear?
5      A. Anything that can accommodate the brace
6  would be fine, because the brace would be the
7  immob -- you know, the support.
8      Q. Okay. And what would the brace help with?
9      A. Immobilize the ankle. It helps with the
10 arthritic pain that he has, or the pain from his
11 ankle. It just immobilizes the ankle, so it's not
12 being --
13     (Fire drill interruption.)
14     MS. JOHNSON: Can we go off record for a
16:22:23
15 minute?
16     THE VIDEOGRAPHER: We're going off record.
17 The time is 4:22.
18     (Off the record.)
19     THE VIDEOGRAPHER: Okay. We're back on the
20 record. The time is 4:26.
21 BY MS. JOHNSON:
22     Q. Okay. We were talking about an AFO brace
23 to immobilize his ankle.
24     A. Okay.
25     Q. And you wrote in your notes that he doesn't

Page 62

16:26:25
1  have to wear it full time, but should wear it full
2  time to get some of the pain and discomfort to
3  subside; is that it?
4      A.  Yeah. It's just -- it's just a correlation
5  between how much you wear it and how much benefit you
6  get from it.
7      Q.  Okay.
8      A.  Yeah.
9      Q.  And then you also wrote him a prescription
10 for Valium. Why was that?
11     A.  For the spasms that he was complaining
12 about.
13     Q.  Do you have a note in your chart right
14 there, not going through like we did before, but a
16:26:56
15 note in your chart of how many Valium you gave him?
16     A.  It's typically 30. I don't know from
17 memory. Typically, that's kind of my standard
18 amount, is 30.
19     Q.  Okay. And you said you wanted him to use
20 those sparingly?
21     A.  Yeah.
22     Q.  Okay. And why -- why do you recommend...
23     A.  Well, just for all the reasons. It is an
24 addictive thing, and it's something -- and he's --
25 and he's well out from surgery. You know? So if we

Page 63

16:27:23
1  do -- it's not unusual to get some spasm. I don't
2  mind writing pain pills that far out from surgery, as
3  long as it's being used sparingly and I don't see a
4  pattern of addiction.
5      Q.  Okay. The next time you saw him was in
6  October?
7      A.  Yes.
8      Q.  Or was it -- oh, I'm sorry.
9      A.  Yeah. I saw him October 28th. Says he
10 does use it periodically. It does help when his
11 ankle swells. But when his ankle swells he has some
12 trouble with keeping it on. And so it sounds like
13 he's not too crazy about the AFO, but using it when
14 he can. He also is focused on workman's comp
16:28:08
15 retraining.
16     Q.  Okay. What -- what is your opinion about
17 workers' comp retraining? Did you have one?
18     A.  Well, I thought -- yeah. Concerning what
19 he did, I thought it was a reasonable thing to do.
20 And he knew it. He's kind of an older guy, and, you
21 know, and retraining sometimes at that age sometimes
22 is not desirable for either party's -- but, you know,
23 he had his choices, and that was -- and that was this
24 whole workman's comp deal that he was dealing with.
25     Q.  Did he ever tell you that his goal was to

Page 64

16:28:39
1  get back to work?
2      A.  I think that would have been ideal for him,
3  in his mind. I don't recall exactly what he wanted
4  to do, what his personal goals were.
5      Q.  You don't recall asking him that?
6      A.  I don't. I don't, no.
7      Q.  Okay. On September 9th, he had an IME by a
8  Dr. Bryan Laycoe.
9      A.  Okay.
10     Q.  Were you aware of that?
11     A.  No. If I did, I have no recollection of
12 it.
13     Q.  Okay.
14     A.  I do recall, though, he had an IME
16:29:10
15 somewhere along the way, and perhaps it was this one.
16     Q.  Okay. If he told Dr. Laycoe that his daily
17 pain was seven out of ten, would that be consistent
18 with what you saw?
19     A.  Yeah. I would -- you know, everyone's
20 subjective -- I mean, one guy might say it's a two
21 out of ten, and some guy might say it's a ten out of
22 ten. So seven out of ten is -- you know, it's that
23 pain scale we always use. But it doesn't really
24 reflect the level of function of the patient.
25     Q.  Okay. So -- but a seven out of ten,

Page 65

16:29:45
1  normally, isn't that pretty significant pain?
2      A.  It's significant. Yeah, it's significant.
3      Q.  And if he's able to walk around and do
4  chores and go hunting, is that sig -- is that
5  consistent with seven-out-of-ten pain?
6          MR. WEIDNER: Objection: Form of the
7  question.
8          THE WITNESS: If it's a consistent seven
9  out of pain [As spoken], I think it would be hard to
10 go, let's say, hunting or doing your usual routine.
11 Yeah.
12 BY MS. JOHNSON:
13     Q.  Okay. So the next time that you saw him
14 was when?
16:30:16
15     A.  October 28th, 2005. Comes back with his
16 AFO. Okay, we already talked about that.
17     Q.  Yeah, we did that one.
18     A.  Okay.
19     Q.  Sorry.
20     A.  Moving on. January 13th, 2006.
21     Q.  And he says he's still having pain in the
22 anterolateral aspect of his ankle. Is that where you
23 went in and took out the --
24     A.  Yeah. This is the same area. Nothing has
25 changed on this guy.

17 (Pages 62 to 65)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 17 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

**Page 66**

16:30:39
1  Q. Okay.
2  A. It's like every time he comes back, he has
3  pain in the same area.
4  Q. Okay.
5  A. So now it's been a while. It's been
6  probably seven months since I injected him. He says
7  he's going to be doing some walking on a little bit
8  of a trip. He anticipates doing a lot of walking,
9  can he get another injection since he's had good
10 relief in the past.
11     Did I give him injection? Yeah, I did give
12 him an injection in his ankle.
13 Q. Okay.
14 A. And he wanted another pain pill, just in
16:31:04
15 case pain overrides the injection. And I saw that he
16 did not have a refill of Percocet since March of
17 2005, which was quite a while ago, so I did not feel
18 he was abusing it, so I gave him another Percocet...
19 Q. What was it about the anterolateral region
20 that would have caused him continued pain? Did you
21 see anything at this time?
22 A. Well, that's -- that's where the defect on
23 the lateral aspect of the talus radiates. Okay,
24 that's -- that's -- it's right there. It's deep to
25 the skin anterolaterally. That's where the lateral

**Page 67**

16:31:39
1  ridge of the talus is. Yeah.
2  Q. So the next time you saw him was in April;
3  is that right?
4  A. Let's see. Now we're going back to --
5  Q. Oh, I'm sorry. No, the next time that --
6  that --
7  A. Oh, yeah. April, April 28th, that's what
8  I have.
9  Q. Okay. So first, before that, he got a
10 physical capacities evaluation. Do you recall that?
11 A. No. I think I saw something in my chart,
12 from the image, though.
13     MS. JOHNSON: Phil, I'm on your production
14 1044.
16:32:13
15 BY MS. JOHNSON:
16 Q. And the first page --
17 A. Yeah. He got a -- in May of 2006, he got
18 one. Is that the one you're talking about?
19 Q. April 27?
20 A. April 27th, actually. Yeah. Yeah, you're
21 right. Yup.
22 Q. And it says that you referred him; is that
23 correct?
24 A. Yes.
25 Q. Okay. And why did you do that?

