
Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

---

LAWRENCE H. GROVE, CYNTHIA )
GROVE, SARAH GROVE, and MICHAEL )
GROVE (DOB 1/21/88) by and through )
his father LAWRANCE H. GROVE, )
)
        Plaintiffs, )
)
vs. )
)
UNOCAL CORPORATION, )
)
        Defendant. )
)

Case No. 3:04-cv-0096-TMB

---

VIDEOTAPED DEPOSITION OF EUGENE M. CHANG, M.D.

---

Pages 1 - 111; Inclusive

Wednesday, October 25, 2006

3:18 p.m.

Taken by Counsel for Defendant
at
ORTHOPEDIC PHYSICIANS
3801 Lake Otis Parkway, Suite 300
Anchorage, Alaska  99503

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 1 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

## Page 2

```
 1        A-P-P-E-A-R-A-N-C-E-S
 2
    For Plaintiffs:
 3
       Phillip Paul Weidner
 4     PHILLIP PAUL WEIDNER & ASSOCIATES
       330 L Street, Suite 200
 5     Anchorage, Alaska 99501
       907/276-1200
 6
 7
    For Defendant:
 8
       Linda J. Johnson
 9     CLAPP PETERSON VANFLEIN TIEMESSEN THORSNESS LLC
       711 H Street, Suite 620
10     Anchorage, Alaska 99501-3454
       907/272-9631
11
12
    Videographer:
13
       Eric R. Cossman, JD, CLVS, Pacific Rim Reporting
14
15
    Court Reporter:
16
       Gail Ruth Peckham, RPR
17     Registered Professional Reporter
       PACIFIC RIM REPORTING
18     711 M Street, Suite 4
       Anchorage, Alaska 99501
19     907-272-4383
```

## Page 3

```
 1              I-N-D-E-X
 2
    EXAMINATION BY              PAGE
 3
    Ms. Johnson                   5
 4  Mr. Weidner                  89
 5
 6
 7
    EXHIBITS
 8
    1 Orthopedic Physicians's computer-scanned   110
 9    medical chart for Patient Grove, Lawrence H.
      (multi-file disk)
10
    (Exhibit 1 to be marked subsequent to the
11  taking of the deposition)
12
    2 "OPERATIVE REPORT," Patient: Grove, Lawrence  89
13    H., Date of Surgery: March 8, 2005, Surgeon:
      Eugene Chang, M.D. (4 pgs.)
14
    3 Illustrative diagram: "LAWRENCE GROVE RIGHT  91
15    ANKLE SURGERY 3/8/05" (1 pg.)
```

## Page 4

```
14:59:08  1         ANCHORAGE, ALASKA; WEDNESDAY, OCTOBER 25, 2006
          2              3:18 P.M.
          3              -o0o-
          4         P-R-O-C-E-E-D-I-N-G-S
          5         THE VIDEOGRAPHER: We are on the record at
          6  3:18.
          7         This is the video deposition of Eugene
          8  Chang, M.D., taken by the defendant, in the matter
          9  of Grove versus Unocal Corp., Case Number
         10  3:04-cv-0096-TMB, in the United States District Court
         11  for the District of Alaska.
         12         This deposition is being held in the office
         13  of Orthopedic Physicians, located at 3801 Lake Otis
         14  Parkway, Suite 300, Anchorage, Alaska, on October
15:18:59 15  25th, 2006.
         16         My name is Eric Cossman, here today on
         17  behalf of Pacific Rim Reporting, located at 711 M
         18  Street, Suite 4, Anchorage, Alaska, 99501. The court
         19  reporter is Gail Peckham, also with the firm Pacific
         20  Rim Reporting.
         21         Will Counsel, please, identify themselves
         22  for the record.
         23         MS. JOHNSON: Linda Johnson, from Clapp
         24  Peterson, here on behalf of Unocal.
         25         MR. WEIDNER: My name is Phillip Paul
```

## Page 5

```
15:19:22  1  Weidner. I'm here on behalf of the plaintiffs.
          2         THE VIDEOGRAPHER: Thank you.
          3         Will our reporter, please, swear in the
          4  witness.
          5              EUGENE M. CHANG, M.D.,
          6     Deponent herein, having been duly sworn,
          7       was examined and testified as follows:
          8              EXAMINATION
          9  BY MS. JOHNSON:
         10    Q. Dr. Chang, can you tell us about your
         11  education, starting with your bachelor's degree?
         12    A. Bachelor's degree at Cornell University;
         13  medical school at St. Louis University; orthopedic
         14  training at Loyolla University Chicago, and a
15:19:54 15  fellowship, foot and ankle, in Phoenix, Arizona.
         16    Q. When did you get your bachelor's?
         17    A. In '92.
         18    Q. And your medical school degree was?
         19    A. '97.
         20    Q. And you said you did an orthopedic --
         21    A. Fellow -- residency.
         22    Q. -- residency.
         23    A. Yeah, to 2002. And then I did a one-year
         24  fellowship in 2003; '2 to '3, yeah, one year.
         25    Q. '02 to '03?
```

2 (Pages 2 to 5)



**Page 6**

```
15:20:20  1    A.  Yes.
          2    Q.  Okay. And you said in Phoenix. Was there
          3  any particular...
          4    A.  Institute for Bone and Joint Disorders.
          5        (Reporter requested clarification.)
          6        THE WITNESS: Institute for Bone and Joint
          7  Disorders. Yeah.
          8  BY MS. JOHNSON:
          9    Q.  And what states are you licensed in?
         10    A.  Alaska.
         11    Q.  Were you -- you must have been licensed
         12  when you did your residency; is that right? Or your
         13  fellowship?
         14    A.  Along the way, yeah, sure. In the
15:20:43 15  respective states, I was licensed everywhere, yeah.
         16    Q.  Have those lapsed?
         17    A.  They have, yeah.
         18    Q.  Okay. And are you board certified?
         19    A.  Yes.
         20    Q.  In?
         21    A.  Board certified in orthopedic surgery.
         22    Q.  Any others?
         23    A.  No, that's -- that's it.
         24    Q.  So your specialty is in orthopedics?
         25    A.  Foot, foot and ankle, yeah.
```

**Page 7**

```
15:21:06  1    Q.  Specifically --
          2    A.  You don't get certi -- you don't get board
          3  certified in a specialty within orthopedics. But,
          4  yeah, I did a fellowship in foot and ankle. And
          5  that is my specialty, yeah.
          6    Q.  And since you completed your fellowship
          7  in '03, where have you worked?
          8    A.  Here.
          9    Q.  In Alaska?
         10    A.  Alaska, Anchorage.
         11    Q.  With?
         12    A.  My first and only job.
         13    Q.  Okay.
         14    A.  Yup.
15:21:30 15    Q.  So have you always been with Orthopedic --
         16    A.  Physicians Anchorage, yes.
         17    Q.  And what other doctors do you practice
         18  with?
         19    A.  Oh, Dr. R.J. Hall, Dr. Bill Mills,
         20  Dr. James Eule, Dr. Ed Voke, Dr. Marc Kornmesser,
         21  Dr. Chris Manion.
         22        (Reporter requested clarification.)
         23        THE WITNESS: Manion, M-a-n-i-o-n. Yeah.
         24  BY MS. JOHNSON:
         25    Q.  You're here today because you were a
```

