John B. Thorsness, Esq.
Linda J. Johnson, Esq.
CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501
(907) 272-9272
usdc-anch-ntc@cplawak.com
Attorneys for Defendant Unocal Alaska

RECEIVED
MAY 2 5 2006
WEIDNER & ASSOCIATES

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA GROVE, SARAH GROVE, and MICHAEL GROVE (DOB 1/21/88) by and through his father LAWRENCE H. GROVE,

Plaintiffs,

vs.

UNOCAL CORPORATION,

Defendant.

Case No. 3:04-cv-0096-TMB

## DEFENDANT'S RESPONSES TO PLAINTIFFS 15th DISCOVERY REQUESTS TO UNOCAL CORPORATION

Defendant, Unocal Corporation, by and through its counsel of record, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, submits its response to Plaintiffs' Fourteenth Discovery Requests to Unocal Corporation Pursuant to Federal Rules of Civil Procedure 26 and 34, dated April 11, 2006, as follows:

Exhibit 5
page 1 of 6

Defendant's Responses to Plaintiffs 15th
Set of Discovery Requests
Grove v UNOCAL, Case No. 3:04-cv-0096-TMB
Page 1 of 6

**REQUEST FOR PRODUCTION NO. 1:** Please produce any and all documents regarding repairs, remodeling, remediation, renovation and/or redesign of the filter room from the time the building opened to the present date.

**RESPONSE:**

Objection vague, burdensome and overbroad.

All responsive, non-privileged documents that have been previously requested and produced.

**REQUEST FOR PRODUCTION NO. 2:** Please produce any and all documents regarding repairs, remodeling, remediation, renovation and/or redesign of the mechanical room from the time the building opened to the present date.

**RESPONSE:**

Objection vague, burdensome and overbroad.

All responsive, non-privileged documents that have been previously requested and produced.

**REQUEST FOR PRODUCTION NO. 3:** Please produce any and all documents regarding asbestos removal/remediation in the mechanical room and/or the filter room.

**RESPONSE:**

Objection vague, burdensome, irrelevant and overbroad.

Defendant's Responses to Plaintiffs 15th Set of Discovery Requests
Grove v UNOCAL, Case No. 3:04-cv-0096-TMB
Page 2 of 6

There is no limit on the subject matter and therefore it calls for information that is not related to this litigation nor will it likely lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 4:** Please produce any and all documents including, but not limited to, manuals, guidelines, instructions, procedures, policies regarding construction and/or building standards and/or maintenance and/or inspection and/or testing for work platforms utilized and/or required by Unocal and/or Union Oil Company of California and/or Unocal Alaska anywhere they operate from 1970 to the present.

**RESPONSE:**

Objection vague, burdensome and overbroad.

All responsive, non-privileged documents that have been previously requested and produced.

**REQUEST FOR PRODUCTION NO . 5:** Please produce any and all documents or evidence that supports any alleged claim that anyone other than Unocal designed, constructed, maintained, repaired, authorized or approved the work platform in the filter room that is the subject of this litigation.

**RESPONSE:**

Objection vague, burdensome and overbroad.

Unocal has been unable to locate any responsive documents. If Unocal is able to locate any responsive documents in the future, they will be produced.

Defendant's Responses to Plaintiffs 15th
Set of Discovery Requests
Grove v UNOCAL, Case No. 3:04-cv-0096-TMB
Page 3 of 6

**REQUEST FOR PRODUCTION NO. 6:** The drawing produced as to the penthouse in previous discovery requests is not completely accurate as to the penthouse as observed during inspections. Please produce accurate drawings of the Penthouse as (1) it was at the time of the accident of September 9, 2002; (2) as of today; and (3) that reflect each and every change/modification of the penthouse since the building opened.

**RESPONSE:**

Objection vague, burdensome and overbroad.

All responsive, non-privileged documents that have been previously requested and produced.

**REQUEST FOR PRODUCTION NO. 7:** Please produce each and every fire marshal report on the Unocal building.

**RESPONSE:**

Objection vague, burdensome, irrelevant and overbroad.

