Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA )
GROVE, SARAH GROVE, and MICHAEL )
GROVE (DOB 1/21/88) by and )
through his father, LAWRENCE H. )
GROVE, )
                                )
        Plaintiffs,             )
                                )
vs.                             )
                                )
UNOCAL CORPORATION,             )
                                )
        Defendant.              )
_____)
Case No. 3:04-cv-0096-TMB

VIDEOTAPED DEPOSITION OF RICHARD EALUM, D.C.

Pages 1 - 189
Friday, November 3, 2006
11:00 A.M.

at
CLAPP PETERSON VAN FLEIN TIEMESSEN & THORSNESS
711 H Street, Suite 620
Anchorage, Alaska 99501

Exhibit 11
page 1 of 11

Page 142

1  talked about earlier.
2     Q. And the clinical internship in your third
3  year, it says 390 hours. What did that involve?
4     A. That's actual treatment of patients,
5  radiographic interpretation. Of course, there is
6  always a doctor of chiropractic looking over your
7  shoulder, reviewing your material, looking at your
8  treatment with your patients.
9     Q. Because, you know, I see somewhere else --
10 in year three you've got radiological position and
11 technique, 30 hours.
12    A. Um-hum.
13    Q. Is that having to do with how to position
14 people when you take the --
15    A. Correct.
16    Q. -- x-rays? And it looks like -- and you
17 said the clinical internship, that part of that was
18 radiological interpretation?
19    A. Well, you're -- yes. You take films of
20 your patients or you present the case to the
21 clinician, the chiropractor in charge of the actual
22 case, you request the opportunity to take x-rays if
23 they're indicated. He allows you to take them.
24       You go in, and under the guidance of the
25 x-ray technician there, you figure technique, do all

Page 143

1  that, position the patient, take the film. When the
2  film comes out, you interpret it and present that to
3  your clinician with your opinion and render
4  treatment, if anything.
5     Q. Well, that wasn't -- there was 390 hours on
6  the clinical internship. That wasn't all you did was
7  the radiology?
8     A. Oh, no. No. That included treating
9  patients.
10    Q. Okay.
11    A. All of that stuff. Examinations. All
12 that. It's just required time in the clinic, the
13 student clinic.
14    Q. And when you had the year four clinical
15 internship, 450 hours, would that be --
16    A. Similar.
17    Q. Similar to what you did before?
18    A. Yeah.
19    Q. Okay. So I take it in your practice, that
20 you've taken many x-rays in your career.
21    A. I have. Fair enough, I'd say.
22    Q. And you've read these x-rays?
23    A. Yes.
24    Q. And do you feel competent to review and
25 interpret an X-ray?

Page 144

1     A. Yes. If I have any questions, I usually
2  take them up to HealthSouth or one of the other
3  radiologists in town, just have them verify. I've
4  done that on a number of occasions in the past.
5     Q. Now, marked as Exhibit 3 is -- appears to
6  be -- is that your entire --
7     A. This is --
8     Q. -- chart on Larry Grove that you brought
9  with you?
10    A. My entire record on Larry Grove.
11    Q. And it looks like it was broken down into
12 separate files. So the top one -- did you put it in
13 order of the treatment that was rendered, for the
14 most part?
15    A. Basically, yes, by injury date and
16 treatment. I keep them -- this isn't something that
17 I did for this deposition. This is the way it works
18 in my office. Each time they come in on some sort of
19 new injury, I generate a new file. Just makes it
20 easier to keep track of that because the old files
21 get put in the archive, and if there is billing
22 payment, request for records, such -- and the like,
23 it usually goes in the most current file, and it
24 keeps it reasonably straight, but errors do happen.
25    Q. Now, there is some handwriting on the cover

Page 145

1  of each of these documents. Is that something that
2  you just did before this deposition?
3     A. This is something I did in the last few
4  days, yeah.
5     Q. Okay. And what does it say on the first
6  file?
7     A. 12/12/94. Cervical, dorsal, left neck,
8  upper back and left shoulder. And then it says
9  4/7/95, same thing.
10    Q. I believe we agreed that that first file
11 would have -- would be marked as Exhibit 3A to the
12 deposition.
13       And that was the -- was that the first time
14 you treated Mr. Grove, was for that 12 -- starting in
15 12/12/94 for his neck and upper back?
16    A. I believe so, yes. That's what my record
17 reflects.
18    Q. And do you recall if it indicated that
19 the -- that it was a work-related injury?
20    A. I believe it was, yes. Yes, it was.
21    Q. And in that -- and you treated him for that
22 until -- initially until when?
23    A. Initially from 12/12/94 to 2/2/95.
24    Q. And we have your records previously, most
25 of them, but that's -- so we're separately marking

Page 146

1  your whole file as an exhibit. But in the -- in a
2  request for documentation that was received by Clapp
3  Peterson Van Flein Tiemessen & Thorsness, there were
4  some documents that have been provided to our office,
5  and they've been stamped 302405 to 302480, and these
6  are -- appear to be records that were received from
7  your office, and I'm going to just individually mark
8  these as Exhibit 4 just because I'm going to refer to
9  the numbers here, and then it will be easy to see
10 that.
11     (Exhibit 4 marked.)
12     Q. I haven't made an additional copy of it
13 yet, but you could look through your old records for
14 that. I want to -- there is a document that's in the
15 records I have that's marked 302439, and it's -- on
16 the top of it it says, "If yours is an accident
17 injury, please complete following questions."
18     A. Let's see. 11/22/94. I've got it right
19 here.
20     Q. Okay. Now, do you notice that in the
21 middle column, "If work-related accident, please
22 complete the following"?
23     A. Yeah.
24     Q. It indicates injury date, November 22nd,
25 '94?

