GROVE v. UNOCAL

NOAH LAUFER, M.D.
10/20/2006

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3

4    LAWRENCE H. GROVE, CYNTHIA          )
     GROVE, SARAH GROVE, and MICHAEL     )
5    GROVE (DOB 1/21/88) by and          )
     through his father, LAWRENCE H.     )
6    GROVE,                              )
                                         )
7              Plaintiffs,               )
                                         )
8    vs.                                 )
                                         )
9    UNOCAL CORPORATION,                 )
                                         )
10             Defendant.                )
     _____)
11   Case No. 3:04-cv-0096-TMB

12

13

14   _____

15       VIDEOTAPED DEPOSITION OF NOAH LAUFER, M.D.

16   _____

17

18                 Pages 1 - 67
                Friday, October 20, 2006
19                  12:30 P.M.

20

21                     at
              MEDICAL PARK FAMILY CARE
22   2211 East Northern Lights Boulevard, Suite 101
                 Anchorage, Alaska
23

24

25

RECEIVED
OCT 2 5 2006
COPY
Exhibit 13
page 1 of 5

Page 28

1    And then lastly I mention dorsalis and
2    posterior tibial pulses, which is pulses in the feet,
3    to know that he's vascularly intact down to his feet,
4    or at least to the ankles, and they were normal.
5        Q.   Okay.  And then what did you diagnose him
6    as?
7        A.   His story, the notation from Dr. Ealum and
8    his exam were consistent with this transverse process
9    L1 fracture.
10       Q.   So what did you -- what did you ask him
11   to -- what kind of treatment did you recommend?
12       A.   Typically these will heal.  They can't
13   be -- or they're not typically opened or fixed with
14   wires or anything like that.  However, they do hurt a
15   lot, and so what I did is I gave him medication for
16   pain and wanted to see what would happen with time,
17   which is the most appropriate thing to do.
18       Q.   Okay.  Did you give him any restrictions at
19   that time?
20       A.   That's a good question.  I think there is a
21   work restriction here.  We had said that -- I said
22   that he could return -- I believe this is the right
23   note.  On the -- on -- may return to his work on the
24   6th if free of symptoms, on 3/6 of 2002.
25       Q.   So who would decide whether he was free of

Page 29

1    symptoms?
2        A.   Only he could know if he's free of
3    symptoms.
4        Q.   Okay.  So it wasn't that you were asking
5    him to come back.  You were giving him a general --
6        A.   No.  If he felt he was able to, he could.
7    But obviously if he didn't, he would need to come
8    back.
9        Q.   Okay.  And I have -- in my records I have
10   302365.  It looks like it's a letter from Dr. Ealum.
11       A.   Ealum, yeah.  And I think that --
12       Q.   Do you have that?
13       A.   -- he brought that with me.  I have an
14   original.
15       Q.   Okay.  Is that what you relied upon?
16       A.   Yes.
17       Q.   So this is where you understood that he had
18   a fractured -- he'd fractured a transverse process on
19   his L1?
20       A.   Um-hum.
21       Q.   Okay.  When was the next time that you saw
22   Mr. Grove?
23       A.   Looks like it was the 4th.  Oh, that makes
24   sense, yeah.  He was seen on the 4th for a renal
25   ultrasound.

Page 30

1        Q.   Why were you asking for a renal ultrasound?
2        A.   There are actually two reasons.  Injury to
3    your kidneys can cause hypertension.  Failure of --
4    you know, inadequate blood flow to the kidneys can
5    cause hypertension, and certainly a fall where you
6    landed and hit your back could cause kidney disease
7    or injury.  And so it was a multifaceted reason.
8    It's a cheap, inexpensive and very safe test.
9        Q.   Okay.  Was that the only reason that you
10   recall seeing him that day?
11       A.   It's also an opportunity to see how he's
12   doing.
13       Q.   So also a follow-up visit?
14       A.   Yeah, um-hum.
15       Q.   And what did you -- what did you observe
16   that day?
17       A.   Well, a normal ultrasound of his kidneys,
18   fortunately.  Worsening pain or continued pain,
19   because I changed him from Vicodin to Percocet, which
20   is a slightly stronger pain medication.
21       Q.   How long was he to take those meds for?  Do
22   you have a note in there for that?
23       A.   I wrote for 30 of them, and he was
24   instructed to use them one - q.h.s. means prior to
25   bed - as needed.

Page 31

1        Q.   So did he -- do you recall from either this
2    visit or the visit before that whether you had
3    prescribed him anything for general daily pain rather
4    than --
5        A.   I don't believe I did.
6        Q.   Okay.  You don't see a note in the March
7    1st, '02?
8        A.   Let's see.  March 1st of '02?
9        Q.   Yes.  What did you prescribe him?  You
10   prescribed him some blood medication, blood pressure
11   medication that day.
12       A.   Um-hum.
13       Q.   Did you prescribe him other medication as
14   well?
15       A.   Yeah.  Noted on the workman's comp note,
16   which is this one (indicating).
17       Q.   The dictated note?
18       A.   Yeah.  He had been given a prescription for
19   Vicodin.
20       Q.   Okay.
21       A.   Number 20.  And those do have daytime use
22   numbers on them, one to two every four hours -- every
23   four to six hours as needed for pain.
24       Q.   Okay.  And the Vioxx.  In the March
25   1st, '02, the Vioxx that he was using, in the

10 (Pages 28 to 31)

GROVE v. UNOCAL

NOAH LAUFER, M.D.
10/20/2006

Page 32

1  subjective section at the top, about in the middle of
2  your dictated note, it says he had Vioxx left over
3  from a prior injury and had been taking that.
4      A.  Um-hum.
5      Q.  Do you -- what is your medical opinion on
6  taking old medication?
7          MR. COHN: Objection to the form of the
8  question. Speculation and vague as to how old and
9  whether it's --
10         THE WITNESS: Yeah.
11         MR. COHN: -- no longer effective, et
12  cetera.
13         MS. JOHNSON: Form and foundation is really
14  all you need, Mike.
15         THE WITNESS: I'm sorry. The question is
16  how do I feel about taking old medication?
17  BY MS. JOHNSON:
18      Q.  Yes.
19         MR. COHN: Objection. Form, foundation,
20  speculation, relevance.
21         MS. JOHNSON: Which are all form and
22  foundation.
23         MR. COHN: No.
24  BY MS. JOHNSON:
25      Q.  Go ahead.

Page 33

1      A.  It obviously depends on the medication. I
2  don't know whether it matters that I object because
3  it's common practice.
4      Q.  Okay.
5      A.  Somewhat alarmingly so, but yes.
6      Q.  Do you recommend that people do that?
7      A.  I don't usually recommend that.
8      Q.  Okay. And did you have any advice for
9  Mr. Grove on that practice?
10         MR. COHN: Objection to form of the
11  question.
12         THE WITNESS: I don't -- well, at the end I
13  said I asked him to discontinue the Vioxx and to
14  avoid NSAIDs, which is a large class of medications,
15  the most useful anti-inflammatories, until his blood
16  pressure was under better control, and of course this
17  is on the day where he was 210/118.
18  BY MS. JOHNSON:
19      Q.  Okay. So the reason you asked him to
20  discontinuity Vioxx was why?
21      A.  Vioxx is a nonsteroidal anti-inflammatory
22  medication, like ibuprofen or Aleve or
23  over-the-counter medications. They can harm the
24  kidney and could cause hypertension, and I was
25  worried about his kidneys because of his blood

Page 34

1  pressure.
2      Q.  Okay. So going back to your March 4th --
3      A.  Okay.
4      Q.  -- follow-up visit. Did he indicate to you
5  that day how his pain was in his back?
6      A.  I don't have a notation on the scale here.
7      Q.  Okay.
8      A.  Gosh. And again there are two March 4th
9  notes, it looks like. Is that right?
10     Q.  Is there one for his blood pressure again?
11     A.  Yes, there is.
12     Q.  Okay. So let's stick with the one that's
13  related to his workers' comp back injury.
14     A.  Okay.
15     Q.  For now. We'll go to the other one.
16  That's the one I have at 302354. Is he still
17  reporting pain to you?
18     A.  Um-hum. It says I'd given him Vicodin,
19  which he found helpful, but he continued to have pain
20  on moving.
21     Q.  Okay.
22     A.  And I prescribed him, like I said,
23  Percocet, which is a little stronger.
24     Q.  And then the blood pressure note which I
25  have at 302352, it's your dictated note. Do you see

Page 35

1  that?
2      A.  Yes, it is.
3      Q.  What were you reporting or what did you
4  find that day on blood pressure?
5      A.  I had given him the medication Zestoretic.
6  He had a much more reasonable blood pressure,
7  although it was still elevated. This is -- would be
8  within goal in that you don't usually want to drop
9  someone that rapidly.
10         We'd also done some labs by that point and
11  knew the result of the ultrasound and all that. I
12  hadn't found another cause of the hypertension.
13     Q.  You noted in the subjective portion, which
14  is the top portion, that he had recently been
15  drinking. Those are your five words that you used.
16     A.  Um-hum.
17     Q.  Where did you get that information?
18     A.  I'm sure I got it from him.
19     Q.  Okay. Do you recall -- other than those
20  words that you used, do you recall anything else that
21  he said?
22     A.  No, I don't.
23     Q.  And then the next time that you saw him was
24  when?
25     A.  The next note is Dr. Lanza's.

