Plaintiffs - Balser

RECEIVED
NOV 1 2 2006
WEIDNER & ASSOCIATES

**Joseph d. Balser, PH. D.**
**Mechanical Engineer/Metallurgist**
**510 Escondido Circle**
**Livermore, CA. 94550**
**(925) 455-0418**          (phone & fax)

Michael Cohn, Esq.                                November 9, 2006
Phillip Paul Weidner and Associates
330 L Street, Suite 200
Anchorage, AK 99501

RE: Grove, et al., v. UNOCAL, Case # A04-0096 CV
Man Platform Collapse – Bolt Fracture Report

Dear Mr. Cohn,

    My understanding of the incident that led to Mr. Grove's injuries is that on September 9, 2002, Mr. Grove was replacing air filters of an air conditioning system in a Unocal Building in Anchorage. In order to replace the upper filters, he was standing on an elevated Man Platform attached to the sides of the air conditioner approximately 8 feet above the floor. The platform collapsed causing Mr. Grove to fall to the floor resulting in injury.

    The Man Platform was constructed from approximately 3"x 3" perforated angle iron support frames of unknown thickness attached to the side of the air conditioner using self tapping screws. The perforated slots in the angle sections were described to me as being approximately 3/8 inch wide slots of varying lengths and rounded at the ends of each slot. On the horizontal members of this angle iron structure, a wooden plank provided the working platform on which Mr. Grove was standing. The plank dos not appear to have been anchored to the support beams of the angle iron structure. From the photographs provided by you and reportedly taken by Mr. Grove, there did not appear to be a protective railing associated with this Man Platform.

    From the photographs, it appears that the vertical members of the angle iron support remained in place as attached to the side of the air conditioner. The ends of these vertical members appear to be un-deformed where the horizontal members attach to the vertical members. For the horizontal angle section that separated, it appears that the joint of the horizontal to vertical member separated without loading of the angle members causing any structural deformation of the support. Therefore, the joint failure appears to be a fastener failure. It is evident from the photographs that two bolts were used to secure each joint for those joints still remaining in these post-accident photographs. However, the number of bolts in the failed joint that secured the joint at the time it failed cannot be ascertained with certainty. The weight loading of this joint appears to be due only to the weight of the user plus any items that he might carry onto the working platform.

Exhibit 1
page 1 of 6

Mr. Grove reportedly collected a number of fastener related items from the floor area of the accident scene a short time after the accident. These items are identified as Exhibit 16 items to his deposition. It is noted that only one fractured bolt and one square nut were collected by Mr. Grove in his Exhibit 16 collection of items. Four ¾ inch OD by 5/16 inch ID flat washers were also present in this collection of fastener items. The collection of only one fracture bolt may indicate that only one bolt secured the subject joint at the time of the accident. It was also noted that the square nut did not contain the a fragment of the fractured bolt which suggests that the square nut may have been separated from the bolt prior to the fracture of the bolt within the joint. The fractured bolt was noted to be ¼ - 20 round head cap screw that was significantly rusted on its entire surface including on the fractured bolt surface itself. The use of a common round head cap screw as a fastener for the platform structural joint which is of small diameter (1/4 inch) and with a single square nut and flat washers is inappropriate for a structural man bearing joint. The cap screw will not allow preloading of the joint by the application of suitable torque on the bolt. Furthermore, the square nut of NC thread is inferior due to a lack of thread length for engagement at high preloads for a structural joint. The use of "Nylock" hex nuts or lock washers would be expected in a structurally sound joint, especially in joints that are attached to a structure that is subjected to vibration such as an air conditioner. The fractured bolt and the square nut did not contain any markings as to strength grade indicating that high strength fasteners were not being used.

The examination of the subject bolt from Exhibit #16 was required to determine the fracture mode of the bolt. For this examination, the rust coating of the fracture surface needed to be removed in a non-destructive manner so that the fracture morphology could be examined in a scanning electron microscope. A metallurgical protocol was proposed for this examination in my Protocol of February 16, 2006. The examination of this bolt fracture was conducted on July 25, 2006 at Anamet, Inc. Laboratories in Hayward, California. Also present at the examination was Dustin A. Turnquist of Engineering Systems, Inc.. The bolt from Exhibit 16 as well as fractured bolt found at the air conditioner location during later site inspections were cleaned and examined in the SEM for fracture mode determinations.

