Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ALASKA
 2
 3
     LAWRENCE H. GROVE, et al.,    )
 4                                 )
              Plaintiffs,          )    RECEIVED
 5                                 )
                                   )    MAY 2 2 2006
     vs.                           )
 6                                 )    WEIDNER & ASSOCIATES
     UNOCAL CORPORATION,           )
 7                                 )
              Defendant.           )
 8   _____)
     Case No. A 04-0096 CV (JKS)
 9
10
11   _____
12
         VIDEOTAPED DEPOSITION OF KENNETH BURNS
13
14   _____
15
                   Pages 1 - 146
16              Tuesday, May 9, 2006
                    9:00 A.M.
17
18
                        at
19               WEIDNER & ASSOCIATES
              330 L Street, Suite 200
20              Anchorage, Alaska
21                                         Exhibit  5
22                                         page  1 of 3
23
24
25
```

---

**Page 2**

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiffs:
Michael Cohn
WEIDNER & ASSOCIATES
330 L Street, Suite 200
Anchorage, Alaska 99501
(276-1200)

For the Defendants:
John Thorsness
CLAPP PETERSON VAN FLEIN TIEMESSEN & THORSNESS
711 H Street, Suite 620
Anchorage, Alaska 99501
(272-9272)

The Videographer:
Eric R. Cossman
ALASKA LEGAL VIDEO
645 G Street, Suite 892
Anchorage, Alaska 99501
(276-8601)

Court Reporter:
Diane M. (Preece) Bondeson
PACIFIC RIM REPORTING
711 M Street, Suite 4
Anchorage, Alaska 99501

---

**Page 3**

INDEX

EXAMINATION BY:                        Page

Mr. Cohn                               5
                                       135

Mr. Thorsness                          129

EXHIBITS

1  Burns' Notes of State OSHA Visit (1 pg)    36

2  Unocal's Ninth Supplement to Initial       55
   Disclosures (126 pgs)

3  Additional Documents from Initial          56
   Disclosures (19 pgs)

4  Plaintiffs' Rules 26 (Fifth) Supplemental  77
   Disclosures (93 pgs)

5  Photocopies of Photographs (5 pgs)         99

6  Siemens Safety Evaluation (14 pgs)         123

---

**Page 4**

ANCHORAGE, ALASKA; TUESDAY, MAY 9, 2006
9:11 A.M.
-oOo-

   THE VIDEOGRAPHER: Okay. We're on the record at 9:11. This is the video deposition of Ken Burns, taken by the plaintiffs in the matter of Grove, et al, vs. Unocal Corp., Case No. A 04-0096 CV (JKS) in the United States District Court for the District of Alaska.
   This deposition is being held in the offices of Weidner & Associates, located at 330 L Street, Suite 200, Anchorage, Alaska, on May 9, 2006.
   My name is Eric Cossman from Alaska Legal Video, mailing address 645 G Street, No. 892, Anchorage, Alaska 99501. The court reporter is Diane Bondeson from the firm Pacific Rim Reporters.
   Will counsel please identify themselves for the record.
   MR. COHN: My name is Michael Cohn. I'm an attorney at the law offices of Weidner & Associates, Inc. I'm here on behalf of the plaintiffs.
   MR. THORSNESS: John Thorsness for defendant Unocal.
   THE VIDEOGRAPHER: Thank you. Would the reporter please swear in the witness.

---

**Page 5**

   MR. THORSNESS: Excuse me. And representing the witness as well.
         KENNETH BURNS
   witness herein, being sworn on oath was examined and testified as follows:
         EXAMINATION
BY MR. COHN:
   Q. Good morning, Mr. Burns.
   A. Good morning.
   Q. Are you here pursuant to a deposition notice? Have you seen the deposition notice in this case?
   A. No, I don't recall seeing it.
   Q. Well, how did you know you had a deposition today?
   A. I was notified by paralegal for Chevron.
   Q. Where do you work?
   A. For Chevron.
   Q. What is your job position?
   A. My job position is safety specialist.
   Q. And how long have you worked for Chevron?
   A. Chevron recently purchased Unocal, approximately six months ago. I joined Unocal in September 1997, continuous employment till the merger of Chevron and Unocal.

---

Page 94

1  after he was --
2     A. No, I did not.
3     Q. Was there any reason why instead of just
4  destroying or dismantling the platform you couldn't
5  have built side rails and toe kicks?
6     A. A proper work platform could have been
7  constructed, yes.
8     Q. Did you consider that a proper work
9  platform?
10    A. No.
11    Q. Previously you said that you -- that you
12 may not have gone up to the penthouse before when you
13 did your '98 and '99 inspections. If you had, would
14 that be reflected on the '98 and '99 inspection, what
15 areas you inspected?
16    A. Only if there would have been a violation
17 or an item that needed abatement. If we found
18 nothing, then it would not have been mentioned.
19    Q. If you had conducted the '98 and '99
20 inspection and saw that work platform in the filter
21 room, would you have considered that a hazard to be
22 abated?
23    A. Yes.
24    Q. Now, in Exhibit 1 you indicated -- at least
25 in Exhibit 1 you indicated that the platform, the --

Page 95

1  you had stated, quote: It was obvious from the
2  structure that it had been erected many years ago.
3         Do you remember that from your notes, that
4  that's in the next-to-last paragraph?
5     A. Yes.
6     Q. Would you be -- would you be in a position
7  to dispute testimony that the platform had been there
8  for at least 12 years before the accident?
9     A. I would not comment on how long it had been
10 there.
11    Q. I mean, when you put that sentence in
12 your -- in your notes here, did you consider that --
13 why did you consider it significant enough to put
14 into your -- in your notes?
15    A. That there was an oversight on not having
16 that work platform erected properly. Someone in the
17 past years had failed -- or neglected to do their
18 job.
19    Q. Oh, okay.
20    A. Whether it was Unocal or the company that
21 Mr. Grove works for. Because we don't know who
22 erected the scaffolding. The work platform, excuse
23 me.
24    Q. When you say we don't know who, did you
25 have conversations about this with other Unocal

Page 96

1  individuals?
2     A. Paul Crapps.
3     Q. Paul Crapps. And do you know how long Paul
