Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3  _____
 4  LAWRENCE H. GROVE, CYNTHIA GROVE,      )
    SARAH GROVE and MICHAEL GROVE (DOB    )
 5  1/21/88) by and through his father    )
    LAWRENCE H. GROVE,                    )
 6                                        )
               Plaintiffs,                )
 7                                        )
    vs.                                   )
 8                                        )
    UNOCAL CORPORATION,                   )
 9                                        )
               Defendants.                )
10  _____)
11  Case No. A04-0096 CV (JKS)
12
13
14  _____
15        VIDEOTAPED DEPOSITION OF CHARLIE ARNETT
16  _____
17              Tuesday, April 26, 2006
                      9:30 a.m.
18
19           Taken by Counsel for Defendant
                          at
20    Clapp, Peterson, Van Flein, Tiemessen & Thorsness
                711 H Street, Suite 620
21                 Anchorage, Alaska
22
23                                        Exhibit 11
24                                        page 1 of 6
25
```

COPY

Page 4

1     ANCHORAGE, ALASKA; APRIL 25, 2006
2              9:30 A.M.
3              -o0o-
4     VIDEOGRAPHER: We're on record at 9:30.
5  This is the video deposition of Charles Arnett taken by
6  the plaintiff in the matter of Grove, et al. versus
7  Unocal Corp., Case Number A04-0096 CV (JKS), in the
8  United States District Court for the District of Alaska.
9     This deposition is being held in the offices
10 of Clapp, Peterson, Van Flein, Tiemessen & Thorsness,
11 located at 711 H Street, Suite 620, Anchorage, Alaska,
12 on April 25, 2006.
13    My name is Eric Cossman from Alaska Legal
14 Video, mailing address 645 G Street, #892, Anchorage,
15 Alaska 99501. The court reporter is Sonja Reeves from
16 the firm of Pacific Rim Reporters.
17    Will counsel please identify themselves for
18 the record?
19    MS. JOHNSON: Linda Johnson from Clapp
20 Peterson for Unocal.
21    MR. COHN: And Michael Cohn from the Law
22 Offices of Phillip Paul Weidner & Associates on behalf
23 of the plaintiffs.
24    One technical correction, the deposition is
25 being taken by the defendant, just for the record.

Page 5

1          CHARLIE ARNETT,
2       deponent herein, being sworn on oath,
3       was examined and testified as follows:
4              EXAMINATION
5  BY MS. JOHNSON:
6  Q. Mr. Arnett, would you be sure and spell your last
7  name?
8  A. A-r-n-e-t-t.
9  Q. Can you tell us what your educational background
10 is, please?
11 A. My educational background?
12 Q. Right. Graduate from high school?
13 A. Yeah, I finished high school, some college.
14 Q. What were you working towards in college?
15 A. Nothing specific, just generalized.
16 Q. Did you do any trade schools, anything like that?
17 A. No.
18 Q. Where are you working now?
19 A. I work for All Star Realty, Inc.
20 Q. When did you start working there?
21 A. I want to say June '03.
22 Q. And what do you do for them?
23 A. I take care of the maintenance department. It's
24 a property management company.
25 Q. How many properties are there?

Page 6

1  A. That I don't know.
2  Q. More than 100?
3  A. There could be.
4  Q. Do you do general maintenance or do you
5  supervise?
6  A. I coordinate any maintenance that needs to be
7  taken care of.
8  Q. So you actually don't do it yourself? You make
9  sure that other people are doing it?
10 A. Correct. I get the job done.
11 Q. Before All Star Realty, where did you work?
12 A. Well, I actually worked for Peak Oilfield
13 Services, but it was at the Unocal building.
14 Q. So you were a Peak employee?
15 A. Yes.
16 Q. How long were you a Peak employee?
17 A. About five years, I think.
18 Q. You left in '02; is that correct?
19 A. November '02, yes.
20 Q. Do you recall what year you started with them?
21 A. '90. Well, with Peak?
22 Q. With Peak, right.
23 A. '97, I think.
24 Q. And then who was your employer before Peak?
25 A. I was with Kelly Services for about six months.

Page 7

1  Q. Before Kelly Services?
2  A. Professional Business Services.
3  Q. Where was that at? Was that in Anchorage?
4  A. Yes.
5  Q. And how long were you with Professional Business
6  Services?
7  A. From '90 up until '96.
8  Q. And before Professional Business Services?
9  A. You are asking me something that's 15 years ago.
10 Q. I know. I'm sorry. I was just trying to figure
11 out what kind of experience in the industry you have.
12 A. Which industry?
13 Q. Well, especially the maintenance work that you
14 have been doing. What did you do for Professional
15 Business Services?
16 A. I was hired as computer operator for Unocal.
17 Q. So how did you learn to be a computer operator?
18 A. Air Force.
19 Q. When were you in the Air Force?
20 A. '78 to '87.
21 Q. When did you come to Alaska?
22 A. '80.
23 Q. So did you retire from the Air Force in Alaska?
24 A. Yes.
25 Q. So from that, we are only missing three years.

Page 96

1  door that appeared to still be intact?
2       MS. JOHNSON: Objection; form of the
3  question.
4    A. I don't remember seeing one.
5    Q. Well, do you recall -- do you recall if there was
6  more than one cross beam or bracket which held up the
7  planks?
8    A. No. I don't remember seeing any. Just because
9  of the angle, this stuck out in my mind because it was
10 like there.
11   Q. Now, you indicated that -- in questioning you
12 said that Larry Grove was obviously hurt. What do you
13 mean by that?
14   A. Well, he was moaning, shortness of breath.
15   Q. Was he -- were you able to see any -- you say you
16 saw some cuts on his --
17   A. Yes. It looked like the shin of one of his legs.
18 He pulled his pant leg up and showed me where maybe the
19 platform had hit to indicate that he was in pain.
20   Q. That was going to be one of my questions, how
21 would you tell, whether he was wearing shorts. He was
22 wearing long pants?
23   A. Yes.
24   Q. Now, you were showed these photos in Exhibit
25 No. 3 and asked some questions about the ladder, but do

Page 97

1  you know when these photos were taken?
2    A. No.
3    Q. So you have no idea whether, at this time,
4  whether that ladder was in the room at the time of the
5  accident?
6    A. I don't know. I just remember seeing the ladder
7  there.
8    Q. But you do recall that cross beam or bracket
9  that's down in this picture?
