Page 1

1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
2
3
    LAWRENCE H. GROVE, et al.,      )
4                                   )
              Plaintiffs,           )
5                                   )
    vs.                             )
6                                   )
    UNOCAL CORPORATION,             )
7                                   )
              Defendant.            )
8   _____)
    Case No. A 04-0096 CV   (JKS)
9

10  _____

             VIDEOTAPED DEPOSITION OF TOM SCANLON
11  _____
12
                     Pages 1 - 220
13                Friday, April 14, 2006
                       9:16 a.m.
14
            Taken by Counsel for Plaintiffs
15                        at
    The Offices of Department of Labor & Workforce
16                    Development
             3301 Eagle Street, Suite 209
17              Anchorage, Alaska
18
19
20                                      Exhibit  10
21                                      page  1  of  30
22
23
24
25

Page 38

1  this yourself?
2     A  Correct.
3     Q  And then is that your handwriting on the
4  top?
5     A  Correct. With your name, Linda's name,
6  Leslie's name. You know, just to help me.
7     Q  And is there specific reason this
8  information was culled out of the file as opposed
9  to other information?
10    A  No. Just something that I thought --
11 again, I was not sure if we were going to be able
12 to bring, you know, refer to the files or
13 anything. It' just who did I talk to, the dates.
14    Q  Now, we are going to mark as exhibits
15 actual copies of the files that were received by
16 OSHA previously, because they have number stamps
17 on them and I've marked as Exhibit No. 6, is that,
18 Leslie --
19       THE REPORTER: Yes.
20    Q  -- the files we received at the end of
21 January of 2006 from OSHA, and they have already
22 been Bates stamped with an LG symbol -- that's for
23 Larry Grove -- and numbers. And Ms. Johnson has a
24 copy, I have a copy and you'll have a copy of the
25 exhibit. And it will be easier to go through

Page 39

1  those so that we can then know we're on the same
2  page.
3     A  This is what we're talking about, right?
4     Q  Right. That will be Exhibit 6. And
5  I'll also ask you about Exhibit 5 in a minute.
6        But before we even get to that, when we
7  looked through the file before, just a
8  housekeeping thing, we noticed that in Exhibit 3,
9  which is the Unocal file, there was one document
10 that apparently we couldn't locate in what's our
11 own OSHA records that we've received and we're
12 going to mark that as Exhibit 3A. And that is --
13 and that's a document -- it says, Citation Record
14 Update, U.S. Department of Labor. And it says,
15 Received 5/16/03 and it says DM -- I can't tell if
16 that's DM -- is that DMK, Donna Kurka?
17    A  Where?
18    Q  At the top right-hand corner.
19    A  To me, it's illegible.
20    Q  But this is one document that we
21 apparently didn't have in our records, but it
22 looks like in going through, but we'll check it
23 again, that the rest of Exhibit 3 we already
24 possess. And this is one where it's entered
25 5/30/03, reduced by 30 percent. And were you

Page 40

1  familiar with this reduction of the penalty?
2     A  No. Again, once we hand the file in,
3  unless we get called into the informal, and I
4  wasn't at this time, we don't see the file again
5  necessarily unless we happen to go back to review
6  it for whatever reason. Usually it's because we
7  have had a similar case in four, five, six months
8  and we want to take a look at it.
9        We don't get involved from the abatement
10 issues or anything. That's all handled by either
11 Mr. Stallone and/or the administrative staff.
12 Quite frankly, I've never seen that copy of that
13 before that I know of. I mean, again, we deal
14 with a lot of paper, but...
15    Q  I want to go back to Deposition Exhibit
16 4, and in that one you listed names of
17 individuals. Well, you said, "3/02/06, Siemens
18 and inspection." When you say inspection, would
19 that be the inspection of the platform?
20    A  We went to Siemens' office on the
21 morning of the 2nd, yes.
22    Q  And after you went to Siemens, did you
23 then go to the Unocal --
24    A  We proceeded to Unocal at my request.
25 We did a very brief opening and wanted to go --

Page 41

1  one of our protocols, if you will, is to obviously
2  try to get to any location as soon as possible in
3  the event that it doesn't get changed.
4     Q  And in your notes here, these
5  individuals, are these individuals that you
6  yourself talked to? Roxanne Sinz, Ken Burns, Paul
7  Crapps?
8     A  The majority of them, yes. The only
9  one --
10    Q  You have Exhibit 4 there. That's the
11 same document I'm looking at.
12    A  Okay. I can't remember if I, in fact,
13 did talk to Charles Arnett, which was -- he was
14 retired. I believe he was living in Soldotna, and
15 I know I called him three or four times and did
16 not get a phone call and somebody said he was
17 either in Florida or Hawaii for a period of time.
18 So I quite frankly -- the reason why I was trying
19 to call Mr. Arnett was somebody had made the
20 comment, and I believe it was Mr. Cook, that the
21 platform had probably been there since the '70s.
22    Q  What's make you believe it was Mr. Cook
23 that said that? Do you have a specific
24 recollection that it was Mr. Cook?
25    A  No, not a specific, but if I was

Page 42

1  betting, I think it was Mr. Cook that said it was
2  probably -- that the platform had probably been
3  there since the '70s.
4     Q  Did the names of these individuals --
5  did you get them for the most part off of your
6  safety narrative?
7     A  I just took them off the -- yes.
8     Q  It says -- further down you said, "After
9  the accident on September 9th, 2002 Unocal
10 management directed that the platform be put back
11 up."
12    A  Yes.
13    Q  Is that in your -- in the records?
14    A  I believe that is in the records.
15    Q  And do you have a recollection of Unocal
16 management telling you that?
17    A  Yes.
18    Q  And do you recall who at Unocal told
19 you?
20    A  I don't remember that. Again, it was
21 a -- you have to understand the situation.
22 Ms. Sinz -- is that how you pronounce Roxanne's
23 name -- had just been given the building
24 maintenance responsibilities, I believe, eight,
25 nine, ten days before that. It wasn't a full two

Page 43

1  weeks I know.
2     Q  Further on -- one other thing I want to
3  mention in here. You said, "Platform had been in
4  place for years, probably back to the '70s." And
5  we talked about that before. What is the
6  significance to you if it had been in place for
7  years, if any?
8     A  Well, obviously we're looking at what --
9  OSHA as the multi-employer citation policy, which
10 you consider the controlling employer, the
11 creating employer, you know, et cetera, and so
12 we're looking at who created the hazard.
13       Larry, did you bring your copy of that
14 multi-employer --
15    Q  Well, if it's in here, we'll be going
16 through this --
17    A  I doubt if it's in there.
18    Q  Well, we'll talk about that. That's
19 something we want to discuss soon.
20       Further on it says, "Unocal did not
21 conduct safety meetings nor any safety
22 inspections." Did you pull that out of --
23    A  A letter from Roxanne Sinz.
24    Q  And did you -- does that have any
25 significance to you?

