

FILE COPY

LAW OFFICES
## PHILLIP PAUL WEIDNER AND ASSOCIATES
A PROFESSIONAL CORPORATION
330 L STREET, SUITE 200
ANCHORAGE, ALASKA 99501

E-Mail:
phillipweidner@weidner-justice.com

907/276-1200
FAX 907/278-6571

October 20, 2006

John Thorsness
Linda Johnson
Clapp Peterson Van Flien
Tiemessen & Thorsness, LLC
711 H St., Suite. 620
Anchorage, AK 99501-3454

*Via fax to 272-9586*
*& U.S. Mail*

Re:    Grove v. Unocal; Case No. A04-0096 CV (JKS)

Dear Counsel:

I have recently reviewed a number of discovery responses, and Defendant's Supplemental Responses to Plaintiffs' 14th Discovery Requests to Unocal Corporation refers to a document (101719-101720; enclosed) that is being produced in "redacted" form on the grounds of "proprietary objection." Proprietary objection is a vague and non-responsive answer. Please specify in more detail why a proprietary objection allegedly applies to information that appears highly relevant to the issues in this litigation.

Sincerely,

WEIDNER & ASSOCIATES, Inc.
*A Professional Corporation*

Michael Cohn
Attorney at Law

MC/ngb
Enclosures

Exhibit   7
page   1   of   6

10-20-06

John B. Thorsness, Esq.
Linda J. Johnson, Esq.
CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
711 H Street, Suite 620
Anchorage, Alaska  99501
(907) 272-9272
usdc-anch-ntc@cplawak.com
Attorneys for Defendant Unocal Alaska

RECEIVED

JUN  0 1 2006

WEIDNER & ASSOCIATES

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and MICHAEL
GROVE (DOB 1/21/88) by and through his
father LAWRENCE H. GROVE,

                    Plaintiffs,

          vs.

UNOCAL CORPORATION,

                    Defendant.

Case No. 3:04-cv-0096-TMB

## DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' 14th DISCOVERY REQUESTS TO UNOCAL CORPORATION

Defendant, Unocal Corporation, by and through its counsel of record, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, submits its supplemental response to Plaintiffs' Fourteenth Discovery Requests to Unocal Corporation Pursuant to Federal Rules of Civil Procedure 26 and 34, served April 13, 2006, as follows:

Defendant's Suppl Responses to Plaintiffs' 14th Discovery Requests
Grove v UNOCAL, 3:04-cv-0096-TMB
Page 1 of 2

Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

5-31-06

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO.31:** Please produce any and all management meetings records and corporate records, including minutes of said meetings, concerning Larry Grove, the work platform, safety in the building, the OSHA investigation.

### RESPONSE

Objection, vague, overbroad and burdensome. Objection to the extent it calls for the disclosure of attorney-client privilege and work product information, and proprietary information. Notwithstanding the above objections, produced herewith is a redacted copy of Unocal's Staff Meeting Agenda for March 4, 2003, identifying OSHA as a topic for discussion. This document is being produced in redacted form as defendant asserts a proprietary objection. (101719-101720).

DATED at Anchorage, Alaska, this 31 day of May, 2006.

CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
Attorneys for Defendant Unocal

By _____
Linda J. Johnson
Alaska Bar No. 8911070

Certificate of Service:

I certify that a copy of this document was mailed  X ,
faxed _____, hand delivered_____ on
May 31 , 2006, to the following:

Phillip P. Weidner Esq.
330 L Street, Suite 200
Anchorage AK 99501

By: _____

Defendant's Suppl Responses to Plaintiffs' 14th Discovery Requests
Grove v UNOCAL, 3:04-cv-0096-TMB
Page 2 of 2

Tiemessen & Thorsness, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
(907) 272-9272 fax (907) 272-9586

Staff Meeting
March 4, 2003

Notes and Action Items

# REDACTED

101719

# REDACTED

21.   OSHA – Building Inspection – Sinz
- Fix scaffholding by March 14
- Inspect Building and prioritize
- Work Permit System
- Tag out scaffholding

# REDACTED

101720

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2533 |
| CONNECTION TEL | 2729586 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 10/20 17:22 |
| USAGE T | 00'51 |
| PGS. SENT | 6 |
| RESULT | OK |

LAW OFFICES

PHILLIP PAUL WEIDNER AND ASSOCIATES

A PROFESSIONAL CORPORATION
330 L STREET, SUITE 200
ANCHORAGE, ALASKA 99501

907/276-1200
FAX 907/278-6571

E-Mail:
phillipweidner@weidner-justice.com

## TELECOPIER COVER LETTER

Please deliver the following pages to:

NAME: _John Thorness / Linda Johnson_

FIRM: _CLAPP PETERSON, et al._

FAX NO.: _272-9586_     TELEPHONE NO.: _____

* * * * * *

FROM: _Michael Cohn_

DATE: _10-20-06_     TIME: _5:20 p.m._

MATTER: _GROVE_

FILE NO.: _____

COMMENTS: _Please see attached letter with Enclosures._

WE ARE TRANSMITTING _6_ PAGES (including this cover page). If you do not receive all the pages, please contact _NIITA_ as soon as possible, at (907) 276-1200.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3    _____

 4    LAWRENCE H. GROVE, ET AL.,           )
                                           )
 5                Plaintiffs,              )
                                           )
 6       vs.                               )
                                           )
 7    UNOCAL CORPORATION,                  )
                                           )
 8                Defendant.               )
                                           )
 9    _____

10    Case No. A-04-0096 CV (JKS)

11

12

13    _____

14          TELEPHONIC DEPOSITION OF ARCHIE COOK
      _____
15

16

17                    March 15, 2006
                       7:30 a.m.
18

19              Taken by Counsel for Plaintiffs
                           at
20              330 L Street, Suite 200
                    Anchorage, Alaska
21

