IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

    Plaintiffs,

vs.

UNOCAL CORPORATION,

    Defendant.

Case No. A04-0096 CV(JKS)



RECEIVED APR 25 2005

**VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE**

Pages 1 - 158, inclusive

Friday, November 12, 2004, 10:42 a.m.

Anchorage, Alaska

EXHIBIT A
PAGE 1 OF 10

**Alaska Stenotype Reporters**
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*



Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3

 4   LAWRENCE H. GROVE, CYNTHIA
     GROVE, SARAH GROVE, and
 5   MICHAEL GROVE (DOB 1/21/88)
     by and through his father
 6   LAWRENCE H. GROVE,

 7              Plaintiffs,

 8       vs.

 9   UNOCAL CORPORATION,

10              Defendant.
     _____/
11   Case No. A04-0096 CV(JKS)

12

13
```

**VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE,**

taken on behalf of the Defendant, pursuant to notice,

at the offices of Lane Powell Spears Lubersky, 301 West

Northern Lights Boulevard, Suite 301, Anchorage, Alaska,

before Gary Brooking, Registered Professional Reporter

for Alaska Stenotype Reporters and Notary Public for the

State of Alaska.

EXHIBIT A
PAGE 2 OF 10

2

Alaska Stenotype Reporters

LAWRENCE H. GROVE

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3     For Plaintiffs:        LAW OFFICES OF PHILLIP PAUL
                                 WEIDNER & ASSOCIATES
 4                            By:  Phillip Paul Weidner
                                   Michael Cohn
 5                            330 L Street, Suite 200
                              Anchorage, Alaska   99501
 6                            907/276-1200

 7
       For Defendant:         LANE POWELL SPEARS LUBERSKY
 8                            By:  Shannon W. Martin
                              301 W. Northern Lights Blvd.
 9                            Suite 301
                              Anchorage, Alaska   99503
10                            907/277-9511

11
       Also Present:          Cynthia Grove
12

13     Videotaped By:         Professional Business Video
                              Eric Baldwin
14

15     Reported By:           Gary Brooking, Registered
                              Professional Reporter
16

17

18

19

20

21

22

23
                                               EXHIBIT  A
24                                             PAGE 3 OF 10

25
```

3

Alaska Stenotype Reporters

Page 73

1  who attended to this job site, or were -- was it --
2    A.  On Unocal, it was primarily me, because I
3  got asbestos-awarement [as spoken] training. They
4  have some asbestos issues there. And in order to work
5  above the ceiling or in an area where there was --
6  ACMs were present, someone had to be certified to do
7  that type of work. So there wouldn't be any problems.
8    Q.  And so you were the only one that you -- are
9  you the only Siemens guy who's -- the only union guy
10 who's asbestos trained?
11   A.  At that point I was, yes.
12   Q.  Do you remember the -- the first time you
13 went to this job site?
14   A.  Not very -- I mean I remember about when,
15 but not the exact date or time or what the reason was.
16   Q.  You said about five years ago --
17   A.  About five years ago.
18   Q.  -- when you -- when started with Siemens in
19 '99, right?
20   A.  Uh-huh.
21   Q.  Do you remember who you reported to, for
22 example?
23   A.  Yes. Charles Arnett. He was -- he worked
24 under Eddie --
25   Q.  Barratt?

Page 74

1    A.  Barratt, yes. Charles worked under Eddie,
2  and Eddie, I think, was the building manager or
3  coordinator. I don't know his exact title. He's a...
4    Q.  Was it -- now, before you started at this
5  job site, was there someone else for Siemens doing
6  that, doing the job?
7    A.  Yeah. Siemens done work there for some
8  years prior --
9    Q.  Right.
10   A.  -- to me coming to work there, yeah.
11   Q.  According to the -- to the contract, it
12 looks like the predecessor, Landis, had been doing
13 work there since '94 at least.
14   A.  They have. And I know that Honeywell has
15 been in there. And I don't know what other mechanical
16 contractors have been in the building. But the
17 building has been there since 1969 or '70 so...
18   Q.  Right. Yeah. It's -- it's been there a
19 while.
20   A.  Honeywell did the initial install for the
21 pneumatic control and environmental system, so I know
22 they were in there for a while, too, so...
23   Q.  Did -- did you ever talk to the guy who was
24 doing the same work that you started to do at Unocal
25 when you took over?

