

3851 Exchange Avenue
Aurora, Illinois 60504

Phone: (630) 851-4566
Fax: (630) 851-4870
esi-website.com

# EXPERT REPORT

## GROVE (LAWRENCE) V. UNOCAL CORPORATION

ESI File No.:  21002A
Client's File No.:  6200-1

Report Submitted to:

John B. Thorsness, Esq.
Linda J. Johnson, Esq.
Clapp, Peterson, Van Flein, Tiemessen, Thorsness LLC
711 H Street, Suite 620
Anchorage, AK  99501

Report Submitted by:

*Charles R. Morin*

Charles R. Morin, P.E.
Chairman, CEO and Principal Engineer
P.E. Lic. Expires: 11/30/07

12 / 6 / 06
Date Signed

Reviewed by:

*John A. Wilkinson*

John A. Wilkinson, P.E.
Manager, Applied Mechanics
P.E. Lic. Expires: 11/30/07

12 / 6 / 06
Date Signed

EXHIBIT  C
PAGE  1  OF  6

*Providing Clear Answers*
*Through Insights and Multidisciplinary Excellence*

| COLORADO | FLORIDA | **ILLINOIS** | LOUISIANA | MISSOURI | TEXAS |

Grove (Lawrence) v. Unocal Corporation

December 6, 2006

ESI File No. 21002A

## INTRODUCTION

Engineering Systems Inc. (ESI) was retained by the law firm of Clapp, Peterson, Van Flein, Tiemessen, Thorsness LLC to undertake a technical accident investigation into the facts and circumstances surrounding Mr. Lawrence Grove's accident, which has given rise to the case at hand. ESI has reviewed numerous documents, photographs and related discovery materials and has visited the scene of the accident and participated in a joint party examination of some of the evidence in this case. Based on the review and study of the available information and by virtue of analysis, testing, education, prior experience and training I have reached certain expert opinions as expressed herein.

## MATERIALS REVIEWED

The following information and data was provided or collected as part of the ESI investigation in this matter:

- Complaint
- Answer
- OSHA documents (**Bates Nos. LG00685-LG00783, LG00782-LG00858**)
- Blueprint of Unocal Penthouse
- Siemens Records and Safety Resource Manual
- Unocal contract (Technical Support Program Proposal) and related documents
- OSHA reports
- Resume of plaintiff's safety expert, Sally Ann Carey
- Proposed metallurgical protocol – bolt analysis by Plaintiff's expert Dr. Joseph Balser, dated 2/16/06
- Plaintiff's response to ConocoPhillips proposed additions to bolt inspection protocol
- Transmittal documents for client's shipping subject bolts to Anamet for inspection
- Color photographs from site inspection – 1/24/06 by plaintiff expert, Sally Carey
- Color bolt photographs taken by V. Homan- 9/2005
- Color laser copied photographs taken by Unocal
- (15) color copies of photos of the scaffolding in the Unocal Building "filter room" taken by plaintiff and reproduced from negatives
- Report by Bob Carmichael – 7/29/06
- Report by Joseph Balser – 11/9/06
- Report by Lindley Manning – 11/7/06

EXHIBIT C
PAGE 2 OF 6

*Engineering Systems Inc.*

esi-website.com

Grove (Lawrence) v. Unocal Corporation
ESI File No. 21002A

- Depositions:

  Lawrence Grove (Vol. I and II)

  Cynthia Grove

  Michael Grove

  Sarah Grove

  Doug Schutte with exhibits

  Tom Scanlon with exhibits

  John Stallone with exhibits

  Robert Sprinkle with exhibits

  Charlie Arnett with exhibits

  Noah Laufer, M.D. with exhibits

## RESULTS AND DISCUSSION

It has been reported that perforated steel angles were being used to support a wood plank in a filter room of a building. It has been claimed that some of the threaded fasteners used to connect what comprised a mid-position horizontal member support to its end connections failed, resulting in Mr. Grove's fall. This report focuses on the metallurgical and failure analysis aspects of ESI's work with particular emphasis on the failure mode and condition of the threaded fasteners made available for study. As part of this investigation, ESI has also considered various aspects related to the strength and clamping ability of such fasteners.

