GROVE, ET AL. v. UNOCAL                                     ARCHIE COOK
                                                             3/15/2006

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF ALASKA AT ANCHORAGE
3  _____
4  LAWRENCE H. GROVE, ET AL.,        )
                                     )   COPY
5              Plaintiffs,           )
                                     )
6       vs.                          )
                                     )
7  UNOCAL CORPORATION,               )
                                     )
8              Defendant.            )
9  _____
10 Case No. A-04-0096 CV (JKS)
11
12         —
13 _____
14            TELEPHONIC DEPOSITION OF ARCHIE COOK
15 _____
16
17                   March 15, 2006
                      7:30 a.m.
18
19             Taken by Counsel for Plaintiffs
                            at
20                330 L Street, Suite 200
                     Anchorage, Alaska
21
22                                         HD 1130
23                                         0200-1
                                           MAR 24 2006
24
                             EXHIBIT  D
25                           PAGE 1 OF 6

Page 2

```
 1                      A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiffs:
 4       Michael Cohn, Esq.
         PHILIP PAUL WEIDNER & ASSOCIATES
 5       330 L Street, Suite 200
         Anchorage, Alaska 99501
 6       (907) 276-1200
 7
 8   For Defendant:
 9       John B. Thorsness, Esq.
         (via speaker phone)
10       CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
         711 H Street, Suite 620
11       Anchorage, Alaska 99501
         (907) 272-9273
12
13
14   Court Reporter:
15       Sonja L. Reeves, RPR
         PACIFIC RIM REPORTING
16       711 M Street, Suite 4
         Anchorage, Alaska 99501
17
18
19
20
21
22
23
24
25
```

