Page 1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
 2

 3
    LAWRENCE H. GROVE, et al.,    )
 4                                )
              Plaintiffs,         )
 5                                )
    vs.                           )
 6                                )
    UNOCAL CORPORATION,           )
 7                                )
              Defendant.          )
 8  _____)
    Case No. A 04-0096 CV   (JKS)
 9

10  _____

            VIDEOTAPED DEPOSITION OF TOM SCANLON
11  _____

12
                   Pages 1 - 220
13              Friday, April 14, 2006
                     9:16 a.m.
14
           Taken by Counsel for Plaintiffs
15                       at
    The Offices of Department of Labor & Workforce
16                  Development
         3301 Eagle Street, Suite 209
17            Anchorage, Alaska
```

EXHIBIT G
PAGE 1 OF 7

GROVE v. UNOCAL												TOM SCANLON
																4/14/2006

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S
 2
     For Plaintiffs:
 3      Michael Cohn
        PHILLIP PAUL WEIDNER & ASSOCIATES
 4      330 L Street, Suite 200
        Anchorage, Alaska 99501
 5      907/276-1200
 6
     For Defendant:
 7      Linda J. Johnson
        CLAPP PETERSON VAN FLEIN TIEMESSEN THORSNESS, LLC
 8      711 H Street, Suite 620
        Anchorage, Alaska 99501-3654
 9      907/272-9272
10
     For the State of Alaska:
11      Larry A. McKinstry
        Assistant Attorney General
12      Department of Law, Civil Division
        1031 West 4th Avenue, Suite 200
13      Anchorage, Alaska  99501-1994
        907/ 269-6612
14
     Also Present:
15      Eric R. Cossman, JD, CLVS

16   Court Reporter:
        Leslie J. Knisley
17      PACIFIC RIM REPORTING
        711 M Street, Suite 4
18      Anchorage, Alaska 99501
19
20
21
22
23                                    EXHIBIT   G
                                      PAGE  2  OF  7
24
25
```

GROVE v. UNOCAL                                              TOM SCANLON
                                                              4/14/2006

Page 5

1  ANCHORAGE, ALASKA; FRIDAY, APRIL 14, 2006
2              9:16 A.M.
3              -o0o-
4     (Exhibit 1 marked.)
5         THE VIDEOGRAPHER:  We're on the record
6  at 9:16.  This is the video deposition of Tom
7  Scanlon taken by the plaintiffs in the matter of
8  Grove, et al. versus Unocal Corp., Case No.
9  A-04-0096 CV (JKS), In The United States District
10 Court For The District of Alaska.
11        This deposition is being held in the
12 offices of OSHA located at 3301 Eagle Street,
13 Suite 209, Anchorage, Alaska on April 14th, 2006.
14 My name is Eric Cossman from Alaska Legal Video,
15 mailing address, 645 G Street, No. 892, Anchorage,
16 Alaska 99501.  The court reporter is Leslie
17 Knisley from the firm Pacific Rim Reporting.
18        Will counsel and all present please
19 identify themselves for the record?
20        MR. COHN:  My name is Michael Cohn from
21 the offices of Phillip Paul Weidner and Associates
22 here on behalf of the plaintiffs.
23        MS. JOHNSON:  Linda Johnson.  I'm from
24 Clapp Peterson and we represent Unocal.
25        MR. MCKINSTRY:  I'm Larry McKinstry.

Page 6

1  I'm an assistant attorney general and I represent
2  the Department of Labor.
3         THE VIDEOGRAPHER:  Thank you.  Would the
4  reporter please swear in the witness?
5              TOM SCANLON,
6    deponent herein, being duly sworn under oath,
7         was examined and testified as follows:
8              EXAMINATION
9  BY MR. COHN:
10   Q    Good morning, Mr. Scanlon.
11   A    Good morning.
12   Q    Once again, my name is Michael Cohn.
13 I'm here on behalf of the plaintiffs --
14   A    Okay --
15   Q    -- Larry Grove, Cynthia Grove, and their
16 children, Sarah Grove and Michael Grove.  And
17 we're here because of an accident that occurred on
18 September 9th, 2002 when a work platform collapsed
19 at the Unocal building at 909 West 9th Avenue.
20   A    Right.
21   Q    This deposition is being videotaped, and
22 I know sometimes it's a little awkward.  You'll be
23 looking at me.  It probably -- I don't know how
24 that usually works with deponents, but you'll be
25 videotaped straight ahead there.

