GROVE v UNOCAL                                                              PAUL CRAPPS
                                                                             3/3/2006

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    _____

4    LAWRENCE H. GROVE, ET AL.,        )
                                       )
5              Plaintiffs,             )
                                       )
6       vs.                            )
                                       )   COPY
7    UNOCAL CORPORATION,               )
                                       )
8              Defendant.              )

9    _____

10   Case No. A-04-0096 CV (JKS)

11

12                    —

13   _____

14          VIDEOTAPED DEPOSITION OF PAUL CRAPPS

15   _____

16                  March 3, 2006
                    11:00 a.m.
17

18          Taken by Counsel for Plaintiffs
                           at
19              330 L Street, Suite 200
                   Anchorage, Alaska
20

21

22                                         HD 4pm
                                           6200-1
23                                         MAR 21 2006

24

25

PACIFIC RIM REPORTING   907-272-4383
www.courtreportersalaska.com

GROVE v UNOCAL                                                                                      PAUL CRAPPS
                                                                                                    3/3/2006

Page 5

1
2      ANCHORAGE, ALASKA; MARCH 3, 2006
3                11:00 A.M.
4         VIDEOGRAPHER: My name is Martha Enslow of
       Media Impressions, P.O. Box 112181, Anchorage, Alaska
5      99511. I am the videographer representing Pacific Rim
6      Reporting.
7         It is the 3rd day of March the year 2006.
8      We're on record 11:08 a.m. We're at the offices of Phil
9      Weidner in Anchorage, Alaska to take the deposition of
10     Paul Crapps in Case Number 04-0096 Civil, Lawrence H.
11     Grove, et al. versus Unocal Corporation.
12        This deposition is being taken on behalf of
13     the plaintiff. At this time, I would like everyone in
14     the room to identify themselves verbally.
15        MR. COHN: My name is Michael Cohn. I am an
16     attorney with the law firm of Phillip Paul Weidner &
17     Associates. I'm here representing the plaintiffs, Larry
18     Grove; his wife, Cynthia Grove; his children, Michael
19     Grove and Sarah Grove. And alongside me is plaintiff,
20     Larry Grove.
21        MR. THORSNESS: John Thorsness here for the
22     defendant, Unocal, and representing the witness.
23        MR. CRAPPS: My name is Paul Crapps.
24        MR. WEIDNER: The record should reflect, my
25     name is Phillip Weidner. I am here with Mr. Cohn. I am

Page 6

1      also here on behalf of the plaintiffs. I'll be here for
2      portions of the deposition.
3         VIDEOGRAPHER: Are there any stipulations?
4         MR. COHN: None.
5         MR. THORSNESS: No.
6                 -oOo-
7                 PAUL CRAPPS,
8          deponent herein, being sworn on oath,
9          was examined and testified as follows:
10                EXAMINATION
11     BY MR. COHN:
12     Q. Good morning, Mr. Crapps.
13     A. Good morning.
14     Q. You understand that we're here to take your
15     deposition?
16     A. Yes.
17     Q. And you understand that this deposition is being
18     videotaped?
19     A. Yes.
20     Q. And you understand that we're taking your
21     deposition in a lawsuit against Unocal filed by the
22     plaintiffs?
23     A. Yes.
24     Q. Do you understand that anything you say here can
25     be used -- may be used in court?

Page 7

1      A. Yes.
2      Q. And you understand this is a formal proceeding?
3      A. Yes.
4      Q. And you understand that in certain instances this
5      deposition may be used instead of your live testimony at
6      trial if appropriate?
7      A. Yes.
8      Q. Are you taking any medication?
9      A. No.
10     Q. So there is nothing that would affect your
11     ability to understand the questions that I ask you other
12     than the way I phrase my questions?
13     A. No.
14        MR. THORSNESS: Paul, if there is anything
15     you don't understand about Mr. Cohn's questions, just
16     ask him to rephrase it. He'll be happy to do that.
17     Q. If for some reason you need to take a break, and
18     sometimes deponents don't realize that they are allowed
19     to take a potty break if they need one and they don't
20     have to wait for the lawyers to say, "Time for a break,"
21     just let us know and I will be happy to accommodate you.
22        And another thing which is a lot of times
23     deponents sometimes do not answer "yes" or "no" and they
24     go "uh-huh," but even though we're on videotape, if you
25     can, instead of shaking your head, give us a "yes" or a

