John B. Thorsness, Esq.
Linda J. Johnson, Esq.
CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
711 H Street, Suite 620
Anchorage, Alaska  99501
(907) 272-9272
usdc-anch-ntc@cplawak.com
Attorneys for Defendant Unocal Alaska

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LAWRENCE H. GROVE, CYNTHIA GROVE, SARAH GROVE, and MICHAEL GROVE (DOB 1/21/88) by and through his father LAWRENCE H. GROVE,<br><br>Plaintiffs,<br><br>vs.<br><br>UNOCAL CORPORATION,<br><br>Defendant. | Case No. 3:04-cv-0096-TMB |

### OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE

Defendant Unocal Corporation opposes plaintiffs' omnibus motion in limine. Plaintiffs have filed a motion that covers thirty one issues.  The timing of the motion is premature since discovery is not complete in this case.  Plaintiffs improperly ask the court to exclude evidence as a sanction, which is unwarranted.  Plaintiffs argue facts in their attempt to persuade the court to exclude evidence.   The court should not determine facts issues that must be left to a jury.  Plaintiffs' motion should be denied.

Unocal will bring its own motion at the appropriate time.

I.    **PLAINTIFFS' REQUEST FOR SANCTIONS AGAINST UNOCAL IS INAPPROPRIATE AND UNWARRANTED.**

1.    **Plaintiffs Improperly Request Sanctions To Preclude Evidence of Who Designed, Constructed, Maintained, Repaired, Authorized, Approved, or Owned the Work Platform.**

Plaintiffs ask that the court sanction Unocal because Plaintiffs believe that Unocal did not properly take responsibility for the design, construction, maintenance, repair, authorization and approval for the work platform. Each of Plaintiffs' complaints is a separate idea and cannot simply be lumped into one category.

Plaintiffs ask that the court exclude evidence of ownership and control of the platform and deem the platform Unocal's sole responsibility. To that end, Plaintiffs argue facts to prove that because no evidence can be found regarding who installed the platform and for what purpose, that Unocal must be held accountable. In order for the court to rule for Plaintiffs, the court must determine that Plaintiffs' facts are correct. This would be improper. For a court to grant summary judgment there must be no genuine issue of material fact. Plaintiffs' factual argument confirms that genuine issues of fact exist. If Unocal is to be "held accountable", then a jury must make that determination.

Unocal does not deny that the platform was bolted to the filter wall inside the filter room. However, Unocal does deny that it installed, designed, constructed or used the platform. Plaintiffs are aware that the platform does not appear on the original design of the building. Crapps Deposition at 102, attached hereto as Ex. A. Plaintiffs are also aware that since the building was constructed Unocal has always

hired independent contractors to perform the work on the air filters, including Siemens, Landis Gyr, and Honeywell.  Grove Depo I at 74, attached hereto as Ex. B.  Sprinkle deposition at 10, attached hereto as Ex. C.  These two facts alone should convince a jury that Unocal did not install, design or construct the platform.

Plaintiffs leap to the conclusion that because the platform was built inside Unocal building, that Unocal must have known and approved of the design and construction of the platform.  There is no evidence or testimony to support Plaintiffs bald contention that Unocal was aware of or participated in the construction of the platform.

In pursuit of its own discovery, Unocal subpoenaed records from Honeywell, Peak, and Kelley Services.  These records were disclosed to Plaintiffs.  None of these entities produced names or evidence that would aid the parties in determining who built the platform in the filter room, when it was built or why. Plaintiffs ignore these discovery efforts and shrilly blame Unocal.

Plaintiffs likewise ignore the testimony they obtained from former Unocal employees who indicate that no Unocal employee worked inside the filter room. See e.g. Cook Deposition 21-23, attached hereto as Ex. D.  Charles Arnett, who worked in the Unocal building as an independent contractor for 12 years stated that he had never even seen the platform until the day that Larry Grove injured himself. Arnett Depo at 41, Ex. E hereto.  Plaintiffs have stated that they talked informally with retired Unocal employees Don Akers and Eddie Barratt and have learned that

they knew nothing about the platform.   Therefore, despite Unocal and Plaintiff's discovery efforts, no one has discovered the owner or origin of the platform.

The admissible evidence does establish that Unocal employees did not work in the filter room.   Therefore, it is logical that a contractor designed and built the platform without Unocal's consent or knowledge.   The issue must be left to the jury.

Plaintiffs' request to restrict Unocal's evidence on the platform is a sanction that can only be made pursuant to Fed. R. Civ. P. 37.   Unocal has cooperated in discovery, fully disclosing its own documents and even subpoenaing contractor documents.   A request for sanctions has been improperly made and there is no evidence to support it.  The motion should be denied.

**2.   Plaintiffs Improperly Request Sanctions That Preclude Unocal from Presenting Arguments That:**
   **A.  Larry Grove "Faked" the Accident;**
   **B.  Nuts and Bolts Are Not Part of the Platform**
   **C.  The Platform Was Not Defectively Designed, Built or Maintained.**

Plaintiffs argue for the exclusion of evidence as a sanction for the alleged spoliation of evidence.  The sanctions Plaintiffs request are inappropriate.  *Sweet v. Sisters of Providence*, 895 P.2d 484 (Alaska 1995) requires: a) "a plaintiff must first establish to the satisfaction of the court that the absence of [the evidence] hinders his ability to establish a prima facie case" and b) the essential evidence is missing through the negligence of the defendant.   Plaintiffs' motion and supporting evidence are insufficient for the court to make the determination required by *Sweet v. Sisters of Providence*.   Until and unless Plaintiffs properly brief the issue, the court should not consider it.

Taking the platform apart and disposing of it did not constitute spoliation for several reasons.  First, the platform was abated as part of the response to an OSHA citation, and Unocal's actions should have immunity as a result.  Unocal was cited for not having a "toe board" on the platform.  Rather than trying to "fix" the problem underlying the citation, Unocal simply removed the platform, an appropriate action in response to an OSHA citation.  See generally, 29 C.F.R. §1903.19, as adopted by 08 AAC 61.142(a).  Removal and disposal of the pieces of the platform/scaffolding was not spoliation but a reasonable action in response to the OSHA citation.

Second, defendant had no notice that plaintiff would file a lawsuit.  Grove came back to "visit" Unocal and its contract workers at least one time.  Grove First Deposition at 128; Grove Second Deposition at 114, attached hereto as Ex. F. However, he never mentioned, not even to the maintenance contractors, that he was contemplating a lawsuit.  There was no demand from a plaintiff's lawyer to Unocal.  There was no hint while Grove was working on his Workers Compensation issues, that he would sue Unocal.[1]

At the heart of any spoliation of evidence claim, is the need to establish a legal or contractual duty to preserve evidence in a civil action. In the absence of a contract or agreement between the parties to preserve evidence, or a special

---

[1] There is not even anything in Grove's history that would have led someone to warn Unocal that Grove was litigious.  The fall at Unocal appears to constitute Grove's eighth workers compensation complaint, but it does not appear that Grove sued the premises owner of any of the other accidents.

relationship recognized by law which would require one of the parties to do so, there can be no claim for spoliation of evidence without creating a common-law duty on the part of the defendant to preserve that evidence.

A New York state case, *Montiero v. R.D. Werner Co., Inc.*, 754 N.Y.S.2d 328, 301 A.D.2d 636 (2003), has addressed this very issue. Even though the case is not binding, it sets out an example of how this issue has been addressed elsewhere. In *Montiero*, a municipal employee sued the city for failing to preserve a scaffold involved in an accident on city property. The New York court found that the city had no duty to preserve the scaffold and that the city was not on notice that the scaffold might be needed for future litigation. New York found that Montiero did not ask the city to preserve the scaffolding nor did he tell the city that he intended to sue the scaffold manufacturer. Most persuasively, the court found that neither the plaintiff's injury nor the OSHA investigation conducted at the work site put the city on notice of future litigation or a need to preserve the scaffold.

