IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

    Plaintiffs,

vs.

UNOCAL CORPORATION,

    Defendant.

_____/

Case No. A04-0096 CV(JKS)



RECEIVED APR 2 5 2005

**VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE**

Pages 1 - 158, inclusive

Friday, November 12, 2004, 10:42 a.m.

Anchorage, Alaska

EXHIBIT B
PAGE 1 OF 7

## Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*



Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3

 4   LAWRENCE H. GROVE, CYNTHIA
     GROVE, SARAH GROVE, and
 5   MICHAEL GROVE (DOB 1/21/88)
     by and through his father
 6   LAWRENCE H. GROVE,

 7           Plaintiffs,

 8     vs.

 9   UNOCAL CORPORATION,

10           Defendant.
                                    /
11   Case No. A04-0096 CV(JKS)

12

13

14        VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE,

15   taken on behalf of the Defendant, pursuant to notice,

16   at the offices of Lane Powell Spears Lubersky, 301 West

17   Northern Lights Boulevard, Suite 301, Anchorage, Alaska,

18   before Gary Brooking, Registered Professional Reporter

19   for Alaska Stenotype Reporters and Notary Public for the

20   State of Alaska.

21

22

23

24                                      EXHIBIT    B
                                        PAGE  2 OF 7
25

                                                          2

                    Alaska Stenotype Reporters
```

LAWRENCE H. GROVE

```
 1                          A-P-P-E-A-R-A-N-C-E-S

 2

 3      For Plaintiffs:           LAW OFFICES OF PHILLIP PAUL
                                     WEIDNER & ASSOCIATES
 4                                By:  Phillip Paul Weidner
                                       Michael Cohn
 5                                330 L Street, Suite 200
                                  Anchorage, Alaska   99501
 6                                907/276-1200

 7
        For Defendant:            LANE POWELL SPEARS LUBERSKY
 8                                By:  Shannon W. Martin
                                  301 W. Northern Lights Blvd.
                                  Suite 301
 9                                Anchorage, Alaska   99503
10                                907/277-9511

