GROVE v. UNOCAL　　　　　　　　　　　　　　　　　　　　　　　CHARLIE ARNETT
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　4/25/2006

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3    _____
 4    LAWRENCE H. GROVE, CYNTHIA GROVE,         )
      SARAH GROVE and MICHAEL GROVE (DOB        )
 5    1/21/88) by and through his father        )
      LAWRENCE H. GROVE,                        )
 6                                              )
                Plaintiffs,                     )
 7                                              )
      vs.                                       )
 8                                              )
      UNOCAL CORPORATION,                       )
 9                                              )
                Defendants.                     )
10    _____)
11    Case No. A04-0096 CV (JKS)
12
13
14    _____
15         VIDEOTAPED DEPOSITION OF CHARLIE ARNETT

16    _____
17              Tuesday, April 26, 2006
                     9:30 a.m.
18
19            Taken by Counsel for Defendant
                          at
20    Clapp, Peterson, Van Flein, Tiemessen & Thorsness
                 711 H Street, Suite 620
21                  Anchorage, Alaska
22
23                                          EXHIBIT  E
24                                          PAGE  1  OF  6
25
```

GROVE v. UNOCAL                                                   CHARLIE ARNETT
                                                                  4/25/2006

Page 2

1     A-P-P-E-A-R-A-N-C-E-S
2
3    For Plaintiffs:
4    Michael Cohn, Esq.
     PHILLIP PAUL WEIDNER & ASSOCIATES
5    330 L Street, Suite 200
     Anchorage, Alaska 99501
6    (907) 276-1200
7
8    For Defendant:
9    Linda J. Johnson, Esq.
     CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
10   711 H Street, Suite 620
     Anchorage, Alaska 99501
11   (907) 272-9272
12
13   Videographer:
14   Eric Cossman
     ALASKA LEGAL VIDEO
15   645 G Street, #892
     Anchorage, Alaska 99501
16   (907) 276-8601
17
18   Court Reporter:
19   Sonja L. Reeves, RPR
     PACIFIC RIM REPORTING
20   711 M Street, Suite 4
     Anchorage, Alaska 99501
21
22
23
24
25

Page 3

1           I-N-D-E-X
2
3    EXAMINATION BY                              PAGE
4      Ms. Johnson                  5
5      Mr. Cohn                     90
6
7    FURTHER EXAMINATION
8      Ms. Johnson                  131
9      Mr. Cohn                     137
10
11   EXHIBITS
12   1    Schematic (1 pg.)              35
13   2    Copies of Photos (10 pgs.)     36
14   3    Copies of Photos (12 pgs.)     57
15   4    Personnel File (63 pgs.)       75
16   5    Technical Support Proposal (10 pgs.)   123
17
18
19
20
21
22
23
24
25

Page 4

1         ANCHORAGE, ALASKA; APRIL 25, 2006
2                   9:30 A.M.
3                    -o0o-
4          VIDEOGRAPHER: We're on record at 9:30.
5    This is the video deposition of Charles Arnett taken by
6    the plaintiff in the matter of Grove, et al. versus
7    Unocal Corp., Case Number A04-0096 CV (JKS), in the
8    United States District Court for the District of Alaska.
9          This deposition is being held in the offices
10   of Clapp, Peterson, Van Flein, Tiemessen & Thorsness,
11   located at 711 H Street, Suite 620, Anchorage, Alaska,
12   on April 25, 2006.
13         My name is Eric Cossman from Alaska Legal
14   Video, mailing address 645 G Street, #892, Anchorage,
15   Alaska 99501. The court reporter is Sonja Reeves from
16   the firm of Pacific Rim Reporters.
17         Will counsel please identify themselves for
18   the record?
19         MS. JOHNSON: Linda Johnson from Clapp
20   Peterson for Unocal.
21         MR. COHN: And Michael Cohn from the Law
22   Offices of Phillip Paul Weidner & Associates on behalf
23   of the plaintiffs.
24         One technical correction, the deposition is
25   being taken by the defendant, just for the record.

