GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA

 3  _____

 4  LAWRENCE H. GROVE, CYNTHIA      )
    GROVE, SARAH GROVE, and MICHAEL )
    GROVE (DOB 1/21/88) by and      )
 5  through his father LAWRENCE     )
    H. GROVE,                       )
 6                                  )
           Plaintiffs,             )
 7                                  )
        vs.                         )
 8                                  )
    UNOCAL CORPORATION,             )
 9                                  )
           Defendant.              )
10  _____)
    Case No. A04-0096 CV (JKS)
11                          —
12

13  _____

    VIDEOTAPED DEPOSITION OF LAWRENCE H. "LARRY" GROVE
14  _____
15
               Pages 1 - 121
16        Thursday, December 15, 2005
                9:21 a.m.
17
18        Taken by Counsel for Defendant
                    at
19  The Law Offices of Clapp, Peterson, Van Flein,
           Tiemessen & Thorsness, LLC
20          711 H Street, Suite 620
              Anchorage, Alaska
21
22
23
24
25
```

[COPY]

EXHIBIT _F_
PAGE _1_ OF _7_

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 2

```
 1              A-P-P-E-A-R-A-N-C-E-S

 2   For Plaintiffs:

 3     PHILLIP PAUL WEIDNER
       MICHAEL COHN
 4     PHILLIP PAUL WEIDNER & ASSOCIATES
       330 L Street, Suite 200
 5     Anchorage, Alaska  99501
       907/276-1200
 6
     For Defendant:
 7
       JOHN B. THORSNESS
 8     CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
       711 H Street, Suite 620
 9     Anchorage, Alaska  99501
       907/272-9273
10
     Also Present:
11
       ERIC BALDWIN, PROFESSIONAL BUSINESS VIDEO
12
     Court Reporter:
13
       Leslie J. Knisley
14     PACIFIC RIM REPORTING
       711 M Street, Suite 4
15     Anchorage, Alaska  99501

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT _F_
PAGE _2_ OF _7_

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 4

1    ANCHORAGE, ALASKA; THURSDAY, DECEMBER 15, 2005
2                9:21 A.M.
3                 -oOo-
4    (Exhibits 1 through 12 marked.)
5        THE VIDEOGRAPHER:  We're on record at
6    approximately 21 minutes past 9:00 a.m.  This is
7    the deposition of Lawrence Grove taken by
8    defendants in the matter Grove, et al. versus
9    Unocal Corporation, Case A04-0096 Civil.
10       We are in the offices of Clapp Peterson,
11   711 H Street, Anchorage, Alaska on Thursday,
12   December 15th, 2005.  The court reporter is Leslie
13   Knisley with Pacific Rim Reporting of Anchorage,
14   Alaska.  My name is Eric Baldwin with Professional
15   Business Video of Anchorage.
16       I'll now invite counsel to identify
17   themselves for the record.
18       MR. WEIDNER:  Good morning, everyone.
19   My name is Phillip Paul Weidner.  I'm here on
20   behalf of the plaintiff.  With me today is Michael
21   Cohn, my associate.
22       MR. THORSNESS:  John Thorsness for the
23   defendant.
24       THE VIDEOGRAPHER:  Would our reporter
25   please swear the witness?

Page 5

1        LAWRENCE H. "LARRY" GROVE,
2    deponent herein, being duly sworn under oath, was
3        was examined and testified as follows:
4        MR. WEIDNER:  Mr. Thorsness, remind me
5    again.  I just want to note for the record that
6    we're here today pursuant to Judge Singleton's
7    Order of 6/24/05 in this matter, which provided
8    that there will be a limited supplemental
9    deposition.  It read in part, Grove should submit
10   to a second deposition limited to an inquiry
11   regarding the circumstances in which he found the
12   bolts, comma, the condition at the time, comma,
13   and the chain of custody since that time, period.
14       If it, comma, as appears likely, comma,
15   Grove gave the bolts to his attorney and does not
16   know what happened to them after that, comma, the
17   Court expects that counsel can agree upon the
18   further chain of custody without deposing lawyers.
19       The Order also provided that we were to
20   meet and confer prior to argument and attempt to
21   reach an agreement for a second deposition of
22   Grove limited to the issues identified in the
23   Order.
24       We have done that and that's what we're
25   here to discuss.  Of course I'll allow you some

