LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF ALASKA
 3   LAWRENCE H. GROVE, CYNTHIA    )
     GROVE, SARAH GROVE, and MICHAEL )
 4   GROVE (DOB 1/21/88) by and     )
     through his father             )
 5   LAWRENCE H. GROVE,             )
                                    )
 6                 Plaintiffs,      )
                                    )
 7   vs.                           )
                                    )
 8   UNOCAL CORPORATION,            )
                                    )
 9                 Defendant.       )   Case No. A04-0096 CV (JKS)
     _____)
10
             VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
11                  January 12, 2007
12   APPEARANCES:
             FOR PLAINTIFFS:    MR. MICHAEL COHN
                                Phillip Paul Weidner & Associates
14                              Attorneys at Law
                                330 L Street
15                              Suite 200
                                Anchorage, Alaska 99501
16                              (907) 276-1200
17           FOR DEFENDANT:     MS. LINDA J. JOHNSON
                                Clapp, Peterson, Van Flein,
18                                  Tiemessen & Thorsness, LLC
                                Attorneys at Law
19                              711 H Street
                                Suite 620
20                              Anchorage, Alaska 99501
                                (907) 272-9266
21
             ALSO PRESENT:     MS. VICTORIA HOMAN
22                             MR. ROBERT L. GRIFFIN
23                             * * * *
24
25
```

EXHIBIT _K_
PAGE _1_ OF _9_

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 2

PURSUANT TO NOTICE, the Videotape Deposition of
LAWRENCE H. GROVE was taken on behalf of Defendant, Unocal
3  Corporation, before Maureen Green, Notary Public in and for
4  the State of Alaska and Reporter for Metro Court Reporting, at
5  the offices of Clapp, Peterson, Van Flein, Tiemessen &
6  Thorsness, LLC, 711 H Street, Suite 620, Anchorage, Alaska, on
7  the 12th day of January 2007 commencing at the hour of 9:00
8  o'clock a.m.
9                  * * * *
10           TABLE OF CONTENTS

11  Direct Examination by Ms. Johnson . . . . . . . . . 5
    Cross Examination by Mr. Cohn . . . . . . . . . . 346
12  Redirect Examination by Ms. Johnson . . . . . . . 348
13  EXHIBITS
14  1 - Response to Third Discovery Requests
        to Plaintiff Lawrence Grove . . . . . . . . . . 8
15  2 - Supplemental Response to Third Discovery
        Requests to Plaintiff Lawrence Grove . . . . . 15
16  3 - Alaska Trial Court Case, Minor Offenses
        Summary, Bates numbers 102355 - 102362 . . . . 25
17  4 - State of Alaska, Department of Fish
        and Game, Division of Wildlife Conservation,
18      Affidavit that Records are Authentic . . . . . 33
    5 - Excerpt of Cynthia Grove Deposition . . . . . 54
19  6 - Defendant's 12th Supplemental Initial
        Disclosures . . . . . . . . . . . . . . . . . . 68
20  7 - Plaintiff's Rule 26 (16th) Supplemental
        Disclosure . . . . . . . . . . . . . . . . . . 108
21  8 - Photographs from Africa . . . . . . . . . 114
    9 - U.S. Fish and Wildlife Service,
22      Declaration for Importation or Exportation
        of Fish or Wildlife and attachments . . . . . 114
23  10- Blog entries of Sarah Grove . . . . . . . . 205
    11- Blog entries of Sarah Grove . . . . . . . . 211
24  12- Blog entries of Sarah Grove . . . . . . . . 287
25

Page 3

1            P R O C E E D I N G S
2       (On record)
3       COURT REPORTER: On record. My name is
4  Maureen Green and I'm a court reporter for Metro Court
5  Reporting, 121 West Fireweed Lane, Suite 260, Anchorage,
6  Alaska. Today's date is January 12th 2007, the time is 9:15
7  a.m. We are at the offices of Clapp, Peterson, Van Flein,
8  Tiemessen and Thorsness, 711 H Street, Suite 620, Anchorage,
9  Alaska 99501 for the deposition of Mr. Lawrence Grove. This
10  case is in the United States District Court for the District
11  of Alaska, Lawrence H. Grove, Cynthia Grove, Sarah Grove,
12  Michael Grove, DOB January 21st 1988, by and through his
13  father, Lawrence H. Grove, Plaintiffs vs. Unocal Corporation,
14  Defendant, Case Number A04-0096 CV. I am also the
15  audiographer and videographer.
