Page 1

1           IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF ALASKA

3  ------------------------------------------
   LAWRENCE H. GROVE, CYNTHIA         )
4  GROVE, SARAH GROVE, and            )
   MICHAEL GROVE (DOB 1/21/88)        )
5  by and through his father          )
   LAWRENCE H. GROVE,                 )
6                                     )      COPY
              Plaintiffs,             )
7                                     )
       vs.                            )
8                                     )
   UNOCAL CORPORATION,                )
9                                     )
              Defendant.              )
10 ------------------------------------------
   Case No. 3:04-cv-0096-TMB
11

12              —

13 _____

        VIDEOTAPED DEPOSITION OF MICHAEL GEITZ, M.D.
14 _____

15
                    Pages 1 - 143
16             Tuesday, October 10, 2006
                     9:12 A.M.
17
           Taken by Counsel for Defendant
18                      at
            C Tower, Regional Hospital
19       2741 DeBarr Road, Suite 415-C
                Anchorage, Alaska
20

21

22

23

24
                                      EXHIBIT  M
25                                    PAGE  1  OF  11

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2
     For Plaintiffs:
 3      Phillip P. Weidner
        Michael Cohn
 4      PHILLIP PAUL WEIDNER & ASSOCIATES
        330 L Street, Suite 200
 5      Anchorage, Alaska 99501
        907/276-1200
 6

 7
     For Defendant:
 8      Linda J. Johnson
        CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS, LLC
 9      711 H Street, Suite 620
        Anchorage, Alaska 99501
10      907/272-9272

11
     Videographer/Court Reporter:
12      Eric Baldwin
        Lisa L. Shaffer
13      PACIFIC RIM REPORTING
        711 M Street, Suite 4
14      Anchorage, Alaska 99501