**Page 68**

16:32:26
1  A. Basically to see where he was at, as far as
2  how much he can and cannot do.
3  Q. And this was your idea or his?
4  A. I think it was my idea. My idea, because I
5  think -- I think the issue of vocational retraining
6  came up, and I think he -- from my understanding -
7  and I'm no whiz with workman's comp - you've got to
8  have an idea of what you can and can't do with a PC
9  before they kind of know where they can place you or
10 what kind of job or jobs you're qualified for.
11 Q. So did you want this after your surgery,
12 even though he had had one after Dr. Geitz' surgery?
13 A. Yeah. Because, you know, there's been a
14 change, there's been a new surgery, there's --
16:33:08
15 exactly. And to see if he's come along, yeah.
16 Q. Okay.
17 A. See where he was now.
18 Q. And let's see. Again, I know that you're
19 not so focused on range of motion. But one of the
20 things that this showed was that his dorsiflexion had
21 actually gotten considerably worse than when you had
22 evaluated him after surgery.
23 A. Okay.
24 Q. Did you notice that in your exam of him?
25 A. No. No.

**Page 69**

16:33:38
1     You know, at this point, I'm not too -- I
2  don't perseverate too much on the range of motion,
3  because that's not really -- my functional end point
4  is not to get him increased range of motion. My hope
5  is to -- just to get him more functional in terms of
6  pain relief. So I guess depending on what our goals
7  are in his health providing -- I mean, physical
8  therapy is really focused on range of motion, because
9  that's kind of -- kind of what they do. They
10 perseverate on that. But I did not really notice it.
11 Q. Okay.
12 A. And it really wasn't that important to me.
13 Q. In your next exam, which was 4/28 --
14 A. 4/28, yup.
16:34:18
15 Q. -- you said good range of motion. What
16 would be a good range of motion?
17 A. You know what? I don't have that note
18 here. I've got a note --
19 Q. Oh, you don't?
20 A. -- of our encounter. But this is right
21 when we started scanning things in, and I do not have
22 a copy of that note.
23 Q. Oh.
24 A. So if you have it, I would like to...
25 Q. Okay. Let me look.

**Page 70**

```
16:34:54  1      A. Oh, here we go. I got it.
          2      Q. Okay.
          3      A. Yup.
          4         I'm not sure what I meant by good range of
          5   motion. Perhaps, no change from before. It didn't
          6   look extremely stiff. It's not very specific, not
          7   really meaningful. Or it can be meaningful.
          8   It's not rigid.
          9      Q. And you stated he is medically stable; you
         10   again stated that, right?
         11      A. Yeah.
         12      Q. Okay.
         13      A. No change.
         14      Q. "No interval changes," what does that mean?
16:35:26 15      A. Since our last time, the -- compared to the
         16   last time that I saw him - okay - no significant
         17   changes.
         18      Q. Okay. Does that mean that he remained the
         19   same as --
         20      A. Yes --
         21      Q. -- when you last saw him?
         22      A. -- remained the same as before.
         23      Q. All right. And you were interpreting an
         24   x-ray?
         25      A. Yeah. I wanted to see if there was any
```

**Page 71**

```
16:35:46  1   changes. You know, it's been nearly probably a year
          2   since the surgery. I wanted to see if there's any
          3   obvious progress of his arthritis. And it didn't
          4   look that significantly different. Okay? So, at
          5   that point, I decided to get an MRI to see if there
          6   was something occult that I was missing.
          7      Q. Okay, hold on. Back up one second.
          8         Who took the x-ray?
          9      A. Our -- John, our guy.
         10      Q. So you had it here?
         11      A. John, the x-ray guy.
         12      Q. Okay, good enough for me.
         13         And you said: "No progressive arthritis in
         14   the ankle"?
16:36:19 15      A. Yeah. It looked pretty much the same.
         16      Q. And the --
         17      A. There were no significant --
         18      Q. What were you --
         19      A. -- collapse or anything like that.
         20      Q. -- comparing it to?
         21      A. If not -- if not some other x-rays I had,
         22   because, I mean, everything is gone here; I'm not
         23   sure where they went. Maybe there was other stuff.
         24   But probably compared it to other x-rays I had.
         25      Q. Okay.
```

**Page 72**

```
16:36:36  1      A. Okay?
          2      Q. So "no progressive arthritis," does that
          3   mean no arthritis or --
          4      A. No.
          5      Q. -- it --
          6      A. No. No increase. Yeah. No significant
          7   change from the -- from the last...
          8      Q. So you ordered an MRI?
          9      A. Yup.
         10      Q. And when did they -- when was the MRI done?
         11      A. It was done -- oh, let's see here.
         12         May 2nd, 2006.
         13      Q. And who did that?
         14      A. John, the x-ray guy. No, I'm just kidding.
16:37:01 15         HealthSouth.
         16      Q. HealthSouth. Right, I got that one.
         17         And HealthSouth was Dr. McCormick (ph); is
         18   that right?
         19      A. Dr. McCormick.
         20      Q. Do you have that in front of you?
         21      A. I do, right here.
         22      Q. Okay. And it says, "Radiographic
         23   interpretation at the time"?
         24      A. Yup.
         25         MS. JOHNSON: Okay. I have 302488, Phil.
```

**Page 73**

```
16:37:20  1         MR. WEIDNER: Thank you.
          2   BY MS. JOHNSON:
          3      Q. And what did -- what did Dr. McCormick (ph)
          4   find?
          5      A. He found pretty much -- he found a little
          6   sub -- lateral dome of the talus, degenerative
          7   changes...
          8         And then he goes on. And there's some
          9   peripheral things, like a small subcortical cyst of
         10   the medial aspect of the medial malleolus --
         11      Q. Okay, hold on.
         12      A. -- that's not significant.
         13      Q. He said, "minor degenerative change"; is
         14   that correct?
16:37:44 15      A. Yup.
         16      Q. What was he looking at to compare it to, do
         17   you know?
         18      A. He might have not been comparing it to
         19   anything, just looking at it just alone.
         20      Q. How could he know if there was a change, if
         21   he didn't compare it?
         22      A. Degenerative change, change from normal --
         23      Q. Ah.
         24      A. -- this is what he means. Yeah.
         25      Q. So he saw minor degenerative changes?
```