**Page 8**

```
15:22:05  1  treating doctor for Larry Grove; is that correct?
          2    A.  Correct.
          3    Q.  And can you tell us, did you bring any
          4  records with you today?
          5    A.  I did, yeah.
          6    Q.  And what records did you bring?
          7    A.  Our clinic notes and our operative notes.
          8    Q.  Okay.
          9    A.  Yeah.
         10    Q.  And you brought them on a computer?
         11    A.  Yes.
         12    Q.  Okay. From the computer, can you tell us
         13  the first time that you ever saw Mr. Grove?
         14    A.  First time? Let's see here. I think it
15:22:37 15  was...
         16        January 10th, 2005.
         17    Q.  And what brought him to see you?
         18    A.  He was referred by Dr. Geitz for ongoing
         19  ankle pain.
         20    Q.  And what were you asked to do?
         21    A.  To evaluate him, just -- for further
         22  management. I believe Dr. Geitz had done a previous
         23  surgery on his tendon, as well as -- my memory is
         24  failing me a little. He did a -- some tendon
         25  surgery, as well as noted some injury in his ankle.
```

**Page 9**

```
15:23:16  1  And Dr. Geitz saw that there was some joint narrowing
          2  laterally where his pain was, so he always -- he
          3  asked me to evaluate him to see if there was anything
          4  I could do for him to reconstruct his cartilage and
          5  so on.
          6    Q.  Did you receive Dr. Geitz' record?
          7    A.  Yeah, I did.
          8    Q.  Did you have it on that first visit?
          9    A.  You know, I -- yeah, I did. And I'm
         10  actually looking for it now on my computer, and I
         11  don't see it with me here.
         12    Q.  On the second page of your record that I
         13  have, I have your January 10th, '05, as two pages.
         14  And just for our purposes, I have it marked LG00551
15:24:03 15  and 00552. And on the second page it says that he
         16  brought you in x-rays from Dr. Geitz today.
         17    A.  Uh-huh.
         18    Q.  Does that help you remember what you looked
         19  at?
         20    A.  Nah. Frankly, it doesn't, no.
         21    Q.  Do you have a copy of Dr. Geitz' x-rays?
         22    A.  You know, I'll tell you what, I've got all
         23  our copies here. And it looks like they were all
         24  borrowed for something. IM -- maybe previous IMEs.
         25  The only record I have right here with me is his MRI
```

### Page 10

15:24:32
1 from earlier this year; that's -- that's all the
2 records I have. I'm sure they've been kind of passed
3 around a little bit.
4     I do see here that I got Dr. Geitz'
5 operative note scanned in it.
6   Q. What about Dr. Geitz' record from January
7 '05, did you receive that one?
8   A. Yeah, I do, actually. It's scanned in
9 right here. Yup.
10  Q. I think it was January 3rd; is that
11 correct?
12  A. You know, that part -- I see the January.
13 I don't see the date, per se.
14  Q. Okay. What about, did you also receive a
15:25:22
15 radiology reading from Brad Cruz?
16  A. You mean from Dr. Geitz?
17  Q. From any source.
18  A. You mean at the time that he was sent over?
19  Q. It should be dated January 3rd, as well.
20  A. January 3rd, 2005?
21  Q. Yes.
22  A. MRI or plain x-rays? MRI, are you talking
23 about.
24  Q. It doesn't say on my cheat sheet here.
25 I'll have to look for it.

### Page 11

15:26:08
1   A. See an MRI from 2003.
2     It's a little bit laborious here, kind of.
3   Q. Yeah.
4   A. There's like 139 things scanned in here.
5   Q. I think it was x-rays. But I don't -- I
6 can't tell you further than that.
7   A. Nah, I can't find them. Nope.
8   Q. Okay. So if he said he brought you x-rays,
9 you don't know what the date of those x-rays were?
10  A. I don't, no, not specifically.
11  Q. Okay. So you don't recall if you actually
12 reviewed Dr. Cruz' reading of an x-ray from that
13 period?
14  A. I'm sure -- you know, I probably -- if he
15:26:45
15 brought it in, I'm sure I reviewed it. I just don't
16 have any recollection of what I read or what the
17 x-rays look like.
18    Excuse me. I'm kind of flipping through,
19 seeing if I can find it anywhere.
20  Q. I do have a copy of it, if you want to look
21 at the hard copy of it.
22  A. Yeah.
23  Q. It's --
24  A. So this is from March '03. Yeah, actually
25 I have this one. I was looking for the January '05

### Page 12

15:27:56
1 one.
2   Q. Oh, you're right.
3     MS. JOHNSON: What's the date on that,
4 Counsel?
5     THE WITNESS: March twenty --
6     MS. JOHNSON: This is the wrong one.
7     MR. WEIDNER: Okay.
8     MS. JOHNSON: There was another one by Brad
9 Cruz.
10    Cruz. It's 556.
11    MR. WEIDNER: What's the number, again?
12    MS. JOHNSON: 556.
13    MR. WEIDNER: 556.
14    THE WITNESS: Yes. Okay.
15:28:32
15 BY MS. JOHNSON:
16  Q. You recall seeing that?
17  A. I don't recall specifically. But I agree
18 with the reading.
19  Q. Okay.
20  A. Yeah.
21  Q. So you agree -- you agree with Brad Cruz'
22 reading?
23  A. Yeah. That's pretty -- to a certain
24 degree. I mean, I could see why he said that.
25  Q. Okay.

### Page 13

15:28:45
1   A. You know, it's -- I mean, you know, the --
2 a radiologist's reading is kind of limited to just
3 what he sees on an x-ray.
4   Q. Correct.
5   A. And I could -- I could understand. I could
6 understand why he read it like that.
7   Q. Okay. So the initial complaint, when he
8 came in to see you, was what?
9   A. Ankle pain.
10  Q. Okay. And what did you do to confirm or
11 investigate that inquiry?
12  A. Well, based on what he came with, his
13 previous injury, as well as some of the narrowing --
14 and I believe we had an MRI.
15:29:33
15    I gave him a cortisone injection to see if
16 this diagnostic injection would help him.
17  Q. You did that on the 10th?
18  A. Yeah.
19    And then I said we'll also send him off for
20 an MRI to evaluate him again.
21    MR. WEIDNER: Now, this is the 10th of what
22 year, Counsel?
23    THE WITNESS: 10th of January, 1/10/05, the
24 first time I met him.
25    MR. WEIDNER: Can we get a Bates stamp

4 (Pages 10 to 13)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 4 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

### Page 14

15:29:59
1  reference on that record, if we have it?
2       MS. JOHNSON: I gave it to you before. I
3  think it was -- I don't have it in front of me, Phil.
4  It's the same one that we were looking at before.
5       THE WITNESS: Okay.
6  BY MS. JOHNSON:
7    Q.  Okay. So you sent him off for the MRI.
8  Did you make any conclusions on the 10th about his
9  injury?
10   A.  No. You know sometimes you see
11 radiographic things, but it doesn't always correlate
12 with their clinic symptoms. That's why I gave him
13 the cortisone injection in the ankle, as well as got
14 a repeat MRI, since it had been a little while since
15:30:41
15 he got one. And then I saw him back nine days later
16 on the 19th.
17   Q.  Okay.
18   A.  He said the injection did help quite a bit,
19 which does help -- it's a diagnostic injection. If
20 the injection helps a lot, you know that it's a
21 joint -- probably a joint-origin source of pain.
22      MRI shows that there is some cartilage
23 damage in his talus, which we --
24   Q.  Okay, hold on. You're going a little fast
25 for me.