There is no limit on the subject matter and therefore it calls for information that is not related to this litigation nor will it likely lead to the discovery of admissible evidence. Defendants are unaware of any fire marshal report related to the filter room.

**REQUEST FOR PRODUCTION NO. 8:** Please produce each and every inspection report concerning (a) the filter room; (b) the penthouse and (c) components/ systems within the filter room and/or the penthouse.

Defendant's Responses to Plaintiffs 15th
Set of Discovery Requests
Grove v UNOCAL, Case No. 3:04-cv-0096-TMB
Page 4 of 6

Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

**RESPONSE:**

Objection vague, overbroad, burdensome.

All relevant and responsive documents have been previously produced.

**REQUEST FOR PRODUCTION NO. 9:** Please produce each and every architectural/structural/design drawing of modifications/remodeling /renovations/re-designs/remediation for the penthouse.

**RESPONSE:**

Objection, vague, ambiguous, overbroad.

This request has been made and responded to numerous times by Plaintiffs. See e.g. response to RFP # 13 and RFP #18, in Response to Plaintiffs' 14th Set of Discovery Requests.

**REQUEST FOR PRODUCTION NO. 10:** Please produce any and all documents regarding (a) hazards; (b) safety violations; or (c) OSHA investigations involving the penthouse since the Unocal building was built.

**RESPONSE:**

Objection, vague, ambiguous, overbroad. Objection to the extent that it calls for the production of attorney-client, work product or proprietary information.

This request has been made numerous times by Plaintiffs. See e.g. response to RFP # 22, in Response to Plaintiffs' 14th Set of Discovery Requests.

Defendant's Responses to Plaintiffs 15th Set of Discovery Requests
Grove v UNOCAL, Case No. 3:04-cv-0096-TMB
Page 5 of 6

Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

**REQUEST FOR PRODUCTION NO. 11:** Please produce <u>all</u> safety reports, and <u>all</u> safety meeting minutes, or notes concerning the Unocal building from its opening to the present time.

**RESPONSE:**

Objection, vague, ambiguous, overbroad. Objection to the extent that it calls for the production of attorney-client, work product or proprietary information.

This request has been made numerous times by Plaintiffs. See e.g. response to RFP # 13 and RFP #18, in Response to Plaintiffs' 14th Set of Discovery Requests.

DATED at Anchorage, Alaska, this 25 day of May, 2006.

CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
Attorneys for Defendant Unocal

By: _____
Linda J. Johnson
Alaska Bar No. 8911070

Certificate of Service:

I certify that a copy of this document was mailed  X , faxed  X , hand delivered ____ on May 25, 2006, to the following:

Phillip P. Weidner Esq.
330 L Street, Suite 200
Anchorage AK 99501

By: _____

Defendant's Responses to Plaintiffs 15th
Set of Discovery Requests
<u>Grove v UNOCAL</u>, Case No. 3:04-cv-0096-TMB
Page 6 of 6