Page 147

1     A. Uh-huh.
2     Q. And it describes the injury as, "Climbing
3  between piping and slipped. Pulled shoulder muscles
4  and hit back of shoulders on exposed pipes." Do you
5  see that?
6     A. Yes, I do.
7     Q. Do you recall if Mr. Grove -- how did you
8  get a copy of this document? Do you recall? Would
9  this be something that Mr. Grove forwarded in, or did
10 he fill it out at your office?
11    A. No, this is an in-office thing. He filled
12 this out when he came in.
13    Q. Okay. Now, underneath that, when it says,
14 "Have you lost any time from work," do you see where
15 it's checked off?
16    A. Yeah.
17    Q. No?
18    A. It says no.
19    Q. And it says the last day worked, 12/12/94.
20 And he came in to see you -- was that the date he
21 came in to see you?
22    A. I believe -- let me check here. Appears
23 so, yeah. So he had worked that day.
24    Q. So this is a -- from the best of your
25 knowledge, does it appear that Mr. Grove lost any

Page 148

1  time from work due to this injury?
2     A. No. To the best of my knowledge, no.
3     Q. But he was just receiving treatment for
4  this injury, but he still worked?
5     A. Correct. Yeah, I never removed him from
6  work.
7     Q. And then it looks like in regard to this
8  injury -- or to his back and upper neck, you then
9  again saw him again, it looks like from your chart
10 notes I have -- 302461 is the document that I'm
11 referring to, and that shows -- this is your chart
12 note, and it starts off April --
13    A. Yeah, 4/7.
14    Q. -- 27, '90. Now, that might be the wrong
15 one.
16    A. Yeah, 4/7, I think it says.
17    Q. Yeah, this is the wrong document here.
18 Excuse me. Let me start all over.
19        The document is 302435, and that document
20 appears to show that -- and that's in the same file
21 that's marked as Exhibit 3A?
22    A. Yes.
23    Q. And why is that in the same file?
24    A. I considered it an exacerbation of the
25 prior injury.

Page 149

1     Q. Okay. And it looks like you saw him for
2  that on -- the first time on -- you saw him on April
3  7. Now, did you fill out -- it looks like you filed
4  a physician's report dated April 10th, 1995 --
5     A. Okay.
6     Q. -- on that.
7     A. What that is, that's my initial report to
8  the insurance company regarding this specific case.
9  I don't fill one of these out for each and every
10 treatment.
11    Q. Now, on that -- under No. 32.
12    A. Okay.
13    Q. It's checked off. It says, "Release for
14 work." And you would have filled out this form?
15    A. Yes.
16    Q. It says --
17    A. Yes.
18    Q. -- "Release for work? Yes."
19    A. Yeah.
20    Q. And it says regular work, and it says the
21 date, April 7, 1995?
22    A. That's correct.
23    Q. Does that indicate to you that you had not
24 taken him off work due to this injury?
25    A. I did not.

GROVE v. UNOCAL                                                    RICHARD EALUM, D.C.
                                                                   11/3/2006

Page 150

1    Q. And you treated him for this, from your
2    records, it looks like April 7, 1995, to September
3    27, 1995?
4    A. 9/27/1995, yeah.
5    Q. And to the best of your knowledge, he was
6    able to continue working?
7    A. Yeah. I try to keep my patients working.
8    They seem to heal better, I think. I think
9    statistics, you know, national type statistics show
10   that patients that work recover better and faster. I
11   try to.
12   Q. Now, there is another file that we're going
13   to mark as Exhibit 3B, and what does it say on the
14   top of that, the file, second file in yours?
15   A. It says 2/8/1995. It says it's a work
16   comp. It's a right elbow.
17   Q. Right elbow. Okay. Now, it looks like you
18   completed a physician's report on that, and it's got
19   the -- for Exhibit 4, Bates stamped 302428. And is
20   this something that you -- it's typed up. Would
21   you -- did you do this form?
22   A. I may have typed it up. At that time I
23   think my mother was working for me. Perhaps she did
24   it, but I may have done it. Regardless, it came out
25   in ink by my hand first, and then it was just copied

Page 151

1    off on here. I don't do that any longer. Now I just
2    turn them in handwritten.
3    Q. So how did that go, your mom working for
4    you?
5    A. As suspected.
6    Q. Okay.
7    A. Not good. We did good, though.
8    Q. In this document, it says under No. 32,
9    "Released for work? Yes."
10   A. Um-hum.
11   Q. It's an X. And regular work, and it's got
12   the date February 8, 1995. Does that -- would
13   this -- did you -- was Mr. Grove able to continue
14   working, to the best of your knowledge, even despite
15   this injury?
16   A. Yes. I didn't remove him from work. He
17   had been working with it for a couple of years as it
18   was, so I didn't take -- give any time off for that.
19   Q. And it says -- now, this is -- I see on a
20   number of things. On No. 30 it says impairment
21   rating, N slash A. What does that mean?
22   A. Excuse me. What line?
23   Q. Line 30 on the physician's report.
24   A. Okay.
25   Q. Impairment rating, and you have N slash A.