11 (Pages 32 to 35)

Page 48

```
 1   chart?
 2       A.  It is.
 3          MR. COHN:  What number is that?
 4          MS. JOHNSON:  It's 302297.
 5       Q.  And you said yes?
 6       A.  It is, yes.
 7       Q.  Okay.  Do you have any notations on this
 8   chart in your handwriting?  Are any of these yours?
 9       A.  No.  No, they're not.
10       Q.  Okay.
11       A.  I don't believe they are.  No.
12       Q.  Are there initials for anyone who has
13   written on here?  How would I tell who wrote these?
14       A.  That would be hard to tell.  Possibly by
15   the date of entry.
16       Q.  So there is one for 3/4/02 as a start date.
17       A.  Yeah, and that was -- I saw him on 3/4/02,
18   and that may have been Nurse Vicki who wrote that in
19   because it's a chronic medicine, or whomever I was
20   working with at that time.
21       Q.  There is two different signatures here, one
22   is on my page 302300 and 302301.  Can you tell me
23   whose signatures are on each page?
24       A.  This is my signature.
25       Q.  302300 is yours?
```

Page 49

```
 1       A.  Yes.
 2       Q.  Do you recognize 302301?
 3       A.  This is Ken Laufer, my father's signature.
 4       Q.  Okay.  Thank you.
 5          Okay.  I don't have any other questions.
 6             EXAMINATION
 7   BY MR. COHN:
 8       Q.  Good afternoon, Dr. Laufer.  I just had a
 9   few questions.  I don't really have that many.  In
10   regard to -- there was some question regarding -- you
11   said you hadn't treated Mr. Grove for his ankle
12   injury, but -- let me see.  Where is that?
13          I want to -- is there any chart note for a
14   visit on September 9, 2002?
15       A.  2002?  September 9th.  Yes, there is a
16   September 9, 2002 note.
17       Q.  I'm trying to locate it here.
18       A.  Yeah.
19       Q.  Mine is cut off.  Does it -- on the bottom
20   of it, does it say which doctor saw him on that day?
21       A.  I can tell you based on the handwriting.
22   That's my father's handwriting, Ken Laufer.
23       Q.  And so this appears to be your father's
24   handwriting?
25       A.  Yes.
```

Page 50

```
 1       Q.  And do you see where it says "marked
 2   swelling above lateral malleolus"?
 3       A.  Yes.
 4       Q.  What does that mean?
 5          MS. JOHNSON:  Objection.  Foundation.
 6          THE WITNESS:  Yeah, it --
 7   BY MR. COHN:
 8       Q.  I mean, do you know what that means, and
 9   how do you know what that would mean?
10       A.  Well, it's in, you know, medicalese, I
11   guess you call it.  Lateral malleolus is a part of
12   your ankle, the bump on the outside part of your
13   ankle.  It's the distal end of your fibula, and it
14   would be a place you would always look when someone
15   has injured their ankle.
16          "Swelling" is fairly straightforward, and
17   "above" I think is fairly straightforward.
18       Q.  I want to go back to some of the earlier
19   chart notes.  There was a chart note from Dr. Lanza
20   on March 19, '02.
21       A.  March 19 of '02?
22       Q.  Right.  I mean, I would give you a number,
23   but I don't believe yours has the Bates stamp numbers
24   that we have.  I think this was one of the documents
25   that counsel was questioning you about, Dr. Lanza's
```

Page 51

```
 1   chart note.
 2       A.  Okay.
 3       Q.  Typed.
 4       A.  The typed chart note.  Yes.
 5       Q.  Now, in regard to the alcoholic beverage
 6   consumption, it says four or more daily.  Does it
 7   indicate how long that's been going on?
 8       A.  No, it does not.
 9       Q.  And in regard -- for your purposes, would
10   it make a difference to you if it was four beers or
11   four hard alcohol beverages?
12       A.  It wouldn't.  I always take these with a
13   grain of salt.
14       Q.  What I'm -- actually, one of the things I
15   want to ask about is that last sentence in there on
16   that -- under No. 1.
17       A.  Of note, he recently had some?  Oh, yeah.
18       Q.  Can you read that?
19       A.  It says, "Of note, he has recently had some
20   work on the North Slope, where he went ten days
21   without any alcohol consumption and had no withdrawal
22   symptoms whatsoever."
23       Q.  In your experience, what's the significance
24   of that?
25       A.  Someone who has developed a tolerance and
```

15 (Pages 48 to 51)

Page 52

1  dependence on alcohol may have symptoms when they
2  stop it. I think it may be Dr. Lanza's concern that
3  if he did ask him to stop it completely, which he
4  does, that he could have withdrawal symptoms. The
5  DTs can actually be quite severe and dangerous for
6  people, precipitate seizures or even death
7  traditionally. Although, we don't usually see that
8  these days.
9      Q. Well, could it also mean if he had no
10  withdrawal symptoms whatsoever, that his alcohol
11  consumption is not that great?
12      MS. JOHNSON: Objection. Form.
13      THE WITNESS: It could.
14  BY MR. COHN:
15      Q. There are some -- there was questioning and
16  there was marked as an exhibit a photograph in regard
17  to a jump into the water outside the Ketchikan Moose
18  Lodge.
19      A. Yes.
20      Q. Does it make a difference, for example, if
21  the jump was outside the Moose Lodge as opposed to,
22  say, into a swimming pool? Is that the significance?
23      MS. JOHNSON: Objection. Form.
24      THE WITNESS: To me, no, but --
25  ////

Page 53

1  BY MR. COHN:
2      Q. So the most significant point would be the
3  height from which the jump occurred?
4      A. To me the most significant thing is that
5  he's out and being fairly active, but -- yeah. I
6  guess as far as the mechanism of it, he is jumping
7  into water, which isn't going to be a hard impact.
8  Or I don't know if he is. There are some people
9  jumping in the water, which is -- you know.
10      Q. Well, in regard to when Mr. Grove went to
11  see you, did you give him any limitations on his
12  activities?
13      A. I would not have. I didn't note that, but
14  I don't think I would have.
15      Q. And do you -- would you have expected he or
16  any other patient to tell you, "Oh, by the way,
17  Doctor. In another week I'm going to Ketchikan"?
18      A. No.
19      Q. In your chart note of March 1st, 2002 --
20      A. Okay. I'm getting there. Which one?
21      Q. Just the bottom. It says A slash P. Well,
22  it's typed.
23      A. There is one for the workman's comp and
24  then one for the hypertension. It's a shorter one.
25      Q. I believe -- well, I guess I've been told

Page 54

1  by counsel it's the workers' comp one.
2      A. Okay. That's the wordier one.
3      Q. Well, one question I had, and I don't know
4  what this -- there's some capital letters, the second
5  line from the bottom. N-S-A-I-D?
6      A. Oh, yes.
7      Q. What is that?
8      A. This is nonsteroidal anti-inflammatory
9  drugs. And should I clarify that? That includes
10  Vioxx and Celebrex and Bextra and Relafen and Mobic,
11  but also over-the-counter medications like ibuprofen
12  and Aleve.
13      Q. On this visit, you indicated his blood
14  pressure was 210/118.
15      A. Yes.
16      MS. JOHNSON: Why don't we go off record.
17      MR. COHN: Let's go off record.
18      THE VIDEOGRAPHER: Okay. Going off record.
19  The time is 1:35.
20      (Off record.)
21      THE VIDEOGRAPHER: We're back on the
22  record. The time is 1:36.
23  BY MR. COHN:
24      Q. Doctor, in your first visit that we were
25  talking about on March 1st or 2nd of 2002, you

Page 55

1  recorded blood pressure of 210/118.
2      A. Yes.
3      Q. And then on a follow-up visit, it was
4  154/98. Is that a fairly significant reduction?
5      A. It is, yes.
6      Q. And did you attribute that to the
7  discontinuance of the Vioxx?
8      A. I attributed that to the medication I put
9  him on.
10      Q. Could the stress of an injury cause
11  heightened --
12      A. Yes.
13      Q. -- blood pressure? And --
14      A. Yes, definitely.
15      Q. And I think there was a subsequent visit
16  when he had the ear problem?
17      A. Yes.
18      Q. Could the stress related to that type of
19  injury also result in an elevated blood pressure?
20      A. Yeah, if it were painful enough or it was
21  causing him anxiety.
22      Q. Now, when he came to see you and your
23  objective findings were consistent with the -- is it
24  traverse or transverse?
25      A. Yes. Transverse process.

16 (Pages 52 to 55)

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

Page 1

10:09:51

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA      )
GROVE, SARAH GROVE, and MICHAEL )
GROVE (DOB 1/21/88) by and through )
his father LAWRANCE H. GROVE,   )
                                )
          Plaintiffs,           )
                                )
     vs.                        )
                                )
UNOCAL CORPORATION,             )
                                )
          Defendant.            )
_____)

Case No. 3:04-cv-0096-TMB

VIDEOTAPED DEPOSITION OF FOROOZ SAKATA, M.S., O.T.R.