Three separate collections of various fasteners and associated hardware were submitted for examination. The exhibit 16 items collected by Mr. Grove as well as two other collections identified as Group I and Group II were cataloged as individual items as shown in the attached list. The Group I and Group II items were collected from the floor of the North and South Filter Rooms in subsequent site inspections following the disassembly of the Man Platform from the air conditioner. From the wide array of items submitted, the experts agreed to focus the fractography inspection to only four fractured bolts. The first bolt (#7) was from the Exhibit #16 items, and the other fractured bolts were from the Group I items identified as Items 39, 40 and 41.

The bolt fractures were successfully cleaned of rust so that detailed optical photographs could be taken of the fracture surfaces, and subsequently examined and photographed in the Scanning Electron Microscope for fracture morphology. The fractured bolt from Exhibit #16 clearly exhibited a simple sheared cross section. The

other bolt fractures from Group I contain mixtures of shear and tensile fractures and evidence of reverse bending loading. Since these bolts are most likely to be associated with the dis-assembly of the platform, these tortured fractures are likely to be due to the brute force overloading of the joints during the dis-assembly. Also, the platform joints would not be expected to subject the joint bolts to reverse bending in their normal use of supporting a man on the working platform. The fracture morphologies of all four of these bolt fractures contain internal microstructural delaminations of the matrix metal that has become obvious on the fracture surfaces by being opened up by the deformation of the bolts during fracture. The presence of an number of delaminations are good indicators of a poor, non-structural steel being used for these bolts. Clearly, they are of low strength and should not be used in a structural application.

The shear fracture of the bolt from Exhibit #16 is consistent with the bolt failure to be expected in a loose joint on the platform. A loose joint is most likely to have caused the bolt to be heavily loaded in a shear loading, since the loose joint has lost its preload, shifting the entire joint load to the bolts in shear. The presence of the square nut of Exhibit #16 being found without a broken bolt fragment still threaded into the nut is a strong indicator that the nut was not only loose on the fastener, but was likely completely detached from the bolt prior to the collapse leaving a loose joint to bear the weight of Mr. Grove.

The low strength steel bolts utilized in this construction is a strong contributer to this joint failure, but so is the use of small diameter bolts and using cap head cap screws instead of hex head bolts that can be torqued to higher levels providing a stronger clamping force across the joint and a reduction of the shear loading on the bolts. Both the platform design and materials selections used in this man-platform were improper.