4  Crapps had been working in the building?
5     A. Well, as far as I know, when I first met
6  Paul was back when I went to Kenai the first time in
7  '98, '99 time frame. I can't be sure. And he was
8  the building maintenance supervisor.
9     Q. In previous discovery requests, there have
10 been some indications when defendant has answered
11 that they indicated that information and belief,
12 Siemens Building Technology, Inc., may have been the
13 owner of the building or creator of the platform. Do
14 you have any information as to that?
15    A. No.
16    Q. I think previously -- in your -- in Exhibit
17 1, you indicated that Tom Scanlon had presented the
18 complaint form from it, and I believe in your prior
19 testimony you indicated you might have looked at
20 the -- seen the complaint form.
21         Can you take a look at -- and it's Exhibit
22 4, I believe. And it would be LG 700.
23    A. I have that.
24    Q. Is this the complaint form that you would
25 be referring to? I mean, there is a couple other

Page 97

1  pages to it. Yeah, on the top it has a complaint
2  number, and it lists Siemens Building Technology as
3  the employer, and it says the hazard description,
4  "Using homemade, nonapproved scaffolding, cross
5  support fastener sheared when stepped on, causing
6  ankle injury." Do you recall that?
7        MR. THORSNESS: Mike, I'm sorry, what Bates
8  number?
9        MR. COHN: I'm sorry. It's 700, LG 700.
10       MR. THORSNESS: LG 700. Thank you.
11       THE WITNESS: This is an internal
12 Department of Labor document.
13 BY MR. COHN:
14    Q. That wouldn't be the complaint form --
15    A. No.
16    Q. -- that you said you saw?
17    A. No. This is Notice of Alleged Safety and
18 Health Hazard. That's his worksheet.
19    Q. Okay. That would be -- I'll take a look
20 separately for that document on a break, then.
21       But had you at some point been aware of the
22 fact that the -- that the allegation was that a bolt
23 had sheared, causing the collapse of the platform?
24    A. No. Sheared bolt, first time I heard that
25 was right there.

<sub>Notes concerning visit by State of Alaska OSHA Inspector as compiled by Ken Burns, Drilling Safety Advisor</sub>

03/03/03 -- Monday

State OSHA Inspectors Tom Scanlon and Lee Zhao (Trainee) came to the reception desk asking for Siemens. OSHA was advised that Siemens was not at this building. Both inspectors departed.

After lunch, Paul Crapps received a call from Tome Lake, Siemens Supervisor that State OSHA was at their office investigating a complaint from one of their employees regarding conditions (scaffolding) here at Unocal. Lake further advised that OSHA was on their way to Unocal.

I received a call from Roxanne that she wanted my assistance upon the arrival of OSHA.

At approximately 1440 hrs, I was notified by Paul Crapps that State OSHA was at the reception desk to conduct a Complaint Inspection. Paul further explained that several months ago a Siemens employee fell and hurt himself while working in the penthouse.

I responded to the front desk (reception) and was met by Paul Crapps, Tom Scanlon and Lee Zhao from State OSHA and Tom Lake, Siemens Supervisor. Tom Scanlon presented credentials and business card and explained that he was here to conduct a complaint inspection. He introduced Lee Zhao as a trainee. Mr. Zhao did not have either a business card or credentials. Tom Scanlon presented the complaint form from a confidential source. The complaint alleged that Unocal had improper scaffold erected in the penthouse. I escorted OSHA and others previously mentioned to Roxanne's office. Together we discussed the complaint. Scanlon stated that he wanted to view the location listed on the compliant and to take some photographs of the scaffolding. I asked Tom if he was going to conduct an Opening Conference and he replied that he had some papers but he would do an opening conference later. He made reference that the paper work was too detailed or lengthy to do at that time.

Tom Scanlon, Lee Zhao, Tom Lake, Paul Crapps and I went to the Penthouse and allowed the inspectors to view the area of the complaint. Prior to entering, Paul had to shut the air conditioner down because of the noise and wind velocity in the filter chamber. Tom Scanlon and trainee Lee Zhao entered the chamber and proceeded to take photograph and measurements. Both Tom Scanlon and Lee Zhao climbed the ladder and exposed themselves to the open-sided platform. One significant question was asked. "Who erected this scaffolding?" No one knew the answer. It was obvious from the structure that it had been erected many years ago. At approximately 3:35 pm, the party departed for the reception area. The OSHA inspectors signed out at 3:43 and departed. Prior to departing, I asked Scanlon if he was going to conduct a closing and he replied "No."

Later in the afternoon, after briefing Roxanne, I was requested (e-mail) by the Law Department and Roxanne to

REDACTED

Exhibit 6
page 1 of 1



DEF 00027
*Grove v. UNOCAL*

**FILE COPY**   Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3   _____
 4   LAWRENCE H. GROVE, CYNTHIA GROVE,    )
     SARAH GROVE and MICHAEL GROVE (DOB   )
 5   1/21/88) by and through his father   )
     LAWRENCE H. GROVE,                   )
 6                                        )
              Plaintiffs,                 )
 7                                        )
     vs.                                  )
 8                                        )
     UNOCAL CORPORATION,                  )
 9                                        )
              Defendants.                 )
10   _____
11   Case No. A04-0096 CV (JKS)
12
13
14   _____
15        VIDEOTAPED DEPOSITION OF ROBERT SPRINKLE
16   _____
17              Monday, April 24, 2006
                     9:24 a.m.
18
19          Taken by Counsel for Defendant
                         at
20              Weidner & Associates
             330 L Street, Suite 200
21                Anchorage, Alaska
22                                       Exhibit   7
23                                       page  1  of  3
24
25
```