10   A. Yes.
11   Q. Can you just point that bracket out for the
12 camera that you recall seeing?
13   A. This one here.
14   Q. Can you just hold it there?
15      MR. COHN: Did you get that? Thank you.
16   Q. Now, you indicated that the bolt had been --
17 looked sheared?
18   A. It looked like it was sheared.
19   Q. What does that mean to you?
20   A. The bolt looked rusted and old all the way around
21 it, but the end looked like it was nice and shiny like
22 it had been cut or it wasn't a smooth end, but it was
23 very shiny compared to the rest of them.
24   Q. So from looking at that, did it appear to you
25 that that had sheared off causing the platform to

Page 98

1  collapse?
2    A. It looked like it had been sheared off because,
3  like I say, the area that I saw was not smooth. It was
4  -- it just wasn't smooth. It was kind of --
5    Q. Jagged?
6    A. Yeah.
7    Q. When you -- now, you indicated you helped
8  Mr. Grove get up and leave the room. Did anybody see
9  the two of you together on the way out of the building,
10 to the best of your personal recollection?
11   A. Best of my -- I don't remember seeing anyone in
12 the elevators. If anyone would have seen us, it would
13 have been the receptionist.
14   Q. Do you know the name of the receptionist?
15   A. No, I don't, to be honest with you, because we
16 went through -- back at that time, we had gone through
17 two or three different receptionists.
18   Q. So it would probably be a matter of the time
19 cards for Unocal to see who the receptionist was on duty
20 on September 9th '02?
21   A. (Witness nods head.)
22   Q. Was there one entrance into the building?
23   A. There are actually two entrances to the building,
24 but everyone used the north entrance all the time.
25   Q. When you -- the north entrance, are those glass

Page 99

1  doors?
2    A. Yes.
3    Q. When you enter the north entrance, is the
4  reception area on your right as you come in?
5    A. Yes, through another set of glass.
6    Q. If you keep going straight, do you then instead
7  of turning right into the reception area, you reach the
8  elevators?
9    A. You mean when you first go into the building?
10   Q. Right.
11   A. Yes. You go in through the outside doors and
12 then you got another set of doors where you put your
13 coat in, and then you go through there and then the
14 elevator is on the right-hand side.
15   Q. Is it -- normally would you -- was your office
16 through the reception area?
17   A. My office is located behind the receptionist,
18 yes.
19   Q. Now, you indicated that Mr. Grove had an access
20 code and that --
21   A. I believe so, yes.
22   Q. But that Unocal could tell -- whenever the access
23 code was used, it would be input into some sort of
24 system?
25   A. It was kept on a PC, yes.

Page 112

1  A. Yes.
2  Q. When was that?
3  A. It was early the following year, about
4  springtime. That's about the best I can remember. And
5  I was only -- I wasn't actually in the building. I was
6  more like in the reception area.
7  Q. Why were you in the building?
8  A. Well, I went there once just to say hi to some
9  old friends, but no one was around, so I left. They
10 were all out to lunch.
11 Q. Do you recall ever talking to any inspectors from
12 OSHA?
13 A. Yes.
14 Q. Do you recall -- well, tell us what they asked
15 you and what you told them.
16 A. Well, again, this was a long time back.
17 Q. Based on the best of your personal recollection.
18 A. When I talked to them, I didn't talk to them
19 face-to-face. It would be a phone call. And he just
20 asked me background on the room, if I remember Larry, an
21 accident happening with Mr. Grove, and I said yes.
22     He asked me, you know, when the platform -- if I
23 knew about the platform, and, if so, when was it put in.
24 And, of course, I had no knowledge of it. I don't know
25 when it was put in.

Page 113

1     He was asking me who may have known, and I told
2  him, well, the people that I worked for as long as I
3  have been there have been Don Acres, Eddie Barrett,
4  Archie Cook, but prior to that, I don't know.
5  Q. What did you tell him about Don Acres, Eddie
6  Barrett and Archie Cook?
7  A. That Don Acres was the building manager at the
8  time, that he may know something about it.
9  Q. Now, even though you became a Peak employee, did
10 you take your direction from Unocal employees as to what
11 you would do in the building?
12 A. Yes.
13 Q. And when you talked about your time cards, they
14 would go through Archie Cook for him to review before
15 going back to you to be faxed to Peak?
16 A. Correct, because he would have to sign it.
17 Q. I am just going to go through this quickly
18 because there was some questioning here about your
19 records in terms of you indicated that as a building
20 maintenance tech one that your pay was higher, but you
21 were being directed to Exhibit No. 4, page 200614, in
22 which your pay as a building maintenance tech one was
23 the same as a building specialist.
24     And it appears that once you became a building
25 specialist, all the time for building maintenance tech

Page 114

1  was overtime.
2      And you indicated that your pay rate was higher
3  as a maintenance tech after you became a building
4  specialist. Do you recall that testimony?
5  A. Yes, but there are two titles in there for
6  building maintenance tech. One is maintenance tech one.
7  The other one is maintenance tech two.
8      I believe maintenance tech two involved wearing a
9  face mask; thus, that was a higher rate of pay.
10 Q. Well, it looks like they have building
11 maintenance tech one listed, but it looks like starting
12 on page 200616 where it lists building maintenance tech,
13 your pay rate does reflect 32 as opposed to 21.5. Do
14 you see that?
15 A. Yes.
16 Q. So at some point your pay scale went up when you
17 were doing building maintenance tech work; is that
18 correct?
19 A. Correct.
20 Q. Yeah. That was the only point I was going to
21 make in regard to that. Actually, now that we're on
22 Exhibit No. 4, there was some reference to safety
23 awards.
24 A. Right.
25 Q. Do you know if you were singled out for a safety

Page 115

1  award or whether or not this was given to all eligible
2  employees?
3  A. These were given to all Peak employees, because
4  the way I understood it, the company had gone a year
5  without any accidents.
6  Q. Now, in your job, were you a maintenance
7  coordinator at the Unocal building when you were on the
8  Peak payroll?
9  A. No. You mean reference to my job title?
10 Q. Right.
11 A. My job title changed two or three times. God, I
12 want to say -- again, this is my memory, but I want to
13 say I was originally hired as building maintenance one.
14     Maybe it was -- I thought it was building
15 maintenance tech one, building maintenance tech two, and
16 then I don't remember which one, but I thought two was
17 concerning the full face respirator. I may have that
18 backwards.