Page 44

1     A  Yes, it would, I guess, if I was look --
2  if I'm looking for causal factors or looking for
3  contributing factors.
4     Q  Well, how did -- did you happen -- why
5  would she have told you this, to the best of your
6  personal knowledge? Did you ask her?
7     A  Because I asked for that. I had asked
8  her for a laundry list, if you will, and she
9  responded into a memo and saying, we didn't do
10 this. We -- is that the letter?
11    Q  Yeah. Why don't -- I want to show you
12 what's been marked as Deposition Exhibit -- is it
13 6? And can you take a look at that? Does that
14 appear to be a copy of the OSHA records -- OSHA
15 records that we've received that were in your
16 files?
17    A  Where is it in the file here?
18    Q  Well, it would be LG00757.
19    A  LG what?
20    Q  00757. See the numbers?
21    A  I got it. 757. Right back here. Yes.
22    Q  Is this the --
23    A  That's what I took that from.
24    Q  I'm curious as to the area that -- why
25 there's certain spaces that are lined out where --

Page 45

1     A  I didn't do that.
2     Q  Was this -- was this --
3     A  Well, where is the --
4        MR. MCKINSTRY: Why don't you look in
5  the file.
6        THE WITNESS: Yeah, look at the
7  original.
8     Q  (By Mr. Cohn) Take a look in the
9  original. I've seen it as like a red line through
10 it in the original. Why don't you take a minute
11 to find that in there.
12    A  Right there. I don't remember
13 specifically. My guess is I put a -- identified
14 that as just thinking, why didn't they have safety
15 meetings.
16    Q  Now, you've indicated when you worked as
17 a manager, you would have safety meetings when you
18 worked for BP?
19    A  For the oil companies, usually they --
20 and also Arco and also at ConocoPhillips.
21    Q  And then the third sentence where it
22 says -- it's been blanked out where it says,
23 "Safety meeting minutes from Anchorage office from
24 past year: no minutes provided. All safety
25 meetings (with minutes) occur for offshore

Page 46

1 facilities only." That's the area that's crossed
2 out; is that correct?
3     A   Correct.
4     Q   And then the next sentence --
5     A   It's not crossed out. I think it was a
6 matter of -- it was my idea of highlighting.
7     Q   Oh, highlighting. Okay. And then --
8 okay, that clarifies it because I wasn't sure what
9 that was.
10    A   No, it's not crossed out. I didn't have
11 the Magic Marker and I just...
12    Q   And it says, "As a result of this,
13 quarterly safety meetings (see attached sample
14 agenda) will be implemented for Anchorage office."
15        Is that something that you requested
16 that they do?
17    A   No. We don't ask them -- OSHA does not
18 ask employers to do things. You don't have to
19 have a safety meeting. There is no requirement
20 for them to do a safety meeting.
21    Q   Okay. But they indicated that they
22 would implement that. And another -- after that
23 it says, "200 and 300 logs for past 3 years:
24 provided." What are 200 and 300 logs?
25    A   Occupational illness, summary of

Page 47

1 work-related injuries and illness.
2     Q   And then the next one which you have
3 highlighted -- I guess we would call it
4 highlighted as opposed to crossed out. "Periodic
5 safety inspections, colon, nothing provided. A
6 system for the Anchorage office will be
7 implemented."
8         So, from your notes on Deposition
9 Exhibit 4, Unocal did not conduct safety meetings
10 nor any safety inspections; is that where you got
11 that information from?
12    A   Correct.
13    Q   And then the next one is, "Siemens
14 contract: most current provided. The earliest
15 contract we have with them is dated July, 1994."
16        Did you get -- do you recall getting the
17 Siemens contract?
18    A   Yes. One of the things that we do as
19 matter of course and we're directed to under our
20 legal aspects for us is to ask for the contract,
21 and they white out any confidential financial
22 information, et cetera.
23    Q   And did you get this information, do you
24 recall, from Unocal or from Siemens?
25    A   I don't remember, to be honest.

Page 48

1     Q   Now, going a little out of order in
2 which I originally intended, but I want to read to
3 you something. We took the deposition of Archie
4 Cook.
5     A   Okay.
6     Q   Who was the human resources manager at
7 the time.
8     A   Right.
9     Q   And on page 32 of his deposition I asked
10 him:
11        Question: Were there periodic safety
12 inspections -- and before I finished the question,
13 he answers, Yes.
14        Question: -- of the building from the
15 time that you arrived in 1999 through 2002?
16 Answer: Yes.
17        What did these periodic safety
18 inspections entail? Answer: Involved one of our
19 safety technicians going around the office looking
20 for safety hazards.
21        So this information that Mr. Cook
22 indicated in his deposition is that different than
23 the information that was provided to you?
24    A   Yes. This is from Ms. Sinz. Remember,
25 he was in charge for, I believe, three-and-a-half

Page 49

1 years before. Roxanne had just taken over. And
2 he was very busy. I did not -- I talked to him
3 just very briefly. He was -- I think they were in
4 the middle of union negotiations or something, so
5 I did not have -- he did not have a lot of time to
6 discuss with me.
7     Q   Right. But Roxanne Sinz had just taken
8 over a few days earlier; was that your
9 understanding?
10    A   Within two weeks.
11    Q   So, was it your understanding when she
12 told you that there were no safety meetings nor
13 any safety inspections that she was just talking
14 about the two weeks since she took over?
15    A   I wouldn't know. I would think -- I
16 guess I would have assumed that she would have
17 checked with somebody else.
18    Q   And further on in Mr. Cook's deposition
19 at page 33 I asked: Did you observe the safety
20 inspection at all? His answer is: I didn't
21 observe the inspection. I saw the report.
22        Question: You saw the report? Answer:
23 Yes.
24        Question: Can you tell me how detailed
25 the report would be? Answer: I mean, it was

Page 50

1  basically telling us what things were hazardous or
2  potentially hazardous and potentially needed
3  fixing.
4         Now, you didn't see any of these
5  reports, did you?
6     A   No. Right there, none. At the time I
7  was there we met with Roxanne and Ken Burns, which
8  was a safety specialist, but his primary focus
9  it's my understanding was not in the office; it
10 was for the drilling rigs.
11    Q   When Roxanne -- when you would meet with
12 Roxanne Sinz, was that with Ken Burns?
13    A   Yes, the majority of the time. One time
14 I went back because, again, the lighting was
15 terrible in there. So I called her. I said,
16 look, I need to try to get a better picture. So I
17 went back. Ken was -- showed up, but he was busy,
18 so she said, I'll take him up.
19    Q   Well, when you asked Roxanne Sinz about
20 the safety meetings or safety reports, was
21 Mr. Burns present, to the best of your
22 recollection?
23    A   I don't remember.
24    Q   Because in Mr. Cook's deposition further
25 on, on page 35 he goes: And do you recall the

Page 51

1  name -- I asked: Do you recall the name of the
2  safety technician that would have done this
3  report? His answer is: I think Ken Burns did at
4  least one of them.
5         Now, Ken Burns, did he tell you that he
6  had done periodic safety inspections of the
7  building?
8     A   I don't remember.
9     Q   If he had told you that, would you have
10 put that in your report?
11    A   I'm not sure. It would just depend on
12 if I thought it was relevant at the time.
13    Q   Well, if he had told you --
14    A   I guess I was -- from my previous
15 background, I assumed that they had safety
16 meetings and safety inspections and that I was
17 just asking -- I asked Roxanne just for the notes,
18 et cetera. I was surprised when this came back.
19 And my guess is I don't think I met with Mr. Burns
20 after I saw this. I don't know if I did or not.
21    Q   To the best of your recollection, nobody
22 informed you that they had done periodic safety
23 inspections --
24    A   No.
25    Q   -- of the building? Because -- and --