22

23

24

25
```

Exhibit 8
page 1 of 5

Page 24

1    answer. I'm sorry.
2        Q. Well, who would be the person that a contractor
3    would need to go to to get permission to do work?
4        A. For something like that, it would go to our
5    engineering department.
6        Q. The engineering department. And there was an
7    engineering department in the building?
8        A. Yes.
9        Q. Do you know who was in charge of the engineering
10   department?
11       A. Yes. Scott Hanson was his name. He wasn't all
12   the time, but he was for at least a couple of the years
13   he was the engineering manager. There was another one
14   before him, but I can't remember his name. I'm sorry.
15       Q. Why did you indicate that they would have to go
16   through the engineering department?
17       A. If we were going to be doing structural -- well,
18   if we were doing structural alterations to the building,
19   then we would have had to go through a procedure of
20   getting appropriate designs and quotes and all of that
21   kind of stuff.
22       I certainly would not be qualified to say whether
23   something was structurally sound or not. But generally
24   speaking, if we were employing contractors to do work,
25   then they would be qualified to do that kind of work.

Page 25

1        Q. Well, I understand you say "qualified." You mean
2    qualified to do that kind of work you mean erecting like
3    an elevated work platform?
4        A. Sure. I would expect, for example, if we were
5    employing painters, let's say, I would expect the
6    painters to bring along appropriate equipment with which
7    to access the workplace.
8        Q. Well, let me ask you this: If the painters would
9    have to bolt a platform to the wall, then that includes
10   screws or bolts into the wall, would they need to get
11   authorization or approval from Unocal?
12       MR. THORSNESS: Objection; foundation.
13       Q. If you have personal knowledge of it or if you
14   don't, who would have, do you know, who would have the
15   knowledge of that answer?
16       A. I don't. I'm sorry. Could you rephrase the
17   question?
18       Q. That's fair enough. You indicated that you would
19   assume or expect that the painters would bring what they
20   need to do their job.
21       A. Yes. I mean I would think. If we were -- I
22   know. I mean, if we were asking decorators, let's say,
23   to come into the building to do work, we would expect
24   them to bring their equipment with them.
25       If an electrician was coming in to do some

Page 26

1    wiring, we would expect that person to bring his
2    equipment with him.
3        Q. Did you have the opportunity to see the
4    contracts, let's say, between the electricians and
5    Unocal -- I mean to the contractors -- let me start
6    over.
7        For contractors that came into the Unocal
8    building to do work in the building, would the contracts
9    be something that you would get a copy of or review?
10       A. Yeah. I mean there was kind of a safety review,
11   I think, as I recall, where contractors had to provide
12   safety certificates. And let's see.
13       There was a procedure that we had to go through
14   indicating whether the work was giving a level of risk
15   for the worker that had to be carried out, and it went
16   past the safety department. And the contractors had to
17   provide certificates of insurance, so there was a
18   procedure for new contractors, yes.
19       Q. And I think earlier you indicated that the job
20   specifications would be -- there would be job
21   specifications for the contractors?
22       A. It would depend. Certainly, I mean if we were
23   bringing in a contract, let's say, petroleum engineer to
24   work on a prospect, then there would certainly be a
25   detailed job description. Certainly coming in to do

Page 27

1    painting and decorating, there wouldn't be, no.
2        Q. In terms of a contract, do you have personal
3    knowledge -- well, you have dealt with contracts, is
4    that correct, between -- you have seen contracts at
5    least between Unocal and contractors?
6        A. Yes.
7        Q. Would you expect that in the contract the
8    responsibility for providing certain equipment would be
9    laid out in the contract?
10       MR. THORSNESS: Objection; speculation and
11   lack of foundation.
12       Q. To the best of your personal knowledge?
13       MR. THORSNESS: Same.
14       Q. You may answer, if you can.
15       A. Well, I won't answer because of the objection.
16       Q. The objection doesn't mean that you don't answer.
17   It means he is preserving it for the record.
18       MR. THORSNESS: Archie, the objection is for
19   the record; however, you cannot be compelled to guess or
20   to speculate about something you don't know about, so if
21   you know the answer to the question, then, of course,
22   answer the question.
23       A. I would be speculating, but it would be an
24   informed guess. Then I won't speculate.
25       MR. THORSNESS: Okay. Because you cannot be

9 (Pages 24 to 27)

GROVE, ET AL. v. UNOCAL

Page 32

1    Q. That's shortly after you arrived?
2    A. Maybe -- I can't remember the exact time. It
3  seemed like maybe six months, six to nine months
4  possibly.
5    Q. Do you recall if there were any periodic safety
6  inspections of the building at 909 --
7    A. Yes, there were.
8    Q. I'm sorry. Just please let me finish the
9  question first.
10    A. Okay.
11    Q. I mean, I was almost done. Were there periodic
12  safety inspections --
13    A. Yes.
14    Q. -- of the building from the time that you arrived
15  in 1999 through 2002?
16    A. Yes.
17    Q. What did these periodic safety inspections
18  entail?
19    A. Involved one of our safety technicians going
20  around the office looking for safety hazards.
21    Q. Were you the person that oversaw or supervised
22  the safety technicians?
23    A. No. We had a health and safety and environment
24  manager.
25    Q. Who was the health and safety environment

Page 33

1  manager?
2    A. Well, that's a complicated question because it
3  changed.
4    Q. Well, I guess if there were several, to the best
5  of your recollection.
6    A. First of all, the environmental department was
7  the safety -- was a separate department. Anyway, I mean
8  it was a person called Harry Eaton who was in charge of
9  safety, health and environment.
10    Q. Was he there when you got to Unocal?
11    A. He was based in Kenai when I first got to Alaska.
12    Q. Do you recall if he worked in the building at 909
13  West Ninth at any time between '99 and when you left?
14    A. He had an office there, but I think his normal
15  place of work was the Kenai office.
16    Q. But to the best of your understanding, if safety
17  technicians did periodic checks in the building, that