Page 75

1    A.  No.
2    Q.  Do you know who this guy is?
3    A.  There were two other employees. Jeez, I
4  don't think I have seen Dan Hartman for years. And
5  there was another gentleman. I can't recall his name.
6    Q.  These were Siemens employees who you think
7  may have been performing HVAC services on behalf of
8  Siemens at Unocal before you started in '99?
9    A.  Yes.
10   Q.  Dan Hartman?
11   A.  Is one of them. Robert Sprinkle, he worked
12 there; was formerly at Landis Gyr. Robert Sprinkle is
13 an employee of -- of Siemens now. I got him to come
14 over from Johnson to us.
15   Q.  Okay.
16   A.  But I -- I can't name everyone that was
17 there prior to me in there.
18   Q.  Okay. No lead man that stands out in your
19 mind or a guy that was special trained in --
20   A.  At that point, they didn't have that large
21 of a service business, so they went through a lot of
22 different changes. And they were more construction
23 orientated. They did have a service department, but
24 they weren't focused on it a hundred percent like we
25 did.

Page 76

1    Q.  In 1999, when you physic- -- when you first
2  physically entered the building for Unocal, was that
3  the first time you had ever entered that building --
4    A.  Yes.
5    Q.  -- to do work for Siemens?
6    A.  Yes.
7    Q.  Okay. Is that the first time that you ever
8  met Charles Arnett or Eddie Barratt?
9    A.  Yes.
10   Q.  And were these -- did you -- did you go to
11 these men and -- and say, I'm here to do work for
12 Siemens, take me to -- to where I need to go, and they
13 showed you around, that type of thing?
14   A.  Correct, yeah, to check in, sign in. Let
15 them know what you're going to be doing. If you
16 weren't familiar with it, they would take you to the
17 area and show you what was going on, and that was it.
18   Q.  So there wasn't any predecessor to you, for
19 example, that went to the job site with you and said,
20 this is what I have been doing for the past X number
21 of years?
22   A.  No.
23   Q.  This is how you should do it?
24   A.  No.
25   Q.  No one from Siemens went to that job site

EXHIBIT A
PAGE 4 OF 10

Lawrence H. Grove                    Deposition                    November 12, 2004

Page 89

1   A.  Depends on the job.
2   Q.  Some have handrails, some don't. Is that
3   right?
4   A.  Yes.
5   Q.  Okay. Did the one at Unocal have handrails?
6   A.  No.
7   Q.  Did you -- you have already -- we have
8   already discussed that the -- the only purpose for
9   that scaffolding, in your opinion, was to change air
10  filters, right?
11  A.  (Witness nods head.)
12  Q.  You never --
13      THE REPORTER: Is that a --
14      MR. COHN: You got to --
15  BY MR. MARTIN:
16  Q.  Is that a yes?
17  A.  Yes.
18  Q.  Sorry. Did you ever look at the -- the
19  mechanism that that scaffolding was -- was bolted to
20  the wall?
21  A.  No. You don't have time to do that on every
22  job. If you did that, you wouldn't get any work done.
23  Q.  Okay. Did you -- did you ever have any
24  reason to suspect that that scaffolding was unsafe?
25  A.  No. Because it's been there for so long, I

Page 90

1   figured that people were using it for years.
2   Q.  Now you have said that once or twice. Your
3   understanding of the fact that you believe this
4   scaffolding has been there for some time is based on
5   conversations you've had with a number of people since
6   the accident, right?
7   A.  Yes.
8   Q.  Did you have any basis for believing how old
9   this scaffolding was when you first saw it?
10  A.  No.
11  Q.  Did you look at it, for example, and say,
12  man, that thing is old?
13  A.  No.
14  Q.  You didn't look at it and say, wow, that
15  looks shiny and brand-new?
16  A.  I have got a job-specific -- specific task,
17  no.
18  Q.  It was -- it was there. It appeared to be
19  there for your use --
20  A.  Right.
21  Q.  -- to -- to change air filters?
22  A.  Correct.
23  Q.  That's all you know?
24  A.  That's all I know.
25  Q.  Okay. And on September 9th, 2002, you were