The physical evidence consists primarily of a large number of miscellaneous pieces of hardware which were collected at the scene by different individuals at different times after the date of the occurrence. Photographs of particular parts were provided to us early in the course of this investigation. Later, certain of the parts were examined more closely at a joint party examination to document the evidence more thoroughly and to conduct detailed fracture analysis of selected fasteners. This evidence, along with the site visit and other background information, provided the following facts to consider:

1. How was the site configured at the time of the accident?

The site was a filter room in an office building that required periodic servicing of a bank of air filters. The work was done by an outside contractor (Siemens) without supervision of the building owner. The contractor provided the workers, training and supervision necessary to complete the work. After the accident, one of the horizontal metal supports for a wood plank had reportedly been found partially separated. Some time after the accident, and without full chain-of-custody documentation, the plaintiff removed some hardware from the site and took it home. Later, this hardware became a central issue in the lawsuit when it was alleged that the work area was improperly designed and that the attaching hardware had either failed or come apart prior to the date of the accident. Analysis of that hardware and the connected joint are the main focus areas of this particular report.

EXHIBIT     C

PAGE  3  OF  6

Engineering
Systems
Inc.
*esi-website.com*

As part of this study, ESI (Van Bree) visited the site and examined the filter wall, plenum and available evidence which were still in place. We were particularly interested in determining whether the physical evidence was consistent with the basic theories of the plaintiff's experts in this case – namely, was there any scientific evidence that the connections for the support of the wood plank were non-functional at the time of the accident? Based upon a close physical inspection of the filter room and by review of accident site photographs, no evidence of looseness or progressive failure was observed for any of the available structural connection locations. The horizontal and vertical angles were no longer present at the time of the inspection. However, the positions where the parts had previously been installed were still apparent. Examination of those connections showed no evidence of pre-existing wear or looseness.

2.  What was the failure mode of the broken fasteners?

Another ESI engineering staff member (Turnquist) participated in the joint party examination of the numerous pieces of subject hardware in a laboratory located in California. That examination involved physical examination, microscopic examination and scanning electron microscopy (SEM) of fracture surfaces. The broken fasteners of interest showed only one-time overload signatures consistent with bending and shear overloading. No long-term wear or thread damage, that might be associated with progressive loosening, was found. SEM examinations of the fractures revealed only bending and shear overstress-type fracture features. No evidence of fatigue or other pre-existing damage was observed. Light surface rusting of certain fractures occurred after the accident and was not of a quality or character to suggest pre-separation cracking had been present prior to Mr. Grove's fall. The nature of the mid-plane fracture tending to slightly split lengthwise is a consequence of the texture of the steel and occurred as the screw was fracturing. Accordingly, this feature did not cause or contribute to the onset of the overload separation.

3.  What are the strength issues associated with the threaded connection?

Stress and clamping calculations have been performed to study the capacity of the connections supporting the wood plank at the time of the accident. Standard design analysis methods were employed in these calculations (see attached MathCad worksheets). This assessment is based on a single commonly available ¼"-20 steel screw and nut. Clamping of a joint is accomplished as the screw and nut are tightened; the clamping force in the joint is a direct function of the amount of torque applied. Experiments conducted at the ESI laboratory with a digital torque sensor showed that 50 in-lbs of tightening torque is achieved with a hand-held screw driver (see attached data). Accordingly, based on a standard torque-tension relationship, a clamping load of approximately 1000 pounds is therefore achieved when a ¼-20 fastener is tightened to 50 in-lbs. It should be further noted that this clamping calculation is based on a single fastener acting alone. It is likely that at least two fasteners were being used at either end of the horizontal steel angle. Two or more fasteners would increase this clamping capacity proportionately.