EXHIBIT D
PAGE 2 OF 6

GROVE, ET AL. v. UNOCAL

ARCHIE COOK
3/15/2006

Page 3

```
 1                        I-N-D-E-X

 2

 3   EXAMINATION BY                                    PAGE

 4      Mr. Cohn                                        4

 5

 6   EXHIBITS

 7   1    Notice of Deposition (2 pgs.)                 --
          (Marked off record.)
 8

 9

10

11

12                       --

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT D
PAGE 3 OF 6

GROVE, ET AL. v. UNOCAL                                    ARCHIE COOK
                                                           3/15/2006

Page 8

1  information, those two people would be Vickie Holman,
2  our paralegal possibly, and I believe Mr. Cook did also
3  speak with Linda Johnson.
4      MR. COHN: Thank you, John.
5  Q. Were you shown any papers at that time last
6  summer?
7  A. I received from Linda Johnson a copy of a safety
8  narrative prepared by OSHA. I think three pages of
9  that.
10 Q. Yes. Anything else?
11 A. That was it.
12 Q. Prior to the contact from Mr. Thorsness and
13 Ms. Johnson, have you had contact with any previous
14 counsel for Unocal?
15 A. Somebody from another legal company called me
16 previously. I'm sorry. I can't remember his name. He
17 used to work for Unocal.
18     I can't remember his name, but he called me just
19 wondering what I knew about this incident. He was a
20 lawyer.
21 Q. Right.
22 A. I can't remember his name.
23 Q. I don't want to mislead you or anything. We do
24 have some responses to discovery requests, and this is
25 from a previous counsel for Unocal in which they

Page 9

1  indicated your name as one of the people that they had
2  conferred with, and that was in a response to third
3  discovery requests.
4      And in regard to they asked you what you knew
5  about the case, I don't want to ask you about what you
6  told them, but can you just tell me briefly, first of
7  all, were you working in the building at the time
8  that --
9  A. I had left. I had long gone.
10     MR. THORSNESS: This is John Thorsness. I
11 don't think Mr. Cohn was finished with his question.
12 A. I'm sorry.
13     MR. THORSNESS: That's okay. And so just be
14 sure he has finished and then answer the question.
15 Q. Let me just explain that. If you don't
16 understand my question, you can always ask me to
17 rephrase it. I was finished, but I didn't explain it
18 well. Let me start over.
19     You indicated -- Mr. Grove's accident was
20 September 9, 2002?
21 A. That is my understanding.
22 Q. And you indicated that you retired from Unocal
23 April 13, 2003?
24 A. April the 30th.
25 Q. But when was the last time -- when did you stop

Page 10

1  working at the building at 909 West Ninth Avenue?
2  A. April the 30th.
3  Q. Of 2003?
4  A. Yes.
5  Q. Okay. So that's the reason why -- my question
6  before was were you working -- well --
7  A. Sorry. Please finish your question.
8  Q. Mr. Grove was injured on September 9, 2002.
9  First, let me ask you, were you working that day, if you
10 recall?
11 A. What day was it?
12 Q. September 9, 2002.
13 A. Yes, I know that. Was it a weekday?
14 Q. I would have to look at a calendar to see, but --
15 well, let me put it this way: When did you first become
16 aware of Mr. Grove's accident?
17 A. When I received a called from Roxanne Sinz when
18 an OSHA inspector visited our office. That would be in,
19 I guess, February. I think February of 2003.
20 Q. You know, I won't -- I won't hold you to specific
21 dates. I understand this is now we're talking about
22 four years ago, and so, I mean, there is some paperwork
23 that OSHA came out and inspected the premises in March.
24     They may have been out in February also. But I
25 understand that if you are just recalling to the best of

Page 11

1  your recollection that's okay too. I don't --
2  A. I do certainly recall Roxanne Sinz calling me to
3  say that there were a couple of OSHA inspectors in her
4  office and asked me if I knew about, as I recall, she
5  said a ladder, a broken ladder. That is my recollection
6  of it.
7      A ladder had broken and somebody had been hurt.
8  I was asked by Roxanne, Roxanne Sinz if I knew anything
9  about it, and I didn't.
10 Q. Who is Roxanne Sinz?
11 A. Roxanne was the public relations consultant for
12 Unocal. And I think maybe a week or so before the
13 inspectors visited the office, she was given
14 responsibility for managing the office.
15 Q. And as the building manager, would she be the
16 individual that you reported to as the human resources
17 manager?
18 A. No. I reported to the vice-president of the
19 company in Alaska.
20 Q. Who would that be?
21 A. A guy called Chuck Pierce. He was vice-president
22 of Unocal Alaska.
23 Q. Did he work in the building also?
24 A. Yes.
25 Q. Now, can you tell me what a human resources

EXHIBIT D
PAGE 4 OF 6

5 (Pages 8 to 11)

Page 20

1  Q. Did you go through the penthouse?
2  A. Yes, I went through -- they showed me -- what do
3  you call it -- the big tunnel with switches on it, and
4  they showed me the boilers for the heating system.
5     They showed me where there was an air intake,
6  where the fan was that made sure there was proper
7  ventilation within the office.
8  Q. When you said "they" showed me, do you recall --
9  A. Probably only Eddie. It wouldn't be two of them.
10 I can't remember, to be honest, but I can't remember.
11 But it would almost certainly be Eddie Barrett.
12    MR. THORSNESS: This is John Thorsness.
13 Excuse the interruption here. Just a reminder to wait
14 until Mr. Cohn finishes his question, and that also will
15 help you focus on the question itself and answering the
16 question as put to you.
17    I'm sure Mr. Cohn will appreciate if you
18 limit your answer to the question, and, like I said,
19 make sure to let him finish. Thanks.
20    THE WITNESS: All right, John. Thank you.
21 Q. Mr. Cook, when you talked about the orientation
22 up in the penthouse, did they show you the various rooms
23 in the penthouse?
24 A. Yes.
25 Q. Did you have any opportunity -- are you familiar

Page 21

1  with the room that's called the filter room where the
2  air filters are against one wall?
3  A. Yes, I'm familiar with it, yes.
4  Q. Did you have an opportunity to see that room
5  during your orientation in 1999?
6  A. Yes.
7  Q. And when you saw that room during your
8  orientation, can you describe what you saw in that room?
9  A. Well, yes, I think I can. To the right as you go
10 in the door there was -- what would you call it -- bulk
11 head, and then above that I could see louvers, which
12 opened and closed. On the left were filters. That's as
13 I recall that room.
14    I'm trying to think if there was a shaft at the
15 far end of the room. I just can't remember. I think
16 there was a shaft at the far end of the room.
17 Q. Well, when you talk about the wall to the right,
18 did that appear to be sheet metal?
19 A. I'm sorry. I can't remember. I remember it was
20 about eye level for me.