Page 7

1    A    So, should I be looking at you or should
2  I --
3    Q    Well, you'll probably do what's natural,
4  and I think you probably should be facing the
5  person you're looking at.  But even though we have
6  it videotaped, you should still answer "yes" or
7  "no" to a question as opposed to shaking your
8  head -- there's also a transcript being made --
9    A    No, I understand.
10   Q    -- to a yes or no question.
11        Have you ever had your deposition taken
12 before?
13   A    Not that I remember, no.
14   Q    Do you understand -- have you had
15 explained to you what a deposition is?
16   A    Actually, no.
17   Q    A deposition is -- this is a proceeding
18 that under the Federal Rules of Civil Procedure we
19 take your deposition under oath.  And the
20 deposition can be used sometimes -- sometimes in
21 place of your testimony if we go to trial if
22 you're not available.  And the videotape, we might
23 agree to just use your deposition, or even if you
24 would appear, we might be able to use your
25 deposition in questioning you or in

Page 8

1  cross-examining you or confirming what you said
2  previously.
3         So there's a possibility that this
4  videotape is as if you're talking to the jury and
5  the jury is listening to you as if you were in
6  court.  Now, there may be some times when -- if
7  you don't understand the question that I'm asking
8  or, you know, you're confused, just let me know
9  because --
10   A    I'll ask for a reclarification.  Again,
11 this is my first time and I want to --
12   Q    Right.  And the other thing is, if I'm
13 asking you a question or Ms. Johnson's asking you
14 a question, it's easier for the court reporter to
15 first let us finish the question and then we try
16 and let you finish the answer without interrupting
17 you so that we don't have two voices at the same
18 time.
19        In addition, Ms. Johnson, and then when
20 she's questioning you, I might make objections to
21 certain questions.  We're just preserving that for
22 the record.  There's certain times where there's
23 questions that the Court may rule on as to whether
24 or not it's admissible in court.  Then we're just
25 preserving the objections, but you should still go

5 (Pages 5 to 8)

EXHIBIT G
PAGE 3 OF 7

GROVE v. UNOCAL                                                    TOM SCANLON
                                                                   4/14/2006

Page 137

1      MR. COHN: Yes, it's 8A and 8B.
2      Q   (By Ms. Johnson) Okay. So Exhibit 8A
3  is what I want you to look at, please.
4      A   8A?
5      Q   Uh-huh. And I'm going to refer to page
6  797 and 798, those two pages together.
7      A   Okay.
8      Q   Did you create this document?
9      A   Yes.
10     Q   Both of these? 797 and 798?
11     A   Right. If that is the -- oh, did I
12 create these? No, this is not -- this is done,
13 again, after I turn it in. This is nothing that
14 we --
15     Q   Not something that you did?
16     A   No.
17     Q   Okay. You agree that you came up with
18 two violations for Siemens; is that correct?
19     A   I believe so, yes.
20     Q   And the first one looks like it's the
21 same citation that Unocal received; is that
22 correct?
23     A   Correct.
24     Q   And you found that this was a serious
25 violation from Siemens' aspect?

Page 138

1      A   Right.
2      MR. COHN: Objection; form of the
3  question.
4      Q   (By Ms. Johnson) Why did you find that
5  Siemens had also violated this?
6      MR. COHN: Objection; foundation; form.
7      A   I refer back to the multi-employer work
8  site where you can be the creating, exposing.
9      Q   (By Ms. Johnson) And which one was
10 Siemens? Do you recall?
11     A   The exposing.
12     Q   Okay. As the actual employer of
13 Mr. Grove, does Siemens have a duty to provide him
14 a safe place to work?
15     MR. COHN: Objection to form of the
16 question; foundation.
17     A   Yes.
18     Q   (By Ms. JOhnson) Okay. And is that
19 provided for in OSHA regulations?
20     A   Yes, under the general duty clause, 5A
21 -- 5A? I'm looking to Larry for clarification
22 there.
23     MR. MCKINSTRY: I can't answer the
24 question. You've got to answer it if you know it.
25 If you don't...