Page 8

1      "no" if that's the appropriate response.
2      A. Okay.
3      Q. That will make a more complete and better record
4      to follow. Even though it is videotaped, there is also
5      a transcript that will be made.
6         Have you done anything to prepare for this
7      deposition today?
8      A. Yes.
9      Q. What did you do?
10     A. We met earlier.
11     Q. When you say "we" --
12     A. My lawyer or Unocal's lawyer, Mr. -- I'm sorry.
13        MR. THORSNESS: Thorsness.
14     Q. Have you talked to anyone else besides Mr.
15     Thorsness about your deposition today?
16     A. Yes, Tracy Howard.
17     Q. Who is Tracy Howard?
18     A. She is our legal department of Unocal.
19     Q. Did you review any papers or notes?
20     A. Yes.
21     Q. And what did you review?
22     A. I reviewed the OSHA inspections, some photos and
23     some of the questions. I don't know what the legal term
24     is for them.
25     Q. Questions, are you talking about discovery

5 (Pages 5 to 8)

EXHIBIT #10
PAGE 2 OF 10

Page 29

1   Q. Did you ever go back to the filter room after
2   that time?
3   A. Yes.
4   Q. When was the next time you went to the filter
5   room?
6   A. A couple of days after that.
7   Q. And did somebody ask you to go to the filter room
8   on that occasion?
9   A. Yes.
10  Q. Who was that?
11  A. Charles Arnett.
12  Q. And did Mr. Arnett give you any instructions?
13  A. Yes.
14  Q. What did he tell you?
15  A. He asked me to remove the platform.
16  Q. Did you know at that time that there was a
17  platform in that room before he told you to remove the
18  platform?
19  A. No.
20  Q. Was this in a telephone call or face-to-face?
21  A. Face-to-face.
22  Q. Did you immediately go up to the filter room
23  then?
24  A. Yes.
25  Q. Did you have a tool box with you?

Page 30

1   A. No, I didn't actually have a tool box. I had a
2   few hand tools.
3   Q. How did you know -- did he give you the hand
4   tools?
5   A. I can't recall actually what I had with me, if it
6   was -- if I went up and came back down for the tools or
7   if I went up with them.
8   Q. So now you go up to the filter room and you have
9   hand tools?
10  A. Okay.
11  Q. Do you open the door -- are you by yourself at
12  this time?
13  A. Yes.
14  Q. You open the door?
15  A. Uh-huh.
16  Q. You walk in?
17  A. Yes.
18  Q. And what do you see?
19  A. Two -- excuse me. One wood plank partially
20  laying on the floor and two metal brackets mounted on
21  the wall.
22  Q. Two metal brackets?
23  A. Yes.
24  Q. Was the wood plank completely on the floor?
25  A. Partially on the floor.

Page 31

1   Q. One part was on the floor and where was the other
2   part?
3   A. Laying on one of the brackets.
4   Q. Can you estimate the length of that wooden plank?
5   A. I would estimate 10, 12 feet.
6   Q. And how thick -- can you estimate how thick the
7   plank was?
8   A. Probably two-inch.
9   Q. Where was the -- so I take it the bracket -- one
10  end of the bracket was still affixed to something; is
11  that correct?
12  A. Yes.
13  Q. Was it affixed to the wall where the filters were
14  or was it affixed to the other wall?
15  A. Both.
16  Q. So there were two brackets facing each other on
17  -- the bracket spanned the wall to the two walls?
18  A. Yes.
19  Q. And there were two of these brackets?
20  A. Yes.
21  Q. So both of them were still connected to the wall
22  on both sides?
23  A. One was connected to the wall on both sides. One
24  was connected just to one wall.
25  Q. And which one was only connected to one wall, was

Page 32

1   that the one further from the door or closest to the
2   door?
3   A. Further from the door.
4   Q. And which wall was it still connected to?
5   A. The opposite side of the filters.
6   Q. How would you describe the wall opposite side of
7   the filter? Was that sheet metal?
8   A. Yes. It's sheet metal with a steel skeleton.
9   Q. Now, what did you do -- by the way, what was the
10  lighting like in the room?
11  A. There is one or two light bulbs in the room.
12  Q. Are they dim bulbs or bright bulbs?
13  A. Light bulbs.
14  Q. Describe the lighting in the room. Was it well
15  lit?
16  A. I wouldn't say well lit. I would say dimly lit.
17  Q. Now, what did you do when you got into the room
18  and you saw the plank and you saw the brackets? What
19  was the next thing you did?
20  A. I pulled the plank and took it outside the filter
21  room.
22  Q. Now, at the time that you -- just to back up. At
23  the time you went into this room, have you talked to
24  anyone else about the filter room other than Charles
25  Arnett?