The New York case is instructive in determining the issues in this case. Unocal was not on notice that it should preserve the platform/scaffolding just because Grove was injured. Grove did not tell anyone at Unocal or even any Unocal contractor that he intended to file a lawsuit against Unocal. Grove did not even disclose that he had re-entered the Unocal building to appropriate the bolts and take photographs, which he ultimately used as a basis to sue Unocal.

The OSHA investigation did not place Unocal on notice of a potential lawsuit either. The OSHA investigation was conducted for a completely different purpose

than private litigation.  Additionally, the citation by OSHA was for no "toe board", not for any failure to construct or maintain the platform/scaffolding properly, as is alleged by plaintiffs.  The OSHA investigation was not a herald of future litigation by Plaintiffs.

Unocal had no notice and therefore had no duty to preserve the platform/scaffolding.  Plaintiffs ask for three sanctions: 1) exclusion of evidence that Grove "Faked" the accident; 2) exclusion of argument that the bolts picked up by Grove are not part of the platform; and 3) exclusion of argument that the platform was not defectively designed, build or maintained.  The harsh sanctions requested by Plaintiffs are not supported by the holding in *Sweet v. Sisters of Providence,* 895 P.2d 484 (Alaska 1995).

Plaintiffs must first establish spoliation according to the standards set in *Sweet v. Sisters of Providence*, which they have not done.  Only after spoliation is established, is a burden shifting remedy applied. The relief for a plaintiff is provided in the form of a rebuttable presumption, imposed by shifting the burden of the negligence cause of action to the defendant to prove the non-existence of the fact presumed.   This is done via a jury instruction, not by exclusion of evidence. Plaintiffs have not complied with the requirements set forth in *Sweet*, and their motion should be denied.

     **3.**    **Plaintiffs Improperly Request Sanctions Precluding Unocal from Raising Argument About the Chain of Custody of the "Sheared Bolts".**

Plaintiffs request as a sanction that Unocal be prohibited from arguing the suspicious chain of custody of the bolts.  Larry Grove surreptitiously re entered Unocal's building the day after his accident to take photos and pilfer evidence. Grove Depo II at 28.  Grove claims he put the bolts into his dresser drawer and held them there for at least a year.  *Id.* at 107.  In the meantime, at least his family members had access to the bolts.  The chain of custody is indeed suspect.

Plaintiffs ask for sanctions against Unocal because Plaintiffs believe that Unocal intentionally withheld evidence about who dismantled the platform.  Plaintiff had the affidavit of Paul Crapps since they received the OSHA file in January 2006, and had the bulk of the OSHA file since 2004.  Plaintiffs did not disclose the OSHA files until after they used them to ambush Paul Crapps during his deposition. Therefore, it was Plaintiffs who withheld evidence.  Plaintiffs did so knowingly.  AT Paul Crapps' deposition, the following conversation took place which conclusively establishes that Plaintiffs knew they had deliberately concealed the OSHA files:

> Q.  Mr. Crapps, I want to show you what's been marked as Exhibit No.
> 9.  And, first, do you recognize that document?
> A.  I must have.  I signed it, but not off the top of my head, but yeah.
> Q.  So that is your signature on the document?
> A.  Yes.
> MR. THORSNESS:  What's the Bates number at the bottom here?
> MR. COHN:    It's LG 00739.    That's Larry Grove.    That will be supplemental --
> MR. THORSNESS:  **Has been this been produced yet**?
> MR. COHN:  **It is going to be produced**, but
> this is a document that I would assume that Unocal would
> have possession of.
> MR. THORSNESS:  Right, but **you have not produced it yet**?
> MR. COHN:  **No, but it is coming**.

Deposition of Paul Crapps, at 68, emphasis added.

Plaintiffs knowingly withheld the OSHA file containing Paul Crapps' affidavit stating that he was the person who dismantled the platform and when it was done. See Motion for Rule 37 Sanctions, filed March 28, 2006. Plaintiffs are once again attempting to deflect attention from their discovery violations onto Unocal. Plaintiffs should not be rewarded for their own discovery violation.

Plaintiffs have merged many alleged grievances in order to create an argument that the chain of custody on the bolts should be deemed proper as a sanction. However, Plaintiffs' theory requires the court to ignore significant issues of fact in order to rule. For example, Plaintiffs assert without evidence that the bolts Grove has submitted are genuine. There is evidence for the court to consider that establishes the bolts match the photos, that the bolts are of sufficient age, or that the chain of custody for the bolts was unbroken. In fact, these facts would necessarily have to be determined by the court first before the court can determine that the bolts are genuine, a determination best left to the jury. The sanction is unwarranted and should be denied.

### 4. Plaintiffs Improperly Request Sanctions Precluding Unocal from Raising Argument That Siemens Should Be Allocated Fault.

Plaintiffs object to Unocal allocating fault to Siemens primarily based upon the fact that Unocal had a "knock for knock" indemnity agreement with Siemens. DEF 00013-18, attached hereto as Ex. G. Unocal tendered defense to Siemens and Siemens accepted the tender. The knock for knock indemnity agreement is not relevant to the claim and is not admissible in trial. Just as evidence of

insurance is inadmissible under Fed. R. Evid. 411, so is Siemens' acceptance of

tender in this case.

The Ninth Circuit has long ago agreed that apportionment should be brought

to the attention of the jury.  In *Sears v. Southern Pac. Co.,* 313 F.2d 498 (9th Cir.

1963) the court said:

> We share the view of the Sixth Circuit that no fair appraisal of the fault
> of the party can be made unless all incidents of an act of negligence,
> as well as the act itself, are presented to the jury for its consideration.

*Id* at 502.  The Ninth Circuit's ruling argues for the inclusion of evidence that might

point at other parties, so that the jury can fairly determine each actor's

responsibility.

In the case before the court, Siemens bears some responsibility as Grove's

employer.[2]  The OSHA investigator, Tom Scanlon, stated that Siemens had a

responsibility as Grove's employer to provide a safe workplace for Grove.

> Q   As the actual employer of Mr. Grove, does Siemens have a duty to
> provide him a safe place to work?
> MR. COHN:  Objection to form of the question; foundation.
> A  Yes.
> Q   (By Ms. Johnson) Okay. And is that provided for in OSHA
> regulations?
> A  Yes, under the general duty clause, 5A  -- 5A?  . . . .

Scanlon Deposition at 138, attached hereto as Ex. H.  Therefore, to the extent that

Grove blames his injury on a poorly designed, constructed and maintained

---

[2] Siemens cannot be sued directly for their fault because of the workers compensation
exclusionary rule.  See AS 23.30.

platform, his employer had a duty to ensure that the platform that Grove was standing on to perform his work was safe.  So far, there is no developed testimony that Siemens took any responsibility for Grove's safety inside Unocal.

Plaintiffs accuse Unocal of "tainting the litigation process" because Siemens has refused to cooperate freely with Plaintiffs without a subpoena.  Cooperation without a subpoena is not required.  Siemens is not a party to the litigation[3], even if they accepted tender of defense.  Plaintiffs issued only one subpoena to Siemens.  Plaintiffs' lack of discovery effort is not attributable to Unocal.

Plaintiffs' assertion that cooperation between Siemens and Unocal is "unfair" is without legal basis.  Plaintiffs cite to no rule or case law forbidding cooperation.  Instead, Plaintiffs mix a number of facts and present the mix to the court for a sanction against Unocal.  No discovery violation has occurred. Plaintiffs request for sanctions preventing allocation should be denied.

The indemnity agreement[4] between Unocal and Siemens should be excluded from evidence.  The Ninth Circuit has stated:

> Evidence of the type represented by the indemnity agreement is so easily misused and its purpose so likely to be misunderstood that, even if relevant, reasons of policy may well dictate its exclusion.