11
        Also Present:             Cynthia Grove
12

13      Videotaped By:            Professional Business Video
                                  Eric Baldwin
14

15      Reported By:              Gary Brooking, Registered
                                  Professional Reporter
16

17

18

19

20

21

22

23
                                                EXHIBIT  B
24                                              PAGE 3 OF 7
25
```

3

Page 73

1  who attended to this job site, or were -- was it --
2    A.  On Unocal, it was primarily me, because I
3  got asbestos-awarement [as spoken] training. They
4  have some asbestos issues there. And in order to work
5  above the ceiling or in an area where there was --
6  ACMs were present, someone had to be certified to do
7  that type of work. So there wouldn't be any problems.
8    Q.  And so you were the only one that you -- are
9  you the only Siemens guy who's -- the only union guy
10 who's asbestos trained?
11   A.  At that point I was, yes.
12   Q.  Do you remember the -- the first time you
13 went to this job site?
14   A.  Not very -- I mean I remember about when,
15 but not the exact date or time or what the reason was.
16   Q.  You said about five years ago --
17   A.  About five years ago.
18   Q.  -- when you -- when started with Siemens in
19 '99, right?
20   A.  Uh-huh.
21   Q.  Do you remember who you reported to, for
22 example?
23   A.  Yes. Charles Arnett. He was -- he worked
24 under Eddie --
25   Q.  Barratt?

Page 74

1    A.  Barratt, yes. Charles worked under Eddie,
2  and Eddie, I think, was the building manager or
3  coordinator. I don't know his exact title. He's a...
4    Q.  Was it -- now, before you started at this
5  job site, was there someone else for Siemens doing
6  that, doing the job?
7    A.  Yeah. Siemens done work there for some
8  years prior --
9    Q.  Right.
10   A.  -- to me coming to work there, yeah.
11   Q.  According to the -- to the contract, it
12 looks like the predecessor, Landis, had been doing
13 work there since '94 at least.
14   A.  They have. And I know that Honeywell has
15 been in there. And I don't know what other mechanical
16 contractors have been in the building. But the
17 building has been there since 1969 or '70 so...
18   Q.  Right. Yeah. It's -- it's been there a
19 while.
20   A.  Honeywell did the initial install for the
21 pneumatic control and environmental system, so I know
22 they were in there for a while, too, so...
23   Q.  Did -- did you ever talk to the guy who was
24 doing the same work that you started to do at Unocal
25 when you took over?

Page 75

1    A.  No.
2    Q.  Do you know who this guy is?
3    A.  There were two other employees. Jeez, I
4  don't think I have seen Dan Hartman for years. And
5  there was another gentleman. I can't recall his name.
6    Q.  These were Siemens employees who you think
7  may have been performing HVAC services on behalf of
8  Siemens at Unocal before you started in '99?
9    A.  Yes.
10   Q.  Dan Hartman?
11   A.  Is one of them. Robert Sprinkle, he worked
12 there; was formerly at Landis Gyr. Robert Sprinkle is
13 an employee of -- of Siemens now. I got him to come
14 over from Johnson to us.
15   Q.  Okay.
16   A.  But I -- I can't name everyone that was
17 there prior to me in there.
18   Q.  Okay. No lead man that stands out in your
19 mind or a guy that was special trained in --
20   A.  At that point, they didn't have that large
21 of a service business, so they went through a lot of
22 different changes. And they were more construction
23 orientated. They did have a service department, but
24 they weren't focused on it a hundred percent like we
25 did.

Page 76

1    Q.  In 1999, when you physic- -- when you first
2  physically entered the building for Unocal, was that
3  the first time you had ever entered that building --
4    A.  Yes.
5    Q.  -- to do work for Siemens?
6    A.  Yes.
7    Q.  Okay. Is that the first time that you ever
8  met Charles Arnett or Eddie Barratt?
9    A.  Yes.
10   Q.  And were these -- did you -- did you go to
11 these men and -- and say, I'm here to do work for
12 Siemens, take me to -- to where I need to go, and they
13 showed you around, that type of thing?
14   A.  Correct, yeah, to check in, sign in. Let
15 them know what you're going to be doing. If you
16 weren't familiar with it, they would take you to the
17 area and show you what was going on, and that was it.
18   Q.  So there wasn't any predecessor to you, for
19 example, that went to the job site with you and said,
20 this is what I have been doing for the past X number
21 of years?
22   A.  No.
23   Q.  This is how you should do it?
24   A.  No.
25   Q.  No one from Siemens went to that job site

Page 125

1  Q. You had other concerns?
2  A. Yeah. Get to the hospital.
3  Q. And so did you make a -- did you have a cell
4  phone on you?
5  A. Yes, I did. I called Charles to come give
6  me a hand getting out of there. Charles --
7  Q. Did he come up?
8  A. Yes, he did.
9  Q. Did he help shoulder you out of there?
10 A. Yeah, he helped me out.
11 Q. Okay. And then how did you get to the
12 hospital?
13 A. Drove with one foot.
14 Q. Okay. You drove yourself to the hospital?
15 A. Right.
16 Q. You drove with your right foot, though?
17 A. My left foot.
18 Q. Oh, really?
19 A. Uh-huh.
20 Q. Okay. It must have been kind of hard?
21 A. Well, that's the only one that worked.
22 Q. Yeah.
23    MR. COHN: I know it's unusual, but I think
24 Cynthia had some question about whether you drove to
25 the hospital or not.

Page 126

1     THE WITNESS: Well, I drove to the doctor's,
2  attending physician. And I called Cindy at work. And
3  that's when the doctor decided to send me to
4  Providence. And she came down and picked me up and
5  took me to Providence. That's how that took place.
6  BY MR. MARTIN:
7  Q. She picked you up from the attending
8  physician?
9  A. Correct. It was close to -- fairly close
10 to --
11 Q. This is Laufer?
12 A. Yes.
13 Q. Picked you up from Laufer, took you to
14 Providence --
15 A. Right.
16 Q. -- for further care?
17 A. Yeah. I had no idea the injury was that
18 severe so...
19 Q. Okay. Did you talk to Mr. Arnett, after he
20 got to the filter room, about what had happened?
21 A. He just looked at it and said, what
22 happened? I said, the darn thing collapsed, come down
23 on my ankle. He said, let's get you out of here.
24 Q. He didn't say -- I mean, he didn't say
25 anything about the -- the scaffolding?

Page 127

1  A. Not at that time, no.