Page 5

1                CHARLIE ARNETT,
2        deponent herein, being sworn on oath,
3          was examined and testified as follows:
4                  EXAMINATION
5    BY MS. JOHNSON:
6     Q. Mr. Arnett, would you be sure and spell your last
7    name?
8     A. A-r-n-e-t-t.
9     Q. Can you tell us what your educational background
10   is, please?
11    A. My educational background?
12    Q. Right. Graduate from high school?
13    A. Yeah, I finished high school, some college.
14    Q. What were you working towards in college?
15    A. Nothing specific, just generalized.
16    Q. Did you do any trade schools, anything like that?
17    A. No.
18    Q. Where are you working now?
19    A. I work for All Star Realty, Inc.
20    Q. When did you start working there?
21    A. I want to say June '03.
22    Q. And what do you do for them?
23    A. I take care of the maintenance department. It's
24   a property management company.
25    Q. How many properties are there?

EXHIBIT E
PAGE 2 OF 6

2 (Pages 2 to 5)

**Page 6**

1   A. That I don't know.
2   Q. More than 100?
3   A. There could be.
4   Q. Do you do general maintenance or do you
5   supervise?
6   A. I coordinate any maintenance that needs to be
7   taken care of.
8   Q. So you actually don't do it yourself? You make
9   sure that other people are doing it?
10  A. Correct. I get the job done.
11  Q. Before All Star Realty, where did you work?
12  A. Well, I actually worked for Peak Oilfield
13  Services, but it was at the Unocal building.
14  Q. So you were a Peak employee?
15  A. Yes.
16  Q. How long were you a Peak employee?
17  A. About five years, I think.
18  Q. You left in '02; is that correct?
19  A. November '02, yes.
20  Q. Do you recall what year you started with them?
21  A. '90. Well, with Peak?
22  Q. With Peak, right.
23  A. '97, I think.
24  Q. And then who was your employer before Peak?
25  A. I was with Kelly Services for about six months.

**Page 7**

1   Q. Before Kelly Services?
2   A. Professional Business Services.
3   Q. Where was that at? Was that in Anchorage?
4   A. Yes.
5   Q. And how long were you with Professional Business
6   Services?
7   A. From '90 up until '96.
8   Q. And before Professional Business Services?
9   A. You are asking me something that's 15 years ago.
10  Q. I know. I'm sorry. I was just trying to figure
11  out what kind of experience in the industry you have.
12  A. Which industry?
13  Q. Well, especially the maintenance work that you
14  have been doing. What did you do for Professional
15  Business Services?
16  A. I was hired as computer operator for Unocal.
17  Q. So how did you learn to be a computer operator?
18  A. Air Force.
19  Q. When were you in the Air Force?
20  A. '78 to '87.
21  Q. When did you come to Alaska?
22  A. '80.
23  Q. So did you retire from the Air Force in Alaska?
24  A. Yes.
25  Q. So from that, we are only missing three years.

**Page 8**

1   So what did you do between the Air Force and
2   Professional Business Services?
3   A. Again, computer operator for ATU, and also for
4   another company. I don't quite remember their name, but
5   we worked at the federal building.
6   Q. So you had a contract to work inside the federal
7   building?
8   A. Yes.
9   Q. So as a computer operator for Unocal from, you
10  said, about '90 to '96, is that what you did the entire
11  time?
12  A. No. Actually, '90 to, I want to say, '94,
13  because they centralized their computer. They got rid
14  of their computers.
15  Q. In about '94?
16  A. I believe so.
17  Q. So Unocal centralized its computers about '94,
18  but you were still working for Professional Business
19  Services. What did you do with them?
20  A. Same thing. I was still under the same title.
21  Q. You were still the computer operator?
22  A. Right. It was actually a combination computer
23  operator, part-time actually, because they had installed
24  a new Unex system for plotting their maps and everything
25  and I was heavily involved in that. And then I worked

**Page 9**

1   part-time for the building manager at the time.
2   Q. Who was that?
3   A. That was Don Acres.
4   Q. What did you do for Don at that time?
5   A. I went around kind of odd-type jobs. I went
6   around -- I handled the mail for the building. I went
7   around and collected mail at certain times and
8   redistributed it.