Page 6

1    reasonable latitude in that regard, but I just
2    want to note it's a limited deposition.
3                EXAMINATION
4    BY MR. THORSNESS:
5        Q    Okay.  Good morning, Mr. Grove.
6        A    Good morning.
7        Q    We've been introduced, and I represent
8    Unocal in this case; I'm their lawyer, I guess
9    you'd say.
10       You've been deposed previously in this
11   case; is that right?
12       A    Yes.
13       Q    Okay.
14       MR. THORSNESS:  And have we gone through
15   our -- finished our preamble?
16       THE VIDEOGRAPHER:  Yes, we have.
17       MR. THORSNESS:  Did you swear the
18   witness?
19       THE REPORTER:  I did.
20       MR. THORSNESS:  You did?  I wasn't
21   listening.  Forgive me.  All right.
22       Q    You've been deposed before, correct?
23       A    Yes.
24       Q    And this is the same sort of a -- this
25   is just a continuation of the deposition, and so

Page 7

1    the same rules apply.  The most important rule is
2    you tell the truth.
3        Do you understand that?
4        A    (Witness nods head.)
5        Q    You have to answer audibly.
6        A    Yes, I understand.
7        Q    Okay.  And, secondly, it's very
8    important that before you answer my question, you
9    understand my question.  Okay?
10       A    Yes.
11       Q    Okay.  And believe me, you will not hurt
12   my feelings if you ask me to rephrase or restate,
13   and it's very important that you do that if you
14   have any doubt about the question.
15       Understand?
16       A    Yes.
17       Q    Okay.  And you agree if you have any
18   problem with my question for whatever reason,
19   you'll ask me to rephrase or restate it?
20       A    Yes.
21       Q    Okay.
22       MR. THORSNESS:  Counsel, I'd like to
23   start with a housekeeping matter and I'd like to
24   open this box that I'm told the bolts, or some
25   bolts reside in.

EXHIBIT _F_
PAGE _3_ OF _7_

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 28

1    Q    Did you tell him that you'd removed
2  these nuts and bolts and washers in Exhibit 16?
3    A    I may have. I don't recall.
4    Q    Do you recall his response, if any, to
5  your informing him you'd removed these nuts and
6  bolts from the fan room?
7    A    No, I don't.
8    Q    Did you have anybody's permission to
9  remove these nuts and bolts from the fan room?
10    A    No, I didn't.
11    Q    Did you feel that they belonged to you?
12    A    No, I didn't.
13    Q    Who did they belong to?
14    A    Unocal.
15    Q    Why did you think that you were -- let
16  me strike that question.
17         Did you believe that you should ask
18  anybody's permission before you removed these nuts
19  and bolts that belonged to Unocal from their fan
20  room?
21    A    At that time, no.
22    Q    And why didn't you think you should ask
23  permission?
24    A    I don't have a good answer for that, to
25  tell you the truth.

Page 29

1    Q    Okay. Did anybody suggest that you go
2  back to the fan room and remove these nuts and
3  bolts?
4    A    No.
5         MR. WEIDNER: Counsel, that's the second
6  time you asked that question.
7    Q    (By Mr. Thorsness) Okay. Okay.
8         The day you went back to the fan room,
9  did the -- did you have to have some sort of a
10  card to gain access to the building?
11    A    Yes, you'd have to have a security code
12  access, which everyone is assigned their own
13  personal security code --
14    Q    All right.
15    A    -- and I had a building master key.
16    Q    Okay. And this code, is that a
17  numerical code?
18    A    Yes.
19    Q    That you punch in on a keypad outside
20  the door?
21    A    That's correct.
22    Q    All right. What was your code number?
23  Do you remember?
24    A    8027.
25    Q    All right. Is that the code you used to

Page 30

1  get inside the building that day?
2    A    Yes.
3    Q    All right. And -- and did you also have
4  to use a key to access the fan room?
5    A    Yes.
6    Q    And so -- and by a key, this is like
7  a -- like a regular old -- I'm showing you a key
8  from my key ring, building key. It looks
9  something like that?
10    A    That's correct.
11    Q    Okay. And, again, I'm not real familiar
12  with key terminology. It's a flat key, not a
13  round key?
14    A    That's correct.
15    Q    All right. Do you still have that key?
16    A    Yes, I do.
17    Q    Okay. Is it on your person?
18    A    No.
19    Q    Where is it?
20    A    At home on my key ring with the company
21  keys.
22    Q    Okay. Why do you still have that key?
23  Do you know?
24    A    No one ever asked for it.
25    Q    Okay.