16      (Off record)
17      (On record)
18      COURT REPORTER: On record at 9:37. Before I
19  swear in the witness could I have counsel identify themselves
20  and who they represent please?
21      MS. JOHNSON: Linda Johnson, I'm from Clapp
22  Peterson, I represent Unocal and I have Vicki Homan with me
23  today.
24      MR. COHN: Michael Cohn from the Law Offices
25  of Phillip Paul Weidner and Associates, here on behalf of the

Page 4

1  plaintiffs and representing Larry Grove. And I think there's
2  another attorney here --
3       MR. GRIFFIN: I'm Bob Griffin with Griffin and
4  Smith. I represent Mr. Grove's Workers' Compensation carrier,
5  St. Paul Travelers'. And I wish to thank counsel for the
6  courtesy of letting me observe this deposition. Thank you.
7       COURT REPORTER: Thank you. And also present
8  is Victoria Homan. Please raise your right hand.
9       (Oath administered)
10      MR. GROVE: I do.
11           LAWRENCE H. GROVE
12  having first been duly sworn under oath, testified as follows
13  on examination:
14      COURT REPORTER: Please state your full name,
15  spelling your last sir.
16  A    Lawrence Grove, G-r-o-v-e.
17      COURT REPORTER: And your mailing address sir?
18  A    P.O. Box 222253, Anchorage, Alaska 99522.
19      COURT REPORTER: And your telephone number
20  sir?
21  A    Home or cell? Home number is 248-6031. Cell number
22      is 229-1167.
23      COURT REPORTER: Thank you sir. Ms. Johnson,
24  you may proceed.
25                                          —

Page 5

1            DIRECT EXAMINATION
2  BY MS. JOHNSON:
3  Q    Mr. Grove, are you taking any medications today?
4  A    Yes.
5  Q    Okay. And what medications did you take?
6  A    Think of the name of that, Neuroprentin and Percocet.
7  Q    And what --
8  A    Neuro-- --
9  Q    Neuro what? Neuropentin, you said?
10  A   Neuropentin, I think, is the -- the name of it.
11  Q   Who prescribed that?
12  A   Dr. Taylor.
13  Q   And what's it for?
14  A   It kills the -- it's supposed to manage the pain in
15      the nerves from nerve damage.
16  Q   Okay. And will that prevent you from understanding my
17      questions today?
18  A   No. I -- I can understand what you're --
19  Q   And will it prevent you from being able to answer any
20      questions?
21  A   No.
22  Q   Okay. And you are also -- you also took Percocet?
23  A   Yes.
24  Q   Okay. And who prescribed that?
25  A   Dr. Taylor.

EXHIBIT  R
PAGE  2  OF  9

METRO COURT REPORTING
907.276.3876          745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501          metro@gci.net

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 30

1 Q    What were you hunting for?
2 A    Well, that's a -- it's a caribou permit, that's the
3 only thing it's good for, it's a special permit.
4 Q    Okay.  And did you actually hunt each of those three
5 years, '92, '93 and '94?
6 A    Yes.
7 Q    And how about your wife, did she hunt?
8 A    She went out once or twice with me, I think.
9 Q    Can you tell me how tall you are?
10 A    5' 7".
11 Q    And on September 9th 2002, how much did you weigh?
12 A    165 -- 170, in that range.
13 Q    And how much do you weigh today?
14 A    About 168.
15 Q    During your November 2002 hunt, do you recall that
16 your cast had actually already been taken off?
17 A    It was either that -- I was either in a cast or in a
18 walking cast.  I don't recall exactly what I had on at
19 that time.
20 Q    And the walking cast would be what?
21 A    It's a large plastic cast that you can put on with
22 velcro and -- walking cast.
23 Q    You told Dr. Nolan that you had no previous injury to
24 that foot, do you recall that?
25 A    I -- I don't know.  I don't recall.

Page 31

1         MR. COHN:  You know, Larry, if you don't
2 recall and you need to look at the document, you can ask to
3 see the document.
4 A    I never had any serious injuries to that ankle.
5 Q    (By Ms. Johnson)  But you did have a sprained ankle,
6 correct?
7 A    A slight, very slight strain.  I pulled a tendon or
8 something at one other time.
9 Q    Okay.  You filed a Workers' Comp claim on it though,
10 didn't you?
11 A    I don't recall that.
12 Q    Do you recall seeing a chiropractor for it?
13 A    Oh.  If that's Case, yes.  I mean, if that's what you
14 want to call a Workers' Comps claim but I don't thi-
15 -- recall losing any work over it.  It was just a
16 minor -- I wasn't sure if it was a muscle or what.