15

16

17

18

19

20

21

22

23

24                                              EXHIBIT  M
                                                PAGE  2  OF  11
25
```

GROVE v. UNOCAL                                                           MICHAEL GEITZ, M.D.
                                                                                10/10/2006

Page 4

1  ANCHORAGE, ALASKA; TUESDAY, OCTOBER 10, 2006
2                 9:12 A.M.
3                   -o0o-
4      VIDEOGRAPHER: We're on record. It's
5  approximately 12 minutes past 9 a.m. This is the
6  deposition of Dr. Michael Geitz, taken by defendant,
7  in the matter Grove versus Unocal, Case
8  3:04-cv-0069-TMB.
9      We are at 2741 DeBarr Road, Anchorage,
10 Alaska, on Tuesday, October 10th, 2006. I'm the video
11 operator, Eric Baldwin; the court reporter is Lisa
12 Shaffer. We are with Pacific Rim Reporting, 711 M
13 Street, Anchorage.
14     I'll now ask counsel present to please
15 identify themselves for the record.
16     MS. JOHNSON: My name is Linda Johnson. I'm
17 here from Clapp Peterson, and we represent Unocal.
18     MR. WEIDNER: My name is Phillip Paul
19 Weidner. I'm here on behalf of the Grove plaintiffs,
20 and with me today is my associate Michael Cohn.
21     VIDEOGRAPHER: Thank you. Would our reporter
22 please swear the doctor.
23                  -o0o-
24     MICHAEL GEITZ, M.D.,
25     deponent herein, being sworn on oath,

Page 5

1  was examined and testified as follows:
2                  EXAMINATION
3  BY MS. JOHNSON:
4      Q  Doctor, my name is Linda Johnson, and I
5  represent Unocal. And you're here under subpoena
6  today, correct?
7      A  Correct.
8      Q  And I understand that Larry Grove was a
9  patient of yours?
10     A  Yes.
11     Q  Okay. I'd like to start with some basic
12 information.
13        Could you give us your education, please.
14     A  My bachelor's degree was at the University of
15 Kansas, medical school was Northwestern University in
16 Chicago, my residency was at Blodgett and Butterworth
17 Hospitals in Grand Rapids, Michigan.
18        I'm board certified in orthopedic surgery by
19 the American Board of Orthopedic Surgery, I'm a fellow
20 in the American Academy of Orthopedic Surgery, and my
21 practice is limited to orthopedic surgery.
22     Q  Can you tell us what year you got your
23 medical degree?
24     A  1973.
25     Q  And what year did you do your residency?

Page 6

1      A  1979 to 1983.
2      Q  What did do you between '73 and '79?
3      A  I was in the Public Health Service.
4      Q  Where at?
5      A  In Alaska.
6      Q  And you said you were board certified and a
7  fellow?
8      A  Yes.
9      Q  What year were you licensed to practice in
10 Alaska?
11     A  1974.
12     Q  Are you licensed to practice in any other
13 state?
14     A  Yes. Michigan.
15     Q  And have you practiced there?
16     A  That's where I did my residency.
17     Q  Just as a resident, okay. Have you worked
18 anywhere else other than Alaska, other than your
19 residency?
20     A  Orthopedically, no.
21     Q  When you say orthopedically, do you mean --
22     A  I've been in practice here since I finished
23 my residency.
24     Q  I'm sorry?
25     A  Since I finished my residency, I've been in

Page 7

1  full-time orthopedic practice here in Anchorage.
2      Q  In Alaska?
3      A  In Alaska.
4      Q  And when did you first see Mr. Larry Grove?
5      A  I saw him on January the 6th, 2003.
6      Q  And how did you get to see Mr. Grove? Was he
7  referred to you?
8      A  He was referred to me by Dr. Laufer.
9      Q  And were you aware that he had seen any other
10 doctors before he saw you?
11     A  Yes. He had seen Dr. Declan Nolan.
12     Q  And why was he referred to you by Dr. Laufer?
13     A  He had a crush injury to his right ankle and
14 it was for a second opinion.
15     Q  And did you review the notes from Dr. Nolan?
16     A  Yes.
17     Q  Did you receive the notes from Dr. Nolan in
18 January?
19     A  Yes.
20     Q  And what was the -- other than the crush
21 injury, was there other complaints that he came in
22 with?
23     A  The complaints I saw him for was his ankle.
24     Q  Do you remember which ankle it was?
25     A  It was his right ankle.

4 (Pages 4 to 7)

EXHIBIT M
PAGE 3 OF 11

Page 12

1  Q  What is posterior tibial tendonitis?
2  A  It's inflammation of the posterior tibial
3  tendon, which is a major tendon that supports your
4  medial arch.
5  Q  And your recommendation, when you said you
6  agreed with his previous treatment and restrictions,
7  what did that consist of?
8  A  He was in a cast, and then he subsequently
9  had physical therapy and progressive weight bearing.
10 Q  Did he tell you that he had gone to physical
11 therapy, or did you see physical therapy notes?
12 A  There were physical therapy notes.