**Page 74**

16:38:06
1  A. He saw minor degenerative changes. Yeah.
2  Q. Okay. And the next sentence: "Frank
3  aseptic necrosis," what is that?
4  A. Is not -- is just death of the bone. It
5  kind of takes on a certain color on the -- on an MRI.
6  He didn't see that.
7  Q. The next part is "osteochondritis
8  dessicants."
9  A. Yes.
10 Q. How is -- is that arthritis?
11 A. It is a lesion in the surface of the talus,
12 like a big old divot.
13 Q. Okay. And he said he did not identify
14 those?
16:38:35
15 A. Yeah, wasn't obvious. There wasn't a huge
16 one obvious.
17 Q. Okay.
18 A. Not a big obvious lesion.
19 Q. So he didn't see one; is that what he's
20 saying?
21 A. No, he did not see one. Yeah.
22 Q. Okay.
23 A. "Not" -- "not identified."
24 Q. "Not identified."
25 A. No.

**Page 75**

16:38:47
1  Q. So it means he didn't see it?
2  A. Yup.
3  Q. And did you review this report?
4  A. With Larry?
5  Q. Yes.
6  A. Yes, I did.
7  Q. Okay.
8  A. Yup.
9  Q. And --
10 A. I probably did that on our May 12th
11 follow-up.
12 Q. May 12th?
13 A. Yup.
14 Q. Okay. And so did you review the MRI
16:39:07
15 yourself?
16 A. Yes, I did. I have it right here,
17 actually.
18 Q. Did you make findings different than
19 Dr. McCormick's (ph)?
20 A. Let me read.
21    "Pointed out this MRI irregularity to the
22 patient." I said I'm not convinced that the little
23 cyst -- addressing the cyst -- I basically said I
24 don't think any more surgery's going to help this
25 guy. All right?

**Page 76**

16:39:28
1     Yeah. It shows a small subcortical cyst on
2  the lateral aspect of his talus. The cartilage looks
3  slightly fibrolated in the area. That's the minor
4  degeneration that Dr. McCormick (ph) talked about.
5  Q. Okay. So why would more surgery not help
6  him?
7  A. He's already failed. This is how it look
8  going into the first surgery. I did my surgery. It
9  looks the same. No change in pain afterwards.
10 There's really nothing else I can offer him.
11 Q. And the cyst, what was that from?
12 A. It is just some degeneration, some
13 degeneration in the subchondral bone, just deep to
14 the cartilage.
16:40:19
15 Q. And where was it located?
16 A. The lateral aspect of the talus, lateral
17 dome of the talus.
18 Q. So where you had gone in?
19 A. Yes.
20 Q. And it -- was that new, from when you were
21 in there?
22    No. It's -- well, I mean, the subcortical
23 cyst, you'd pick up on an MRI. Sometimes you can see
24 it. But when I looked in there, all I see is the
25 fibrolated cartilage. You can't really see what's

**Page 77**

16:40:38
1  deep to it.
2  Q. Okay.
3  A. Okay.
4  Q. Was this cyst contributing to the pain?
5  A. Secondary to the pain. I think it was
6  secondary. The cartilage damage on the lateral
7  aspect of the talus caused this cortical cyst thus
8  causing the pain.
9  Q. I'm sorry, say that again.
10 A. It's all part of this -- it's a
11 constellation of things. It's -- it's the cartilage
12 being broken down, and when the cartilage breaks
13 down, you get a little bit of a subcortical cyst due
14 to the breakdown of cartilage above it.
16:41:10
15 Q. Okay. Does it prevent him from walking?
16 A. It hasn't. It didn't.
17 Q. Will it get any larger?
18 A. Probably not. I mean, his -- his --
19 there's no change in the cyst from his MRI before the
20 surgery, and a year later it looks the same. So
21 we have actually two points in time, separated by a
22 year or so. No significant change; so it probably
23 won't get bigger over time.
24 Q. Is this the kind of cyst that you can
25 aspirate?

20 (Pages 74 to 77)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 20 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

GROVE v. UNOCAL                                      EUGENE CHANG, M.D.
                                                         10/25/2006

Page 78

16:41:42
1  A. No.
2  Q. Okay.
3  A. No. It's just a lesion. It's more of an
4  MR -- MRI wording than a radiographic reading.
5  Q. So if they were saying they saw a lesion
6  before, this would be the same lesion?
7  A. Probably, yeah. Same area, yeah.
8  Q. All right. And then the next time you saw
9  him was when?
10  A. Let's see here.
11  July 17th.
12  Q. Okay. Any change in your diagnosis on that
13  day?
14  A. No, same old thing. It's like -- it's like
16:42:15 15  Groundhog's Day.
16  Q. You said that you were going to discontinue
17  Valium and Percocet refills. Why did you say that?
18  A. Ah, it's just, you know, in the last few
19  months -- it's -- yeah, he's a year out from surgery.
20  At some point, you've got to just wean them off of
21  it. This is pretty strong stuff. So every physician
22  has kind of an internal sense of, you know, how much
23  is too much and when they want to quit giving them
24  stuff. So, yeah, everyone -- everyone's got their
25  own little, you know, threshold, and I guess mine was

Page 79

16:42:46
1  met.
2  Q. Okay.
3  A. Yeah.
4  Q. So does Mr. Grove's injury prevent him from
5  running?
6  A. Yeah, it does.
7  Q. Why?
8  A. Well, if he says he's got seven-out-of-ten
9  pain -- and certainly running is something that could
10  really progress the arthritis in his ankle, so it's
11  not something I would recommend. Okay? Does it
12  prevent him from running? Probably not. But would
13  it be something I would recommend for him to do? No,
14  I wouldn't.
16:43:16 15  Q. Okay.
16  A. No.
17  Q. What about walking on tundra or unstable
18  surfaces?
19  A. You know, for a long period of time, it
20  probably wouldn't be a good idea. Yeah. You know,
21  at this point, it's a wear-and-tear deal, so the more
22  he uses it, the more it wears out. It's just like
23  treads on your tire. Okay? Keep it in the garage.
24  Q. Can he actually climb a ladder?
25  A. He probably could a few times. Yeah. I

Page 80

16:43:42
1  mean, repetitively is -- is the issue with him.
2  Yeah.
3  Q. What do you mean by "repetitively"?
4  A. Well, up and down every day, you know,
5  multiple times. Probably not the range of -- you
6  know, he always said that he had trouble going
7  up and down stairs. Okay? And going up a ladder
8  would be the ultimate form of that. So I would
9  imagine it would be hard to go up and down ladder
10  repetitively.
11  Q. Okay. How about squatting?
12  A. Squatting I think would be difficult.
13  Q. Can he turn as he walks?
14  A. Sure.
16:44:08 15  Q. Can he turn and go the other way?
16  A. Yeah, absolutely. Yeah.
17  Q. Okay.
18  A. No, he doesn't.
19  No -- yeah, he can -- he can make turns.
20  Q. He can make turns?
21  A. Yes.
22  No left turns, but just right. No, just
23  kidding.
24  Q. Okay. You got me on that one.
25  What kind of boots can he wear? Anything?