### Page 15

15:31:04
1    A.  Okay.
2    Q.  The cortisone helped, therefore you knew
3  it was a joint problem?
4    A.  Yeah, it suggests.
5    Q.  A suggestion.
6    A.  Suggests it is a joint-related issue.
7    Q.  Okay. And why is that?
8    A.  When you numb up the area, decrease
9  inflammation in a localized area, and they respond
10 soon thereafter, you can make the conclusion that you
11 affected the pain source or you decreased the pain
12 from the pain source, and it's joint or joint in
13 origin. Okay?
14   Q.  Okay.
15:31:30
15   A.  It's called a diagnostic -- that's why we
16 gave it. We gave it to see -- you know, well, we see
17 all these lesions on the talus and some injury in his
18 ankle, but is it indeed his ankle that's giving him
19 the problem? Let's -- let's numb it up, let's take
20 away the pain and let's see if this corresponds and
21 gives him the relief.
22      And nine days later, in my -- per my
23 record, it said it did. He said it did help quite a
24 bit. He does have less pain. His pain is still
25 there, to a certain degree, but he says it got --

### Page 16

15:31:52
1  it's easier to go up and down stairs. Okay?
2    Q.  Okay.
3    A.  So that makes me feel better, as a
4  clinician, that it is ankle in origin and pain.
5       And also, at the same visit, I reviewed his
6  MRI, as well.
7    Q.  Okay. And who did the MRI for you?
8    A.  I don't know. Usually it's HealthSouth.
9  That's kind of the place that's used to reading my --
10 it's usually HealthSouth.
11   Q.  Do you have a copy of it in there?
12   A.  Let me see.
13      No, I don't. I don't have it. Nope.
14   Q.  Okay. So you ordered the MRI. And then it
15:33:02
15 came back to you, and -- and what did you see on the
16 MRI?
17   A.  Well, I saw the lesion on his talus, which
18 was consistent with his injury and his previous
19 findings.
20   Q.  Okay. And when you say a "lesion," what do
21 you -- what are you referring to?
22   A.  A defect, incongruity, of the lateral ridge
23 of the talus, which is consistent with the findings
24 of Dr. Geitz, as well as would explain some of the
25 mild narrowing on the lateral side of the plain

### Page 17

15:33:27
1  x-rays.
2    Q.  Okay. "Mild narrowing" being very --
3    A.  The space.
4    Q.  -- small?
5    A.  Very -- yeah, very subtle. It's subtle,
6  yeah. Yeah.
7    Q.  It says -- in your notes it says: Some
8  cartilage damage laterally on the talus.
9    A.  Yeah.
10   Q.  If I'm looking at the right foot as if it's
11 my foot, what side would that be?
12   A.  That would be on your outside.
13   Q.  On the outside?
14   A.  Yeah.
15:33:56
15   Q.  Okay. And what else did you see?
16   A.  On the MRI?
17   Q.  (Nodding head.)
18   A.  That's -- that's the -- that's the --
19 that's the gist of it, right there.
20   Q.  Okay.
21   A.  Yeah.
22   Q.  Did you go back and review the surgery that
23 Dr. Geitz had done?
24   A.  I did. Actually, I did. I have it right
25 here, actually.

**Page 18**

15:34:18
1  Yup. What about it?
2  Q. He was treating doctor -- or he was
3  treating Larry Grove for a bone chip?
4  A. Uh-huh.
5  Q. Was there any problems with the surgery,
6  that you saw?
7  A. Of what Geitz did?
8  Q. Yes.
9  A. No. I saw evidence of the damage and
10 probably where the bone chip came out.
11    On top of that, though, what I saw was he
12 had some wear of the cartilage of the other side of
13 his talus, on the tibial side. And that's why he
14 wasn't a good candidate -- you know, as I'm talking
15:34:52
15 here, it's coming back to me.
16    Dr. Geitz wanted to see if he'd be a good
17 candidate for like an OATS procedure, where you
18 transplant cartilage and restore that little defect
19 in the talus. Okay? And based on the -- my -- our
20 arthroscope, our scope -- you know, when you've got a
21 lesion on the corresponding side, on the tibial side,
22 you can't really do successfully a cartilage
23 transplant. That's why the procedure that I did was
24 limited to cleaning it out, as well as getting a lot
25 of that soft tissue out of the gutter, and that was

**Page 19**

15:35:26
1  the extent of our procedure.
2  Q. Okay. Why can't you do the transplant?
3  A. Well, you can transplant one side, but you
4  can't successfully transplant the other side. You
5  can transplant one side, and as long as it's got a
6  good side to rub against, the longevity of it is
7  good. But if both sides are compromised, it's just
8  not going to work. It's not indicated to do that
9  procedure.
10 Q. Did you -- have you seen studies that
11 have --
12 A. Yeah. It's --
13 Q. -- stated that?
14 A. Yeah. Yeah. It's pretty standard. That's
15:35:55
15 one of the contraindications, is to not do it, if
16 you've got kissing lesions or reciprocal lesions on
17 the tibia and talus.
18 Q. Okay. And then your diagnosis on the 19th
19 said "post-traumatic osteoarthritis." What does that
20 mean?
21 A. Well, that means there's been some
22 compromise of the cartilage in the ankle joint.
23 Okay? And it was trauma in origin. So it's
24 post-traumatic arthritis.
25 Q. Trauma in origin, because that's what they

**Page 20**

15:36:28
1  reported to you, correct?
2  A. Right.
3  Q. And osteoarthritis, what makes you think
4  it was arthritic? What was it about the injury
5  that...
6  A. Well, "arthritic" means damage in
7  cartilage.
8  Q. Okay.
9  A. Okay? And it's a broad term, but what
10 you're -- what it basically means is that the joint
11 is compromised, and then, really, it's the cartilage
12 that makes up the joint.
13 Q. Now, there's different levels of damage and
14 compromise, correct?
15:36:57
15 A. Uh-huh. Uh-huh.
16 Q. You can have something minor or you could
17 have --
18 A. Sure.
19 Q. -- something catastrophic?
20 A. Sure. Yup.
21 Q. Where would --
22 A. And I believe I reported a grade 2 or 3
23 chondromalacia on the -- on my operative note.
24 Q. Uh-huh. When we get to your operative
25 note, I will want to know what that means.

**Page 21**

15:37:14
1  A. Yeah.
2  Q. Okay. So you, also, in your conclusion,
3  you said he has advanced chondromalacia. What is
4  that?
5  A. Chondromalacia -- it's grade 2 or 3
6  chondromalacia.
7  Q. Oh, okay.
8  A. Yeah.
9  Q. That's what "advanced" means?
10 A. "Advanced" is a general term. But it
11 means -- it's more than just mild, yeah.
12 Q. Is that something different than
13 osteoarthritis?
14 A. No. Actually, chondromalacia often leads
15:37:35
15 to arthritis, or if it's severe enough, it can be
16 considered arthritis.
17 Q. Okay. So if you have written "advanced
18 chondromalacia" and you've also said he has
19 osteoarthritis, how do you -- how do you combine
20 those two? What would you --
21 A. Well, you know, when you say arthritis,
22 it's more of an x-ray definition. You can see it on
23 x-ray, where the joints are a little bit narrowed.
24 Okay? Chondromalacia is something that you can't
25 tell, unless you're actually in there and feeling and

**Page 22**

15:38:00
1  looking at the cartilage. Okay? And so an internist
2  would alway -- would never say there's
3  chondromalacia, because they're not operating,
4  they're not looking at the cartilage. All they do is
5  see the x-ray, and they can say: Oh, there's a
6  little bit of narrowing; thus, arthritis. As a
7  surgeon, I can see it on x-ray, see a little bit of
8  narrowing, call it arthritis; but then, if I go in
9  operatively and look at it myself, I can see that
10 actually the cartilage is damaged, and I call that
11 chondromalacia.
12     Q. Now, going back to Brad Cruz, in January of
13 '05, he had said there was no osteoarthritis,
14 correct?
15:38:36
15     MR. WEIDNER: Objection: Form of the
16 question.
17     THE WITNESS: You know, from his position,
18 he might not notice there's arthritis. You know?
19 It's hard to tell on -- especially on an MRI. Okay?
20 It's usually a "big picture" thing, where you
21 kind of stand back and see, is there any narrowing.
22 Okay?
23 BY MS. JOHNSON:
24     Q. If he had gone back and compared it to his
25 own x-rays, prior x-rays, and still said there was no