FILE COPY                                             Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3   _____
 4   LAWRENCE H. GROVE, CYNTHIA GROVE,       )
     SARAH GROVE and MICHAEL GROVE (DOB      )
 5   1/21/88) by and through his father      )
     LAWRENCE H. GROVE,                      )
 6                                           )
                  Plaintiffs,                )
 7                                           )
     vs.                                     )
 8                                           )
     UNOCAL CORPORATION,                     )
 9                                           )
                  Defendants.                )
10   _____
11   Case No. A04-0096 CV (JKS)
12
13
14   _____
15        VIDEOTAPED DEPOSITION OF ROBERT SPRINKLE
16   _____
17                 Monday, April 24, 2006
                        9:24 a.m.
18
19              Taken by Counsel for Defendant
                             at
20                  Weidner & Associates
                   330 L Street, Suite 200
21                    Anchorage, Alaska
22
23                                       Exhibit  6
                                         page  1  of  2
24
25
```

Page 70

1  A. Well, it is all sheet metal inside there.
2  Q. Sheet metal is how thick, do you recall?
3  A. Well, there is different gauges, but this has to
4  be a fairly thick gauge. I am not that good on numbers.
5  26 gauge, 38, 18 gauge, whatever, but it is not going to
6  be a thin gauge because you got all of that air and you
7  got pressure inside of the plenum and you got air going
8  through there itself.
9     You got a 75 or 100 horsepower fan motor on the
10 other side, so if you get too thin a metal, it is just
11 going to collapse it.
12 Q. You say if it is too thin a metal it will
13 collapse it?
14 A. There is specs that you got to know and like that
15 has got to be a certain grade or certain thickness of
16 metal because between the way your dampers are and you
17 start a motor that big you are going to have suction.
18 Q. So did you assume that they built this to a
19 sufficient grade to maintain the weight of workers that
20 would climb on the platform?
21    MS. JOHNSON: Objection; foundation.
22 A. Yeah. I didn't ever question who built it, to
23 tell the truth. I never even thought about it. I
24 figured it was there from day one.
25 Q. Did you ever try to find out who built it after

Page 71

1  Larry's accident?
2  A. Yes, I did ask people, but everybody I asked -- I
3  mean the people that I knew that worked for Honeywell or
4  worked for Honeywell now were never in the building
5  before that time, or before I was ever in there, so I
6  mean I have out of curiosity asked around, but I
7  couldn't get an answer from nobody.
8  Q. Has anybody ever told you that it was built by
9  Gyr & Landis?
10 A. Nobody has ever told me who it was built by.
11 Like I said, then our conversations through different
12 people throughout the years, nobody has any clue who
13 built it, that I know of.
14 Q. To the best of your personal knowledge, it wasn't
15 built by Landis & Gyr?
16 A. No, it was not built by Landis & Gyr. It was
17 there when we took over the contract.
18 Q. To the --
19 A. Sorry.
20 Q. No, I'm sorry. I interrupted you. Go ahead.
21 A. I said I don't know. Like I said, Honeywell was
22 there before us and then we got there, but I can't say
23 who did it.
24 Q. Did you ever -- did you have to have an
25 orientation when you first started working in the

Page 72

1  building for Landis & Gyr, safety orientation?
2  A. You know, it seems like we might have had to do
3  something. I can't remember exactly now. But with
4  Unocal, I mean, I know that we had a talk because we
5  couldn't go in the ceilings because of the asbestos.
6     I'm sure we had a talk in case we had to solder
7  anything or work in the computer room. As far as a sit
8  down formal safety thing, I can't say honestly yes or
9  no.
10    I know we discussed those things especially. Don
11 Acres made it a special point that I could not stick my
12 head above that ceiling tile whatsoever. That one was a
13 no-brainer that we couldn't do that.
14    As far as anything else goes, I don't recall off
15 the top of my head.
16 Q. And that was because of the asbestos?
17 A. Exactly. We were not allowed to go above the
18 ceilings whatsoever. If we found a problem like a
19 thermostat bad to a valve or something like that, we
20 definitely had to go get Charles or Don in order to
21 address it.