Page 152

1    A. Right.
2    Q. Does that mean not applicable?
3    A. That's what that means. That means -- No.
4    1, I'm not qualified to give an impairment rating;
5    and No. 2, at that point in time it's not even
6    anything that we had discussed, and so we proceeded
7    that way.
8    Q. And this was a -- appeared to be a right
9    elbow injury?
10   A. Yes.
11   Q. All right. And how long did you treat him
12   for that?
13   A. From 2/8 of '95 through -- I referred him
14   out to Dr. Lipke on 2/24 of '95.
15   Q. And then did you -- did you get a note back
16   from Dr. Lipke on that?
17   A. Yeah, I did. It's dated March 3rd, 1995.
18   Q. And -- yeah, in our record it's marked --
19   Exhibit 4, it would be 302424 and 25. And did you
20   ever have to treat him again for his elbow after
21   that?
22   A. No. The occasion never arose, that I can
23   recall.
24   Q. And then it looks like -- did you treat him
25   at all in 1996 or 1997?

Page 153

1    A. Let me see. It doesn't appear so.
2    Q. Let's go to the next file, which we're
3    going to mark as Exhibit 3C.
4         And the record reflect that the doctor is
5    marking the numbers on each of the folders, and --
6    oh, and --
7         MS. JOHNSON: The letters.
8         MR. COHN: Hmm?
9         MS. JOHNSON: Letters. I mean, numbers or
10   letters?
11        MR. COHN: Oh. The number and letter.
12        MS. JOHNSON: Okay.
13   BY MR. COHN:
14   Q. I didn't go into that before, but there is
15   some little notes that you made -- that you have in
16   each of those files. Are those notes that you
17   prepared --
18   A. These?
19   Q. -- in preparation for this deposition?
20   Yes.
21   A. These? Yeah. Yeah, this is something I
22   made here in the last two or three days.
23   Q. And is that just a summary of the dates?
24   A. Yes.
25   Q. Or times of treatment?

Page 154

1  A. Yeah.
2  Q. And the type of treatment?
3  A. Cryptically done, yes.
4  Q. Okay. Actually it's fairly legible.
5  A. Good.
6  Q. So what's marked as 3C?
7  A. 3C is a -- it says 5/26/1998, neck and
8  upper back. C/D is what that means. And left
9  shoulder.
10 Q. Now, I believe in the previous testimony it
11 appears that that might be a mistake and that you
12 actually did treat him earlier, because the first
13 entry here is April 27, 1998, for that, and it's a
14 document marked 302461. I'll show you that document.
15 A. Oh, this is -- this is out of my regular
16 insurance file. It's out of this file. Let me dig
17 it out. That's out of this file right here.
18 Q. And that one --
19 A. Yeah, I see 4/27/98.
20 Q. Does that indicate to you that that was the
21 first time you treated him for that -- since
22 September 1995, you didn't see him again until the
23 end of April 2000 -- the end of April, 1998?
24 A. Yeah. Yes, sorry.
25 Q. That's -- yeah, the insurance file, we'll

Page 155

1  mark that. Now, why did this document end up in the
2  insurance file? Because that looks to be some
3  treatment notes.
4  A. Well, it is treatment notes, but it's out
5  of my regular insurance file. We've got six
6  insurances here, five are -- all but one are workers'
7  comp files. This one is a regular health insurance
8  file.
9  Q. In other words, this was not a claimed
10 workers' comp injury?
11 A. Correct.
12 Q. And showing you a document that's marked
13 302467, and I'm not sure if this is -- would this be
14 in your --
15 A. What's the date on it?
16 Q. -- regular file? It's got the --
17 A. 5/21/98. Let's see if it's in here.
18 Q. That might be --
19 A. I have it right here. It's in this file
20 right here, 5/26/98.
21 Q. Actually, I believe I might have jumped up
22 ahead because that looks like something separate from
23 the injury from the -- so let me go back. Excuse me.
24 I went out of order here.
25    So on April 27, 1998, you saw him for an

Page 156

1  injury where he claimed he injured it doing yard
2  work?
3  A. Correct.
4  Q. And if you look at -- and I don't know if
5  it's your next document on that. In that -- on that
6  same injury. It says time lost from work. Do you
7  see the next page, the next page in the file?
8  A. Oh, you're looking at exam here.
9  Q. It talks about the cause of complaint.
10 A. What's your --
11 Q. Yard work, raking, carrying garbage. Our
12 number is 302 --
13 A. Yeah, 4/27/98 exam.
14 Q. And it says time lost from work, and there
15 is a check mark, no. Was this what you completed?
16 A. Yes, I completed this.
17 Q. Does that indicate to you that there is no
18 claim that there is any lost work due to this injury?
19 A. It indicates two things. There is no lost
20 time, and it's not a workers' comp.
21 Q. Okay. And now let's -- so that file --
22 that's out of the insurance file, correct?
23 A. Yes, just his regular health insurance
24 file.
25 Q. Okay. Since I marked the other one as 3C,