10:09:51

Pages 1 - 156; Inclusive

Monday, November 13, 2006

10:12 a.m.

Taken by Counsel for Defendant
at
Clapp Peterson Vanflein Tiemessen Thorsness LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454

Exhibit 14
page 1 of 11

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

Page 74

11:54:36 1  I'll do that; that's fine, also. And as you know,
        2  this is being videotaped, and there's also a
        3  transcript being made. After the -- at the end of
        4  this deposition, the court reporter is going to make
        5  a transcript of this, and then you will have an
        6  opportunity to look it over and verify it for
        7  accuracy and sign the deposition.
        8      The deposition may be used, if appropriate,
        9  to examine you at trial. If you appear and testify
       10  in person, or if you, for some reason, you can't be
       11  there, it might be -- it could be used instead of
       12  your testimony, or to supplement your testimony, or
       13  to cross-examine you.
       14      Let me start in the beginning here. You
11:55:22 15  did a physical capacity evaluation, which is
       16  called -- is that called a PCE?
       17      A. Yes.
       18      Q. You did that on March 13th, 2003, for
       19  Mr. Grove?
       20      A. Yes.
       21      Q. Is that correct?
       22      Have you seen Mr. Grove since that date?
       23      A. No.
       24      Q. Do you know anything at all about his
       25  medical treatment since that date?

Page 75

11:55:39 1      A. No.
        2      Q. So you don't know that he had surgery from
        3  Dr. Geitz for three major ankle injuries two months
        4  later?
        5      A. No.
        6      MS. JOHNSON: Objection: Form.
        7  BY MR. COHN:
        8      Q. Did you know he had surgery for three ankle
        9  injuries in May of 2003?
       10      A. No.
       11      Q. Is -- and when you do your physical
       12  capacity evaluation, that is your evaluation as of
       13  March 13th, 2003; is that fair to say?
       14      A. Yes.
11:56:08 15      Q. So today you would not know what his
       16  physical capacity is to return to his job?
       17      A. No.
       18      Q. And you don't know what his physical
       19  capacity was to return to his job after his surgery
       20  in May 2003?
       21      A. No.
       22      Q. You don't know how his ankle is today as
       23  compared to what it was on the date that you saw him?
       24      A. No.
       25      Q. You don't know if it's deteriorated since

Page 76

11:56:32 1  May of 2003?
        2      A. No.
        3      Q. And you are unaware that he had surgery in
        4  2005 from Dr. Chang?
        5      A. Right.
        6      Q. Okay. Now, previously you said you have
        7  been -- have you been deposed before?
        8      A. Yes.
        9      Q. And you indicated -- do you know -- you
       10  weren't sure how many times. Has it been quite a few
       11  times?
       12      A. I don't remember. When I was working with
       13  Dr. James, yes, we were. And a lot of times it was
       14  just jointly, too.
11:57:10 15      Q. And have you testified at trial, at any
       16  trials?
       17      A. No.
       18      Q. Have you testified in front of a workers'
       19  compensation board?
       20      A. Many times.
       21      Q. Now, let me see if I can find the report.
       22      MR. COHN: Now, has our file been marked as
       23  Exhibit 1?
       24      MS. JOHNSON: Exhibit 1.
       25  ///

Page 77

11:57:39 1  BY MR. COHN:
        2      Q. Looking at Exhibit 1, just the document
        3  which is your report, can we go to that for a second.
        4  Now, where it says patient information, insurance,
        5  adjuster, physician and the date, how -- where did
        6  you get the information about who the insurance
        7  adjuster was?
        8      A. Asking Mr. Grove.
        9      Q. And same thing about the insurance company?
       10      A. Yes.
       11      Q. And do you know who Joanne Pride is?
       12      A. Yes.
       13      Q. Who is Joanne Pride at that time?
       14      A. His adjuster.
11:58:21 15      Q. When you say "adjuster," you mean workers'
       16  comp adjuster?
       17      A. Yes.
       18      Q. Did you have any conversations or -- with
       19  Joanne Pride?
       20      A. I don't remember.
       21      Q. Is that --
       22      A. I don't remember.
       23      Q. Would that be something that you normally
       24  would have, is conversation with the insurance
       25  adjuster?

20 (Pages 74 to 77)

a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

---

Page 86

12:09:42 1    you differed refusing to sign the consent form?
2        A.  He hadn't seen the consent form.  He was
3    just refusing to sign anything, because he didn't
4    know he should be there or not, even though he had
5    driven and came to my office.
6        Q.  Does the fact that he didn't initially sign
7    the consent form indicate that he was not going to
8    cooperate in doing the testing?
9        A.  Obviously, he walked in there with an
10   attitude that:  Why am I here.  I didn't go looking
11   for him.  I -- he was there because he was asked, or
12   his physician referred him to be there.
13       And I usually tell them:  It's a free
14   country; I'm not -- if you want -- if you want to go
12:10:27 15  through with this testing, go through with this
16   testing; if you don't want to, don't.
17       Having -- owning my own business, I do not
18   go out of my way to create problems.  If he didn't
19   want to do it, then that's fine.  He can go somewhere
20   else or not.  And he just didn't know -- he had
21   problems figuring out why he was there.  And after he
22   made his phone calls, and somebody must have told him
23   why he was there, and then he...
24       Q.  Go ahead.
25       A.  Then he did -- and he signed.  He -- he

---

Page 87

12:11:00 1    really was cooperative, in terms of doing what he was
2    asked to do, except he was really symptom -- he
3    exaggerated his symptoms, in between -- but he
4    really -- he was nice.  He did what I asked him in
5    between acting like he couldn't do it.
6        Q.  Well, when you say exaggeration, that's
7    your subjective finding of an exaggeration?
8        MS. JOHNSON:  Objection:  Form.
9        THE WITNESS:  Well, no, it's not.  It's
10   very objective.  When you stand there and tell me you
11   can't put weight on the foot, and you are clearly
12   standing on it, walking on it, and putting weight on
13   it, I don't know how much more objective you can
14   get.
12:11:42 15  BY MR. COHN:
16       Q.  Do you know how much pain he was in when he
17   was standing on his foot?
18       A.  No, but -- obviously, not.  I don't know
19   that.  No one will ever know that.
20       And I also tell them that they are the only
21   people that know how they are feeling, how much pain
22   they are experiencing.
23       If, in fact, he was experiencing eight to
24   ten pain, there is no way he would have been able to
25   ambulate on the treadmill for 20 minutes.

---

Page 88

12:12:08 1    Q.  Well, in all respect, when he put down an
2    eight, he said an eight at the end of the day with
3    you, he didn't say he was an eight when he started
4    the testing; would that be fair to say?
5        A.  Right, that is.
6        Q.  I just want to go through the consent form
7    a little bit, because in the consent form -- well,
8    before I get to the consent form.  Have you had
9    occasion to have people that are sent to you for
10   physical capacity evaluation who express some
11   frustration over the lack of a definitive medical
12   diagnosis?
13       A.  Yes.  But that's not my job to --
14       Q.  No.  I understand --
12:12:46 15  A.  Sure, sure, sure.
16       Q.  -- what you're talking about.
17       A.  Sure.
18       Q.  And would you say from your recollection
19   that Mr. Grove was one of these people that was
20   concerned about the lack of a definitive medical
21   diagnosis of his ankle?
22       MS. JOHNSON:  Objection:  Form.
23       THE WITNESS:  He was concerned that the
24   MRI -- yes.
25       ///

---

Page 89

12:13:11 1    BY MR. COHN:
2        Q.  And --
3        A.  And that, within itself, is very
4    subjective.  Because they don't have a medical
5    degree, they don't know -- you know, that's --
6    sometimes they think they didn't do everything, but
7    when you look at the records, everything that's
8    medically possible has been done for them.  But they
9    don't look at it, you know, I'm sure...
10       Q.  Well, do you know if everything medically
11   possible had been done for Mr. Grove before he saw
12   you?
13       A.  Based on what I read up to that point, yes.
14       Q.  And do you know if -- I believe you had --
12:13:51 15  do you know if he saw Dr. Geitz after he saw you?
16       A.  No.  No.
17       Q.  And do you know that he saw Dr. Geitz March
18   19th, 2003, and he diagnosed three injuries to his
19   ankle?
20       A.  No.
21       MS. JOHNSON:  Objection:  Form.
22   BY MR. COHN:
23       Q.  If a person, such as Mr. Grove, at least,
24   doesn't have a definitive medical diagnosis, and then
25   they're sent for physical capacity evaluation, have

---

23 (Pages 86 to 89)

a5dba8cd-92d6-47dc-a9fb-28685392f140

Page 102

12:29:03  1    have anything specific.
2        Q.  So there's no specific order that you can
3    find in there from either Dr. Nolan --
4        A.  Right.
5        Q.  -- or anyone else for that evaluation?
6        A.  Right.
7        Q.  Now, did you test -- besides up and down,
8    did you test the range of motion of the ankle side to
9    side?
10       A.  No.
11       Q.  Just up and down?
12       A.  The range of motion, ankle, I must have.  I
13   don't have anything, but whatever the ankle is,
14   bending forward, bending backward and eversion -- I
12:29:46 15  don't remember.
16       Q.  Okay.  But if you -- if you had done that,
17   would you have noted it in your report, most
18   probably?
19       A.  No.  Because I wasn't specifically
20   writing -- measuring any range of motion.  I just
21   wanted to make sure he has got strength, and just a
22   gross overall strength.  No, I did not.  And I would
23   not have, because I was not asked to do range of
24   motion, specifically.
25           And it really doesn't matter, for the

Page 103

12:30:13  1    functional testing, what you are able to do.  It
2    doesn't really matter whether you can go 10 degrees
3    or 12 degrees or -- it's really immaterial, when
4    you're measuring a person's function.  What you see
5    is what you get.  I want to know what he can do with
6    what he's got.
7        Q.  Well, do you know whether activity, such as
8    testing you did, could cause swelling of his ankle
9    later on or the next day?
10       A.  Anything is possible.
11       Q.  Have you ever had that happen, where you do
12   testing and the next day the person's ankle is
13   swollen?
14       A.  Usually I get a phone call from them.
12:30:56 15      Q.  But in this case, was he your patient or
16   was he referred to you by someone and you don't
17   know --
18       A.  Right.
19       Q.  -- whether it was the doctor or the
20   insurance company?
21       A.  He was -- he was referred to me by
22   Dr. Nolan.  And -- I'm sorry what was your question?
23       Q.  Well, the question is, so you don't know if
24   the next day his ankle was swollen?
25       A.  No.