Respectfully Submitted,

_____
Joseph d. Balser, PH. D.

| ID # | Location | Type | Lentgh (in) | OD (in) | ID (in) |
|---|---|---|---|---|---|
| 1 | Ex #16 | Square Nut | -- | 0.425 | 0.205 |
| 2 | Ex #16 | Flat Washer | -- | 0.750 | 0.312 |
| 3 | Ex #16 | Flat Washer | -- | 0.750 | 0.312 |
| 4 | Ex #16 | Flat Washer | -- | 0.750 | 0.312 |
| 5 | Ex #16 | Flat Washer | -- | 0.750 | 0.312 |
| 6 | Ex #16 | Round Head Cap Screw | 0.490 | 0.243 | -- |
| 7 | Ex #16 | Round Head Cap Screw | 0.236 | 0.242 | -- |
| 8 | Ex #16 | Round Head Cap Screw | 0.760 | 0.244 | -- |
| 9 | Group II | Flat Washer | -- | 0.558 | 0.244 |
| 10 | Group II | Flat Washer | -- | 0.558 | 0.245 |
| 11 | Group II | Flat Washer | -- | 0.884 | 0.365 |
| 12 | Group II | Slotted Pan Head Tapping Screw | 0.725 | 0.185 | -- |
| 13 | Group II | Slotted Pan Head Tapping Screw | 0.660 | 0.240 | -- |
| 14 | Group II | Slotted Pan Head Tapping Screw | 0.990 | 0.251 | -- |
| 15 | Group II | Slotted Pan Head Tapping Screw | 0.708 | 0.241 | -- |
| 16 | Group II | Slotted Flat Head Machine Screw | 0.427 | 0.245 | -- |
| 17 | Group II | Hex-head Machine Screw | 0.985 | 0.238 | -- |
| 18 | Group II | Round Head Cap Screw | 0.749 | 0.242 | -- |
| 19 | Group II | Round Head Cap Screw | 1.462 | 0.243 | -- |
| 20 | Group II | Hex Washer Head Tapping Screw | 1.508 | 0.210 | -- |
| 21 | Group II | Spring | -- | -- | -- |
| 22 | Group II | Spring | -- | -- | -- |
| 23 | Group II | Spring | -- | -- | -- |
| 24 | Group II | Spring | -- | -- | -- |
| 25 | Group II | Spring | -- | -- | -- |
| 26 | Group II | Nail | 1.568 | -- | -- |
| 27 | Group II | Gasket | -- | 5.462 | 4.910 |
| 28 | Group I | Slotted Pan Head Tapping Screw | 0.683 | 0.241 | -- |
| 29 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 30 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 31 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 32 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 33 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 34 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 35 | Group I | Slotted Pan Head Tapping Screw | 0.690 | 0.184 | -- |
| 36 | Group I | Slotted Pan Head Tapping Screw | 0.605 | 0.164 | -- |
| 37 | Group I | Slotted Pan Head Tapping Screw | 0.605 | 0.164 | -- |
| 38 | Group I | Slotted Pan Head Tapping Screw | 0.605 | 0.164 | -- |
| 39 | Group I | Round-head Self-tapping Screw | 0.145 | 0.240 | -- |
| 40 | Group I | Hex Nut/Broken Screw | -- | 0.434 | 0.230 |
| 41 | Group I | Hex Nut/Broken Screw | -- | 0.435 | 0.241 |
| 42 | Group I | Hex Nut | -- | 0.434 | 0.205 |
| 43 | Group I | Square Nut | -- | 0.435 | 0.204 |
| 44 | Group I | Flat Washer | n/a | 0.740 | 0.318 |
| 45 | Group I | Flat Washer | n/a | 0.737 | 0.317 |
| 46 | Group I | Flat Washer | n/a | 0.752 | 0.312 |
| 47 | Group I | Flat Washer | n/a | 0.736 | 0.314 |
| 48 | Group I | Flat Washer | n/a | 0.565 | 0.250 |
| 49 | Group I | Flat Washer | n/a | 0.562 | 0.250 |
| 50 | Group I | Split Washer | n/a | 0.480 | 0.258 |

| Thread | Thickness (in.) | Comments |
|---|---|---|
| 20/in | -- | |
| -- | 0.064 | |
| -- | 0.078 | |
| -- | 0.064 | |
| -- | 0.068 | |
| 20/in | -- | |
| 20/in | -- | fractured |
| 20/in | -- | |
| -- | 0.050 | |
| -- | 0.055 | |
| -- | 0.085 | |
| 0.075 per rev. | -- | |
| 0.085 per rev. | -- | |
| 0.092 per rev. | -- | |
| 0.065 per rev. | -- | |
| 20/in | -- | |
| 20/in | -- | |
| 20/in | -- | |
| 20/in | -- | |
| 0.090 per rev. | -- | |
| -- | -- | 0.102 dia. Wire |
| -- | -- | 0.102 dia. Wire |
| -- | -- | 0.102 dia. Wire |
| -- | -- | 0.102 dia. Wire |
| -- | -- | 0.102 dia. Wire |
| -- | -- | 0.078 dia. |
| -- | 0.060 | |
| 0.065 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.052 per rev. | -- | |
| 0.066 per rev. | -- | |
| 0.066 per rev. | -- | |
| 0.066 per rev. | -- | |
| 20/in | -- | |
| ? | 0.188 | |
| 20/in | 0.188 | |
| 20/in | 0.188 | |
| 20/in | 0.181 | |
| n/a | 0.064 | |
| n/a | 0.068 | |
| n/a | 0.059 | |
| n/a | 0.062 | |
| n/a | 0.051 | |
| n/a | 0.058 | |
| n/a | 0.072 | |