Page 66

1  Miller and went to Landis & Gyr.
2      And then I left Landis & Gyr and went to work
3  with Larry at Johnson Controls. Then I left Johnson
4  Controls and went to work with Larry back at Siemens.
5      Q. Was Larry very good at his job?
6         MS. JOHNSON: Objection; foundation.
7      A. Yes. He was excellent at his job.
8      Q. How do you know that?
9      A. Because like I said, I have worked with him
10 through several different places and one reason that I
11 left -- like I left Landis to go to Johnson pretty much
12 because Larry recruited me and he was instrumental in me
13 leaving Johnson and going back to Siemens too.
14     Q. Now, when you went to work for Landis & Gyr, at
15 that time did Landis & Gyr, to the best of your personal
16 knowledge, already have the contract for the Unocal
17 building?
18     A. No, they did not at that time.
19     Q. Do you recall when they got the contract?
20     A. Like I said, it was towards the end of '91 or
21 '90, '91 sometime. It probably was in '91. A guy named
22 Jim Everest was the salesman that picked up the
23 contract. That's the best I can remember on years.
24     Q. I think you indicated you were -- were you the
25 primary at Landis & Gyr on that contract for the Unocal

Page 67

1  building?
2      A. Pretty much, yes, at that time.
3      Q. And do you recall -- were you involved in the
4  formation of the contract at all?
5      A. No. I had nothing to do with it except for
6  execution.
7      Q. Do you have any personal knowledge as to how
8  Landis & Gyr would go about making their bid, whether
9  they got to go up and look at the mechanical room first?
10     A. At that time, we had a salesman named Jim
11 Everest, which I used to call like a used car salesman,
12 so whether he knew Don Acres or whether they put it out
13 on the street when the contract was up with Honeywell, I
14 am not sure exactly how he came across knowing about the
15 contract or picking it up.
16         If I recall right, I think him and Don could have
17 been friends and the contract with Honeywell was up at
18 the same time, because I believe that they had to have
19 bid Honeywell pretty good or else Unocal wanted to scale
20 it down at the same time, is what I remember.
21        MS. JOHNSON: Objection; speculation.
22     Q. In terms of the -- when you first went into the
23 filter room -- is that what the room was called where
24 the air filters were changed?
25     A. That would be a proper way to put it.

Page 68

1      Q. And when I refer to the filter room, I mean the
2  filter room where the work platform was located.
3      A. Uh-huh.
4      Q. When you first went into that filter room to
5  change the filters, was the work platform there?
6      A. Yes, it was.
7      Q. To the best of your personal knowledge, was that
8  built by -- who was that built by?
9      A. I have no idea who built it. I have tried to ask
10 people questions in the past and nobody seems to know,
11 and I don't know anybody from Honeywell that was there
12 before.
13     Q. To the best of your personal knowledge, was it
14 built by Landis & Gyr?
15        MS. JOHNSON: Objection.
16     A. It was not built by Landis or Siemens or anybody.
17 It was there when Landis took over the contract. Who
18 put it up, to the best of my knowledge, I have no clue.
19     Q. Do you recall if Don Acres mentioned to you the
20 work platform at all?
21     A. No.
22     Q. You indicated there was already a ladder -- was
23 it a ladder or stepladder that was on site that you used
24 on top of the platform?
25     A. There was a six-foot wooden ladder that we used

Page 69

1  to use that was up there. I mean it was already on
2  site.
3      Q. That was not supplied by Landis & Gyr, to the
4  best of your knowledge?
5      A. To the best of my knowledge, no. It was just
6  there.
7      Q. Did you know the terms, any of the terms of the
8  contract as to who was supposed to supply the equipment
9  to use to access the filters?
10     A. We were buying the filters. As far as equipment
11 to access, I doubt if it was in the contract. I never
12 read the contract so I am just speculating on that part.
13        As a general rule, if there is something on site,
14 you use it instead of hauling your own stuff up just
15 because of convenience and time.
16     Q. Did you assume that this work platform on site
17 was safe for use?
18        MS. JOHNSON: Objection; speculation.
19     A. Yeah. Of course, you go check it out, walk out
20 on it and make sure you felt okay. Why it would not be
21 there if it wasn't intended to be used because of
22 convenience to do your job in that case. I mean you are
23 only doing it three or four times a year.
24     Q. And do you recall if it was -- the wall where the
25 platform was located, was that a sheet metal wall?