19     And then later when Eddie Barrett left, retired,
20 it took a while, but I finally got a pay raise because I
21 was taking over some of his duties. And that's when I
22 became building maintenance specialist, and that
23 increased the pay there, too.
24 Q. Now, in terms of the building, if you, let's say,
25 put a new chair in your office, could you just go out

31 (Pages 112 to 115)

### Page 116

1 and get a new chair?
2    A. No. I would have to get authorization from
3 Archie.
4    Q. To the best of your personal knowledge, given the
5 position you were in while you were working in the
6 Unocal building, would Unocal have to give approval and
7 authorization to build a work platform inside the
8 building?
9    A. Yeah, they would have to give authorization.
10   Q. To the best of your personal knowledge, would
11 Unocal inspect any work that was done by the -- if you
12 built a work platform, would Unocal inspect to make sure
13 that it met specifications?
14       MS. JOHNSON: Objection; foundation.
15   A. I don't know. I would assume they would.
16   Q. Have you seen any work that was done in the
17 building where -- that Unocal employees came and
18 inspected to make sure that it met Unocal's requirements
19 while you were working there?
20   A. I don't recall that, no.
21       MR. COHN: Let's take a break.
22       VIDEOGRAPHER: Off record. The time is
23 1:08.
24       (There was a short break.)
25       VIDEOGRAPHER: Back on the record. The time

### Page 117

1 is 1:14.
2    Q. Good afternoon again, Mr. Arnett, and I'll try
3 and make this reasonably brief.
4       You indicated that you had gotten an asbestos
5 certificate. Did you get the asbestos certificate
6 because of the asbestos problem in the Unocal building?
7    A. Yes. I was asked by Don Acres if I wanted to
8 take training for it, and I agreed to it.
9    Q. What type of training did that involve?
10   A. Mostly classroom. Some hands-on.
11   Q. Did they already -- did Mr. Acres already know
12 that there was an asbestos problem in the building?
13   A. Yes.
14   Q. You referenced -- you talked about intranet
15 before. Can you tell me was there like an internal
16 intranet Unocal system?
17   A. Yes. Unocal had its own communications
18 networking systems in the computer room, especially to
19 handle the various PCs in the building.
20   Q. Did you communicate with Mr. Acres or Barrett or
21 Mr. Cook by the intranet?
22   A. No, mostly verbal.
23   Q. Did you get any instructions from them through
24 the intranet?
25   A. I don't recall any specific instructions on

### Page 118

1 things. Maybe times for meetings, staff meetings,
2 things like that, through e-mail.
3    Q. You attended staff meetings during your time at
4 the building?
5    A. I attended very few.
6    Q. And can you give me -- did they have like a
7 written handout when you would go to these staff
8 meetings as to what was going to be discussed?
9    A. No. I call them staff meetings because it was
10 actually meetings between myself and Archie Cook on
11 problems that were going on, status updates, things like
12 that.
13   Q. Okay. When you first came on way back and doing
14 the computer work around 1990, did you say?
15   A. Yes.
16   Q. Did you have any orientation as to the building
17 that was given to you by Unocal?
18   A. You know, I don't remember, but I believe there
19 was.
20   Q. And do you recall whether that involved going
21 through safety procedures for the building?
22   A. Yeah. I mean, a lot of it was what to do in case
23 fire alarms went off, different things like that that
24 most buildings have.
25   Q. Now, at that time you were working in the

### Page 119

1 computer room mainly. In that orientation, did they
2 ever have you go take a look at the penthouse?
3    A. No.
4    Q. Did there ever come a time when you switched from
5 computer to building maintenance section that you were
6 given an orientation of the penthouse?
7    A. If I did, it would have been done by Don Acres.
8 It would have been more like a walk-through.
9    Q. Can you describe -- would the walk-through entail
10 him showing you everything?
11   A. Basically, you know, he would show me where the
12 boilers were in relation to the building, where the gas
13 alarms were.
14       There was a gas alarm in there, which was tied
15 into the building fire system. Where the air supply
16 room was, radio room.
17   Q. Would he have opened the doors and showed you the
18 inside of the rooms, to the best of your recollection?
19   A. Yeah.
20   Q. You talked about a lot of -- especially in 2001
21 you indicated you had a lot of overtime because there
22 was a lot of work being done in the building?
23   A. Correct. They were going through and doing a
24 couple different reconstruction projects at the same
25 time, and plus we had had furniture shipped up from

Page 124
1  Siemens Building Technology and obtained this document.
2      I wanted to just ask you about this. Do you
3  recall this document?
4      A. Yes.
5      Q. And let me ask you, why would it be, to the best
6  of your knowledge, why would it be presented to you?
7      A. Well, the only reason I could think of is because
8  I was taking care of building services. This was a
9  building services function was to get proposals on
10 support for certain systems within the building that we
11 didn't have manpower to take care of or the expertise
12 to.
13     Q. When you get a document such -- so you would have
14 gotten documents such as this from other vendors?
15     A. Yeah, and then I would in turn present them to
16 Archie.
17     Q. Would you have yourself reviewed the document?
18     A. Yeah, I would have reviewed it.
19     Q. I want to show you -- it's not a numbered page,
20 but if you go past page nine of the document, then there
21 is an attachment to it. It says, "Siemens Building
22 Technology, Inc. terms and conditions."
23         And if you go to the second page after the one
24 that's labeled "Article Six, Customer Responsibilities,"
25 and I'll represent that actually it says -- and then

Page 125
1  SBTI presumably stands for Siemens Building Technology,
2  Inc.
3          And is it your understanding that when they say
4  "customer," they are referring to Unocal?
5      A. That is correct.
6      Q. Now, under "customer responsibility, 6.3," can
7  you read what that says?
8      A. Yeah. "Customer will provide SBTI with
9  reasonable means of access to the equipment and shall
10 make any necessary provisions to reach the equipment and
11 peripheral devices. Customer will be solely responsible
12 for any removal, replacement or refinishing of the
13 building structure or finishes that may be required to
14 gain access to such equipment."
15     Q. You indicated that you would have seen this
16 document and reviewed it and then passed it on to Archie
17 Cook?
18     A. Yes.
19     Q. It's been established that there was a work
20 platform in the filter room, and I'll represent to you
21 that that work platform was used by Siemens technicians,
22 such as Larry Grove, to replace the filters that were
23 higher up in the room.