Page 52

1     A   It could have been -- he could have said
2  that. I just --
3     Q   Well, if he had told you that, would you
4  most likely have gotten -- asked for a copy of the
5  safety report?
6     A   Not necessarily. Well, I did ask.
7  Safety meetings -- usually they're included when
8  you ask for safety meetings.
9     Q   And then the last thing I'm going to say
10 is that Mr. Cook on page 35, 36 of his deposition
11 states in regard to these periodic safety reports
12 by the safety techs: Well, I can tell you what we
13 wanted from the report was an indication of any
14 violations of standards or an indication of any
15 hazards, actual or potential. That's what we
16 would expect from a report.
17        He also indicated on page 35: It's an
18 expectation rather than knowledge that he did
19 check every nook and cranny within the office.
20    A   Who's "he"?
21    Q   The safety tech. When he said the
22 safety tech would do a report. That time he
23 didn't specifically say Ken Burns, but he did say
24 in his understanding Ken Burns had done some.
25        Well, the reason I want to get to this: You

Page 53

1  yourself indicated you had safety techs like when
2  you were manager of the camps over at British
3  Petroleum.
4     A   Right, but there's -- now, you've got to
5  understand. Let's make a distinction here.
6  There's no -- historically, when you're in the
7  field, either on a platform or in Prudhoe, it's a
8  heck of a lot different than working in an office
9  here. I mean, let's just --
10    Q   Right, right. But I'm just making the
11 point that they said they had no safety records
12 and this appears to be contradictory.
13    A   That's what Roxanne had. In fairness to
14 her, she had just taken over. I would have
15 thought she would have asked somebody else, but,
16 again, my perception was that her predecessor
17 was -- I walked over to his office and his desk
18 was buried and I believe -- and you might want to
19 verify this -- that they were under union
20 negotiations at the time. So he did not have a
21 lot of free time for me and was apologetic and we
22 went from there.
23    Q   Okay. Because that's something that I
24 still have not seen myself, is these safety
25 reports.

**Page 54**

1   Okay. Let's go to Exhibit No. 6, which
2   is the -- they're basically the documents, many of
3   the documents that were pulled out of Exhibit No.
4   3, but what they have is a Bates stamp number so
5   it's easier for us to track. I wanted to ask you
6   about a couple of questions. On LG 686 --
7      A   686.
8      Q   Actually, let's go past that. I wanted
9   to go to some other area. At some point did there
10  come a time when you did -- did somebody do a
11  check to see who -- I want to show you LG730, and
12  take a look at that in Exhibit -- they're in
13  sequence, number sequence. 730.
14     A   730, okay.
15     MR. MCKINSTRY: Can you identify that
16  for me?
17     MR. COHN: Oh, okay. It looks like it's
18  a report to find out a company -- actually, I'll
19  show it to you right here.
20     THE WITNESS: It's our history report,
21  Larry.
22     Q   (By Mr. Cohn) It says on top, "This
23  report requested for Tom Scanlon."
24     Did you make a request for that
25  document?

**Page 55**

1      A   Yes. This is out of our database, out
2   of our -- we have an internal system called NCR.
3      Q   And why would you ask for this document?
4      A   We always do because part of fines
5   depend on their history. They can -- if they
6   haven't been cited in the previous ten -- three
7   years, they get ten percent reduction in a fine.
8      Q   And at the bottom of the page there
9   looks like there's something violation data?
10     A   Right.
11     Q   Was that a different matter? It says,
12  Date, 12/31/1899. That doesn't seem to be right,
13  does it?
14     A   Now, where?
15     Q   On the bottom of that document.
16     A   It says, Related Activity.
17     Q   You said you were looking for other
18  violations --
19     A   Right.
20     Q   -- in the last ten years. What does
21  that convey to you? I don't know what that means.
22     A   Probably that I'm a poor typist.
23     Q   Well, does it indicate another incident?
24     A   Yes. It probably -- but there's no --
25  right, okay. Basically, what this is is my

**Page 56**

1   inspection. If you look up here. This is my
2   number and I had just typed in the wrong number.
3   But they had -- it automatically generated. That
4   was all.
5      MR. MCKINSTRY: I'm confused. We're
6   talking about the statement down below? The 1989?
7   The violation down there?
8      THE WITNESS: 1899, but that was
9   1910 0023 C 1, which we --
10     MR. MCKINSTRY: Do you know what that
11  is?
12     THE WITNESS: That's the work platform,
13  unguarded platform.
14     Q   (By Mr. Cohn) So that's this incident,
15  then?
16     A   My guess is yes.
17     Q   Looks like there's some data on there,
18  an inspection number.
19     A   Right, above here.
20     Q   Yeah, that's the citation number.
21     A   Right. Well, let's just -- it will take
22  a second to verify it. 577. 577, yes. That was
23  just an erroneous date.
24     Q   And it says, "Inspection type,
25  unprogrammed related." What does that mean?

**Page 57**

1      A   Right. Because we have a series of
2   classifications and because I went and did the
3   inspection on Siemens, this was a result of that.
4   That we decided -- and it's in the narrative --
5   that after looking at it we went back and notified
6   Unocal that they were considered the creating
7   employer.
8      Q   What does "creating employer" mean?
9      A   It would probably make life a lot easier
10  if I just went and got a copy of the
11  multi-employer citation policy to let you read
12  that. It means -- I'll make it short for you --
13  that they were the ones that created it.
14     Q   By "created it" are they the ones
15  that -- are you saying that built it?
16     A   Yes.
17     Q   Did Unocal management tell you they
18  built it?
19     A   I believe so. If you read the file, it
20  says -- not being rude, but it said, after Larry
21  fell, Unocal management directed that the platform
22  be put back up.
23     Q   Well, what about before Larry fell? I
24  mean --
25     A   Again, the comment was, it's probably

Page 58

1  been there since the '70s.
2    Q  And the scope was "partial." What does
3  partial mean?
4    A  That we only focus on the accident. If
5  we go in to do an inspection, I could spend two
6  days there. For accidents, for formal complaints,
7  we are told to just focus on the complaint items,
8  otherwise we could be there for several days.
9    Q  Well, if you don't just focus -- so, in
10 other words, you don't look at any other part of
11 the building or --
12   A  No. If we see something, if we walk by
13 something, yes, we are obligated to bring that up.
14 But we're not going to go say, hey, let's go look
15 at your electrical room, let's look at your
16 panels, et cetera. And that is our protocol.
17   Q  And it says, "Entry date, 3/6/03"?
18   A  Because, remember, I did the Siemens
19 first on the 2nd and 3rd and then when I came
20 back -- and, again, I was relatively new. The
21 person that was the assistant chief at the time
22 said, oh, we talked about it, he said two things.
23 A, you need to go back and cite -- open with
24 Siemens -- or, I mean, with Unocal because they
25 could be the controlling or creating employer and,