18  would be under the authorization of the health and
19  safety environment manager?
20    A. Yes. The safety technicians were based in Kenai,
21  but at least on two occasions that I can recall, one of
22  them came to Anchorage, to the Anchorage office and did
23  a safety inspection.
24    Q. Did you observe the safety inspection at all?
25    A. I didn't observe the inspection. I saw the

Page 34

1  report.
2    Q. You saw the report?
3    A. Yes.
4    Q. And can you tell me how detailed the report would
5  be?
6    A. I mean it was basically telling us what things
7  were hazardous or potentially hazardous and potentially
8  needed fixing.
9    Q. Do you recall if that report encompassed the
10  entire building from -- I am not sure. Is there a
11  basement in the building?
12    A. Yes, there is.
13    Q. From the basement all the way to the top level of
14  the building?
15    A. Yes. Well, I'm sorry. I mean, I can't remember.
16    Q. That's okay if you can't remember completely.
17    A. I can't remember whether it covered -- the safety
18  inspection from a qualified inspector, that's about as
19  much as I can remember. Sorry.
20        I mean what he did was he focused on things that
21  we had to fix.
22    Q. Well, is it your understanding -- I mean to the
23  best of your personal knowledge, would that individual
24  go and check each room in the building?
25    A. Yes, to the best of my understanding.

Page 35

1        MR. THORSNESS: Objection; foundation and
2  speculation.
3    Q. That's okay. What is the basis of your
4  understanding? Can you tell me? Would it be from
5  review of the report?
6    A. Say it again, please.
7    Q. What would be the basis of your understanding
8  that the safety technician would check each of the rooms
9  in the building?
10    A. My understanding is that he was brought up to do
11  a safety inspection. I would expect him -- it's an
12  expectation rather than knowledge -- that he did check
13  every nook and cranny within the office.
14    Q. And do you know how frequently -- how many of
15  these inspections are you aware of occurring during your
16  period of time at the building?
17    A. I am aware of two, to the best of my
18  recollection.
19    Q. And do you recall the name of the safety
20  technician that would have done this report?
21    A. I think Ken Burns did at least one of them.
22    Q. Who is Ken Burns?
23    A. Ken Burns is a safety technician.
24    Q. And this safety report, do you recall --
25    A. Well, I can tell what we wanted from the report

11 (Pages 32 to 35)

Page 44

1  going. I'm going out tonight playing bridge, so I would
2  like to get this done.
3         MR. THORSNESS: Archie, that was my next
4  question, and so we'll continue. I just wanted to give
5  you a chance to take a potty break. You don't need one,
6  so let's continue. If you do need a break --
7         THE WITNESS: I will let you know.
8         MR. THORSNESS: Very good.
9  BY MR. COHN:
10     Q. Let me ask you, just to be sure, how soon do you
11  need to leave? I don't want to impinge upon your time.
12     A. I am not -- I am playing bridge at 7:00. I have
13  got plenty of time.
14     Q. If we take a break, it will be only a couple of
15  minutes. I don't mean by that question to try and find
16  out so that I can make sure that I use up every second
17  even if I don't need to.
18         Let me just go through a few names here. I have
19  seen in some discovery responses the name of
20  Mr. Congail. Are you familiar with him?
21     A. He was my predecessor, a wider responsibility
22  than I had because he was also responsible for the
23  chemical plant in Kenai, but he was my Unocal
24  predecessor.
25     Q. Did Mr. --

Page 45

1     A. Subsequently, I reported to him functionally. He
2  was based in Houston and I reported to him for human
3  resources issues.
4     Q. Did Mr. Congail, did he give you any orientation
5  when you replaced him in the job responsibilities as
6  human resources manager?
7     A. By telephone. He was based in Los Angeles at the
8  time. So when we spoke by telephone -- and there was
9  actually a contractor in place who showed me what he had
10  been doing. I can't remember his name. I'm sorry.
11     Q. So you mean a contractor at the building that
12  showed you --
13     A. There was a contractor who was filling the HR
14  role.
15     Q. Was there any sort of a written description of
16  what your job duties would be as the HR manager?
17     A. Yes, I had a job description. Yeah, I mean in
18  fact I was asked -- I was given it and asked to comment
19  and make suggestions for change. I don't still have it,
20  but, yes, I remember that.
21     Q. To make suggestions for change?
22     A. For the job description, whether I thought that
23  they were hitting the right priorities.
24     Q. Did you ever have any contact with Mr. Don Acres?
25     A. No. Well, hold on.

Page 46

1     Q. Let me just describe it.
2     A. Only socially.
3     Q. Because I am not sure -- he may have been --
4  because it indicates in response that he was a building
5  service manager during the eighties and nineties, but
6  that might be well before you came on.
7     A. Yeah, I have met him, but only socially. At
8  least I think I met him.
9     Q. Do you know an individual named Tim Brandenberg?
10     A. Yes.
11     Q. Who is Tim Brandenberg?
12     A. Who is he? Tim was a coordinator and then in the
13  office -- the reorganization of the business unit in the
14  first quarter of 2003, he became the logistics manager.
15  He would be responsible for purchasing, procurement for
16  the helicopter contract and for the contract with the
17  boats. And other duties I don't know about them.
18     Q. Contract with who?
19     A. With the vessels, the ships.
20     Q. Was he --
21     A. The supply vessels.
22     Q. Was he based in the building at 909 West Ninth
23  Avenue?
24     A. Yes.
25     Q. You said he was involved in purchasing. If there

Page 47

1  was any supplies or anything needed for the building --
2     A. No, there are different things. I mean, he would
3  be -- his main job would be for the procurement of heavy
4  equipment used in operations for the drilling program.
5         We had it set up, as I recall, so that
6  departmental secretaries could order in their own
7  stationery and stuff like that or blanket purchase
8  orders.
9         But you have an overall procurement manager. And
10  Tim Brandenberg got that job. I can't remember exactly
11  when, but in the first quarter of 2003.
12     Q. Well, in regard to procurement, let's say, for
13  the building at 909 West Ninth Avenue, and I'm talking
14  about not something like stationery, if you are
15  ordering, let's say, hypothetically if a work platform
16  was to be built in the building, would there be some