Page 91

1   on that scaffolding, right?
2   A.  That's correct.
3   Q.  And it collapsed? Is that what happened?
4   A.  Yes.
5   Q.  Okay.
6   A.  I -- well, I'll tell you what happened. I
7   changed the bottom rows of filters as high as you can
8   go, and went up, got on the work platform, went to
9   reach out, and it collapsed.
10  Q.  Okay. Had you ever been on there before
11  that day and felt that scaffolding might be wobbly or
12  anything of that nature?
13  A.  No.
14  Q.  Okay. So it seemed safe up until that time?
15  A.  Up until that time, yes.
16  Q.  Did you ever have any reason to believe that
17  it was unsafe because it didn't have handrails?
18  A.  No.
19  Q.  Okay. Did you write a letter to the
20  Department of Labor filing a formal complaint against
21  Siemens?
22      MR. COHN: Can you show him the letter, and
23  can I see --
24      MR. MARTIN: I will.
25      MR. COHN: -- a copy of that. I would like

Page 92

1   to see a copy of what you're --
2   BY MR. MARTIN:
3   Q.  Did you?
4   A.  Against Siemens?
5   Q.  Yes.
6   A.  I reported the accident, and I just filled
7   out the paperwork as the OSHA officer indicated.
8       MR. COHN: I would like to see a copy of the
9   letter, please.
10      MR. MARTIN: I can give you a copy when I'm
11  prepared to give you a copy.
12      MR. COHN: I want to see a copy now. If
13  you're going to make --
14      MR. MARTIN: How do you even --
15      MR. COHN: -- make that an exhibit --
16      MR. MARTIN: -- know what I'm looking at?
17      MR. COHN: Well, you're referring to a
18  letter. I would like to see the letter.
19      MR. MARTIN: I'm looking at something, but I
20  haven't decided that I want to enter it in as -- as an
21  exhibit yet.
22      MR. COHN: Well, as matter of courtesy --
23      MR. MARTIN: I -- I think you ought to
24  just -- I think you ought to just let me turn it over
25  when I will. I'm going to do everything professional

26 (Pages 89 to 92)

EXHIBIT A
PAGE 5 OF 10

Page 105

1  field, have you ever had any reason to believe that it
2  was unsafe to stand on a scaffolding that did not have
3  handrails?
4      A.  No.
5          MR. COHN:  Objection to the form of the
6  question.  Whether or not he's ever worked on any
7  other platforms like this hasn't been established.
8  BY MR. MARTIN:
9      Q.  Go ahead and answer.
10     A.  Well, repeat the question again, please.
11     Q.  Well, in your 30-something years as an HVAC
12 technician, have you ever had any reason to believe
13 that standing on a scaffolding or work platform or a
14 raised area without handrails is unsafe?
15         MR. COHN:  Same objection.
16         THE WITNESS:  No.  I -- being not familiar
17 with OSHA's standards, I mean just some come with
18 handrails, some don't come with handrails.  I'm
19 assuming that if it's a manufactured one, the
20 manufacturers know what they're doing; or whoever
21 constructs it, I assume they know what they're doing.
22 BY MR. MARTIN:
23     Q.  Have you ever been told by any of your
24 employers or by OSHA people or by anyone else that
25 platforms of a certain height or stairs require

Page 106

1  handrails?
2          MR. COHN:  Are we talking about before the
3  accident?
4          MR. MARTIN:  Before the accident.
5          THE WITNESS:  Only after -- only after the
6  accident.  When I talked to the guy at OSHA, you know,
7  they had some difficulty even determining, you
8  know, what they were going to call it.  They were going
9  to call it a platform, or they were going to call it a
10 scaffold.  But prior to that, that's the first time I
11 ever heard that there were requirements for it.
12 BY MR. MARTIN:
13     Q.  Did you union -- and I may have asked you
14 this, but did your union, 367, did that -- did it have
15 any requirements for safety training?
16     A.  None that I'm aware of.
17     Q.  Okay.
18     A.  We have a first aid card.  We're required as
19 a -- to carry a CPR card and a first aid card and keep
20 them up to date.
21     Q.  Did you, at any -- at any of your other
22 jobs, engage in regular safety meetings?
23         MR. COHN:  What do you mean by "regular"?
24 Weekly?  Monthly?
25 BY MR. MARTIN:

Page 107

1      Q.  You tell me.  Monthly, weekly, annually.
2  What do you define "regular" as?
3      A.  Depending on the employer -- like when we
4  work for Alyeska Pipeline, they would have them every
5  morning before the job.  You would get your hot
6  permits.  If you're working in there with
7  hydrocarbons, you have to get electrically intristic
8  safety cords.  And they would discuss where you're
9  working and -- and be job-specific.  But that was
10 about the only time there that there was anything
11 where there was a regular program by an employer.
12     Q.  Did -- did the other -- your other prior
13 employers, did they have safety manuals, if you
14 recall?
15     A.  Not that I -- not that I know of, or I
16 wouldn't even know where to look.
17     Q.  Okay.
18     A.  They had safety bulletins basically just
19 like Siemens' program.  I'm assuming there's a company
20 out there that goes to Siemens or to Johnson's and,
21 hey, look, they got these little safety letters, you
22 know.  This is what it would cost for us to send them
23 to your employees.  That's -- Johnson Controls has
24 something similar to that.
25         MR. MARTIN:  Okay.  Let's go ahead and

Page 108

1  change your tape and take a break.
2          THE VIDEOGRAPHER:  Thank you.  Let me
3  conclude tape one, and move off record at 12:47.
4              (Recess taken.)
5          THE VIDEOGRAPHER:  We're on record at 12:55,
6  beginning tape two.
7  BY MR. MARTIN:
8      Q.  Mr. Grove, you -- you said that prior to
9  this accident you didn't have any reason to suspect
10 that this scaffolding was in any danger of busting?
11     A.  That's correct.  I figured it had been there
12 that long.  Held up guys bigger than me.
13     Q.  Okay.  Again, at that time, though, you
14 didn't know how long it had been there.  Is that
15 right?
16     A.  No, I did not.
17     Q.  Okay.  You never saw any -- any bolts
18 popping out, anything of that nature to cause you to
19 suspect that it might be in danger of busting?
20     A.  The lighting is not all that good in there.
21 I mean, you could look at things, but the lighting --
22 they've only got one light in there.
23     Q.  So you -- did you ever perform inspections
24 of this scaffolding?
25     A.  Not part of my job description.  My job was

Page 109

1  in there to change the filters, get the job done, and
2  get on my next -- next task.
3      Q.  But the scaffolding was there for one
4  purpose and one purpose only, in your opinion?
5      A.  Yes.
6      Q.  And that was to change air filters?
7      A.  Change air filters.
8      Q.  Okay.  But you never inspected this
9  scaffolding?
10     A.  Not in detail.
11     Q.  Okay.
12     A.  I mean, you look at it, and you walk by it.
13     Q.  Just in passing?
14     A.  Yeah, just in passing.
15     Q.  Do you have any reason to believe that
16  anyone else ever inspected the scaffolding?
17     A.  I have no idea if it ever was.
18     Q.  Okay.
19     A.  What the safety stuff that Unocal provides,
20  I mean, before I could light a torch in the building,
21  hot -- have to get a hot permit.  We have to disarm --
22  Unocal had a pretty set thing.  I figured that they
23  keep up on their stuff.
24     Q.  Okay.
25     A.  Even before a generator test, you have to