In comparison, if a screw/nut joint is tightened with a wrench on the nut side (while using a screw driver to keep the screw from turning), a much higher torque is achieved and the clamping load is proportionately increased as well. The second data chart included herewith demonstrates the effect of using a wrench to tighten the nut side of the joint rather than using a screw driver to



EXHIBIT  C
PAGE  4  OF 6



Engineering
Systems
Inc.

*esi-website.com*

tighten the slotted screw while the nut is restrained. Using a 3/8" ratchet handle, an exemplar fastener was able to be tightened to as much as 180 in-lbs of torque before the screw twisted off. Therefore, assuming a person uses a wrench to tighten the nut while holding the screw fixed with a screw driver, up to 3600 pounds of clamping force is achieved: (180/50)*1000 =>3600 pounds.

Given that each horizontal member is supported by two ends, the total vertical capacity of the horizontal support is the sum of the strength of both ends. The vertical load on the beam may be assumed to be supported directly in shear of the fastener, or alternatively, carried by the friction developed between the clamped surfaces of the joint. In either case, the ultimate capacity of the joint would be governed by the shear strength of a threaded fastener loaded in single shear. The ultimate single shear capacity of a single fastener has been calculated to be in excess of 1200 pounds. The vertical load capacity is greater than 1200 pounds because, depending on where a localized load is applied, the load is reacted by the connection at both ends of the horizontal member. Furthermore, portions of the fastener are cold-worked when the threads are rolled resulting in an increase in hardness and strength (see attached hardness test report). For the purposes of this analysis, we have bounded the likely tensile strength of a ¼ -20, grade 2, steel fastener between 70,000 and 80,000psi. This equates to ultimate shear strengths between 1200 and 1400 pounds.

Therefore, it is fair to infer that the load capacity of a single horizontal supporting member is not less than 1200 pounds. If the applied loading acting on horizontal supports is assumed to be positioned midway along the plank between two horizontal supports, the loading at each connection is reduced. Accordingly, with a single fastener assumed to be loaded in shear with the applied load conservatively assumed to be adjacent to a single joint fastened with a single screw and nut, the vertical shear capacity is at least 6 times the static weight of a 200 pound person (75th percentile male). It has been reported that Larry Grove weighed between 170 and 180 pounds. Accordingly, from a design loading perspective, the static capacity of the configuration is adequate.

For the fasteners that failed, assuming that the horizontal angles had been exposed to such loading for a period of years and given the fact that no evidence of progressive failure or loosening was observed, it is fair to conclude that the support connection was overloaded at the time of the accident. Since static loading from a person, even if they are carrying a heavy weight is insufficient to overload this configuration, dynamic loading or prying are the only logical ways of significantly increasing the loading on the support. Prying loads are not present when the system is used as has been claimed in this case. Dynamic loading, however, can occur by dropping a large weight or by someone falling onto the surface. The metallurgical evidence and the observed fracture mode of the screws are consistent with such one-time overloading events.

In summary, the strength of the fasteners used to makeup the end connections of the horizontal steel angles in this case was substantial. The fact that commonly available hardware was used in the assembly of this framework is not a causative factor in this case. The fracture of the hardware examined was a consequence of a one-time overload as opposed to a failure under normal and expected conditions. The hardness and strength of the fasteners used in this case was more than capable of supporting the static weight of an adult person.



EXHIBIT ___C___

PAGE _5_ OF _6_



esi-website.com

Grove (Lawrence) v. Unocal Corporation

ESI File No. 21002A

This report summarizes the opinions reached and the bases for those findings, in this investigation to date. ESI reserves the right to clarify or supplement this report, if warranted, as new information becomes available. Attached hereto is the CV of Charles R. Morin, P.E., which sets forth pertinent qualifications and experience and lists the technical presentations and publications authored. Also appended is a listing of depositions and trials wherein expert testimony has been given over the last four years. ESI bills Mr. Morin's time at $250 per hour (in-house/local) or $295 per hour (out-of-town work) for research and analysis in this matter.

[END OF REPORT]



EXHIBIT ___C___

PAGE _6_ OF _6_



esi-website.com