21 Q. Do you recall if there was any sort of a
22 structure affixed to the wall to the right?
23 A. To the right, no, I don't recall that.
24 Q. You don't recall if there was a work platform?
25 A. No. No. I mean, I was able to look up at an

Page 22

1  angle over, I would call it bulk head or whatever, and I
2  could see the louvers. That's my recollection of what
3  was in that room.
4  Q. Levers?
5  A. L-o-u-v-e-r-s.
6  Q. And what are those?
7  A. Well, these are essentially slats of plastic or
8  wood that swivel so that at one point they can be
9  completely closed so that no air is coming in or they
10 can be at right angles to that so that as much air as
11 possible is coming in.
12 Q. When I refer to the filter room, is it your
13 understanding that that's the room where Mr. Grove had
14 his accident?
15 A. If he was changing the filters, my understanding
16 is, yes, that's where he would have had his accident.
17 Q. So have you at any time ever seen the elevated
18 work platform that was in the filter room?
19 A. I have not.
20 Q. Have you had any knowledge of that work platform?
21 A. No, I have no knowledge of it.
22 Q. Do you have any knowledge of who owned that work
23 platform?
24 A. No.
25 Q. Or who built that?

Page 23

1  A. No, I have no knowledge.
2  Q. Previously we were asking -- I was asking you
3  questions regarding what contractors could do in the
4  building.
5  A. Correct.
6  Q. In terms of building an elevated work platform,
7  when you were human resource consultant or manager from
8  '99 to 2003, would the contractor have to get
9  authorization or approval from Unocal to construct such
10 an apparatus?
11 A. To construct such an apparatus? Let me see.
12 Need approval from Unocal?
13 Q. What was that?
14 A. I'm trying to formulate an answer. I'm sorry.
15 The question is would they require permission from
16 Unocal?
17 Q. To erect a work platform in the Unocal building
18 that includes brackets with nuts and bolts and affixing
19 it to the wall.
20    MR. THORSNESS: Objection here to foundation
21 and calls for speculation. Thank you.
22 Q. Mr. Thorsness may object from time to time, but
23 you can still answer the question. He is just
24 preserving objections for the record.
25 A. I don't know the answer. I don't know the

GROVE, ET AL. v. UNOCAL                                    ARCHIE COOK
                                                            3/15/2006

Page 60

1  should have come to me for authorization to work
2  overtime and give me a reason.
3      Q. Right. Okay. So since the filter replacement
4  would be done during after hours, Mr. Arnett would need
5  to come to you for approval?
6      A. That would be done after hours.
7      Q. Are those the only documents that you were
8  provided, LG00749, 755 and 756?
9      A. Yes. I mean, they were attached to an e-mail.
10 That's it.
11     Q. Was there any other information attached to that
12 e-mail of a factual nature?
13     A. No.
14     Q. On LG00756, on the second paragraph --
15     A. Yes.
16     Q. Where it says -- it's the third sentence in which
17 they are talking about Unocal. "It has the
18 responsibility and duty to exercise reasonable care to
19 prevent and detect safety hazards and/or violations."
20     A. Yes.
21     Q. Would you agree with that statement?
22     A. Yes, I believe we have a legal obligation to do
23 that.
24     Q. Mr. Cook, thank you for your patience. I'm just
25 about done, and I don't want you to miss your bridge

Page 61

1  meeting.
2      A. This is more important.
3      Q. I played bridge, but I don't remember it. I am a
4  terrible player. On LG00749, when it lists some of
5  these people, I am just trying to find out who some
6  people are. Do you know who Dan Harten is?
7      A. No, I don't. I don't know who that is.
8      Q. And did you personally ever meet Mr. Grove?
9      A. Yes. Yes, I met him many times, because we had a
10 major problem with the ventilation system, so I was
11 always on his case to get it fixed.
12     Q. So did you ever see Mr. Grove after the accident?
13     A. No.
14     Q. Do you know who from Siemens took over for Mr.
15 Grove after his injury?
16     A. No. I'm sorry. I don't know.
17     Q. So you were aware that Mr. Grove was servicing
18 the filter room?
19     A. Yes. We had a problem with the ventilation
20 system and eventually it was -- the problem was resolved
21 by installing a bigger fan. That I know to be the cause
22 of the problem.
23     Q. Now, you indicated that during your orientation
24 you went and looked at the filter room. Did you ever
25 look inside the filter room at any time after your

Page 62

1  orientation?
2      A. Yes, I had. At least on one occasion, maybe two,
3  Larry Grove actually showed me how the louvers turned to
4  bring in more air, and how it interconnected with the
5  fans, so he explained that system to me.
6      Q. Can you recall how well lit the filter room was?
7      A. Not very well lit, as I recall.
8      Q. Would you describe it as dimly lit?
9      A. Dimly lit, yes. Although I wanted to see the
10 apparatus and the louver frame. I wanted to see what
11 was the general apparatus so I could get a feel for how
12 much they had to turn to give us proper ventilation.
13     Q. Now, where was that? Was that located on the
14 outside wall?
15     A. On the outside wall, so on the right of the room
16 as you come in. It was off to the right. I could see
17 it because just standing on the ground I could look up
18 and see it.
19     Q. So you would be on the ground in the filter room
20 -- and there was a short wall. Was there a wall about
21 six or seven feet high?
22     A. Yeah. My recollection was it was about head
23 height for me. I could certainly see over the edge of
24 it and look up at the louvers.
25     Q. How tall are you?

Page 63

1      A. I'm 5'8".
2      Q. The reason I asked is because you said it was
3  about your head height, so that's why I asked that.
4      A. I'm certainly not a tall man.
5      Q. I mean if you told me seven feet --
6      A. I understand. Yes.
7      Q. And when the louvers were opened, would there be
8  a lot of cold air coming in?
9      A. Yes. When the fan was operating, yes, there was
10 a fair breeze in there.
11         MR. COHN: I don't have any more questions
12 for this witness. John, I would like him to get a copy
13 of his depo and to review it and sign it and to make any
14 changes if he thinks there are changes that need to be
15 made.
16         MR. THORSNESS: He will. I will ask the
17 court reporter to send that to me, and then, Archie, I'm
18 going to send you a copy of the transcript for your
19 review and then signature.
20         I have no questions for the witness.
21         MR. COHN: Thank you, Mr. Cook. It was nice
22 talking with you. And enjoy retirement, which I hope
23 some day to be there.
24         (Proceedings concluded at 9:15 a.m.)
25         (Signature reserved.)

18 (Pages 60 to 63)

EXHIBIT D
PAGE 6 OF 6