Page 139

1      THE WITNESS: Okay.
2      Q   (By Ms. Johnson) You think that it
3  could be 5A, but you know that it's in there
4  somewhere?
5      A   General duty clause, yes, where every
6  employer has the responsibility to provide a safe
7  and health --
8      Q   Can Siemens contract away that duty?
9      MR. COHN: Objection to the foundation.
10     A   I don't know. It would be pure
11 speculation on my part.
12     Q   (By Ms. Johnson) Okay. So the
13 regulations don't say one way or another whether
14 somebody could contract away their specific
15 regulatory duty to provide a safe workplace?
16     A   Well, again, I refer back to the
17 multi-employer work site where it says different
18 employers can be cited for the same violation
19 depending on if you're the controlling, the
20 creating, the exposing, correcting employer.
21     Q   Looking at page 798, there was another
22 citation that was issued apparently. Can you tell
23 me what this was for?
24     A   That was for the portable ladder.
25     Q   And that was specifically to Siemens; is

Page 140

1  that correct?
2      MR. COHN: Objection to form of the
3  question.
4      A   Yes.
5      Q   (By Ms. Johnson) And you didn't find
6  the citation -- you didn't give a citation to
7  Unocal for a ladder; is that right?
8      A   No.
9      Q   Why did you cite Siemens for a ladder
10 violation?
11     A   Because their employee was using it to
12 access an area without it being three feet above,
13 which is a requirement.
14     Q   Did it make a difference to you that
15 this particular ladder, if you look at these
16 pictures -- and you're welcome to refer back to
17 these pictures -- does it make a difference to you
18 whether the ladder had two legs or four legs?
19 That's the best I can describe it to you.
20     A   No, but if you do use a stepladder, you
21 are not supposed to use the top rung to access
22 anyplace.
23     Q   Okay. So, would it matter to you that
24 Mr. Grove as a Siemens employee was using a
25 stepladder or a four-legged ladder in a leaning

EXHIBIT G
PAGE 4 OF 7

38 (Pages 137 to 140)

Page 177

1  Q  Okay. Do you have specific numbers for
2  inspections that are different from the citation
3  number, or do they always stay consistent across?
4  A  Well, let's go back to -- inspection
5  number is not generated by us. It's --
6  Q  What page are you looking at?
7  A  Look on page -- I'm sorry -- 710.
8  Q  Thanks.
9  A  Well, let's go back even further. Let's
10 go back to 701.
11 Q  Okay.
12 A  Again, the inspection number is
13 generated from the federal OSHA NCR system. So we
14 just punch it in and it says, do you want to
15 assign a number? We say yes, and then it comes up
16 and it can be, you know, just depends on how many
17 other people have asked in the last ten minutes.
18 The optional inspection number is ours. This
19 means that this was the 21st, 021 was the 21st
20 inspection I had done in 2003.
21 Q  You personally?
22 A  Yes.
23 Q  That's a personal number to you?
24 A  Right. And, again, you have to
25 understand, we don't go on calendar years. We go

Page 178

1  from October -- actually, in reality that was from
2  the previous August, September after I got
3  released to that point. This was my 21st
4  inspection.
5  Q  And what about the citation number?
6  Will it use the inspection number?
7  A  I'm sorry?
8  Q  Is there a citation number that's
9  different than an inspection number? Do you know?
10 Do you generate inspection -- or citation numbers?
11 A  Well, as far as citation No. 1, citation
12 No. -- item group 1, yes. But that's -- we start
13 every inspection with 01, 001, 2, you know,
14 depends on --
15 Q  Did you make any determination whether
16 Larry Grove's injury would have occurred if the
17 platform had had the proper railings and the toe
18 board?
19 A  No.
20 Q  Do you have any basis to say that it
21 would not have -- do you have any evidence to say
22 that it would not have happened if the railing had
23 been up?
24     MR. COHN: Objection to the form of the
25 question; foundation.