11 (Pages 29 to 32)

EXHIBIT 4
PAGE 3 OF 10

GROVE v UNOCAL                                                         PAUL CRAPPS
                                                                        3/3/2006

Page 33

1   A. No.
2   Q. So you pulled the plank outside the filter room,
3   and then what did you proceed to do? Did you proceed to
4   unscrew any of the nuts?
5   A. I removed the two metal brackets.
6   Q. And what did you do with the hardware that was
7   used to attach the brackets to the wall?
8   A. I put it in the trash can.
9   Q. Was the trash can in the filter room or right
10  outside the filter room?
11  A. It was as you entered the penthouse.
12  Q. Do you recall how many nuts and bolts you had to
13  remove?
14  A. No.
15  Q. Do you recall what the size of the bolts were?
16  A. I would estimate like a quarter inch.
17  Q. Do you know the strength of those bolts?
18  A. No.
19  Q. How long did it take you to remove the brackets?
20  A. I would say -- I would estimate maybe 15 or
21  20 minutes.
22  Q. Did you observe any debris on the floor of the
23  filter room while you were working?
24  A. No.
25  Q. And when you removed the bolts, did you catch

Page 34

1   them in your hand or did you have like a baggy you were
2   putting them in?
3   A. No. I just removed them and whatever I pulled
4   out, I put in my hand, or whatever. It landed where it
5   landed.
6   Q. Did you say it went where it landed?
7   A. Yeah.
8   Q. So did some fall on the floor?
9   A. They could have, yes.
10  Q. And did you go and pick up the ones that fell on
11  the floor?
12  A. No.
13  Q. How soon was this second visit to the filter room
14  from the first time that you went in -- not that you
15  went in, that you went up there with Charles the first
16  time and now the second time you went in to remove it.
17  Do you have any idea how much time had passed?
18  A. A couple of days.
19  Q. Now, can you describe the hardware that you
20  removed? Was it just bolts or what else was there?
21  A. I removed the two metal brackets and the bolts
22  holding it on.
23  Q. Well, were there like washers attached to the
24  bolts?
25  A. I don't recall. There could have been.

Page 35

1   Q. Were there nuts at the end of the bolt?
2   A. Yes.
3   Q. Can you describe the shape of the nuts? Round?
4   Square?
5   A. The nuts themselves were square.
6   Q. Now, you said you threw the nuts and bolts away.
7   Did somebody tell you to do that?
8   A. No. I was just told to remove it.
9   Q. By Charles?
10  A. Yes.
11  Q. Do you know if -- did you put anything up in its
12  place after you removed it?
13  A. No.
14      MR. THORSNESS: By "it," you would mean the
15  brackets and that sort of stuff?
16      MR. COHN: Yeah.
17      MR. THORSNESS: Thank you. That's how you
18  understood the question?
19      THE WITNESS: Yes.
20  Q. Do you know if you removed the plank and the
21  bracket and the nuts and the bolts after OSHA inspected
22  the room, the filter room?
23  A. What do you mean?
24  Q. Are you aware that OSHA came out and inspected
25  the filter room?

Page 36

1   A. Yes.
2   Q. And the removal of the brackets and the nuts and
3   the bolts -- we didn't actually talk about what you did
4   with the plank yet. Did that occur after OSHA came in?
5   A. No, that was before.
6   Q. Now, you have this plank that you estimated,
7   what, about 12 feet long?
8   A. Yeah.
9   Q. What did you do with the plank?
10  A. I put it up in a long storage area as you come
11  into the penthouse. I placed it up in that.
12  Q. And do you know how long the plank was in that
13  area?
14  A. No.
15  Q. Do you know what happened to the plank after you
16  placed it there?
17  A. No.
18  Q. Now, the brackets that you removed, the metal --
19  they were metal brackets?
20  A. Yes.
21  Q. So there were four of them? Was it like a
22  bracket on each wall or was it one?
23  A. There was two brackets.
24  Q. But when you are referring to the bracket, you
25  are talking about just -- well, I can show you. Well,