*Sears v. Southern Pacific Co.,* 313 F.2d at 504.

---

[3] Siemens does have an open workers compensation case with Larry Grove, and therefore its reluctance to "cooperate" with Larry Grove outside the workers compensation case is understandable.

[4] The indemnity agreement was disclosed to Plaintiffs in Unocal's initial disclosures.  In fact, the document has been in Plaintiffs possession so long that its first page is Bates numbered 0013.

The indemnity agreement is likely to be misunderstood by the jury and misused by the Plaintiffs.  The agreement should be excluded from evidence.

## II.     PLAINTIFFS ASK FOR EXCLUSION OF EVIDENCE THAT IS RELEVANT AND ADMISSIBLE.

### 5.     Plaintiffs Seek To Exclude Rule 609 Evidence of a Conviction for False Statement.

Plaintiffs object to the introduction of evidence of Larry and Cynthia Grove's convictions for false statement.  Larry was convicted multiple times, and Cynthia once.  See Alaska State Court Database information, attached hereto as Ex. I. Fed. R. Evid. 609 states:

> Impeachment by Evidence of Conviction of Crime
> (a) General rule.— For the purpose of attacking the credibility of a witness, . . .
> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
> (b) Time limit.— Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later

The evidence of Grove's conviction is more than 10 years old.  But the convictions should still be admitted because the evidence has value for other purposes. For example, Grove has a pattern or habit of providing false information to Alaska Fish and Game.  The "moose tag" incident is but one such incident.  See Argument #24 below.  Grove states that he did not kill a moose, but records prove that he filled out the card to get credit for the moose kill with State Fish and Game. Fish and Game records at 101725-726, Ex. J hereto.  When confronted with the issue, Grove claimed that the tag he affirmatively filled out in his name was simply

done by mistake.  Grove Depo III at 61, attached hereto as Ex. K.  Grove's prior convictions for false statements should be admissible under Fed. R. Evid. 404(b) as "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or <u>absence of mistake or accident</u>".  It is no mistake that Larry Grove made another false statement to Alaska Fish and Game.  Grove's continuing pattern and habit of false statements to the state Fish and Game are relevant to his credibility as a whole.

Another example of Grove providing false information to Alaska Fish and Game is in his application for personal use fishery.  Grove claimed twice that his 32 year old son, who has always lived in Pennsylvania, was a household member. Fish & Game permit, Ex. L hereto, at 302274.  The false statement on his personal use application allowed Larry Grove to fish for and keep more salmon than he was entitled to.  *Id.*  Grove claimed that Fish and Game "told him" he could count his son living in Pennsylvania as part of his household, so the evidence of past false statements is important to show that there was no mistake—this is a pattern of false statements made by Grove.  The evidence of prior convictions establishes a pattern that Grove apparently has continued to the present day and is be relevant to impeach Grove's credibility.  The prior convictions should be admissible.

**6.    Surveillance Video of Larry Grove Is Not "Harassment."**

Plaintiffs seek to exclude the video surveillance of Larry Grove.  There were two surveillance incidents.  One was authorized and/or performed by workers compensation personnel.  That video was not known or produced to Unocal.

Unocal reviewed workers comp records and found a reference to the video. Unocal then asked for the video and it was produced. Within a week, Unocal also produced the video to Plaintiffs. Unocal does not have any other producible information with regard to the workers compensation video.

The second video was taken in 2006 with Unocal's authorization. That video was produced to Plaintiffs December 2006. The video was uncut and shows Larry Grove at an air carrier warehouse retrieving cargo that was shipped after one of his many hunts. Grove is wearing a short pair of rubber boots and walks back and forth on a concrete surface and up and down a stair without visible limping. The video is relevant to impeach Grove's claim that he limps all the time. Additionally, the video belies Grove's claim that his ankle swells and is painful after any activity, since on the video Grove is clearly not limping or in pain the conclusion of his hunting trip. The impeachment value of the 2006 video is clear.

The prejudice to Grove is minimal. Any evidence that impeaches Grove's own testimony and claims will potentially harm Grove's damages claim. However, that is not the standard by which a federal court evaluates a claim of prejudice. Instead, the court should look to Fed. R. Evid. 403 which states:

> Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The video tapes are probative of Grove's true physical abilities. The video tapes will not confuse the jury, nor will the videotapes unfairly prejudice the jury.

Instead the jury will get a glimpse of how Larry Grove walks when he does not know anyone is observing him.  This is highly probative of his alleged disability as well as his credibility.

Grove has refused to apply for work.  Grove Depo III at 315.  Regardless, Plaintiffs claim that the measure of their damages includes all wages Grove did not earn.  Grove's only physical limitations on working are for squatting and climbing ladders. Geitz Depo at 38, attached hereto as Ex. M. Chang Deposition, at 78-80, attached hereto as Ex. N.  How much activity Grove is capable of performing is relevant to his failure to mitigate his damages and is highly probative.  The videotapes should not be excluded.

**7.    Prior Workers Compensation Claims Are Relevant and Not Prejudicial.**

Plaintiffs seek the exclusion of Larry Grove's seven prior workers compensation claims.  Those seven prior workers compensation claims are:

> November 22, 1994 for left shoulder pain;
> April 6, 1995 for a re-injury of his left shoulder;
> May 26, 1998 for injury to his left shoulder;
> May 25, 2000 for a sprain to his right ankle;
> August 24, 2000 for a "jammed" index finger;
> January 4, 2001 for tennis elbow and finger injury; and
> February 22, 2002 for an injury to his left shoulder, hip and back.

Plaintiffs complain about how the workers compensation history will "hurt their case".  But the sheer volume of complaints is relevant and probative to Unocal's contention that Grove does not take care of his own safety.

The individual workers compensation claims are significant for various reasons.  Certain of Grove's claims show his lack of veracity.  Some of the claims

prove that Grove had an undisclosed pre-existing injury. See argument in #8, below. Various claims prove that Grove has a pattern of pursuing recreational activities inconsistent with his reported injuries and his doctors' recommendations. See argument in #14, below. There are a variety of uses for Grove's workers compensation history that do not require "mini-trials".

Grove must accept some responsibility for his own failure to inspect the platform or otherwise notice what Plaintiffs term a "clearly identifiable hazard." See plaintiffs' motion for partial summary judgment. The prior workers compensation cases demonstrate that Grove had a pattern or habit of failing to take care of himself and failed to look out for his own safety.

The potential prejudice to Plaintiffs does not outweigh the probative value of the workers compensation cases. The modest use of all the claims together will `not be misused by the jury, especially given any jury instructions thereon. The evidence should be admissible.

### 8.    Grove's Prior Ankle Sprain Is Relevant and Admissible.

Larry Grove injured his right ankle in May 2000 and filed a workers compensation claim.[5] The same ankle was injured on September 9, 2002.

---

[5]  Grove's reaction to his pre-existing injury should be repeated for the jury. He states:
   I mean, <u>if that's what you want to call a Workers' Comps claim</u> but I don't thi-
   -- recall losing any work over it. It was just a minor -- I wasn't sure if it was a muscle or what. And he did some ultrasound treatment on that -- that one part there. It wasn't anything serious.
Grove Deposition III at 31.

Grove did not tell his treating doctors that he had a prior existing injury to his right ankle.     In fact, Dr. Nolan's medical chart notes indicate that Grove affirmatively stated on September 11, 2002 that he had "No previous injury to foot." Ex. O hereto, at 200492-493.  This statement was made two days after the injury at issue in this case.  This statement alone is admissible on the issue of Grove's credibility.