2  Q. Did -- did you talk to any --
3     THE VIDEOGRAPHER: Excuse me, Counsel.
4  Buried our microphone. Thank you.
5     MR. MARTIN: Did you pick up what I had said
6  before that? I'm sorry.
7     THE VIDEOGRAPHER: Right up until your last
8  question.
9  BY MR. MARTIN:
10 Q. Did you talk to anyone else other than
11 Charles about the scaffolding failing, before you left
12 that day to go to the doctor?
13 A. Not that I can remember, no.
14 Q. The next day when you came back,
15 September 10th, to take the pictures, did you talk
16 with anyone, any Unocal employees?
17 A. Charles was not in there. His manager was
18 not in there. So I just used my security access and
19 went upstairs and took the pictures.
20 Q. Did you talk to any Unocal employees about
21 the incident that day?
22 A. No.
23 Q. October 10th?
24    MR. COHN: September 10th.
25 BY MR. MARTIN:

Page 128

1  Q. September 10th?
2  A. September 10th, no.
3  Q. Did you talk with any Unocal employees at
4  all after the incident?
5  A. Just Charles once. It was just brief. He
6  asked me how I was doing. And OSHA went down, did an
7  inspection. And after that, nobody really said much
8  about anything after that.
9  Q. Did you talk to your own employer at all
10 about this incident after it happened?
11 A. Yes.
12 Q. Who in particular did you talk with?
13 A. My branch manager and my service department
14 supervisor. Service department supervisor would be
15 Leverette Hoover. Leverette, L-e-v-i-t-t (sic)
16 Hoover. And our branch manager at that time was Ben
17 Sietz, S-i-e-t-z.
18 Q. And did you -- are they both people who work
19 in the Anchorage office?
20 A. The only one there now is Ben Sietz.
21 Mr. Hoover is now an employee of Johnson Controls in
22 Michigan.
23 Q. At the time they worked in -- in the
24 Anchorage office?
25 A. Yes.

### Page 153

1 something that was preconceived.
2   Q. But would they -- would they look at the --
3 for example, would they use this newsletter and the
4 safety tips addressed in the newsletter as a protocol
5 for that particular meeting on any given month?
6     MR. COHN: Objection as to foundation.
7     THE WITNESS: I would say no. They never
8 picked a specific issue and said, you know, don't do
9 this. And when you're doing this, don't do that. But
10 I think they just read over it, you know, said
11 everybody would be safe and --
12 BY MR. MARTIN:
13   Q. They didn't say, okay, has everyone got a
14 copy of the newsletter this month? I want -- we want
15 to review this or that?
16   A. No.
17   Q. No, okay. And they weren't ever handed out
18 at the safety meetings, the newsletters?
19   A. Letters that I received came through the
20 mail.
21   Q. Okay. Did they ever hand out any other
22 literature at safety meetings?
23   A. Very little, if anything.
24   Q. And you don't remember signing lists, if you
25 attended?

### Page 154

1   A. Not with Siemens. I know at Johnson
2 Controls, when we did, when they had a sign-in list.
3 They may have done it at Siemens. I just don't
4 recall. It's been five years there, and a lot of
5 things have happened. It's hard to remember every
6 day.
7   Q. Okay. You have not been back to Unocal
8 since September 10th, 2002?
9   A. I stopped one by -- one day to say hi to
10 Charles, and he asked me how I was doing. And that
11 was about it.
12   Q. That was in the front lobby?
13   A. Yes.
14   Q. Okay. Have -- have you talked with anyone
15 from Unocal, other than Charles, about this accident?
16   A. Not -- not particularly.
17   Q. No? Have you talked with anyone other than
18 management, in connection with this document here,
19 this -- did we mark this document, report of
20 occupational injury?
21     THE REPORTER: No.
22     MR. MARTIN: Okay. Let's -- let's go ahead
23 and mark that, if we could, as Exhibit D.
24     (Exhibit D marked.)
25 BY MR. MARTIN:

### Page 155

1   Q. Have you talked with any other Siemens
2 employees about this accident?
3   A. I try not to. People ask me about it, and I
4 try not to be -- say too much about it. You have to
5 just be careful what you're doing. Don't get hurt.
6   Q. All right. Have you talked with any Siemens
7 employees since the accident about how the accident
8 happened?
9   A. Well, they know how the accident happened.
10   Q. "They" being what, employees in general?
11   A. Office gossip, I guess.
12   Q. Have you talked to any of your -- the guys
13 that worked with you or for you about how the accident
14 happened?
15   A. I mentioned it, yes.
16   Q. And did you mention scaffolding gave -- gave
17 way?
18   A. I just told them what took place, that
19 basically I was changing the filters. The platform
20 collapsed. And that's what happened to my leg. And,
21 you know, don't let it happen to yourself.
22   Q. Did Siemens hold any safety meetings, after
23 the accident, addressing these issues?
24   A. I wasn't --
25     MR. COHN: Objection on foundation.

### Page 156

1 BY MR. MARTIN:
2   Q. Do you know? Did --
3   A. I'm not in the office. I have no -- no
4 idea.
5   Q. Okay.
6   A. If I -- if I'm not there, I can't give you a
7 yes or a no, because I don't know.
8   Q. You haven't been back to Siemens since the
9 accident to --
10   A. Stop in the office occasionally.
11   Q. But not to attend any safety meetings?
12   A. No. I never have been invited to any. They
13 may have some, but I haven't been informed of them or
14 invited.
15   Q. Have any employees talked to you about
16 what's gone on in any safety meetings --
17   A. No.
18   Q. -- since the accident?
19   A. No.
20     MR. MARTIN: No. Okay, Mr. Grove. Those
21 are all the questions I have. Thank you very much for
22 attending. Off record.
23     THE VIDEOGRAPHER: We are concluded at 1:52.
24     (Proceedings concluded
25       at 1:52 p.m.)

EXHIBIT B PAGE 6 OF 7

LAWRENCE H. GROVE

REPORTER'S CERTIFICATE

I, GARY BROOKING, RPR, hereby certify:

That I am a Registered Professional Reporter for Alaska Stenotype Reporters and Notary Public for the State of Alaska; that the foregoing proceedings were taken by me in computerized machine shorthand and thereafter transcribed by me; that the transcript constitutes a full, true and correct record of said proceedings taken on the date and time indicated therein.

Further, that I am a disinterested person to said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my official seal this 24th day of April, 2005.

_____
GARY BROOKING
Registered Professional Reporter
My Commission Expires 5.24.08

EXHIBIT B
PAGE 7 OF 7

158

Alaska Stenotype Reporters