9       But most of the time, I was in the computer room.
10  Well, part-time actually. Then I would change out light
11  bulbs whenever he needed it.
12  Q. So would you say it was light maintenance work?
13  A. Yes.
14  Q. Do you recall while you were a computer operator
15  whether you ever went upstairs into the mechanical room?
16  A. No, never. The computer room was located on the
17  first floor and that's where I primarily stayed.
18  Q. Do you know whoever did work upstairs in the
19  mechanical room from '90 to --
20      MR. COHN: Objection on lack of foundation.
21  Q. I'm just asking your knowledge, if you know.
22  A. No, I didn't.
23  Q. You didn't know who was working up there?
24  A. No.
25  Q. Did you know Robert Sprinkle from Landis & Gyr a

EXHIBIT E
PAGE 3 OF 6

3 (Pages 6 to 9)

Page 38

1  Q. I'm just asking for your memory, so if you don't
2  remember it, that's fine. I wanted to show you the
3  pictures to see if this helped bring anything back for
4  you.
5     Turn to the last page. Do you recall walking all
6  the way inside the filter room and looking back towards
7  the door? Did you ever do that?
8  A. No.
9  Q. I guess this is kind of an odd question. Why
10 would you -- for what reason would you ever go into the
11 filter room?
12 A. Normally, I wouldn't have a reason to go. But
13 the only time that I was ever in there was to go inside
14 this encasement with Larry because inside this
15 encasement on a wall are the control mechanisms for the
16 air louvers. And that's where the problem was, and, of
17 course, everything is dark in there.
18 Q. So you believe you went under the metal casing?
19 A. I went inside the metal casing.
20 Q. Okay.
21 A. The sheet metal casing.
22 Q. Did you ever go inside the filter room and crawl
23 up on top of the sheet metal casing?
24 A. No. It was a little taller than I could get up
25 on.

Page 39

1  Q. Do you recall, looking at the schematic, do you
2  recall where you would have entered to get underneath
3  the casing?
4  A. Somewhere in here.
5  Q. You thought there was a door inside the filter
6  room itself?
7     MR. COHN: Objection; leading, and I want to
8  -- this is not an accurate depiction of what the thing
9  looks like.
10    MS. JOHNSON: Let him testify to his memory,
11 please.
12    MR. COHN: You are leading him to say
13 something that is not there.
14    MS. JOHNSON: I'm asking what his memory is.
15 If his memory is that there's one in there, then that's
16 his memory, whether it is correct or not.
17 Q. All I'm asking is for your best memory.
18 A. Well, I don't remember a door per se. More like
19 a panel.
20 Q. How often did Larry Grove come inside the Unocal
21 building?
22    MR. COHN: Objection; foundation.
23 A. I don't know.
24 Q. Did you meet Larry Grove at the front desk each
25 and every time that he came to the building, are you

Page 40

1  aware?
2     MR. COHN: Objection; foundation.
3  A. No.
4  Q. Why do you think that you didn't do that?
5  A. There were times when he would come in and do
6  scheduled maintenance. There was times when I was
7  taking care of other projects in the building. I didn't
8  always have time to meet and greet everyone that came
9  in.
10 Q. How did he get in if you weren't at the front
11 desk?
12    MR. COHN: Objection; foundation.
13 A. How did he get in? He had a code to get in.
14 Q. And how do you know he had a code to get in?
15 A. I issued him the code.
16 Q. Did he also have a key?
17 A. I don't remember if he did or not. He may have.
18 I don't know.
19 Q. Did you issue keys as well?
20 A. I did when I started taking over some of Eddie
21 Barrett's duties, but prior to that, no.
22    MS. JOHNSON: Do you want to take a break?
23 Let's take a break.
24    THE WITNESS: Yeah. It's getting close.
25    VIDEOGRAPHER: Going off record. The time

Page 41

1  is 10:33.
2     (There was a short break.)
3     VIDEOGRAPHER: Back on the record. The time
4  is 10:45.
5  Q. I know you said that you don't recall seeing the
6  platform inside the filter room prior to the accident.