Page 31

1         MR. THORSNESS: Counsel, could you
2  arrange to have your client deliver that key to
3  your office? And I probably want to get it back.
4         MR. WEIDNER: In all likelihood, we'll
5  do that. I'll consider that. In all likelihood,
6  we will do that, Counsel.
7         MR. THORSNESS: I'll write you a letter.
8  How does that sound?
9         MR. WEIDNER: That's appropriate.
10         MR. THORSNESS: Okay.
11    Q    Is that the only key that you still have
12  that, as far as you know, opens any door or fits
13  any lock over at the Unocal building?
14    A    Yes.
15    Q    Okay. Who gave you that key?
16    A    Charles Arnett.
17    Q    All right. Have you gone back to the
18  fan room after the day you went back and picked up
19  these nuts and bolts?
20    A    Yes, I did.
21    Q    Okay. When was that?
22    A    I don't recall. I don't remember.
23    Q    Can you give me any estimate of how long
24  after your accident you went back?
25    A    I can't remember.

EXHIBIT F
PAGE 4 OF 7

PACIFIC RIM REPORTING   907-272-4383
www.courtreportersalaska.com

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 104

1    Q   All right.  Exhibit 7, then -- I'm
2  sorry -- Exhibit 8, does this appear to be one of
3  the middle scaffolding supports?
4    A   I don't know which one that is, to tell
5  you the truth.
6    Q   You can't tell whether that's a middle
7  or an end?
8    A   Well, I can't see a wall anywhere.  I
9  may have been standing in the doorway and took a
10 picture looking up.  I don't know.  They're not
11 directly against the wall, so it could be like a
12 foot or two this direction.
13   Q   To the right?
14   A   To the right or the left, but it appears
15 to the right.  I don't know.
16   Q   All right.  See this piece of flashing?
17 I'll call it a piece of flashing.
18   A   That's a piece of sheet metal from the
19 plenum wall.
20   Q   All right.
21   A   It's a vertical support to keep it from
22 flexing.  Got nothing to do with the scaffolding.
23   Q   I understand.  Are there several pieces
24 of these vertical pieces of sheet metal along the
25 plenum?

Page 105

1    A   There could be.  I don't know how many
2  exactly, but there's several in there at least.
3  One, two, three, four.
4    Q   All right.  Can you tell
5  whether -- let's grab the color photo that
6  corresponds to that.  That would be Exhibit 19,
7  the bottom photo, right?
8    A   Right.
9    Q   Look right here.  Are there two --
10   A   Those are the round heads.
11   Q   Those are the machine screw heads?
12   A   Correct, correct.
13   Q   And there's two of them?
14   A   Yes.
15   Q   All right.  All right.  Could you circle
16 those on Exhibit 8, please?  Do you see them on
17 Exhibit 8?
18   A   Right there.
19   Q   And put "machine screw heads," if you
20 will.
21   A   (Witness complies.)
22   Q   I'm just about done, Phil.
23       Look at Exhibit 12 for me, will you?
24 Okay.  That shows some filters still in their
25 boxes, correct?

Page 106

1    A   No.  There's the filter itself, the
2  cardboard frame.
3    Q   That's right.  Thanks for the
4  correction.
5        And what's in the middle of Exhibit 12
6  there?
7    A   I think that's the center support.
8    Q   Is that the support -- is that the
9  vertical portion of the scaffolding support that
10 you believe failed during your accident?
11   A   That could be it.
12   Q   Okay.  Why did you take a picture of
13 this?
14   A   I took a picture of -- I took a picture
15 of everything.  I knew I was going to be asked
16 some questions after the accident, so I decided to
17 take some pictures.
18   Q   The nut that's in the baggy in Exhibit
19 16 --
20   A   Yes.
21   Q   -- was that separate from any of the
22 machine screws, or was it affixed to any of the
23 machine screws?
24   A   Well, They were all separate on the
25 floor.