17 And he did some ultrasound treatment on that -- that
18 one part there.  It wasn't anything serious.
19 Q    Did you finish the treatment that he prescribed?
20 A    Yes, to my best recollection I did.  It wasn't a real
21 serious injury.
22 Q    When you kill a moose what are the paperwork
23 requirements for what you have to do after you kill a
24 moose?
25         MR. COHN:  I'm just going to object as to what

Page 32

1 year.  It changes year by year and I don't know --
2 A    Well, they ask you to file a report but you don't have
3 to.
4 Q    (By Ms. Johnson)  What kind of a report would that be?
5 A    It's just a Harvest Report.
6 Q    Okay.  Who asked you to do it?
7 A    Alaska Fish and Game.  The only time you are required
8 and must send in a report is on a drawing permit.  If
9 you don't file it you will be black listed for like
10 five years, you won't be able to put in for any
11 drawings or permits.
12 Q    Okay.  After you kill a moose or any other animal, do
13 you normally fill out that report?
14 A    I try to.
15 Q    When you fill the report out are you honest in your
16 report?
17 A    Yes.
18 Q    Are you required to be honest if you fill the report
19 out?
20         MR. COHN:  Objection to the form of the
21 question.
22 A    There's nothing to be dishonest about.  I mean it asks
23 you, how many points it had, what game management unit
24 you killed it in and the date of the harvest, that's
25 it.

Page 33

1 Q    (By Ms. Johnson)  So when you fill it out you
2 accurately report where you've been?
3 A    If I fill it out, yes.
4 Q    And what days were you there?
5 A    I don't know if they ask -- they tell that.  They ask
6 what date you killed the moose on but they don't ask
7 you how long you were there.
8 Q    Okay.  All right.
9 A    That I can recall anyways.
10         MS. JOHNSON:  I'd like to have this marked
11 Exhibit 4.
12         COURT REPORTER:  Exhibit 4 marked.
13         (Deposition Exhibit 4 marked)
14 Q    This was produced through your attorney, have you seen
15 that document before?
16 A    I don't recall.  I don't think I've seen all the
17 paperwork.
18         MR. COHN:  Why don't you go -- look through it
19 Larry?
20         MS. JOHNSON:  Why don't we go off record while
21 he looks through it, please?
22         (Off record)
23         (On record)
24 Q    (By Ms. Johnson)  I'm going to ask you a couple
25 questions about some of the record detail in this

EXHIBIT  K
PAGE  3  OF  9

METRO COURT REPORTING
907.276.3876                745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501                metro@gci.net

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

---

Page 58

one where he shot it on the -- in Talkeetna?

2  Q   That's what I'm asking you.
3  A   Oh yeah. Okay. Yeah, that's probably the thing, yes.
4  Q   So -- it's the same -- it's the same trip where you
5      were driving?
6  A   Yeah.
7  Q   Okay.
8  A   Okay.
9  Q   And it's the same trip where you were driving around
10     Talkeetna, is that right?
11 A   Well, we were just driving back to the cabin. We
12     weren't necessarily even -- we were just driving back
13     to the cabin to lo- -- to lock it up and head home.
14 Q   Okay. So you think that this was the same one at the
15     end of September?
16 A   Yes, I think so.
17 Q   So you're not talking about a separate trip, you're
18     talking about the same trip?
19 A   Yes, I'm -- yes.
20 Q   Let's go back to the document that your attorney is
21     holding. I believe it's Exhibit 3, is that right?
22     MR. COHN: Four.
23     MS. JOHNSON: Four? Sorry. I'll put it on
24 here so I know. If you could give it back to him so he could
25 look at it?

---

Page 59

1  A   Okay.
2  Q   And first I want you to look at the third page, the
3      harvest ticket.
4  A   Okay.
5  Q   And go to 2004.
6  A   Okay.
7  Q   And there's a listing for you for a moose, see that?
8  A   Uh-huh (affirmative).
9  Q   And if you match it up with the.....
10 A   Okay. Where -- where we lo- -- where we at here?
11 Q   2004.
12 A   Okay.
13 Q   Oh. Page before. 2004, there's a moose.....
14 A   Uh-huh (affirmative).
15 Q   .....there's a moose.....
16 A   Uh-huh (affirmative).
17 Q   Okay. Now, if you hold them like this, page over to
18     the next page.