13 Q  And you actually saw him before you made this
14 recommendation; is that right?
15 A  Yes.
16 Q  He was physically in your office?
17 A  Yes.
18 Q  Okay. And did you ask him about prior
19 injuries?
20 A  If I did, I did not note it.
21 Q  So you have no independent recollection of
22 him telling you of a prior injury to his ankle in
23 2000?
24 A  No. If he had told me, I would have put that
25 in there.

Page 13

1  Q  Would that have been important to you?
2  A  Yes.
3  Q  And if he had films from his prior right
4  ankle injury, would you have wanted to look at those?
5  A  Yes.
6  Q  Do you recall if you ever saw any old films
7  from the year 2000?
8  A  I don't believe I did.
9  Q  And you would have wanted to see those films,
10 right?
11 A  Yes.
12 Q  Okay. So when is the next time that you saw
13 Mr. Grove?
14 A  I saw him three months later, on 3/19/03.
15 Q  And why did you see him at that time?
16 A  He was again referred by Dr. Laufer.
17 Q  And at this time your notes state that he is
18 no longer seeing Dr. Nolan; is that correct?
19 A  That's what I was told, yes.
20 Q  Did you then consider him to be your patient?
21 A  Yes.
22 Q  And you stated that he is not getting any
23 better. Why would you make that notation?
24 A  He told me.
25 Q  Did you see anything in his ankle that would

Page 14

1  lead you to conclude he was not getting any better?
2  A  Yes.
3  Q  What was that?
4  A  He was limping and he had a large effusion of
5  his ankle joint. He also had tenderness over his
6  posterior tibial tendon, he had pain on doing a heel
7  rise, and he was tender over his anterior lateral
8  ligaments.
9  Q  Okay. Did you say a large effusion?
10 A  Yes.
11 Q  And what is that?
12 A  Swelling in the joint.
13 Q  And this is something that you could see?
14 A  Yes.
15 Q  And you looked at new x-rays; is that
16 correct?
17 A  Yes.
18 Q  Did you order the x-rays?
19 A  I believe I did, yes. I'll have to check
20 those, the x-ray report.
21    Yes, I did.
22 Q  And who -- did somebody read the x-rays for
23 you, or do you do that yourself?
24 A  I read them and I review the radiologist's
25 report.

Page 15

1  Q  Who was the radiologist on that one?
2  A  Benis Babusis.
3  Q  And do you recall if you agreed with the
4  radiologist's report?
5  A  Yes.
6  Q  And what examination -- other than you said
7  he had tenderness, so you must have been touching his
8  ankle, what else did you do in your examination that
9  day?
10 A  I checked his heel rise and I checked the
11 angulation of his ankle.
12 Q  And when you say angulation, what do you mean
13 by that?
14 A  Whether the ankle is rolling in or out, both
15 when he's standing and when he lifts up onto his toes.
16 Q  What did you find?
17 A  With his heel rise, he can pull his heel into
18 varus, which is inversion, and the hind foot remains
19 flexible.
20 Q  What did that mean to you?
21 A  It means he has a Stage I chronic posterior
22 tibial tendon rupture.
23 Q  And that's your impression, that No. 1 --
24 A  Yes.
25 Q  -- on, I have document 302516, but it's

Page 20

1  recommendations would you have continued to recommend
2  at this point?
3     A    All three.
4     Q    Okay. And then the next time that you saw
5  Mr. Grove?
6     A    Was March 27th, 2003.
7     Q    And why did you see him at that time?
8     A    This was a preoperative review to discuss
9  with him, again, the findings on the MRI scan and also
10 to check his blood pressure, which had been high.
11    Q    And the blood pressure was high. Did that
12 concern you?
13    A    Yes. It was a little bit too high to do
14 elective surgery when I saw him on 3/19/03, and I
15 referred him back to Laufer to get that under better
16 control.
17    Q    Okay. And his blood pressure, I'm sorry, did
18 you say his blood pressure had been -- on 3/19 you
19 indicated that his blood pressure was 160 over 108; is
20 that correct?
21    A    Yes.
22    Q    And what did you want it to be in order to do
23 elective surgery?
24    A    Within normal limits and with a diastolic
25 pressure of 90 or less.

Page 21

1     Q    And so when you saw Mr. Grove on 3/27, what
2  was his blood pressure then?
3     A    It was 148 over 90.
4     Q    Was that acceptable to you?
5     A    That was good.
6     Q    It was better?
7     A    Better.
8     Q    Okay. Did you do a physical examination on
9  3/27?
10    A    Yes. And my note says physical findings are
11 unchanged.
12    Q    And you talked to him about his MRI at that
13 time?
14    A    Yes.
15    Q    And what options did you give him? Or did
16 you give him options, I should say.
17    A    Whenever we talk about surgery, one of the
18 options is, number one, no surgery - continue with
19 nonoperative management, the brace, the activity
20 restriction, a supportive shoe, anti-inflammatory