Page 81

16:44:31
1  A. Anything he wants.
2  Q. Okay.
3  A. Yeah. Black, brown, big, small.
4  Q. Would any -- it's getting late, isn't it?
5  A. It is.
6  Q. What about rubber boots; is that any worse
7  than a hiking boot?
8  A. Yeah, less supportive. Less supportive,
9  yeah.
10  Q. If he wears rubber boots, should he wear
11  his brace?
12  A. Should he wear what?
13  Q. Brace?
14  A. I don't think a brace would fit in a rubber
16:44:59 15  boot.
16  Q. Okay.
17  A. Yeah.
18  Q. Did you always -- did you ever notice him
19  limping?
20  A. Early on, after surgery, I did. And to me,
21  I think I've not -- you know, usually when I come in
22  the room, they're sitting down.
23  Q. Okay.
24  A. And when I examine them. Yeah.
25  So I don't really recall him limping. I

21 (Pages 78 to 81)

Page 82

16:45:24
1  don't. I mean, it wasn't -- not that he -- he always
2  walked in independently without any assistive
3  devices, and visibly, he always looked pretty
4  comfortable.
5      Q. But you never actually saw him walk?
6      A. No. I --
7      Q. Did you ask --
8      A. I probably did the first time. I don't
9  have any recollection specifically that he was a big
10 limper.
11         If anything always is out of the ordinary,
12 I tend to note it in my chart. Okay? So if it's not
13 an issue, I kind of just omit it.
14     Q. Okay. When you do an exam, do you tell
16:45:56 15 them: Get up and walk; I want to see you walk?
16     A. Sometimes I do, yeah. Yeah.
17     Q. If he -- if he has no limp now, would you
18 say that he is perhaps making some progress?
19         MR. WEIDNER: Objection: Form of the
20 question.
21         THE WITNESS: Well, I'll tell you what, let
22 me just put it this way: If he has a
23 seven-out-of-ten pain, you would probably expect some
24 kind of a limp. I mean -- I mean, that's, I think,
25 you could deduce that. If he still says he has

Page 83

16:46:31
1  seven-to-ten pain, yeah, I would expect somewhat of a
2  limp.
3  BY MS. JOHNSON:
4      Q. But that would be based solely on his
5  subjective report?
6      A. Exactly.
7      Q. Do you assess your patients for
8  malingering?
9      A. No. It's just kind of a sense that
10 you have as a physician. If there's obviously no
11 physical findings that you can really grab ahold of,
12 and if the subjective complaints don't really match
13 with the objective findings, then you kind of wonder,
14 you know, "Oh, why is this disparity?" Yeah.
16:47:16 15     Q. What --
16     A. But that's -- that's hard, I'll tell you.
17 That's -- yes, go on.
18     Q. No. Go ahead.
19     A. Well, we've had some patients who don't
20 have huge lesions but don't hurt much, and then some
21 with smaller lesions that are quite disabled. So
22 it's really hard to -- to say, you know: You should
23 be having this much kind of pain. And that's --
24 that's hard for me.
25     Q. Sure.

Page 84

16:47:36
1      A. And especially, once you operate on a
2  patient, they're your patients and you want to take
3  care of them. And typically, if they're not giving
4  the clinic too much of a problem, we keep working
5  cordially with them and kind of work them through
6  their problem.
7      Q. Okay. If -- if you had a report that
8  somebody acted differently outside the clinic than
9  they acted when they were inside the clinic, would
10 that lead you to believe that they were perhaps
11 malingering?
12         MR. WEIDNER: Objection: Form of the
13 question.
14         THE WITNESS: Well, what's your definition
16:48:07 15 of "malingering"?
16 BY MS. JOHNSON:
17     Q. Well, what is your definition?
18     A. Well, no. I mean, I want to answer your
19 question, so why don't you tell me what you mean by
20 malingering.
21     Q. Is there a medical diagnosis for
22 malingering?
23     A. There probably is, and it's more of a
24 psych -- psychiatry position.
25         I mean, we -- I mean, I think what you're

Page 85

16:48:30
1  getting at is -- I mean, is he being forthright in
2  how disabling his pain is?
3      Q. Yes.
4      A. Is that what you mean?
5      Q. Possibly. That would be one.
6      A. Sure, sure. I mean, you know, I always
7  got -- believe me, don't get me wrong, I always got a
8  feeling that Larry had a high level of function. And
9  he never really tried to hide that. I mean, he said
10 he was going hunting, he was going walking. But just
11 a lot of anything caused pain in his ankle. And that
12 was -- that was kind of my position on him. And I
13 said: Larry, you know, this is just what you have,
14 okay, this is going to probably be progressive, and
16:49:08 15 just do the best you can; and if you have to get
16 retrained, get retrained, but, you know, it is what
17 it is.
18     Q. Okay. So if he was able to hunt for a week
19 without any pain, but reported to you that he had
20 pain, how would that affect your diagnosis?
21         MR. WEIDNER: Objection: Form of the
22 question.
23         THE WITNESS: If he came in and said he had
24 seven-out-of-seven -- seven-out-of-ten pain before he
25 went hunting, and then he went hunting, had a great

22 (Pages 82 to 85)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 22 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

### Page 86

16:49:36
1  hunt and was walking miles and miles, yeah, I think
2  common sense would say, you know, maybe he's not
3  hurting as much as you -- I mean, I see what you're
4  getting at, but we're speaking hypothetically here,
5  as far as I know.
6     Q.  Would it change your diagnosis of him at
7  all?
8     A.  Not our diagnosis.  And as you can see, I'm
9  not asking him to come back.  Okay?  I'm saying we've
10 done what we can.  And he comes back periodically,
11 for this and that.  But it is what it is.  Okay?  I
12 don't think there's anything more I can offer him.
13 All right?
14    Q.  Okay.  Have you told him that?
16:50:09
15    A.  Oh, yeah.  Yeah.
16    Q.  Okay.  Have you referred him on to anybody
17 else?
18    A.  I'm not sure there's anything else -- yeah,
19 if there was somewhere else I thought could help him.
20 But right now, it's more of just an activity issue.
21 Okay?  And I don't want to send him to a pain person
22 and just have him be on Percocet forever.  Okay?  So
23 anti-inflammatories, periodic injections, and he can
24 come back and see me periodically, whenever that is.
25 Yeah.