**Page 23**

15:38:55
1  osteoarthritis, how could you account for the fact
2  that he is making that finding versus what you have
3  found?
4      MR. WEIDNER: Objection: Form of the
5  question.
6      THE WITNESS: I'm sorry, I'm not following
7  your question.
8  BY MS. JOHNSON:
9      Q. Well, I guess -- let me ask it a different
10 way.
11     Is your finding based at all upon the
12 subjective reports from Larry Grove about where his
13 pain is and what sort of pain he has?
14     A. No. It was basically -- it was based on
15:39:25
15 Dr. Geitz' previous surgery - okay - as well as that
16 initial -- the report of the x-ray of it -- of being
17 narrowed on the lateral side.
18     Q. Okay.
19     A. Okay?
20     Q. And if Geitz' report differed from Cruz'
21 report -- --
22     A. Which often does, between an orthopedic
23 surgeon and a radiologist. Yeah.
24     Q. And --
25     A. Well, it's because, first of all, an

**Page 24**

15:39:51
1  orthopedic surgeon is so specialized, and they're --
2  they're noticing subtleties and kind of comparing it
3  with the clinical picture, as well. Whereas an
4  orth -- a radiologist, they're just -- they're
5  sitting in a darkroom, with no contact with the
6  patient, and they're not putting one and one
7  together; they're just reading just a series of
8  x-rays that's just come across their reader.
9      Q. Could you say it the other way around:
10 That the orthopedic surgeon also uses the subjective
11 information from the patient to make his
12 determination?
13     MR. WEIDNER: Objection: Form of the
14 question.
15:40:25
15     THE WITNESS: You know, a lot of people
16 come in -- can come in complaining of ankle pain, and
17 without an appropriate history to back it up or
18 x-rays to back it up, you wouldn't call it arthritis.
19     I think in Dr. Geitz' case, he had known
20 the kind of injury that he had, it correlated with
21 the x-ray that he saw - okay - and then he came to
22 the conclusion, his deduction, that it was
23 arthritis.
24 BY MS. JOHNSON:
25     Q. Okay. We'll come back to that.

**Page 25**

15:40:50
1      So on the 19th, the cortisone injection
2  helped?
3      A. Uh-huh.
4      Q. And what did you propose as a treatment?
5      A. Let me just go back and refresh my memory
6  here.
7      (Reviewing out loud.)
8      (Reporter requested clarification.)
9      THE WITNESS: I'm just reading -- I'm just
10 mumbling --
11     MR. WEIDNER: Oh, he's just mumbling.
12     THE WITNESS: -- to myself. I'm just
13 mumbling to myself, yup, thinking out loud.
14     MR. WEIDNER: She'll want you not to do
15:41:25
15 that, because she needs to take down every word.
16     MR. WEIDNER: Let the record reflect,
17 "Doctor mumbling."
18     THE WITNESS: So the options included
19 continued injec -- periodic injections in the ankle
20 or arthroscopic excision, curettage and drilling of
21 the area that's giving him pain in the lateral
22 talus.
23 BY MS. JOHNSON:
24     Q. And above that you said that you would wait
25 a few weeks, see if the cortisone injection "held"?

7 (Pages 22 to 25)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 7 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

### Page 26

15:41:58
1  A. Yeah.
2  Q. Would that be a proper way to say it?
3  A. Yeah.
4  Q. And then if it doesn't, you could either
5  give him periodic injections, or if he continues to
6  hurt, there's little to lose by --
7  A. Doing the arthroscopic procedure, where you
8  kind of stimulate some growth in that talus - okay -
9  and you drill it and cause it to repair itself.
10  Q. When did you next see him?
11  A. Going a long way, here, on the...
12  The 4th -- actually, I saw him on the --
13  Q. February --
14  A. About a month later, March 4th.
15:42:42
15  Q. Oh, okay. I have one on February 9th. Is
16  that correct, did you see him on --
17  A. Okay. Oh, yeah, I do. I got this right
18  here.
19  Q. Okay. And what was the -- what was the
20  subjective report from Mr. Grove?
21  A. He said it did help for a week or so, and
22  he says the --
23  Q. The cortisone?
24  A. Yeah.
25  He says the pain has returned. He says he

### Page 27

15:43:11
1  consistently has pain in the anterolateral aspect of
2  his ankle.
3  Q. Where would that be?
4  A. The outside, front outside of his ankle.
5  Q. Okay. Anything else?
6  A. No. That's the main procedure.
7  At that point I talked to him, he's been
8  dealing with it for a couple years, still giving him
9  ongoing pain. I anticipated some soft tissue
10  overgrowth in the lateral aspect of his ankle, which
11  I certainly did find. And if there's a full --
12  Q. I'm sorry. In the lateral...
13  A. Anterolateral aspect of his ankle.
14  Q. Okay.
15:43:45
15  A. And then all -- we can also drill and
16  stimulate that area of the talus that's compromised.
17  We did talk about those procedures. I said
18  I would anticipate, if there was broad arthritis in
19  the ankle, it would be hard to do a focal loads
20  transfer. Basically, what I touched on earlier, that
21  it's probably not going to work.
22  Q. Okay. And then you said he has a lot to
23  gain from surgery?
24  A. Little to lose. Because his baseline --
25  when a baseline is so low -- and -- and he's got some

### Page 28

15:44:19
1  known defects, at this point, there's little to lose
2  by doing the surgery. Okay? I think it could
3  have -- I mean, barring any kind of infection or
4  anything traumatic happening, complication from it
5  it was reasonable to go ahead with it.
6  Q. Okay.
7  A. Yeah.
8  Q. When you say "baseline is so low," what
9  does that mean?
10  A. Well, he was struggling, having a lot of
11  pain, not getting any better with any modalities that
12  he was using up to then. So, you know, at some
13  point, it's either go or no-go. Either you accept
14  this -- okay, you've been having it for two years;
15:44:52
15  it's not going to get any better in, you know, two
16  years and two months later. So you either accept
17  this or we can proceed with -- we can try to make it
18  a little bit better by doing a clean out of your
19  ankle and stimulating the talus, to try to get some
20  regrowth of some fibrocartilage.
21  Q. And did he make a decision on that day?
22  A. I think he was -- yeah, he was interested
23  in it. And I think I saw him for -- our next visit
24  says I saw him on March 4th for his preoperative
25  visit.