22 Q. Do you recall what the lighting was like when you
23 would go into that filter room?
24 A. Well, if your outside air dampers were open, it
25 is pretty light in there from outside. I can't remember

Page 73

1  whether there was a light inside that room or not, to
2  tell you the truth. I don't remember working in the
3  dark, but I mean most of them penthouses even if there
4  are lights they are hidden by pipes and everything so
5  you are in a shadow sometimes anyway.
6  Q. Do you recall if the platform was affixed to the
7  brackets or was it hanging loose, just placed on the
8  brackets?
9     MS. JOHNSON: Objection; form of question.
10 Q. Well, let me rephrase that. Do you know if the
11 platform was simply resting on the brackets?
12 A. I believe it was just sitting on top of the
13 brackets. I don't think we were attached down, screwed
14 to it, but it's actually been so darn long in there,
15 that I don't remember specifically, you know, whether we
16 were screwed down or bolted down or what we were.
17 Q. Now, you indicated that you had gone -- how often
18 did you go hunting with Larry before the accident?
19 A. I remember going caribou hunting up by Eureka
20 with him the very first time. We have been moose
21 hunting probably twice. Once at Point McKenzie and I
22 had a permit over there, and then I had a permit up by
23 Petersville one year and we were hunting up there.
24 Q. When you went hunting, did you do a fair amount
25 of hiking?

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF ALASKA AT ANCHORAGE
3    _____
4    LAWRENCE H. GROVE, ET AL.,      )
                                     )
5              Plaintiffs,           )
                                     )
6      vs.                           )
                                     )
7    UNOCAL CORPORATION,             )
                                     )
8              Defendant.            )
9    _____
10   Case No. A-04-0096 CV (JKS)
11
12
13   _____
14            VIDEOTAPED DEPOSITION OF PAUL CRAPPS
15   _____
16                     March 3, 2006
                        11:00 a.m.
17
18            Taken by Counsel for Plaintiffs
                            at
19                 330 L Street, Suite 200
                     Anchorage, Alaska
20
21
22
23
24
25

COPY
RECEIVED MAR 21 2006
WEIDNER & ASSOCIATES

Exhibit 7
page 1 of 3

Page 33

1   A. No.
2   Q. So you pulled the plank outside the filter room,
3   and then what did you proceed to do? Did you proceed to
4   unscrew any of the nuts?
5   A. I removed the two metal brackets.
6   Q. And what did you do with the hardware that was
7   used to attach the brackets to the wall?
8   A. I put it in the trash can.
9   Q. Was the trash can in the filter room or right
10  outside the filter room?
11  A. It was as you entered the penthouse.
12  Q. Do you recall how many nuts and bolts you had to
13  remove?
14  A. No.
15  Q. Do you recall what the size of the bolts were?
16  A. I would estimate like a quarter inch.
17  Q. Do you know the strength of those bolts?
18  A. No.
19  Q. How long did it take you to remove the brackets?
20  A. I would say -- I would estimate maybe 15 or
21  20 minutes.
22  Q. Did you observe any debris on the floor of the
23  filter room while you were working?
24  A. No.
25  Q. And when you removed the bolts, did you catch

Page 34

1   them in your hand or did you have like a baggy you were
2   putting them in?
3   A. No. I just removed them and whatever I pulled
4   out, I put in my hand, or whatever. It landed where it
5   landed.
6   Q. Did you say it went where it landed?
7   A. Yeah.
8   Q. So did some fall on the floor?
9   A. They could have, yes.
10  Q. And did you go and pick up the ones that fell on
11  the floor?
12  A. No.
13  Q. How soon was this second visit to the filter room
14  from the first time that you went in -- not that you
15  went in, that you went up there with Charles the first
16  time and now the second time you went in to remove it.
17  Do you have any idea how much time had passed?
18  A. A couple of days.
19  Q. Now, can you describe the hardware that you
20  removed? Was it just bolts or what else was there?
21  A. I removed the two metal brackets and the bolts
22  holding it on.
23  Q. Well, were there like washers attached to the
24  bolts?
25  A. I don't recall. There could have been.

Page 35

1   Q. Were there nuts at the end of the bolt?
2   A. Yes.
3   Q. Can you describe the shape of the nuts? Round?
4   Square?
5   A. The nuts themselves were square.