Page 157

1  why don't we make that one 3D, the next one in order.
2     And then it appears that you saw him again,
3  that file that's marked 3C, it looks like starting in
4  May for a shoulder and -- injury.
5  A. Correct.
6  Q. And there was some question about whether
7  it would be the -- it's in the same area but not --
8  but you can't tell from that whether it's the same
9  injury?
10 A. Well, on this file, if we look at this exam
11 dated 5/26/1998, if you look at the little man on the
12 right-hand side of the paper. Do you see that?
13 Q. Yes.
14 A. Okay. You'll see the Xs are right up there
15 at the crick of the neck basically, in layperson's
16 terms, and it's noted as a little tingling down the
17 arm.
18    If you go to the file we've marked here 3D,
19 the regular insurance file, and look at the exam
20 dated 4/27/98, you'll see that his complaint is
21 between his shoulder blades. It's actually a little
22 bit different area.
23 Q. Okay. And the -- now, this one says on the
24 next -- then that page where you had indicated
25 tingling and the Xs on Exhibit 4 is 302466.

### Page 158

1  On the next page it says, "If yours is an
2  accidental injury, please complete the following.
3  Strained left shoulder while assembling equipment.
4  Left hand numbness." Do you have that in front of
5  you?
6     A.  I see that, yes.
7     Q.  And underneath it says, "Have you lost any
8  time from work?" And did you complete this form?
9     A.  No. This is something that Mr. Grove would
10 have completed.
11    Q.  And is it checked off no?
12    A.  Correct.
13    Q.  And how long did you treat him for that
14 injury?
15    A.  Let's see. On this one I began treatment
16 5/26/98. I treated through 7/27/98. So almost two
17 months exactly. Almost eight weeks it appears.
18    Q.  And did you ever treat him again for his
19 back or shoulder or elbow since that date?
20    A.  This specific area, I don't believe so.
21 There is a reference to left shoulder pain on 10/1 of
22 '01. However, I made note in here of acromial
23 clavicular joint pop during shoulder elevation. So I
24 actually believe it was actually the shoulder
25 shoulder, not the crick-in-the-neck area up here.

### Page 159

1     Q.  Okay.
2     A.  Okay. There is a difference.
3     Q.  Oh, is that in that same file that's been
4  marked -- a record of that in the file that's marked
5  Exhibit 3C? So that's the insurance file?
6     A.  No. This file is a compensation file.
7     Q.  Oh.
8     A.  The notation on 10/1/01 is his regular
9  insurance file.
10    Q.  Which indicates that you were not
11 considering it in the --
12    A.  No.
13    Q.  -- context of workers' comp?
14    A.  And I don't consider it -- I don't think it
15 was the same injury. My notes are a little unclear
16 on that.
17    Q.  Does it appear that he lost any time from
18 work due to that injury?
19    A.  No.
20    Q.  Let's go to the -- so what we have here is,
21 it looks like from the last time of treatment in
22 September 1995, you did not treat him for over two
23 and a half years, until April of 1998.
24    A.  It appears to be correct.
25    Q.  Then after the last treatment --

### Page 160

1     A.  May of '98, I think. 5/26/98 is that date.
2  Oh, I'm sorry.
3     Q.  I'm including also --
4     A.  I'm sorry.
5     Q.  -- the nonworkers' --
6     A.  I'm sorry.
7     Q.  -- comp injury in April 27, 1998.
8     A.  You're right.
9     Q.  So then after that, after the last
10 treatment for the back, which was July 20, 1998,
11 approximately 22 months later, you then saw him
12 again, and for the first time he was complaining of
13 an ankle injury. Would that be fair to say?
14    A.  Appears to be accurate.
15    Q.  And let's mark that next file as 3E.
16    A.  (Complies.)
17    Q.  Now, again with this ankle, it looks like
18 in the document that we have that's been marked as
19 302473, it looks like notes from you and that you
20 treated him starting June 6 of 2000?
21    A.  Correct.
22    Q.  And on the next document, which appears to
23 have the people on the left side, you indicated that
24 would have been done by your --
25    A.  Massage lady, yeah.

### Page 161

1     Q.  And the assessment was slight inflammation
2  in ankle?
3     A.  That appears to be correct.
4     Q.  But before going into that in detail, I
5  just want to take a look at this and see -- yeah,
6  there is a document, the physician's report, that it
7  looks like you signed, dated June 6, 2000.
8     A.  Um-hum.
9     Q.  And you have that in front of you?
10    A.  Yes, I do.
11    Q.  And on it, on the No. 32 it says, "Release
12 for work," and have you checked off "yes" and
13 "regular work"?
14    A.  Yes.
15    Q.  June 6, '00?
16    A.  Correct.
17    Q.  So even though that's the first date that
18 you saw him for the ankle injury, you've released him
19 for work?
20    A.  Correct.
21    Q.  As of that date?
22    A.  Correct.
23    Q.  Now, I don't know if we went into it in
24 detail. You indicated that you were, like, an
25 unofficial care provider for the Bartlett basketball