Page 104

12:31:21  1        Q.  So in terms of going back, returning to a
2    job, whether medium, medium heavy, say an
3    eight-hour-a-day job, 5 days a week, in order to do
4    that job, would you expect they would have to be able
5    to have good function of that body part for the
6    entire workweek?
7        MS. JOHNSON:  Objection:  Form.
8        THE WITNESS:  Sure.
9        MR. COHN:  So even if his ankle can
10   function in the first couple of hours, his ankle has
11   to hold up for the next day, the next day and the
12   next day; is that fair?
13       MS. JOHNSON:  Form.
14       THE WITNESS:  Yes.
12:31:53 15  BY MR. COHN:
16       Q.  Do you know what the talus bone is?  The
17   talus bone?
18           You've never heard of the talus bone?
19       A.  Yes, I have.
20       Q.  Do you know what the talus bone does?
21       A.  I don't know.
22       Q.  Did you know he had a fracture of his talus
23   bone?
24       A.  I don't remember.  I don't remember the
25   medical records.  I haven't read it recently.

Page 105

12:32:15  1        Q.  Do you know that Dr. Geitz removed the
2    fracture from his talus bone at his surgery in May
3    2005 --
4        MS. JOHNSON:  Objection:  Foundation.
5        MR. COHN:  -- 2003.
6        THE WITNESS:  No.  Because I never had any
7    contact with him later.
8    BY MR. COHN:
9        Q.  Is the talus bone a weightbearing bone, do
10   you know?
11       A.  Uh-huh.
12       Q.  And if there's a fracture of the talus
13   bone, could that cause pain?
14       MS. JOHNSON:  Objection:  Foundation.
12:32:40 15      THE WITNESS:  Yes.  But he wouldn't be able
16   to do what he did.
17           If the pain was that excruciating, that it
18   prevented him from doing what I was asking him to do,
19   he's a grown up man, he should have said I can't do
20   this.
21   BY MR. COHN:
22       Q.  Well, is there a -- you're saying it's
23   either you can do it or you can't do it.  Isn't there
24   some mid range, where maybe you can do it but there's
25   pain?

27  (Pages 102 to 105)

a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

---

Page 106

12:33:03
1    A.  Sure.  Sure.
2    Q.  And you don't have any reason to disbelieve
3  Mr. Grove if he says he had pain when he did the
4  testing?
5        MS. JOHNSON:  Objection: Form.
6        THE WITNESS:  No.
7  BY MR. COHN:
8    Q.  Getting back -- oh, you had -- there's some
9  machines we have talked about, the computerized
10  machines, to measure -- is that for the isometric
11  testing?
12    A.  Uh-huh.
13    Q.  Are there different for the dynamic?
14    A.  No.  Dynamic is just what you do in
12:33:38 15  everyday.  It's basically box and weights.  No.
16    Q.  The milk boxes?
17    A.  Right.
18    Q.  Okay.  But the isometric testing there, do
19  you have the computer system checked periodically?
20    A.  Oh, yes.  Yes.  Unfortunately, I pay a good
21  price for that every -- every year I check it for
22  $1,500, and then every -- actually, every couple of
23  months, we just make -- put weight on it and make
24  sure it's weighing appropriately.  But, yeah, we
25  do --

---

Page 107

12:34:19
1    Q.  Do you know --
2    A.  -- check that.
3    Q.  -- who does the checking?  Is this the
4  company in Utah?
5    A.  Right.
6    Q.  Do they send somebody up from Utah to check
7  it?
8    A.  No.  It's all computerized.  It's really
9  interesting.  It's all computerized.
10    Q.  Now, is this something, in terms of a
11  computer program running system, that they programmed
12  out of Salt Lake City, the J -- what...
13    A.  JTech.
14    Q.  Yeah, JTech.
12:34:47 15    A.  Uh-huh.
16      All medical offices, they all now have some
17  sort of computer.  Really, I don't need the computer.
18  I wish -- I mean, I got it because all the doctors
19  look at the computer this and computer that.  The
20  most important thing is my boxes, my weights and
21  observing him and being able -- that he has got good
22  body mechanics, he's able to lift.  And computers is
23  just kind of an icing on the cake.
24    Q.  Now, when you did your -- the isometric
25  testing, have them standing in one spot.  And the

---

Page 108

12:35:26
1  dynamic testing, were they also standing in one spot?
2    A.  They're able to move.  They move forward,
3  backwards, sideways.
4      And they're able to, on the isometrics,
5  they can move, because they're on this platform and
6  they stand.
7    Q.  Uh-huh.
8    A.  Dynamic, they can move.
9    Q.  Well, what I'm asking is, is the dynamic
10  testing -- did you have him walking across the floor?
11    A.  Yes.
12    Q.  Carrying objects?
13    A.  Yes.
14    Q.  Did you have him carrying objects, while he
12:35:57 15  was climbing up the stairs, the steps?
16    A.  No, I didn't.  No.
17    Q.  Do you know if in his job he might have to
18  carry objects while he was -- he's climbing up the
19  stairs or the steps?
20    A.  He may have.  I don't know.
21    Q.  Or climbing up a ladder?
22    A.  Yeah.
23    Q.  We have talked about this before.  But are
24  you aware, on March 13th, 2003, the day after
25  Mr. Grove saw you -- and there's a document from

---

Page 109

12:36:32
1  Defendant's files, 200453 -- he went to Medical Park
2  Family Care and they examined him and indicated that
3  he still -- he had swelling in his ankle?  Are you
4  aware of that?
5    A.  No.
6    Q.  Or on March 19th, 2003, Mr. Grove was
7  seen -- was referred by Dr. Laufer to Dr. Geitz?
8    A.  Uh-huh.
9      Dr. Geitz, he's a pediatric orthopod.  And
10  most of his work is in pediatrics [As spoken].
11    Q.  If it's -- I don't know if that's the same
12  Dr. Geitz.
13    A.  Anyway.  Yeah, there's only one.
14      G-e-i-t-z?
12:37:45 15    Q.  G-e-i-t-z, right.
16      It says examination -- this is March 19th.
17  "Exam today shows significant anti limp on the right
18  side."  Do you know what that means?
19    A.  Anti limp, yes.  I didn't observe that when
20  he saw me.  He had absolutely no limp.
21    Q.  He has a large ankle effusion.  Do you know
22  what an effusion is?
23    A.  Yes.
24    Q.  Is that an objective finding of swelling
25  that you can --

---

28 (Pages 106 to 109)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com
a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

---

**Page 110**

12:38:15 1    A. Well, it depends. He had -- if he measured
2    it and he compared it with the other foot -- some
3    people -- yeah, yes.
4        You have to ask him, though. I don't know.
5    Q. He said: He is very tender over the
6    posterior tibial tendon behind the medial
7    malleolus --
8    A. Right.
9    Q. -- extent of six centimeters?
10        MS. JOHNSON: Objection: Form.
11    BY MR. COHN:
12    Q. What does that mean?
13    A. You have to ask him.
14    Q. He said: New x-rays today show
12:38:52 15   osteochondral fragments from the lateral talus and
16   it is unrelated (Indiscernible) tips without
17   impingement.
18        Does that indicate that they found on
19   x-rays that there is a fracture of the talus bone?
20        MS. JOHNSON: Objection: Foundation.
21        THE WITNESS: You have to ask Dr. Geitz. I
22   don't know. Those are his records. I -- yeah.
23    BY MR. COHN:
24    Q. Well, in regard to whether --
25    A. Yeah.