other bolt fractures from Group I contain mixtures of shear and tensile fractures and evidence of reverse bending loading. Since these bolts are most likely to be associated with the dis-assembly of the platform, these tortured fractures are likely to be due to the brute force overloading of the joints during the dis-assembly. Also, the platform joints would not be expected to subject the joint bolts to reverse bending in their normal use of supporting a man on the working platform. The fracture morphologies of all four of these bolt fractures contain internal microstructural delaminations of the matrix metal that has become obvious on the fracture surfaces by being opened up by the deformation of the bolts during fracture. The presence of an number of delaminations are good indicators of a poor, non-structural steel being used for these bolts. Clearly, they are of low strength and should not be used in a structural application.

The shear fracture of the bolt from Exhibit #16 is consistent with the bolt failure to be expected in a loose joint on the platform. A loose joint is most likely to have caused the bolt to be heavily loaded in a shear loading, since the loose joint has lost its preload, shifting the entire joint load to the bolts in shear. The presence of the square nut of Exhibit #16 being found without a broken bolt fragment still threaded into the nut is a strong indicator that the nut was not only loose on the fastener, but was likely completely detached from the bolt prior to the collapse leaving a loose joint to bear the weight of Mr. Grove.

The low strength steel bolts utilized in this construction is a strong contributer to this joint failure, but so is the use of small diameter bolts and using cap head cap screws instead of hex head bolts that can be torqued to higher levels providing a stronger clamping force across the joint and a reduction of the shear loading on the bolts. Both the platform design and materials selections used in this man-platform were improper.

Respectfully Submitted,

*Joseph d. Balser*
Joseph d. Balser, PH. D.

# Lindley Manning, P.E.

FORENSIC ENGINEERING PRACTICE LIMITED TO: ACCIDENT RECONSTRUCTION AND FAILURE ANALYSIS
Federal Tax ID #88-0224722

P.O. Box 13392
Reno, Nevada 89507
Phone (775) 786-2711
Fax (775) 329-6906
E-mail: Lin@gbis.com

November 7, 2006

Re.: Grove vs. Unocal

**RECEIVED**

NOV 1 4 2006

WEIDNER & ASSOCIATES

To whom it may concern,

On September 9, 2002, Mr. Lawrence H. Grove was replacing the air filters of an air conditioning system in a Unocal Building in the course of his employment with an air conditioning contractor. To accomplish a part of this task he was standing on a scaffold-like platform approximately 8 feet above a floor. The platform collapsed resulting in Mr. Grove falling to the floor and sustaining injury.

I was asked to provide what analysis I could of the failure of the platform from an engineering standpoint. A vast amount of written material was provided, of which typically very little bore on my task. Photographs of the platform, platform components and area were provided. I have also had discussions with Dr. Joseph Balser, metallurgist/engineer regarding his inspection of the components above. I am familiar with the competency of Dr. Balser.

The State of Alaska OSHA type department considered the platform to be in violation of railing and ladder regulations and took appropriate action. As the ladder was not being used by Mr. Grove at the time of the failure, it seemed unlikely to have played any direct part in this specific incident.

The lack of a railing may have played a part, in that a proper and properly anchored railing might have assisted in preventing and/or reducing the severity of Mr. Grove's fall. Note that this latter consideration is only a possibility, not a probability due to lack of evidence, thus the conditions leading to the OSHA actions may or may not have played a part in the injury. They are a general indication of the quality of the platform design.

The platform framework had been constructed of formed, rather than rolled, steel angle members. The size appeared to have been legs of 2 inches and 3 inches. Slots approximately 3/8 inch wide were provided in the legs for fasteners. Material thickness was not provided, but it appeared to have been substantially less than 1/8 inch. Note that to my knowledge at this time, these members themselves did not fail, one or more of the fasteners did, either by breaking, loosening or both.

The walking surface of the platform was a wooden plank resting freely on top of the steel angle members described above. While such a surface was likely not a safe working surface, that, to my present knowledge, did not appear to have been a cause of the failure nor of the injury to Mr. Grove.