18 (Pages 66 to 69)

Page 70

1  A. Well, it is all sheet metal inside there.
2  Q. Sheet metal is how thick, do you recall?
3  A. Well, there is different gauges, but this has to
4  be a fairly thick gauge. I am not that good on numbers.
5  26 gauge, 38, 18 gauge, whatever, but it is not going to
6  be a thin gauge because you got all of that air and you
7  got pressure inside of the plenum and you got air going
8  through there itself.
9       You got a 75 or 100 horsepower fan motor on the
10 other side, so if you get too thin a metal, it is just
11 going to collapse it.
12 Q. You say if it is too thin a metal it will
13 collapse it?
14 A. There is specs that you got to know and like that
15 has got to be a certain grade or certain thickness of
16 metal because between the way your dampers are and you
17 start a motor that big you are going to have suction.
18 Q. So did you assume that they built this to a
19 sufficient grade to maintain the weight of workers that
20 would climb on the platform?
21      MS. JOHNSON: Objection; foundation.
22 A. Yeah. I didn't ever question who built it, to
23 tell the truth. I never even thought about it. I
24 figured it was there from day one.
25 Q. Did you ever try to find out who built it after

Page 71

1  Larry's accident?
2  A. Yes, I did ask people, but everybody I asked -- I
3  mean the people that I knew that worked for Honeywell or
4  worked for Honeywell now were never in the building
5  before that time, or before I was ever in there, so I
6  mean I have out of curiosity asked around, but I
7  couldn't get an answer from nobody.
8  Q. Has anybody ever told you that it was built by
9  Gyr & Landis?
10 A. Nobody has ever told me who it was built by.
11 Like I said, then our conversations through different
12 people throughout the years, nobody has any clue who
13 built it, that I know of.
14 Q. To the best of your personal knowledge, it wasn't
15 built by Landis & Gyr?
16 A. No, it was not built by Landis & Gyr. It was
17 there when we took over the contract.
18 Q. To the --
19 A. Sorry.
20 Q. No, I'm sorry. I interrupted you. Go ahead.
21 A. I said I don't know. Like I said, Honeywell was
22 there before us and then we got there, but I can't say
23 who did it.
24 Q. Did you ever -- did you have to have an
25 orientation when you first started working in the

Page 72

1  building for Landis & Gyr, safety orientation?
2  A. You know, it seems like we might have had to do
3  something. I can't remember exactly now. But with
4  Unocal, I mean, I know that we had a talk because we
5  couldn't go in the ceilings because of the asbestos.
6       I'm sure we had a talk in case we had to solder
7  anything or work in the computer room. As far as a sit
8  down formal safety thing, I can't say honestly yes or
9  no.
10      I know we discussed those things especially. Don
11 Acres made it a special point that I could not stick my
12 head above that ceiling tile whatsoever. That one was a
13 no-brainer that we couldn't do that.
14      As far as anything else goes, I don't recall off
15 the top of my head.
16 Q. And that was because of the asbestos?
17 A. Exactly. We were not allowed to go above the
18 ceilings whatsoever. If we found a problem like a
19 thermostat bad to a valve or something like that, we
20 definitely had to go get Charles or Don in order to
21 address it.
22 Q. Do you recall what the lighting was like when you
23 would go into that filter room?
24 A. Well, if your outside air dampers were open, it
25 is pretty light in there from outside. I can't remember

Page 73

1  whether there was a light inside that room or not, to
2  tell you the truth. I don't remember working in the
3  dark, but I mean most of them penthouses even if there
4  are lights they are hidden by pipes and everything so
5  you are in a shadow sometimes anyway.
6  Q. Do you recall if the platform was affixed to the
7  brackets or was it hanging loose, just placed on the
8  brackets?
9       MS. JOHNSON: Objection; form of question.
10 Q. Well, let me rephrase that. Do you know if the
11 platform was simply resting on the brackets?
12 A. I believe it was just sitting on top of the
13 brackets. I don't think we were attached down, screwed
14 to it, but it's actually been so darn long in there,
15 that I don't remember specifically, you know, whether we
16 were screwed down or bolted down or what we were.
17 Q. Now, you indicated that you had gone -- how often
18 did you go hunting with Larry before the accident?
19 A. I remember going caribou hunting up by Eureka
20 with him the very first time. We have been moose
21 hunting probably twice. Once at Point McKenzie and I
22 had a permit over there, and then I had a permit up by
23 Petersville one year and we were hunting up there.
24 Q. When you went hunting, did you do a fair amount
25 of hiking?