24         The section that you just read, would you
25 interpret that to mean that Unocal was to provide access

Page 126
1  for the Siemens technicians to change the filters?
2          MS. JOHNSON: Objection; foundation, calls
3  for a legal conclusion.
4      A. I would think that it would indicate that, you
5  know, that the customer would have to provide a means to
6  access it, yes.
7      Q. And is that how you interpreted it when you saw
8  this document?
9          MS. JOHNSON: Objection; foundation.
10     A. Well, that's the way I interpret it, yes, but --
11     Q. I know there was an objection to foundation, but
12 since you reviewed it and who else would have a
13 foundation to testify what you yourself thought about
14 the document?
15         MS. JOHNSON: Objection to speaking. You
16 are not the witness here, Mike.
17         MR. COHN: The witness -- it will just speak
18 for itself what he testified about.
19     Q. Now, have you ever had occasion yourself to bring
20 like ladders, take a ladder and go up to the penthouse?
21     A. No.
22     Q. Would it be -- do you know how tall the elevators
23 are in the building?
24     A. Well, if you don't take the level out, they are
25 probably seven or seven and a half maybe. I don't

Page 127
1  believe they are eight feet.
2      Q. Were you aware that there may have been Siemens
3  technicians, including Larry Grove, that couldn't get
4  the ladder that they had into that elevator?
5          MS. JOHNSON: Objection; form.
6      Q. Did you have any personal knowledge of that?
7      A. No.
8      Q. But in any event, you would have to have a ladder
9  that would be small enough to fit into that elevator;
10 otherwise, you would have to go up the stairs; is that
11 correct?
12     A. That is correct.
13     Q. Even if you fit the ladder into the elevator, you
14 still have to go up a flight of stairs after you get out
15 of the elevator to get up into the mechanical room?
16     A. Correct.
17     Q. Even after you are in the mechanical room, you
18 have to go and keep turning right and going underneath
19 equipment to get in there to the filter room?
20     A. Yeah, you would have to. There would be duct
21 work overhead for air supplies.
22     Q. It would be easier just to maintain a structure
23 inside the building as opposed to having to take an
24 apparatus up into the filter room each time you went to
25 change the filters?

**SIEMENS**

# UNOCAL 76

## Technical Support Program Proposal

**Presented to:**

Charles Arnett
Unocal

**Presented by:**

Amber Goldberg
Siemens Building Technologies, Inc.

May 31, 2000

(Rev. 1)

Exhibit __12__
page __1__ of __12__





Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 1 of 10

**SIEMENS**



# Technical Support Program
## Index

| Section Title | Section No. |
|---|---|
| **Executive Summary** | 3 |
| **Siemens Building Technologies Capabilities**<br>A. Total Capabilities<br>B. Local On-Site Maintenance | 4 |
| **Business Proposal**<br>A. Project Scope<br>B. Detailed Description of Service to be Provided<br>C. Emergency Services | 5 |
| **Agreement**<br>Terms and Conditions | 9 |
| **List of Maintained and Inspected Equipment** | 10 |

---

**Siemens Building Technologies, Inc.**  
5333 Fairbanks St., Suite B  
Anchorage AK 99518-1258  
(907) 563-2242 / FAX (907) 563-6139

Page 2 of 10

**SIEMENS**

## Section 1: Executive Summary

*Purpose of This Proposal:*

The intent of this proposal is to provide Unocal with a responsible, reliable and cost effective solution for on-going technical support of the HVAC mechanical equipment and the temperature control system. Siemens Building Technologies is a worldwide company with fifty-eight branch locations located throughout North America. Locally, we have thirty-eight dedicated building professionals with the experience to install, commission and service building controls systems and mechanical equipment systems.

**Sites and Locations:**
Unocal
909 West 9th Ave.
Anchorage, AK 99501

Discussions of a support program were initiated through a desire to work with a vendor who has the capabilities and expertise to maintain the HVAC mechanical equipment and temperature control system. You are also interested in partnering with a vendor who can meet your stated objectives of reliability, continuity and quality of work, and technical support and advice. The purpose of this proposal is to become that vendor and ensure that your substantial investment in your HVAC system is maintained and enhanced throughout the life of your facility. We are proposing to accomplish this by pro-actively maintaining the equipment listed on the attached list of maintained equipment through a customized Technical Support Program.

With a Technical Support Program we will perform maintenance routines on your equipment, designed to increase the life and ensure optimum operation. As part of the Technical Support Program we will also provide annual oil analysis for your chiller.

**SIEMENS**

## Section 2: Siemens Building Technologies Capabilities

Siemens Building Technologies proposes to implement a partnered approach to the on-going technical support and maintenance of the HVAC system.

This would entail the purchase of a *Technical Support Program* customized to meet the stated objective of having a partnership with a vendor who can provide reliability, continuity and consistency in quality of service, installation, and technical support. This program will provide Unocal with technical support for the following systems:

- **HVAC Mechanical Equipment**
- **Pneumatic Temperature Control System**
- **DDC Temperature Control System**
- **Generator System**

### A. Total Capabilities:

The purchase of a *Technical Support Program* from Siemens Building Technologies means the confidence of knowing that you are backed by a company dedicated to customer service with over 100 years proven experience. With company-owned branches, Siemens Building Technologies is today providing direct local support to customers throughout the entire world.

Our commitment is to support Unocal as our customer. We have a fully staffed service department for on-going technical support of mechanical equipment and installed pneumatic, electric and automated controls systems and for consultation with our customers on optimal operations and facilities management.

As one of the largest manufacturer, installer and service provider for building HVAC systems in the world, partnering with Siemens Building Technologies also means the confidence of knowing that you are working with a company dedicated to growing with you over the long term. We have provided superior customer support in the form of turn key project implementation and follow-up technical support. For these reasons, we are well positioned to support your current and future activities.

### B. Local On-Site Maintenance

This solution centers on providing Unocal with a technical support program in the following areas of accountability:

- *Scheduled Maintenance and Inspection Intervals*
- *Standardized Task Driven Maintenance Routines*
- *Factory Trained and Certified Technicians*
- *Engineering Consultation*
- *Consistent Pricing Structure*

---

**Siemens Building Technologies, Inc.**　　　　　　　　　　　　　　　　Page 4 of 10
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

**SIEMENS**

## Section 3: Business Proposal

Following is our solution to meeting your main objective, to form a cost-effective solution to the on-going maintenance and technical support of your mechanical and temperature control equipment.