Page 59

1  too, he said, it's a work platform versus a
2  scaffold.
3    Q  And who was that that told you that?
4    A  Tom Bernicke.
5    Q  Tom?
6    A  Bernicke.
7    Q  So was Tom Bernicke supervising your
8  work and checking what you did?
9    A  At that time. Again, after Tom Stewart
10 left, John stepped up as acting chief. Then there
11 was several people that rotated out of John's job,
12 as I guess -- I don't remember what it is
13 technically -- but it was assistant chief
14 overseeing the day-to-day directions of the CHSOs.
15   Q  Do you know how his name is spelled?
16   A  No. He's long gone.
17   Q  Long gone, you mean left the agency?
18   A  Left the agency, left the state.
19   Q  Do you know if Mr. Stallone reviewed any
20 of -- would he review of them?
21   A  I don't know.
22   Q  Okay. The next page, which is 731, is a
23 Case Audit Report?
24   A  Yes.
25   Q  Is that contained -- is this a document

Page 60

1  you yourself prepared?
2    A  It's -- we simply -- it's part of our
3  federal, what they call database. And it looks
4  like -- same number, 577.
5    Q  Okay. If we go back to 730 for a
6  second, there's one thing else I wanted to ask
7  before.
8    A  Okay.
9    Q  It says, This Report Requested for Tom
10 Scanlon, Company History For, and then it lists
11 four different names; Unocal Alaska Incorporated.
12 Unocal 76 Incorporated, Unocal Alaska Resources
13 Incorporated and Unocal. Why are there four
14 different names on there?
15   A  Normally there is, because people change
16 names, so we go through -- and that's why you also
17 see the little asterisk, because then that
18 broadens the scope of the computer's search.
19   Q  I see. So you search -- the computer
20 searches all four of those names?
21   A  Correct.
22   Q  And how would you know these four names
23 to input into there? Did you get some information
24 that these are the different names?
25   A  Obviously, from either Mr. Burns,

Page 61

1  Ms. Sinz at the time. I don't remember, I mean.
2    Q  So, was it mainly -- were you dealing
3  mainly with Roxanne Sinz and Ken Burns in this
4  investigation of Unocal?
5    A  Of Unocal, yes. Not necessarily with
6  Siemens.
7    Q  Right. No, that's why I specifically
8  mentioned it for -- I know that there were other
9  people for Siemens.
10   A  Right.
11   Q  Was it -- let's see. So, do you recall
12 what day it was you actually went in and inspected
13 the platform?
14   A  The first -- well, I was there several
15 times because of the light issue. I believe the
16 first time was the 2nd of March.
17   Q  And do you recall -- were you there --
18 when you went, was Lee Zhao with you each time you
19 went and visited Unocal?
20   A  I believe so.
21   Q  And when you questioned or talked with
22 people, would Lee be with you?
23   A  Not necessarily. You know, obviously
24 one of the problems we have when you're
25 interviewing people, you want -- you don't want to

Page 62

1  intimidate them. This is why historically we do
2  not send -- like to send two or three different
3  officers to the same location, because it gives a
4  perception of overbearing or -- my guess is the
5  majority of the people I interviewed, I normally
6  would not do it in front of Lee unless I asked
7  them to. I just don't remember. I could have
8  said, hey, he's here -- we introduce him as a CHSO
9  in training and I easily could have said, look, if
10 you don't mind, could he listen into this so he
11 can hear how we conduct an interview.
12     Q  Let's go to LG749 in Exhibit 6, and I
13 believe it's also -- might be -- I'm not sure if
14 it's a document that was --
15     A  Okay.
16     Q  It's also part of Deposition Exhibit 5,
17 the first page of Deposition Exhibit 5 is this
18 same document. And on the top it's called Safety
19 Narrative. Is this something that you typed up?
20     A  Correct. And, again, this is part of
21 the NCR system, which is a federal computer
22 program that we generate the 1's, 1A's, which is
23 this report here and it start right there. That's
24 the 1. Then it goes 1A. That includes a
25 narrative and then all the backup information.

Page 63

1      Q  Now, would that -- when you typed up
2  this -- the date on the top says, Wednesday,
3  April 9th, 2003, 8:29 a.m. Is that the date that
4  you input it into the computer?
5      A  Of course. Yes.
6      Q  So that's a little over a month after
7  your inspection. Would you be doing this by
8  memory, or would you have notes?
9      A  Well, quite frankly, I probably did
10 this -- normally how I do the narrative -- and not
11 all of the CHSOs do this. When we come back, we
12 have to generate the inspection number right away.
13        Two, because of -- the system is
14 archaic, at best, normally we will go over and do
15 it on -- a narrative on Microsoft Word. And
16 once -- as you want to get as much information
17 down as you can if you don't have field notes.
18 And then when that gets final, you know, when you
19 get ready to write the report, you can -- you
20 transfer it over.
21     Q  So, are you saying if you didn't do
22 field notes, you would have put this on the
23 computer shortly after the inspection?
24     A  Yes, I would think so.
25     Q  Would you have the computer with you,

Page 64

1  like --
2      A  No. We do -- we just got laptops,
3  but...
4      Q  Okay. I wanted to go through the Safety
5  Narrative report.
6      A  Sure.
7      Q  Specifically, the second paragraph where
8  it says -- well, on the top it says, Employer
9  Unocal 76 Inc. Did you determine Unocal 76 Inc.
10 was the owner of the building?
11     A  I'm sure that's what Roxanne Sinz told
12 me to use. I got that from either the meeting
13 with Roxanne or Ken Burns. I might even -- I
14 don't know what their business card says. I would
15 assume I just took it off their business card.
16     Q  Now, in the Safety Narrative, LG749 as
17 part of Exhibit 6 and the first page of Deposition
18 Exhibit 5 and also, I believe, contained within
19 Deposition Exhibit 3, it says, "On Monday,
20 March 2nd, 2003 Mr. Lee Zhao, CHSO trainee" --
21 what does CHSO stand for?
22     A  Compliance health and safety officer.
23     Q  -- "and I conducted an opening
24 conference with Siemens management. After a brief
25 opening conference, we proceeded to the Unocal

Page 65

1  building to begin the inspection. At the Unocal
2  building we met Roxanne Sinz and Mr. Ken Burns and
3  explained the purpose of our visit."
4         Did you already know who Roxanne Sinz
5  and Ken Burns was at the time you went over?
6      A  No, I did not.
7      Q  And did they --
8      A  Well, I think the Siemens people
9  probably referenced their name. I don't know
10 that.
11     Q  Okay. And then it says, "Ms. Sinz and
12 Mr. Burns accompanied us to the work site in
13 question."
14        Do you recall where the work site in
15 question was in the building?
16     A  It was the room -- it went upstairs from
17 her office and, again, I don't remember what floor
18 she was on.
19     Q  Do you recall if you had to take the
20 elevator up and then walk a flight of stairs or --
21     A  I believe we took the elevator up. I
22 don't remember.
23     Q  You've had hundreds of -- I understand,
24 hundreds of investigations. Well, we'll show you
25 some more specific photos of what happened there