17  procurement --
18     A. The way that would work is that there would be a
19  purchase requisition from whoever wanted to initiate the
20  process, whoever wanted to buy something. There would
21  be a purchase requisition, and then that would be
22  translated into a purchase order.
23         Now, if it was office-based materials and I was
24  the manager responsible, then I would sign that -- I
25  would sign that purchase requisition, because I would

14 (Pages 44 to 47)

GROVE, ET AL. v. UNOCAL

ARCHIE COOK
3/15/2006

Page 48

1  have budgeted for maintenance costs.
2      Q.  So if that was like -- if it was considered under
3  maintenance, then that would be -- if it happened during
4  your time period, it would be -- you would be the one
5  that would sign off on it?
6      A.  I would sign the purchase order, yes.
7      Q.  And that's because that would be the
8  responsibility of the human resources manager?
9      A.  Yeah.  There were two budgets basically that I
10  was responsible for.  One was the human resources budget
11  that included things like training costs, training
12  software, that kind of thing, and the staff costs,
13  Unocal staff.
14      But then that was rolled into Rick's budget
15  because he had become the head of HR domestic.  He was
16  based in Houston, so I would send him my budget to be
17  approved down in Houston.
18      And then I had another budget, which was the
19  office budget, so we budgeted for ongoing maintenance,
20  for special projects, just anything connected with the
21  office.
22      Q.  And if there were like requisition, purchase
23  requisition forms and purchase orders, where would that
24  paperwork eventually be stored, if you know?
25      A.  Well, I mean, I think it would depend.  Let's say

Page 49

1  we were -- if it was something for the office and if it
2  was not something that was of a serious contract, if it
3  was a special thing, then I would have to sign the
4  purchase order that would go to the supplier.
5      Q.  But is there --
6      A.  And the copy order, I mean I could sign it, but I
7  tried to keep my paperwork to a minimum, and it would
8  have been kept within the office, within the maintenance
9  office by Charles Arnett actually.
10      MR. THORSNESS:  Excuse me, gentlemen.  I
11  object to this whole line of questioning based on lack
12  of foundation and calling for speculation with regard to
13  this specific work platform.  Thank you.
14      MR. COHN:  Well, John, I understand that the
15  platform was not constructed, or my understanding,
16  during Mr. Cook's tenure, so it is not obviously
17  specific to that.
18      I'm just trying to find out where records
19  would be kept for special projects.  We can find out
20  later if records are available for this platform.  This
21  is a discovery deposition.
22      Q.  So you said there is a maintenance office in the
23  building at 909 West Ninth?
24      A.  Yes, Charles Arnett.  He was the maintenance
25  coordinator and he maintained like the records, the

Page 50

1  maintenance records.  When maintenance work was
2  carried out, when maintenance work was required to be
3  carried out, that kind of thing, for which we had long
4  running contracts, so that was fairly routine.
5      But Charles, as a contractor, could not sign
6  documents on behalf of Unocal, so if it involved any
7  kind of expenditure, other than expenditure that was
8  already covered by contract, then I would have to sign
9  that.
10      Q.  Now, you indicated the maintenance records would
11  be kept in the maintenance office, but let's say after a
12  certain period of time, would records from the
13  maintenance office be, after a certain number of years
14  be moved into another archive?
15      A.  Certainly there was a central conglomerty of all
16  contracts.
17      Q.  Would that be within the building?
18      A.  Yes.
19      Q.  And would that be -- do you know how far back
20  this central repository would go in terms of records?
21      A.  I can tell you that it was fairly late in my time
22  there that we decided to do this.  The records at one
23  time had been kept down in various places, were kept
24  down in Kenai, they were in departments, they were in
25  Anchorage.

Page 51

1      And we hired a paralegal.  Well, I mean her job
2  had been a paralegal.  We hired someone to take
3  responsibility for centralizing all of our contracts.
4  So this was part of a fairly major reorganization of the
5  business unit.
6      Q.  So who made the decision to centralize all of
7  these contracts?
8      A.  A decision had been made to close the Kenai
9  office and we knew that they maintained contracts down
10  there, so that function was moved up to Anchorage, and
11  so they centralized in Anchorage.
12      Q.  Would the contracts -- if one was to look in the
13  archives, how could one find a specific contract?  How
14  were they indexed or cataloged, do you know?
15      A.  I don't know.
16      Q.  Do you know the name of the paralegal that did
17  this work of organizing the documents?  I know these
18  questions -- I mean, if you know.
19      A.  Tracy, as I recall.  Tracy somebody.  I'm sorry.
20  I can't remember her second name.
21      Q.  You think her first name was Tracy?
22      A.  I think so.
23      MR. COHN:  Can we just take a two-minute
24  break?  And I'm almost done, Mr. Cook.  Thank you for
25  your patience.

15 (Pages 48 to 51)

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA

2

3

   LAWRENCE H. GROVE, et al.,        )

4                                    )    RECEIVED
              Plaintiffs,            )

5                                    )    MAY 2 2 2006
   vs.                               )

6                                    WEIDNER & ASSOCIATES
   UNOCAL CORPORATION,               )

7                                    )
              Defendant.             )

8   _____)

   Case No. A 04-0096 CV (JKS)

9

10

11

12  _____

        VIDEOTAPED DEPOSITION OF KENNETH BURNS

13

14  _____

15

                    Pages 1 - 146

16               Tuesday, May 9, 2006
                      9:00 A.M.

17

18

                         at

19              WEIDNER & ASSOCIATES
              330 L Street, Suite 200

20               Anchorage, Alaska

21                                   Exhibit    9

22                                   page  1  of  2

23

24

25

GROVE v. UNOCAL

KENNETH BURNS
5/9/2006

Page 74

1  you whether we have copies of any safety meetings,
2  and again you said -- you indicate in the previous
3  message that I have the OSHA 200/300s. "I provide
4  the OSHA 200s/300s." What are those documents?
5      A.  OSHA 200/300 are logs of occupational
6  injuries and illnesses.
7      Q.  And in an earlier message on the bottom of
8  the page from Roxanne Sinz to you and to