Page 110

1  notify everybody.  Before you can light a torch to
2  solder, you have to get a hot permit.  Before you can
3  do this, you got to talk to them and get -- you know,
4  so everybody knows what's going on.  You would think
5  that with all the safety procedures they have in
6  force, that wouldn't be an issue but...
7      Q.  How many -- how many times did you change
8  those air filters before this accident?  Three years'
9  worth --
10     A.  Five --
11     Q.  -- three times a year?
12     A.  Four times a year probably for the -- four
13  or five years.
14     Q.  Between '99 and 2002, before the accident?
15     A.  Yeah.
16     Q.  Four times a year for three years.  Is that
17  about right?
18     A.  According to contract.  And if we had to do
19  it more often, we would do it more often.
20     Q.  So you had probably been in that room at
21  least a dozen times before this accident.  Is that --
22     A.  Yeah.
23     Q.  -- fair to say?
24     A.  I would say that would be a good estimate.
25     Q.  And on each of those occasions, did you go

Page 111

1  in alone or did you ever bring anyone else with you?
2      A.  Pretty much alone.  There's only -- not a
3  lot of room in there.
4      Q.  Did anyone else, other than you, go in
5  between 1999 and 2002, to your knowledge?
6      A.  There may have.  I -- you know, I work at
7  different places every day.  It's difficult for me to
8  recall every time I have been to one place.
9      Q.  Did anyone else for Siemens, to your
10  knowledge, any of your men, for example, go into the
11  filter room between 1999 and 2002?
12     A.  Probably.
13     Q.  Would that have been to change air filters,
14  or would that have been for some other reason?
15     A.  Yeah, change filters, maybe to check the
16  outside air dampers.  I had Charles in there one time.
17  He was handing filters up to me while I was changing
18  them.
19     Q.  Okay.
20         MR. COHN:  And to clarify by "Charles,"
21  which --
22         THE WITNESS:  Charles Arnett.
23         MR. COHN:  Okay.  Because you asked about
24  Siemens employees.
25         MR. MARTIN:  Right.

Page 112

1  BY MR. MARTIN:
2      Q.  And then you switched to Charles.  That's
3  fine.  So you -- what you said, though, is that
4  perhaps another Siemens employee may have gone in
5  there between '99 and the time of this accident to
6  change the filters?
7      A.  Yeah.  I may have not been the guy doing it
8  all the time, but the majority of the time that was my
9  responsibility.
10     Q.  Most of the time you would do it.  So out of
11  those dozen times between '99 and the time of the
12  accident, you were the one performing the filter
13  service most of the time?
14     A.  Yes.
15     Q.  All right.  Was Charles Arnett in there on
16  more than one occasion?  Was that just one occasion
17  you can remember?
18     A.  That's the one that comes to my mind.  I'm
19  sure -- he's been in that building a lot longer than I
20  have.  I'm sure he would be in there before.
21     Q.  Right.  But with you between '99 and the
22  time of the accident?
23     A.  From what I can remember, he was handing me
24  some filters.  He just came up to see what was going
25  on.  I said, hey, how about handing me a couple

Lawrence H. Grove — Deposition — November 12, 2004

Page 125

1  Q. You had other concerns?
2  A. Yeah. Get to the hospital.
3  Q. And so did you make a -- did you have a cell
4  phone on you?
5  A. Yes, I did. I called Charles to come give
6  me a hand getting out of there. Charles --
7  Q. Did he come up?
8  A. Yes, he did.
9  Q. Did he help shoulder you out of there?
10 A. Yeah, he helped me out.
11 Q. Okay. And then how did you get to the
12 hospital?
13 A. Drove with one foot.
14 Q. Okay. You drove yourself to the hospital?
15 A. Right.
16 Q. You drove with your right foot, though?
17 A. My left foot.
18 Q. Oh, really?
19 A. Uh-huh.
20 Q. Okay. It must have been kind of hard?
21 A. Well, that's the only one that worked.
22 Q. Yeah.
23    MR. COHN: I know it's unusual, but I think
24 Cynthia had some question about whether you drove to
25 the hospital or not.