Page 179

1  A  No, I don't have.
2  Q  (By Ms. Johnson) Can you look at page
3  754, please? Looking at the bottom, the graph
4  that starts with the words Penalty Calculations.
5  A  Yes.
6  Q  Do you generate those numbers?
7  A  We put -- no -- yeah -- we put -- I'm
8  jumping ahead. If you would read the FIRM, it
9  would explain to you how these numbers are based.
10 We go through and make the assessment, is it
11 lower, higher, probability, lesser or higher, and
12 then the computer generates based on number of
13 employees, good faith, and the size of
14 the employee -- the numbers, the gravity-based
15 penalty.
16 Q  So the first one, the severity, you
17 determined that this was low in severity?
18 A  Right.
19 Q  Okay. And why was it low in severity?
20 Do you recall?
21 A  Because I did not think the fall was
22 that high. I think it was under what, eight feet.
23 Q  Okay. So that was the height that he
24 fell that --
25 A  I don't remember, but...

Page 180

1  Q  Would that be one of the things you'd
2  normally look at?
3  A  Yes. Right.
4  Q  Probability, what does that mean?
5  A  That -- what is the probability if there
6  would be an accident that was going to happen or
7  not. Remember, this had been there since the
8  '70s. It just happened in 2003. The fact that it
9  happened, I guess is unfortunate, but the
10 probability -- statistically, if it was there for
11 23 years before something happened.
12 Q  Gravity, what are the various options
13 you can put in gravity; 01 to what would be the
14 highest?
15 A  I don't know. The computer does that.
16 We just put in the high, medium or low.
17 Q  Okay. So you don't put the number in
18 gravities?
19 A  No.
20 Q  Okay. Do you add in the number for good
21 faith?
22 A  That's what we put as size. Good faith
23 is if they have a safety program, if they've
24 looked like they've been proactive.
25 Q  Okay. In this case you gave 15 points

48 (Pages 177 to 180)

EXHIBIT G
PAGE 5 OF 7

GROVE v. UNOCAL                                                TOM SCANLON
                                                               4/14/2006

Page 189

1  coordinator to be upstairs with Siemens?
2       MR. COHN: Objection; foundation.
3     Q  (By Mr. Johnson) Did they express that
4  to you?
5     A  The answer is no, but my recollection
6  was that it was they didn't want a subcontractor
7  roaming the offices of an oil company unescorted.
8  I mean, that's just --
9     Q  Did they tell you that the coordinator
10 was also a subcontractor? He was the Peak
11 employee.
12    A  Did they tell me that? No, but
13 obviously since then I have found that out. But
14 you have to understand that there is a distinction
15 in the oil industry, which I assume you know,
16 is -- classic case, when I worked for Arco slash
17 ConocoPhillips at Alpine as the Alpine camp
18 manager with maintenance and security and medical
19 under me, I was considered a ConocoPhillips
20 employee, had line item authority to sign
21 contracts, et cetera, until the Arco lawyer found
22 out about it by accident. But that is -- I'm not
23 being facetious, but that is not uncommon.
24    Q  But in 2002 you're not sure what the
25 arrangement was?

Page 190

1     A  I do not know. But I'm just saying from
2  my experience both at BP and with Arco and
3  ConocoPhillips, yes, I wasn't a direct Arco
4  employee because I was not going -- I did not want
5  to go back up and work on the Slope. I did it
6  just for a short period -- three years, but I was
7  considered an Arco manager.
8     Q  So when you were looking at the various
9  relationships, you were drawing from your own
10 experience -- your own background and experience?
11    A  Sure. I just assumed that when they
12 said he was Unocal, I took it as that he was a
13 Unocal employee. But in -- I guess my point is, I
14 could understand why they could tell me that and
15 not draw the distinction.
16    Q  And that was based on your own
17 experiences?
18    A  Yes.
19    Q  Okay. In the next paragraph it talks
20 about "Unocal is the creating employer." When
21 you're talking about "creating," at what point did
22 you decide that -- I'm not sure how to phrase
23 this. The creation -- did you think that Unocal
24 -- did you go back and look at whether Unocal had
25 originally put up the structure, or were you

Page 191

1  looking at the statement to you that they had
2  somehow repaired this after the accident? Which
3  one was creation to you?
4     A  Creation --
5       MR. COHN: Objection to the form of the
6  question; compound; vague.
7     A  I refer to the multi-employer citation
8  policy. It's a pretty specific definition.
9     Q  Okay. What page are you looking at
10 there?
11    A  On page 4 of 11 under the creating
12 employer.
13    Q  Okay.
14    A  Employer that caused a hazardous
15 condition that violates an OSHA standard.
16    Q  Where is that? I'm sorry.
17    A  Right there under B, No. 1, under
18 Definition.
19    Q  Okay. And the -- you're looking at
20 Unocal having created a hazardous condition?
21    A  Right, from several perspectives. One,
22 the first perspective, the comment that it had
23 been there since the -- probably the '70s. I
24 think that was the consensus of everybody's that
25 had been there for a number of years. And, 2, the