Page 37

1  we'll get to that afterwards, but we'll talk about the
2  brackets what they looked like after, but what did you
3  do with the brackets?
4      A. What did I do with them?
5      Q. Yes.
6      A. I discarded them in the trash with the nuts and
7  bolts.
8      Q. Now, did you ever go back into the room after
9  that day that you removed it?
10     A. What time period? As a contractor or since I
11 worked there?
12     Q. Let's talk about first as a contractor.
13     A. Yes.
14     Q. When did you -- actually, I should just go in
15 order. You removed all of these things from the room?
16     A. Yes.
17     Q. Then when is the next time you came back into the
18 room?
19     A. I couldn't recollect that. The last time I could
20 recollect going back up there and going physically in
21 that room would be the OSHA inspection.
22     Q. Well, if the planks had been removed and the nuts
23 and bolts had been removed and the brackets removed,
24 what did they have to look at?
25         MR. THORSNESS: Objection; foundation.

Page 38

1      Q. Well --
2          MR. THORSNESS: You are asking him what OSHA
3  had to look at?
4          MR. COHN: No speaking objection, please,
5  John. He says he is in the room with them.
6      Q. You are in the room?
7      A. With who?
8      Q. With the OSHA people?
9      A. No.
10     Q. You didn't go in the room. I asked you the next
11 time you went into the room.
12         MR. THORSNESS: You say "the room."
13         MR. COHN: The filter room. When we are
14 talking about "the room," we are talking about the
15 filter room unless otherwise specified.
16     A. The filter room, I would have to say I didn't set
17 foot in that filter room when the OSHA inspectors came.
18 I let them into that room.
19     Q. Was the door open and you standing outside the
20 room?
21     A. Yes.
22     Q. But when they went into the room to inspect, the
23 platform wasn't there?
24     A. No.
25     Q. And do you know who went into that room?

Page 39

1      A. The OSHA inspector and our safety person, Ken
2  Burns.
3      Q. And was Charles Arnett -- did Charles Arnett go
4  into the room?
5      A. No.
6      Q. What about Roseanne Sinz?
7      A. No.
8      Q. Did you have any -- did Roseanne Sinz direct you
9  to do anything in the filter room?
10     A. No.
11         MR. THORSNESS: Are you talking on the day
12 of the OSHA inspection or any time?
13     Q. I guess that was at any time.
14     A. At any time, I would say no. Actually, I would
15 say no, not from Roxanne, no.
16     Q. Well, not from Roxanne, then, okay. Who, besides
17 Charles Arnett, who has directed you to do anything in
18 connection with the filter room?
19     A. I took pictures after the OSHA inspection of the
20 filter room.
21     Q. How many pictures did you take?
22     A. Half a dozen, I would estimate.
23     Q. Well, why did you take these pictures?
24     A. After the OSHA inspection, we just figured it
25 would be good to have our own pictures.

Page 40

1      Q. When you said "we thought it would be good," you
2  are talking more than just you? Did anybody direct you
3  to take these pictures?
4      A. Ken Burns.
5      Q. Did you see anyone else taking pictures?
6      A. No.
7      Q. What type of camera did you use?
8      A. Digital.
9      Q. And what areas of the room did he have you take
10 pictures of?
11     A. Where the platform existed.
12     Q. When you say where -- did you do any close-up
13 shots or zoom in to where the brackets were located?
14     A. From knowledge of where I pulled them down.
15     Q. So did you take pictures at both sides of the
16 wall or just the sheetrock side?
17     A. It's not real sheetrock. Just the opposite side
18 of the filters.
19     Q. Do you know what happened to those pictures after
20 you took them?
21     A. I sent them off to, I think, Ken Burns and
22 Roxanne Sinz.
23     Q. Have you, yourself, ever had to work on a --
24 stand on a work platform?
25     A. At my present job or at that point?

13 (Pages 37 to 40)

EXHIBIT H
PAGE 5 OF 10

Page 57

1  though. Let's continue.
2         MR. COHN: The problem with the answers is
3  that they have been misrepresenting the facts all along,
4  which is why there is now a second supplement. And Mr.
5  Thorsness has told me there will be a third supplement,
6  which isn't here yet.
7         MR. THORSNESS: You know, I object to your
8  allegation of misrepresentation. There is no basis for
9  that. I object to it, Counsel. I object to it.
10        MR. COHN: That's fine. You can make
11 whatever you objections you want, John.
12        MR. THORSNESS: Let's continue, please.
13        (Exhibit No. 6-B marked.)
14    Q. Defendant's Second Supplemental Response to
15 Plaintiffs' Fifth Discovery Requests, which is Exhibit
16 No. 6-B, and I'm going to show you that document. This
17 is a supplement to the supplement.
18        MR. THORSNESS: Object to characterization.
19 Ask your question, Counsel. And move to strike.
20        MR. COHN: Objection to that as proposed.
21    Q. I just want to -- and the same question about
22 what happened to the work platform.
23        MR. THORSNESS: Object to foundation. You
24 haven't laid a foundation.
25    Q. Exhibit No. 6-B, have you seen this exhibit