Doctor Geitz did not know of any prior injury to the right foot before he performed surgery.  He stated:

> Q  So you have no independent recollection of him telling you of a prior injury to his ankle in 2000?
> A  No.  If he had told me, I would have put that in there.
> Q  Would that have been important to you?
> A  Yes.
> Q  And if he had films from his prior right ankle injury, would you have wanted to look at those?
> A  Yes.

Geitz Deposition at 12-13.  Doctor Geitz' statement that he would have wanted to see the prior films taken of the ankle is relevant to the question of whether any of the injuries Dr. Geitz repaired were pre-existing.   In fact, Dr. Geitz could not affirmatively state that his post-traumatic arthritis diagnosis stemmed from the 2000 or the 2002 injury to the right ankle.   *Id.* at 138-139.   Grove contends that his alleged arthritis was all caused by his fall at Unocal.  Unocal should have the right to challenge that claim based on the existence of a prior injury.

Dr. Chang removed scar tissue from Grove's ankle during a second surgery in January 2005.  Dr. Chang stated that he had no means to verify when the scar

tissue was created and it could have "been there for a while".  Chang deposition at 35-36.

Dr. Ealum stated that when he treated the right ankle injury in 2000 he used ultrasound in order to create "good scar tissue".  Ealum Deposition at 69, attached hereto as Ex. P.  He expected scar tissue to form in the ankle because of the ankle sprain.

Because of the existence of a prior existing sprain which resulted in scar tissue, the prior injury is significant evidence that calls into question the cause of Grove's alleged continuing pain in 2005.

Unocal should have the right to demonstrate to the jury that Grove's pre-existing injury was at least a contributing factor to his current condition, for which Unocal is not responsible.

**9.    Larry Grove's Mitigation, Including Applying to Siemens for a Job, Is Relevant.**

Plaintiffs seek to exclude testimony about Grove's refusal to look at possible jobs at Siemens as part of his mitigation efforts.

Plaintiffs merge workers compensation with this tort case when they discuss mitigation efforts.  Plaintiff had an independent duty in this tort case to mitigate his damages, beyond any efforts that he made in the workers compensation case. *Home Indem. Co. v. Lane Powell Moss and Miller,* 43 F.3d 1322 (9th Cir. 1995), found that:

> A wronged party must use reasonable efforts to avoid the consequences of injury done by another. *See Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991). This duty to mitigate

> damages rests on the party claiming damages, but the burden of proving failure to mitigate falls on the breaching party. *See West v. Whitney-Fidalgo Seafoods, Inc.,* 628 P.2d 10, 18 (Alaska 1981).

*Id.* at 1329.  S*ee also University of Alaska v. Chauvin,* 521 P.2d 1234, 1239 (Alaska 1974) ("A wronged party must use reasonable efforts to avoid the consequences of injury done by another.").

In *Spruce Equipment Co. v. Maloney,* 527 P.2d 1295 (Alaska 1974), a truck driver, who was injured, was unable to continue working as a truck driver.  He made no effort to secure alternative employment, although he could have done so.  The Alaska Supreme Court held that he failed to mitigate his damages.  The failure of the trial court to issue a proper instruction on his duty to mitigate resulted in a reversal of the case.  The court said:

> It is a cardinal rule in the law of damages that a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them. This rule applies whether the action is in tort or breach of contract and is known as the avoidable consequences rule.

*Id.*

As one means of mitigating his damages, Larry Grove could have, but did not, pursue alternative positions at Siemens, including applying for open clerk, supervisor or other jobs.  There is no evidence whether Siemens would have found Grove qualified, since Grove has made no effort whatsoever to apply for any job with any company since his injury September 9, 2002.  Therefore, if there were openings at Siemens other than as an HVAC worker, Grove should have applied for those positions.  His failure to do so is relevant and admissible.

**10.  Benefits Received and Property Owned By Grove Family Are Relevant, Admissible and Currently the Parameters Are Unknown.**

Plaintiffs seek to exclude evidence of financial matters before Unocal has completed discovery on it.  Discovery may be made of any information reasonably calculated to lead to the discovery of evidence.  Fed. R. Civ. P. 26.  Therefore, discovery of parcels of property and the valuation of that property are relevant.  Further discovery of these issues are necessary before the court can determine whether it has any relevance at trial.

Discovery must first be completed on these issues.  Income or benefits from any source after 2002 is of interest to Unocal as potential mitigation.  Payment for land parcels with money from "other income" is of interest to Unocal.  Grove has failed and refused to cooperate in Unocal's attempts to verify the types of businesses, the income or the activity level he is engaged in, despite the court's order to do so.

Any ruling on these issues is premature until Unocal completes its investigation.

**11.   True Workers Compensation "Settlement" Discussions Are Irrelevant.**

Unocal has no intention of introducing true settlement discussions of workers compensation claims.

**12.   Evidence of the OSHA Citations to Siemens Is Relevant and Admissible.**

In part, Plaintiffs' motion repeats the same issue found in #4, above.  Unocal will try not to repeat itself and instead will rely upon the argument made therein.

OSHA regulations require Siemens to provide a safe place for their employees to work.  In the underlying case, Siemens was cited twice: once for no toe board on the platform Grove was using to change filters, and once for improper use of a ladder.  Unocal was cited only for the toe board violation.

The ladder violation is an important part of the allocation to both Siemens and to Grove himself.  There is no rational basis upon which to exclude the citations.  The motion should be denied.

### 13.  Unocal Did Not Make Admissions to OSHA and Contractors Have No Authority To Bind Unocal.

Plaintiff asks the court to deem as true hearsay[6] statements made to and repeated by the OSHA investigator.   Plaintiffs want to use the statements as proof of age of the platform, ownership of the platform and responsibility for the platform. The statements are hearsay because Plaintiffs intend to use the statements to prove the truth of the matter asserted.

Hearsay is not admissible unless an exception exists.  Fed. R. Evid. 802. One exception, which plaintiff appears to rely upon is found in Fed. R. Evid. 801(d)(2):

> (2) Admission by party-opponent.—The statement is offered against a party and is
> (A) the party's own statement, in either an individual or a representative capacity or
> (B) a statement of which the party has manifested an adoption or belief in its truth, or

---

[6] Fed. R. Evid. 801(c) Hearsay.—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(C) a statement by a person authorized by the party to make a statement concerning the subject, or

(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

The statements cannot be directly attributed to a Unocal employee with authority to bind Unocal.  The OSHA quotes are not reliable and there is no way to verify who made the statements.  In fact, Tom Scanlon stated that he was directed by his supervisor not to identify the employee who made a statement, and therefore he attributes the statements generically in his report.  Scanlon Deposition at 151-152.  Tom Scanlon wrote the OSHA statements and listed Charles Arnett as "the Unocal Manager responsible for Building Maintenance. . . ."  Exhibit 12 to Plaintiff's Motion in Limine, at LG 756.  There are numerous alleged quotes that OSHA attributes to Unocal "management."   Examining the actual wording, however, it appears that Charles Arnett could have made the statements to the OSHA inspector:

> Q  "That the platform had been in place for, quote, years and years, unquote, probably back to the '70s.  One employee who had worked for Unocal -- worked for 12 years at Unocal said the platform had been there when he started work."   And this is information that Unocal management told you?
> A  Yes.

Scanlon Deposition at 110.  Arnett could be the "one employee" who worked for Unocal for 12 years, since he began working on contract to Unocal in about 1990 and the interview was conducted in early 2003.  Arnett Depo. at 8.

Charles Arnett was never a Unocal employee.  He was never management.  From the OSHA report, it is impossible to determine who made the alleged

statement, since Tom Scanlon purposely left out the witness identification. Therefore, because OSHA did not note who made each comment, there is no way to know if the statement was made by Unocal or a Unocal contractor.