7  Do you recall anybody ever talking about the platform?
8  A. No.
9  Q. If the platform was there prior to the accident,
10 let's just assume that it was, and if there was a
11 problem with it, who would have been the person to
12 inspect that particular platform?
13 A. I would assume that I would have been instructed
14 to go up and have a look at it.
15 Q. How would that come to your attention?
16 A. Through the person I report to, Eddie Barrett, or
17 it could have been one of the service personnel.
18 Q. So if the service personnel reported it, who
19 would the service personnel report to?
20    MR. COHN: Objection; foundation.
21 A. Since I usually worked with them, probably me.
22 Q. Did you ever receive any sort of --
23 A. Uh-huh. Concerning the platform, no.
24 Q. No complaints about the platform prior to the
25 injury?

EXHIBIT E
PAGE 4 OF 6

GROVE v. UNOCAL

CHARLIE ARNETT
4/25/2006

Page 126

1  for the Siemens technicians to change the filters?
2     MS. JOHNSON: Objection; foundation, calls
3  for a legal conclusion.
4     A. I would think that it would indicate that, you
5  know, that the customer would have to provide a means to
6  access it, yes.
7     Q. And is that how you interpreted it when you saw
8  this document?
9     MS. JOHNSON: Objection; foundation.
10    A. Well, that's the way I interpret it, yes, but --
11    Q. I know there was an objection to foundation, but
12  since you reviewed it and who else would have a
13  foundation to testify what you yourself thought about
14  the document?
15    MS. JOHNSON: Objection to speaking. You
16  are not the witness here, Mike.
17    MR. COHN: The witness -- it will just speak
18  for itself what he testified about.
19    Q. Now, have you ever had occasion yourself to bring
20  like ladders, take a ladder and go up to the penthouse?
21    A. No.
22    Q. Would it be -- do you know how tall the elevators
23  are in the building?
24    A. Well, if you don't take the level out, they are
25  probably seven or seven and a half maybe. I don't

Page 127

1  believe they are eight feet.
2     Q. Were you aware that there may have been Siemens
3  technicians, including Larry Grove, that couldn't get
4  the ladder that they had into that elevator?
5     MS. JOHNSON: Objection; form.
6     Q. Did you have any personal knowledge of that?
7     A. No.
8     Q. But in any event, you would have to have a ladder
9  that would be small enough to fit into that elevator;
10  otherwise, you would have to go up the stairs; is that
11  correct?
12    A. That is correct.
13    Q. Even if you fit the ladder into the elevator, you
14  still have to go up a flight of stairs after you get out
15  of the elevator to get up into the mechanical room?
16    A. Correct.
17    Q. Even after you are in the mechanical room, you
18  have to go and keep turning right and going underneath
19  equipment to get in there to the filter room?
20    A. Yeah, you would have to. There would be duct
21  work overhead for air supplies.
22    Q. It would be easier just to maintain a structure
23  inside the building as opposed to having to take an
24  apparatus up into the filter room each time you went to
25  change the filters?

Page 128

1     MS. JOHNSON: Objection; form.
2     Q. Would that be correct?
3     A. It would make more sense to me to do that, yes.
4     Q. Do you know an individual named Kevin Tabler?
5     A. Yes.
6     Q. How do you know Mr. Tabler?
7     A. Just from working in the building.
8     Q. Did he have any supervisory authority over you?
9     A. Kevin Tabler? Not that I recall. He was in the
10  legal department.
11    Q. And do you know an individual named Mark Bond?
12    A. Yes. He was corporate counsel for Unocal.
13    Q. Did any individuals from Unocal talk to you in
14  regard to the Grove litigation?
15    A. No.
16    Q. No contact at any time?
17    A. I have not had any contact with Unocal personnel
18  since basically I left the building, except for the one
19  time that I met Roxanne Sinz when she had left me a
20  message and I tried to reach her, and it turned out to
21  be concerning the OSHA inspector.
22    Q. I don't have it in front of me, but I'll
23  represent to you that in the response to the third
24  discovery requests that the plaintiff did to Unocal in
25  which the plaintiff asked them -- asked Unocal for the

Page 129

1  basis of their answers to the responses to the first two
2  discovery requests wherein they said upon information
3  and belief that Siemens built the structure, they
4  indicated in response to interrogatory number one that
5  they had conferred with the following people, and your
6  name was one of the individuals listed in that response.