Page 107

1    Q   They were all separate?
2    A   Right.
3    Q   Okay.  When you put these pieces, these
4  machine screws and washers and the nut into the
5  baggy, what did you do with them after you left
6  the fan room?
7    A   Put them in my pocket.
8    Q   Okay.  That's just the kind of detail
9  I'm looking for.
10   A   Go ahead.
11   Q   And then where did they go?
12   A   They went home with me.
13   Q   Okay.  And where did they go once you
14 got home?
15   A   Dresser drawer.
16   Q   Okay.  And how long did they stay there?
17   A   Quite some time.  At least almost a
18 year.
19   Q   Were they ever removed from the baggy?
20   A   No.
21   Q   Okay.  Did anybody ever -- did you or
22 anybody ever inspect them?
23   A   Not that I can recall.
24   Q   Okay.  Where did they go from your
25 dresser drawer?

29 (Pages 104 to 107)

EXHIBIT E
PAGE 5 OF 7

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 112

1  location of any of the scaffolding support
2  material shown in any of these photographs as we
3  sit here today?
4  A  To the best of my knowledge, I do not.
5  It was demoed by Unocal personnel.
6  Q  Say again.
7  A  It was demolished, demoed by Unocal
8  personnel.
9  Q  How do you know that?
10  A  That's what I was told.
11  Q  Who told you that?
12  A  I think Mr. Paul Crapps, C-r-a-p-p-s.  I
13  stopped in to say hello one day and --
14  Q  And what?
15  A  I think he mentioned he was the one that
16  was instructed to remove it.
17  Q  Did he tell you who instructed him to
18  remove it?
19  A  I don't recall exactly.  I don't know
20  who would have told him to do that.  Possibly --
21  he was working for Charles at that time, so...
22  Q  Did he tell you what he did with it?
23  A  No, he didn't go into any detail.
24  Q  Have you been back to the building since
25  you -- since the day after your accident when you

Page 113

1  removed the machine screws from the building?
2  A  Once or twice to say hi to Charles, but
3  just front office type visit.
4  Q  Did you ever do any work at the Unocal
5  building after the day of your accident?
6  A  No, I did not.
7  Q  Where were you horizontally on the
8  scaffolding when you fell?
9  A  Just about midsection.
10  Q  Okay.
11  MR. WEIDNER:  Counsel, that's obviously
12  outside the scope of the Order.  It was also asked
13  in the previous deposition.
14  Q  (By Mr. Thorsness)  What were you doing
15  when you fell?
16  A  Reaching for a filter.
17  Q  Okay.  So were both your hands above
18  your head?
19  A  Yes.
20  MR. WEIDNER:  Again, Counsel, that was
21  asked in a previous deposition.  That's outside
22  the scope of the Order.
23  Q  (By Mr. Thorsness)  In addition to the
24  scaffolding planks that were on top of these
25  horizontal supports we've talked about --

Page 114

1  A  Uh-huh.
2  Q  -- did the planking also continue on to
3  this ledge here, like shown in Exhibit 1?
4  A  I think it was just abutted up to it.  I
5  don't think it extended past it.
6  Q  Okay.  So the scaffolding planks were
7  all supported by these horizontal pieces, then?
8  A  Correct.
9  Q  You said there may have been twice after
10  your visit to the fan room where you collected
11  these machine screws that you stopped in to the
12  Unocal building.  Remember that conversation?
13  A  And spoke to Charles or Paul, yeah.
14  Q  Okay.  Do you remember anything about
15  this -- if there was a second time and, if so,
16  what you may have done then when you were there?
17  A  Just basically a social call to say hi.
18  That's all.  In the neighborhood.
19  Q  Okay.  Did you inspect the condition of
20  any of the machine screws and nuts that were still
21  affixed to any of these angle -- perforated angle
22  pieces when you went back and you collected these
23  machine screws?
24  A  Just looked at them and took a picture
25  of them.  I didn't tamper with anything.

Page 115

1  Q  Did you notice any that were loose or
2  the nuts were missing?
3  A  Not to my knowledge.  I didn't tamper
4  with anything else.  I just took some pictures and
5  that was it.
6  Q  Okay.  Okay.  Those are -- did you talk
7  to anybody besides your lawyers about these pieces
8  in Exhibit 16?
9  A  In what regards?
10  Q  Well, with -- anything about them, their
11  condition, their -- whether or not -- anything
12  about them.
13  A  No, I didn't.
14  Q  Okay.
15  MR. THORSNESS:  Those are all the
16  questions I have.  If you have -- do you have any
17  questions?
18  MR. WEIDNER:  No.
19  MR. THORSNESS:  Okay.
20  MR. WEIDNER:  That will terminate the
21  deposition?
22  MR. THORSNESS:  Yes, it will.
23  THE REPORTER:  Do you want to stay on
24  the record?
25  MR. WEIDNER:  Well, we need to seal