19 A   To the front one?
20 Q   To the next page.
21 A   Okay.
22 Q   You can match them over and it states on here that you
23     reported that you killed a moose in 2004.
24 A   Okay.
25 Q   Do you see that?

---

Page 60

1  A   Where are we looking at?
2      MR. COHN: Objection to form of the question
3  about what it says -- it states he said.
4  A   It says, hunted one.
5  Q   (By Ms. Johnson) Okay. Do you recall turning in a
6      harvest ticket to fish and game that said you hunted
7      one moose in 2004?
8  A   That says, you hunted but that -- does that say I
9      killed one?
10 Q   Do you recall turning that in?
11 A   Not that -- I don't recall that far back ma'am. I'm
12     sorry.
13 Q   And you hunted for 14 days?
14 A   That's a guess how many days I went out.
15 Q   Okay.
16 A   Okay? I -- I can't -- you know, you can't --
17 Q   You don't think it was 14 consecutive days?
18 A   I don't think so.
19 Q   The next on says, killed. It says: One killed.
20 A   Yep, that's unit 14B.
21 Q   Okay. And you -- where's unit 14B?
22 A   That's Talkeetna.
23 Q   Okay. And then it says date of kill, 9/29/2004.
24 A   Hmm.
25 Q   See that?

---

Page 61

1  A   That's screwed up because John shot the moose because
2      he still had his non-resident tag on it. I got the
3      horns at home.
4  Q   Why do you have the horns?
5  A   He left them here. They're only a small set, they're
6      nothing big about them.
7  Q   So did you report.....
8  A   I might of just --
9  Q   Do you recall reporting to fish and game that you
10     killed a moose September 29th 2004?
11 A   I might have sent the wrong card in because John left
12     his card with me.
13 Q   Well, why would you fill out a card?
14 A   Well, I reported his kill. So I mu- -- I must have
15     sent my report card in. They both -- they all look
16     the same.
17 Q   I don't understand how -- how -- he left his report
18     card with you to fill out for him?
19 A   Yes. He had to get home, right? So he left his
20     report card back there and I had my report card.
21     Apparently, I must have filled out the wrong report
22     card. They both look the same, they're green.
23 Q   Did you sign -- did you sign his name to it?
24 A   You don't have to sign anything.
25 Q   You don't have to put a signature on it?

---

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 90

1  A  Yes, we clipped them like that, yes. That's how we
2  use two nets.
3  Q  Okay. And who picked the fish?
4  A  Everybody did.
5  Q  Did you pick fish?
6  A  A few.
7  Q  How many?
8  A  I really can't tell you. I -- it's something -- I --
9  I don't know. I don't count them. I was -- generally
10  what I do is first, the net comes up -- up close, if
11  there's a couple close I'll grab those and throw them
12  up. And then when they start picking I go up to the
13  table and I chop tails. We get like a little line
14  going. I'll just sit there and chop tails off. We
15  have like a system.
16  Q  Once you're done with the fish where are you putting
17  the fish?
18  A  Put them into coolers. And we ice them down.
19  Q  Into a cooler?
20  A  Yes.
21  Q  And in 2005, what were you wearing on your feet?
22  A  Boots.
23  Q  Same boots?
24  A  Probably.
25  Q  Okay.

Page 91

1  A  I've had -- I've had the same boots for a long time.
2  Q  Why did you list Brian as one of your household
3  members?
4  A  Well, I asked the guy at the permit place, I said, hey
5  my son lives out of state. And I said, it's my
6  natural son, I go, does he count as my household? He
7  said, yes. I said, okay.
8  Q  How old is Brian?
9  A  Thirty-three.
10  Q  Is he married?
11  A  Yes he is.
12  Q  Does he have any children?
13  A  Yes. A daughter, Hanna. She's three years old.
14  Q  So you have a grandchild?
15  A  Yes. With one on the way in March.
16  Q  Congratulations. And has he always lived in
17  Pennsylvania?
18  A  Yes.
19  Q  Has he ever lived with you in Alaska?
20  A  First year, he used to come up for the summers.
21  Q  Used to -- when did that quit?
22  A  Oh, when he started going to college. And got a
23  girlfriend first but that --
24  Q  How many years ago was that?
25  A  Oh. He's thirty-three, so -- about 15 years ago,

Page 92

1  something like that. Maybe 20. I'm not exactly sure.