21 medications and give it more time - the other is to do
22 the surgery.
23    Q    Okay. Of the options, did you recommend one
24 or the other?
25    A    I recommended surgery on the ankle because of

Page 22

1  the -- primarily because of the loose piece of bone
2  and cartilage that's in his joint that hasn't healed
3  in six months and, untreated, that will cause rapidly
4  progressive arthritis. It'll just grind up the joint.
5  Like I said, it's like a marble in a gear box.
6     Q    And do you -- did you indicate which one he
7  chose? Did he make a choice during that exam?
8     A    I don't believe he did. My note states that
9  he had an IME the next Friday, which would have been
10 following, and I will be happy to discuss surgery with
11 him after this.
12    Q    Okay. So this was just your recommendation?
13    A    My recommendations, chances of success.
14    Q    What chance of success did you give him?
15    A    70 to 80 percent.
16    Q    And why did you rate that so high?
17    A    I would call that low, but ...
18    Q    Okay. Why did you rate that so low?
19    A    When you have injuries on both sides, when
20 you have multiple things after an injury, where you've
21 got ligaments on one side, tendon on the other, bone
22 in the joint, the goal is to relieve all the pain and
23 to get them back to their preinjury employment. Well,
24 those are fairly substantial goals. When we talk
25 about success, everybody wants to be as good as new.

Page 23

1  That, in middle-aged people, you have to be somewhat
2  guarded about that, just because there is scar tissue,
3  there has been damage to the joint.
4          So I think that usually if you address the
5  joint problems, that 70 to 80 percent of the time the
6  pain is relieved, which is a consideration, and your
7  function is improved. Whether or not it gets back to
8  preinjury levels, you really can't determine. And I
9  noted that in my note, that no guarantee can be given
10 to be able to return to manual labor construction work
11 after a joint injury.
12         This is inside the joint, this is basically a
13 crush injury of the smooth articular surface, so by
14 definition you have some arthritis at the instant of
15 the impact, because it's not smooth anymore. And what
16 we try to do is in minimize the effects of that
17 injury.
18    Q    And you had estimated he would be in a cast
19 for six weeks. Anything else that would follow a
20 surgery like this?
21    A    And then afterwards an orthotic with a medial
22 heel wedge, an insert to support the tendons and the
23 ligaments.
24    Q    While he was in a cast, would he be
25 restricted from doing any particular behaviors?

EXHIBIT M
PAGE 5 OF 11

GROVE v. UNOCAL                                                    MICHAEL GEITZ, M.D.
                                                                   10/10/2006

Page 36
1   A   It's the size of the fracture fragment and
2   the crater that we found.  8 x 16 millimeters is a
3   very large defect for ankles.
4   Q   So was there anything unusual that you saw
5   during this particular exam?
6   A   No.
7   Q   And did you refer him to physical therapy
8   during this exam?
9   A   I did not make a note of that.
10  Q   At what point -- do you normally refer to
11  physical therapy after surgery?
12  A   Not this type, no.
13  Q   Okay.  So let's go to the next time that you
14  saw him.  When was that?
15  A   6/30/03.
16  Q   Okay.  And did you do another exam?
17  A   Yes.
18  Q   And how did the ankle look at this point?
19  A   He had a well-healed surgical scar, the
20  swelling was down, the lateral ligaments were stable,
21  his drawer sign was negative.
22  Q   What does that mean?
23  A   It means the ligament that we repaired was
24  tight.
25      His posterior tibial tendon sheath palpates

Page 37
1   smoothly, there was no excessive swelling, which means
2   there was a little bit of swelling, his ankle motion
3   was good, and his nerves and blood supply were normal.
4   Q   And you said "same impression"?
5   A   Right.
6   Q   And so now you state that he's nearly six
7   weeks post-op.  You said recheck four to six weeks,
8   then begin physical therapy; is that right?
9   A   Yes.
10  Q   So did you have any concerns with him at that
11  time?
12  A   No.
13  Q   When did you see him next?
14  A   I saw him on 8/8/03.
15  Q   And now he's 11 weeks post-op; is that right?
16  A   Correct.
17  Q   And what did you observe this time?
18  A   He had complaints that -- he stated that he
19  was better than he was preoperatively, with both
20  medial and lateral symptoms, but it still swells at
21  the end of the day and he did not feel that he could
22  return to his regular job duties.
23  Q   Okay.  So those were his reports to you?
24  A   Right.  And I did not find -- my exam showed