### Page 87

16:50:40
1     Q.  If he was to be retrained as a supervisor,
2  where the primary work duty was sitting, do you think
3  that that would be a job, given his ankle injury,
4  that he could perform?
5     A.  Yeah, I do.
6     Q.  Okay.
7        THE WITNESS:  Guys, I'm pretty serious
8  about the time limit.  So --
9        MS. JOHNSON:  Okay.  What time is it?
10       THE WITNESS:  -- I think at the latest ten
11 after 5:00, because I've got to get there by 5:30.
12       MS. JOHNSON:  What time is it, please?
13       THE REPORTER:  4:51.
14       MS. JOHNSON:  Well, that was the only other
16:51:13
15 question I had --
16       THE WITNESS:  Okay.
17       MS. JOHNSON:  -- so...
18       MR. WEIDNER:  Well, Counsel, I do need
19 appropriate time with this witness.  We can go a few
20 more moments, but we need to respect his time period.
21 So we're going to have to adjourn the deposition and
22 you can complete it at a future date, because you've
23 taken almost two hours, and I need to make inquiry in
24 the areas you've inquired.
25       But I understand, sir, you need to go pick

### Page 88

16:51:34
1  up your child.
2        THE WITNESS:  Yup.  5:00.  Yup.
3        MR. WEIDNER:  Do you want to leave right
4  now or do you want to go for a few more minutes?
5  What's your pleasure...
6        THE WITNESS:  Well, if we can -- keep
7  talking.  I mean, if we can do something now that
8  will make our next visit shorter, let's do that.
9        MR. WEIDNER:  All right.  Let's do that.
10 All right.
11       Good afternoon, again, Doctor.  I represent
12 Mr. Grove.  If I put a question to you that's
13 confusing, or use a word that appears confusing and
14 you don't understand, you let me know and I'll
16:51:55
15 rephrase.
16       THE WITNESS:  All right.  I'm going to have
17 this marked as the exhibit next in order.  It's a
18 copy of the operative report.  It's Bates number
19 LG00597 through LG00600.
20       MS. JOHNSON:  We didn't talk about Exhibit
21 1.  We were going to ask you, can you make a disk out
22 of what you have on that computer and give it to us?
23       THE WITNESS:  I don't know.  I'm not a
24 computer guy.  I have no idea.
25       MS. JOHNSON:  Can we ask the --

### Page 89

16:52:20
1        THE WITNESS:  You can request that.
2        MS. JOHNSON:  Okay.  We would like to --
3        THE WITNESS:  You can request whatever you
4  want.
5        MS. JOHNSON:  We would like to request
6  that.
7        And then, if that's possible, Phil, then
8  we'll mark that as Exhibit 1.
9        MR. WEIDNER:  That's fine.
10       MS. JOHNSON:  Okay.
11       MR. WEIDNER:  So let's call this Exhibit 2.
12 Will you, please, hand that to the witness.
13       (Exhibit 2 marked.)
14            EXAMINATION
16:52:51
15 BY MR. WEIDNER:
16    Q.  Doctor, do you recognize that as your
17 operative report, as the --
18    A.  Yes, sir.
19    Q.  And that's the -- that's the -- does that
20 record your medical observations and opinions as of
21 the date of surgery of March 8th, 2005 --
22    A.  Yes, it does.
23    Q.  -- as to Larry Grove?
24       And are the observations that you recorded
25 therein, did you make those in the course of your

Page 90

16:53:09
1  expertise as an orthopedic surgeon?
2     A. Yes, I did.
3     Q. And were you accurate in recording those?
4     A. Yes, I was.
5     Q. And the opinions you expressed therein and
6  observations, were those expressed to a reasonable
7  degree of medical certainty?
8     A. Yes.
9     Q. And what were your specific findings?
10    A. Grade 2 and 3 chondromalacia on the lateral
11 aspect of the talus. He had a thick area of fibrotic
12 tissue impingement anterolaterally, which was pulled
13 back, receded with my shaver. Rest of the joint
14 looking good.
16:53:39
15    Q. Okay. I may ask you a few more questions
16 about this, but we're kind of pressed for time right
17 now. I want to just move to another area -- or not
18 another area, but...
19    Do you recall on a previous occasion
20 discussing some of your observations with Mr. Cohn,
21 an attorney from my office?
22    A. No, I don't.
23    Q. Have you ever made a statement to the
24 effect that your assessment of Mr. Grove's disability
25 would be in the area of 35 to 45 percent? Do you

Page 91

16:54:06
1  recall that or no?
2     A. No, I don't recall that at all.
3        MS. JOHNSON: Objection: Foundation.
4  BY MR. WEIDNER:
5     Q. All right. Have you ever made an actual
6  assessment or percentage of his disability?
7     A. No. Because I don't do that. I don't have
8  the books. I refer people out for that.
9        MR. WEIDNER: All right. Let's mark this
10 as the exhibit next in order, Exhibit 3.
11       MS. JOHNSON: I object to this on
12 foundational grounds.
13       MR. WEIDNER: Okay.
14       (Exhibit 3 marked.)
16:54:34
15 BY MR. WEIDNER:
16    Q. Doctor, this is an illustrative exhibit
17 that has been prepared, to the best of our ability,
18 from your medical report, that is, your operative
19 chart.
20    A. Uh-huh.
21    Q. And I realize you've just seen it. So to
22 the best you can, can you take a look at that and
23 tell me if it appears to be accurate as to your
24 observations and procedures on 3/8/05?
25    A. Yeah. I think it's pretty accurate. I

Page 92

16:54:57
1  mean -- I mean as best as you -- as the best you
2  could have done.
3     Q. Okay.
4     A. But, you know, it looks like you're
5  cleaning out some stuff there, and then there's a
6  little bit of a lesion left on the talus.
7     Q. Okay. What I'd like for you to do is, if
8  you could turn that around and hold it up. And I'll
9  give you an extra copy, if you need to look down when
10 you're doing that. If you could just take a pen and
11 point. And with Counsel's permission, we'll zoom in.
12 Just explain to the jury what you did and what you
13 observed.
14    A. Well --
16:55:21
15       MS. JOHNSON: I object to form and
16 foundation, please.
17       THE WITNESS: There's car -- there's
18 overgrowth of soft tissue in the ankle joint, which
19 we cleaned out with a shaver. And after that's
20 cleaned out, you observe that there's cartilage
21 overlying this area that is fibrolated and damaged.
22    Q. And it says -- "B," it says, "Chondroplasty
23 of Lateral Talar Dome Chondromalacia"?
24    A. Chondromalacia, yeah.
25    Q. What does that mean?