### Page 29

15:45:22
1  Q. Okay.
2  A. For the surgery -- (Reviewing out loud) --
3  shortly thereafter. Yeah.
4  Q. In the second paragraph, under "Chief
5  complaint," it says: "He continues to have
6  consistent pain." What do you mean by that?
7  A. That means -- that's -- that's what -- you
8  don't want to -- he has pain; it's consistently in
9  the anterolateral aspect of his ankle, meaning it
10  hasn't changed from our initial -- my initial
11  impression.
12  Q. Okay.
13  A. It's concerning, when a person hurts all
14  over the place and it's in different places every
15:45:53
15  single time. Okay? But his findings were
16  consistent.
17  Q. Okay. So -- oh, I'm sorry. You also said
18  that his ankle has always been "stable" on exam.
19  What do you mean by "stable"?
20  A. Well, I wanted to -- you know, he had the
21  lateral ligament repair done by Dr. Geitz, and I just
22  wanted to make sure that there wasn't any history of
23  signs of instability to the ankle that could be
24  contributing to this pain.
25  You know, there's different things that can

8 (Pages 26 to 29)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit  5
page  8  of  29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

## Page 30

```
15:46:26  1    cause this kind of pain. And that was one of the
          2    things I just, obviously, had in mind, and wanted to
          3    make sure that it wasn't.
          4        Q. Okay. If it wasn't stable, what would you
          5    have thought it was?
          6        A. Well, you can have some instability of the
          7    ankle contributing to some of the pain that he's
          8    having.
          9        Q. Okay.
         10        A. Okay?
         11        But it always seemed very stable. He never
         12    complained of his ankle giving out, which is the most
         13    important point here.
         14        Q. So then you proceeded to your surgery?
15:46:56 15        A. Yup, that's what -- yeah, we went to
         16    surgery.
         17        Q. And where did you perform your surgery?
         18        A. I do my surgery at HealthSouth. Alaska
         19    Surgery Center, on March 8th, 2005.
         20        Seems like a long...
         21        Q. Okay.
         22        MS. JOHNSON: And Phil, just so that you
         23    know, I have an operative report at 302489.
         24    BY MS. JOHNSON:
         25        Q. In your operative -- operation -- your
```

## Page 31

```
15:47:40  1    surgery was when?
          2        A. March 8th, 2005.
          3        Q. Okay. And do you have an independent
          4    recollection of that surgery?
          5        A. Outside of my record -- outside of my
          6    record, no, I don't.
          7        Q. Okay. Looking at your record --
          8        MR. WEIDNER: Counsel, is there some way we
          9    can get that op report marked as an exhibit?
         10        MS. JOHNSON: Well, we're going to mark all
         11    of his records as an exhibit.
         12        MR. WEIDNER: Yeah. I'd kind of like to
         13    mark just this operative report, though, just so
         14    there's continuity of reference, if we need to refer
15:48:09 15    to it.
         16        MS. JOHNSON: I'm not going to mark it
         17    right now. But you're welcome to do that, if you
         18    want.
         19        MR. WEIDNER: Yeah. I've got a copy, if
         20    you want to mark it.
         21        MS. JOHNSON: No, I think I'm good.
         22    BY MS. JOHNSON:
         23        Q. So --
         24        MR. WEIDNER: Well, I'd appreciate it if
         25    you would mark it, so we can refer to it for the
```

## Page 32

```
15:48:24  1    record.
          2        MS. JOHNSON: You're welcome to do that
          3    Phil, when you -- when you -- when you do this.
          4    BY MS. JOHNSON:
          5        Q. So you went in. And your pre-operative
          6    diagnosis was, it looks like, the same as your
          7    post-operative diagnosis; is that correct?
          8        A. Yeah.
          9        Q. And the procedure that you used, what did
         10    you do that day?
         11        A. We spent a lot of time cleaning out a lot
         12    of scar in the anterolateral aspect of his ankle.
         13        Q. And when you say -- what did you say;
         14    antero --
15:48:52 15        A. Anterolateral.
         16        Q. So on the outside of his right foot --
         17        A. Yes.
         18        Q. -- towards --
         19        A. Front outside.
         20        Q. The front outside?
         21        A. Yeah.
         22        Q. And when you say "cleaned it out," what
         23    exactly did you do?
         24        A. Just shave out.
         25        Q. What did you use to do that?
```

## Page 33

```
15:49:09  1        A. Shaver.
          2        Q. A shaver?
          3        A. Yeah, mechanical shaver.
          4        Q. Can you explain that to me?
          5        A. Well, it's a shaver; it's probe with a
          6    spinning tip --
          7        Q. Okay.
          8        A. -- that shaves out the soft tissue.
          9        Q. Does it have some sort of a blade on it?
         10        A. Yeah. Yeah.
         11        Q. Does the blade spin?
         12        A. It spins, yeah.
         13        Q. Okay. Was Mr. Grove completely
         14    anesthetized or locally?
15:49:34 15        A. Completely.
         16        Q. Okay. And why was that?
         17        A. Just for pain relief, for muscle
         18    relaxation. Yeah.
         19        Q. And you said you spent some time shaving
         20    out the scar tissue. What did the scarring look
         21    like?
         22        A. A white, thick and fibrotic tissue.
         23        Q. Okay.
         24        A. Yeah.
         25        Q. And was it attached to --
```

## Page 34

```
15:50:00  1      A.  It was stuck to the anterolateral aspect of
          2  his capsule.
          3      Q.  His "capsule," what would that be?
          4      A.  Capsule, it's a soft capsule around --
          5  every joint has a capsule.
          6      Q.  Okay.
          7      A.  It was attached to the capsule, kind of in
          8  the -- kind of in the lateral gutter of the ankle.
          9      Q.  Was it on the outside of the joint?
         10      A.  Within the joint.
         11      Q.  Inside the joint?
         12      A.  Inside, yeah.  Everything is inside the
         13  joint, once you go in with the scope.
         14      Q.  Okay.  And how long did it take you to get
15:50:23 15  that shaved out?
         16      A.  It says I spent about a half an hour to 45
         17  minutes.  I spent a lot of time.  That's a lot of
         18  time to do that.  Usually it doesn't take more than
         19  five minutes or so.
         20      Q.  Okay.
         21      A.  But there was a lot of overgrowth
         22  laterally.
         23      Q.  And "overgrowth" meaning?
         24      A.  The scar tissue, the stuff that I cleaned
         25  out.
```

## Page 35

```
15:50:46  1      Q.  Okay.  Did you do anything else while you
          2  were in there?
          3      A.  Let me see here.
          4          No, that's it.
          5      Q.  You said that there were no loose bodies.
          6  Were -- "no loose bodies were noted"?
          7      A.  Seen in the ankle.  Yeah.
          8      Q.  Okay.  And what does that mean?  What were
          9  you looking for?
         10      A.  Just loose bodies.  Maybe a piece of
         11  cartilage or a piece of bone that might be floating
         12  around that you can't pick up on MRI that might
         13  have -- he might have been getting pain from.
         14      Q.  And how would this -- why would this scar
15:51:30 15  tissue be inside the joint?
         16      A.  It's just an inflammatory response to the
         17  injury.  It happens after even minor ankle sprains.
         18  It certainly could happen after something that's
         19  traumatic enough for him to fracture off a part of
         20  his talus.  Ankle instability can cause it, if your
         21  ankle's unstable, which he had.
         22          About 25 percent of ankles that eventually
         23  have a lateral ligament repair, like he had, has some
         24  kind of lesion on the talus.
         25      Q.  Okay.  Can you tell when the scar tissue
```

## Page 36

```
15:52:04  1  formed?
          2      A.  No.
          3      Q.  Could it have been there for years?
          4          MR. WEIDNER:  Objection:  Form of the
          5  question; calls for speculation.
          6          THE WITNESS:  It could have been there for
          7  a while, sure.
          8  BY MS. JOHNSON:
          9      Q.  Okay.
         10      A.  Yeah.  And I would -- but something that
         11  I would have anticipated Dr. Geitz to have removed
         12  when he was in there earlier.
         13      Q.  Okay.  Did Mr. Grove ever tell you that he
         14  had a prior ankle injury in the year 2000?
15:52:33 15      MR. WEIDNER:  Objection:  Form of the
         16  question.
         17      THE WITNESS:  I don't recall he did.
         18  BY MS. JOHNSON:
         19      Q.  And did you see any documents from a
         20  chiropractor named Ealum, E-a-l-u-m?
         21      A.  No.  I have no recollection of that.
         22      Q.  Would you have wanted to see -- if there
         23  was an x-ray from the year 2000, would you have
         24  wanted to see that?
         25          MR. WEIDNER:  Objection:  Form of the
```