6   Q. Now, you said you threw the nuts and bolts away.
7   Did somebody tell you to do that?
8   A. No. I was just told to remove it.
9   Q. By Charles?
10  A. Yes.
11  Q. Do you know if -- did you put anything up in its
12  place after you removed it?
13  A. No.
14      MR. THORSNESS: By "it," you would mean the
15  brackets and that sort of stuff?
16      MR. COHN: Yeah.
17      MR. THORSNESS: Thank you. That's how you
18  understood the question?
19      THE WITNESS: Yes.
20  Q. Do you know if you removed the plank and the
21  bracket and the nuts and the bolts after OSHA inspected
22  the room, the filter room?
23  A. What do you mean?
24  Q. Are you aware that OSHA came out and inspected
25  the filter room?

Page 36

1   A. Yes.
2   Q. And the removal of the brackets and the nuts and
3   the bolts -- we didn't actually talk about what you did
4   with the plank yet. Did that occur after OSHA came in?
5   A. No, that was before.
6   Q. Now, you have this plank that you estimated,
7   what, about 12 feet long?
8   A. Yeah.
9   Q. What did you do with the plank?
10  A. I put it up in a long storage area as you come
11  into the penthouse. I placed it up in that.
12  Q. And do you know how long the plank was in that
13  area?
14  A. No.
15  Q. Do you know what happened to the plank after you
16  placed it there?
17  A. No.
18  Q. Now, the brackets that you removed, the metal --
19  they were metal brackets?
20  A. Yes.
21  Q. So there were four of them? Was it like a
22  bracket on each wall or was it one?
23  A. There was two brackets.
24  Q. But when you are referring to the bracket, you
25  are talking about just -- well, I can show you. Well,

12 (Pages 33 to 36)

Page 37

1  we'll get to that afterwards, but we'll talk about the
2  brackets what they looked like after, but what did you
3  do with the brackets?
4     A. What did I do with them?
5     Q. Yes.
6     A. I discarded them in the trash with the nuts and
7  bolts.
8     Q. Now, did you ever go back into the room after
9  that day that you removed it?
10    A. What time period? As a contractor or since I
11 worked there?
12    Q. Let's talk about first as a contractor.
13    A. Yes.
14    Q. When did you -- actually, I should just go in
15 order. You removed all of these things from the room?
16    A. Yes.
17    Q. Then when is the next time you came back into the
18 room?
19    A. I couldn't recollect that. The last time I could
20 recollect going back up there and going physically in
21 that room would be the OSHA inspection.
22    Q. Well, if the planks had been removed and the nuts
23 and bolts had been removed and the brackets removed,
24 what did they have to look at?
25       MR. THORSNESS: Objection; foundation.

Page 38

1     Q. Well --
2        MR. THORSNESS: You are asking him what OSHA
3  had to look at?
4        MR. COHN: No speaking objection, please,
5  John. He says he is in the room with them.
6     Q. You are in the room?
7     A. With who?
8     Q. With the OSHA people?
9     A. No.
10    Q. You didn't go in the room. I asked you the next
11 time you went into the room.
12       MR. THORSNESS: You say "the room."
13       MR. COHN: The filter room. When we are
14 talking about "the room," we are talking about the
15 filter room unless otherwise specified.
16    A. The filter room, I would have to say I didn't set
17 foot in that filter room when the OSHA inspectors came.
18 I let them into that room.
19    Q. Was the door open and you standing outside the
20 room?
21    A. Yes.
22    Q. But when they went into the room to inspect, the
23 platform wasn't there?
24    A. No.
25    Q. And do you know who went into that room?

Page 39

1     A. The OSHA inspector and our safety person, Ken
2  Burns.
3     Q. And was Charles Arnett -- did Charles Arnett go
4  into the room?
5     A. No.
6     Q. What about Roseanne Sinz?
7     A. No.
8     Q. Did you have any -- did Roseanne Sinz direct you
9  to do anything in the filter room?
10    A. No.
11       MR. THORSNESS: Are you talking on the day
12 of the OSHA inspection or any time?
13    Q. I guess that was at any time.
14    A. At any time, I would say no. Actually, I would
15 say no, not from Roxanne, no.
16    Q. Well, not from Roxanne, then, okay. Who, besides
17 Charles Arnett, who has directed you to do anything in
18 connection with the filter room?
19    A. I took pictures after the OSHA inspection of the
20 filter room.
21    Q. How many pictures did you take?
22    A. Half a dozen, I would estimate.
23    Q. Well, why did you take these pictures?