Page 162

1 team, was it?
2    A. I had a friend that was a coach of the JV
3 team, and I used to out and help out when I could,
4 watch the ball games and look at the kids if they
5 have sprains or anything.
6    Q. And did you have occasion to treat ankle
7 sprains?
8    A. On occasion.
9    Q. And you indicated you've treated ankle
10 injuries in your years of practice?
11   A. Yes.
12   Q. And have you yourself suffered ankle
13 sprains?
14   A. Yes.
15   Q. Is an ankle sprain something -- an uncommon
16 thing for people to get just by generally living?
17   A. No, I believe it's one of the more common.
18   Q. Now, what would -- how would you assess the
19 severity of the ankle injury that you saw Mr. Grove
20 for on June 6, 2000?
21   A. At the time that he presented to my office,
22 I would -- based on my evaluation, I would qualify it
23 as mild at that point. In my examination, he reports
24 that at -- at the time of injury, which was 5/25,
25 some 11 days prior, that he had a lot of swelling,

Page 163

1 which leads me to believe that it was more moderate
2 at that point in time. But over the course of that
3 11 days' lapse, it had healed considerably.
4    Q. Now, is this the only time you've ever
5 treated him for an ankle problem in all the years
6 that you had treated him?
7    A. Yes.
8    Q. Now, are you aware that we're here today
9 because of an ankle injury by Mr. Grove that he
10 incurred in September 2002?
11   A. I am.
12   Q. And have you ever seen any of the medical
13 records in regard to that ankle injury?
14   A. I have not.
15   Q. I'm not going to have you go through those
16 records, but there were three separate diagnoses. Do
17 you know Dr. Michael Getz?
18   A. Dr. Getz? I'm familiar with the name. I
19 don't know any of them personally.
20   Q. Or Dr. Chang?
21   A. No.
22   Q. Well, Dr. Getz in 2003 diagnosed three
23 separate injuries to his right ankle, and I just want
24 to go through those with you. One of them was -- he
25 called an osteochondral fracture and loose body

Page 164

1 lateral talus right ankle.
2       Now, you yourself took an X-ray of
3 Mr. Grove at the time of his ankle injury.
4    A. I did.
5    Q. And why did you take an X-ray?
6    A. To rule out gross fracture.
7    Q. Is that a normal part of your practice when
8 somebody would come in with an injury, to do an X-ray
9 before treating?
10   A. Not always. Not always but sometimes,
11 yes.
12   Q. Now, are you familiar with the talus bone?
13   A. Somewhat, yes. It's not my area of
14 specialty, but yes.
15   Q. And if I tell you that Mr. Grove's injury
16 was in September 2002 and his last treatment from you
17 was in -- you treated him in June 2000. Now, so that
18 would mean it would be about two years, three months,
19 approximately, from the time of his -- the ankle
20 injury you treated him for from the time of the
21 injury in September 2002. Would that be fair to say?
22   A. Yes. That time passed between, yes.
23   Q. And would you be able to express an opinion
24 if he had a fracture of the talus bone, what effect
25 that would have had on him in those -- if he had that

Page 165

1 fracture at the time you saw him?
2       MR. COHN: Objection. Form, foundation.
3       THE VIDEOGRAPHER: Two minutes.
4       THE WITNESS: TaylorDome fractures are very
5 painful. Usually patients are reasonably
6 nonambulatory. Certain types of Taylor fractures can
7 be seen on an AP radiograph. I didn't see anything.
8 And based on -- I didn't treat Mr. Grove for this
9 ankle injury. However, as we all know, I do know
10 him. We have had occasion to speak and see one
11 another. And he did have, you know, swelling and
12 obvious clear visual bruising six months, nine months
13 later, and it would come and go, and --
14      MS. JOHNSON: Objection. Form and
15 foundation.
16      THE WITNESS: Nothing I saw -- at least he
17 didn't report anything like that to me after --
18 between 2000 and the more recent injury.
19      MS. JOHNSON: Objection. Hearsay.
20      MR. COHN: Okay. Let's go off record while
21 the tape is changed.
22      THE VIDEOGRAPHER: This is the end of tape
23 No. 3. We are off record at 2:32 p.m.
24      (Recess held.)
25      THE VIDEOGRAPHER: We're on record at 2:35

Page 166

1  p.m. This is the start of tape No. 4 in the
2  videotaped deposition of Richard Ealum, D.C., Case
3  No. 3:04-cv-0096-TMB, taken on November 3rd, 2006.
4  You may continue.
5  BY MR. COHN:
6     Q. Dr. Ealum. At the end of the last tape you
7  were talking about seeing bruising six to nine months
8  later. Are you talking about -- what period of time
9  are you talking about? Because we kind of jumped
10 from the June injury to the September injury.
11       Are you talking about after -- which injury
12 are you talking about?
13    A. I'm going to go back and clarify. I'm not
14 positive it was six to nine months later. It was a
15 long time after the initial injury. Okay? So it
16 might have been four months. You know, I mean, it
17 was a long time.
18       But anyhow, the injury that I'm talking
19 about is the one -- the ankle injury I did not treat
20 him for, and he would come in every now and then and
21 say, "What's up with this?" kind of thing. You know,
22 that's the kind of relationship Larry and I have.
23    Q. So to further clarify, we're not now
24 talking about the June 6, '00 injury that he came --
25    A. No.