---

**Page 111**

12:39:26 1    Q. -- Mr. Grove could return to work, would
2    you defer to doctor -- to a doctor that was treating
3    him?
4    A. Sure.
5    Q. Or doing his treatment? Dr. Geitz?
6    A. Sure.
7    Q. Or would you also defer to Dr. Chang, his
8    present treating doctor?
9    A. At the time I did my testing, my testing is
10   what it is.
11    Q. Now, in regard to physical -- have you seen
12   any physical capacity evaluations that have been done
13   since your physical capacity evaluation?
14    A. No.
12:39:57 15    Q. And if those physical capacity evaluations
16   are different than yours, does that mean that those
17   are incorrect?
18        MS. JOHNSON: Objection: Form;
19   foundation.
20        THE WITNESS: No, but there are very few
21   people in this town that have done extensive physical
22   capacity evaluation. Some, actually, are much better
23   at it than others. And I guess you get what -- this
24   is something you really have to have a lot of
25   experience, to be able to observe these people and

---

**Page 112**

12:40:34 1    draw your conclusion. It's not something you can do
2    one here and two there and be able to do these
3    capacities. It's very complicated, and you just have
4    to -- it depends who did it. If it's someone that
5    has a lot of experience doing it, then -- but that
6    doesn't mean they can't become really good at it
7    after doing a lot of them. But I wouldn't certainly
8    go to a surgeon that has done one or two surgeries.
9    Q. So if I get you right, when you're talking
10   about going to do, say, a physical capacity
11   evaluation, the level of their evaluation and how
12   well they do it might be a combination of factors,
13   such as experience, how long they've been doing it --
14    A. Right.
12:41:27 15    Q. -- and training?
16    A. Right.
17    Q. Is there a fair amount of subjectivity, in
18   terms of a physical capacity evaluation such as you
19   do? I mean, you know, which you're also using your
20   experience and training, but is there also a lot of
21   subjective component to it?
22    A. Not really, not really.
23    Q. Well, when you say "not really," nothing --
24   "not at all" --
25    A. Well, certainly, we're all human. You can

---

**Page 113**

12:41:55 1    look, yeah -- but not -- your numbers speak for
2    themselves. The patient's behavior, in terms of
3    movement and their ability to sit, stand, squat,
4    kneel, all of those physical commands, if you're not
5    experienced in looking at it and being able to pick
6    out in what you're looking at -- you know, just
7    because you say you're hurting doesn't mean you're
8    hurting, although I record it as such. And just
9    because you say you cannot do your job doesn't mean
10   you don't have the physical capacity to not do it [As
11   spoken]. There is a lot of psychosocial stuff that
12   goes -- I mean, there's a lot of factors. Just
13   because you sit down and look at me and say, "I can't
14   do it," doesn't mean you can't do it.
12:42:45 15    Q. Well, okay. I know you're saying what you
16   just said --
17    A. To -- I'm not saying this to this
18   particular person.
19    Q. Yeah.
20    A. I'm just saying you have to know what
21   you're doing when you are performing these physical
22   capacity evaluations. If you -- I have seen a lot of
23   reports by a lot of physical therapists. The patient
24   goes to them and says they can't sit, but yet
25   they have sat and interviewed them for two hours.

---

29 (Pages 110 to 113)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com
a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

---

**Page 122**

12:52:07 1    Q.  And if he had --

2    A.  It's kind of really -- I don't know what

3   he'd be doing to -- unless he try to fall and twist

4   it.

5    Q.  Well, is there any side-to-side movement in

6   the ankle, just in the normal course of walking

7   around?

8    A.  No.  No.  You can --

9    Q.  Well, what's the purpose of a foot brace,

10  of an ankle brace?

11    MS. JOHNSON: Objection: Foundation.

12  BY MR. COHN:

13    Q.  You know, have you ever prescribed an ankle

14  brace for an individual?

12:52:38 15   A.  No.  I'm not a physician.  But to keep, if

16  they're loose, if they have lax tendons, and they

17  want to keep them in a more fixed position, if

18  they're just to immobilize it.

19    Q.  Is that because the ankle is still moving?

20    A.  Yes.

21    Q.  And you still have side to side --

22    A.  It's unstable.

23    Q.  -- movement?

24    So if he -- if he has instability from the

25  tendon or ligament, would that affect his ability to

---

**Page 123**

12:53:09 1  do his job?

2    A.  I don't know.  I don't know.  Nowadays,

3  they have good shoes and good support and...

4    Q.  Do you know what happened with your -- with

5  your report on Mr. Grove after you did it?

6    A.  No.  No.

7    Do I want to know what happened?

8    Q.  Well, do you know that the insurance

9  company promptly hired a surveillance, Quantum

10  Investigations, to videotape him, to find out whether

11  he was a liar or malingerer?

12    MS. JOHNSON: Objection: Form.

13    THE WITNESS: No, I don't.

14  BY MR. COHN:

12:53:49 15   Q.  If, in fact, Mr. Grove has the three

16  injuries that Dr. Geitz found, could that be an

17  explanation for his self-limiting participation in

18  the testing that you did --

19    A.  Sure.

20    Q.  -- on March 13th, 2003?

21    MR. COHN: Let's take a break for a few

22  minutes.

23    THE VIDEOGRAPHER: Off record, 12:55.

24    (Off the record.)

25    THE VIDEOGRAPHER: We are on record,

---

**Page 124**

12:58:09 1  12:59.

2    MR. COHN: Good afternoon.

3  BY MR. COHN:

4    Q.  Under the job requirements in your report,

5  you indicated that Mr. Grove agreed that he had the

6  physical strength to do the job?

7    A.  Uh-huh.

8    Q.  He did not claim he could not physically

9  lift certain objects?

10    A.  Right.  Right.

11    Q.  However, you also indicated he said he is

12  concerned and does not want to take a chance and put

13  too much weight on his right foot since his

14  physicians have not addressed all of his questions?

12:58:46 15   A.  Uh-huh.

16    Q.  Do you have any reason to disagree --

17    A.  No.

18    Q.  -- with what you indicated Mr. Grove said?

19    A.  No.

20    Q.  And if, in fact, he had a fracture in his

21  talus, would that be a concern that would make it

22  legitimate for Mr. Grove to be worried about his

23  ability to do his job?

24    A.  It depends what they do with it.  If they

25  fix it and --

---

**Page 125**

12:59:15 1   Q.  Right.  Right, if they fix it.

2    A.  He can do something; he certainly can go

3  back to his job and do at least up to a medium

4  capacity.  Maybe he wouldn't want to put -- lift 100

5  pounds, but he shouldn't have any problems going back

6  the very next day and work up to medium capacity.

7    Q.  But the very next day he went to his doctor

8  and he had a swollen ankle.  Were you aware of that?

9    MS. JOHNSON: Objection: Form;

10  foundation.

11    THE WITNESS: No.  But with his attitude,

12  with his -- with the fact -- no, I'm not surprised.

13  That's very common.  That is just par for the -- the

14  course.

12:59:50 15  BY MR. COHN:

16    Q.  Was Mr. Grove a whiner?

17    A.  He certainly was an angry guy, yeah.

18    Q.  Is it possible he's angry because he

19  doesn't have answers as to what's wrong with his

20  ankle?

21    MS. JOHNSON: Objection: Form.

22  BY MR. COHN:

23    Q.  Would you be upset if you went to a doctor,

24  and you're still having a problem, and the doctor

25  hasn't diagnosed you?

---

32 (Pages 122 to 125)

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

Page 126

13:00:09 1          MS. JOHNSON: Objection: Form.
       2          THE WITNESS: Yeah, I would. But I
       3     wouldn't continue -- I wouldn't go lifting 80 pounds
       4     so well. I wouldn't be able to do it.
       5     BY MR. COHN:
       6          Q.  Well, it depends on what body part we're
       7     talking about. If you're talking about your back
       8     or --
       9          A.  Believe me, your foot is the most important
      10     part in your body. If you ever had foot problems,
      11     you would know. I would rather have neck injuries,
      12     shoulder, back, than have a foot problem.
      13          Q.  Why is that?
      14          A.  Because you can't do anything. Have you
13:00:42 15    ever had plantar fasciitis? You can't put weight on
      16     that foot. You can't walk. There is no way in the
      17     world you can do what this guy did. I mean, it's
      18     painful. In fact, I've had plantar fasciitis, and I
      19     said: Oh, my God. You can't walk.
      20          Q.  What is plantar fasciitis?
      21          A.  It's foot pain. You just -- you just
      22     can't -- you cannot -- it's really painful, and you
      23     cannot do -- you can't walk on it. You can't
      24     certainly get on a treadmill, and you just can't do a
      25     lot of this stuff.