Exhibit 2
page 1 of 3

Fellow, National Academy of Forensic Engineers (NAFE)
President NAFE, 1990

11-7-06

Re.: Grove vs. Unocal
November 7, 2006

Page 2.

Fasteners found loose and damaged at the site shortly after the accident and similar appearing ones depicted in photographs were 1/4 - 20 round head screws with a slot for a blade type screwdriver. The nuts used were common square nuts.

The screws and nuts bore no markings as to strength grade nor other identifying markings of any type. These screws and nuts appeared to be common inexpensive hardware store fasteners, often called "Stove Bolts." SAE Grade 2 might have come close to describing the screw strength. Dr. Balser's work in a scanning electron microscope confirmed the visual grade of the fasteners and typical low quality of the steel used in their manufacture.

The failed screw found shortly after the accident had failed in shear. The only external load expected on such a screw would have been due to Mr. Grove's weight or that of prior users plus whatever was carried with them. Thus it is probable that the screw failed due to the weight of a person or persons using the platform. The proximity in time of the finding of the screw to the fall makes it probable that the sheared screw or screws were sheared at the time of the fall.

The slotted head screws and thin square nuts would not permit tightening the screw sufficiently to provide proper pretensioning for a structural fastener even had the screw and nut material been strong enough to sustain such load, which it clearly was not. There was no prevailing torque locking means built into the nut, so combined with the low preload and the vibration during use and possibly at other times, it would have been highly probable that many of the nuts used to hold the structural members together would loosen over time, leading to improper load carrying in the joints as well as wear as the platform was used.

A moist corrosive environment likely existed in the area of the platform. The rusted condition of the bolts found at the site indicated that they were not of a corrosion resisting material nor were they adequately protected from corrosion. Use of 1/4 inch diameter screws of this type in corrosive conditions to carry a structural load supporting persons, even though two screws were used for most joints, should have been considered highly likely to lead to screw failure.

The slots in the angle members surely would have accommodated 5/16 inch diameter screws and very likely would have taken 3/8 inch screws without taking the time to drill or file the slots for such clearance, although that would have been good design. We thus note that the screw diameters were smaller than should have been used with the angle members.

Re.: Grove vs. Unocal
November 7, 2006

Page 3.

To summarize, the screws were too weak to properly tighten, even for their size, due to the low material strength and did not have hex or other heads permitting higher tightening torque to be applied. The screws were subject to loosening in service due to the low preloads and a lack of any retention means, such as prevailing torque lock nuts, or even as a poorer last resort, lock washers. The screws were not corrosion resistant and were too small for the task.

A subsequent scene examination after the platform had been removed produced a larger number of fasteners. There were screws and bolts, both intact and damaged or broken. In addition, there were self taping, or sheet metal screws. By using the photos of the air conditioning unit, it appeared that these sheet metal screws had been used to attach the platform frame to the air conditioner, at least in part. It appeared likely that the damaged screws found at this time had been damaged during the removal of the platform.

Use of a sheet metal screw in a vibration environment where larger transient loads are occasionally encountered is poor practice because these fasteners would also have a tendency to work loose over time. There is no way with the evidence I know of at this time to determine if these screws did loosen, nor to determine of there were loosening that it contributed to the platform collapse.

In addition to industrial engineering design experience which varied from engine components for a nuclear powered bomber to coin handling devices for gaming machines, I taught Machine Design to Senior Mechanical Engineering students in a four year degree program at a state university for about 20 years. Design of threaded fasteners and the joints they formed was a major part of that course, as it is in all such programs. The use of undersized low quality fasteners, such as was in this platform would not have met the design criteria presented in the class.

In conclusion, I believe that this platform failed because of improper design. The poor preservation of evidence has limited my ability to make a more detailed description of the defects.

Very truly yours,

Lindley Manning, P.E., NV, OH

Bob Carmichael, CSP  OHST  CHST
Bob Carmichael & Associates HSE
200 West 34th Avenue, #47
Anchorage, AK  99503
907-561-9977
r.j.carmichael@att.net

July 29, 2006

Michael Cohen.
Weidner and Associates
330 "L" Street, Suite 200
Anchorage, Alaska  99501

Re:  Lawrence H. GROVE, et al. v. UNOCAL CORPORATION
     Case No. A04-0096-CV (JKS)

Dear Mr. Cohen,

Per your request, I have reviewed the available facts of the above referenced case. Information was supplemented by a personal visit to the accident site on April 12, 2006 by myself and on January 24, 2006 by my associate Sally Ann Carey.