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    _____

4    LAWRENCE H. GROVE, ET AL.,           )
                                          )
5              Plaintiffs,                )
                                          )
6        vs.                              )
                                          )
7    UNOCAL CORPORATION,                  )
                                          )
8              Defendant.                 )
                                          )
9    _____

10   Case No. A-04-0096 CV (JKS)

11

12

13   _____

14         VIDEOTAPED DEPOSITION OF PAUL CRAPPS

15   _____

16                  March 3, 2006
                    11:00 a.m.
17

18          Taken by Counsel for Plaintiffs
                          at
19              330 L Street, Suite 200
                   Anchorage, Alaska
20

21

22                                       Exhibit   8
23                                       page  1  of  4

24

25

Page 33

1  A. No.
2  Q. So you pulled the plank outside the filter room,
3  and then what did you proceed to do? Did you proceed to
4  unscrew any of the nuts?
5  A. I removed the two metal brackets.
6  Q. And what did you do with the hardware that was
7  used to attach the brackets to the wall?
8  A. I put it in the trash can.
9  Q. Was the trash can in the filter room or right
10 outside the filter room?
11 A. It was as you entered the penthouse.
12 Q. Do you recall how many nuts and bolts you had to
13 remove?
14 A. No.
15 Q. Do you recall what the size of the bolts were?
16 A. I would estimate like a quarter inch.
17 Q. Do you know the strength of those bolts?
18 A. No.
19 Q. How long did it take you to remove the brackets?
20 A. I would say -- I would estimate maybe 15 or
21 20 minutes.
22 Q. Did you observe any debris on the floor of the
23 filter room while you were working?
24 A. No.
25 Q. And when you removed the bolts, did you catch

Page 34

1  them in your hand or did you have like a baggy you were
2  putting them in?
3  A. No. I just removed them and whatever I pulled
4  out, I put in my hand, or whatever. It landed where it
5  landed.
6  Q. Did you say it went where it landed?
7  A. Yeah.
8  Q. So did some fall on the floor?
9  A. They could have, yes.
10 Q. And did you go and pick up the ones that fell on
11 the floor?
12 A. No.
13 Q. How soon was this second visit to the filter room
14 from the first time that you went in -- not that you
15 went in, that you went up there with Charles the first
16 time and now the second time you went in to remove it.
17 Do you have any idea how much time had passed?
18 A. A couple of days.
19 Q. Now, can you describe the hardware that you
20 removed? Was it just bolts or what else was there?
21 A. I removed the two metal brackets and the bolts
22 holding it on.
23 Q. Well, were there like washers attached to the
24 bolts?
25 A. I don't recall. There could have been.

Page 35

1  Q. Were there nuts at the end of the bolt?
2  A. Yes.
3  Q. Can you describe the shape of the nuts? Round?
4  Square?
5  A. The nuts themselves were square.
6  Q. Now, you said you threw the nuts and bolts away.
7  Did somebody tell you to do that?
8  A. No. I was just told to remove it.
9  Q. By Charles?
10 A. Yes.
11 Q. Do you know if -- did you put anything up in its
12 place after you removed it?
13 A. No.
14     MR. THORSNESS: By "it," you would mean the
15 brackets and that sort of stuff?
16     MR. COHN: Yeah.
17     MR. THORSNESS: Thank you. That's how you
18 understood the question?
19     THE WITNESS: Yes.
20 Q. Do you know if you removed the plank and the
21 bracket and the nuts and the bolts after OSHA inspected
22 the room, the filter room?
23 A. What do you mean?
24 Q. Are you aware that OSHA came out and inspected
25 the filter room?

Page 36

1  A. Yes.
2  Q. And the removal of the brackets and the nuts and
3  the bolts -- we didn't actually talk about what you did
4  with the plank yet. Did that occur after OSHA came in?
5  A. No, that was before.
6  Q. Now, you have this plank that you estimated,
7  what, about 12 feet long?
8  A. Yeah.
9  Q. What did you do with the plank?
10 A. I put it up in a long storage area as you come
11 into the penthouse. I placed it up in that.
12 Q. And do you know how long the plank was in that
13 area?
14 A. No.
15 Q. Do you know what happened to the plank after you
16 placed it there?
17 A. No.
18 Q. Now, the brackets that you removed, the metal --
19 they were metal brackets?
20 A. Yes.
21 Q. So there were four of them? Was it like a
22 bracket on each wall or was it one?
23 A. There was two brackets.
24 Q. But when you are referring to the bracket, you
25 are talking about just -- well, I can show you. Well,

### Page 37

1  we'll get to that afterwards, but we'll talk about the
2  brackets what they looked like after, but what did you
3  do with the brackets?
4    A. What did I do with them?
5    Q. Yes.
6    A. I discarded them in the trash with the nuts and
7  bolts.
8    Q. Now, did you ever go back into the room after
9  that day that you removed it?
10   A. What time period? As a contractor or since I
11 worked there?
12   Q. Let's talk about first as a contractor.
13   A. Yes.
14   Q. When did you -- actually, I should just go in
15 order. You removed all of these things from the room?
16   A. Yes.
17   Q. Then when is the next time you came back into the
18 room?
19   A. I couldn't recollect that. The last time I could
20 recollect going back up there and going physically in
21 that room would be the OSHA inspection.
22   Q. Well, if the planks had been removed and the nuts
23 and bolts had been removed and the brackets removed,
24 what did they have to look at?
25        MR. THORSNESS: Objection; foundation.