### A. *Project Scope:*

Siemens Building Technologies will provide Unocal with the following as part of our *Technical Support Program* offering:

**HVAC Mechanical Equipment:**
- Preventive Maintenance and Operating Inspections
- Quarterly Filter Changes

**Pneumatic Temperature Control System:**
- Annual Preventive Maintenance

**Generator System:**
- Quarterly Operating Inspections
- Quarterly Testing

**DDC Temperature Control System:**
- Annual Preventive Maintenance
- Operator/Online Support

**Account Management Support:**
- Dedicated Account Management
- Sole Source Accountability, with our local Branch coordinating all aspects of the program
- Annual performance review

**SIEMENS**

## Section 3 Continued:

**B. Detail of Services to be Provided:**

**Central Cooling Equipment:**

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls, and fluid levels to maximize system efficiency and reliability. One operating inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will provide one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings, and other moving parts. This service will be provided during the spring startup of the Chiller.

**Refrigerant Containment Service.** We will leak test all equipment containing refrigerant. We will keep you informed regarding refrigerant issues and opportunities. We will make recommendations based on equipment age and the business objectives of your facility. This service will be provided during the spring startup visit.

**Refrigerant Oil Analysis.** We will provide one (1) spectrochemical refrigerant oil analysis per year on your chiller to trend oil condition and provide predictive wear analysis. Based on oil analysis results we will make recommendations for any needed repairs or additional service. This service will be provided during the spring startup visit.

**Chiller Startup and Shutdown.** We will provide spring startup of the Chiller and fall shutdown of the Chiller.

*(+) Included oil filter change if needed annual. See addendum dated 8/20/04*

**Central Heating Equipment:**

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls and fluid levels to maximize efficiency and reliability. One operating inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings and other moving parts. This service will be provided during the heating season.

---

Siemens Building Technologies, Inc.  
5333 Fairbanks St., Suite B  
Anchorage AK 99518-1258  
(907) 563-2242 / FAX (907) 563-6139

Page 6 of 10

**SIEMENS**

## Section 3 Continued:

### Air Handling Units:

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls and fluid levels to maximize efficiency and reliability. One operating inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings and other moving parts. This service will be provided annually.

**Filter Replacement.** We will provide quarterly (4) filter changes. **HEPA filters are not included with this service.**

*[handwritten: removed on Addendum dated 8/20/04 due to Asbestos.]*

### Pneumatic Temperature Control System:

**Operating Inspections.** We will provide one (1) routine scheduled operating inspections to check system performance and system operation to maximize efficiency and reliability.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for pneumatic temperature controls and calibration of thermostats and receiver controllers.

### DDC Temperature Control System.

**Preventive Maintenance.** We will provide one (1) extensive scheduled inspection and maintenance of the DDC control system. We will perform database diagnostics of the field panel to check for points in alarm, operator priority and unresolved lines of programming. We will also provide two (2) hours annually of operator/online support.

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 7 of 10

**SIEMENS**

## Section 3 Continued:

**Other Services:**

**Standby Emergency Generator.** We will provide four (4) exercise tests of the standby generator system. Prior to the exercise test the generator fluids and controls will be inspected for proper operation. We will make recommendations for any needed repairs.

**Backflow Preventer Testing.** We will provide annual testing and certification of the backflow preventer.

### C. Emergency Services

We will provide on-site emergency service within four (4) hours. Our on-site emergency service coverage for your facility is twenty-four hours a day, seven days per week. Non-emergency calls, as determined by the Unocal and Siemens Building Technologies, will be incorporated into the next scheduled preventive maintenance visit. **Repair or replacement of any and all equipment is not covered under this contract.** If emergency service is needed for repairs or system failures you will be billed at our <u>preferred</u> customer rates. See below for our service labor rates and parts discounts.

**Discounted Labor and Material Rates for 2000:**

| Labor Type: | Preferred Hourly Rates (M-F 8 AM to 5 PM) (excl. holidays) | Regular Overtime (M-F 5 PM to 8 AM, & Sat) | Sunday & Holiday |
|---|---|---|---|
| DDC Specialist | $83 | $124.50 | $166 |
| Mechanic | $71 | $106.50 | $142 |
| Electrician | $69 | $103.50 | $138 |
| Fire Technician | $73 | $109.50 | $146 |
| SBT Product Discount | List less 50/20% | | |
| Outside Products | Cost plus 30% | | |

Note: Prices and discounts are subject to change.

**Documentation of All Services Provided.** We will document each on-site service call and furnish you with a copy showing time, date, and a brief description of activity. Work orders for on-site system preventive maintenance will list the inspection date, individual to report to, equipment identification, equipment location, work to be performed, and any special instructions.

**Quality Assurance Program.** We will meet with you once a year to evaluate system performance and your satisfaction with the quality of service that is being provided under your Technical Support Program.

---

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 8 of 10

**SIEMENS**

## Section 4: Agreement

### Technical Support Program

By and Between:

Siemens Building Technologies
5333 Fairbanks St. Suite B
Anchorage, AK 99518

Unocal
909 West 9th Ave.
Anchorage, AK 99501

Services shall be provided at the following facilities:
**Unocal Building**
**909 West 9th Ave.**
**Anchorage, AK 99501**

Siemens Building Technologies shall provide the services as outlined in the attached proposal dated May 31, 2000. The following terms and conditions shall apply, but where there is a conflict with the Master Services Contract, the Master Services Contract shall supercede (contract dated 4/18/94, #3282-ONS). Labor for all services under this TSP Agreement is warranted for one (1) year after the work is performed.

**Duration:** This agreement shall remain in effect for an original term of one year beginning June 1st, 2000 and shall end May 31st, 2001. This agreement may be extended at one year intervals, if mutually agreed to in writing by both parties. The agreement may be cancelled upon thirty (30) days written notice by either party.