Page 66

1  later. You said, "Began inspection, photographed
2  the work site and completed the inspection."
3       And we do have some photos and we'll
4  show you those soon.
5     A   Okay.
6     Q   Do you recall -- do you recall
7  inspecting that site based on your review of the
8  records and your personal recollection right now?
9  Do you recall the platform itself?
10    A   Briefly. At the time it was a board and
11 we had the dimensions at one time. We even had
12 pictures of Lee taking the pictures of us and was
13 supposedly recording them. But, yes, it was
14 basically boards. And the second board was -- and
15 I got this from Lee's recollection -- was down on
16 the floor.
17    Q   So that there might have been two boards
18 that were side by side?
19    A   Might have been. Again, I don't
20 remember that. Lee remembers that.
21    Q   Do you recall if the boards were
22 attached or just loosely placed on top?
23    A   They were loose.
24    Q   Is that a violation to have the boards
25 just loosely attached?

Page 67

1     A   Not necessarily. They need to be
2  secure, I mean, but...
3     Q   Do you have any recollection of whether
4  that was the same as it existed at the time of
5  Mr. Grove's accident on September 9th, 2002?
6     A   How would I know that?
7     Q   Well, did you ask?
8     A   It was discussed and they said, well, we
9  told them to put it back up.
10    Q   Well, to you, "put it back up," would
11 that in your mind mean it's the original platform
12 put back the way it was?
13       MS. JOHNSON: Objection; speculation.
14    A   Yes, it's speculation. But, yes.
15    Q   (By Mr. Cohn) Well, if --
16    A   My assumption, it's nothing but an
17 assumption, but my assumption, speculation, would
18 be that they put it back. If the guy is told to
19 put it back up, it's put back, you know. The
20 board had fallen and they said, hey, fix it and
21 they put the -- I assume, unless the board was
22 damaged, they put the same board back up.
23    Q   Did you inspect the brackets that the --
24 the board -- that was fixed to the wall?
25    A   Yes, we did. But, again, they were new

Page 68

1  brackets. I mean, the other one had broken.
2     Q   Well, okay. Well, we'll go over the
3  photos, but did you assume that all the brackets
4  were new?
5     A   I don't remember.
6     Q   Because, well, I'll show you some
7  pictures later that was taken by Mr. Grove after
8  the accident. Not all the brackets fell, but one
9  side collapsed.
10    A   Right, one side.
11    Q   So, is it your understanding -- well,
12 you wouldn't -- so nobody told you that this was a
13 completely new platform?
14    A   No, to the best of my recollection.
15    Q   And to the best of your recollection,
16 you were told that it was put back up right after
17 the accident?
18    A   Yes, I think it's somewhere in the
19 narrative that Unocal management directed and I
20 believe it probably was to the building
21 maintenance technician that replaced Mr. Grove.
22    Q   I want to show you what's been -- what
23 is -- was produced by the defendant in the initial
24 disclosures and this is DEF 00027. This says,
25 "Notes concerning visit by State of Alaska OSHA

Page 69

1  inspector as compiled by Ken Burns, Drilling
2  Safety Advisor."
3        Have you ever seen this document before?
4     A   No.
5        MR. MCKINSTRY: Did you want to mark
6  that?
7        MR. COHN: I hadn't -- well, we can mark
8  it as an exhibit. Why don't we mark it as Exhibit
9  No. 7.
10       (Exhibit 7 marked.)
11    Q   Can you review that document, because
12 this kind of parallels the narrative of yours, to
13 see whether or not you agree or disagree with
14 what's in here that you would have personal
15 knowledge of. It says March 3rd, '03. Now, I
16 don't know if that's the correct date. It said,
17 Monday. That's the date that's written on top of
18 these notes. It says, "State OSHA inspectors Tom
19 Scanlon and Lee Zhao (trainee) came to the
20 reception desk asking for Siemens. OSHA was
21 advised that Siemens was not at this building.
22 Both inspectors departed."
23       Is that correct, as far as your
24 recollection?
25    A   It seems, yes, but that was very vague.

Page 70

1  I don't -- yes, I believe that was the case.
2     Q  Now, the next sentence says, "After
3  lunch, Paul Crapps received a call from Tom Lake,
4  Siemens supervisor, that State OSHA was at their
5  office investigating a complaint from one of their
6  employees regarding conditions, paren,
7  scaffolding, unparen, here at Unocal. Lake
8  further advised that OSHA was on their way to
9  Unocal, period."
10        I don't know if you -- were you there
11  when Mr. Lake made the call?
12    A  (Witness shakes head.)
13    Q  So you don't have any personal knowledge
14  of who -- that Mr. Lake called or who he called?
15    A  No, I don't.
16    Q  But were you aware that -- had you told
17  Siemens to call Unocal that you were coming over
18  to the Unocal building?
19    A  No, we would not have done that.
20    Q  And then the next one is, "I received"
21  -- I, since these are notes by Ken Burns, assume
22  Ken Burns -- "received a call from Roxane" -- who
23  I assume is Sinz -- "that she wanted my assistance
24  upon the arrival of OSHA."
25        That I think you would have personal

Page 71

1  knowledge of, other than that you did meet with
2  Roxanne Sinz and Ken Burns were the people that
3  met you when you came in?
4     A  Correct.
5     Q  When did you first meet Paul Crapps? Do
6  you recall?
7     A  I don't remember.
8     Q  Because it says, "At approximately 1440
9  hours I was notified by Paul Crapps that State
10  OSHA was at the reception desk to conduct a
11  complaint inspection. Paul further explained
12  several months ago a Siemens employee fell and
13  hurt himself while working in the penthouse."
14        So, do you recall if there was some --
15  did you go first to the reception desk when you
16  came into the building?
17    A  Yes, we always do. We have to go in and
18  identify ourselves and present our credentials.
19    Q  And do you recall if you met an
20  individual named Paul Crapps at the desk?
21    A  My recollection is probably I met Paul
22  at some point in time.
23    Q  And then-
24    A  I actually -- I believe he just
25  coincidentally happened to be walking in the area

Page 72

1  and the receptionist said, oh, here's, you know.
2     Q  And it said, "I responded to the front
3  desk, paren, reception, unparen, and was met by
4  Paul Crapps, comma, Tom Scanlon and Lee Zhao from
5  State OSHA and Tom Lake, comma, Siemens
6  supervisor, period."
7         Do you recall if Mr. Lake accompanied
8  you to the Unocal building?
9     A  I believe so.
10    Q  And, "Tom Scanlon presented credentials
11  and business card and explained that he was here
12  to conduct a complaint inspection. He introduced
13  Lee Zhao as a trainee."
14        Do you recall both introducing yourself
15  and identifying Mr. Zhao?
16    A  Not specifically, but that's our
17  protocol.
18    Q  And it says, "Tom Scanlon presented the
19  complaint form from a confidential source."
20    A  Right. Again, that's our protocol. We
21  just don't arbitrarily walk through the door.
22    Q  Had you notified Siemens who the
23  individual was, though, because I think the
24  complaint form didn't indicate that you were to
25  keep it secret from Siemens?