9  Mr. Richardson, it says she was interviewed and he
10  requested safety meetings, safety inspections, and we
11  then -- and we need to show we've been proactive with
12  our safety program and please provide this --
13  actually, I probably should start the documents from
14  the bottom because the bottom is the first one, and
15  then your response is the middle one.
16      A.  That's correct.
17      Q.  In which you indicate you hope that Archie
18  has copies of the inspections but you have the
19  200/300s. So that's your response to her message at
20  the bottom.
21      MR. THORSNESS:  What's your question, Mike?
22      MR. COHN:  I went in -- I've got to start
23  at the bottom of the page. So let me start at the
24  bottom.
25      Q.  So at the bottom of the page she's asking

Page 75

1  you and other people about safety meetings, injury
2  and illness logs, the 200/300 logs and safety
3  inspections; is that correct?
4      A.  That's correct.
5      Q.  And then in the middle of the page you were
6  writing her back, saying, "The only safety meetings I
7  know were conducted in cooperation with Archie Cook
8  and that was several years ago. In regard to
9  inspections, I did two back in 1998/99 with copies to
10  Charles. I would hope Archie has copies as he was
11  the action person." What does action person mean?
12      A.  That he was responsible for the building.
13      Q.  And when you say that you have the injury
14  logs, and you also say, "Here is a copy of my
15  inspection," are you referring to the March 5th, 2003
16  inspection?
17      A.  Yes, that's correct.
18      Q.  It looks -- then there is page 35. Again
19  that's the -- it looks like the bottom is the message
20  from Roxanne Sinz we referred to where she's asking
21  for the information, and then the middle document is
22  the original message from Patty Bielawski to Karen M.
23  Crapps. Who is Karen M. Crapps?
24      A.  She is a data technician.
25      Q.  Do you have any idea why she would have

Page 76

1  been cross-copied with this document?
2      A.  Karen was responsible for retention of the
3  OSHA 200/300s. At this time it was OSHA 300s.
4  Sometime during this time the OSHA log went from a
5  200 to a 300. It went through some reorganization.
6  So that's why you see both. But it's in fact the
7  same document.
8      Q.  Some of these documents are repeated, it
9  looks like. DEF 85.
10      A.  Yes, sir.
11      Q.  It looks like they have here some plan,
12  evacuation of the building. Is that what --
13      A.  It looks like part of the incident command,
14  the emergency evacuation plan, yes.
15      Q.  It looks like that there was different --
16  did you have any responsibility for preparing these
17  plans at all?
18      A.  No.
19      MR. COHN:  Let's go off record a second.
20      THE VIDEOGRAPHER:  Going off record. The
21  time is 11:12.
22      (Off Record.)
23      (Exhibit 4 marked.)
24      THE VIDEOGRAPHER:  Back on the record. The
25  time is 11:13.

Page 77

1  BY MR. COHN:
2      Q.  Mr. Burns, showing you what's been marked
3  as Exhibit 4, and it's a document, the first page is
4  Plaintiffs' Rule 26 Fifth Supplemental Disclosures,
5  and these are records that were received from state
6  OSHA, and many of these records deal with the
7  investigation in regard to Unocal.
8      And I wanted to start off by looking at
9  739. It's -- all of them are Bates stamped LG for
10  Larry Grove, as opposed to DEF, the defendant. So
11  I'll just use the number 739.
12      A.  Okay. I have that.
13      Q.  Can you tell who the -- this is an
14  Affidavit of Abatement and Posting signed by Paul
15  Crapps. Can you tell who the notary public is at the
16  bottom?
17      A.  No, I cannot read that.
18      Q.  It's good to have a signature you can't
19  read.
20      MR. THORSNESS:  This is LG 739?
21      MR. COHN:  Yes.
22      MR. THORSNESS:  Thank you.
23  BY MR. COHN:
24      Q.  And in this, Mr. Crapps says, "On or about
25  March 8, 2003, the platform which is the subject

20 (Pages 74 to 77)

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ALASKA

3    _____

4    LAWRENCE H. GROVE, CYNTHIA GROVE,     )
     SARAH GROVE and MICHAEL GROVE (DOB    )
5    1/21/88) by and through his father    )
     LAWRENCE H. GROVE,                    )
6                                          )
              Plaintiffs,                  )
7                                          )
     vs.                                   )
8                                          )
     UNOCAL CORPORATION,                   )
9                                          )
              Defendants.                  )
10   _____)

11   Case No. A04-0096 CV (JKS)

12

13

14   _____

15       VIDEOTAPED DEPOSITION OF CHARLIE ARNETT

16   _____

17              Tuesday, April 26, 2006
                      9:30 a.m.

18

19          Taken by Counsel for Defendant
                        at
20   Clapp, Peterson, Van Flein, Tiemessen & Thorsness
                711 H Street, Suite 620
21                 Anchorage, Alaska

22
                                    Exhibit___10___
23                                  page__1__of_3
24

25

Page 112

1   A. Yes.
2   Q. When was that?
3   A. It was early the following year, about
4   springtime. That's about the best I can remember. And
5   I was only -- I wasn't actually in the building. I was
6   more like in the reception area.
7   Q. Why were you in the building?
8   A. Well, I went there once just to say hi to some
9   old friends, but no one was around, so I left. They
10  were all out to lunch.
11  Q. Do you recall ever talking to any inspectors from
12  OSHA?
13  A. Yes.
14  Q. Do you recall -- well, tell us what they asked
15  you and what you told them.
16  A. Well, again, this was a long time back.
17  Q. Based on the best of your personal recollection.
18  A. When I talked to them, I didn't talk to them
19  face-to-face. It would be a phone call. And he just
20  asked me background on the room, if I remember Larry, an
21  accident happening with Mr. Grove, and I said yes.
22      He asked me, you know, when the platform -- if I
23  knew about the platform, and, if so, when was it put in.
24  And, of course, I had no knowledge of it. I don't know
25  when it was put in.

Page 113

1       He was asking me who may have known, and I told
2   him, well, the people that I worked for as long as I
3   have been there have been Don Acres, Eddie Barrett,
4   Archie Cook, but prior to that, I don't know.
5   Q. What did you tell him about Don Acres, Eddie
6   Barrett and Archie Cook?
7   A. That Don Acres was the building manager at the
8   time, that he may know something about it.
9   Q. Now, even though you became a Peak employee, did
10  you take your direction from Unocal employees as to what
11  you would do in the building?