Page 126

1    THE WITNESS: Well, I drove to the doctor's,
2  attending physician. And I called Cindy at work. And
3  that's when the doctor decided to send me to
4  Providence. And she came down and picked me up and
5  took me to Providence. That's how that took place.
6  BY MR. MARTIN:
7  Q. She picked you up from the attending
8  physician?
9  A. Correct. It was close to -- fairly close
10 to --
11 Q. This is Laufer?
12 A. Yes.
13 Q. Picked you up from Laufer, took you to
14 Providence --
15 A. Right.
16 Q. -- for further care?
17 A. Yeah. I had no idea the injury was that
18 severe so...
19 Q. Okay. Did you talk to Mr. Arnett, after he
20 got to the filter room, about what had happened?
21 A. He just looked at it and said, what
22 happened? I said, the darn thing collapsed, come down
23 on my ankle. He said, let's get you out of here.
24 Q. He didn't say -- I mean, he didn't say
25 anything about the -- the scaffolding?

Page 127

1  A. Not at that time, no.
2  Q. Did -- did you talk to any --
3     THE VIDEOGRAPHER: Excuse me, Counsel.
4  Buried our microphone. Thank you.
5     MR. MARTIN: Did you pick up what I had said
6  before that? I'm sorry.
7     THE VIDEOGRAPHER: Right up until your last
8  question.
9  BY MR. MARTIN:
10 Q. Did you talk to anyone else other than
11 Charles about the scaffolding failing, before you left
12 that day to go to the doctor?
13 A. Not that I can remember, no.
14 Q. The next day when you came back,
15 September 10th, to take the pictures, did you talk
16 with anyone, any Unocal employees?
17 A. Charles was not in there. His manager was
18 not in there. So I just used my security access and
19 went upstairs and took the pictures.
20 Q. Did you talk to any Unocal employees about
21 the incident that day?
22 A. No.
23 Q. October 10th?
24    MR. COHN: September 10th.
25 BY MR. MARTIN:

Page 128

1  Q. September 10th?
2  A. September 10th, no.
3  Q. Did you talk with any Unocal employees at
4  all after the incident?
5  A. Just Charles once. It was just brief. He
6  asked me how I was doing. And OSHA went down, did an
7  inspection. And after that, nobody really said much
8  about anything after that.
9  Q. Did you talk to your own employer at all
10 about this incident after it happened?
11 A. Yes.
12 Q. Who in particular did you talk with?
13 A. My branch manager and my service department
14 supervisor. Service department supervisor would be
15 Leverette Hoover. Leverette, L-e-v-i-t-t (sic)
16 Hoover. And our branch manager at that time was Ben
17 Sietz, S-i-e-t-z.
18 Q. And did you -- are they both people who work
19 in the Anchorage office?
20 A. The only one there now is Ben Sietz.
21 Mr. Hoover is now an employee of Johnson Controls in
22 Michigan.
23 Q. At the time they worked in -- in the
24 Anchorage office?
25 A. Yes.

35 (Pages 125 to 128)

EXHIBIT A
PAGE 8 OF 10

Lawrence H. Grove　　　　　　　　Deposition　　　　　　　　November 12, 2004

Page 153

1 something that was preconceived.
2 　Q.　But would they -- would they look at the --
3 for example, would they use this newsletter and the
4 safety tips addressed in the newsletter as a protocol
5 for that particular meeting on any given month?
6 　　MR. COHN:　Objection as to foundation.
7 　　THE WITNESS:　I would say no.　They never
8 picked a specific issue and said, you know, don't do
9 this.　And when you're doing this, don't do that.　But
10 I think they just read over it, you know, said
11 everybody would be safe and --
12 BY MR. MARTIN:
13 　Q.　They didn't say, okay, has everyone got a
14 copy of the newsletter this month?　I want -- we want
15 to review this or that?
16 　A.　No.
17 　Q.　No, okay.　And they weren't ever handed out
18 at the safety meetings, the newsletters?
19 　A.　Letters that I received came through the
20 mail.
21 　Q.　Okay.　Did they ever hand out any other
22 literature at safety meetings?
23 　A.　Very little, if anything.
24 　Q.　And you don't remember signing lists, if you
25 attended?