Page 192

1  fact then that they had put it -- Unocal
2  management had directed Paul to put it back up and
3  it still did not have fall protection.
4     Q  So back in the '70s -- it made no
5  difference to you who installed it in the '70s.
6  You were looking at the fact that Unocal just --
7  you thought Unocal knew it was there for that
8  length of time?
9       MR. COHN: Objection to the form of the
10 question. That's not what he said. You just
11 changed what he said.
12      MS. JOHNSON: I don't need a speaking
13 objection. Just give me the objection, please.
14      MR. COHN: You changed the answer.
15 Objection to form; misstates the testimony.
16      MS. JOHNSON: Form is all we need.
17 Thank you.
18    Q  Go ahead.
19    A  Okay. Just what I said. You know, I
20 look at it from two different perspectives. The
21 most relevant would be that Unocal management had
22 it put up right after the accident and it still
23 didn't have fall protection.
24    Q  Okay.
25    A  A peripheral issue was that, yes, it had

51 (Pages 189 to 192)

EXHIBIT 6
PAGE 6 OF 7

GROVE v. UNOCAL                                                         TOM SCANLON
                                                                        4/14/2006

Page 217

1  wall in Unocal and there's some -- and your notes
2  indicate that it may have been there since the
3  1970s.
4      A   Right.
5      Q   Now, what does -- does this convey to
6  you that Unocal as the employer or owner of the
7  building is the one responsible for this -- is
8  responsible for this work platform?
9          MS. JOHNSON:  Objection; foundation.
10     A   Again, a complex issue.  It could depend
11 on a couple of things.  Getting back to Step 1 is,
12 they had their own ladders and they were extension
13 ladders.  I would think that under the reasonable
14 man concept it might be much more prudent not to
15 use the work platform and use your own ladder just
16 to go all the way up.
17     Q   (By Mr. Cohn)  And how do you get the
18 ladder into the building?
19     A   Well, he had gotten it in there several
20 times before, you know
21     Q   Dragging it up seven flights of stairs?
22         MS. JOHNSON:  Objection; argumentative.
23     Q   (By Mr. Cohn)  Well, that leads to
24 another question:  Your own notes indicate that
25 under the service contract between Unocal and

Page 218

1  Siemens it was the duty of Unocal to provide
2  access to the equipment that they were going to
3  replace.
4      A   Right.
5      Q   Would that indicate to you it was the
6  responsibility of Unocal to supply the ladder or
7  work platform that was to be used by Siemens to
8  access the filters to replace them?
9          MS. JOHNSON:  Objection; foundation.
10     A   I'm not in a position to make that
11 judgment.
12     Q   (By Mr. Cohn)  You put that down --
13 well, why did you put that down in your Safety
14 Narrative report if it's --
15     A   Because it's --
16     Q   Did you consider it important?
17     A   Yes.  And I go back to my previous
18 statement that we are told to ask for the contract
19 to try to determine.  It's not a cut and dry
20 situation, but we try to help determine who has
21 the responsibility.
22     Q   Was there anything in any of the
23 contracts you read between Unocal and Siemens that
24 placed the responsibility on Siemens to supply
25 ladders or work platforms to access the equipment?

Page 219

1      A   I don't remember.
2      Q   And if there was no such requirement in
3  the contract and if in fact the requirement was on
4  Unocal, you wouldn't have -- is that a factor in
5  considering Unocal's liability for the citations?
6      A   Yes.
7          MR. COHN:  I don't have any further
8  questions.
9          MS. JOHNSON:  Objection to the
10 foundation on the last question.
11         I don't have any other questions.  You
12 are free to go.  Get out quick.
13         THE VIDEOGRAPHER:  This concludes the
14 deposition of Tom Scanlon.  The time is 3:30.
15         (Signature waived.)
16         (Proceedings concluded at 3:30 p.m.)

EXHIBIT G
PAGE 7 OF 7

58 (Pages 217 to 219)