Page 58

1  before?
2     A. Yes.
3     Q. When did you see that exhibit?
4     A. Earlier today.
5     Q. Were you -- did you provide information that went
6  into this exhibit?
7     A. Yes.
8     Q. And when were you contacted in regard to this
9  information that's provided here?
10    A. I don't know.
11    Q. Could you read the answers into the record,
12 number two and three, and then I want to ask you if
13 that's information that you provided?
14    A. "Defendant believes that Paul Crapps removed the
15 scaffolding from inside the filter room within a few
16 days of the alleged incident. At that time, Paul
17 Crapps' title was building services coordinator.
18        He provided services to Union Oil Company of
19 California through Kelly Services. Mr. Crapps' contact
20 information has been previously provided.
21        Upon information and belief, Paul Crapps placed
22 metal pieces of the platform in a trash can located
23 outside the filter room. Subsequent to removing the
24 platform from the filter room, Mr. Crapps has attempted
25 to locate boards at part of the platform, but has been

Page 59

1  unable to do so. Defendant does not know the current
2  location of the boards."
3     Q. What information in number two and number three
4  did you provide?
5     A. All of it.
6     Q. Have you gone back and checked to see if the
7  plank is still in the location that you stored it?
8     A. Yes.
9     Q. Is it there?
10    A. No.
11    Q. Do you know who removed it?
12    A. No.
13        MR. THORSNESS: I want to state for the
14 record that there is an error in answer number two that
15 was explained to Counsel before the deposition today.
16        And if he doesn't clear it up, I'm going to
17 clear it up on cross examination.
18        MR. COHN: You are right. We did talk about
19 that previously, and I would appreciate it if counsel
20 would explain what the changes are.
21        MR. THORSNESS: We're going to file another
22 supplemental here. Mr. Crapps was not building services
23 coordinator at the time the scaffolding was removed.
24 That job title and duties came after that event.
25        MR. THORSNESS: I'll ask the witness right

Page 60

1  now, have I just made a correct statement of the fact,
2  Mr. Crapps?
3         THE WITNESS: Yes.
4         MR. THORSNESS: Anything you wish to add to
5  that?
6         THE WITNESS: No.
7         MR. THORSNESS: Thank you.
8     Q. I would like to mark as the next exhibit in
9  order, which would be Exhibit No. 7, Defendant's
10 Responses to Plaintiffs' Ninth Discovery Requests. If
11 you can hold on one moment, I might get a --
12        (Exhibit No. 7 marked.)
13    Q. I'm showing deponent Defendant's Response to
14 Plaintiffs' Ninth Discovery Requests. Have you seen
15 this document before?
16        The "MC," that's just a notation here at the
17 office, so that's not part of the response on the cover.
18    A. Yes.
19    Q. You have seen that document before?
20    A. Yes.
21    Q. When have you seen that document?
22    A. Earlier today.
23    Q. In that interrogatory number one, "Identify any
24 and all persons who provided information that became the
25 basis of Defendant's Supplemental Responses to

EXHIBIT H
PAGE 6 OF 10

GROVE v UNOCAL                                                    PAUL CRAPPS
                                                                   3/3/2006

Page 61

1  Plaintiffs' Fifth Discovery Requests," which is Exhibit
2  No. 6-A herein, and subsequent to that there has been a
3  second supplement, which is Exhibit No. 6-B, and under
4  the representations of Counsel and we have talked about
5  it, there will be a clarification, so there will be a
6  third supplement.
7      It asks about where Unocal said they don't know
8  the whereabouts of the work platform and identity of the
9  persons who removed it. Can you read off under the
10 answer the third line where it starts "until"?
11     MR. THORSNESS: Object to the form of the
12 question and move to strike it.
13 Q. Well, where it starts off "Until Paul Crapps."
14 A. I am lost here. Where are you at?
15 Q. On page two, the answer.
16 A. The answer here?
17 Q. Right.
18 A. "Until Paul Crapps was interviewed, no current
19 Unocal employee was identified as possessing the
20 information requested."
21 Q. Do you know when you were interviewed?
22 A. I don't know the date, no.
23 Q. Was it 2006?
24 A. This has been going on so long. I couldn't tell
25 you.