If a statement was made by Charles Arnett, Arnett did not have any authority to bind Unocal, since at the time of the OSHA interview, Arnett no longer worked for Peake and no longer worked inside the Unocal building.  Arnett Deposition at 128.  Fed. R. Evid. 801(d)(2)(d) does not apply to any statement made by Arnett.

The statements are hearsay and unreliable.  They must be excluded.

### 14.  Grove's Behavior During Prior Workers Compensation Claims Is Relevant to This Claim.

In the same year as the Unocal incident occurred, Larry Grove filed for workers compensation because he allegedly injured his back during a fall in an icy parking lot.  Ealum Deposition at 82.  He was diagnosed with a "transverse process fracture" in his middle back.  *Id.* at 84.  His treating doctor stated that he needed to avoid "rotation" so that his back would heal.  *Id.* at 99-100.  Larry Grove was off work due to the injury from March 1, 2003 through   *Id.* at 101.

Larry Grove's treating doctor reported to workers compensation that on **March 9, 2002** Grove was only 50% improved and his doctor stated that Grove was not sufficiently well enough to bend or twist and should remain off work.  *Id.* at 113-114.  His treating doctor stated that he would not have wanted Grove to bend or twist and would not have wanted him to climb a ladder, as it could have re-injured Grove.  *Id.* at 115-116.  His doctor stated that it was reasonable for Larry to

discuss a trip beforehand and ask if the planned activity would potentially hurt his recovery.  *Id.* at 124-125.

During Grove's time off for his workers compensation injury, Larry Grove was photographed in Ketchikan jumping off the dock into the ocean on **March 9, 2002**.  His treating doctor would have advised Grove not to make the jump, given his injury at the time.  *Id.* at 132.  In response to a question by Grove's attorney, his treating doctor stated:

> Q.   So in terms of -- and in addition, especially in regard to the question of the photograph that was shown, does it make a difference to you whether somebody is going to be doing a job where they may have to be continuously or frequently bending and twisting as opposed to where they may occasionally be bending and twisting?
> . . .
> Q.  In regard to this type of injury.
> A.  To this specific injury?
> Q.  Yes.
> A.  Boy.  I would <u>say I would try to eliminate those activities altogether</u> if -- to the extent that it was possible.  Okay?  You know, whether it was repetitive or just occasionally, I mean, <u>if it could be minimized and not done, then that's what I would have recommended</u>.

Ealum at 177, emphasis added.

The jump into the water had the potential to exacerbate the work injury for which Grove was off work.  In addition, Grove took a personal trip to Ketchikan while allegedly too injured to work.  These two factors are indicative of exactly the behavior exhibited by Grove in this case.   The incident demonstrates several patterns of behavior:  1) Grove not caring for his own well being while injured, 2) Grove taking advantage of paid time off work in order to pursue personal

recreational activities, and 3) Grove demonstrating activity levels that are inconsistent with his alleged injury.

Pursuant to Fed. R. Evid. 406, a pattern of conduct or "habit" is admissible. Grove's behavioral patterns in his prior workers compensation cases are relevant to his behavior in this case.  He has pursued recreational activities while on paid workers compensation that are inconsistent with his reported pain level and injury. The jury should hear that Grove's behavior has been repeated during other workers compensation claims, because it is his "habit" to take advantage of paid time off to pursue recreational activities.

Likewise, this evidence is admissible under Fed. R. Evid. 404(b) as "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident".  Grove's prior actions in Ketchikan are relevant to the current claim, to prove that his recreational activities in excess of his treating doctor's advice is not a mistake or accident and that he intended to pursue recreational activities while taking advantage of paid time off work.

The Ketchikan photo and the testimony from Dr. Ealum are admissible and relevant and should not be excluded.

### 15. Alcohol Consumption and Continued Alcohol Purchases by Grove Are Relevant to the Circumstances Surrounding His Injury and Whether Grove Takes Responsibility for His Own Safety.

Plaintiffs seek to exclude medical testimony that in March and April of 2002 Grove admitted to his treating doctor that he consumed 4 alcoholic beverages per day for many years.  The voluntary admission came at a time when Grove's blood

pressure was diagnosed as excessively high.  Laufer deposition at 37, attached hereto as Ex. Q.  Grove's treating doctors have stated that excessive drinking is a habit that they would want to know about when treating Grove.  See Ealum Deposition at 122-123.  However, Grove did not tell Dr. Ealum that he was consuming so much alcohol, even though Dr. Ealum was treating him at that time for a workers compensation injury.  Grove only told his family doctor about his drinking.

Grove's family doctor stated that high blood pressure is often associated with excessive drinking.  Laufer Deposition at 37.  He believed that drinking 4 or more alcoholic beverages in a day was significant.  *Id.* at 40.  On April 15, 2002, Grove's family doctor advised him to **completely abstain** from alcohol.  However, on June 27, 2002, Grove charged $686.86 in Florida at ABC Wine and Spirits.  See Ex. R hereto, at 304885.

It would appear from this evidence, that Grove did not obey his doctor's instructions to completely abstain from alcohol in 2002, since two months after the order was given, Grove purchased a significant amount of alcohol while on a trip to Florida.   Grove's pattern/habit of not taking care of his health is apparent in his failure to follow his doctor's orders.  Therefore the alcohol problems are admissible.

Thereafter, Grove's treating doctor, Michael Geitz, was forced to postpone Grove's surgery on Grove's ankle scheduled for March 19, 2003 because of Grove's high blood pressure.  Geitz Deposition at 20.  The surgery did not take place until late May 2003.  When Grove visited his general practice doctor in March

20, 2003 for his high blood pressure problems, he admitted to drinking beer, although he did not admit to drinking as much as he had before.  The clear inference however is that Larry Grove did not stop drinking when his doctor told him to and his own actions caused his surgery to be postponed, also postponing Grove's recovery.

There are significant charges on Grove's credit card for alcohol purchases right before Geitz postponed Grove's surgery due to high blood pressure.  See e.g. charges on December 22, 2002 for $233.85 and February 14, 2003 for $286.19, Ex. R at 304897 and 304901.   Further, Plaintiffs bank accounts show monthly checks for alcohol purchases, in addition to the large credit card charges.   It appears that although Grove told his doctors that his drinking was minimal, he continued to drink, which raised his blood pressure and forced his surgery to be postponed.

Unocal should be allowed to present to the jury that Grove's surgery was postponed because of Grove's failure to take care of his health.  In fact, Unocal will ask for an instruction for the jury based upon the holding in *Irving v. Bullock,* 549 P.2d 1184, 1187 (Alaska 1976), quoting Restatement of Torts Second, Section 9.8 and McCormick on Damages § 36 (1935), which stated that a plaintiff has "the duty to use reasonable diligence to care for one's injuries."  The alcohol's effect on his blood pressure cannot be ignored and Grove's established behavior is relevant to prove that Grove did not care for his injuries and did not mitigate his damages.

### 16. Grove's High Blood Pressure Affected His Medical Condition and Therefore Is Relevant.

Plaintiffs repeat their alcohol/blood pressure argument in this section. Unocal adopts the argument in section 15 and incorporates it herein. High blood pressure caused Grove's surgery to be postponed and is relevant to his damages.

### 17. Medications Taken by Grove Are Relevant to Whether Grove Takes Responsibility for His Own Safety.

Plaintiffs seek to exclude the issue of Grove consuming "left over" Vioxx medication in March 2002. The argument is the same as for the other deviations from medical recommendations that Grove made. Grove consistently exhibits behaviors that indicate that he does not properly care for his own safety and health. Grove has a duty to use reasonable diligence to care for himself. Taking "left over" medication is indicative of Grove's carelessness and should be admissible for such purpose. The evidence should not be excluded.

### 18. Grove's Failure To Follow His Health Care Providers' Recommended Treatment Is Relevant.

Part of Grove's responsibilities is to mitigate his damages, which includes following the medical treatment prescribed by his doctors. If his failure to follow the recommended treatment actually caused his injuries to worsen, then Unocal should not be held liable for Grove's actions which aggravated his injuries.