7     That was with previous counsel. Do you recall
8  talking to somebody by the name of Shannon Martin?
9     A. Yes.
10    Q. And do you recall what he asked you and what you
11  told him?
12    A. It was a fairly short conversation actually. He
13  had stated that he was counsel for Unocal and it was
14  concerning the accident.
15    And he asked me if I knew about the platform, and
16  I replied no, I was not aware of the platform until the
17  actual accident. And he asked if I knew of anyone that
18  may have known, and I believe I told him Eddie Barrett,
19  Don Acres were the only ones I could think of that may
20  have known, because if it was there, it had to have been
21  there for quite a while, as far as I know.
22    Q. What makes you say it had to have been there for
23  quite a while?
24    A. Because I have never seen it, but it was there.
25  It is an assumption on my part.

33 (Pages 126 to 129)

EXHIBIT 4
PAGE 5 OF 6

**Page 138**

1  which are Exhibit No. 2 to your deposition, if these --
2  I'm going to represent to you that these are pictures
3  that were taken in March of '03. So you would not have
4  been around the building at the time of these pictures?
5  A. Correct.
6  Q. But in any event, Ken Burns, which is entitled
7  "Notes Concerning Visits by State of Alaska OSHA
8  Inspectors compiled by Ken Burns, Drilling Safety
9  Advisor," one of the notes he writes here is, "It was
10  obvious from the structure that it had been erected many
11  years ago."
12      Would you have any reason to disagree with
13  Mr. Burns' statement?
14      MS. JOHNSON: Objection; foundation.
15  A. No.
16  Q. I noted -- when you came into the filter room
17  after Larry Grove was injured, were you more concerned
18  with Mr. Grove than with examining the structure? Would
19  that be fair to say?
20  A. Yes.
21  Q. In showing you this document, not necessarily for
22  the content, does that appear to be -- I don't know if
23  that would appear to be like if you used the intranet at
24  Unocal, whether that would be the font, the print that
25  would come out?

**Page 139**

1      MS. JOHNSON: Objection; foundation.
2  A. That I wouldn't know.
3  Q. In the OSHA investigation, in the narrative
4  compiled by the OSHA inspector, he said, in regard to
5  employer knowledge, "Unocal management acknowledged
6  during inspections, subsequent conversations with OSHA
7  safety officers that the platform has been in place for
8  years and years, probably back to the seventies."
9      Would you have any knowledge of who in Unocal
10  management would have provided that statement?
11      MS. JOHNSON: Objection; foundation.
12  A. Who would have provided that statement?
13  Q. Yes, or that information.
14  A. I do not know.
15  Q. Has anybody at Unocal management ever told you
16  that that platform had been there for years and years?
17  A. No.
18  Q. You haven't talked to Unocal management regarding
19  the accident?
20  A. No.
21      MR. COHN: I don't have any further
22  questions.
23      VIDEOGRAPHER: This concludes the deposition
24  of Charles Arnett. The time is 2:20.
25      (Proceedings concluded at 2:20 p.m.)

**Page 140**

1  (Signature reserved.)
2  -o0o-

**Page 141**

1  CERTIFICATE
2
3  I, SONJA L. REEVES, Registered Professional Reporter
4  and Notary Public in and for the State of Alaska, do
5  hereby certify that the witness in the foregoing
6  proceedings was duly sworn; that the proceedings were
7  then taken before me at the time and place herein set
8  forth; that the testimony and proceedings were reported
9  stenographically by me and later transcribed by computer
10  transcription; that the foregoing is a true record of
11  the testimony and proceedings taken at that time; and
12  that I am not a party to nor have I any interest in the
13  outcome of the action herein contained.
14  IN WITNESS WHEREOF, I have hereunto set my hand and
15  affixed my seal this 9th day of May 2006.
16
17
18  _____
19  SONJA L. REEVES, RPR
20  My Commission Expires 8/7/07

EXHIBIT E
PAGE 6 OF 6

36 (Pages 138 to 141)