31 (Pages 112 to 115)

EXHIBIT E
PAGE 6 OF 7

GROVE v UNOCAL

LARRY GROVE
12/15/2005

Page 116

1  those bolts back up.  If I could just look at them
2  for a second before we do that, and let's just
3  seal them up on the record.
4      MR. THORSNESS:  Let me -- I've got to
5  run downstairs and talk to somebody for a second
6  and --
7      MR. WEIDNER:  Sure.
8      MR. THORSNESS:  But I'll send somebody
9  in here.
10      (Mr. Thorsness leaves the proceedings
11  and Mr. Moran enters the proceedings.)
12      MR. WEIDNER:  All right.
13      THE VIDEOGRAPHER:  We are on record.
14      MR. WEIDNER:  Yeah, let's stay on
15  record.
16      MR. COHN:  Do we want to seal them up on
17  the record?
18      MR. WEIDNER:  Yeah, I want to seal them
19  up on the record.
20      Do you know when John's going to be
21  back?
22      MR. MORAN:  Could be momentarily.
23      MR. WEIDNER:  Let's just stay on the
24  record.
25      MR. THORSNESS:  Okay.  I'm back.

Page 117

1      MR. WEIDNER:  Okay.  I'd just like to
2  seal these up again in a similar fashion.  I
3  suggest that we --
4      MR. THORSNESS:  Natalie, would you get
5  some strapping tape, please, that clear tape for
6  sealing boxes?
7      MR. WEIDNER:  Could I suggest that we
8  put the plastic bag back inside Exhibit 13, put 13
9  back in 14 and seal it up?
10      MR. THORSNESS:  Okay.  I agree.  I'm
11  doing it, for the record.  Are we on the record?
12      MR. WEIDNER:  Yeah.  We stayed on the
13  record while you were gone.
14      MR. THORSNESS:  Thank you.  Hey,
15  Natalie, I need a Magic Marker.  Yeah, just like
16  that.
17      Phil, you stop me if I'm not doing this
18  right.
19      MR. WEIDNER:  You're doing great.
20      MR. THORSNESS:  Just for the record,
21  we've left the old tape on and we're basically
22  just taping over it.
23      MR. WEIDNER:  Wrap it under there.  Why
24  don't you sign over it, John, and date it.
25      MR. THORSNESS:  And I'm putting my

Page 118

1  initials over the top.  Today is the 15th of
2  December.  You want to put your initials down
3  below there, too?
4      MR. WEIDNER:  Sure.
5      MR. THORSNESS:  Okay.  And I want to
6  make sure our court reporter gets our exhibits.
7      MR. WEIDNER:  I'm just going to hold
8  that up for a second.
9      MR. THORSNESS:  That's a good idea.
10  Thank you.  Okay.
11      MR. WEIDNER:  I think you caught that
12  sticky with a little bit of tape.  Actually, could
13  you take a little piece of tape and tape over
14  that?
15      MR. THORSNESS:  Yeah, we were going to
16  tape over that sticky.
17      MR. WEIDNER:  All right.
18      MR. THORSNESS:  All right.  We done?
19      MR. WEIDNER:  Yeah.  Let's go off
20  record.
21      MR. THORSNESS:  Okay.
22      THE VIDEOGRAPHER:  Close the record at
23  11:55.
24      (Videotaped proceedings concluded at
25  11:55 a.m.)

Page 119

1      MR. WEIDNER:  Let's go back on the
2  stenographic record for a second.
3      MR. THORSNESS:  Yeah, yeah, just the
4  stenographic record for a second.
5      MR. WEIDNER:  The record should reflect
6  that the contents of Exhibit 15, that is the two
7  envelopes and the bolts that have been marked, are
8  going to be returned to the possession of Mr.
9  Thorsness, who is the appropriate agent for this
10  firm, with our understanding that it won't be
11  opened until we have either an agreed or a court
12  Order of protocol for its inspection at the
13  appropriate time.
14      MR. THORSNESS:  Right.
15      MR. WEIDNER:  Okay.
16      MR. THORSNESS:  We're done.
17      (Proceedings concluded at 11:56 a.m.)
18
19
20
21
22
23
24
25

EXHIBIT __

PAGE 7 OF 7

32 (Pages 116 to 119)