2  Q  So it's your testimony that the person at the --
3  A  At the desk where he got the permit, yes.
4  Q  Okay. And what -- what office is that?
5  A  You can pick these permits up either at -- well, I got
6  this one right at fish and game office.
7  Q  So fish and game told you it was okay to list Brian?
8  A  The guy there -- he was part of my household, I said,
9  yeah, what do you consider a household? They're not
10  your household anymore if they move across town or how
11  do you -- that's why I asked him, I said, well, I have
12  another son. And he goes, is he your birth son? I
13  says, yeah. And he goes, well yeah you can count him
14  as household, so I did.
15  Q  Did you read the regulations before you added him in?
16  A  No. I mean, what -- this is all the regulations,
17  they're all right here aren't they?
18  Q  That's what I'm asking: Did you read any other
19  regulations other than what's on this -- the paper?
20  A  No, I did not. Not that I can recall.
21  Q  You applied -- somewhere your attorney has told me
22  that you applied for a fish per-- -- a personal fish --
23  a personal fisheries use permit for '06.
24  A  No, I haven't -- have I?
25  Q  You -- you applied.

Page 93

1  A  Oh, yes I did. Yes. Yes I did.
2  Q  Okay. Did you fish, subsistence fish -- this kind of
3  fishing in '06?
4  A  Yes. Yeah, this year, yes I did.
5  Q  Okay. Same question, when did you go down?
6  A  Right around that part-time in June because that's
7  right about the 20th of June is the best time of the
8  tides. It depends on the tides really. And the
9  season's only open for 15 or 20 days. It's -- and
10  it's -- if they change it -- they'll open it, I think,
11  they have to give you a certain date they open it.
12  Then you have to get an escapement up the Kasilof
13  River first, then they open it up to the netting.
14  Q  Did you drive down this year?
15  A  Yes.
16  Q  And you took your three-wheeler?
17  A  Yep.
18  Q  And who went with you in your truck?
19  A  I'm pretty -- Sarah was home that time, so I'm pretty
20  sure Sarah went there, my wife, Michael.
21  Q  Okay. Was there anybody else on the beach with you?
22  A  Oh, yeah. There was a big crowd this year.
23  Q  Robert Sprinkle was there?
24  A  Robert Sprinkle, his buddy from Girdwood again, Wes
25  was there.....

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 134

Q   Did you get out of the vehicle?
A   No, you can't see them. You have to be standing up in the back and look down in the grass or you can't even see them, they're so short.
Q   You shot it out in the grass?
A   Yes.
Q   Okay. And did you move it in order to take a picture?
A   The trackers brought it out and brought it over here. This is actually part of the road, you got one lane and grass and another lane, so it's right there.
Q   The boots that you're wearing in this photo, are those the same ones you have on today?
A   No, that's a different set. That's a real high -- high set, leather set that's got a good support in it.
Q   Did you wear your brace while you were there?
A   Yes I did have my brace. Not this one, I had another one that's a little shorter that can get into the boots. So -- I have several braces, so -- this is the best one by far.
Q   Page 0519.
A   Same animal.
Q   Same animal?
A   Yes.
Q   So that is also a steenbok?
A   Correct.

Page 135

Q   Okay. Page 0520 is not an animal, it looks like a lodge, is that right?
A   That's -- that's the -- well, like a social area in the lodge. That's like -- everybody comes in, sits down, has a drink there at the -- cocktail if you want or --
Q   Okay. Are these tourist photos that you took?
A   Yeah, I took those. Yeah. For the life of the -- place looks like and --
Q   Next page, 05--
A   Just another part of the lodge. It's like the social area.
Q   Is it the same room?
A   Yes, just looking different directions.
Q   Okay. So you said that the original hunt came with four to five animals.....
A   Uh-huh (affirmative).
Q   How many total animals do you think that you shot?
A   I think I shot 11, I think.
Q   Do you want to look through there. You're welcome to.
A   One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve -- probably thirteen total with the other impala.
Q   So are there any animals that aren't depicted in your photographs that you shot?

Page 136

A   Yeah, there's one other impala but how many pictures of an impala are you going to take?
Q   So the photos show 12 of your 13 animals?
A   Correct.
Q   The animals over and above the four or five that were included, how much money did you pay for each animal?
A   Depending on the animal. I think -- I think the zebra was like $300.00 or $400.00. It's really cheap because it's off season, some of the farmers, you know, ranchers or whatever you want to call them, they -- they had them real cheap for this time of year. Generally, they'd be like $600.00 for a brown impala but the cull ones were free.