25  no swelling - it was a morning appointment - his

Page 38
1   incisions were healed, ligaments were stable, no
2   swelling in the posterior tibial tendon sheath, his
3   ankle motion was good.  There was no crepitation,
4   which is grinding in the joint, and he still was
5   wearing his brace.
6   Q   So you didn't see any swelling at all; is
7   that right?
8   A   No.  Not on that morning visit, no.
9   Q   And at this time you did refer him to
10  physical therapy; is that right?
11  A   Yes.
12  Q   And what did you expect to gain from physical
13  therapy?
14  A   Try to work on strength and motion and what
15  we call work hardening, just trying to accommodate
16  different positions.
17  Q   Your plan, No. 2 for your plan, talks about
18  he could return to modified work.  What do you mean by
19  modified work?
20  A   Just what I said after that.  Involve level
21  surfaces, no stair or ladder climbing, no squatting,
22  and he would need to wear a brace.
23  Q   And you talk about vocational rehabilitation.
24  Why did you think he might need vocational
25  rehabilitation?

Page 39
1   A   If he could not return to his preinjury
2   employment.
3   Q   Okay.  Did you discuss that with him?
4   A   I usually tell the patients exactly what I
5   dictated.  "I don't know if you'll be able to return
6   to your original work, it depends on your symptoms."
7   Q   So at this time you were advising him that
8   that was a possibility?
9   A   I don't think I advised him; I just -- it's
10  very early.  11 to 12 weeks is very early in the
11  healing course.
12  Q   Okay.  How long would you consider the
13  healing course to be?
14  A   Minimum, four to six months.
15  Q   You said: I think he will have a partial
16  permanent impairment?
17  A   Right.
18  Q   What made you think that?
19  A   Partial permanent impairments are based upon
20  the standard Guides to the Evaluation of Permanent
21  Impairment from the AMA, and they're based upon range
22  of motion.  So if you lose any motion at all, there is
23  a permanent impairment.
24  Q   And what range of motion did you think that
25  he could lose?

12 (Pages 36 to 39)

EXHIBIT M  PAGE 6 OF 11

Page 40

1  A  I didn't know at that time, but I thought I
2  should check it at about six months post-surgery and
3  measure it. That's why I sent him to physical
4  therapy, to get his motion back, work on his strength.
5  Q  And do you know whether he went to physical
6  therapy?
7  A  I have a prescription from United Physical
8  Therapy. I'd have to review the entire chart to see
9  if there's physical therapy notes in here from United.
10 Q  Do you normally get reports from --
11 A  Yes.
12 Q  -- physical therapy, when you are the --
13 A  Right.
14 Q  -- referring doctor?
15 A  Yes, we do. United's very good about that.
16 Do you want me to look?
17 Q  Just if you could, real quick.
18 A  They're in a separate section.
19 Q  If you received them, you would normally keep
20 them in your file?
21 A  Yes.
22    Yes, he did. I have a report from United
23 dated 8/19/03, stating that the patient will be seen
24 three days a week, and then it lists the goals they
25 were going to work on.

Page 41

1  Q  Do you have anything else, other than -- that
2  was a first exam; is that right?
3  A  Yes.
4  Q  Do you have anything else, other than that
5  particular document?
6  A  I have an update on 9/4/03, and I have
7  another. Oh, that's a duplicate.
8     That's the last update I have.
9  Q  Okay. On 9/4/03, does that document tell you
10 how many times he had gone so far?
11 A  About five patient visits.
12 Q  So the next time that you saw Mr. Grove, was
13 that September 5th?
14 A  November 5th, 2003.
15    No, you're right. September 5th, 2003,
16 correct.
17 Q  And what did he tell you about physical
18 therapy at that time?
19 A  My note states he continues to have
20 improvement with physical therapy, although his
21 difficulties are with climbing up and down stairs.
22 Physical therapy is helping, his motion is better,
23 swelling is down. He states that there is no level
24 work in his previous employment.
25 Q  Okay. So from this would you conclude that

Page 42

1  physical therapy was helping?
2  A  Yes.
3  Q  And would you -- why did you write these in
4  your notes? Is that what he told you?
5  A  Yes.
6  Q  So in this first paragraph, this is your
7  subjective --
8  A  That's the history.
9  Q  -- his subjective discussion to you, and
10 you're just noting what he tells you; is that correct?
11 A  Yes.
12 Q  Do you ever write anything in this section
13 that the patient hasn't told you?
14 A  No. It's the history from the patient.
15 Q  So you write it down. Do you note it, you
16 write it down in your own handwriting and then you
17 dictate it; would that be correct?
18 A  Yes.
19 Q  He's saying he has difficulty climbing up and