Page 93

16:55:49
1     A. Sick cartilage.
2     Q. Pardon me?
3     A. Sick cartilage.
4     Q. Sick cartilage?
5     A. Chondromalacia, yeah.
6     Q. And those are your observations?
7     A. Uh-huh.
8     Q. And that's what you actually saw?
9     A. Yeah, that's what I actually saw, right.
10    Q. With your own eyes?
11    A. With my own eyes. Through the TV.
12    Q. Right.
13    A. Yeah.
14    Q. Okay. And you made those observations and
16:56:08
15 conclusions based upon your expertise?
16    A. Yes.
17    Q. All right. And is this the kind of thing
18 that you might see in surgery, as opposed to what
19 someone might try and see through an x-ray or an MRI?
20    A. Yeah, exactly what I saw. What I saw
21 myself, yup.
22    Q. All right. And then, as a basis of what
23 you saw, as illustrated there, your findings were a
24 Grade 2 to 3 chondromalacia?
25    A. Uh-huh.

**Page 94**

16:56:31
1  Q. And what's a Grade 3 chondromalacia?
2  A. It's like when there's fissuring of the
3  cartilage, that you can kind of see the bottom of the
4  bone; you can see the subchondral bone.
5  Q. What are the levels of gradation?
6  A. 1 to 4. Okay? 4 meaning completely
7  eburnated; you're down to bone. One being just soft
8  cartilage. Okay? And Grade 2 and 3 can be a little
9  bit subjective about the degree.
10  Q. You said 4 is completely ebur --
11  A. Completely eburnated.
12  Q. Eburnated?
13  A. Yeah.
14  Q. Okay. Can you do me a favor and spell
16:57:01 15 that?
16  A. E-b-u-r-n-a-t-e.
17  Q. What does that mean?
18  A. It means just worn out, or polished.
19  Q. All right. Okay. And what's the function
20  of the cartilage in the ankle that you saw that was
21  sick? Or what does the cartilage do for you?
22  A. Well, it protects the bone. It gives it a
23  nice gliding surface for the joint.
24  Q. Did you ever get any indication, in your
25  observations of Mr. Grove, that he was malingering?

**Page 95**

16:57:39
1  A. I'll tell you what: No. You know, that's
2  a very complex question. I mean, I don't think it
3  can be answered black or white. I can clearly see
4  why he would be hurting. Okay?
5  Q. Uh-huh.
6  A. I mean, he had damage. I saw it with my
7  own eyes. Okay?
8  Q. All right.
9  A. So let's put it that way. As far as a
10  level of function, he was quite functional. Okay?
11  He was quite functional, and enough to go hunting and
12  such. Okay? Which I think he's beating the odds; I
13  mean, he's doing quite well considering his ankle.
14  Q. Now, in terms of -- do you have any
16:58:17 15 personal knowledge as to -- if he did go hunting, as
16  to what he actually did when he was hunting?
17  A. No, I have no idea what he did. He could
18  have sat on a chair the whole time, or he could have
19  been cutting meat, walking around.
20  Q. Okay.
21  A. You know, that's -- hunting is -- you know,
22  you do different things when you hunt.
23  Q. I want to go for a moment to your -- the
24  last record we have, the last time you saw him, which
25  is 7/17, 2006. Can you locate that?

**Page 96**

16:58:40
1  A. Right here.
2  Q. And what was your diagnosis?
3  A. Ankle post-traumatic arthritis.
4  Q. And that was your opinion to a reasonable
5  degree of medical certainty?
6  A. Yeah.
7  Q. And you say, "Conclusion: He has known
8  degeneration in the medial aspect of his tibial talar
9  joint."
10  A. Uh-huh.
11  Q. You said -- and I think I understood you,
12  but is that a "yes"?
13  A. That's a "yes."
14  Q. And so that was your medical opinion to a
16:59:06 15 reasonable degree of medical certainty?
16  A. Yes.
17  Q. All right. And there's been some questions
18  asked of you about Valium and Percocet.
19  A. Yeah.
20  Q. Did you say, "I told him I was going to
21  discontinue his Valium and Percocet here, yet he --
22  yet he does just get it very infrequently, so I do
23  not feel too concerned about any habituation"?
24  A. Yeah.
25  Q. That was your opinion?

**Page 97**

16:59:28
1  A. Yeah.
2  Q. Now, this MRI that you explained to him, of
3  5/12/06, there was an evidence of MRI irregularity;
4  is that correct?
5  A. That's correct.
6  Q. And that showed a small subcortical cyst of
7  the antero aspect [As spoken] of his talus?
8  A. Yeah.
9  Q. And can you help me understand, in simple
10  terms, what's a subcortical cyst?
11  A. It's just an area where there's no bone.
12  It's either been damaged or gone from injury.
13  Q. Okay.
14  A. Okay? So it's a void.
17:00:03 15  Q. Do you know if that was from the prior
16  surgery or from some type of other process? Can
17  you -- can you tell us?
18  A. It's probably -- well, you know, there's
19  note of injury in that area from Dr. Geitz' surgery.
20  Okay? So it's the same area, same source.
21  Q. Okay.
22  A. Yeah.
23  Q. And you say the cartilage looks slightly
24  fibrolated in this area.
25  A. Uh-huh.

**Page 98**

17:00:25
1  Q. What does that mean?
2  A. It means -- it's kind of --
3  "disfibrolated," meaning there's breaks in the
4  cartilage; it's not smooth and solid.
5  Q. All right.
6  A. Yup.
7  Q. Okay. Now, Counsel read you the notes from
8  4/28/06. And what I'm doing, Doctor, I'm kind of
9  working back from the last time you saw him.
10 A. Okay.
11 Q. You see the 4/28/06 follow-up?
12 A. Let me get that there.
13    Yup.
14 Q. So if the surgery was on 3/8/05, that would
17:01:02
15 be about a year post...
16 A. Yeah, about a year. Over a year, yup.
17 Q. She read you part of the conclusion. Let
18 me read you the whole sentence. "As demonstrated by
19 the patient's exam and symptoms, he is medically
20 stable at this point, yet he still does hurt quite a
21 bit."
22    That was your observation?
23 A. Yeah. That was my observation, yup.
24 Q. Okay. All right. And going to 1/13/06, in
25 the physical examination you said: On exam he has