## Page 37

```
15:52:52  1  question.
          2          THE WITNESS:  Well, I'm thinking out loud.
          3  I'm trying to see if it would have really affected my
          4  treatment for him.  And -- no, I don't -- you know,
          5  if he came straight -- if I was his first orthopedic
          6  surgeon, I think I would have wanted to see all his
          7  records.  But Dr. Geitz is a very reputable surgeon.
          8  Okay?  So him being the first gateway into this whole
          9  specialty, I felt confident that he evaluated
         10  everything up to now, and the information that he was
         11  giving me was current and complete, so...
         12  BY MS. JOHNSON:
         13      Q.  If Dr. Geitz didn't know about the prior
         14  injury, either, would that concern you?
15:53:32 15          MR. WEIDNER:  Objection:  Form of the
         16  question.
         17          THE WITNESS:  Well, it wouldn't necessarily
         18  change what I would do for him medically, okay.  Now,
         19  obviously, you know, from his story standpoint, it
         20  could, sure.  I could see -- I could see why you're
         21  asking that question.
         22  BY MS. JOHNSON:
         23      Q.  Okay.  So you -- you shaved off the scar
         24  tissue.  And did you -- did I ask you; did you do
         25  anything else?
```

Page 38

```
15:54:03  1      A.  No, that's it.
          2      Q.  Okay.
          3      A.  Oh, I evaluated the rest of the joint, and
          4   it looked pretty good.
          5      Q.  And it looked good?
          6      A.  Yeah.
          7      Q.  Okay. So then what was the next thing that
          8   you did? I guess I should ask this question first:
          9   Did you think that the surgery was successful, in
         10   your opinion?
         11      A.  I did. Because I got a significant -- it's
         12   one of those good news/bad news things, where you go:
         13   You know, we took out a lot of scar tissue in your
         14   ankle, and I'm hopeful that that will help you, okay;
15:54:30 15   but the cartilage on the lateral aspect of your
         16   talus, you know, as expected, looks pretty crummy,
         17   and -- but I'm hopeful that by removing this bulk of
         18   tissue from your ankle that you're able to have a
         19   little less pain. Okay?
         20      Q.  Okay.
         21      A.  I made it very clear that he's going to
         22   probably continue to have some pain in his ankle -
         23   okay - given his injury and what his cartilage looked
         24   like. You know?
         25      Q.  When was the next time that you saw him?
```

Page 39

```
15:54:54  1      A.  For his first visit -- let's see here --
          2   March 16, 2005.
          3      Q.  Okay. And what was your observation of
          4   his --
          5      A.  Everything looked fine. It's just so soon.
          6   You just -- all you do is change, take the dressing
          7   off, tell him to stay off of it for a couple weeks
          8   and then gradually start walking after that.
          9      Q.  Okay. When did you see him next?
         10      A.  Three weeks later, from my note. Let's see
         11   when I actually did see him back.
         12          April 6th, five weeks after his ankle
         13   scope, he's full weightbearing, using a single
         14   crutch, cast boot.
15:55:48 15      Q.  Okay. What does "full weightbearing" mean?
         16      A.  Meaning putting all your weight to walking,
         17   to have a normal distribution of weight on each leg
         18   as you're walking.
         19      Q.  And the "cast boot," what was that?
         20      A.  "Cast boot" is as it sounds; it's a plastic
         21   boot that immobilizes your ankle.
         22      Q.  Why do you want him to immobilize it?
         23      A.  Well, you kind of gradually wean him out of
         24   it. He's had surgery, so he still has a lot of
         25   swelling in the area. So you get them weightbearing
```

Page 40

```
15:56:14  1   first, and then you gradually get them out of the
          2   boot, as the -- as the swelling and the pain calms
          3   down.
          4      Q.  Okay. After his surgery, did you prescribe
          5   any medication for Mr. Grove?
          6      A.  Per my record, I did. It looks like I gave
          7   him some Percocet, as well as some Vicodin.
          8      Q.  How much?
          9      A.  I don't remember. You know, people are --
         10   they call in, so I don't -- there's -- just because
         11   my records aren't amenable for me flipping to that
         12   part very easily. I could tell you more recently
         13   what I gave him but not afterwards.
         14      Q.  That's all right. I was just wondering.
15:56:53 15          Did you continue to prescribe him
         16   medication at the follow-up visits?
         17      A.  Yes. Yes.
         18      Q.  Okay. And where would I find reference to
         19   that?
         20      A.  We could -- we could dig that up for you
         21   probably. Yeah. Yeah.
         22      Q.  What part of your record is it kept in?
         23      A.  Yeah. Parts -- let me see here, how to --
         24   wherever the scanner scanned it in. You know? All
         25   our old records are kind of scanned in, and they
```

Page 41

```
15:57:21  1   don't really fit the category that they're really
          2   scanned in. So it takes a little bit of...
          3      Q.  Do you keep a separate medical chart, where
          4   you write down the meds that are prescribed?
          5      A.  We do, but they're all scanned in. We
          6   converted to this, you know, only three months ago.
          7   So the question is: Where in this body of software
          8   is it? And that's the part that can take a little
          9   long to find.
         10          I'm just kind of touching on a few things
         11   here.
         12          Here's a couple prescription -- ou, I just
         13   lost it. I saw a couple scanned in.
         14      Q.  Yeah, I saw them.
15:59:01 15      A.  But it's not the whole body of...
         16          Got some from 1/13/06 and 9/2/05. These
         17   are just recent. And then 4/4/06. March 11th, '05.
         18      Q.  Okay. What did you prescribe that day?
         19      A.  March -- Percocet. And then March 4th,
         20   '05, Percocet. And that's all I have here.
         21      Q.  How many -- how much Percocet was...
         22      A.  Usually 30. Yeah, 30 each time.
         23          So it looks like I gave some to him
         24   pre-operatively, as well as some a few days after
         25   surgery, like about a week after surgery.
```



Page 42

16:00:00
1  Q. Okay.
2  A. And then some kind of just spread out.
3     Another one -- this is more -- just April.
4  That's the one I saw in April.
5  Q. Of this year?
6  A. Yeah.
7     And some in September of 2005. Yeah.
8  Q. Okay. So let's go back. I'm sorry, now
9  that I made you do that, can we go back to 4/6/05?
10 A. Oh, for -- for what? Oh, for our clinic?
11 Q. Yeah, and your post-op visit.
12 A. Yeah.
13 Q. Okay. In your conclusion, you say, "based
14 on his post-traumatic arthritic changes in his
16:00:50
15 ankle," what are you seeing; what kind of changes in
16 the ankle are you talking about?
17 A. The chondromalacia in his talus.
18 Q. Okay. And you said, "It's my early feeling
19 he will -- he will likely be" --
20 A. "...it will likely be..."
21 Q. "...it will likely be difficult for the
22 patient to return to the type of job he had before
23 his injury."
24 A. Uh-huh.
25 Q. Why do you think that's right?