24    A. After the OSHA inspection, we just figured it
25 would be good to have our own pictures.

Page 40

1     Q. When you said "we thought it would be good," you
2  are talking more than just you? Did anybody direct you
3  to take these pictures?
4     A. Ken Burns.
5     Q. Did you see anyone else taking pictures?
6     A. No.
7     Q. What type of camera did you use?
8     A. Digital.
9     Q. And what areas of the room did he have you take
10 pictures of?
11    A. Where the platform existed.
12    Q. When you say where -- did you do any close-up
13 shots or zoom in to where the brackets were located?
14    A. From knowledge of where I pulled them down.
15    Q. So did you take pictures at both sides of the
16 wall or just the sheetrock side?
17    A. It's not real sheetrock. Just the opposite side
18 of the filters.
19    Q. Do you know what happened to those pictures after
20 you took them?
21    A. I sent them off to, I think, Ken Burns and
22 Roxanne Sinz.
23    Q. Have you, yourself, ever had to work on a --
24 stand on a work platform?
25    A. At my present job or at that point?

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ALASKA

3  _____

4  LAWRENCE H. GROVE, CYNTHIA GROVE,        )
   SARAH GROVE and MICHAEL GROVE (DOB       )
5  1/21/88) by and through his father       )
   LAWRENCE H. GROVE,                       )
6                                           )
                Plaintiffs,                 )
7                                           )
   vs.                                      )
8                                           )
   UNOCAL CORPORATION,                      )
9                                           )
                Defendants.                 )
10 _____)

11 Case No. A04-0096 CV (JKS)

12

13

14 _____

15         VIDEOTAPED DEPOSITION OF CHARLIE ARNETT

16 _____

17              Tuesday, April 26, 2006
                     9:30 a.m.
18

19         Taken by Counsel for Defendant
                        at
20  Clapp, Peterson, Van Flein, Tiemessen & Thorsness
              711 H Street, Suite 620
21                Anchorage, Alaska

22
                                         Exhibit  8
23                                       page  1  of  2

24

25

COPY

Exhibit 8 page 1 of 2

**Page 96**

1  door that appeared to still be intact?
2     MS. JOHNSON: Objection; form of the
3  question.
4     A. I don't remember seeing one.
5     Q. Well, do you recall -- do you recall if there was
6  more than one cross beam or bracket which held up the
7  planks?
8     A. No. I don't remember seeing any. Just because
9  of the angle, this stuck out in my mind because it was
10 like there.
11    Q. Now, you indicated that -- in questioning you
12 said that Larry Grove was obviously hurt. What do you
13 mean by that?
14    A. Well, he was moaning, shortness of breath.
15    Q. Was he -- were you able to see any -- you say you
16 saw some cuts on his --
17    A. Yes. It looked like the shin of one of his legs.
18 He pulled his pant leg up and showed me where maybe the
19 platform had hit to indicate that he was in pain.
20    Q. That was going to be one of my questions, how
21 would you tell, whether he was wearing shorts. He was
22 wearing long pants?
23    A. Yes.
24    Q. Now, you were showed these photos in Exhibit
25 No. 3 and asked some questions about the ladder, but do

**Page 97**

1  you know when these photos were taken?
2     A. No.
3     Q. So you have no idea whether, at this time,
4  whether that ladder was in the room at the time of the
5  accident?
6     A. I don't know. I just remember seeing the ladder
7  there.
8     Q. But you do recall that cross beam or bracket
9  that's down in this picture?
10    A. Yes.
11    Q. Can you just point that bracket out for the
12 camera that you recall seeing?
13    A. This one here.
14    Q. Can you just hold it there?
15       MR. COHN: Did you get that? Thank you.
16    Q. Now, you indicated that the bolt had been --
17 looked sheared?
18    A. It looked like it was sheared.
19    Q. What does that mean to you?
20    A. The bolt looked rusted and old all the way around
21 it, but the end looked like it was nice and shiny like
22 it had been cut or it wasn't a smooth end, but it was
23 very shiny compared to the rest of them.
24    Q. So from looking at that, did it appear to you
25 that that had sheared off causing the platform to

**Page 98**

1  collapse?
2     A. It looked like it had been sheared off because,
3  like I say, the area that I saw was not smooth. It was