Page 167

1     Q. -- in and you treated him for?
2     A. No.
3     Q. We're talking about the later injury?
4     A. Correct. After -- after I completed
5  treatment on the June 6, 2000 injury, Mr. Grove and I
6  never -- to the best of my recollection never
7  discussed that again.
8     Q. Well, why didn't you treat him for this
9  last ankle injury?
10    A. I'm not sure. I don't know if I was out of
11 town. Perhaps it happened on a weekend. I have no
12 recollection of a reason for that. I have no idea.
13    Q. But you indicated -- but saw that -- you
14 saw his ankle, though?
15    A. Sometime after he had begun treatment with
16 whoever it was that he saw. I don't know who it was.
17    Q. Is it your practice that if somebody is
18 being treated by a medical doctor, that you don't --
19 that you defer from treating that injury if he's
20 under the care of a doctor for it?
21    A. In some cases. In some cases. There is
22 nothing that I'm going to be able to do with the
23 ankle -- with his ankle, and he's being treated by a
24 medical physician already. There is no reason to
25 complicate that. He's already doing whatever forms

Page 168

1  of therapy he feels are appropriate, and the plan's
2  underway. There is no reason to intervene in that.
3     Q. Now, in your record from June of '00 --
4     A. Okay.
5     Q. -- it looks like this was the -- it's
6  marked here 302474. This looks like it would have
7  been done by your staff because the people are on the
8  left.
9     A. Oh, right.
10    Q. It's the one with the photos on it. And it
11 looks like it appears to attempt to show the area
12 of -- what does that attempt to show on there?
13    A. Just basically the area that she's -- that
14 she's looking at, area of discomfort there, chief
15 complaint at that point in time.
16    Q. So this -- so what do you call the outside
17 portion of the --
18    A. Lateral.
19    Q. Lateral. And the inside portion is?
20    A. Medial.
21    Q. Medial?
22    A. Um-hum.
23    Q. So if there was an injury -- so there is no
24 record in here of an injury to the inside portion of
25 the ankle?

Page 169

1     A. No. Not that I recollect.
2     Q. So if Mr. Grove was treated and one of the
3  injuries was for treatment of a ligament injury on
4  the inside of his ankle, that appears from -- at
5  least from your records not to have been one of the
6  injured areas that you were treating.
7     A. Right.
8        MS. JOHNSON: Objection. Form and
9  foundation.
10       THE WITNESS: Sorry. That's correct. My
11 initial 6/6/2000 evaluation, it looks like I did make
12 a notation as to eversion was okay. That's where I
13 turned the ankle, the bottom of the foot outwards,
14 which stresses those ligaments on the medial side,
15 and he didn't appear to have any kind of complaint
16 with that. It just says -- I just wrote okay.
17 BY MR. COHN:
18    Q. And in fact, Mr. Grove did not return to
19 you for treatment for that ankle after that last
20 visit of June 26, '00?
21    A. That's correct.
22    Q. Now, there was some reference in these
23 records to whether or not -- about a brace.
24    A. Okay.
25    Q. And you have, I believe, in one of your

Page 170

1  notes, that you stated -- now, this note is dated
2  July -- this one is dated July 1st, 2000.
3     A.  Okay.
4     Q.  And did we mark that as an exhibit?  That's
5  3E, I believe.  Right?  The ankle injury?
6     A.  Yeah, 3E.
7     Q.  July 1st, 2000.  And in here it's 302479,
8  And it says --
9     A.  What's the date?  July 1st?
10    Q.  July 1st.
11    A.  Okay.
12    Q.  Would that be the date on which you made --
13 well, the reason I'm asking about that is it looks
14 like your last time you treated him was June 26,
15 2000, and this note is dated July 1st.
16    A.  Correct.
17    Q.  Would that -- would the -- would this be
18 something you thought of for treatment after the last
19 time you saw him?
20    A.  I'm kind of unclear as to what you're
21 looking for, but what this is is that when I sent in
22 notes to the insurance company and a report, I do --
23 I typically do those reports on the first of the
24 month or at the late -- at the end of the month.
25        And what this is is if -- this is a report

Page 171

1  that I sent in with chart notes and stuff from, you
2  know, probably 6/26.  Now, I may very well have had
3  intents of a little -- some more additional
4  treatment, but certainly judging by the progress
5  reflected in my notes, probably not much, if any at
6  all.
7         It's clear that I was still planning on
8  prescribing him a brace, but it doesn't appear that
9  that ever transpired.
10    Q.  Now, when you say "I plan on," so you can't
11 recall whether you actually prescribed him a brace?
12    A.  I have no recollection, yeah, regarding
13 this at all.
14    Q.  And even if you prescribed him a brace, for
15 how long a period of time were you intending that
16 brace to be used?
17    A.  Certainly not more than just a few weeks.
18 Probably -- at that point, probably more on an
19 as-needed type basis, I think.
20    Q.  Now, when -- you've indicated that Larry
21 came in and showed you his ankle injury at some point
22 after his September 2002 injury.  Did that appear to
23 you to be a different injury than the one you treated
24 in June 2000?
25        MS. JOHNSON:  Objection.  Foundation.