Page 127

13:01:21 1          But anyway -- I'm sorry.
       2          Q.  No. That's -- that's perfectly fine.
       3          So you consider if there was a
       4     surgically-addressed ankle injury that it's very
       5     serious?
       6          A.  Uh-huh.
       7          Q.  And you note you didn't seek medical
       8     records after. But in light of -- assuming what I
       9     presented to you from Dr. Geitz is correct, would
      10     that indicate to you that he did have serious ankle
      11     injuries that needed to be addressed?
      12          MS. JOHNSON: Objection: Form and
      13     foundation.
      14          THE WITNESS: Of course, it needed to be
13:01:57 15    addressed.
      16          But does not take the fact -- even with the
      17     pain, even with Dr. Geitz' medical evaluation, he
      18     does have, at the very least, the capacity to do 50
      19     pounds on -- or a medium level work, pretty
      20     comfortably and safely. Now, when you push it beyond
      21     that, maybe he would experience more pain. And yeah,
      22     all the medical issues should be -- it's only fair to
      23     say, yeah --
      24     BY MR. COHN:
      25          Q.  Well, you said he could do 50 pounds. But

Page 128

13:02:28 1     like you said before, you don't know whether that's
       2     something he can do everyday.
       3          MS. JOHNSON: Objection: Foundation;
       4     form.
       5          THE WITNESS: If he did -- if he did what
       6     he did that day, he certainly can do medium capacity
       7     on a daily basis, yes.
       8     BY MR. COHN:
       9          Q.  And that's based on - what - on your -- how
      10     long did you have him in your office?
      11          A.  Four hours.
      12          Q.  Four hours. Based on four hours seeing
      13     this man, you've made a determination he could go
      14     back and do this job; and you don't even know
13:02:54 15    about the pain he was in the next day, or that his
      16     ankle swelled up the day after, or that he had
      17     surgery shortly thereafter?
      18          MS. JOHNSON: Objection: Form.
      19          THE WITNESS: No.
      20     BY MR. COHN:
      21          Q.  I mean, do you know -- you don't know these
      22     things?
      23          A.  No.
      24          Q.  So you made -- you made a decision to
      25     categorize this man as a whiner, as a malingerer; is

Page 129

13:03:16 1     that true?
       2          A.  No.
       3          Q.  You don't consider him a malingerer?
       4          A.  He had a lot of verbal complaints that were
       5     totally inconsistent with his movement pattern. That
       6     only leads me to believe there's inconsistencies.
       7          Q.  Even though you found -- on the first page
       8     of your report -- that he met the validity --
       9     validity presentation on your profile?
      10          A.  Yes. Yes.
      11          Q.  Now -- have you found in the course of
      12     doing your evaluations through the years, whether
      13     it's PCE or B.E.A.R., that there are a lot of people
      14     that appear to complain and not put out what you
13:04:03 15    consider the maximum effort they can do; would that
      16     be fair to say?
      17          A.  No, I'm sorry. Repeat that.
      18          Q.  Well, have you had, besides Mr. Grove,
      19     other individuals that you considered didn't put out
      20     maximum efforts on PCE or B.E.A.R. testing?
      21          A.  On some people, yes, but really not very
      22     many.
      23          Q.  Do you -- not very many? Well, what
      24     percentage would you say you found they did not do
      25     the work to your satisfaction?

33 (Pages 126 to 129)

a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

Page 130

13:04:34 1    A. That's -- I -- they don't have to do work
2    to my satisfaction; they just have to follow
3    procedure. And I just record what they do and what
4    they -- that's all I do. I didn't make those numbers
5    up. I just reported and recorded what he did.
6    Q. Did you testify in the case of -- the
7    workers' comp case of Stewart versus Providence
8    Alaska Medical Center?
9    A. Stewart? Oh, my God. Do you know how many
10    years ago? You know, it just clicked, so many years
11    ago. What year was that?
12    Q. 1999, it looks like the decision came out.
13    A. Oh, my goodness.
14    Q. Well, because in that -- in the decision,
13:05:21 15    at page 13, the board wrote: In evaluating the
16    medical evidence, we find the May 26, 1998, B.E.A.R.
17    PCE report is not credible based on Sakata's
18    mischaracterization and omissions of several physical
19    requirements listed in the applicable Dictionary of
20    Occupational Titles job description for phlebotomist
21    and medical laboratory technician and give it little
22    weight.
23        Do you recall that?
24    A. Just the name sounds familiar. Nothing --
25    no.

Page 131

13:05:53 1    Q. Do you recall at any time being overridden
2    by a physician as to whether a person had the
3    physical capacity to do a -- do a job that you
4    indicated they could do?
5    A. I'm sorry. Repeat that question.
6    Q. Are you aware of any instances where you,
7    in a physical capacity evaluation, determined that an
8    individual could do a certain job, and then the
9    physician determined contrary to you, that they could
10    not do that work?
11    A. I'm sure there has been cases, and vice
12    versa, also - many vice versa cases, too - that I
13    have said they can't do it and the physician says,
14    oh, yes they can.
13:07:03 15    Q. Now, you write in your report on page 2:
16    Due to his stated report of unfamiliarity with safe
17    maximal effort, all the activities were performed
18    well within comfort level or pain tolerance.
19        Now, with regard to that, if an individual
20    has not been at least diagnosed in whatever their
21    condition is, would that be reasonable for them,
22    to --
23    A. Yes.
24    Q. -- slow down or not do --
25    A. Yes.

Page 132

13:07:32 1    Q. -- as much as they can?
2    A. Yes.
3    Q. And if they did that, that wouldn't
4    indicate that they were malingering?
5    A. No.
6    Q. Now, overall, did you find that Mr. Grove
7    attempted to comply with instructions that you gave
8    him?
9    A. Yes.
10    Q. Now, you indicated that the -- let's see --
11    if you had a job description from DOT, why did you
12    need one from Siemens?
13    A. They just send it to me. They usually do
14    send them.
13:08:05 15    Q. And it looks like, in looking over the
16    report from Corvel -- because you indicated that
17    the --
18    A. (Reviewing.)
19        See, all of this came from Dr. Nolan's
20    office.
21    Q. Are you sure it came from Dr. Nolan; or
22    from Corvel, sending you Dr. Nolan's reports?
23        Because doesn't it indicate facsimile
24    transmittal to Forooz Sakata from Laura Fabari from
25    Corvel, pages including cover, 14, and says,

Page 133

13:08:45 1    "Regarding chart notes on Patient Lawrence Grove,"
2    and then attached to that appear to be the records
3    from Anchorage Fracture, and some other clinic. So
4    does that indicate the records were not sent from the
5    doctor but sent from Corvel?
6    A. Probably. But I always call the doctors
7    and tell them. Even if -- especially the surgeons, I
8    always. Because of sometimes it may be premature. I
9    always call the doctor and said, "Doctor" -
10    especially the surgeons - "are you aware that they
11    sent your patient for a physical capacity? Do you
12    want me to do this or not?" And if the surgeons have
13    any problems with it, if they don't want it, they say
14    no, or if they do, they say, yeah, go ahead and do
15    it.
13:09:34 16    Q. Well, do you recall talking to Dr. Nolan
17    about Mr. Grove?
18    A. It wouldn't be Dr. Nolan. It would
19    be probably -- it would be his nurse that would ask
20    him and call me back. And as routine practice, I
21    usually do that. I don't remember. That's 2003.
22    Q. I see, on the top here, there is a
23    document. It says Siemens Building Technology, and
24    it's from L. Hoover, and it looks like it's got a
25    name -- and I can't read it -- Laura Cer -- it

34 (Pages 130 to 133)

a5dba8cd-92d6-47dc-a9fb-28685392f140

Page 142

13:19:32   1        A. Right.
           2        Q. And it looks like now it says pain rating
           3   now, eight, and says best, five?
           4        A. This is consistent with what he said at the
           5   beginning.
           6        I only ask him just to do those two. Just
           7   say pain rating at the beginning; he says his best
           8   was three. Now he says his best is five. Here he
           9   says his worst is seven. Now he says is eight. So
          10   these are just examples of inconsistencies you were
          11   asking me for.
          12        Q. Well, is that -- seven to eight, would you
          13   say that's a major inconsistency?
          14        A. No, but it's an inconsistency. Though,
13:20:16  15   there is a difference between three and five. Five
          16   is strong; three is moderate. I mean, it's when
          17   you -- in the big picture, it really doesn't matter.
          18   The bottom line is he does have the capacity -- at
          19   the very least, he has a medium heavy capacity and...
          20        Q. Here you have PCE Data Sheet dated March
          21   13th, '03. It says insurance company.
          22        A. Travelers.
          23        Q. Is this something you would have --
          24        A. This is my interview with the patient.
          25   I would ask him -- I go over the medical records. I

Page 143

13:20:59   1   read that. And I'll just ask him -- this is what he
           2   told me. I had no idea Joanne Pride was the
           3   adjuster.
           4        Q. Well, and in the back here, because we saw
           5   this and -- and I don't know -- you had some other
           6   writing on the back. Now, it said CAT scan --
           7   chip...
           8        A. Chips taken off, I guess.
           9        Q. Talus?
          10        A. No -- I don't know.
          11        Q. MRI --
          12        A. MRI confirms.
          13        Q. You don't know when you would have written
          14   what's on the back of that page?
13:21:33  15        A. "Right side feels like something stuck in
          16   ankle; toward the end of the day..." No, this is
          17   what he told me at the beginning. This is -- these
          18   are his symptoms.
          19        Q. And he wrote his symptoms, a.m.:
          20   Stiffens -- stiffer than hell?
          21        A. In the morning he's more stiffer.
          22        THE VIDEOGRAPHER: Excuse me.
          23        MR. COHN: Okay. Let's take a break and go
          24   to a new tape.
          25        THE VIDEOGRAPHER: Okay.