In preparing my opinion, I have reviewed the following documents:

   Plaintiff's rule 26(A)(1) Initial Disclosures (Bates numbers LG000001 to LG00508) (Cohen 07-20-04)
   Defendant's initial disclosures (Bates numbers DEF 00001 to DEF 00063) (Jamieson 07-28-04)
   Complaint (04-16-04)
   Answer (05-17-04)
   Deposition of Cynthia H. Grove
   Deposition of Lawrence H. Grove
   Photographs of mechanical room and work platform
   OSHA records Bates stamp LG000025 to LG 000030
   Scheduling and Planning Order (07-08-04 Judge Singleton)
   Stipulation for extension of time to prepare expert reports (Judge Singleton 06-08-05)
   Joint motion to extend discovery and modify the scheduling and planning conference report (08-23-05 Thorsness)
   Response to first discovery requests to plaintiff Cynthia Grove (Cohen 08-30-04)
   Response to first discovery requests to plaintiff Michael Grove (Cohen 08-30-04)
   Response to first discovery requests to plaintiff Sarah Grove (Cohen 08-30-04)
   Response to first discovery requests to plaintiff Lawrence Grove / Photographs (Cohen 08-30-04 Bates stamp LG00509 to LGA00528)
   Responses to plaintiff's second discovery requests (Martin 11-11-04)
   Defendant's first supplemental disclosures (Martin 11-11-04)

Exhibit 3
page 1 of 5

- Responses to plaintiff's third discovery request (Martin 11-0-04 Bates stamp DEF 01032 to DEV 01040)
- Defendant UNOCAL Alaska's second supplement to Initial disclosures (Thorsness 05-31-05)
- Plaintiff's rule 26 supplemental disclosures (Cohen 06-09-05 Bates stamp LG 00529 to LG 00572)
- Plaintiff Larry Grove's responses to defendant's second discovery requests (Cohen 06-09-05). Documents are not Bates stamped.
- Plaintiff's rule 26 2nd supplemental disclosers (Cohen 06-24-05)
- Defendant's responses to plaintiff's third (sic) discovery requests (Thorsness 06-27-04)
- Defendant's responses to plaintiff's fifth discovery requests (Thorsness 06-27-05)
- State of Alaska, Department of Labor and Workforce Development, Occupational Safety & Health Labor Standards & Safety Division (OSHA) (Bates stamp numbers LG00782 to LG00858)
- Grove v. UNOCAL photos (Bates stamped LG00859 to LG00873)

*Incident History*

The UNOCAL Anchorage office is located at 909 West 9th Avenue. The top level of the building contains air conditioning equipment and other utilities. The air conditioning system includes a bank of filters which can be exposed to outside air through a set of louvers mounted in an outside wall. Each individual filter is set into a vertical frame thus creating a filter bank. These filters require periodic maintenance.

The filter bank is contained in a service room at the top of the building. The service room is entered through a hatchway from a utility corridor. The top row of filters in the rack is too far above the floor to be reachable by an average-sized person. At some time prior to the accident to Mr. Grove, a work platform had been installed in the filter room to allow access to the upper rows of filters. According to statements made in the case, it was the collapse of this platform that resulted in the injuries to Mr. Grove.

*Platform Condition Factors*

To my knowledge, no engineering diagrams, as-builts, or photos of the work platform exist. However, based on deposition statements and physical inspection of the filter room, the platform consisted of metal brackets which were attached to the sheetmetal of the filter frame on one side and sheetmetal ductwork on the other using screws. The brackets did not appear to extend to the floor and were thus suspended by the screws. The brackets were then used to support wooden planks which partially spanned the working surface. The platform was accessed by using a ladder.

Examination of the mounting holes where the brackets had been installed indicated that none of the screws had penetrated into any solid structural element and it was the strength

of the screw-to-sheetmetal interface that was intended to support the weight of the platform and whatever load was placed on it.