### Page 38

1    Q. Well --
2        MR. THORSNESS: You are asking him what OSHA
3  had to look at?
4        MR. COHN: No speaking objection, please,
5  John. He says he is in the room with them.
6    Q. You are in the room?
7    A. With who?
8    Q. With the OSHA people?
9    A. No.
10   Q. You didn't go in the room. I asked you the next
11 time you went into the room.
12       MR. THORSNESS: You say "the room."
13       MR. COHN: The filter room. When we are
14 talking about "the room," we are talking about the
15 filter room unless otherwise specified.
16   A. The filter room, I would have to say I didn't set
17 foot in that filter room when the OSHA inspectors came.
18 I let them into that room.
19   Q. Was the door open and you standing outside the
20 room?
21   A. Yes.
22   Q. But when they went into the room to inspect, the
23 platform wasn't there?
24   A. No.
25   Q. And do you know who went into that room?

### Page 39

1    A. The OSHA inspector and our safety person, Ken
2  Burns.
3    Q. And was Charles Arnett -- did Charles Arnett go
4  into the room?
5    A. No.
6    Q. What about Roseanne Sinz?
7    A. No.
8    Q. Did you have any -- did Roseanne Sinz direct you
9  to do anything in the filter room?
10   A. No.
11       MR. THORSNESS: Are you talking on the day
12 of the OSHA inspection or any time?
13   Q. I guess that was at any time.
14   A. At any time, I would say no. Actually, I would
15 say no, not from Roxanne, no.
16   Q. Well, not from Roxanne, then, okay. Who, besides
17 Charles Arnett, who has directed you to do anything in
18 connection with the filter room?
19   A. I took pictures after the OSHA inspection of the
20 filter room.
21   Q. How many pictures did you take?
22   A. Half a dozen, I would estimate.
23   Q. Well, why did you take these pictures?
24   A. After the OSHA inspection, we just figured it
25 would be good to have our own pictures.

### Page 40

1    Q. When you said "we thought it would be good," you
2  are talking more than just you? Did anybody direct you
3  to take these pictures?
4    A. Ken Burns.
5    Q. Did you see anyone else taking pictures?
6    A. No.
7    Q. What type of camera did you use?
8    A. Digital.
9    Q. And what areas of the room did he have you take
10 pictures of?
11   A. Where the platform existed.
12   Q. When you say where -- did you do any close-up
13 shots or zoom in to where the brackets were located?
14   A. From knowledge of where I pulled them down.
15   Q. So did you take pictures at both sides of the
16 wall or just the sheetrock side?
17   A. It's not real sheetrock. Just the opposite side
18 of the filters.
19   Q. Do you know what happened to those pictures after
20 you took them?
21   A. I sent them off to, I think, Ken Burns and
22 Roxanne Sinz.
23   Q. Have you, yourself, ever had to work on a --
24 stand on a work platform?
25   A. At my present job or at that point?

Page 89

1  correct?
2  A. Yes.
3  Q. And you did that?
4  A. Yes.
5  Q. And then on September 9, 2002, you were a
6  contract employee working for Kelly Services?
7  A. Yes.
8  Q. Did you have a specific written contract for
9  working in the Unocal building?
10 A. No.
11 Q. Did you have like a timesheet that you had to
12 fill out?
13 A. Yeah, I had weekly timesheets.
14 Q. And in those timesheets, did you have to put down
15 -- was it just -- did you have to put down what you did
16 during the days?
17 A. No.
18 Q. Did you keep any diaries or notes about what you
19 did?
20 A. Nope.
21 Q. So there would be no -- they wouldn't have any
22 record at Kelly or Unocal as to what you were doing on
23 specific days?
24 A. No. It was just a general 8:00 to 5:00 type job.
25 Q. And in the last paragraph in answer to

Page 90

1  interrogatory number one, which is, I believe it is
2  Exhibit No. 11, "Defendant is not aware of any
3  photographs, videotaping or documentation during the
4  specified time period except for the photographs
5  produced by plaintiff."
6      We have already talked about that. That answer
7  isn't correct, am I right?
8      MR. THORSNESS: Objection to form.
9  Q. That would be wrong?
10     MR. THORSNESS: Objection to form.
11 A. "Defendant is not aware of any photographs,
12 videotapes or documents --" I don't know what
13 photographs were produced. Oh, the plaintiff?
14 Q. There is a specified time period. The time
15 period of the accident until the scaffolding was
16 removed.
17 A. No, there was no pictures and video.
18 Q. You indicated earlier you took photographs
19 though.
20 A. I took photographs of the -- after the OSHA
21 investigation.
22 Q. After the OSHA investigation?
23 A. Yes.
24 Q. And not before the OSHA investigation?
25 A. Yes.