**Charges:**

|         | Year | Dates                  | Annual Cost | Quarterly Payment |
|---------|------|------------------------|-------------|-------------------|
|         | 1    | June 2000 to May 2001  | $16,774     | $4,194            |
| Option: | 2    | June 2001 to May 2002  | $17,361     | $4,340            |
| Option: | 3    | June 2002 to May 2003  | $17,969     | $4,492            |
| Option: | 4    | June 2003 to May 2004  | $18,598     | $4,649            |
| Option: | 5    | June 2004 to May 2005  | $19,249     | $4,812            |

**Proposal accepted by:**
Unocal

_signature_  7-19-00
Signature        Date

**Proposal submitted by:**
Amber Goldberg
Service Sales Engineer

_Amber M. Goldberg_  6/23/00
Signature        Date

---

**Siemens Building Technologies, Inc.**
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 9 of 10

# SIEMENS BUILDING TECHNOLOGIES, INC.                              Landis Division

### TERMS AND CONDITIONS (W/O FLS)

The following terms and conditions are attached to and form an integral part of Siemens Building Technologies, Inc.'s (referred to herein as "SBTI") Technical Support Program Proposal ("Proposal"). The portions of such Proposal relating to "Scope of Work" or any "Proposed Solution" (in either case, referred to herein as the "Proposed Solution"), together with these terms and conditions, are collectively referred to as the "TSP Agreement".

### Article 1: General

1.1 a) The TSP Agreement, when accepted in writing by the Customer and approved by an authorized representative of SBTI shall constitute the entire, complete and exclusive agreement between the parties relating to a technical support program ("Services") for the equipment and software identified in the List of Equipment or the Service Coverage Report attached to the TSP Agreement ("Equipment") and shall supersede and cancel all prior agreements and understandings, written or oral, relating to the subject matter of the TSP Agreement. The TSP Agreement and any rights or obligations thereunder may not be assigned by either party without the advance written consent of the other.

b) The terms and conditions of this TSP Agreement shall not be modified or rescinded except in writing, signed by a corporate officer of SBTI. SBTI's performance under this TSP Agreement is expressly conditioned on Customer's assenting to all of the terms of this TSP Agreement, notwithstanding any different or additional terms contained in any writing at any time submitted or to be submitted to SBTI by Customer relating to this subject matter.

c) The terms and conditions set forth herein shall supersede, govern and control any conflicting terms of the Proposed Solution or the Proposal.

1.2 This TSP Agreement shall automatically renew for successive one (1) year periods beginning on the anniversary date of the original term as set forth in the Proposal, unless stated otherwise in the TSP Agreement.

1.3 Either party may terminate or amend this TSP Agreement at the end of the initial term or at the end of a renewal term by giving the other party at least sixty (60) days prior written notice of such amendments or intent not to renew.

1.4 If, during or within 90 days after the term of this TSP Agreement, Customer engages any SBTI employee who has performed Services under this TSP Agreement, Customer shall pay SBTI an amount equal to the employee's latest annual salary.

1.5 This TSP Agreement shall be governed by and enforced in accordance with the laws of the State of Illinois, or if the Services are provided in Canada, the Province of Ontario. All claims or disputes arising under this TSP Agreement shall be litigated in the State, Commonwealth, or Province in which Services are being provided to Customer hereunder.

1.6 The Services are outlined in the attached Proposal's Proposed Solution provisions, incorporated by reference herein, and shall be performed on the Equipment during SBTI's normal working hours, Monday through Friday inclusive, excluding holidays, unless otherwise set forth herein.

1.7 Customer will at all times designate a contact person with authority to make decisions for Customer regarding the Services. Customer will provide SBTI with information sufficient to contact such person in an emergency. If such representative cannot be reached, any request for Service received from a person located at Customer's premises will be deemed authorized by Customer, and SBTI will, in its discretion, act accordingly.

1.8 SBTI will be permitted to control and/or operate all Equipment necessary to perform the Services.

1.9 SBTI will not be required to conduct safety or other tests, install new devices or equipment or make modifications to any Equipment beyond the Proposed Solution set forth in this TSP Agreement. Any Customer request to change the Proposed Solution or the nature of the Services must be in the form of a mutually agreed change order, effective only when executed by all parties hereto.

1.10 If the Equipment is altered or moved by any person, including Customer, other than SBTI or a person authorized by it, Customer shall immediately notify SBTI in writing, and SBTI reserves the right to perform a acceptance test on, or if necessary a recommissioning of, the system at Customer's expense.

1.11 After any of the following events, SBTI will have no liability or obligation under this TSP Agreement, whether relating to the testing, inspection, maintenance or operation of any Equipment, and may terminate or suspend services under this TSP Agreement immediately upon giving notice to Customer: Customer fails to (a) authorize a reacceptance test or recommissioning that SBTI deems necessary; (b) notify SBTI of any modifications or changes to the Equipment per Section 1.10; (c) notify SBTI of any conditions, malfunctions or changes per Section 6.2; or (d) provide the access required by Section 6.3.

### Article 2: Equipment Testing, Inspection and Maintenance

2.1 The Customer represents that all Equipment is in satisfactory working condition. By the latter of the first thirty (30) days of this TSP Agreement or the first scheduled inspection, SBTI will have inspected all the Equipment.

2.2 If SBTI determines as a result of such inspection that any Equipment is in need of repair or replacement, the Customer will be so notified and shall take corrective action within thirty (30) days, or such Equipment shall be automatically removed from coverage hereunder. SBTI will not be liable or responsible for the continued testing, maintenance, repair, replacement or operating capabilities of any portion of the Equipment until it has been restored to an acceptable initial condition at Customer's sole expense. Any services provided by SBTI in the course of such restoration will be separately charged, on a time and materials basis, and not included in fees paid hereunder. If individual items of Equipment cannot, in SBTI's sole determination, be properly repaired or replaced due to age, obsolescence, lack of availability of refrigerant gas, halon gas, necessary parts, materials, compatibility or otherwise, or as a result of excessive wear or deterioration, SBTI may, within ten (10) days of such inspection, give written notice that it is withdrawing such items from coverage under this TSP Agreement and adjust the amounts to be paid hereunder accordingly.

2.3 If the Proposed Solution provides for maintenance, any repairs and replacements of Equipment are limited to restoring the proper working condition of such Equipment. SBTI will not be obligated to provide replacement Equipment that represents significant capital improvement compared to the original. Exchanged components become the property of SBTI, except Hazardous Materials, which will under all circumstances remain the property and responsibility of Customer.