Page 73

1     A  Right. I don't think I did at the time
2  because I probably -- 95 percent of the people
3  that do complaints want it confidential, and I
4  think I probably made an assumption that he wanted
5  it confidential. I don't remember.
6     Q  And then it says, "The complaint alleged
7  Unocal had improper scaffold erected in the
8  penthouse."
9         Is that your understanding of the
10  complaint?
11    A  Well, I don't -- rather than
12  speculation, let's just go back to the complaint.
13  I mean, Paul's handwritten complaint.
14        MR. MCKINSTRY: You mean the Siemens?
15    A  I mean the Siemens. It referenced a
16  home-made scaffold, but I don't think -- using
17  home-made, nonapproved scaffolding, misspelled,
18  cross-support fastener sheared, I believe -- when
19  stepped on causing ankle injury. Employee is
20  currently on working comp from injury, et cetera.
21  I don't believe that he referenced that it was
22  Unocal or Siemens.
23    Q  (By Mr. Cohn) And then it says, "I
24  escorted OSHA and others previously mentioned to
25  Roxanne's office."

### Page 74

1      "I" being Ken. Do you recall Ken Burns
2  escorting you to Roxanne Sinz's office?
3      A   Yes.
4      Q   And then it says --
5      A   I remember, yes, he came down, met us.
6      Q   And then it says, "Together we discussed
7  the complaint."
8          So, would that mean you discussed the
9  complaint with Roxanne and Ken Burns at that time?
10     A   Right.
11     Q   And then said, "Scanlon stated he wanted
12 to view the location listed on the complaint and
13 take some photographs of the scaffolding. I asked
14 Tom if he was going to conduct an opening
15 conference and he replied he had some papers, but
16 he would do an opening conference later."
17         Is that your recollection?
18     A   Right, because we weren't sure how it
19 was going to play out. I mean, it doesn't
20 necessarily mean that you're going to do an
21 opening with everybody. The complaint was with
22 Siemens.
23     Q   And then it says, "Tom Scanlon, Lee
24 Zhao, Tom Lake, Paul Crapps and I went to the
25 penthouse and allowed the inspectors to view the

### Page 75

1  area of the complaint."
2          So, do you recall going -- being
3  accompanied by Lee Zhao, Tom Lake, Paul Crapps and
4  Ken Burns up to the penthouse to view the filter
5  room where the scaffold erected?
6      A   I believe so. I mean, there was nothing
7  significant about it. I know we all walked up
8  and --
9      Q   It says, "Paul had to shut the air
10 conditioner down because of the noise and wind
11 velocity in the filter chamber."
12     A   Right.
13     Q   Then it says, "Tom Scanlon and trainee
14 Lee Zhao entered the chamber and proceeded to take
15 photographs and measurements."
16         Do you recall that?
17     A   Of course.
18     Q   Did anyone else go into the chamber with
19 you?
20     A   Right. I think Ken was there, Roxanne
21 was there, Tom Lake was there, Paul Crapps was
22 there. Remember, when you say "there," we all
23 didn't get in at the same time. I mean, a number
24 of people would wait outside.
25     Q   Right.

### Page 76

1      A   Because if I remember correctly, it's
2  fairly narrow.
3      Q   And it said -- previously we talked
4  about it off the record, but can you describe the
5  lighting in the room?
6      A   The lighting was extremely poor. To my
7  recollection, we had to take two or three -- Lee
8  and I both carry flashlights, but I think even
9  Roxanne had Paul get another one, trying to get
10 our cameras to take a picture.
11     Q   And how many cameras did you have -- did
12 you use?
13     A   I don't remember. I had mine. And I --
14 to my recollection, I think I asked Lee to try to
15 take some.
16     Q   Do you recall if anyone else took any
17 pictures at that time?
18     A   I thought Ken Burns took some. But,
19 again, that's just recollection. I mean, that's
20 just -- I couldn't say that with any finality.
21     Q   I think at this point, because we're
22 talking about what you took photos of, that I
23 should probably mark the next exhibit and go
24 through the photographs. That would be the most
25 logical sequence. What I want to mark -- what's

### Page 77

1  the next number in order now, Leslie?
2          THE REPORTER: 8.
3      Q   (By Mr. Cohn) We'll break it up into 8A
4  and 8B. 8A should be LG782 to LG847. And then
5  8 --
6      A   Do I have that or --
7      Q   I'm going to give you -- you'll get a
8  copy that she's going to mark -- that Leslie's
9  going to mark, the court reporter. And then LG848
10 will begin Exhibit 8B. There's two separate
11 packets, one at the end of '04 and another one in
12 January '05, though the second packet, which is
13 8B is just duplications of black-and-whites of
14 photos that were already shown in Exhibit 8A.
15         So I'm going to hand this to the court
16 reporter now to mark. And why don't we take a
17 two-minute break while that's happening because
18 we've going for about an hour.
19         THE VIDEOGRAPHER: Going off record.
20 The time is 11:00.
21         (Break taken.)
22         (Exhibits 8A and 8B marked.)
23         THE VIDEOGRAPHER: Back on the record.
24 The time is 11:09.
25     Q   (By Mr. Cohn) Good morning again,

Page 90

1  Q  Did you check to see if there were any
2  bolts on the floor in the room or look at the
3  floor of the room itself to see if there was any
4  debris in there in the filter room?
5  A  Extremely dark.
6  Q  Extremely dark?
7  A  Actually, I did take a flashlight to
8  look, but I don't remember seeing anything.
9  Q  Let's see if there's anything else.
10 A  Because I also believe that Mr. Grove
11 told me when I wrote up the -- his complaint that
12 he thought there was still stuff left that had
13 shredded that was on the floor. If it had been
14 there, I would have picked it up and/or referenced
15 it, I believe.
16 Q  I mean, did you look for it -- for
17 debris on the floor?
18 A  Yes, I did take a flashlight.
19 Q  Okay. I want to go back now to Exhibit
20 6, which is your -- and your Safety Narrative
21 report, which is LG749. And I'll take those.
22 A  Okay. So now we're going back to -- I'm
23 sorry, what's the number again?
24 Q  LG749. You're looking at the wrong
25 packet. It's Exhibit 6.