12  A. Yes.
13  Q. And when you talked about your time cards, they
14  would go through Archie Cook for him to review before
15  going back to you to be faxed to Peak?
16  A. Correct, because he would have to sign it.
17  Q. I am just going to go through this quickly
18  because there was some questioning here about your
19  records in terms of you indicated that as a building
20  maintenance tech one that your pay was higher, but you
21  were being directed to Exhibit No. 4, page 200614, in
22  which your pay as a building maintenance tech one was
23  the same as a building specialist.
24      And it appears that once you became a building
25  specialist, all the time for building maintenance tech

Page 114

1   was overtime.
2       And you indicated that your pay rate was higher
3   as a maintenance tech after you became a building
4   specialist. Do you recall that testimony?
5   A. Yes, but there are two titles in there for
6   building maintenance tech. One is maintenance tech one.
7   The other one is maintenance tech two.
8       I believe maintenance tech two involved wearing a
9   face mask; thus, that was a higher rate of pay.
10  Q. Well, it looks like they have building
11  maintenance tech one listed, but it looks like starting
12  on page 200616 where it lists building maintenance tech,
13  your pay rate does reflect 32 as opposed to 21.5. Do
14  you see that?
15  A. Yes.
16  Q. So at some point your pay scale went up when you
17  were doing building maintenance tech work; is that
18  correct?
19  A. Correct.
20  Q. Yeah. That was the only point I was going to
21  make in regard to that. Actually, now that we're on
22  Exhibit No. 4, there was some reference to safety
23  awards.
24  A. Right.
25  Q. Do you know if you were singled out for a safety

Page 115

1   award or whether or not this was given to all eligible
2   employees?
3   A. These were given to all Peak employees, because
4   the way I understood it, the company had gone a year
5   without any accidents.
6   Q. Now, in your job, were you a maintenance
7   coordinator at the Unocal building when you were on the
8   Peak payroll?
9   A. No. You mean reference to my job title?
10  Q. Right.
11  A. My job title changed two or three times. God, I
12  want to say -- again, this is my memory, but I want to
13  say I was originally hired as building maintenance one.
14      Maybe it was -- I thought it was building
15  maintenance tech one, building maintenance tech two, and
16  then I don't remember which one, but I thought two was
17  concerning the full face respirator. I may have that
18  backwards.
19      And then later when Eddie Barrett left, retired,
20  it took a while, but I finally got a pay raise because I
21  was taking over some of his duties. And that's when I
22  became building maintenance specialist, and that
23  increased the pay there, too.
24  Q. Now, in terms of the building, if you, let's say,
25  put a new chair in your office, could you just go out

31 (Pages 112 to 115)

GROVE v. UNOCAL

CHARLIE ARNETT
4/25/2006

Page 116

1 and get a new chair?
2    A. No. I would have to get authorization from
3 Archie.
4    Q. To the best of your personal knowledge, given the
5 position you were in while you were working in the
6 Unocal building, would Unocal have to give approval and
7 authorization to build a work platform inside the
8 building?
9    A. Yeah, they would have to give authorization.
10    Q. To the best of your personal knowledge, would
11 Unocal inspect any work that was done by the -- if you
12 built a work platform, would Unocal inspect to make sure
13 that it met specifications?
14       MS. JOHNSON: Objection; foundation.
15    A. I don't know. I would assume they would.
16    Q. Have you seen any work that was done in the
17 building where -- that Unocal employees came and
18 inspected to make sure that it met Unocal's requirements
19 while you were working there?
20    A. I don't recall that, no.
21       MR. COHN: Let's take a break.
22       VIDEOGRAPHER: Off record. The time is
23 1:08.
24       (There was a short break.)
25       VIDEOGRAPHER: Back on the record. The time

Page 117

1 is 1:14.
2    Q. Good afternoon again, Mr. Arnett, and I'll try
3 and make this reasonably brief.
4      You indicated that you had gotten an asbestos
5 certificate. Did you get the asbestos certificate
6 because of the asbestos problem in the Unocal building?
7    A. Yes. I was asked by Don Acres if I wanted to
8 take training for it, and I agreed to it.
9    Q. What type of training did that involve?
10    A. Mostly classroom. Some hands-on.
11    Q. Did they already -- did Mr. Acres already know
12 that there was an asbestos problem in the building?
13    A. Yes.
14    Q. You referenced -- you talked about intranet
15 before. Can you tell me was there like an internal
16 intranet Unocal system?
17    A. Yes. Unocal had its own communications
18 networking systems in the computer room, especially to
19 handle the various PCs in the building.
20    Q. Did you communicate with Mr. Acres or Barrett or
21 Mr. Cook by the intranet?
22    A. No, mostly verbal.
23    Q. Did you get any instructions from them through
24 the intranet?
25    A. I don't recall any specific instructions on

Page 118

1 things. Maybe times for meetings, staff meetings,
2 things like that, through e-mail.
3    Q. You attended staff meetings during your time at
4 the building?
5    A. I attended very few.
6    Q. And can you give me -- did they have like a
7 written handout when you would go to these staff
8 meetings as to what was going to be discussed?
9    A. No. I call them staff meetings because it was
10 actually meetings between myself and Archie Cook on
11 problems that were going on, status updates, things like
12 that.
13    Q. Okay. When you first came on way back and doing
14 the computer work around 1990, did you say?
15    A. Yes.
16    Q. Did you have any orientation as to the building
17 that was given to you by Unocal?
18    A. You know, I don't remember, but I believe there
19 was.
20    Q. And do you recall whether that involved going
21 through safety procedures for the building?
22    A. Yeah. I mean, a lot of it was what to do in case
23 fire alarms went off, different things like that that
24 most buildings have.
25    Q. Now, at that time you were working in the

Page 119

1 computer room mainly. In that orientation, did they
2 ever have you go take a look at the penthouse?
3    A. No.
4    Q. Did there ever come a time when you switched from
5 computer to building maintenance section that you were
6 given an orientation of the penthouse?
7    A. If I did, it would have been done by Don Acres.
8 It would have been more like a walk-through.
9    Q. Can you describe -- would the walk-through entail
10 him showing you everything?
11    A. Basically, you know, he would show me where the