Page 154

1 　A.　Not with Siemens.　I know at Johnson
2 Controls, when we did, when they had a sign-in list.
3 They may have done it at Siemens.　I just don't
4 recall.　It's been five years there, and a lot of
5 things have happened.　It's hard to remember every
6 day.
7 　Q.　Okay.　You have not been back to Unocal
8 since September 10th, 2002?
9 　A.　I stopped one by -- one day to say hi to
10 Charles, and he asked me how I was doing.　And that
11 was about it.
12 　Q.　That was in the front lobby?
13 　A.　Yes.
14 　Q.　Okay.　Have -- have you talked with anyone
15 from Unocal, other than Charles, about this accident?
16 　A.　Not -- not particularly.
17 　Q.　No?　Have you talked with anyone other than
18 management, in connection with this document here,
19 this -- did we mark this document, report of
20 occupational injury?
21 　　THE REPORTER:　No.
22 　　MR. MARTIN:　Okay.　Let's -- let's go ahead
23 and mark that, if we could, as Exhibit D.
24 　　(Exhibit D marked.)
25 BY MR. MARTIN:

Page 155

1 　Q.　Have you talked with any other Siemens
2 employees about this accident?
3 　A.　I try not to.　People ask me about it, and I
4 try not to be -- say too much about it.　You have to
5 just be careful what you're doing.　Don't get hurt.
6 　Q.　All right.　Have you talked with any Siemens
7 employees since the accident about how the accident
8 happened?
9 　A.　Well, they know how the accident happened.
10 　Q.　"They" being what, employees in general?
11 　A.　Office gossip, I guess.
12 　Q.　Have you talked to any of your -- the guys
13 that worked with you or for you about how the accident
14 happened?
15 　A.　I mentioned it, yes.
16 　Q.　And did you mention scaffolding gave -- gave
17 way?
18 　A.　I just told them what took place, that
19 basically I was changing the filters.　The platform
20 collapsed.　And that's what happened to my leg.　And,
21 you know, don't let it happen to yourself.
22 　Q.　Did Siemens hold any safety meetings, after
23 the accident, addressing these issues?
24 　A.　I wasn't --
25 　　MR. COHN:　Objection on foundation.

Page 156

1 BY MR. MARTIN:
2 　Q.　Do you know?　Did --
3 　A.　I'm not in the office.　I have no -- no
4 idea.
5 　Q.　Okay.
6 　A.　If I -- if I'm not there, I can't give you a
7 yes or a no, because I don't know.
8 　Q.　You haven't been back to Siemens since the
9 accident to --
10 　A.　Stop in the office occasionally.
11 　Q.　But not to attend any safety meetings?
12 　A.　No.　I never have been invited to any.　They
13 may have some, but I haven't been informed of them or
14 invited.
15 　Q.　Have any employees talked to you about
16 what's gone on in any safety meetings --
17 　A.　No.
18 　Q.　-- since the accident?
19 　A.　No.
20 　　MR. MARTIN:　No.　Okay, Mr. Grove.　Those
21 are all the questions I have.　Thank you very much for
22 attending.　Off record.
23 　　THE VIDEOGRAPHER:　We are concluded at 1:52.
24 　　(Proceedings concluded
25 　　　at 1:52 p.m.)

42 (Pages 153 to 156)

EXHIBIT A PAGE 9 OF 10

LAWRENCE H. GROVE

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | |
| 3 | I, GARY BROOKING, RPR, hereby certify: |
| 4 | That I am a Registered Professional Reporter |
| 5 | for Alaska Stenotype Reporters and Notary Public for the |
| 6 | State of Alaska; that the foregoing proceedings were |
| 7 | taken by me in computerized machine shorthand and |
| 8 | thereafter transcribed by me; that the transcript |
| 9 | constitutes a full, true and correct record of said |
| 10 | proceedings taken on the date and time indicated therein. |
| 11 | Further, that I am a disinterested person to |
| 12 | said action. |
| 13 | IN WITNESS WHEREOF, I have hereunto |
| 14 | subscribed my hand and affixed my official seal this |
| 15 | 24th day of April, 2005. |
| 16 | |
| 17 | |
| 18 | _____ |
| 19 | GARY BROOKING<br>Registered Professional Reporter |
| 20 | My Commission Expires 5.24.08 |
| 21 | |
| 22 | |
| 23 | EXHIBIT A |
| 24 | PAGE 10 OF 10 |
| 25 | |

158