Page 62

1  Q. Well, in the response to the third discovery
2  requests, it indicated that you had been conferred with
3  in the discovery answers to that date.
4      Do you have any recollection of that having been
5  done, getting your input into the answers?
6  A. No.
7     MR. COHN: Can we just take a short break.
8     VIDEOGRAPHER: Off record 12:52 p.m.
9     (There was a short break.)
10    VIDEOGRAPHER: On record 12:57 p.m.
11 Q. Mr. Crapps, I thank you for taking the time here
12 and I'll try and make this as quick as possible, but
13 when lawyers say that, then it keeps going, but I'm
14 going to try and be quick.
15    (Exhibit No. 8 marked.)
16 Q. I'm going to show you what's been marked as
17 Exhibit No. 8, and this is a document that was provided
18 to the plaintiffs in -- I'm going to represent it was --
19 the same document you have in front of you, John.
20    That it was provided to the plaintiffs in initial
21 disclosures by the defendants and it is marked DEF00027
22 Grove versus Unocal. Have you ever seen that document
23 before?
24 A. Yes.
25 Q. When did you see that document?

Page 63

1  A. Earlier today.
2  Q. Have you ever seen that document before today?
3  A. No.
4  Q. I want to ask you a few questions about that
5  document.
6  A. Okay.
7  Q. Now, these -- it's titled Notes Concerning Visit
8  by State of Alaska OSHA Inspection as Compiled by Ken
9  Burns, Drilling Safety Advisor.
10    Did you have any role at all in preparing these
11 notes?
12 A. No.
13 Q. It's dated -- at the top it says, "03/03/03,
14 Monday," which I take it to mean March 3, 2003. Your
15 name is in this document, which is why I am questioning
16 you about this.
17    It says -- the first sentence says, "State OSHA
18 inspectors came to reception desk asking for Siemens.
19 OSHA was advised that Siemens was not at this building.
20 Both inspectors departed."
21    Were you the person that provided that
22 information to the inspectors?
23 A. I think so, yes.
24 Q. And then the second sentence says, "After lunch,
25 Paul Crapps received a call from Tome Lake, Siemens

Page 64

1  supervisor, that state OSHA was at their office
2  investigating a complaint from one of the employees
3  regarding condition (scaffolding) here at Unocal. Lake
4  further advised that OSHA was on their way to Unocal."
5      Is that correct that you received a call from
6  Tome Lake?
7  A. Yes.
8     MR. THORSNESS: Excuse me. Just to
9  interpose again an objection concerning the
10 admissibility of any reference to OSHA or OSHA
11 inspections. Thank you.
12    MR. COHN: I understand. We can take that
13 up later.
14    MR. THORSNESS: Okay.
15 Q. Now, it says on the fourth paragraph, "At
16 approximately 1440 hours, I was notified by Paul Crapps
17 that state OSHA was at the reception desk to conduct a
18 complaint inspection."
19    Were you the person that was -- how did you
20 happen to be at the front desk when the OSHA people came
21 in?
22 A. My office at that point was behind the front desk
23 or someone called me down there.
24 Q. Do you recall that at that time you went up to
25 the penthouse with the OSHA people?

19 (Pages 61 to 64)

EXHIBIT H
PAGE 7 OF 10

Page 65

1  A. Yes.
2  Q. And does this help recollect your memory as to
3  who was there with you?
4  A. No. I mean, I know that Ken Burns went up there
5  with me and there was some OSHA inspectors, but I
6  couldn't put a name to a face.
7  Q. It says here -- now, previously you indicated
8  that the platform had been removed before OSHA conducted
9  their inspection. Do you recall that testimony?
10  A. Yes.
11  Q. Now, if you look at the last paragraph here it
12  says, "Both Tom Scanlon and Lee Zhao climbed the ladder
13  and exposed themselves to the open-sided platform."
14      Does that refresh your memory that the platform
15  had not yet been removed at the time of the inspection
16  by OSHA?
17      MR. THORSNESS: Object to the form of the
18  question.
19  A. No. Where exactly --
20      MR. THORSNESS: Where are you reading from,
21  Mike?
22  Q. Take a look at the next to the last paragraph.
23      MR. THORSNESS: Beginning with "Tom Scanlon
24  and Lee Zhao"?
25      MR. COHN: Yeah.