Hal Egbert, a physical therapist, treated Larry Grove after each surgery. Egbert at 14-15, 59, attached hereto as Ex. S. Egbert recommended a defined course of treatment. Grove failed to follow though, despite continued improvement. Egbert at 92 -93. Grove's treating doctor, Michael Geitz, MD, also found that the

physical therapy was helping, and recommended that he continue for at least two more months.  Geitz Deposition at 43-46.  Egbert believed that further treatment would have resulted in further improvement.  Egbert at 92-93.

Grove has a duty to use reasonable diligence to care for his injuries.  *Irving v. Bullock,* 549 P.2d 1184, 1187 (Alaska 1976).  Failing to follow Egbert's recommended course of treatment is indicative of a pattern of behavior by Grove.  Larry Grove did not use reasonable diligence in caring for his injuries when he failed to follow reasonable treatment recommendations.

Grove's excuse to Egbert for not following up with his physical therapy in 2003 was a lie.  Grove told Egbert that he had to go to Florida to move his father.  Egbert at 56-57.  Grove did not disclose that his real reason for not continuing his physical therapy was that he was going moose hunting up in the Yukon.  *Id.* Egbert said: "If he had told me he was going to go hunt on tundra, I would have recommended he not go hunting on tundra."  *Id.* at 57-58.  Grove's misrepresentation of his true activities was material.

Upon return to his treating doctor, Grove complained of a re-injury and falsely stated that he had quit physical therapy "because he felt it was too aggressive and the stretch caused his posterior tibial tendonitis.  Geitz Deposition at 48.  Grove did not disclose to Dr. Geitz that he had gone moose hunting in a tundra region.  *Id.*  Dr. Geitz opined that hunting on tundra could have caused the re-injury that Grove complained of.

Unocal should be allowed to present evidence to the jury that Grove's failure to continue his treatment and his hunting activities cause re-injury and/or exacerbated his injuries. The evidence is relevant and probative to Grove's damages claim. Plaintiffs claim that the evidence is prejudicial. It is true that Grove's credibility will be impeached by the evidence, which will be prejudicial to his case. But impeachment is admissible and probative and not excludable simply for prejudice.

**19. Farooz Sakata's PCE Assessment Is Admissible.**

Plaintiffs ask that the court make a factual determination and exclude Farooz Sakata's Physical Capacity Evaluation (PCE) which was performed March 13, 2003. Grove's first surgery was performed May 20, 2003.

The basis of plaintiff's argument for exclusion of Ms. Sakata's report is that Ms. Sakata relied upon information that was allegedly "erroneous." However, upon closer examination, one can see that Ms. Sakata relied upon the medical evidence that was available to her at the time. That medical information was not erroneous and no medical provider has claimed that the medical diagnosis from Dr. Nolan was in error. The real basis for excluding Ms. Sakata is the timing of her PCE: she performed her examination prior to either of Grove's surgeries. The timing, however, does not render her conclusion invalid nor does it render the conclusion wrong.

More importantly, however, the determination that Grove was performing at "sub-maxim effort" is not a diagnosis that would have necessarily changed after the

surgery.   Ms. Sakata determined that Grove was self-limiting during his exam for

no particular reason.  Her testimony was:

> Q.   Okay.  You said that Mr. Grove did not perform at a safe maximum
> level.  What did you observe that led you to believe that?
>  MR. COHN:  Objection:  Foundation; form.
>  THE WITNESS:  Well, while he's doing -- right in the middle of it, to
> start tiptoeing or lifting his leg up and say:  Oh, I can't do that; I can't
> put weight on my foot, and then when you ask him to please continue,
> then he would.  After a pause, or after a few minutes, then he would
> continue doing what he was asked to do, which two minutes before he
> says he can't do it.
> Q.   Did he -- after he would begin again, did he give any indication that
> he was in any pain?
> A.   No.

Sakata Deposition at 55, attached hereto as Ex. T.   Ms. Sakata's assessment is

subject to cross examination at trial.   The jury may decide whether Ms. Sakata's

diagnosis was correct.

Ms. Sakata does not comment upon Mr. Grove's "credibility."   She never

uses the work "credible" and never makes any comments about whether Grove is

lying or malingering. Instead she appropriately limited her comments to her factual

observations.  In fact, when Plaintiffs counsel invited Ms. Sakata to label Grove a

"malingerer" she declined, stating:

> Q.   You don't consider him a malingerer?
>
> A.   He had a lot of verbal complaints that were totally inconsistent with
> his movement pattern.   That only leads me to believe there's
> inconsistencies.

Id. at 129.   Ms. Sakata reported her factual observations of Larry Grove's

movements and lack of effort, but did not label him a malingerer.

Ms. Sakata's report is evidence that is relevant and admissible.   Plaintiffs may cross examine her during trial about her conclusions and try to convince the jury that her report is incomplete.   But the fact of Grove's "submaximal effort" is a question that should be left to the jury.

### 20.  Michael Grove's Juvenile Record Is Admissible To Impeach Him About His Consortium Claims.

Plaintiffs have fought the discovery and use of Michael Grove's juvenile records in many forums.   They have continually argued that the timing of the felonies committed by Michael renders the crimes irrelevant.   This argument is flawed.

In *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987), the Alaska Supreme Court recognized that minor children have a cause of action for loss of parental consortium.   In Alaska law, consortium damages may be awarded for the loss of the enjoyment, care, guidance, love and protection between the injured party and the spouse or child.   In deciding whether such a loss has occurred and the amount of any award, the jury is instructed that it may consider, among other things, evidence relating to the nature of the relationship between the parent and child.

Michael Grove is a plaintiff in this lawsuit, having brought his own individual consortium claim for his losses due to his father's injury, alleging in the complaint that he should be awarded in excess of $250,000.00 in damages.   In order to evaluate his consortium claim, the jury will be told to consider evidence relating to the nature of the relationship between the parent and child.

Michael Grove committed a crime July 2006 and was adjudicated delinquent despite Larry Grove being off work and at home with his son since September 2002.  The crime, its effect on the family and the effect on Michael's relationship to his father, are all legitimate areas of exploration to defend against a consortium claim.  If the alleged change in the relationship between Larry Grove and his son was due not to Larry Grove's injury, but instead due to bad behavior by Michael, then Unocal is entitled to present that evidence to the jury.  Evidence of Michael's felonies is relevant to his own consortium claim.

Additionally, Michael's mother, Cynthia, has a consortium claim.  Whether there has been a tear in her relationship with Larry Grove based upon their son's bad behavior is also relevant evidence to explore and present at trial.

### 21.  Sarah Grove's On-line Journal Was Public and Contains Information Relevant to the Claims Made in This Case.

Larry Grove's daughter, Sarah Grove, is a plaintiff in this case.  She has brought her own consortium claim, alleging in the complaint that she should be awarded in excess of $250,000.00 in damages.

During discovery, Unocal found that Sarah Grove had a Myspace page, which was public and published on the Web for anyone to view.  Sarah did not place privacy restrictions upon her Myspace page, which means that anyone in the world, literally, with a computer and internet access was able to view her documents.  Unocal printed off and disclosed only those pages of Sarah's journal

which were relevant, not the entire journal.  No subpoena was necessary to obtain the documents.[7]

Information about Sarah's relationship with her father is relevant to her consortium claim.  *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987).  Further, information about other stresses in her life that may have caused or contributed to the very injury she alleges is also relevant.  Sarah's computer documents are probative of issues that have been alleged in this case, such as how much she spent on her education and living expenses and how much Larry Grove contributed to her living expenses and tuition[8].  Both of those claims have been included in Sarah Grove's consortium claim and she discusses both in her on-line journal.