Q   Okay. The two cull ones were both free?
A   Yeah, they were free. They just want some of the animals off. And the kudu was like a half price animal, if you want to -- it was an opp-- it was an opportunity to take a nice one so he made a deal he couldn't refuse.
Q   Was the warthog part of the.....
A   Yeah.
Q   .....the package?
A   Yeah, that was a -- that was a free one.
Q   How about the blesbok?
A   That was a free one?

Page 137

Q   How about the bushbuck?
A   That was a free one.
Q   The eland?
A   That I paid like, oh shoot, $600.00 for. They're usually a $2,400.00 animal. They're a really -- they're a very large animal. They're the biggest antelope in the world.
Q   So why was the price reduced?
A   Because it was wounded. It was going to die anyways.
Q   Oh. Okay. That was the wounded --
A   Yeah. You couldn't see it on the other side but it had a big gash from fighting with another one so -- and with the bugs and stuff over there it only has about five days to live after they get hur- -- injured and the infection gets in there and --
Q   The impala that was not part of the cull-hunt, did you pay for that one?
A   Yeah, 300 bucks. Blue wildebeest was part of the package.
Q   And you said the kudu was half price, how much was it?
A   Oh, Jesus. I think it was like -- I think I only paid -- I think I paid $750.00. They're usually like 14 or 1500, something like that.
Q   What about the steenbok?
A   That was a freebie (ph).

35 (Pages 134 to 137)

EXHIBIT _K_

PAGE _6_ OF _9_    METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501
907.276.3876                                                    metro@gci.net

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 250

1    A    Okay.
2    Q    And so let's find out which one it is. It's another
3    handwritten --
4    A    Uh-huh (affirmative).
5         (Off record comments).
6         MS. JOHNSON: Let's go off record for a minute
7    please.
8         COURT REPORTER: Off record at 3:33.
9    (Off record)
10   (On record)
11        COURT REPORTER: Back on record at 3:35.
12   Q    We're looking at Exhibit number 7 and attached to it
13   is a handwritten document.
14   A    Uh-huh (affirmative).
15   Q    The first page is LG 01178. Would you look at that
16   please?
17   A    Uh-huh (affirmative).
18   Q    Is that your handwriting?
19   A    Uh-huh (affirmative).
20        COURT REPORTER: Is that a yes?
21        MS. JOHNSON: Yes. You say yes?
22   A    Yes, yes.
23   Q    And you -- do you remember filling this out?
24   A    Yes.
25   Q    This, I believe, is about another African hunt, is

Page 251

1    that correct?
2    A    Yes it is.
3    Q    Okay. And when did you go to Africa the -- during
4    this trip?
5    A    That was in July.
6    Q    July of?
7    A    This year -- last year, I mean.
8    Q    July of '06?
9    A    '06, yes. I think it was the last two weeks of July.
10   Q    And you hunted with Cristo Kaiser again?
11   A    Yes.
12   Q    In Limpopo Province?
13   A    We were in a national park and I don't re- -- it's got
14   a name about two feet long, I don't know what the name
15   of it is.
16   Q    Okay. So it was not on his property?
17   A    Oh, no. No, no. This was a special thing. It was
18   another cull-hunt but it was buffalo.
19   Q    Okay. And what were you hunting?
20   A    Buffalo.
21   Q    Cape buffalo?
22   A    Yes.
23   Q    And you were in -- but you were in South Africa?
24   A    Yes.
25   Q    And did you shoot any other animals while you were

Page 252

1    there?
2    A    I did the cull-hunt for some -- couple of wildebeest
3    on Cristo's property.
4    Q    And those -- those wildebeest are not listed in
5    this --
6    A    Oh, I just forgot to put them down.
7    Q    But they're -- they're not listed in this, right?
8    A    No. It was just a cull-hunt. Shot a couple of --
9    they point them out, shoot that one, shoot it and
10   that's it, you know?
11   Q    Okay. At the top of the page you wrote: Cost of trip
12   $12,000.00.
13   A    Yeah.
14   Q    And what did that include?
15   A    All the -- that was the -- well, the permit, the daily
16   rate and all that stuff included, like a --
17   Q    Did it include shipping the Cape buffalo back?
18   A    No. I'm making arrangements for that now and that's
19   not going to be -- that's only the skull and horns but
20   that shouldn't cost much at all to get back.
21   Q    What about the wildebeest, are you bringing those back
22   as well?