20 down stairs. Would you expect that with his injury?
21 A  Yes.
22 Q  And why is that?
23 A  The posterior tibial tendonitis, the injury
24 to the tendon on the medial inside part of the joint,
25 makes push-off difficult.

Page 43

1  Q  So you noted in your exam that the swelling
2  is down. Does that mean there was swelling?
3  A  Yes.
4  Q  So you noted -- did you note swelling at that
5  time?
6  A  No. But I noted that it was down.
7  Q  In the next paragraph in your examination,
8  you stated that his range of motion has definitely
9  improved.
10    Did you do your own physical exam to
11 determine whether his range of motion was improved?
12 A  I'm sure I did. I didn't record any specific
13 numbers, but ...
14 Q  Okay. You had stated that you looked at his
15 physical therapy notes. Could you have made that
16 conclusion just from looking at physical therapy
17 notes, or would you have done your own exam, to
18 double-check the physical therapy?
19 A  I always double-check, to examine it in the
20 office, to look for swelling and check what their
21 motion and what their arch is doing.
22 Q  And you note in the next sentence that he
23 actually has decreased pain in the ankle with physical
24 therapy?
25 A  Yes.

13 (Pages 40 to 43)

GROVE v. UNOCAL                                                MICHAEL GEITZ, M.D.
                                                                     10/10/2006

Page 44
1  Q  Would that -- why did you note that? Did he
2  tell you that?
3  A  No. When I'm examining him, he just doesn't
4  seem to be so uncomfortable.
5  Q  Okay. So because this is in the examination
6  section, that's what you observed?
7  A  Yes.
8     MR. WEIDNER: What's the date of that report?
9     MS. JOHNSON: September 5th.
10 BY MS. JOHNSON:
11 Q  Okay. And you recommended that he continue
12 physical therapy for one to two more months?
13 A  Yes.
14 Q  And you stated he was able to return to some
15 modified work; is that correct?
16    MR. WEIDNER: Objection. That's an
17 incomplete quotation of the sentence.
18 A  No. 2 states he could return to modified work
19 at this point, if there were any work on level
20 surfaces, no stair or ladder climbing, and no
21 squatting.
22 BY MS. JOHNSON:
23 Q  So why did you not want him on the stairs, on
24 a ladder, or squatting?
25 A  Because of the posterior tibial tendon.

Page 45
1  Q  And because, what was it about the tendon
2  that you didn't want him doing those things?
3  A  I don't want him pulling on the tendon.
4  Posterior tibial tendonitis is a very severe,
5  potentially problematic issue, and it goes through
6  four stages. And if it is untreated or if you just
7  work through the symptoms, it will lead to what's
8  called an acquired adult flatfoot. Your entire arch
9  will collapse, your heel will roll out from under you,
10 and it's a totally debilitating condition.
11    He is Stage I, we don't want it to go to
12 Stage IV. So it's just one of these things you just
13 can't force to work through. If it hurts, the tendon
14 is being inflamed. And when you push off, that's what
15 we look for. Many people that have posterior tibial
16 tendon function cannot do a heel rise. They cannot
17 stand up on the ball of their foot, they can't push
18 their foot up, they can't can get their heel off the
19 ground, because the arch collapses.
20    And he still has a heel rise, so he's not
21 progressing from Stage I to Stage II or Stage III.
22 And because this is a chronic problem, I did not want
23 it to progress, which means he has to have activity
24 restrictions and support either from brace or a
25 supportive shoe.

Page 46
1  Q  That's why you said he's not quite medically
2  stable yet?
3  A  Right. He was making progress in physical
4  therapy.
5  Q  Did you explain that to him, that he needed
6  to restrict his movements?
7  A  Yes. Avoid painful activities.
8  Q  And would you have told him -- if he had
9  asked you what kinds of recreational activities he
10 could do, what would you have told him?
11 A  The same thing as work; level surfaces, good
12 supportive shoes, or his orthotics and braces.
13    MR. WEIDNER: Counsel, we've been in session
14 for about an hour. Can we take a break?
15    MS. JOHNSON: Do you need a break?
16    THE WITNESS: I'm fine, but we can. I don't
17 care.
18    MR. WEIDNER: How much longer are you going
19 to be?
20    MS. JOHNSON: I don't know. A little bit.
21    MR. WEIDNER: Yeah. I'd like to take a
22 break.
23    MS. JOHNSON: Can we do just five minutes?
24    MR. WEIDNER: Sure.
25    VIDEOGRAPHER: And conclude Tape 1 and move

Page 47
1  off record at 10:13.
2     (Off the record.)
3     VIDEOGRAPHER: We're on record at 10:03,
4  beginning Tape 2, thank you.
5  BY MS. JOHNSON:
6  Q  So given that you had -- I'm sorry, let's
7  step back just a second.