**Page 99**

17:01:41
1  focal tenderness anterolaterally in his ankle and
2  good range of motion.
3  A. Uh-huh.
4  Q. What does "focal tenderness" mean?
5  A. It means when you push on a certain area,
6  he hurts, and he hurt anterolaterally.
7  Q. What does "anterolaterally" mean?
8  A. The front outside of his ankle, near the
9  incision of his ankle scope.
10 Q. And you go on to say, "He does have some
11 incisional numbness around the anterolateral region."
12 A. Yeah. Sometimes you make an incision there
13 and you get some numbness due to the incision itself.
14 There is a nerve deep to that that sometimes can get
17:02:09
15 damaged.
16 Q. And what was -- your diagnosis was
17 anterolateral ankle -- what is --
18 A. Synovitis.
19 Q. -- associated with arthritis?
20 A. Yeah.
21 Q. What does that mean?
22 A. It means he has got some arthritis in
23 there. It's basically my findings on the x-ray, on
24 the surgery, is what it is -- is what it is. You've
25 got soft tissue overgrowth anterolaterally with some

**Page 100**

17:02:28
1  arthritis, which I'm referring to the cartilage
2  damage on his talus.
3  Q. And touching on the subject of the use of
4  Valium or Percocet, you say, "We also reviewed his
5  Valium and Percocet today. He has not had a refill
6  of Percocet since March of 2005, so I did not feel
7  that he's abusing it." Was that your conclusion?
8  A. Yup. Yup.
9  Q. So that was March of 2005, and this says --
10 is 1/13/06. It was almost ten months, and he hadn't
11 even -- hadn't even had a refill?
12 A. Yeah. Yup.
13    But, you know, when I look back at some of
14 my other things, it looked like I did give him a
17:02:58
15 prescription in April of 2005. So it might not be --
16 Q. All right.
17 A. -- completely accurate. Yeah.
18 Q. In any event --
19 A. But it's been a while.
20 Q. But you never got any indication, to your
21 observations, that he was abusing Valium or Percocet,
22 did you?
23 A. No. No, I mean, frequent calls and all
24 that, constantly renewing it. It was just periodic,
25 you know, separated by many months.

**Page 101**

17:03:17
1  Q. And that's something you're sensitive to,
2  sensitive to as a physician, aren't you?
3  A. Sure. Absolutely. Yeah.
4  Q. All right. I want to go back --
5    MR. WEIDNER: What time do we have?
6    THE REPORTER: 5:03.
7    MR. WEIDNER: Pardon me?
8    THE REPORTER: 5:03.
9    MR. WEIDNER: Can you give me five more
10 minutes here?
11   THE WITNESS: Sure can.
12   MR. WEIDNER: And then we'll see --
13   THE WITNESS: I can give you five minutes.
14   MR. WEIDNER: -- if we have to come back --
17:03:42
15   THE WITNESS: Yeah.
16   MR. WEIDNER: -- or not.
17   THE WITNESS: Sure.
18   MR. WEIDNER: All right. And I appreciate
19 your patience, Doctor.
20 BY MR. WEIDNER:
21 Q. I want to go back to your operative report.
22 A. Okay.
23 Q. Do you have it there before you?
24 A. Uh-huh. Yeah, I got it right here.
25 Q. All right. Can you tell me again what this

26 (Pages 98 to 101)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 26 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

### Page 102

17:03:56
1  synovitis -- synovitis is?
2     A. It's inflamed soft tissue.
3     Q. And both your preoperative and
4  postoperative diagnosis was right ankle anterolateral
5  soft tissue impingement and syn -- can you pronounce
6  that for me?
7     A. Soft tissue overgrowth.
8     Q. All right. Now, in terms of your actual
9  things that you saw with your eyes when you were
10 doing the surgery, I just want to go over that
11 generally.
12    A. Okay.
13    Q. And let's go to the bottom of -- bottom of
14 that first page. I'm just kind of curious. It says:
17:04:26
15 Manual distraction was carried out with the Kerlix
16 tied around my waist.
17       What does that mean?
18    A. Let's see where you are here.
19    Q. On the last paragraph from the bottom.
20    A. Oh. It says, "manual distraction." We do
21 it to distract -- to open up the ankle joint.
22 There's different ways you can open it up, and one
23 way is to just use a sterile Kerlix, wrap it around
24 my waist and then wrap it around his ankle. And as I
25 lean back, almost like you're water skiing, you're

### Page 103

17:04:53
1  distracting the ankle.
2     Q. All right, that's what I thought.
3     A. Yeah.
4     Q. And it says: Anteromedial portal was
5  initially established just medial to the anterior
6  tibial tendon.
7     A. Yeah.
8     Q. What does that mean?
9     A. That means an incision was made just to the
10 inside of his anterior tibial tendon.
11    Q. Okay. Can you -- can you show me on this
12 Exhibit 3 what you mean, so the jury can understand
13 that?
14    A. It's this incision right here. Obviously,
17:05:19
15 this x-ray doesn't -- this picture doesn't show the
16 anterior tibial tendon, but it's this incision right
17 here, followed up by an incision laterally, for this
18 one right here (Indicating).
19    Q. All right.
20    A. Yup.
21    Q. Now, in terms of what you saw, it says:
22 Soft tissue dissection was taken down to the capsule
23 joint.
24       You basically open him up so you can see
25 into the capsule joint?

### Page 104

17:05:36
1     A. Yeah.
2     Q. It says: Evaluation into the capsule joint
3  showed that there was a tremendous amount of soft
4  tissue in the anterior capsule encroaching into the
5  anterior part of the ankle joint from medial to
6  lateral.
7     A. Yup.
8     Q. Those were your observations?
9     A. Yeah. That's what I said, yup.
10    Q. What did you mean by "a tremendous amount
11 of soft tissue"?
12    A. That means a lot; overgrowth, you know, is
13 impressive. There was a lot of overgrowth
14 encroaching in there.
17:06:02
15       At first, usually -- it's first -- usually
16 easy to see the ankle joint, but he had so much
17 overgrowth of soft tissue that I had to spend some
18 time just cleaning it out.
19    Q. What causes that overgrowth of soft tissue?
20    A. Just chronic inflammation, synovitis.
21    Q. Okay.
22    A. Yup.
23    Q. All right. And when one has that type of
24 tremendous soft tissue, can that be painful?
25    A. Oh, sure, it can. Yup.