Page 43

16:01:10
1  A. Given the broad area of cartilage, where
2  it is in his ankle, as well as given the kind of job
3  that he had. You know? Seems like the more active
4  job you have, the less likely you're going to get
5  back to it. It's not across the board. You know?
6  It's just -- it was my early gut feeling. Sometimes
7  people surprise you and actually do better than you
8  think. But what typical -- yeah. So with that broad
9  area of deterioration in there, it was my feeling
10 that's going to get hard to get back to.
11 Q. And did you have knowledge at that time
12 what his job duties had been?
13 A. Well, you know, not exactly. You know, he
14 tells me he -- I don't quite remember exactly what he
16:01:54
15 told me he does. But I mean, I remember him talking
16 about him going up and down ladders, and it sounds
17 like he did pretty -- a lot of manual stuff. So he
18 kind of fits in that category of, you know, on his
19 feet a lot, climbing ladders, going up and down
20 things, lifting things up and down. And with this
21 kind of an injury, where a tendon was repaired, a
22 lateral ligament was reconstructed, and all these
23 kind of multi-focal lesions in his ankle, given that
24 kind of an injury, I think it would have been hard
25 for him to go back, at least to the level that he

Page 44

16:02:25
1  was. Maybe he can go back to the job that he had,
2  but maybe not to the degree that he was at. Yeah.
3  Q. Okay. So did you ever recommend that he go
4  to physical therapy?
5  A. I did. And I think I remember seeing that
6  in my notes somewhere.
7  Q. Oh, at the front of that conclusion, in
8  4/6/05, the first sentence.
9  A. Uh-huh.
10 Q. You say that you would like to start him on
11 physical therapy. Did you make a referral to
12 physical therapy at the time?
13 A. Yeah, I did. I probably did, if that's
14 what I said.
16:03:13
15 Q. Okay.
16 A. Do I have a recollection of where I sent
17 him? I don't.
18 Q. Okay. Do you have any report from United
19 Physical Therapy?
20 A. Let's see. Yeah. I guess the "Physical
21 Therapy" category here, that's good. That's Alaska
22 Spine Institute. That's what all this is about here.
23 Q. Do you have a physical therapist that you
24 work with on a regular basis?
25 A. I mean, a handful of them; not -- not

Page 45

16:03:52
1  exclusively to anyone.
2  Q. Okay.
3  A. And this is really not physical therapy.
4  This looks like a physical capacities thing he had at
5  the Alaska Spine Institute a while ago.
6  Q. Yes.
7  A. It's not that.
8     Physical therapy; here's one report from
9  April of 2005.
10 Q. Okay. And that -- is that from --
11 A. Hal Egbert.
12 Q. Hal Egbert?
13 A. Yeah.
14 Q. Okay. When you refer somebody to physical
16:05:03
15 therapy, why do you do that after surgery?
16 A. Different goals for different patients. I
17 mean, his -- his -- the goal for him was just to get
18 the range of motion back in the ankle. Okay?
19    And people tend to guard their ankle and
20 let it get stiff, due to some pain, so you kind of
21 need someone pushing them a little bit to kind of
22 work through some of the stiffness and inflammation.
23 Q. Okay. And how many sessions would you
24 normally ask him to --
25 A. I don't specify that. I let the physical

Page 46

16:05:37
1  therapist -- it's kind of a goal-oriented issue. The
2  therapist sets up some criteria and goals, and once
3  they meet that, they're done.
4      Q.  Okay.
5      A.  Yeah.
6      Q.  If the goal set by the physical therapist
7  had been two months of physical therapy, would you
8  have expected that Mr. Grove would follow through
9  with that?
10     MR. WEIDNER:  Objection: Form of the
11 question.
12     THE WITNESS:  I would hope so. But it's
13 usually not a time goal; it's usually when they're a
14 certain range of motion, a certain -- it's not really
16:06:08
15 time-lined, inasmuch as it's goal-oriented as far as
16 function.
17 BY MS. JOHNSON:
18     Q.  Given the surgery that you had performed,
19 is it possible for Mr. Grove to have gained back all
20 of his range of motion in his ankle?
21     MR. WEIDNER:  Objection: Form of the
22 question.
23     THE WITNESS:  It's -- I'll tell you, some
24 people really surprise you. Some people get a lot of
25 range of motion back.

Page 47

16:06:29
1      I took out enough that I thought it would
2  improve his range of motion. But I always -- you
3  know, with this kind of an ankle, you always make it
4  clear that it's not going to be like the other side;
5  it's not going to be like a new ankle. So I
6  anticipate limitations even with physical therapy and
7  surgery, with this kind of an injury.
8  BY MS. JOHNSON:
9      Q.  Okay. Do you have a report in May from
10 physical therapy? Do you recall any report that --
11     A.  From May? Let's see. May of 2005?
12     Q.  Uh-huh.
13     A.  I have one from April.
14     MR. WEIDNER:  Do you have a Bates number,
16:07:19
15 Counsel?
16     MS. JOHNSON:  No.
17     THE WITNESS:  Is it a handwritten -- I got
18 a handwritten one here. Let's see here.
19     No, I don't.
20 BY MS. JOHNSON:
21     Q.  Okay. Well, let's go to your next -- your
22 next visit with Mr. Grove.
23     A.  Which is?
24     Q.  I think it was May 27th, but...
25     A.  May 27th. Okay. Twelve weeks after his

Page 48

16:07:57
1  ankle scope.
2      Q.  Okay. He is telling you he still has
3  swelling; is that correct?
4      A.  And pain, yup; prolonged walking.
5      Q.  Did you actually observe swelling in his
6  ankle?
7      A.  I don't -- I did not dictate it. I just
8  note, obvious -- on the range of motion, as well
9  as --
10     Q.  Okay. So, yeah, let's go to the range of
11 motion. If you didn't dictate it, does that mean you
12 didn't see it or you didn't dictate it?
13     A.  No. It just means I just didn't indicate
14 it.
16:08:38
15     Q.  Okay.
16     A.  If it was extremely impressive, I would
17 have noted it. You know, people always -- it's
18 common people say: I've got swelling. And if it's
19 not significant, I probably wouldn't have noted it.
20     Q.  Okay. You stated that his range of motion
21 was zero to five degrees --
22     A.  Uh-huh.
23     Q.  -- in dorsiflexion?
24     A.  Uh-huh.
25     Q.  And you said plantar flexion is good, at 10

Page 49

16:09:03
1  to 15?
2      A.  Yeah.
3      Q.  What's your -- what do you think the normal
4  range of motion is for dorsiflexion?
5      A.  Dorsiflexion? Boy, you can get up to about
6  40 degrees sometimes. Some people are more flexible
7  than one another. But usually in the 30 degree range
8  is more typical.
9      Q.  Okay. And what about plantar flexion?
10     A.  It's a little bit more. You can get about
11 45 to 50 degrees.
12     You know, ankle range of motion is
13 something that's very hard to really evaluate,
14 because you get motion also through your mid foot.
16:09:33
15 So it's very subjective. It's hard to really
16 quantify how much of it's really coming from the
17 ankle or just you pushing down on the mid foot, as
18 well. That's why degrees, fine degrees, really
19 doesn't -- it's not too meaningful. It's just kind
20 of a gross, you know, a gross observation. It's
21 always just relative. You know?
22     Q.  Okay.
23     A.  Yeah.
24     Q.  So do you use some sort of a --
25     A.  No.

13 (Pages 46 to 49)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 13 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32

**Page 50**

16:10:01
1  Q. -- instrument?
2  A. No, I don't use a machine. It's just
3  eyeball. It's just eyeball.
4  Q. Okay.
5  A. It's very gross.
6  Q. So you do that from experience?
7  A. Yeah. Just from experience, yeah.
8  Q. And one of the things you wanted Mr. Grove
9  to work on with physical therapy was his range of
10 motion, correct?
11 A. Yeah.
12 Q. And at this time, did you note that he had
13 stopped physical therapy?
14 A. Let's see. He continues to do home PT, but
16:10:34 15 has quit going to formal PT.
16    (Reporter requested clarification.)
17    THE WITNESS: He had quit his formal,
18 but -- he continues to do his home PT, but has quit
19 going to formal PT.
20 BY MS. JOHNSON:
21 Q. And in your experience, does a patient work
22 as hard on home PT as they would with a professional?
23 A. It's patient-dependent. Some people are
24 very motivated; some aren't. You just don't -- you
25 can't -- you just don't know.