4  -- it just wasn't smooth. It was kind of --
5     Q. Jagged?
6     A. Yeah.
7     Q. When you -- now, you indicated you helped
8  Mr. Grove get up and leave the room. Did anybody see
9  the two of you together on the way out of the building,
10 to the best of your personal recollection?
11    A. Best of my -- I don't remember seeing anyone in
12 the elevators. If anyone would have seen us, it would
13 have been the receptionist.
14    Q. Do you know the name of the receptionist?
15    A. No, I don't, to be honest with you, because we
16 went through -- back at that time, we had gone through
17 two or three different receptionists.
18    Q. So it would probably be a matter of the time
19 cards for Unocal to see who the receptionist was on duty
20 on September 9th '02?
21    A. (Witness nods head.)
22    Q. Was there one entrance into the building?
23    A. There are actually two entrances to the building,
24 but everyone used the north entrance all the time.
25    Q. When you -- the north entrance, are those glass

**Page 99**

1  doors?
2     A. Yes.
3     Q. When you enter the north entrance, is the
4  reception area on your right as you come in?
5     A. Yes, through another set of glass.
6     Q. If you keep going straight, do you then instead
7  of turning right into the reception area, you reach the
8  elevators?
9     A. You mean when you first go into the building?
10    Q. Right.
11    A. Yes. You go in through the outside doors and
12 then you got another set of doors where you put your
13 coat in, and then you go through there and then the
14 elevator is on the right-hand side.
15    Q. Is it -- normally would you -- was your office
16 through the reception area?
17    A. My office is located behind the receptionist,
18 yes.
19    Q. Now, you indicated that Mr. Grove had an access
20 code and that --
21    A. I believe so, yes.
22    Q. But that Unocal could tell -- whenever the access
23 code was used, it would be input into some sort of
24 system?
25    A. It was kept on a PC, yes.

# CLAPP · PETERSON
## VAN FLEIN · TIEMESSEN · THORSNESS
### LLC

**ANCHORAGE**

Matthew K. Peterson
Thomas V. Van Flein
John B. Thorsness
Scott Hendricks Leuning
Laura S. Gould
John P. Wood
Linda J. Johnson
Liam J. Moran, Of Counsel

**FAIRBANKS**

John J. Tiemessen
David A. Carlson

Marcus R. Clapp, ret.

April 25, 2005

Mary Lee
St. Paul Travelers Insurance
1120 East Huffman, Ste. 23
Box 687
Anchorage, AK 99515

VIA FAX 562-2447

    Re: Lawrence Grove
    DOB: 8-11-53
    Ss# 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
    Our File No. 6200-1

Dear Ms. Lee:

Thank you for returning my telephone call today. As I indicated this firm represents Siemen's Building Technologies in a lawsuit that has been file by Lawrence Grove. The lawsuit is for damages surrounding an injury Lawrence Grove sustained on September 9, 2002. The attorney for Siemen's is John Thorsness and I am the paralegal assigned to the case.

I am writing to obtain copies of your files relating to the workers compensation claim of Lawrence Grove. The claim number given to me by Siemen's is 133-CB-AYL2598A. We would appreciate a copy of all records maintained in the files of St. Paul Travelers Insurance Co., relating to Lawrence Grove. We will pay a reasonable copying fee. Please enclose your invoice with the copies and I will make sure it is promptly paid.

Please feel free to call me if you have any questions.

Thank you,

Clapp, Peterson, Van Flein, Tiemessen & Thorsness

Lori L. O'Brien
Paralegal

Exhibit 9
page 1 of 1

711 H Street, Suite 620 · Anchorage, Alaska 99501-3454
phone · 907-272-9272   email · anch@cpsattorneys.com   fax · 907-272-9586

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF ALASKA
3
4  LAWRENCE H. GROVE, CYNTHIA      )
   GROVE, SARAH GROVE, and         )
   MICHAEL GROVE (DOB 1/21/88)     )
5  by and through his father       )
   LAWRENCE H. GROVE,              )
6                                  )
                Plaintiffs,        )
7                                  )
        vs.                        )
8                                  )
   UNOCAL CORPORATION,             )
9                                  )
                Defendant.         )
10 _____)
   Case No. A04-0096 CV (JKS)
11
12
13  _____
         30(b)(6) DEPOSITION OF SIEMENS BUILDING
14                   TECHNOLOGIES, INC.
             DESIGNEE:  DOUG SCHUTTE
15  _____
16
                       Pages 1 - 46
17              Friday, January 3, 2006
                       2:06 P.M.