Page 172

1         THE WITNESS:  At what point in the -- you
2  know, at what point?  You know, I believe -- I have
3  no specific recollections.  Okay?  I know -- or time
4  line.  I know I was aware he had injured his ankle.
5  I didn't know what kind of injury.  I believe it -- I
6  don't know at what point in time we discussed the
7  fact that it was diagnosed as a severe sprain.  I
8  believe Larry had told me.
9         And, you know, as I said before, you know,
10 there was a lot of warning lights months later when
11 it was just -- you know, I believe the specific
12 instance that I'm recalling, he had told me he had
13 been to the grocery store with his wife, or Christmas
14 shopping or something, and just walking through a
15 mall, and it had flared up, become swollen, and there
16 was a visible contusion on it again.  I wish that I
17 had made notes to that effect, but I didn't.  I
18 wasn't treating him for it, and I just didn't.
19        MS. JOHNSON:  And object to the form as
20 hearsay.
21 BY MR. COHN:
22    Q.  So in other words, you are now talking
23 about the latter -- not the injury you treated him
24 for?
25    A.  Correct.

Page 173

1     Q.  Now, did you ever actually physically --
2  visually, with your own eyes, see that, the bruising
3  on the ankle?
4     A.  Which injury?
5     Q.  The one you didn't treat him for.
6     A.  Yes.
7     Q.  And when you visually observed the bruising
8  on the ankle, in your medical opinion, would that be
9  a different injury than the injury you treated him
10 for in June 2000, to a reasonable degree of medical
11 certainty?
12        MS. JOHNSON:  Objection.  Foundation.
13        THE WITNESS:  I would say yes.  The reason
14 it sticks out in my mind is because such a time frame
15 had lapsed from the injury to the point in time that
16 I saw this visible bruising.  You know, it wasn't
17 like it was a week or two weeks or even three weeks.
18 It was a long period of time.  It was something out
19 of the ordinary, and that's why I remember it.  We
20 may have had other discussions prior to that that I
21 don't remember.  I don't know.
22 BY MR. COHN:
23    Q.  Did you ever try and manipulate his ankle
24 at the time?
25    A.  Absolutely not.

GROVE v. UNOCAL                                          RICHARD EALUM, D.C.
                                                              11/3/2006

Page 174

1  Q. And when you say absolutely not, that was
2  pretty emphatic. Why did you say it that way?
3  A. Something wasn't right, and it was being
4  treated by another physician. It's not something I
5  wanted to interfere with.
6      MS. JOHNSON: Objection. Speculation.
7  BY MR. COHN:
8  Q. And when you say something you wouldn't
9  want to interfere with, were you worried that based
10 on the level of the bruising that you saw, that there
11 might be something seriously wrong in the ankle?
12     MS. JOHNSON: Objection. Foundation, form
13 of the question.
14     THE WITNESS: I really had no idea what was
15 wrong. I just knew it wasn't a simple sprain. At
16 that point in time I don't even think Mr. Grove
17 knew.
18 BY MR. COHN:
19 Q. Okay. And when you observed him, did you
20 observe how he was walking at all at that time?
21 A. Yeah.
22 Q. And how was it?
23 A. It seemed like he's walked with a limp
24 pretty much since the accident. I haven't spent a
25 lot of time with Larry in the last four or five years

Page 175

1  really. It was more late '90s, you know, or early
2  2000s, I would say, that we really did much at all
3  together, and we only did three or four things
4  outside the office really, I would say.
5  Q. Let's go to the next -- let's keep moving
6  and get to the next file, which is the -- your
7  treatment subsequent to the ankle injury. You
8  treated him for another injury?
9  A. Correct.
10 Q. And that looks like you saw him on March
11 1st, 2002, and that was in regard to a back injury
12 where he claimed he slipped and fell on the ice?
13 A. Correct.
14 Q. And you took an X-ray of his back at that
15 time?
16 A. I did.
17 Q. And was it your normal -- was it your
18 normal and customary practice to take an X-ray if
19 somebody came in with a complaint of a back injury?
20 A. Initially with new patient evaluation, yes,
21 that's part of it. Not always. I mean, nothing's
22 carved in stone, but typically, yes.
23 Q. And when you took the X-ray, were you able
24 to diagnose a transverse vertebra fracture?
25 A. Yes, I was.

Page 176

1  Q. And is the transverse vertebra, is that a
2  weight-bearing or nonweight-bearing?
3  A. Nonweight-bearing.
4  Q. And what's, to you, the significance of the
5  fact that it's a nonweight-bearing bone?
6  A. Could you rephrase your question, please?
7  Q. I mean, is there any -- what's the
8  significance of the fact that it's a
9  nonweight-bearing bone as opposed to a weight-bearing
10 bone?
11 A. It was considered a -- I guess it would be
12 what you would consider a stable fracture. You'd
13 probably be better off asking an orthopedic doctor
14 about this. But it's considered stable and doesn't
15 need orthotic support, you know, as in like a body
16 brace or anything like that.
17 Q. Now, you were asked questions about bending
18 and twisting --
19 A. Um-hum.
20 Q. -- when you have such an injury. Now, one
21 of the things that wasn't asked in the question
22 before was, now, there is different degrees of
23 bending and twisting. Would that be fair to say?
24 A. Yes.
25 Q. So in regard to bending and twisting, just