Page 144

13:22:06   1        THE WITNESS: Please let's not take a
           2   break. Let's continue it.
           3        THE VIDEOGRAPHER: I need to change
           4   tapes.
           5        THE WITNESS: Oh, you do.
           6        THE VIDEOGRAPHER: Off record, 1:23.
           7        (Off the record.)
           8        THE VIDEOGRAPHER: We are on record at
           9   1:25, on Tape 3.
          10   BY MR. COHN:
          11        Q. Okay. I'll try and be quick.
          12        A. Okay.
          13        Q. Thank you for your patience to this time.
          14        I was just reading -- you wrote on the
13:24:23  15   back -- and is this information you got from
          16   Mr. Grove on the back of this page?
          17        A. Yes.
          18        Q. Which was a PCE Data Sheet. It says:
          19   Dr. Geitz, six weeks off.
          20        A. I have no idea what that means. That
          21   means --
          22        Q. Yeah, that's okay if you don't know what it
          23   means.
          24        A. I really don't remember. Is he off six
          25   weeks? Had he seen Dr. Geitz at that point? I don't

Page 145

13:24:48   1   know.
           2        Q. And "stiffer than hell; right side feels
           3   like something stuck in ankle; toward the end of the
           4   day ankle hurts." Would that be inconsistent with
           5   the ankle injuries that you --
           6        A. No. These are -- I usually ask them what
           7   are your symptoms at this point.
           8        Q. Said he uses ladders a lot. Doesn't
           9   feel -- doesn't feel safe on ladders and -- if you
          10   have some laxity in your ankle - we talked about with
          11   the ligaments --
          12        A. Uh-huh.
          13        Q. -- would that be something, in your
          14   experience, that could --
13:25:25  15        A. Sure.
          16        Q. -- affect your feeling safe on a ladder?
          17        A. Yes.
          18        Q. Still bruising.
          19        Did you observe any bruising?
          20        A. No.
          21        Q. Did he have a sock on or off when you did
          22   the testing? I don't remember.
          23        A. I don't remember. But believe me, I always
          24   take everything off; shoes and socks. But I don't
          25   remember specifically. But I do -- and in regard

37 (Pages 142 to 145)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com
a5dba8cd-92d6-47dc-a9fb-28685392f140

GROVE, ET AL. v. UNOCAL

FOROOZ SAKATA
11/13/2006

---

Page 146

13:25:53 1 to -- regardless -- regardless of what your physical
2 capacity would have shown, as of March 13th, '03, in
3 your experience and training, would -- to determine
4 if someone could do the job they did before they were
5 injured, would it be appropriate for them to do
6 another physical capacity evaluation following his
7 surgery and recovery?
8     A. Oh, absolutely. Yes.
9     Q. And so to the extent there was validity to
10 your testing on March 13th, '03, that does not tell
11 us anything about what his ankle could bear, in terms
12 of going back to work following his ankle surgery, in
13 May of '03, or his subsequent one, two years later?
14     A. It depends on what they did. If they just went in there
13:26:42 15 and released the scar, I don't see why he couldn't be
16 doing just as well. And it depends, you know, if
17 they're fractured, as you say. If, in fact, that's
18 true. If it has healed, I don't see why he couldn't.
19 
20     Q. Well --
21     A. I don't know. I don't know.
22     Q. But that would still be -- but how would
23 you determine if he could still do that after he had
24 the surgery, from the testing you did in March? I
25 mean, would you have to go back and do an evaluation?

Page 147

13:27:21 1     A. He may or may not. Ankle's hurting or not
2 hurting, the lifting, the rest of his body, his arms
3 and his strong -- his back, his quads, he doesn't
4 really lift with his ankle. But if it's not painful
5 anymore, as he said he was before, I don't see why he
6 couldn't at least do the medium capacity.
7     Q. But you would have to defer to a doctor on
8 that?
9     A. Well, in your cases that whine, whine and
10 complain, yes. Otherwise, no. Why would you --
11 well, it depends.
12     Q. Well --
13     A. I mean, Dr. Geitz doesn't even have to do
14 another physical capacity. He can sit down, look at
13:28:01 15 this. "Your complaint was just the minor pain of the
16 ankle. We fixed it. You're okay. You can do your
17 job. Go do it." Or he may be one of those doctors
18 that want to have another opinion in his record, and
19 he can say, "We'll send to somebody else, so they can
20 make that determination." Then they're completely
21 out of it, themselves. And they can do that, but
22 they don't have to. They don't have to. They
23 certainly can look at the medical records. They look
24 at their, well, surgery, and they can say, "Yeah, you
25 can do it." But the litigious cases, no, there's

Page 148

13:28:40 1 not. And if they're experienced doctors, they
2 wouldn't do it, they would just refer them out.
3     Q. You mean they wouldn't?
4     A. They wouldn't want to be in my place.
5     Q. Well --
6     A. They wouldn't just say, "Go back to work."
7 They would send them to -- for physical capacities
8 or -- but those are only really cases like this.
9 Otherwise, most doctors have a pretty good idea what
10 these people can and cannot do.
11     Q. Well, when you say "most doctors," though,
12 if Dr. Geitz and Dr. Chang expressed opinions as to
13 what Mr. Grove can or cannot do --
14     A. Then they can refer him and get a physical
13:29:16 15 capacity. Hopefully, it would be an objective one
16 and --
17     Q. And you would defer to the opinion of
18 Dr. Geitz, who did his surgery, as to what his
19 capacities were after that surgery, and to Dr. Chang,
20 after the second surgery?
21     A. Yeah. They can...
22     Q. And in regard to saying, "Well, it depends
23 on how well they recover," in this case -- and I have
24 told you and the records will reflect that Dr. Geitz
25 corrected or operated on three separate injuries to

Page 149

13:29:49 1 the ankle. And are you aware --
2     MS. JOHNSON: Objection: Form;
3 foundation.
4 BY MR. COHN:
5     Q. Are you aware that Mr. Grove had been given
6 a permanent partial impairment rating?
7     A. Usually they do; when they have surgeries,
8 they do. That's common. All of them do have some
9 kind of rating. It does not mean they cannot go back
10 and do their job at the time of injury, just the
11 rating basically refers to the type -- you know, the
12 surgery -- and they look at the book and give them a
13 rating for -- that doesn't mean functionally they're
14 not capable of doing --
13:30:31 15     Q. Well, isn't the converse also true: That
16 if you get a rating, and the rating is not
17 necessarily what someone would perceive to be a high
18 rating, that doesn't mean you can go back and do the
19 job?
20     A. No, that's true.
21     MR. COHN: I don't have any further
22 questions at this time.
23     FURTHER EXAMINATION
24 BY MS. JOHNSON:
25     Q. Would you turn to your health

38 (Pages 146 to 149)

a5dba8cd-92d6-47dc-a9fb-28685392f140

This is the html version of the file http://146.63.134.55/workcomp/1999/99-0088.doc.
**G o o g l e** automatically generates html versions of documents as we crawl the web.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:IC6CNcmSBNYJ:146.63.134.55/workcomp/1999/99-0088.doc+Forooz+Sakata&hl=en&gl=us&ct=clnk&cd=8

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **forooz sakata**

# ALASKA WORKERS' COMPENSATION BOARD

**P.O. Box 25512      Juneau, Alaska 99802-5512**

DEANN M. STEWART,   )

                    )

     Employee,   )

       Respondent,  )

                    ) DECISION AND ORDER

   v.   )

                    ) AWCB CASE No. 9507476

PROVIDENCE ALASKA MEDICAL CENTER, )

                    ) AWCB Decision No. 99-0087

     Employer,   ) Filed in Anchorage, AK

                    ) April 20, 1999

   and   )

Exhibit 15
page 1 of 4

)

CONSTITUTION STATE SERVICE  )

COMPANY/HARBOR ADJUSTMENT  )

SERVICES,    )

)

Insurer,  )

Petitioners.  )

_____ )


On February 24, 1999, we heard Employer's petition to terminate reemployment benefits in Anchorage, Alaska.  Employee attended the hearing and was represented by attorney Charles Coe.  Attorney Constance Livsey represented Providence Alaska Medical Center and its insurance carrier, Constitution State Service Company (Employer).  We closed the record on March 23, 1999, when we next met.[1]

ISSUES

(1.) Should Employee's reemployment benefits be terminated?

(2.) Did the Rehabilitation Benefits Administrator (RBA) abuse his discretion in finding Employee noncooperative, under AS 23.30.041(n)(3), from April 30, 1998 through May 26, 1998?

(3.) Should Employee's permanent partial impairment (PPI) benefit payments be recharacterized as permanent total disability (PTD) benefit payments?

(4.) Is Employee entitled to an award of medical benefits under AS 23.30.095?

(5.) Is Employee entitled to an award of penalties and interest?

(6.) Is Employee entitled to an award of attorney fees and legal costs?

SUMMARY OF EVIDENCE

On July 7, 1987, Employee began working as a phlebotomist[2] for Employer.  Eight years later, on April 11, 1995, Employee injured her left shoulder, neck, low back, and left leg, while moving a 100-lb. centrifuge.[3]  Employer accepted the claim and began paying temporary total disability (TTD) benefits effective May 9, 1995.[4]

Ms. Stewart has indicated to me that she believes that she cannot tolerate more than a four hour work or school day. At the present time, I do not have any medical documentation, besides her self report, indicating that Ms. Stewart is restricted from a full 8 hours of activity within her physical capacity. Please respond if appropriate.