The platform boards, when installed, created a work platform that was approximately at the same level as the top of the ductwork located next to the exterior wall of the building. This would make the elevation of the work platform greater than six feet above the floor of the filter room. There has been no evidence that guardrails were installed on the open sides of the work platform. There was also no evidence or statements made that the individual planks had ever been secured to the brackets.

### *Regulatory Considerations*

The following U.S. Occupational Safety and Health Administration (OSHA) citations are from the general industry regulations in 29 CFR 1910.

29 CFR 1910.21(a)(4)
> *"Platform." A working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment.*

29 CFR 1910.21(f)(27)
> *"Scaffold." Any temporary elevated platform and its supporting structure used for supporting workmen or materials or both.*

1910.22(d)(1)
> *In every building or other structure, or part thereof, used for mercantile, business, industrial, or storage purposes, the loads approved by the building official shall be marked on plates of approved design which shall be supplied and securely affixed by the owner of the building, or his duly authorized agent, in a conspicuous place in each space to which they relate. Such plates shall not be removed or defaced but, if lost, removed, or defaced, shall be replaced by the owner or his agent.*

1910.23(c)(1)
> *Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a toeboard wherever, beneath the open sides, . . .*

29 CFR 1910.28(a)(4)
> *Scaffolds and their components shall be capable of supporting without failure at least four times the maximum intended load.*

29 CFR 1910.28(a)(10)

> *Nails or bolts used in the construction of scaffolds shall be of adequate size and in sufficient numbers at each connection to develop the designed strength of the scaffold. Nails shall not be subjected to a straight pull and shall be driven full length.*

### Safety Considerations

Whenever a person is on a surface where areas of lower elevation are nearby, there is a danger of falling to that lower level. This can occur from a slip or trip resulting in a loss of balance; from inattention to surroundings (such as stepping off the edge of a roof during construction work); or physical collapse of the working surface.

In safety practice, there are four general methods of controlling this risk: elimination of the need to work at height, engineering of the work platform, guardrails and other forms of fall prevention and protection, and education and awareness for the workers.

In the case of the work being performed on these filters, it may have been possible to design the filter tray so that it could be lowered to allow floor-level access to all the filters that needed maintenance.

In this particular case, a platform was built to allow access to the upper row of filters. The expectation is that the platform would be able to support its own weight, plus the weight of the worker and his materials, plus a suitable safety factor. In the practice of safety, it would be expected that the platform would be designed by a suitably competent engineer and installed by suitably competent workers. The platform would be subject to regular inspection and maintenance. The specifications for the brackets and their attachment to the structure, the size and strength of the planking and the spacing of their supports, and the maximum working load of the platform would all be specified.

### Opinion

1. Whether intended to be permanent or temporary, neither engineering nor safety standards were applied to the construction of this platform.

2. The screws used to attach the brackets to the walls were not appropriate for the application and failed under load.

3. Floor loading limits for the platform had not been established and posted and the limits had not been reviewed and approved by an engineer or regulatory authority.

It is my professional opinion that had any of these three elements been eliminated, that, although the platform still might not have been considered safe, it would not have collapsed under the load applied at the time of the accident.

Since discovery is still ongoing at the time this report is submitted, I reserve the right to supplement this report as additional information is received throughout the discovery process.

_____          _____
Bob Carmichael, CSP

FILE COPY

ARCHIE COOK
3/15/2006

```
                                                                    Page 1
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE
3    _____
4    LAWRENCE H. GROVE, ET AL.,          )
                                         )
5              Plaintiffs,               )
                                         )
6       vs.                              )
                                         )
7    UNOCAL CORPORATION,                 )
                                         )
8              Defendant.                )
9    _____
10   Case No. A-04-0096 CV (JKS)
11
12
13   _____
14            TELEPHONIC DEPOSITION OF ARCHIE COOK
         _____
15
16
17                     March 15, 2006
                          7:30 a.m.
18
19              Taken by Counsel for Plaintiffs
                             at
20                 330 L Street, Suite 200
                      Anchorage, Alaska
21
22
23
24
25
```