Page 91

1  Q. So you took the photos after the scaffolding was
2  removed?
3  A. Yes.
4      MR. COHN: I am going to want copies of
5  those photographs because I don't believe they have been
6  produced.
7      MR. THORSNESS: Counsel, they have been
8  produced. I can give you Bates numbers. This is on
9  information and belief. They are Bates numbers
10 defendant 00047 through defendant 00063.
11     I believe they have been produced, and check
12 on that. If they haven't, we'll get them right to you.
13     MR. COHN: Can we go off record?
14     VIDEOGRAPHER: Off record 1:47 p.m.
15     (There was a short break.)
16     VIDEOGRAPHER: On record 1:51 p.m.
17     (Exhibit No. 12 marked.)
18 Q. I'm showing you what's marked as Exhibit No. 12.
19 Do you recognize the photographs?
20 A. Yes.
21 Q. The black and whites anyway?
22 A. Yes.
23 Q. And do you recognize these as photographs that
24 you took?
25 A. Yes.

Page 92

1  Q. For the record, these photos are identified as
2  DEF00047 to 00063, and they were attached in the
3  defendant's initial disclosures.
4      The initial disclosures indicated these are
5  photos in their possession without indicating, however,
6  who took them or when they were taken.
7      But you recall these as the photos that you took
8  after the OSHA inspection?
9  A. Yes.
10 Q. Do you recall how soon after the OSHA inspection
11 you took these photographs in the filter room?
12 A. Within probably a day or two.
13     MR. COHN: And if the color or the negatives
14 of these are -- I want the negatives and the color
15 photos of these photographs.
16     MR. THORSNESS: Write me a letter, please.
17 Q. And the first, 0047 to 51 are photos of the
18 mechanical room, the filter room; is that correct?
19 A. Yes.
20 Q. What were you trying to show -- were you trying
21 to show anything in these photos?
22 A. I was just asked to take photos of where it was
23 -- the platform was located.
24 Q. Can you identify on DEF00047 using this red pen
25 where the platform was located?

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
 2

 3   LAWRENCE H. GROVE, et al.,    )
                                   )
 4            Plaintiffs,          )
                                   )
 5   vs.                           )
                                   )
 6   UNOCAL CORPORATION,           )
                                   )
 7            Defendant.           )
                                   )
 8   Case No. A 04-0096 CV  (JKS)