### Article 3: Charges, Fees and Invoices

3.1 Payments to be made under this TSP Agreement will provide for, and be in consideration of, only Services specifically included under the Proposed Solution. All other Services, including but not limited to the following, shall be separately billed or surcharged on a time and materials basis: (a) emergency Services performed at Customer's request, if inspection does not reveal any deficiency covered by this TSP Agreement; (b) Services performed other than during SBTI's normal working hours; and (c) Service performed on equipment not covered by this TSP Agreement.

3.2 Invoices are due upon receipt or otherwise as may be set forth therein. If any payment is not received when due, SBTI may deem Customer to be in breach hereof and may enforce any remedies available to it hereunder or at law, including without limitation suspension or termination of Services and acceleration of payments. Any amount not paid within sixty (60) days of the date due shall accrue interest from the date due, until paid, at the rate of ten percent (10%) per annum. In the event of a dispute by Customer regarding any portion or all of an invoiced amount, the undisputed portion shall be paid when due, and interest on the disputed, unpaid portion shall accrue as aforesaid, from the date due until the date of payment, to the extent that such amounts are finally determined to be payable to SBTI.

3.3 Customer is responsible for paying any present or future sales, use, occupancy, excise or other federal, provincial, or local tax due or owing as a result of this TSP Agreement.

### Article 4: Allocation of Risk

4.1 (a) Until one year from either the date hereof or the date the Equipment is installed, whichever first occurs, all equipment manufactured by SBTI or bearing its nameplate will be free from defects in material and workmanship arising from normal use and service.

(b) Labor for all Services under this TSP Agreement is warranted for 90 days after the work is performed.

(c) Equipment will not fail to function because of errors in processing, providing or receiving date or time data involving dates between January 1, 1999 and March 31, 2001, provided other products and software, including the computer workstation, with which the system interacts properly exchange date and time data with the system.

4.2 (a) The limited warranties set forth in Section 4.1 will be void as to, and shall not apply to, any Equipment (i) repaired, altered or improperly installed by any person other than SBTI or its authorized representative; (ii) subjected to unreasonable or improper use or storage, used beyond rated conditions, operated other than per SBTI's or the manufacturer's instructions, or otherwise subjected to improper maintenance, negligence or accident; (iii) damaged because of any use of the Equipment after Customer has, or should have, knowledge of any defect in the Equipment; or (iv) not manufactured, fabricated and assembled by SBTI or not bearing SBTI's

nameplate. However, SBTI assigns to Customer, without recourse, any and all assignable warranties available from any manufacturer, supplier, or subcontractor of such Equipment.

(b) Any claim under the limited warranty granted above must be made in writing to SBTI within thirty (30) days after discovery of the claimed defect, or with respect only to the warranty set forth in Subsection 4.1(c) prior to April 1, 2001, unless discovered directly by SBTI. Such limited warranty only extends to Customer and not to any subsequent owner of the Equipment. Customer's sole and exclusive remedy for any Equipment or Services not conforming with this limited warranty is limited to, at SBTI's option, (i) repair or replacement of defective components of covered Equipment, or (ii) reperformance of the defective portion of the Services, or (ii) to the extent previously paid, the issuance of a credit or refund for the original purchase price of such defective component or potion of the Equipment or Services.

(c) SBTI shall not be required to repair or replace more than the component(s) of the Equipment actually found to be defective. SBTI's warranty liability shall not exceed the purchase price of such item. Repaired or replaced Equipment will be warranted hereunder only for the remaining portion of the original warranty period.

4.3 THE EXPRESS LIMITED WARRANTIES PROVIDED ABOVE ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, STATUTORY, EXPRESS, OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXPRESSLY DISCLAIMED. SBTI MAKES NO WARRANTY, EXPRESS OR IMPLIED, THAT ANY EQUIPMENT PROVIDED HEREUNDER WILL PREVENT ANY LOSS, OR WILL IN ALL CASES PROVIDE THE PROTECTION FOR WHICH IT IS INSTALLED OR INTENDED. THE LIMITED EXPRESS WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS TSP AGREEMENT MAY ONLY BE MODIFIED OR SUPPLEMENTED IN A WRITING SIGNED BY A DULY AUTHORIZED CORPORATE OFFICER OF SBTI.

4.4 SBTI will indemnify Customer from and against losses, claims, expenses and damages (including reasonable attorney's fees) for personal injury or physical damage to property, but not loss of use of the property resulting from such damage or from damage to any work performed hereunder. Such indemnification shall be solely to the extent caused by or arising directly from SBTI's or its employees', consultants' or agents' negligent acts or omissions or willful misconduct in connection with its performance of Services hereunder. SBTI's obligations under this indemnity provision shall not extend to claims, losses, expenses and damages arising out of or in any way attributable to the negligence of Customer or its agents, consultants or employees other than SBTI. SBTI's liability to Customer or any third party under this Section 4.5 or otherwise under the TSP Agreement is expressly limited to, and SBTI shall not be liable other than for the direct losses, claims, expenses and damages arising as aforesaid. SBTI shall in no event be responsible under this TSP Agreement for incidental, consequential, punitive, exemplary or special damages, including without limitation lost profits and/or lost business opportunities, whether arising in warranty, late or non-delivery of any Equipment or Services, tort, contract or strict liability, and regardless of whether SBTI has been advised of the possibility of such damages. SBTI reserves the right to control the defense and settlement of any claim for which SBTI has an obligation to indemnify hereunder. The parties acknowledge that the price for which SBTI has agreed to perform its Services and obligations under this TSP Agreement has been calculated based upon the foregoing limitations of liability, and that SBTI has expressly relied on, and would not have entered into this TSP Agreement but for, such limitations of liability.

**Article 5: Environmental**

5.1 Except as disclosed pursuant to Section 5.3, Customer represents that there is no asbestos or any other hazardous or toxic materials, as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the regulations promulgated thereunder, and other applicable federal, state or local law ("Hazardous Materials"), present at Customer's locations where Services are performed. SBTI will notify Customer immediately if it discovers or suspects the presence of any Hazardous Material. All Services have been priced and agreed to by SBTI in reliance on Customer's representations as set forth in this Section 5.1 The presence of Hazardous Materials constitutes a change in the Proposed Solution equivalent to a change order whose terms must be agreed to by SBTI before its obligations hereunder will continue.