Page 91

1  A  I'm getting confused then. This is 6
2  here. Where do these go?
3  Q  Well, these go at the back of Exhibit
4  8A -- 8B, actually. Maybe you could put a
5  bracket -- put a bracket so it doesn't fall apart.
6  A  Okay. Number again, please?
7  Q  LG749. And we were talking about
8  this -- going through the Safety Narrative, and we
9  talked about Sinz and Burns accompanying you to
10 the work site. And in it you said you began the
11 inspection, photographed the work site and
12 completed the inspection.
13     Does that appear to be the photographs
14 that we were looking at? Not the most -- the
15 ones -- this report I said Larry Grove took, but
16 the previous set of photos when you and Lee Zhao
17 were there.
18 A  Uh-huh.
19 Q  Then it says, in the next paragraph --
20 can you read the next one which starts on
21 March 5th.
22 A  Okay. "On March 5th OSHA made the
23 following decisions: The work site was to be
24 considered a multi-employer location. Unocal
25 Alaska was the creating employer for this

Page 92

1  complaint. And the structure in question was a
2  work platform and not a scaffold."
3  Q  Was this decision -- we talked about
4  this previously. Was this decision made by you or
5  made by Mr. --
6  A  Bernicke.
7  Q  -- Bernicke?
8  A  Right.
9  Q  And did he make the decision after
10 consulting with you?
11 A  Well, I showed him and we discussed it
12 with, I believe, Mr. Zhao. And I believe he
13 called Mr. Cavanaugh, which is the federal
14 construction manager at Service Area 10 in
15 Seattle. I know he got some direction that it was
16 a work platform versus a scaffold, and he conveyed
17 that to me and I had not known about the multi --
18 Q  Was there any significance to you about
19 it being a work platform and not a scaffold?
20 A  No, except if it was a scaffold, then
21 you have to have a competent person that oversaw
22 it, the construction or the building of it, but,
23 no.
24 Q  And it said it was to be considered a
25 multi-employer location.

Page 93

1  A  Correct.
2  Q  And what does that mean?
3  A  I would like to defer that question
4  until I can get the -- it's just easier if I get
5  you the multi-employer citation policy. It's four
6  or five pages. I can get it. Somebody in my
7  office will have a copy.
8  Q  Well, when we take a break later, we'll
9  get a copy of that and make that an --
10 A  But it breaks it down to if there's
11 four -- you can designate on any job site four
12 different employers; creating, controlling,
13 exposing, i.e., Siemens.
14 Q  Okay. Well, was there a decision made
15 that Unocal was the creating employer?
16 A  Mr. Bernicke directed me to call, you
17 know, if I was doing it today, it would probably
18 be they were the creating and the controlling.
19 And I refer back to the reference from the
20 previous building maintenance person, the HR guy,
21 that he remembered authorizing overtime for their
22 building maintenance tech to allow Siemens in and
23 somebody -- it was either -- it might have been
24 Paul Crapps -- said that he remembers handing new
25 filters up to somebody.

24 (Pages 90 to 93)

Page 94

1  Q  Now, this platform that you've seen the
2  photos, that you've inspected, would you have
3  considered it a hazardous work platform?
4  A  I'm not going to speculate.
5  Q  Well, there were citations issued for
6  violation of --
7  A  Well, it was hazardous because they did
8  not have any fall protection. From that
9  standpoint, yes. I guess I thought you were
10 talking about the structural integrity.
11 Q  Well -- well, the point I'm getting at
12 is if -- you know, you said, you know, you've
13 managed places and you've had safety techs.
14 A  Right.
15 Q  Safety techs go and do a hazard
16 assessment. If a safety tech -- a
17 properly-trained safety tech does a hazard
18 assessment, should this have been -- would this be
19 considered a hazardous platform?
20 A  In all likelihood, yes. There was no --
21 now, somebody -- and you've got to back up and
22 take all the factors into consideration. I don't
23 know if they required them to use some type of
24 other fall protection, i.e., body harnesses. If
25 that's the -- it still wasn't going to be a great

Page 95

1  one, but if he was using some other type of fall
2  protection, i.e., body harness and lanyard --
3  Q  Well, where would the body harness, from
4  your examination, be attached to?
5  A  The anchor point?
6  Q  Yes.
7  A  Oh, it easily could have -- usually what
8  they're done in this type of situation, they
9  anchor it up in the ceiling.
10 Q  Did anybody point out or tell you that
11 there was any anchor point or --
12 A  No.
13 Q  -- or any fall protection used?
14 A  None, to my recollection.
15 Q  It says -- the next sentence, the
16 paragraph on your Safety Narrative on 749 talks
17 about, "I conducted an opening conference with
18 Roxanne Sinz."
19 A  Right.
20 Q  And we talked about this before, that
21 she had just been assigned the responsibility. It
22 says, "has the responsibility for Unocal office
23 building maintenance. She had just been assigned
24 this responsibility the previous week. Discussed
25 all the items on the pre-inspection checklist and

Page 96

1  inspection guide lists."
2      When they say the pre-inspection
3  checklist, what are we talking about there? Are
4  we talking about the documents on L50 and LG751?
5  A  It's on our written, and it should be in
6  there, the inspection form. We ask them
7  permission. We tell them about taking pictures.
8  We ask them if there's anything confidential.
9  There's eight or ten items. Rather than talking
10 about it, we should just look for it.
11 Q  Right. I think I see something --
12 A  Right there. Go to the page before.
13 That's the people who attended. Right there. You
14 go through this list and then this list
15 (indicating).
16 Q  Well, you were just looking at a
17 document that is LG714 and 715. That was a
18 checklist from the Siemens file.
19 A  I'm sorry. What was the number?
20 Q  LG714 and 715.
21 A  In Siemens, not in --
22 Q  Right, but it will still be in that same
23 packet of material.
24 A  Well, it should be -- it should be in
25 Unocal.

Page 97

1  Q  There should be a separate one in there
2  for Unocal --
3  A  Yeah, right here.
4  Q  -- with the same checklist. L60 on
5  the -- 760. And it's just a standard boilerplate
6  where you check that you showed them your
7  credentials and legal authority. If you have to,
8  you explain to them about the 1970 OSHA Act,
9  purpose of inspection, permission of the name for
10 whoever you have to ask permission to proceed.
11     We explain the camera and equipment. We
12 ask them to declare any trade secrets at this
13 time. We tell them that if somebody is pouring
14 gas out the back door, we're going to call EPA.
15 Just standard routine stuff.
16 Q  Okay. Can you take a look at -- well,
17 let's see. Let's continue on that same document,
18 LG749. It says you conducted an opening
19 conference with Roxanne Sinz.
20     What is the opening conference?
21 A  Just this. What we --
22 Q  Oh, the pre-inspection list.
23 A  Right -- well, we go through and get all
24 this type of information, name, address, mailing
25 address, parent corporation, private sector,

**Page 98**

1  public sector, legal entity. The type of, you
2  know, we ask them at that point for their 300
3  logs.
4      Q   And then it says you -- further on down
5  you talked about the logs and then further on you
6  said -- it looks like you went back to the
7  penthouse again.
8      A   Yes. Right, we did.
9      Q   It says, "Ms. Sinz and Mr. Crabbe" --
10 that's a misspelling; it's Paul Crapps --
11 "accompanied me to the rooftop mechanical room
12 (penthouse) to take additional pictures.
13 Interviewed Mr. Crabbe." I think his name is with
14 P's, but...
15         Do you recall taking additional pictures
16 when you went back?
17     A   I know we tried. Again, the lighting
18 was extremely poor and the cameras were not --
19 would not just take them with the naked --
20     Q   Right. And it says you interviewed
21 Mr. Crabbe (sic). Do you recall taking any notes
22 in your interview that you might have anywhere?
23     A   I might have. I don't remember doing
24 it. I don't think it was all that -- it was
25 pretty cut and dry.