12 boilers were in relation to the building, where the gas
13 alarms were.
14      There was a gas alarm in there, which was tied
15 into the building fire system. Where the air supply
16 room was, radio room.
17    Q. Would he have opened the doors and showed you the
18 inside of the rooms, to the best of your recollection?
19    A. Yeah.
20    Q. You talked about a lot of -- especially in 2001
21 you indicated you had a lot of overtime because there
22 was a lot of work being done in the building?
23    A. Correct. They were going through and doing a
24 couple different reconstruction projects at the same
25 time, and plus we had had furniture shipped up from

32 (Pages 116 to 119)

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    _____

4    LAWRENCE H. GROVE, ET AL.,           )
                                          )
5              Plaintiffs,                )
                                          )
6       vs.                               )
                                          )     COPY
7    UNOCAL CORPORATION,                  )
                                          )
8              Defendant.                 )
                                                RECEIVED
9    _____

10   Case No. A-04-0096 CV (JKS)                MAR 2 1 2006

11                                         WEIDNER & ASSOCIATES

12

13        _____

14        VIDEOTAPED DEPOSITION OF PAUL CRAPPS

15        _____

16                    March 3, 2006
                      11:00 a.m.

17

18            Taken by Counsel for Plaintiffs
                          at
19            330 L Street, Suite 200
                   Anchorage, Alaska

20

21                             Exhibit____11____

22                             page__1__of_4_

23

24

25

GROVE v UNOCAL

PAUL CRAPPS
3/3/2006

Page 33

1    A. No.
2    Q. So you pulled the plank outside the filter room,
3  and then what did you proceed to do? Did you proceed to
4  unscrew any of the nuts?
5    A. I removed the two metal brackets.
6    Q. And what did you do with the hardware that was
7  used to attach the brackets to the wall?
8    A. I put it in the trash can.
9    Q. Was the trash can in the filter room or right
10  outside the filter room?
11    A. It was as you entered the penthouse.
12    Q. Do you recall how many nuts and bolts you had to
13  remove?
14    A. No.
15    Q. Do you recall what the size of the bolts were?
16    A. I would estimate like a quarter inch.
17    Q. Do you know the strength of those bolts?
18    A. No.
19    Q. How long did it take you to remove the brackets?
20    A. I would say -- I would estimate maybe 15 or
21  20 minutes.
22    Q. Did you observe any debris on the floor of the
23  filter room while you were working?
24    A. No.
25    Q. And when you removed the bolts, did you catch

Page 34

1  them in your hand or did you have like a baggy you were
2  putting them in?
3    A. No. I just removed them and whatever I pulled
4  out, I put in my hand, or whatever. It landed where it
5  landed.
6    Q. Did you say it went where it landed?
7    A. Yeah.
8    Q. So did some fall on the floor?
9    A. They could have, yes.
10    Q. And did you go and pick up the ones that fell on
11  the floor?
12    A. No.
13    Q. How soon was this second visit to the filter room
14  from the first time that you went in -- not that you
15  went in, that you went up there with Charles the first
16  time and now the second time you went in to remove it.
17  Do you have any idea how much time had passed?
18    A. A couple of days.
19    Q. Now, can you describe the hardware that you
20  removed? Was it just bolts or what else was there?
21    A. I removed the two metal brackets and the bolts
22  holding it on.
23    Q. Well, were there like washers attached to the
24  bolts?
25    A. I don't recall. There could have been.

Page 35

1    Q. Were there nuts at the end of the bolt?
2    A. Yes.
3    Q. Can you describe the shape of the nuts? Round?
4  Square?
5    A. The nuts themselves were square.
6    Q. Now, you said you threw the nuts and bolts away.
7  Did somebody tell you to do that?
8    A. No. I was just told to remove it.
9    Q. By Charles?
10    A. Yes.
11    Q. Do you know if -- did you put anything up in its
12  place after you removed it?
13    A. No.
14    MR. THORSNESS: By "it," you would mean the
15  brackets and that sort of stuff?
16    MR. COHN: Yeah.
17    MR. THORSNESS: Thank you. That's how you
18  understood the question?
19    THE WITNESS: Yes.
20    Q. Do you know if you removed the plank and the
21  bracket and the nuts and the bolts after OSHA inspected
22  the room, the filter room?
23    A. What do you mean?
24    Q. Are you aware that OSHA came out and inspected
25  the filter room?

Page 36

1    A. Yes.
2    Q. And the removal of the brackets and the nuts and
3  the bolts -- we didn't actually talk about what you did
4  with the plank yet. Did that occur after OSHA came in?
5    A. No, that was before.
6    Q. Now, you have this plank that you estimated,
7  what, about 12 feet long?
8    A. Yeah.
9    Q. What did you do with the plank?
10    A. I put it up in a long storage area as you come
11  into the penthouse. I placed it up in that.
12    Q. And do you know how long the plank was in that
13  area?
14    A. No.
15    Q. Do you know what happened to the plank after you
16  placed it there?
17    A. No.
18    Q. Now, the brackets that you removed, the metal --
19  they were metal brackets?
20    A. Yes.
21    Q. So there were four of them? Was it like a
22  bracket on each wall or was it one?
23    A. There was two brackets.
24    Q. But when you are referring to the bracket, you
25  are talking about just -- well, I can show you. Well,

12 (Pages 33 to 36)

GROVE v UNOCAL

PAUL CRAPPS
3/3/2006

Page 37

1  we'll get to that afterwards, but we'll talk about the
2  brackets what they looked like after, but what did you
3  do with the brackets?
4    A. What did I do with them?
5    Q. Yes.
6    A. I discarded them in the trash with the nuts and
7  bolts.
8    Q. Now, did you ever go back into the room after
9  that day that you removed it?
10   A. What time period? As a contractor or since I
11 worked there?
12   Q. Let's talk about first as a contractor.
13   A. Yes.
14   Q. When did you -- actually, I should just go in
15 order. You removed all of these things from the room?
16   A. Yes.
17   Q. Then when is the next time you came back into the
18 room?
19   A. I couldn't recollect that. The last time I could
20 recollect going back up there and going physically in
21 that room would be the OSHA inspection.
22   Q. Well, if the planks had been removed and the nuts
23 and bolts had been removed and the brackets removed,
24 what did they have to look at?
25        MR. THORSNESS: Objection; foundation.

Page 38

1    Q. Well --
2        MR. THORSNESS: You are asking him what OSHA