Page 66

1      MR. THORSNESS: Where are you reading from
2  again, just so I am clear, Mike?
3      MR. COHN: It is about -- starting --
4      MR. THORSNESS: "Both Tom Scanlon"?
5      MR. COHN: Yes.
6  A. That's just how he worded it. The platform was
7  no longer there.
8  Q. So when it says, "Exposed themselves to the
9  open-sided platform," do you have any idea what that
10  refers to?
11  A. There is a pony wall that was constructed and I
12  think what he was referring to is that they crawled up a
13  ladder exposing themselves to that, the wall that it was
14  attached to.
15  Q. Are you talking about the wall opposite the
16  filter wall?
17  A. Yes.
18  Q. And then can you read the next sentence as to
19  about the open-sided platform?
20  A. "One significant question was asked. Who erected
21  the scaffolding? No one knew the answer. It was
22  obvious from the structure that it had been erected many
23  years ago.
24  Q. So you are saying that this structure that they
25  are talking about and that they are referring to -- that

Page 67

1  Mr. Burns is referring to in these notes wasn't even
2  there at the time of that inspection?
3      MR. THORSNESS: Objection; foundation. The
4  witness has testified he didn't write this document.
5      MR. COHN: Well, he was present in the room
6  at the time.
7  A. No, I wasn't.
8      MR. COHN: Well, I have written a letter. I
9  do want to depose Mr. Burns.
10      MR. THORSNESS: Sure, of course, but
11  Mr. Burns is not here today.
12  Q. Tom Scanlon, Lee Zhao, Tome Lake, Paul Crapps,
13  and I, which I am assuming the author went to the
14  penthouse. Did you stay outside the room at that time?
15  A. I escorted them to the penthouse and then I left.
16  Q. So you don't have any explanation as to why they
17  are referring to scaffolding that is not there?
18  A. I was just going on knowing the area itself. I
19  escorted them and then I left.
20  Q. It looks like the date of this inspection is
21  March 3rd, 2003; is that correct?
22  A. If that's what the date says on top of the paper.
23      MR. COHN: Can we go off record one second?
24  I want to make a copy of an exhibit. I don't want to
25  look through the papers to find it.

Page 68

1      VIDEOGRAPHER: Off record 1:05 p.m.
2      (There was a short break.)
3      VIDEOGRAPHER: On record 1:07 p.m.
4      (Exhibit No. 9 marked.)
5  Q. Mr. Crapps, I want to show you what's been marked
6  as Exhibit No. 9. And, first, do you recognize that
7  document?
8  A. I must have. I signed it, but not off the top of
9  my head, but yeah.
10  Q. So that is your signature on the document?
11  A. Yes.
12      MR. THORSNESS: What's the Bates number at
13  the bottom here?
14      MR. COHN: It's LG00739. That's Larry
15  Grove. That will be supplemental --
16      MR. THORSNESS: Has been this been produced
17  yet?
18      MR. COHN: It is going to be produced, but
19  this is a document that I would assume that Unocal would
20  have possession of.
21      MR. THORSNESS: Right, but you have not
22  produced it yet?
23      MR. COHN: No, but it is coming.
24  Q. Now, does this refresh your memory as to when the
25  platform was dismantled?

20 (Pages 65 to 68)

EXHIBIT H
PAGE 8 OF 10

Page 69

1  A. No. This is just saying that I put the
2  notification up.
3  Q. Well, I direct you to paragraph two. It says --
4  the first paragraph says you work at Union Oil Company
5  of California at 909 as a building maintenance
6  specialist. Is that true that at that time you worked
7  as a building maintenance specialist? The date of this
8  is May 9, 2003.
9  A. It was June 13, 2003 that I was hired.
10 Q. So it would be -- that was not a correct title
11 for you, building maintenance --
12 A. I think it was in the works.
13 Q. You say you have -- it says, "Had personal
14 knowledge of the following," and then paragraph two, can
15 you read what that says?
16 A. "On about March 8, 2003, the platform, which is
17 the subject matter of inspection number 305757577 was
18 dismantled."
19 Q. And it says you had personal knowledge of that,
20 that it was dismantled on March 8, 2003. How would you
21 have personal knowledge?
22 A. That it was dismantled?
23 Q. Right?
24 A. Because I dismantled it.
25 Q. It says it was dismantled on March 8, 2003,