Both the Myspace pages and LiveJournal contained relevant information about Larry Grove's activities, which Larry Grove had not disclosed to Unocal, including at least one photo of him.  Several of the pages were used in thediscovery deposition of Larry Grove and were probative of his activities as well.

---

[7] Inside her public Myspace pages, Sarah published a link to her LiveJournal, inviting any visitor to her Myspace page to also read her on-line journal.  Unocal did not invade Sarah's privacy.  It merely printed and disclosed publicly available documents that Sarah voluntarily placed on the web for anyone to view.

[8] For example, it is clear from her journal that Sarah Grove overstated her expenses and failed to disclose the existence of a roommate at college with whom she shared expenses.  See Response to Interrogatory #2 to Second Set of Discovery to Sarah Grove, dated February 6, 2006, attached hereto as Ex. U.

The Plaintiffs' unhappiness with Unocal's discovery of public documents does not bar the use of those records during trial.  The Myspace and LiveJournal documents are relevant and should not be excluded.

### 22.    Grove's African Hunts, and His Numerous Other Recreational Activities, Are Admissible To Prove Grove Has Failed To Mitigate His Damages.

Grove is asking the court to allow him to argue that he has a "severe permanent physical impairment" so that he may enlarge the non-economic cap found in AS 09.17.010.  Whether Grove has suffered a "severe permanent physical impairment" in light of all the hunting and recreational activities is certainly a factual issue for the jury to determine.

Grove's injury occurred September 9, 2002.  Since that date, Grove has not applied for a job, submitted a resume, or even tried to get a job interview.  Grove Depo III at 315-316.  Despite his failure to mitigate his damages, Grove has pursued more recreational activities than before his injury.

Grove has hunted in Africa twice since his injury: once in 2004 and once in 2006.  The 2004 hunt incorporated 13 animals, and the 2006 hunt included a Cape Buffalo, a dangerous animal.  Grove Depo III at 136 and 251.

The two hunting trips to Africa are just the tip of the ice berg.  Between 2002 and today, Grove has hunted all over Alaska, in Pennsylvania, and in Colorado.[9]

---

[9] Grove did not ever disclose to Unocal that he went hunting in Colorado.  That information came from his daughter's LiveJournal records.

The hunting trips are relevant and admissible to prove that Grove is capable of an enormous amount of activity despite his claims of disability.

Plaintiffs argue factual issues in their attempt to suppress the introduction of the evidence on hunting.   In particular, Plaintiffs argue that the weight of the evidence supports Plaintiffs' assertion that Grove is disabled because the African hunting trips were "extremely sedentary."   In order to find that the hunting trips are "extremely sedentary" the court would be forced to make a determination of fact.

Plaintiffs also argue that Unocal did not take the deposition of the African hunting guide (Cristo Kaiser) because Unocal "did not like the answers they would get."  Such an assumption is not only erroneous but also hypocritical.[10]   Plaintiffs also talked to Cristo Kaiser and then informed Unocal that they would take his deposition.  Plaintiffs failed to follow through as well.  No presumption can be made from Plaintiffs' failure to follow through, just as no presumption can be made from Unocal's.

Whether Grove's recreational activities belie his claim of injury is certainly an issue for the jury to determine.   The activities are relevant because they are evidence that Grove could have worked.  The motion should be denied.

---

[10] Plaintiffs refer to Unocal's "pre-deposition mill".  This allegation is spurious and reveals a lack of understanding of pre-trial preparation.  Most parties to civil lawsuits do not have the resources to waste upon unnecessary depositions.  Therefore, to the extent that informal interviews can be arranged, parties tend to use that method to weed out the witnesses who have marginally relevant information and just focus upon witnesses who are important to the relevant issues.  It is undisputed that Plaintiffs have themselves interviewed witnesses prior to deposition.

### 23.  The Sheer Volume of Grove's Recreational Activities Belies His Claim of Injury, and Is a Question for the Jury.

Plaintiffs ask the court to "limit" Unocal's right to discuss Larry Grove's recreational activities, especially his hunting and fishing activities.  Plaintiffs argue unproven facts about Larry Grove's physical abilities in an attempt to persuade the court that Grove's hunting activities are immaterial to his alleged disability.  The argument improperly asks the court to determine factual issues before deciding whether the hunting activities are relevant.

Plaintiffs express the fear that the trial will become focused upon "hunting." Unocal agrees that the testimony on damages will include Grove's recreational activities and whether he is "disabled".  The large volume of trips, hunts, fishing expeditions, and such certainly are inconsistent with Grove's testimony about the extent of his injury and pain, but are probative of his damage claims.

Plaintiffs make sweeping unproven factual assertions about Grove's injury. For example, on page 51-53 of Plaintiffs' Motion, Plaintiffs claim that Larry Grove is "disabled" but is limited in his hunting.   Actually, Larry Grove's deposition admissions and records point to a total of 27 hunting and fishing trips between 2002 and 2007 **that Unocal is aware of**.[11]   These do not include the "other" trips

---

[11] Many of the hunting and fishing trips were not voluntarily disclosed by Larry Grove, even though he has repeatedly been asked for the information.  Instead, Unocal has been forced to subpoena records in order to piece the evidence together.

that Larry Grove appears to have made for non-hunting or fishing purposes.[12]

Given the volume of trips that Larry Grove has taken, Unocal does intend to cross examine Larry Grove on his hunting and fishing activities, which appear to have increased since his injury, not decreased.  His continual hunting in difficult terrain and his uncanny ability to always shoot a trophy animal is evidence the jury should hear in order to assess Grove's claims of "disability."  IN addition, plaintiffs claim they will present "loss of quality of life" especially regarding hunting.  See Plaintiff's Motion at 59.  Grove made these issues relevant when he named them as claims.  Unocal should be allowed the right to challenge Plaintiffs' claims.

The volume of trips taken by Larry Grove is admissible for purposes of impeaching Plaintiffs' damage request.  The motion should be denied.

### 24. The "Moose Tag" Incident Is Indicative of Grove's Lack of Honesty and Is Therefore Admissible.

Plaintiffs seek to exclude evidence that reveals Grove's credibility, or lack thereof.  Grove has in the past been convicted of three violations of state Fish and Game laws for falsifying information.  The "moose tag" incident is an example of Grove's on-going deceptive behavior.

During his wife's deposition in November 2004, Grove interrupted on the record to say that during his September 2004 moose hunting trip, he had not shot a moose:

---

[12] Despite Unocal's request that Larry Grove disclose "all trips" he has repeatedly failed to do so.  For example, after Unocal discovered his adult businesses and pieced together his trips to Las Vegas, Larry Grove has recently, but reluctantly, disclosed that he attended an Adult Video Network convention in Las Vegas.

MR. GROVE: **It wasn't me**.
THE WITNESS: It wasn't you. That's right.
MR. GROVE: It was the other guy.
THE WITNESS: He went hunting with some -- with one of our friends, John.

Cynthia Grove Deposition 60-61, taken November 2004, Ex. V hereto. Grove confirmed in a handwritten attachment to Response to Third Discovery Requests that he was not the hunter who shot the moose:

Sept. 04 – Moose hunt – **Unsucessful [sic] for me**. Friend John Yenason shot moose on last day. Moose was spotted as we were returning from Talkeetna to my cabin (about 2 mi). John was sucessful [sic] in stalking moose close to road. Returned to Talkeetna to get help – (Rich Shiesel). He shot moose with his rifle.

Again, in his Depo III at 41, Grove stated that he did not shoot the moose:

[we were] driving back to my cabin there was bull standing right alongside the road practically. John got out of the truck, the moose went into the woods, 10, 15 yards maybe and John shot the bull.

Grove Depo III at 60.