23   A    Just the horns.
24   Q    But you are making arrangements to bring those back?
25   A    Yes, yes. And they're two little ones. They're not

Page 253

1    very big.
2    Q    Did the cost of -- did the $12,000.00 cover your plane
3    ticket?
4    A    No, I had to bought -- that's when -- I might have
5    covered my plane ticket down. That was like 17 or
6    1800 bucks. I forgot about the plane ticket cost
7    there.
8    Q    How many days were you in South Africa?
9    A    The trip was about two weeks. In South Africa,
10   probably eight to ten days maybe.
11   Q    Did you go anywhere else in Africa while you were
12   there?
13   A    Yes.
14   Q    Where?
15   A    To Lion Park. And where else did we go?
16   Q    Was that in South Africa?
17   A    Yes. Yes, it was about an hour drive. They've --
18   they have five of the only wild white lions. They
19   actually have silver gray eyes. It was kind of
20   interesting.
21   Q    Did you got to any other country other than South
22   Africa?
23   A    No. No, no, no.
24   Q    So other than the Lion Park, what else did you do?
25   A    I hunted with -- hung out with John Yenason's

EXHIBIT ___K___
PAGE __7__ OF __9__    METRO COURT REPORTING
907.276.3876          745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501          metro@gci.net

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

Page 314

attorney or something like that from what I understand but I -- I've never done any of that.

Q  Okay. So you -- sometimes you're on the phone. And what else do you do on a daily basis?

A  I don't know.

Q  Do you watch TV in the daytime?

A  Sometimes, yes.

Q  What do you watch?

A  Whatever's o- -- I like sports programs, stuff like that.

Q  Do you get on your computer?

A  Not very often, I'm not very good with the computer. I'm lucky I can do my e-mail.

Q  Who do you e-mail?

A  Whoever e-mails me.

Q  Who do you correspond with on a regular basis?

A  Nobody.

Q  Do you have friends with e-mail?

A  They have e-mail but if I hear from them, I read it and maybe I'll answer it but usually my wife does the typing because I'm a shitty (ph) typer. Excuse me. I'm a terrible typer.

Q  How about John Yenason, does he e-mail you?

A  Very rarely.

Q  Your son Brian, does he e-mail you?

Page 315

A  Very rarely.

Q  Your daughter from Bel Rea, does she e-mail you?

A  She mails -- e-mails her mom all the time.

Q  Okay. So, does she specifically e-mail you?

A  No. She e-mails her mom all the time and you know, she tells me what's going on.

Q  Okay. So within the last month who have you received an e-mail from?

A  I don't get -- a lot of guys are selling -- selling Viagra.

Q  No. I'm interested in personal e-mail.

A  I have a lot of those ma'am, like 40 in a day. Oh, who was it, I think my friend Phil sells me some -- sends me these joke things, that's about it.

Q  Who's Phil?

A  Phil Krasmer, a friend of mine. He sends me jokes on that -- I mean it's not a whole lot of stuff on my e-mail that's not something corny (ph) or whatever.

Q  Okay. Have you looked for a job since your injury in 2002?

A  No I haven't been released from -- for work yet.

Q  So have you looked for a job?

A  No I haven't.

Q  Do you have a resume?

A  Yes I do have a resume.

Page 316

Q  Okay. And have you given anybody -- have you submitted your resume to anybody since 2002?

A  No I haven't.

Q  Okay.

A  I'm a Union man, I can't do that, I can't solicit work. I'm a Union pipefitter. I'm a proud member of my Union. I believe in -- I believe in the Union ideal and I cannot solicit work.

Q  Well, you haven't tried to get a non-Union job then?

A  I don't work non-Union. I'm not a non-Union worker.

Q  You refuse to work non-Union?

MR. COHN: Objection to the form of the question.

A  Depends on what it is. All the jobs they gave me so far are junk jobs and doesn't meet the minimum wage -- 14, $15.00 an hour, to me, that does much.

Q  (By Ms. Johnson) What jobs are you talking about?

A  Some of the ones that -- at the vocational rehab guys and -- and what's their names? That other outfit that did a PCE. The -- the wages aren't there.

Q  Okay. Liz Dowler submitted a report, have you read that?

A  Yeah. Full of -- full of bunk.

Q  Well, there are construction jobs in Alaska, right?

MR. COHN: Objection to the form of the

Page 317

question, argumentative.