8     During the September 5th exam, you had talked
9  to Mr. Grove about his limitations, correct?
10 A  Yes.
11 Q  And you told him level surfaces, no stairs,
12 no ladders, no squatting, and did you describe to him
13 the reasons for those restrictions?
14 A  Yes.
15 Q  And that was the same as you told us, you
16 don't want him to put any pressure on the tendon?
17 A  Right.
18 Q  Okay. Did he talk to you about his plans to
19 go hunting that fall?
20 A  No.
21 Q  If he had told you that he wanted to go
22 hunting, what would you have advised him?
23    MR. WEIDNER: Objection. Form of the
24 question. It calls for speculation, vague.
25 A  Oh, I would have advised him not to do it.

14 (Pages 44 to 47)

EXHIBIT M
PAGE 8 OF 11

Page 48

BY MS. JOHNSON:
Q   So the next time that you saw Mr. Grove was when?
A   October 3rd, 2003.
Q   And he came in and he had some new complaints; is that right?
A   Yes.
Q   What were those new complaints?
A   He had some medial proximal pain over his posterior tibial tendon and had been sore for two days and he had backed off on physical therapy because he felt it was too aggressive and the stretch caused his posterior tibial tendonitis.
Q   Medial proximal pain, what does that mean?
A   It's inside of the ankle, above the big bone that you feel.
Q   And did he tell you what had caused that?
A   He thought it was the physical therapy, where they had stretched it.
Q   Did he tell you that he had quit physical therapy on September 12th, after his September 12th visit?
    MR. WEIDNER: Objection. Form of the question.
A   No.

Page 49

BY MS. JOHNSON:
Q   Did he describe to you when he had quit?
    MR. WEIDNER: Objection. Form of the question.
A   No.
    MR. WEIDNER: What date are we on now, Counsel? October 3rd?
    MS. JOHNSON: October 3rd.
BY MS. JOHNSON:
Q   Did he tell you, during this visit, that he had gone hunting above the Yukon River in September?
A   No.
Q   So he didn't tell you that he had actually killed a moose during that time?
A   No.
Q   If Mr. Grove had been walking around on tundra for eight days in September, from September 19th through September 27th, would that account for his medial proximal pain?
    MR. WEIDNER: Objection. Form of the question. It calls for speculation, vague.
BY MS. JOHNSON:
Q   In your medical opinion?
    MR. WEIDNER: Objection. Form of the question. It calls for speculation, vague.

Page 50

A   It could have aggravated a posterior tibial tendonitis, yes.
BY MS. JOHNSON:
Q   And let's see, and was that the -- when you said that he had medial proximal pain, did you believe that that was from a posterior tibial tendonitis?
A   Yes.
Q   And what did you do in your examination that day?
A   I examined his ankle. I can read the results, if you would like.
Q   Well, it says the ligaments have healed?
A   Yes.
Q   Okay. What does that mean?
A   The lateral side, the ligament we repaired, there was no swelling and it was stable. There was no swelling in the joint, and his symptoms were over the posterior tibial tendon.
Q   And you said "x-rays today." Does that mean that you had ordered new x-rays?
A   Yes.
Q   And it says it shows no calcium in the sheath. What does that mean?
A   The tendons are enclosed in a tendon sheath, like a sausage skin, and some people will get calcific

Page 51

tendonitis, where you can see calcium being deposited around the ankle and up the inside of the leg. He did not have any.
Q   And you said the osterochondral fracture of the talus appears to be filling in nicely. Is that where you said you purposefully made some little divots?
A   Yes.
Q   And so "filling in nicely," how did you check for that?
A   Just increased density on the x-ray.
Q   And so your impression on this day, October 3rd, is the posterior tibial tendonitis?
A   Yes.
Q   Is that all that you were looking at that day as a problem?
A   Yes.
Q   So between the -- the posterior tibial tendonitis, does that have any relation back to what you originally saw him for?
A   Yes.
Q   How does that relate?
A   It's the same tendon that we debrided, and it tends to be a chronic inflammatory problem. And that's why, during the surgery, we removed all the

15 (Pages 48 to 51)

EXHIBIT M PAGE 9 OF 11

Page 136

it's down to 2 1/2, which means it's starting to narrow down and wear itself down on the lateral corner.
Q Okay. If you could just please move a little slower there for the cameraman, show us where on that model.
A It's right here.
Q And is that where the defect was?
A Yes.
Q So the bottom line is, from your professional opinion, that's objective evidence of arthritis?
A Yes.
Q And when you say he has posttraumatic changes both medial and laterally from his original injury, what did you mean by that? The last sentence in that paragraph.
A There's calcification both -- at the top of both malleoli.