### Page 105

17:06:26
1     Q. And then you talk about using the shaver,
2  and the evaluation of the medial half of the talus.
3     A. Yeah.
4     Q. You say -- you say: Evaluation of the
5  medial half of the talus as well as the medial gutter
6  showed the cartilage was in pristine condition
7  without any defects or any loose bodies.
8     A. Yup.
9     Q. So you're focusing there on the medial half
10 of the talus as --
11    A. Yeah. You're in the ankle joint. You just
12 want to make sure the rest of the ankle looks okay.
13    Q. All right. But you say: The anterolateral
14 gutter and the anterolateral corner was completely
17:06:52
15 obliterated by excessive overgrowth of soft tissue
16 and scar.
17    A. Yup.
18    Q. Could you, again, use this exhibit and tell
19 me the difference between that medial portion that
20 was pristine and the antero --
21    A. Well, you don't see it, because it's
22 turned; you don't see the medial side. But it's on
23 the other side of this bone over here. Okay?
24       So this is the medial side. That looked
25 okay. On the lateral side, on this side, is where

Page 106

17:07:12
1  all the action was. (Indicating.)
2      Q. Okay. And that's where you saw this
3  excessive overgrowth of soft tissue and scar?
4      A. Soft tissue goomba.
5      Q. Okay. All right. And you go on to say:
6  An extensive amount of time had to be spent on using
7  an additional accessory port anterolaterally to shave
8  out this anterolateral soft tissue.
9      A. Yes.
10     Q. That's what you observed?
11     A. Yes.
12     Q. And you said usually you can do it in five
13 or ten minutes?
14     A. In about five or ten minutes.
17:07:38
15     Q. It took you 45?
16     A. Yeah. I didn't have my coffee that
17 morning. No, there was a lot -- a lot of stuff.
18     Q. Great.
19     A. Yeah.
20     Q. And then, in fact, you record it here:
21 "After about a half an hour to 45 minutes of work,
22 I" - that's you - "was finally able to clean up the
23 anterolateral gutter enough to see the fibula and the
24 gutter."
25     A. Yup, that's correct.

Page 107

17:07:55
1      Q. All right. And then, finally, you record
2  it here: With the ankle plantar flexed, I was able
3  to appreciate the cartilage damage from his previous
4  ankle trauma.
5      A. Yes.
6      Q. What did you mean by that?
7      A. That means I was able to see the
8  chondromalacia on the lateral aspect of his talus, as
9  reported per Dr. Geitz.
10     Q. All right.
11     A. Yes.
12     Q. And then you go on to say: Grade 2 -- you
13 went on to say: Grade 2/3 chondromalacia was seen in
14 the mid portion of his talus laterally.
17:08:22
15     A. Yes, sir.
16     Q. And you say: His ankle joint was very
17 tight.
18        What did you mean by that?
19     A. It wasn't loose. I mean, it seemed a
20 little bit fibrotic. You know? Kind of tight. You
21 know?
22     Q. All right. And then, Doctor, in terms of
23 this diagnosis that you -- that I asked you about --
24 and it appears throughout a number of your
25 references, you diagnose as ankle post-traumatic

Page 108

17:08:48
1  arthritis.
2      A. Uh-huh.
3      Q. Right?
4      A. Uh-huh.
5      Q. Are you confident about your diagnosis?
6      A. Yes.
7      Q. And what's your level of certainly on that?
8      A. 100 percent.
9         MR. WEIDNER: Okay. I'm going to take a
10 break now. It may be -- maybe we can avoid having to
11 call you back. We'll work with you on scheduling.
12        THE WITNESS: Great.
13        MR. WEIDNER: And I really appreciate your
14 time and patience.
17:09:04
15        THE WITNESS: You're very welcome.
16        MR. WEIDNER: Thank you.
17        MS. JOHNSON: Thank you, Doctor.
18        THE WITNESS: You're very welcome.
19        THE VIDEOGRAPHER: This concludes the
20 deposition of Eugene Chang, M.D. The time is 5:09.
21        (Videotaped record of deposition concluded
22 at 5:09 p.m.)
23        (Off-the-record discussion.)
24        MR. WEIDNER: The record shall reflect we
25 are still at the deposition of Dr. Chang.

Page 109

17:10:11
1      Counsel and I have agreed -- this is Phil
2  Weidner speaking. Counsel and I have agreed that
3  when the doctor provides Ms. Johnson a copy of
4  Exhibit 1, she, in turn, will provide it to the court
5  reporter.
6      And I would like a copy myself.
7      MS. JOHNSON: Sure.
8      MR. WEIDNER: Thank you.
9      (Proceedings concluded at 5:10 p.m.)
10     (Signature waived.)
11     (Exhibit 1 to be marked subsequent to the
12 taking of the deposition.)
13            -o0o-

28 (Pages 106 to 109)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 28 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

Page 110

1    CERTIFICATE OF REPORTER
2
3         I, GAIL RUTH PECKHAM, RPR, Registered
4    Professional Reporter, hereby certify:
5         That I am a court reporter for Pacific Rim
6    Reporting and Notary Public for the State of Alaska;
7    that the foregoing proceedings were taken by me in
8    Stenotype Shorthand and thereafter transcribed by me;
9    that the transcript constitutes a full, true and
10   correct record of said proceedings taken on the date
11   and time indicated therein.
12        Further, that I am a disinterested person
13   to said action.
14        IN WITNESS WHEREOF, I have hereunto
15   subscribed my hand and affixed my official seal this
16   _____ day of _____, 2006.
17
18
19
20   _____
21   GAIL RUTH PECKHAM, RPR,
     and Notary Public for the
22   State of Alaska
23
24   My commission expires: 3-26-10
25

Page 111

1         WITNESS CERTIFICATE
2    RE: THIS DOCUMENT RELATES TO PLAINTIFFS POLAR
     EQUIPMENT, INC., D/B/A COOK INLET PROCESSING,
3    NAUTILUS MARINE, INC., AND EXXON.
     CASE NO.: A89-095 Civ. (HRH) Consolidated
4    DEPOSITION OF: Brenda L. Norcross, Ph.D.
     DATE TAKEN: 8-10-06
5    FILE ORIGINAL: Case Standard
6       I hereby certify that I have read the foregoing
     deposition and accept it as true and correct, with
7    the following exceptions:
8
9    PAGE  LINE    CHANGE/CORRECTION    REASON
10   ____  ____    _____
11   ____  ____    _____
12   ____  ____    _____
13   ____  ____    _____
14   ____  ____    _____
15   ____  ____    _____
16   ____  ____    _____
17   ____  ____    _____
18   ____  ____    _____
19   ____  ____    _____
20   ____  ____    _____
21   ____  ____    _____
22   ____  ____    _____
     DATED         SIGNATURE
23
24   Please sign your name and date it on the above line.
     (Use additional paper to note corrections as needed,
25   dating and signing each page.)         (GRP)

29 (Pages 110 to 111)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 29 of 29
969d07ef-fb0d-4c46-bf57-ed4e02970d32