**Page 51**

16:10:57
1  Q. Did you have a -- did you have a feeling
2  with Mr. Grove, whether he was motivated at all?
3  A. I -- no, I didn't. I didn't. You know,
4  my -- my contact with Larry has always been pleasant,
5  and he's always been very pleasant. So, you know,
6  he -- no. He seemed like a pretty straightforward
7  guy, as far as, you know, I was concerned.
8  Q. Did he tell you that after his surgery with
9  Dr. Geitz, that Dr. Geitz asked him to go to physical
10 therapy?
11 A. No, I don't recall. I don't recall that.
12 Q. Okay.
13 A. I would -- I just -- as much as Dr. Geitz
14 did, I probably would have just assumed - okay - that
16:11:32 15 he did. Yeah.
16 Q. And so he didn't tell you whether he made
17 progress or not with his former...
18 A. No.
19 Q. Okay. And in your experience, could
20 Mr. Grove improve his range of motion with continued
21 physical therapy at this time?
22 A. It's hard to say. You know, you let them
23 go for a while, let them maximize it, and -- and
24 after, you just -- you get what you get. So it's
25 hard to say.

**Page 52**

16:12:07
1  Q. But it's possible, right?
2  A. It's possible.
3     MR. WEIDNER: Objection: Form of the
4  question.
5  BY MS. JOHNSON:
6  Q. At this time, did you have any -- give him
7  any activity restrictions, tell him not to do any
8  certain activity?
9  A. I don't believe I did. He's 12 weeks out
10 now, so he's ready to kind of start doing what he
11 wants, with pain being his guide.
12 Q. Okay. And although you had said you didn't
13 think he would return to his former employment, did
14 you ever tell him he couldn't return to any
16:12:39 15 employment?
16 A. No. No, I never -- would never have said
17 that.
18 Q. Would you ever say that?
19 A. No, I wouldn't say that.
20 Q. When was the next time that you saw Larry
21 Grove?
22 A. Let's see here.
23    July the 8th, 2005.
24 Q. And what did he report to you then?
25 A. Still hurting.

**Page 53**

16:13:23
1  Q. Okay. And you noted that there was -
2  what - not much change; is that correct?
3  A. Yeah. Not much pain; still hurting, you
4  know. You know?
5  Q. Is there anything that he could have done
6  at this time to help himself with the pain?
7  A. No. I mean, I offered him some modalities,
8  like another injection into his ankle, if he wanted.
9     Actually, we gave him another injection,
10 didn't we? We gave him another injection, because he
11 was hurting. And then I think he got a PPI here. He
12 had a PPI done earlier, before the surgery.
13 Obviously, we ordered a new one for him, since we
14 just, you know, operated on him again.
16:14:18 15 Q. Okay. Would physical therapy have helped
16 him continue to build his range of motion?
17 A. You mean more physical therapy?
18 Q. Right.
19 A. You know, I don't think -- Hal Egbert is so
20 experienced, he wouldn't have -- he sent him off to
21 do home PT. If he felt that he could have got more
22 gain -- I mean, I -- Hal -- I think there's not
23 proba -- none more experienced PT guy than Hal
24 Egbert.
25 Q. Well, if Mr. Egbert didn't know why

### Page 54

16:14:47
```
 1   Mr. Grove had quit, would that change your opinion of
 2   whether he could have made progress in PT?
 3        MR. WEIDNER: Objection: Form, form of the
 4   question.
 5        THE WITNESS: You know, I'll tell you what;
 6   his main issue really wasn't the range of motion, at
 7   this point, as well as -- because he has reasonable
 8   motion. He has 10 degrees of dorsiflexion, 15
 9   degrees of plantar flexion. The stiffness in the
10   ankle is the range-limiting issue as much as the
11   damage of his cartilage, of his talus. So could have
12   more PT have maybe given him some more range of
13   motion in the ankle? It could have, but I'm not
14   convinced that it could have necessarily addressed
```
16:15:23
```
15   the pain that he had emanating from his -- his
16   damaged talus.
17   BY MS. JOHNSON:
18   Q.  Okay. And at this time, you are -- you're
19   basing the fact that he has pain both on his
20   subjective report and on the fact that you know he
21   has prior damage; is that correct?
22   A.  Right. Yeah. And based on what I saw in
23   the surgery.
24   Q.  Okay.
25   A.  Yeah.
```

### Page 55

16:15:54
```
 1   Q.  And you said you considered him medically
 2   stable?
 3   A.  Yeah.
 4   Q.  Why is that?
 5   A.  Well, let's see. He's four months out now.
 6   Okay? So if there really isn't much significant
 7   change in his symptoms, for the past 45 days or so,
 8   he is technically considered medically stable. It
 9   doesn't mean that he can't get better. But really, I
10   haven't seen any significant change in his progress
11   from his previous exam.
12        MR. WEIDNER: Do we have a Bates number on
13   that, Counsel?
14        MS. JOHNSON: It's your document 780.
```
16:16:40
```
15        (Reporter requested clarification.)
16        MS. JOHNSON: 780.
17   BY MS. JOHNSON:
18   Q.  So you did the cortisone injection?
19   A.  Uh-huh.
20   Q.  And you said you don't do those at your
21   office; is that right?
22   A.  Oh, no, we do injections in our office.
23   Q.  Oh. That's what it says at the bottom
24   here. Oh, I'm sorry, I'm looking at the PPI.
25   Nevermind.
```

### Page 56

16:16:54
```
 1   So you gave him a cortisone injection?
 2   A.  Yeah, in the office. And then we sent him
 3   off for a PPI.
 4   Q.  Okay. And then your next visit was when?
 5   A.  Oops, going the wrong way.
 6        September 2nd, 2005: Still having a lot of
 7   pain; spasms at night; got some x-rays. At this
 8   point, I considered bracing him; giving him a brace
 9   to immobilize his ankle.
10   Q.  What was causing his spasms?
11   A.  I don't know. People complain of that.
12   It's a common -- kind of a vague complaint. I don't
13   have a good explanation for that. Pain could be
14   refer -- kind of perceived as spasms. Muscles in the
```
16:18:01
```
15   area of the ankle joint can spasm up because he's
16   guarding so much when he's walking. Some of that
17   could cause spasms.
18   Q.  What about over-use? Does that cause them?
19   A.  It could, one of many things that could
20   cause it, sure.
21   Q.  Okay. Did he report to you here that he
22   had just come back from a hunting trip?
23   A.  I don't note that.
24   Q.  Is that the sort of thing that you would
25   note?
```

### Page 57

16:18:36
```
 1   A.  I would. I would, certainly, if I felt --
 2   I don't -- yeah, I don't have any -- I don't have --
 3   I don't have any memory of that. Yeah, if it was
 4   something --
 5   Q.  So he probably --
 6   A.  If it was something -- yeah. If he came in
 7   and said: I just got back from a hunting trip, I
 8   probably would have noted that.
 9   Q.  Okay.
10   A.  I think that is something that's notable.
11   Q.  Why is it notable?
12   A.  Well, I'll tell you. Well, if -- it kind
13   of gives you the level of function of the gentleman.
14   You know? I have a lot -- I have a lot of my
```
16:19:03
```
15   patients who do come in with bad ankle arthritis, and
16   I can give them an injection that kind of holds them
17   over just to go hunting.
18   Q.  Uh-huh.
19   A.  But it does kind of give you a level of --
20   you know, a baseline level of pain. Obviously, if
21   they're crippled, they can't go hunting. Okay?
22   Q.  Right.
23   A.  But there are -- there are varying degrees
24   of -- some guys are such avid hunters that it's going
25   to take really a wheelchair to keep them out of --
```

15 (Pages 54 to 57)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit 5
page 15 of 29

969d07ef-fb0d-4c46-bf57-ed4e02970d32