18
            Taken by Counsel for Plaintiffs
19                         at
   Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC
20              711 H Street, Suite 620
                   Anchorage, Alaska
21
22                                      Exhibit  10
23                                      page  1  of  2
24
25

COPY

Exhibit 10
page 1 of 2

Page 4

1   ANCHORAGE, ALASKA; FRIDAY, FEBRUARY 3, 2006
2                2:06 P.M.
3          (Exhibit No. 1 marked.)
4                -o0o-
5                DOUG SCHUTTE,
6   deponent herein, being sworn on oath,
7   was examined and testified as follows:
8                EXAMINATION
9   BY MR. COHN:
10      Q   Good afternoon. My name is Michael Cohn.
11  I'm an attorney from the Law Firm of Phillip Paul
12  Weidner & Associates, and I'm here on behalf of the
13  plaintiffs, including Larry Grove, who at one point
14  was an employee of Siemens Technology.
15          MR. COHN: Can I ask for the other attorney
16  present to identify himself?
17          MR. MORAN: Liam Moran. I represent Unocal
18  Corporation and Siemens Building Technologies, Inc.
19          MR. COHN: Just to be clear, are you
20  representing Siemens for purposes of this deposition?
21          MR. MORAN: That's correct.
22          MR. COHN: Just for the record, I object to
23  counsel for Unocal Corporation representing, as
24  attorney of record, Siemens Building Technologies,
25  Inc.

Page 5

1   BY MR. COHN:
2       Q   Mr. Schutte -- did I pronounce it right?
3       A   Schutte.
4       Q   -- can you explain to me what brings you here
5   today?
6       A   This subpoena brings me here today.
7           MR. COHN: Let's mark the subpoena as
8   Exhibit 2.
9           (Exhibit No. 2 marked.)
10  BY MR. COHN:
11      Q   Marked as Exhibit 1 is the renotice of the
12  records deposition, and marked as Exhibit 2 is the
13  subpoena, which also has attached to it the renotice
14  of deposition, which Mr. Schutte has brought here
15  today.
16          Mr. Schutte, what is your position with
17  Siemens Building Technology?
18      A   Service manager.
19      Q   Were you assigned the task of complying with
20  this deposition?
21      A   Yes.
22      Q   And in your -- and who assigned you the task
23  of doing that?
24      A   Ben Seitz.
25      Q   And what did Mr. Seitz tell you to do?

Page 6

1       A   Prepare the documents.
2       Q   And what did you do to comply with the
3   subpoena request?
4       A   I prepared the documents that we had.
5       Q   Well, let's go through the list. Is this
6   your handwriting on Exhibit 2, page 2?
7       A   Yes.
8       Q   The first item requested contracts. How did
9   you go about finding the contract documents?
10      A   We have a contract file, and I got the
11  documents from the contract file.
12      Q   So can you briefly identify what documents
13  you have? Are the top documents the contracts that
14  you're talking about?
15      A   This is what we have for contracts with
16  Unocal.
17      Q   Is that all the contracts with Unocal for
18  servicing the building at 909 --
19      A   Yes.
20      Q   Would you know if and when any of the
21  handwritten portions were placed in the document, like
22  on page 6 of this contract?
23      A   No.
24      Q   So this is the first packet of documents, the
25  contracts. What else -- can you just tell me what you

Page 7

1   brought with you?
2       A   I have brought with me the information we
3   have to satisfy -- there we go [indicating]. Yeah, so
4   I went through 1 through 15 and gathered the documents
5   that we had for each of those items.
6       Q   Is there -- I notice that you have a
7   checkmark on "contracts" and a checkmark on
8   "correspondence," and then "AK OSHA Investigation,"
9   you have "no," and then there's nothing on the
10  remaining items, other than, parenthesis, "OSHA."
11  Does that mean you just stopped putting checkmarks
12  down or you didn't have documents that apply to the
13  remainder?
14      A   That means I just stopped putting checkmarks
15  down.
16      Q   Now, what does putting "OK OSHA
17  investigation - no" down, what does that mean? Does
18  that mean that you're not --
19      A   We don't have any documents for that.
20      Q   And how did you determine that there were no
21  documents?
22      A   I looked in the place where we would keep
23  those kind of documents, and there weren't any there.
24      Q   Where is the place that those documents would
25  be kept?