Page 177

1  as a matter of walking, you're going to be doing a
2  little bit of movement with your back, even with a
3  transverse vertebra fracture. Would that be fair to
4  say?
5  A. Yes.
6  Q. So in terms of -- and in addition,
7  especially in regard to the question of the
8  photograph that was shown, does it make a difference
9  to you whether somebody is going to be doing a job
10 where they may have to be continuously or frequently
11 bending and twisting as opposed to where they may
12 occasionally be bending and twisting?
13     MS. JOHNSON: Objection. Form,
14 foundation.
15 BY MR. COHN:
16 Q. In regard to this type of injury.
17 A. To this specific injury?
18 Q. Yes.
19 A. Boy. I would say I would try to eliminate
20 those activities altogether if -- to the extent that
21 it was possible. Okay? You know, whether it was
22 repetitive or just occasionally, I mean, if it could
23 be minimized and not done, then that's what I would
24 have recommended.
25 Q. Now, do you -- however, the more frequently

45 (Pages 174 to 177)

Page 178

1  you do it and if you're doing it on a job eight hours
2  a day, that would exacerbate the injury?
3      A.  I would think more so than just doing it
4  once, for example.
5      Q.  Now, you wrote just -- in many of the
6  other times you've apparently treated him, there was
7  no time lost from work.  In this one period of time,
8  apparently you had him off work for about 25 days?
9      A.  I think the record reflects that, yes.
10     Q.  And do you recall if at the end of that
11 time -- apparently the last conversation you had,
12 Mr. Grove told you that he had returned to work?
13     A.  I believe I sent him to work on March 26,
14 and I saw him one additional time, which was the 5th,
15 where I dismissed him from the case.
16     Q.  You know, in terms of period of time where
17 he said he felt improved in regard to the back
18 injury, could that make -- could it make a difference
19 if he had been -- was on pain medication?
20     A.  Of course.
21         MS. JOHNSON:  Object to foundation.
22         THE WITNESS:  Of course.
23 BY MR. COHN:
24     Q.  And why would you know that pain medication
25 would have an effect on pain?

Page 179

1      A.  I'm sorry?
2      Q.  Well, there was an objection on foundation,
3  that somehow you wouldn't know that pain medication
4  might help make somebody feel better if they have an
5  injury that causes pain.  How would you know that?
6      A.  That pain would block a pain signal -- or
7  that medication would block a pain signal?
8      Q.  Yes.
9      A.  Through my experience in the past with
10 other patients that have been on it.
11     Q.  And -- okay.
12     A.  Did I answer your question?
13     Q.  Yes.
14     A.  Okay.
15     Q.  And this experience is based on -- is it
16 based on your now 16 years as a chiropractor?
17     A.  Yes.  I've had a number of patients in the
18 past that have had to take pain medication for
19 different complaints.
20     Q.  In your view, is Larry Grove a malingerer?
21     A.  No.
22     Q.  Is Larry Grove truthful when he came in to
23 see you as a patient?
24         MS. JOHNSON:  Object to form.
25         THE WITNESS:  To the best of my knowledge,

Page 180

1  yes.
2  BY MR. COHN:
3      Q.  Did Larry ever talk to you about his job,
4  do you know?
5      A.  As in regards to what he specifically does
6  or if he's getting along?  Because I don't --
7      Q.  Whether he liked his job or --
8      A.  I know he likes his job, and we had
9  discussions on and off over what his job entailed.
10 You know, going back to the twisting, bending thing
11 and in awkward positions.  But other than that, I
12 think that's about it that I can recall.
13     Q.  Now, there was some talk about doing an
14 activity that might irritate the back and increase
15 the pain, but you don't know whether or not, for
16 example, the alleged jump from the dock in Ketchikan
17 increased his pain or caused a delay in his recovery,
18 do you?
19     A.  This is the first I've heard of it right
20 there.  This.  I'm sorry.  This.
21     Q.  And you can't tell how deep that is?
22     A.  No, I can't tell how far the --
23     Q.  And in regard in the transverse fracture
24 and it's a weight -- nonweight-bearing bone, if you
25 go jump into any body of water, whether it's a pool

Page 181

1  or off the dock, and you just go in straight without
2  twisting and bending, in your view would that cause
3  further injury to the transverse fracture?
4      A.  Seems reasonable to me that it most
5  certainly would have caused at least some increase in
6  pain, but I don't know necessarily that it would have
7  delayed or elongated the duration of time to totally
8  heal.  You know, anytime those muscles contract
9  around that, I would think there would have been some
10 pain.
11     Q.  And in regard to him doing an activity, is
12 it your experience that some -- that patients may
13 feel better when they take pain medication and
14 therefore feel they can do more than they should?
15         MS. JOHNSON:  Objection.  Form and
16 foundation.
17         THE WITNESS:  Almost without fail in my
18 experience.
19 BY MR. COHN:
20     Q.  And how do you know that, Doctor?
21     A.  Just based on my experience with repetitive
22 times over the past with patients.
23     Q.  So is one of the problems that might be
24 with a pain medication is it blocks the pain, making
25 an individual feel they can do an activity when the