Although you may have commented about her possible return to work in the past, if you would be so kind to review the attached job descriptions[22] to clarify her potential retraining goals, and capability to attend classes/work activities, we may proceed with the Reemployment Plan. . . . [W]e can not proceed without your input.[23]

On May 26, 1998, Employee participated in a PCE at Body Ergonomics and Rehabilitation (BEAR). The evaluator, **Forooz Sakata**, O.T.R., R.N., stated the PCE results were valid, and Employee had the "capacity for an 8-hour work day on a regular basis as long as the job is limited to light or low-medium capacity."[24] **Sakata** specifically listed the "Physical Requirements" for Phlebotomist P.P.D., Lab Assistant, and Medical Laboratory Technician as:

Standing/Walking:  6 hours in an 8 hr day

Sitting:    2 hours in an 8 hr day

Bend/Stoop:  Occasionally in an 8 hr day

Lifting:    Occasionally in an 8 hr day

Carrying:    Rarely in an 8 hr day

Push/Pull:  Rarely in an 8 hr day

Climb:    Not performed in an 8 hr day

Crawl:    Not performed in an 8 hr day

Reaching:    Occasionally in an 8 hr day[25]

**Sakata** then approved the job descriptions for Phlebotomist and Medical Laboratory Technician as within Employee's demonstrated and recommended physical capacities.

On June 11, 1998, Employee participated in yet another PCE at Healthsouth Rehabilitation Center of Anchorage (Healthsouth). Joann Seethaler, L.P.T., stated the PCE results were valid, and Employee's overall ability improved significantly since her first evaluation on January 11, 1996. Seethaler also stated:

In comparing [Employee's] current capacities with the job description . . . for . . . phlebotomist . . . it appears that she would be able to perform all activities other than reaching with her left hand (especially overhead). Since she is right hand dominant, this may not be a significant problem. The primary restrictions would be the total time of workday tolerance. She would not be able to work a full day at this time. Total workday tolerance has been established at six to seven hours.[26]

> At the administrative level, awards can be reopened by the compensation board for modification to meet changes in claimant's condition, such as increase, decrease or termination of disability. For reasons of administrative practicality, time limits within which such petitions may be brought are usually imposed.
>
> . . . .
>
> Under the typical award in the form of periodic payments during a specified maximum period or during disability, the objectives of the legislation [for modification of awards] are best accomplished if the commission can increase, decrease, revive, or terminate payments to correspond to a claimant's changed condition. Theoretically, then, commissions ought to exercise perpetual and unlimited jurisdiction to reopen cases as often as necessary to make benefits meet current conditions. But the administrative and practical difficulties of such a course have led to severe limitations on the power to reopen and alter awards.[46]

We find AS 23.30.130(a) limits our authority to hear claims under AS 23.30.110(a). We find our legislature, under AS 23.30.130(a), specifically limited the reopening period for modifications to one year after either: (1) the last payment of one of the specified categories of compensation; or (2) the rejection of a claim. We further find there is no statutory exception, e.g., "unusual or extenuating circumstances," to this legislatively imposed time limitation for requesting modifications. We conclude because we previously found Employer's request for modification is barred under AS 23.30.130(a), we do not have authority to hear its request under AS 23.30.110(a).

Assuming, arguendo, we have the authority to hear Employer's request for modification under subsection .110(a), we next consider Employer's evidence. We find Employer failed to prove, by a preponderance of the evidence, Employee's reemployment benefits should be terminated based on changed conditions. We make this finding for the following reasons.

First, we find Employer presents us with the same argument it presented to the RBA in 1997 -- that Employee has the physical capacities to return to her job at the time of injury. We find Employer relies on the May 26, 1998 BEAR PCE report, the June 11, 1998 Healthsouth PCE report, and Dr. Hadley's November 17, 1998 EIME report.

In evaluating the medical evidence, we find the May 26, 1998 BEAR PCE report is not credible, based on Sakata's mischaracterization and omissions of several physical requirements listed in the applicable SCODDOT job descriptions for Phlebotomist and Medical Laboratory Technician, and give it little weight. In her report, **Sakata** lists "reaching" as occasionally (i.e., 0-2.5 hours per day, or 1-33% of the time), and altogether omits "handling" and "fingering." The SCODDOT lists reaching, handling, and fingering as frequently (i.e., 2.5-5.5 hours per day, or 34-66% of the time) for both job descriptions.

Reviewing the June 11, 1998 Healthsouth PCE report, we find Seethaler did not affirmatively state Employee was capable of returning to her job as a phlebotomist. Instead, Seethaler states Employee "would be able to perform all activities [of a phlebotomist] other than reaching with her left hand (especially overhead)." Moreover, we find the Healthsouth PCE report indicates Employee is not able to bend, stoop, or crouch, and can perform simple or fine grasping motion with her left hand only occasionally. The SCODDOT job description for both positions requires a person to frequently stoop, grasp, and finger.

GROVE v. UNOCAL                    CHARLES HOSTETLER 11/9/06

In preparing the following document I have used reports by Michael Geitz M.D.,Eugene Chang M.D., Publications including: Safari Club Journal, Hunting Hard in Alaska, Alaskan Safari, and Hunting in Alaska. I have also conversed with Mr. Grove.

In remarking on Mr. Grove's ability to hunt in Alaska, I have considered the following; The complete hunt, the difference between hunting in Alaska and hunting in Africa, and the physical requirements for Alaskan hunting.

For the non hunter, it may seem that the harvesting of the animal is the primary goal of the hunt, and if this goal is not met, the hunt is a failure. But the planning, preparation, time in camp in the wilderness, the ability to be in and move in the country where the animals are, and the physical requirements of the stalk are all part of the hunting. The hunting experience is all of these things. Granted, you can "hunt" from camp and the animals may walk by, but this is generally not the case.

Alaskans have to hunt hard, if not harder than anywhere else. On a guided hunt, the outfitter will supply a guide, packers, camp cook and basically you just pull the trigger. This is also true of African hunts, only more so. It is possible in Africa to shoot from a vehicle, illegal in Alaska, but most hunting in Africa is done from a blind by a watering hole and in this case really all you do is pull the trigger. You then go back to "camp" where you are waited on by numerous staff members. In Alaska, with no guides involved, the hunter has to do the skinning, packing, cooking, setting up shelter and all the myriad camp chores for himself. This involves a great deal of strenuous work, especially the packing out of the animal or camp gear. Alaska law requires the salvaging of the animal and the fines for wanton waste are high.

The physical requirements for hunting in Alaska are much different than Africa or a Texas game ranch. Most all of Alaskan hunting is "spot and stalk". The hunter finds a vantage point away from camp and uses optics to spot the animal. Once it is spotted, the hunter goes after it. This can be a slow careful stalk over rugged terrain or, more often a fast moving stalk to intercept the animal. Even getting to the vantage point can be difficult.

Walking: At minimum, on my fly out hunts I still manage to walk to and from my vantage point. This will require that I walk three miles a day. Let me warn you, walking in Alaska is not like mall walking. You will be crawling under, over, and through brush, so even in this minimal activity you will need strong ankles, knees and calf muscles that have been conditioned to walking on uneven ground. (1)

Exhibit 66
page 1 of 3

On low ground in alaska in the muskeg the ground is soggy and uneven in some areas and you have to lift your knees, this is while you are usually wearing hip waders. High ground, you will side hill which is torture on your ankles, especially with a load in a pack. (2). Some Alaskan hunting is not as dangerous as others, but that can change depend on weather conditions and terrain. Carrying a hind quarter through a swamp with a swarm of mosquitos is very strenuous.

"I have hunted mountain sheep and goat in Altai, in Caucasus in Iran, in Turkey and in the Alps, but never has the trail been so tough as in Alaska, I begged my guide to stop and sleep." (3)

All the jogging, stair climbing and weight lifting can't prepare you for packing 50-70 pounds through Alaskan terrain.

In considering the complete hunt, the difference in Alaskan and African hunting, and the physical requirements for Alaskan hunting, it is my opinion that Mr. Grove"s hunting ability will be greatly diminished due to his ankle injury. He can participate in the hunt, but will be unable to do much more than hunt from camp. His injury has probably ended any mountain hunting he would do and has greatly reduced his mobility on lower ground. In addition, it is highly unlikely that he would be able to pack or even assist in packing various loads required in the hunt.

Charles Hostetler    registered guide

Footnotes: (1)Hunting Hard in Alaska. Marc Taylor p.97

(2) Hunting in Alaska. Chris Batin p. 213

(3) Alaska Safari. Harold Schetzle p.146

Pertinent Qualifications:

Education:
B.A. English  Eastern Washington University
Masters Communication  Eastern Washington University

Experience:
1995- Present -Alaskan Guide Alaska International Expeditions
1996-2001 Operator Big Mountain Lodge
1982-1986 Anchorage Parks and Recreation Board
1979- Guide Mt. McKinley
1974- Present- Cross Country Ski Coach
        Local, Regional and National
1984 - Present- Coach and Official, U.S. Biathlon team
        Local, National, and International
2002- Official, Olympic Games
2006-Technical Delegate Arctic Winter Games
1966-Present Hunting in Alaska

Compensation for authoring and technical editing $250.00