Exhibit 4
page 1 of 5

```
 1      Q.   That's shortly after you arrived?
 2      A.   Maybe -- I can't remember the exact time.  It
 3  seemed like maybe six months, six to nine months
 4  possibly.
 5      Q.   Do you recall if there were any periodic safety
 6  inspections of the building at 909 --
 7      A.   Yes, there were.
 8      Q.   I'm sorry.  Just please let me finish the
 9  question first.
10      A.   Okay.
11      Q.   I mean, I was almost done.  Were there periodic
12  safety inspections --
13      A.   Yes.
14      Q.   -- of the building from the time that you arrived
15  in 1999 through 2002?
16      A.   Yes.
17      Q.   What did these periodic safety inspections
18  entail?
19      A.   Involved one of our safety technicians going
20  around the office looking for safety hazards.
21      Q.   Were you the person that oversaw or supervised
22  the safety technicians?
23      A.   No.  We had a health and safety and environment
24  manager.
25      Q.   Who was the health and safety environment
```

Page 33

1    manager?
2        A.   Well, that's a complicated question because it
3    changed.
4        Q.   Well, I guess if there were several, to the best
5    of your recollection.
6        A.   First of all, the environmental department was
7    the safety -- was a separate department.  Anyway, I mean
8    it was a person called Harry Eaton who was in charge of
9    safety, health and environment.
10       Q.   Was he there when you got to Unocal?
11       A.   He was based in Kenai when I first got to Alaska.
12       Q.   Do you recall if he worked in the building at 909
13   West Ninth at any time between '99 and when you left?
14       A.   He had an office there, but I think his normal
15   place of work was the Kenai office.
16       Q.   But to the best of your understanding, if safety
17   technicians did periodic checks in the building, that
18   would be under the authorization of the health and
19   safety environment manager?
20       A.   Yes.  The safety technicians were based in Kenai,
21   but at least on two occasions that I can recall, one of
22   them came to Anchorage, to the Anchorage office and did
23   a safety inspection.
24       Q.   Did you observe the safety inspection at all?
25       A.   I didn't observe the inspection.  I saw the

Page 34

1  report.
2     Q.  You saw the report?
3     A.  Yes.
4     Q.  And can you tell me how detailed the report would
5  be?
6     A.  I mean it was basically telling us what things
7  were hazardous or potentially hazardous and potentially
8  needed fixing.
9     Q.  Do you recall if that report encompassed the
10 entire building from -- I am not sure.  Is there a
11 basement in the building?
12    A.  Yes, there is.
13    Q.  From the basement all the way to the top level of
14 the building?
15    A.  Yes.  Well, I'm sorry.  I mean, I can't remember.
16    Q.  That's okay if you can't remember completely.
17    A.  I can't remember whether it covered -- the safety
18 inspection from a qualified inspector, that's about as
19 much as I can remember.  Sorry.
20        I mean what he did was he focused on things that
21 we had to fix.
22    Q.  Well, is it your understanding -- I mean to the
23 best of your personal knowledge, would that individual
24 go and check each room in the building?
25    A.  Yes, to the best of my understanding.

```
 1         MR. THORSNESS:  Objection; foundation and
 2   speculation.
 3       Q.  That's okay.  What is the basis of your
 4   understanding?  Can you tell me?  Would it be from
 5   review of the report?
 6       A.  Say it again, please.
 7       Q.  What would be the basis of your understanding
 8   that the safety technician would check each of the rooms
 9   in the building?
10       A.  My understanding is that he was brought up to do
11   a safety inspection.  I would expect him -- it's an
12   expectation rather than knowledge -- that he did check
13   every nook and cranny within the office.
14       Q.  And do you know how frequently -- how many of
15   these inspections are you aware of occurring during your
16   period of time at the building?
17       A.  I am aware of two, to the best of my
18   recollection.
19       Q.  And do you recall the name of the safety
20   technician that would have done this report?
21       A.  I think Ken Burns did at least one of them.
22       Q.  Who is Ken Burns?
23       A.  Ken Burns is a safety technician.
24       Q.  And this safety report, do you recall --
25       A.  Well, I can tell what we wanted from the report
```