 9   _____

10        VIDEOTAPED DEPOSITION OF JOHN STALLONE

11   _____

12              Pages 1 - 70
             Friday, April 14, 2006
13               3:46 p.m.

14        Taken by Counsel for Plaintiffs
                       at
15   The Offices of Department of Labor & Workforce
                  Development
16       3301 Eagle Street, Suite 209
             Anchorage, Alaska
```

RECEIVED MAY 0 9 2006 WEIDNER & ASSOCIATES

COPY

Exhibit 9
page 1 of 3

Page 60

1  A  If there were, they would be in this
2  case file.
3  Q  And if there aren't, then the statement
4  by Michelle McNair-Davis on the previous page,
5  LG726, is correct. She says, "I can report there
6  are no witness statements to pass on to you."
7  A  Right. I would say that's a correct
8  statement, yeah.
9  Q  Now, this statement itself does not say
10 that the rest of the file has not been passed on
11 to the requesting party.
12 A  No. It's a request to pass it on to the
13 requesting party. You're referring to --
14 Q  I'm talking about 726 now. I'm back to
15 726. 726 doesn't say that the file isn't being
16 sent to them; it's just telling them, however --
17 to enlighten them that there are no written
18 statements in those files?
19 A  Right.
20 Q  So this document itself, does that tell
21 you that you did not send these documents?
22 A  No, no, it doesn't say that at all.
23 Q  Okay. And the -- and there was some --
24 I just wanted to read -- Archie Cook was one of
25 the witnesses that is identified in the Safety

Page 61

1  Narrative that was done by Mr. Scanlon in regard
2  to Unocal, and Mr. Cook was deposed on March 15,
3  2006. And remember we had the discussion about
4  the lack of any safety reports indicated in
5  Mr. Scanlon's report. And Mr. Cook on page 32 of
6  his deposition -- this is what happened.
7      I asked him this question in regard to
8  the building: "Were there periodic safety
9  inspections?"
10     "Answer: Yes."
11     "Question: Of the building from the
12 time you arrived in 1999 through 2002?"
13     "Answer: Yes."
14     "What did these periodic safety
15 inspections entail?"
16     "Answer: It involved one of our safety
17 technicians going around the office looking for
18 safety hazards."
19     And then later on I asked him: "Did you
20 observe the safety inspection at all?"
21     And he said -- "Answer: I didn't
22 observe the inspection; I saw the report."
23     "Question: You saw the report?"
24     "Answer: Yes."
25     "Can you tell me how detailed the report

Page 62

1  would be?"
2      "Answer: I mean, it was basically
3  telling us what things were hazardous or
4  potentially hazardous and potentially needed
5  fixing."
6      And he also indicated later on his
7  understanding was that they would check every nook
8  and cranny within the building.
9      Now, you saw those pictures of that
10 platform. In your opinion as an experienced OSHA
11 investigator and as chief of OSHA, if a safety
12 technician inspected and saw that platform, should
13 he recognize that that was hazardous and should be
14 replaced or repaired?
15     MS. JOHNSON: Objection; foundation.
16 A  Yes.
17 Q  (By Mr. Cohn) Okay. And if there was
18 such safety reports, would that have been
19 something important to share with Mr. Scanlon when
20 he was conducting his investigation, if he asked
21 them for -- if they had any safety reports on the
22 building?
23 A  Well, if he asked them for it, yes, I
24 would expect them to give it to him, yes.
25 Q  And the last subject and then I'm done.

Page 63

1  There was some questioning before about whether or
2  not Siemens could pass on liability to someone
3  else for -- that was their own responsibility. In
4  this case Siemens has an employee and let's say as
5  an employee, a contractor goes to the place of
6  employment of some entity such as Unocal, whether
7  it be their building or on their platform, and
8  they're being supplied the equipment by Unocal,
9  whether it be a ladder or work platform or
10 scaffold.
11     Would it be your opinion that the person
12 responsible for ensuring that the equipment that
13 is used by a contractor is the person providing
14 the equipment for their use?
15 A  It's a dual role there. The
16 contractor -- for example, if Mr. McKinstry wanted
17 me to come over to his house and paint and I'm a
18 contractor and he's hiring me and he says, I'll
19 provide you with the equipment, and I'm going to
20 have an employee with me, I better make sure that
21 the equipment that he's giving me is suitable for
22 my employee to use. So, if I don't and I have
23 this wording that you're talking about in a
24 contract that I say, I'm going to assume all the
25 responsibility of the equipment, I don't know if

18 (Pages 60 to 63)

Page 64

1  it -- I'm not a lawyer, so I don't know if it
2  completely exonerates Mr. McKinstry, but I would
3  say that I have -- I guess it's how good you write
4  these things, so I don't know.
5          But from an OSHA standpoint, it is
6  always the responsibility of the employer to make
7  sure that the employee is working with safe
8  equipment, albeit from the employee himself. We
9  have cited employers for having employees with bad
10 equipment, which infuriates them, because they go,
11 it's not even mine. I said, well, I don't care.
12 He's got it on the job site, he's using it, and
13 you're the responsible party so you have to make
14 sure that the equipment they're using is up to par
15 and meets the regulations. I don't know if that
16 answers your question, but...
17     Q  Well, in a case such as this -- where
18 you said you want to Mr. McKinstry's house to
19 paint his house --
20     A  Yeah.
21     Q  I don't know if I want to use that
22 specific example.
23     A  Well, use whatever one you want. I
24 don't care.
25     Q  If there's a work platform up in the

Page 65

1  filter room where this accident happened and an
2  individual such as Mr. Grove gets up on that work
3  platform, which is provided by Unocal, does he
4  have a right to expect that Unocal has constructed
5  and maintained this structure properly so that the
6  bolts won't shear off and him fall?
7      A  There's a dual responsibility. I'll go
8  back to that again. He also has the -- he should
9  also expect his employer to go inspect what he's
10 about to climb onto to make sure that that is --
11 that platform is secure and will withstand his
12 weight.
13         But, yes, the creating employer in this
14 case, Unocal, was also, we felt, to be held
15 responsible because it was their building, it was
16 their platform. And they're saying, you can come
17 in and use our equipment, okay, fine. But it's
18 also the employer's -- under OSHA now. I'm not
19 here under any other circumstance. Under OSHA
20 regulations that's why we're able to cite both
21 parties.
22     Q  So you're not saying, for example, in a
23 court of law how -- the fines that you issued,
24 what the percentage of fault should be apportioned
25 to each party?

Page 66

1      A  I wouldn't go there, no. I mean, if you
2  asked me my own personal opinion, maybe. But from
3  an OSHA standpoint, I've got to look at this
4  thing, who is the responsible parties here? And I
5  saw two responsible parties. I saw the party that
6  provided the platform, and I saw the party that
7  provided the employee who was standing on the
8  platform. Somebody should have gone over and made
9  sure that this employee was on a good piece of
10 equipment.
11     Q  I know you're talking about technically
12 under the OSHA regs. Like, Siemens has a contract
13 with Unocal to service their building or do other
14 work for them and they go up to this platform,
15 which is provided by Unocal, and then if they
16 complain to Unocal about the equipment and they
17 lose the contract, then they don't have the work.
18         MS. JOHNSON: Objection; foundation.
19     A  I mean, I can't --
20         MR. COHN: I'm just asking if that
21 might --
22     A  I'm sure in the real world that happens,
23 but I can't look at those kind of things when I'm
24 looking at these case files.
25     Q  Well, I'm saying -- and then I'll be

Page 67

1  done -- but when you go -- like, for instance,
2  when you go to Mr. McKinstry's house, you gave the
3  example of defective stairs. If the stairs
4  collapse at the Unocal building while the Siemens
5  employee is on it, would that be the
6  responsibility of Siemens?
7      A  Okay. Let's say -- let's take that
8  example, because I've had this happen in the past.
9  Like I said, Siemens' responsibility is to make
10 sure the equipment their employee is using is up
11 to par, as well as the person who's providing it,
12 the employer who's providing the equipment plus
13 the employer who is providing the employee. I'll
14 go back to that.
15         Now, in a scenario where this employee
16 is coming down the fire escape staircase and
17 there's a chunk of the concrete out of the step
18 and he twists his foot and falls downstairs and
19 gets seriously hurt, is that the employer's fault
20 now? Siemens should have gone and made sure that
21 the fire escapes -- no, because that wasn't part
22 of the original contract work.
23         The employee was up there to replace
24 filters. He's coming down the stairs, he falls
25 down the stairs because the stairs are

19 (Pages 64 to 67)