5.2 Customer shall be solely responsible for testing, abating, encapsulating, removing, remedying or neutralizing such Hazardous Materials, and for the costs thereof. Even if an appropriate change order has been entered into pursuant to Section 5.1 above, SBTI will continue to have the right to stop providing Services until the job site is free from Hazardous Materials. In such event, SBTI will receive an equitable extension of time to complete its Services, and compensation for delays caused by Hazardous Materials remediation.

5.3 Customer warrants that, prior to the execution of the TSP Agreement, it has notified SBTI in writing of any and all Hazardous Materials present, potentially present or likely to become present at Customer's locations and has provided a copy of any jobsite safety policies, including but not limited to lock-out and tag procedures, laboratory procedures, chemical hygiene plan, material safety data sheets, and other items covered or required to be disclosed or maintained by federal, state, or local laws, regulations or ordinances.

5.4 Customer hereby indemnifies and holds harmless SBTI from and against any damages, losses, costs, liabilities or expenses arising from Customer's breach of, or failure to perform its obligations under, Sections 5.1, 5.2 or 5.3 above.

**Article 6: Customer Responsibilities**

6.1 Customer will operate and maintain all Equipment in accordance with applicable manufacturer's specifications, including those set forth in the manufacturer's operating manuals or instructions, as well as all requirements of applicable law or of authorities having jurisdiction. Such Equipment shall be operated only in the specified operating environment, which shall be supplied by Customer, including without limitation: (a) suitable electrical service, including clean, stable, properly conditioned power, to all Equipment; (b) telephone lines, capacity and connectivity as required by such Equipment; and (c) heat, light, air conditioning or other environmental controls, and other utilities in accordance with the specifications for the Equipment. Failure to so operate the Equipment will terminate immediately any maintenance obligations SBTI may have hereunder.

6.2 Customer will promptly notify SBTI of any unusual operating conditions, system malfunctions or building changes that may affect the Equipment or any Services.

6.3 Customer will provide SBTI with reasonable means of access to the Equipment and shall make any necessary provisions to reach the Equipment and peripheral devices. Customer will be solely responsible for any removal, replacement or refinishing of the building structure or finishes that may be required to gain access to such Equipment.

6.4 Customer shall properly dispose of all ballasts, mercury bulb thermostats, used oil, contaminated filters, contaminated absorbents, refrigerant and any other Hazardous Materials that at any time are present at Customer's premises, in accordance with all applicable federal, state, and local laws, regulations, and ordinances. At no time and under no circumstances will SBTI be responsible for any such removal or disposal and Customer hereby indemnifies and holds SBTI harmless from and against any liability or claim arising therefrom.

6.5 Customer will, if applicable, provide and pay for a dedicated voice grade dial-up phone line and install a terminal block in a mutually agreed upon location. All on-line service Equipment (not including the phone line) will remain the property of SBTI unless otherwise stated herein.

**Article 7: Limitations of Maintenance or Service Obligations**

7.1 SBTI will not be responsible for the maintenance, repair or replacement of, or Services necessitated by reason of: (a) non-maintainable, non-replaceable, or obsolete parts of the Equipment, including but not limited to ductwork, shell and tubes, heat exchangers, coils, unit cabinets, casings, refractory material, electrical wiring, water and pneumatic piping, structural supports, cooling tower fill, slats and basins, etc. unless otherwise specifically stated herein; or (b) negligence, abuse, misuse, improper or inadequate repairs or modifications, improper operation, lack of operator maintenance or skill, failure to comply with manufacturer's operating and environmental requirements, Acts of God, or other reasons beyond its control. SBTI assumes no responsibility for any service performed on any Equipment other than by SBTI or its agents.

7.2 SBTI shall not be responsible for loss, delay, injury or damage that may be caused by circumstances beyond its control, including but not restricted to acts or omissions by Customer or its employees or agents, Acts of God, war, civil commotion, acts of government, fire, theft, corrosion, flood, water damage, lightning, freeze-ups, strikes, lockouts, differences with workmen, riots, explosions, quarantine restrictions, delays in transportation, or shortage of vehicles, fuel, labor or materials.

7.3 SBTI is not responsible for repairs, replacements or services to Equipment due to corrosion, erosion, improper or inadequate water treatment by others, electrolytic action, chemical action or other reasons beyond its reasonable control.

7.4 SBTI shall not be responsible for the removal or reinstallation of replacement valves, dampers, waterflow and tamper switches required from pipes and duct work including any venting or draining systems.

**SIEMENS**

## Section 5: List of Maintained Equipment

| Qty. | Equipment | Manufacturer | Serial/Model #/Size |
|---|---|---|---|
| 1 | Diesel Generator | Cummings | 50kw |
| 1 | Backflow Preventer | | |
| 1 | Exhaust Fan | Century | 5hp |
| 2 | Exhaust Fan | Exhausto | |
| 2 | Circ. Pumps | Reliance | 5hp |
| 1 | Pacomonitor System | Paco | |
| 5 | Unit Heaters | Trane | ¼ hp |
| 2 | Fan Coil Units | Trane | (Lobby) |
| 6 | Boilers | AO Smith | |
| 1 | Air Compressor | JCI | 1 hp |
| 1 | Air Dryer | JCI | |
| 1 | Gas Furnace | Reznor | |
| 3 | Boiler Circ. Pumps | Reliance | ½ hp |
| 1 | AHU Supply Fan | Century | 100 hp |
| 2 | Chiller Pumps | Reliance | 25 hp |
| 1 | Return Fan | Century | 25 hp |
| 1 | Centravac Chiller | Trane | 200 ton |
| 1 | Glycol Cooler | Chandler | 1 hp |
| 1 | Glycol Cooler | Trane | 1 hp |
| 1 | Computer Room A/C | EDPAC | 7.5 ton |
| 1 | Computer Room A/C | Trane | 7.5 ton |
| 2 | Humidifiers | | |
| 1 | Boiler Rm Vent Fan | | |
| 1 | Water Filter (AC) | | |
| | Pneumatic Controls | Various | |
| 1 | MEC Field Panel | Siemens | 2.3 |
| 12 | Filters 20x25x2 Pleated | | |
| 12 | Filters 16x25x2 Pleated | | |
| 42 | Filters 20x20x2 Pleated | | |