**Page 99**

1      Q   And it says, "At this time I requested a
2  current copy of the Unocal Siemens service
3  contract."
4          Why did you do that?
5      A   That is protocol for us.
6      Q   And do you recall receiving a copy of
7  it?
8      A   Yes. I believe it was somewhere in
9  there.
10     Q   We'll look and see. Do you recall
11 seeing a copy of that in there?
12         I'm directing that to Ms. Johnson.
13         Okay. And then, it says --
14     A   Actually, I don't know if Roxanne could
15 find it. I remember maybe Tom Lake provided it,
16 because it -- I believe it stipulates that whoever
17 owns the building has to take care of certain
18 things. I don't remember. But I do know that
19 that was an issue.
20     Q   Actually, that's at the bottom of your
21 narrative, which I'll get to in a second. It says
22 the -- then it has a list of people that you --
23 are these individuals that are listed here, in
24 your best recollection, you interviewed or talked
25 to during your investigation, Brent Davies, Larry

**Page 100**

1  Groves, Dan Hartan --
2      A   Right, either the Siemens or these. I
3  mean, you don't go back and --
4      Q   -- Charles Arnett, Paul Crapps, Archie
5  Cook. And then it says, "The day after the
6  inspection Ms. Sinz directed Paul Crabbe to
7  dismantle the work platform and to remove a
8  stepladder that was used to access the platform."
9          What's the basis of that statement? How
10 do you have knowledge of that?
11     A   I don't remember, but supposition is
12 that Ms. Sinz told me. I think she called me and
13 told me.
14     Q   Yeah, I mean, we're just trying to find
15 out...
16     A   I don't remember.
17     Q   That's fine.
18     A   Roxanne called me a number of times
19 because she was so new to the situation and had
20 never done anything with OSHA, and she was just
21 letting me know that she was very proactive.
22     Q   Okay. And then the next sentence says,
23 "On September 9th, 2002 the work platform had
24 collapsed while a Siemens employee was standing on
25 it while replacing filters. Unocal management

**Page 101**

1  directed Paul Crabbe, Unocal building maintenance
2  technician, to replace the platform after it had
3  collapsed."
4          Is that where you get the statement that
5  you put into your notes that's in Deposition
6  Exhibit 4 where you say, "After the accident on
7  9/9/2002 Unocal management directed the platform
8  be put back up"?
9      A   Correct.
10     Q   And do you recall -- do you have any
11 recollection of Unocal management telling you that
12 that's what happened?
13     A   No. I believe that that came from
14 either Mr. Grove or Mr. Crabbe himself.
15     Q   But you don't know from who?
16     A   I don't know.
17     Q   Did you discuss this at all with Roxanne
18 Sinz?
19     A   I don't remember.
20     Q   Now, you said it might have come from
21 Larry Grove. But do you recall Larry Grove
22 working in the building after the accident?
23     A   Oh, I think Larry might have told me
24 that.
25     Q   Might have told you that they put it

26 (Pages 98 to 101)

Page 102

1  back up?
2  A  Right, that somebody had directed them
3  to do it. Not that he did it; I think he was
4  injured. To make it easy, I don't remember. I
5  mean, I just -- I don't have a recollection.
6  Q  Well, if Larry Grove had told you that,
7  would you try and confirm whether that actually
8  had happened by talking to the people that would
9  -- from the Unocal management?
10  A  I don't know. That's logical, but,
11  again, you've got to understand the situation -- I
12  go back to the situation. Roxanne was new to the
13  position. The preceding fellow was -- did not
14  have much time for me, so I guess it's not worth
15  it for me to speculate. I don't know.
16  Q  Well, I'm just -- all I'm doing is --
17  A  Right.
18  Q  You just tell me what you know.
19  A  Right.
20  Q  I mean, I'm just taking the statement
21  you put in your report. That's all I have. I
22  have nothing from any other source after three
23  years of litigation. Then the next paragraph we
24  have is, "The Siemens/Unocal service contract
25  dated May 31, 2000 stated in Article 6, Customer

Page 103

1  Responsibilities: Quote, Customer, paren, Unocal,
2  unparen, will be solely responsible for any
3  removal, comma, replacement, comma, or refinishing
4  of the building structure or finishes that may be
5  required to begin access to the equipment."
6  First of all, why would you put -- where
7  did you get that statement? Did you get that
8  statement from the contract or from some --
9  A  From the contract, the document.
10  Q  And did you -- did you consider that
11  significant? Is that -- was that why it's in your
12  Safety Narrative?
13  A  Yes. I mean, you go back to the
14  multi-employer work site and who is the
15  controlling, the creating, et cetera.
16  Q  I'm going to see if I have an extra copy
17  of the document. I want to show you what was
18  Exhibit 3 to the deposition of -- it's called a
19  30(b)(6) deposition of Siemens Technology where I
20  attempted to get their records. And this was --
21  it was a fellow named Doug Schutte that appeared
22  and he presented me with contract documents. And
23  one of the documents that he presented says,
24  Unocal Technical Support Program Proposal, which
25  was signed by Unocal, and it's got under Article

Page 104

1  6.3, if you can read what it says under 6.3 there.
2  And then --
3  A  6.3, "Customer will provide SBTI with
4  reasonable means of access to the equipment and
5  shall make any necessary provisions to reach the
6  equipment and peripheral devices. Customer will
7  be solely responsible for any removal, replacement
8  or refinishing of the building structure or
9  finishes that may be required to gain access to
10  such equipment."
11  Q  Does that appear to be the document --
12  or that last sentence is identical to the sentence
13  in your Safety Narrative.
14  A  Correct.
15  Q  Would that appear to be a document that
16  you might have gotten it out of?
17  A  Right.
18  Q  And what does that convey to you where
19  it says, "SBTI" -- I'll represent that is Siemens
20  Building Technology, Inc. --
21  A  Right.
22  Q  And when it says, "Customer," Unocal --
23  A  -- is the customer.
24  Q  It says, "Will provide reasonable means
25  of access to the equipment."

Page 105

1  What does that convey to you in terms of
2  responsibility for providing means to change the
3  filters in the filter room and who has the
4  responsibility under that provision?
5  MS. JOHNSON: Objection; foundation;
6  calls for legal conclusion. Go ahead.
7  A  Well, you could interpret that as saying
8  that the customer, Unocal, was to provide not only
9  access but any means to do that. Siemens, as a
10  matter of protocol and their procedure, does
11  provide ladders. And I believe there's somewhere
12  in the narrative is they used to carry their
13  ladder up. But, again, what floor were you at the
14  penthouse? I mean, you were at the seventh,
15  eighth, ninth floor? And they banged the walls
16  and they had to go back and repaint the walls. So
17  instead of bringing their ladders up, which they
18  carry on their trucks -- if you look at any of the
19  Siemens trucks, they do have extension ladders --
20  they decided to use what Unocal had provided.
21  Q  (By Mr. Cohn) Can we mark this
22  document, which is Exhibit 3 to the Schutte
23  deposition, as Exhibit 10 to this deposition?
24  (Exhibit 10 marked.)
25  Q  If we go to the next page, which is