3  had to look at?
4        MR. COHN: No speaking objection, please,
5  John. He says he is in the room with them.
6    Q. You are in the room?
7    A. With who?
8    Q. With the OSHA people?
9    A. No.
10   Q. You didn't go in the room. I asked you the next
11 time you went into the room.
12       MR. THORSNESS: You say "the room."
13       MR. COHN: The filter room. When we are
14 talking about "the room," we are talking about the
15 filter room unless otherwise specified.
16   A. The filter room, I would have to say I didn't set
17 foot in that filter room when the OSHA inspectors came.
18 I let them into that room.
19   Q. Was the door open and you standing outside the
20 room?
21   A. Yes.
22   Q. But when they went into the room to inspect, the
23 platform wasn't there?
24   A. No.
25   Q. And do you know who went into that room?

Page 39

1    A. The OSHA inspector and our safety person, Ken
2  Burns.
3    Q. And was Charles Arnett -- did Charles Arnett go
4  into the room?
5    A. No.
6    Q. What about Roseanne Sinz?
7    A. No.
8    Q. Did you have any -- did Roseanne Sinz direct you
9  to do anything in the filter room?
10   A. No.
11       MR. THORSNESS: Are you talking on the day
12 of the OSHA inspection or any time?
13   Q. I guess that was at any time.
14   A. At any time, I would say no. Actually, I would
15 say no, not from Roxanne, no.
16   Q. Well, not from Roxanne, then, okay. Who, besides
17 Charles Arnett, who has directed you to do anything in
18 connection with the filter room?
19   A. I took pictures after the OSHA inspection of the
20 filter room.
21   Q. How many pictures did you take?
22   A. Half a dozen, I would estimate.
23   Q. Well, why did you take these pictures?
24   A. After the OSHA inspection, we just figured it
25 would be good to have our own pictures.

Page 40

1    Q. When you said "we thought it would be good," you
2  are talking more than just you? Did anybody direct you
3  to take these pictures?
4    A. Ken Burns.
5    Q. Did you see anyone else taking pictures?
6    A. No.
7    Q. What type of camera did you use?
8    A. Digital.
9    Q. And what areas of the room did he have you take
10 pictures of?
11   A. Where the platform existed.
12   Q. When you say where -- did you do any close-up
13 shots or zoom in to where the brackets were located?
14   A. From knowledge of where I pulled them down.
15   Q. So did you take pictures at both sides of the
16 wall or just the sheetrock side?
17   A. It's not real sheetrock. Just the opposite side
18 of the filters.
19   Q. Do you know what happened to those pictures after
20 you took them?
21   A. I sent them off to, I think, Ken Burns and
22 Roxanne Sinz.
23   Q. Have you, yourself, ever had to work on a --
24 stand on a work platform?
25   A. At my present job or at that point?

13 (Pages 37 to 40)

GROVE v UNOCAL

PAUL CRAPPS
3/3/2006

Page 89

1  correct?
2  **A. Yes.**
3  Q. And you did that?
4  **A. Yes.**
5  Q. And then on September 9, 2002, you were a
6  contract employee working for Kelly Services?
7  **A. Yes.**
8  Q. Did you have a specific written contract for
9  working in the Unocal building?
10  **A. No.**
11  Q. Did you have like a timesheet that you had to
12  fill out?
13  **A. Yeah, I had weekly timesheets.**
14  Q. And in those timesheets, did you have to put down
15  -- was it just -- did you have to put down what you did
16  during the days?
17  **A. No.**
18  Q. Did you keep any diaries or notes about what you
19  did?
20  **A. Nope.**
21  Q. So there would be no -- they wouldn't have any
22  record at Kelly or Unocal as to what you were doing on
23  specific days?
24  **A. No. It was just a general 8:00 to 5:00 type job.**
25  Q. And in the last paragraph in answer to

Page 90

1  interrogatory number one, which is, I believe it is
2  Exhibit No. 11, "Defendant is not aware of any
3  photographs, videotaping or documentation during the
4  specified time period except for the photographs
5  produced by plaintiff."
6      We have already talked about that. That answer
7  isn't correct, am I right?
8      MR. THORSNESS: Objection to form.
9  Q. That would be wrong?
10     MR. THORSNESS: Objection to form.
11  **A. "Defendant is not aware of any photographs,**
12  **videotapes or documents --" I don't know what**
13  **photographs were produced. Oh, the plaintiff?**
14  Q. There is a specified time period. The time
15  period of the accident until the scaffolding was
16  removed.
17  **A. No, there was no pictures and video.**
18  Q. You indicated earlier you took photographs
19  though.
20  **A. I took photographs of the -- after the OSHA**
21  **investigation.**
22  Q. After the OSHA investigation?
23  **A. Yes.**
24  Q. And not before the OSHA investigation?
25  **A. Yes.**

Page 91

1  Q. So you took the photos after the scaffolding was
2  removed?
3  **A. Yes.**
4      MR. COHN: I am going to want copies of
5  those photographs because I don't believe they have been
6  produced.
7      MR. THORSNESS: Counsel, they have been
8  produced. I can give you Bates numbers. This is on
9  information and belief. They are Bates numbers
10  defendant 00047 through defendant 00063.
11     I believe they have been produced, and check
12  on that. If they haven't, we'll get them right to you.
13     MR. COHN: Can we go off record?
14     VIDEOGRAPHER: Off record 1:47 p.m.
15       (There was a short break.)
16     VIDEOGRAPHER: On record 1:51 p.m.
17       (Exhibit No. 12 marked.)
18  Q. I'm showing you what's marked as Exhibit No. 12.
19  Do you recognize the photographs?
20  **A. Yes.**
21  Q. The black and whites anyway?
22  **A. Yes.**
23  Q. And do you recognize these as photographs that
24  you took?
25  **A. Yes.**

Page 92

1  Q. For the record, these photos are identified as
2  DEF00047 to 00063, and they were attached in the
3  defendant's initial disclosures.
4      The initial disclosures indicated these are
5  photos in their possession without indicating, however,
6  who took them or when they were taken.
7      But you recall these as the photos that you took
8  after the OSHA inspection?
9  **A. Yes.**
10  Q. Do you recall how soon after the OSHA inspection
11  you took these photographs in the filter room?
12  **A. Within probably a day or two.**
13     MR. COHN: And if the color or the negatives
14  of these are -- I want the negatives and the color
15  photos of these photographs.
16     MR. THORSNESS: Write me a letter, please.
17  Q. And the first, 0047 to 51 are photos of the
18  mechanical room, the filter room; is that correct?
19  **A. Yes.**
20  Q. What were you trying to show -- were you trying
21  to show anything in these photos?
22  **A. I was just asked to take photos of where it was**
23  **-- the platform was located.**
24  Q. Can you identify on DEF00047 using this red pen
25  where the platform was located?

26 (Pages 89 to 92)