Page 70

1  according to this affidavit?
2      MR. THORSNESS: You are asking him what the
3  document says? What's your question?
4  Q. Does the document say that?
5  A. Yes.
6  Q. Did you swear under oath in this document that
7  that was the date it was removed, dismantled?
8  A. I signed it, yes.
9  Q. Is that date, March 8, 2003, later than the date
10 of the OSHA inspection, which if you look at the
11 previous exhibit, which is Exhibit No. 8, indicates,
12 according to the notes of Ken Burns, that the inspection
13 occurred around March 3rd?
14 A. Yes, the date is later.
15 Q. So is it possible that it was March 8, 2003 that
16 you dismantled the platform and threw the metal brackets
17 and the bolts and nuts into the garbage and stored the
18 plank?
19 A. No.
20 Q. That isn't possible?
21 A. No. I did it a couple of days after the
22 incident.
23 Q. So do you have any explanation as to why you
24 signed an affidavit saying it was dismantled on March 8,
25 2003?

Page 71

1  A. No. Other than it might be a typo.
2  Q. A typo which you didn't review?
3  A. I must not have, no.
4  Q. Do you recall if you were told by -- who told you
5  at Unocal to remove the platform?
6  A. Charles Arnett.
7  Q. Did Roseanne Sinz provide you any direction to
8  remove the platform?
9  A. No.
10 Q. Did Ken Burns ask you to remove it?
11 A. No.
12 Q. It was just strictly Charles Arnett?
13 A. Yes.
14 Q. Do you recall if you were interviewed by OSHA
15 people?
16 A. No, I was not.
17 Q. Did you have any discussion with any of the
18 individuals, Unocal people after the OSHA inspection
19 regarding the OSHA investigation?
20 A. Yes.
21 Q. Who did you have discussions with regarding that?
22 A. Roxanne, and I might have been -- the safety
23 specialist, Ken Burns.
24 Q. And do you recall when you would have had these
25 discussions with Roxanne Sinz?

Page 72

1  A. Probably when all the citations and stuff came
2  about.
3  Q. So -- and what was the discussion -- can you
4  recall the discussion at all, what she said to you or --
5  A. That we had the citation and asked me to post the
6  citations.
7  Q. What about the safety individual, was that Ken
8  Burns did you say?
9  A. Yes.
10 Q. Did you have a discussion with him about it?
11 A. I might have had a discussion and it might have
12 -- it probably was just based on that they had taken
13 some pictures up there and that we were probably going
14 to be fined about it.
15 Q. Did anyone indicate that there would be a
16 possibility of a lawsuit?
17 A. No.
18 Q. Have you ever been involved -- have you ever been
19 deposed before?
20 A. Deposed before?
21 Q. Yes.
22 A. No.
23 Q. Have you ever been involved in a lawsuit before?
24 A. No.
25 Q. Do you know that the statute of limitations is

21 (Pages 69 to 72)

EXHIBIT H
PAGE 9 OF 10

GROVE v UNOCAL											PAUL CRAPPS
														3/3/2006

```
                                                          Page 121
 1          MR. THORSNESS:  We are not going to sit here
 2   and listen to you accuse him of this.
 3          MR. COHN:  I'm not accusing him of anything.
 4          MR. THORSNESS:  Let's go.  We're out of
 5   here.
 6          MR. COHN:  Good-bye, John.  Would you like
 7   your witness to sign his affidavit -- sign his
 8   deposition or not, John?  Good-bye, John.
 9          VIDEOGRAPHER:  Off record?
10          MR. COHN:  No, we're not off record yet.
11   Mr. Thorsness has decided to leave the deposition and
12   abruptly get up and walk out with the witness before
13   this deposition has been concluded.
14          I am taking the position that I have not
15   finished this deposition and have the right to redepose
16   Mr. Crapps at a later date.
17          Mr. Thorsness's actions were uncalled for
18   and, therefore, this deposition is not yet concluded.
19          I would like a copy of the transcript myself
20   and the videotape.  And I thank you.  And that's it.
21          VIDEOGRAPHER:  Off record 2:37 p.m.
22          (Proceedings concluded at 2:37 p.m.)
23              (Signature reserved.)
24
25
```

EXHIBIT 4
PAGE 10 OF 10

34 (Page 121)