However, State of Alaska Fish and Game Harvest Ticket reports for Larry Grove show that Grove reported that he shot and killed a moose himself on September 29, 2004, after hunting for 14 days.[13] Ex. J at 101725-726.

When confronted with the inconsistency of the testimony versus the State of Alaska records, Grove's explanation is weak:

Q Do you recall reporting to fish and game that you killed a moose September 29th 2004?
A I might have sent the wrong card in because John left his card with me.

---

[13] Grove's deposition testimony established that he only went on one moose hunt in September 2004.

Q  Well, why would you fill out a card?
A  Well, I reported his kill.  So I mu- -- I must have sent my report card
in.  They both -- they all look the same. . . .

Grove Depo III at 61.

Unocal has the right to prove at trial that Grove's explanation is not credible

regarding why he took credit for a moose that he did not shoot.  This is an issue

that the jury may determine is not a "minor incident" especially in context with all

the other credibility problems that Grove has.

The motion should be denied.

**25.  Grove's False Statements Made on His Personal Use Permits Are
      Admissible To Disprove His Credibility.**

Plaintiffs  seek  to  exclude  the  false  statements  made  by  Grove  on  his

personal use fishing permits.  Grove has an adult son who lives in Pennsylvania.

Grove's son has not even visited him in Alaska for 15 years, but Grove listed him

on his personal use permit as a member of his Alaskan household.  Grove Depo III

at 91-92.

The permit clearly states that fish may only be taken for household members

and that the person must be present while fishing.  Ex. L.  Larry Grove's fraudulent

actions should be admissible and go directly to his credibility.

Further,  Larry  Grove  has  prior  false  statement  convictions.   His  continued

deception to the State of Alaska is admissible as a habit, practice or pattern of false

conduct.

Issues  that  directly  bear  upon  Grove's  credibility  are  admissible  and  the

court should deny the motion to exclude the evidence.

### 26.    Grove's Recreational Activities Are Relevant To Prove He Failed To Mitigate His Damages.

Plaintiffs ask the court to restrict Unocal's use of Larry Grove's trips to Nevada and his gambling records.  Plaintiffs seek the court's protection, claiming that the revelation that Grove was capable of traveling to Nevada and gambling will "somehow diminish the injuries and lessen the damages."

The trips and gambling are relevant to Larry Grove's activity level.  Because he has claimed he is disabled, and because Grove has failed to even apply for a job for 5 years, Unocal should be permitted to present evidence to prove Grove's self proclaimed limitations are false.

Further, the gambling records are relevant to disprove that the consortium claims of Cynthia and Sarah Grove.  Mrs. Grove state in her deposition that her daughter was very concerned about money for college.  Cynthia Grove Depo at 68.  Further Cynthia Grove stated that she was worried about paying her bills.  *Id.* at 42-43.  The fears about money that she expressed are inconsistent with Larry Grove's gambling activities as seen in his casino records.  Larry Grove was traveling to Nevada and gambling money needed by his family.  His gambling should be admissible to prove that the money fears expressed by Cynthia and Sarah Grove are due to irresponsible actions taken by Larry Grove, not because of his injury.

The evidence is relevant and admissible. The motion should be denied.

### 27.  The Term Subsistence Is Broad and Should Not Be Categorically Inadmissible.

On March 27, 2006, Larry Grove moved to amend his complaint and add loss of subsistence hunting.  The court denied the amendment.  Thereafter, Plaintiffs have not pursued the issue and now unequivocally state that they will not pursue loss of economic damages based on loss of "subsistence" hunting and fishing.

However, Larry Grove has taken up "personal use" salmon fishing in Kasilof since his injury.  The "personal use" fishery is much like subsistence.  There are instances where that word may be useful in describing his recreational activities and therefore the court should not categorically rule it inadmissible.

### 28.     Comparison's to Other Individuals with Injuries.

Unocal does not intend to present evidence of a Siemens employee with an ankle fusion.

### 29.     Expert Demonstrative Tests and Experiments Are Admissible.

The depositions of the party's experts have not yet been taken.  Plaintiffs have not explored the testimony or opinions of Unocal's expert witnesses.  Despite this, Plaintiffs ask the court to limit Unocal's use of its "demonstrative test", videotape and photographic evidence.  Plaintiffs are unable to articulate what is objectionable about the evidence.  They simply ask the court to restrict it.

The court will have the opportunity to address this issue at trial.  Based upon the inadequate arguments made by Plaintiffs, the court does not have any basis

upon which to exclude or limit the use of expert testing, videotaping or photographs.  The motion should be denied.,

**30.    Burden of Proof on Mitigation of Damages.**

Unocal will assert that Larry Grove has failed to take any mitigating measures in this case.  Larry Grove has not made any effort to find a new job and has not made any effort to try and get training in order to qualify for a different job.  Larry Grove has admitted this fact multiple times.  *Home Indem. Co. v. Lane Powell Moss and Miller,* 43 F.3d 1322 (9th Cir. 1995), found that:

> A wronged party must use reasonable efforts to avoid the consequences of injury done by another. *See Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991). This duty to mitigate damages rests on the party claiming damages, but the burden of proving failure to mitigate falls on the breaching party. *See West v. Whitney-Fidalgo Seafoods, Inc.,* 628 P.2d 10, 18 (Alaska 1981).

*Id.* at 1329.  S*ee also University of Alaska v. Chauvin,* 521 P.2d 1234, 1239 (Alaska 1974) ("A wronged party must use reasonable efforts to avoid the consequences of injury done by another.").

Larry Grove has an independent duty to mitigate his damages in this case outside of any workers compensation efforts.  Unocal has no control over workers compensation and has the right to expect that Larry Grove will be held to the same standard that any other plaintiff would be held to.

**31.  Evidence of Grove's Involvement in Other Companies of Dubious Repute Is Not a "Diversion," and the Full Extent of His Involvement Is Yet Unknown.**

Plaintiffs refer to Unocal's on-going discovery efforts as an effort "to deflect from the true issues in this case."  Memo at 62.  However, Unocal has merely

explored discovery of the various issues surrounding Plaintiffs' damages claims.

Plaintiffs claim that the "true issues" in this case focus on liability. However, they must prove both liability and damages. It is Unocal's right to delve into both liability and damages and explore any evidence that is likely to lead to the discovery of admissible evidence. See, Fed. R. Civ. P. 26.

Larry Grove has only recently admitted that from 2002–present, he is or has been the "figurehead president" of adult oriented businesses in Pennsylvania. Larry Grove never disclosed his association with the adult oriented businesses or disclosed his payments there from on his IRS forms. "Other income" is discoverable and may be admissible depending on what else Unocal uncovers. The full scope of Larry Grove's involvement is currently not known and therefore it is premature for the court to rule on the admissibility of the evidence uncovered to date.

Finally, Plaintiffs ask that no "pejorative" terms be used to describe Larry Grove. Larry Grove has proven himself to be a malingerer by failing and refusing to even try and get a job for 5 years, and that term should be allowed. The other terms may or may not apply depending on what evidence is uncovered and the court should refrain from ruling on them until and unless necessary.

## III.    CONCLUSION

For all the reasons set forth above, Plaintiffs motion in limine should be denied.

DATED at Anchorage, Alaska, this ___7th___ day of May 2007.

CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS, LLC
Attorneys for Defendant Unocal


s/ Linda J. Johnson
CLAPP, PETERSON, VAN FLEIN,
TIEMESSEN & THORSNESS LLC
711 H Street, Suite 620
Anchorage, AK  99501-3454
Phone:  (907) 272-9631
Fax:  (907) 272-9586
Direct email:  ljj@cplawak.com
Alaska Bar No. 8911070


Certificate of Service

I hereby certify that on May 7, 2007, a copy of the foregoing document was served electronically on Phillip P. Weidner, Esq.

s/ Linda J. Johnson