Q  Are there construction jobs in Alaska?

Q  (By Ms. Johnson) Yes.

A  I'm not -- the doctor won't release me for that, for construction.

Q  Have you explored going back to school?

A  Yes.

Q  When did you do that?

A  Last week we talked about it.

Q  Who's we?

A  .....with Len Mundorf (ph). I've gone over to UAA several times in the last month, I don't know the exact days but did the ACU Placer tests and all that stuff.

Q  I'm sorry, the what placer?

A  ACU Placer.

Q  Okay. Is that the first time that you've done that?

A  Yes.

Q  Had you ever considered going back to school before that?

A  Not seriously, no.

Q  What are you considering at this time, anything?

A  I've got to see what Len comes up with. They're looking at the -- he's talking to the college right now, he's seeing what kind of program we're going to

EXHIBIT____K____
PAGE___8___OF___9___

80 (Pages 314 to 317)

LAWRENCE H. GROVE, et al vs. UNOCAL CORPORATION
CASE NO.: A04-0096 CV (JKS)

VIDEOTAPE DEPOSITION OF LAWRENCE H. GROVE
JANUARY 12, 2007

---

Page 354

1   Q   Retroactive?
2   A   Retroactive it to a certain date.
3   Q   And did you get a check for retroactive pay?
4   A   Yes. I didn't get a check, it was just a deposit in
5      my account?
6   Q   How much?
7   A   Well, let's see, 208, that's --
8         MR. COHN: You don't have to guess if you
9 don't recall Larry.
10  Q   (By Ms. Johnson) You can tell me a month amount or --
11  A   It's 208 bucks a month, so figure what, that's about a
12     couple thousand dol- -- if it was one year it would be
13     like two thousand some dollars. It wasn't a -- a
14     whole --
15  Q   Do you recall how many months they paid you retro?
16  A   I don't recall exactly how many. It had something to
17     do with the Social Security thing.
18  Q   Do you believe you received more than $1,000.00?
19  A   Oh yeah. Oh yeah.
20  Q   And Social Security, you're drawing Social Security
21     disability?
22  A   Yes.
23  Q   How much is it per month?
24  A   Nine hundred and seventeen dollars a month.
25  Q   And you had to pay for that -- or apply for that?

---

Page 355

1   A   Yes.
2   Q   When did you start drawing that, do you remember?
3   A   Actually, I didn't even apply. About a year and a
4     half after I got hurt.
5   Q   '04?
6   A   Something like that. I don't know the exact dates.
7     I'm --
8   Q   Has that amount ever changed?
9   A   It went up a little bit last year.
10  Q   Did you ever get a retroactive check?
11  A   Yes, they gave -- they paid me one year back.
12  Q   Back to 2003?
13  A   From when I applied to it. They can only go back one
14     year. I actually qualified, according to the Social
15     Security, I actually qualified the day I got hurt,
16     Social Security. And -- well, I didn't apply for it
17     because I didn't think, you know -- think it was going
18     to be like that. I expected to be back to work in six
19     months and before you know it, it's getting longer and
20     longer and longer, things aren't looking good so one
21     of my friends said, apply for Social Security. I
22     said, I'm not going to get that. And -- well, I was
23     going to do it anyways, so I applied for it and I got
24     it.
25  Q   For either your national disability or Social Security

---

Page 356

1     disability, did you have to submit any medical
2     records?
3   A   Yes. Oh yeah. Well, for Social Security you have to
4     give them everything.
5   Q   Okay. What about national?
6   A   You get Social Security, you get it automatically.
7   Q   You get the national disability automatically?
8   A   Correct. Yes. They re- -- that's the devi- -- you
9     have to have Social Security before you can get that
10     or you can't really even get it. It's under
11     disability.
12  Q   I'm sorry. You said the national retroactive --
13     retroactive you how long?
14  A   I'm not sure.
15  Q   Okay. Was it back to the date you started drawing
16     Social Security?
17  A   I -- I'm not sure. I think. There was an explanation
18     letter in there, I just looked at it and said okay.
19        MR. COHN: Are we done?
20        MS. JOHNSON: Yes.
21        COURT REPORTER: Off record at 5:30. This
22 concludes the deposition.
23     (Off record)
24
25     * * * * END OF PROCEEDINGS * * * *

---

Page 357

EXHIBIT ___K___
PAGE _9_ OF _9_

METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501

907.276.3876                                      metro@gci.net