Q Okay. And your impression -- and impression is basically a diagnosis; is that right?
A Yes.
Q All right. So given your expertise and your years of experience and your medical training and your observations of this patient on January 3rd, 2005, your diagnosis was posttraumatic arthritis, right

Page 137

ankle, secondary to osteochondral fracture?
A Yes.
Q The bottom line is, your medical opinion was, as of that date, as a result of this chip that got broken out of his ankle and all the procedures, he was developing posttraumatic arthritis?
A It's posttraumatic from the -- something starts it, and then everything after that worsens it.
Q Exactly. And that was your medical opinion?
A Yes.
Q And you held that opinion to a reasonable degree of medical certainty?
A Yes.
Q And the opinions you've expressed here today, have they all been to a reasonable degree of medical certainty?
A Yes.
Q And do you still hold that opinion, that he was exhibiting evidence of posttraumatic arthritis in the right ankle, secondary to osteochondral fracture?
A Yes.
   MR. WEIDNER: I don't have any further questions. Thank you for your time, Doctor.
   MS. JOHNSON: I just have two.
///

Page 138

   FURTHER EXAMINATION
BY MS. JOHNSON:
Q Your opinion of arthritis conflicts with Dr. Brad Cruz's opinion; is that correct?
   MR. WEIDNER: Objection. Form of the question. It calls for speculation.
A The x-ray report on the last x-ray and mine, yes. I measured it very carefully, looking in the specific corner where I know the original injury was. He's looking at it, just reading an x-ray, without all the clinical data.
BY MS. JOHNSON:
Q Well, did you talk to him about his opinion?
A No.
Q Okay. So you don't actually know exactly what he did when he came to that opinion, do you?
A No.
   MR. WEIDNER: Objection. Form of the question.
A No.
BY MS. JOHNSON:
Q And then also your diagnosis of posttraumatic arthritis is based upon the information that was given to you about -- from Dr. Nolan, from Dr. Laufer, from the x-rays, the MRIs, and your own observations; is

Page 139

that correct?
A Yes.
Q And you did not have the ability to go back and look at the 2000 films to detect whether or not there was any injury to the ankle prior to the 2002 injury?
   MR. WEIDNER: Objection. Form of the question. It calls for speculation.
A I did not see previous x-rays. I did measure the joint height on a previous x-ray that was, early in the course, 3 millimeters.
BY MS. JOHNSON:
Q But you have no knowledge of whether there was any preexisting condition, correct?
   MR. WEIDNER: Objection. Form of the question.
A Correct.
   MS. JOHNSON: Thank you. No other questions.
   MR. WEIDNER: I've just got a couple of follow-up questions on that, Doctor.
   FURTHER EXAMINATION
BY MR. WEIDNER:
Q If I understand you correctly - and please correct me if I'm wrong - it's your testimony that, given your observations and including the fact that

EXHIBIT M
PAGE 10 OF 11

Page 140

1  you saw a previous x-ray early in the course of
2  treatment after his injury, which was 3 millimeters,
3  and then you saw this x-ray of 2.5, your diagnosis was
4  posttraumatic arthritis; is that correct?
5      A   Yes.
6      Q   What's your level of certainty on that?
7          MS. JOHNSON:  Objection. Foundation and
8  form.
9  BY MR. WEIDNER:
10     Q   Are you confident in that opinion?
11     **A   I think it's posttraumatic arthritis.  I**
12  **cannot absolutely date the onset of the trauma.**
13     Q   What do you see the significance of the fact
14  that early in the course of treatment there was
15  3 millimeters and then it went to 2.5?  What's the
16  medical implications of that?
17     **A   There's been wear and tear on the joint.**
18         MR. WEIDNER:  All right. Nothing further.
19         VIDEOGRAPHER:  Are we concluded, Counsel?
20  Off record --
21         MR. WEIDNER:  Right.
22         VIDEOGRAPHER:  -- at 12:17.
23         (Off the record.)
24         (Back on record - stenographically recorded.)
25         MR. WEIDNER:  The record should reflect that

Page 141

1  we're back on the record of Dr. Geitz's deposition.
2          We had previously agreed - we still are
3  agreeing - that the court reporter can take his
4  original file, which has been marked as an exhibit,
5  and copy it and substitute a copy for the original.
6          The doctor has expressed a concern that the
7  appropriate procedures are followed under the HIPAA
8  Act, so I'm going to address a letter to the doctor,
9  to counsel for the defendants, and the court reporter,
10 enclosing a copy of the appropriate release so he can
11 then allow the court reporter to take the file out of
12 the office and copy it.
13         MS. JOHNSON:  Thank you.
14         (Proceedings concluded at 12:22 p.m.)
15         (Signature reserved.)
16         (Exhibit No. 1 marked.)
17             -oOo-

38 (Pages 140 to 141)