Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA )
GROVE, SARAH GROVE, and MICHAEL )
GROVE (DOB 1/21/88) by and through )
his father LAWRANCE H. GROVE, )
                                )
            Plaintiffs,         )
                                )
    vs.                         )
                                )
UNOCAL CORPORATION,             )
                                )
            Defendant.          )
_____)
Case No. 3:04-cv-0096-TMB

VIDEOTAPED DEPOSITION OF EUGENE M. CHANG, M.D.

Pages 1 - 111; Inclusive

Wednesday, October 25, 2006

3:18 p.m.

Taken by Counsel for Defendant
at
ORTHOPEDIC PHYSICIANS
3801 Lake Otis Parkway, Suite 300
Anchorage, Alaska 99503

EXHIBIT  N
PAGE  1  OF  5

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

GROVE v. UNOCAL

EUGENE CHANG, M.D.
10/25/2006

Page 2

1  A-P-P-E-A-R-A-N-C-E-S
2
   For Plaintiffs:
3
   Phillip Paul Weidner
4  PHILLIP PAUL WEIDNER & ASSOCIATES
   330 L Street, Suite 200
5  Anchorage, Alaska 99501
   907/276-1200
6
7
   For Defendant:
8
   Linda J. Johnson
9  CLAPP PETERSON VANFLEIN TIEMESSEN THORSNESS LLC
   711 H Street, Suite 620
10 Anchorage, Alaska 99501-3454
   907/272-9631
11
12
   Videographer:
13
   Eric R. Cossman, JD, CLVS, Pacific Rim Reporting
14
15
   Court Reporter:
16
   Gail Ruth Peckham, RPR
17 Registered Professional Reporter
   PACIFIC RIM REPORTING
18 711 M Street, Suite 4
   Anchorage, Alaska 99501
19 907/272-4383
20
21
22
23
24
25

Page 3

1           I-N-D-E-X
2
   EXAMINATION BY              PAGE
3
   Ms. Johnson                  5
4  Mr. Weidner                  89
5
6
7
   EXHIBITS
8
   1 Orthopedic Physicians's computer-scanned   110
9    medical chart for Patient Grove, Lawrence H.
     (multi-file disk)
10
     (Exhibit 1 to be marked subsequent to the
11   taking of the deposition)
12
   2 "OPERATIVE REPORT," Patient: Grove, Lawrence   89
13   H., Date of Surgery: March 8, 2005, Surgeon:
     Eugene Chang, M.D. (4 pgs.)
14
   3 Illustrative diagram: "LAWRENCE GROVE RIGHT    91
15   ANKLE SURGERY 3/8/05" (1 pg.)
16
17
18
19
20
21
22
23
24
25

Page 4

14:59:08  1   ANCHORAGE, ALASKA; WEDNESDAY, OCTOBER 25, 2006
          2   3:18 P.M.
          3                   -o0o-
          4           P-R-O-C-E-E-D-I-N-G-S
          5       THE VIDEOGRAPHER: We are on the record at
          6   3:18.
          7       This is the video deposition of Eugene
          8   Chang, M.D., taken by the defendant, in the matter
          9   of Grove versus Unocal Corp., Case Number
          10  3:04-cv-0096-TMB, in the United States District Court
          11  for the District of Alaska.
          12      This deposition is being held in the office
          13  of Orthopedic Physicians, located at 3801 Lake Otis
          14  Parkway, Suite 300, Anchorage, Alaska, on October
15:18:59  15  25th, 2006.
          16      My name is Eric Cossman, here today on
          17  behalf of Pacific Rim Reporting, located at 711 M
          18  Street, Suite 4, Anchorage, Alaska, 99501. The court
          19  reporter is Gail Peckham, also with the firm Pacific
          20  Rim Reporting.
          21      Will Counsel, please, identify themselves
          22  for the record.
          23      MS. JOHNSON: Linda Johnson, from Clapp
          24  Peterson, here on behalf of Unocal.
          25      MR. WEIDNER: My name is Phillip Paul

Page 5

15:19:22  1   Weidner. I'm here on behalf of the plaintiffs.
          2       THE VIDEOGRAPHER: Thank you.
          3       Will our reporter, please, swear in the
          4   witness.
          5           EUGENE M. CHANG, M.D.,
          6       Deponent herein, having been duly sworn,
          7       was examined and testified as follows:
          8              EXAMINATION
          9   BY MS. JOHNSON:
          10      Q. Dr. Chang, can you tell us about your
          11  education, starting with your bachelor's degree?
          12      A. Bachelor's degree at Cornell University;
          13  medical school at St. Louis University; orthopedic
          14  training at Loyolla University Chicago, and a
15:19:54  15  fellowship, foot and ankle, in Phoenix, Arizona.
          16      Q. When did you get your bachelor's?
          17      A. In '92.
          18      Q. And your medical school degree was?
          19      A. '97.
          20      Q. And you said you did an orthopedic --
          21      A. Fellow -- residency.
          22      Q. -- residency.
          23      A. Yeah, to 2002. And then I did a one-year
          24  fellowship in 2003; '2 to '3, yeah, one year.
          25      Q. '02 to '03?

2 (Pages 2 to 5)

Page 34

```
15:50:00  1       A.  It was stuck to the anterolateral aspect of
          2   his capsule.
          3       Q.  His "capsule," what would that be?
          4       A.  Capsule, it's a soft capsule around --
          5   every joint has a capsule.
          6       Q.  Okay.
          7       A.  It was attached to the capsule, kind of in
          8   the -- kind of in the lateral gutter of the ankle.
          9       Q.  Was it on the outside of the joint?
         10       A.  Within the joint.
         11       Q.  Inside the joint?
         12       A.  Inside, yeah. Everything is inside the
         13   joint, once you go in with the scope.
         14       Q.  Okay. And how long did it take you to get
15:50:23 15   that shaved out?
         16       A.  It says I spent about a half an hour to 45
         17   minutes. I spent a lot of time. That's a lot of
         18   time to do that. Usually it doesn't take more than
         19   five minutes or so.
         20       Q.  Okay.
         21       A.  But there was a lot of overgrowth
         22   laterally.
         23       Q.  And "overgrowth" meaning?
         24       A.  The scar tissue, the stuff that I cleaned
         25   out.
```

Page 35

```
15:50:46  1       Q.  Okay. Did you do anything else while you
          2   were in there?
          3       A.  Let me see here.
          4           No, that's it.
          5       Q.  You said that there were no loose bodies.
          6   Were -- "no loose bodies were noted"?
          7       A.  Seen in the ankle. Yeah.
          8       Q.  Okay. And what does that mean? What were
          9   you looking for?
         10       A.  Just loose bodies. Maybe a piece of
         11   cartilage or a piece of bone that might be floating
         12   around that you can't pick up on MRI that might
         13   have -- he might have been getting pain from.
         14       Q.  And how would this -- why would this scar
15:51:30 15   tissue be inside the joint?
         16       A.  It's just an inflammatory response to the
         17   injury. It happens after even minor ankle sprains.
         18   It certainly could happen after something that's
         19   traumatic enough for him to fracture off a part of
         20   his talus. Ankle instability can cause it, if your
         21   ankle's unstable, which he had.
         22           About 25 percent of ankles that eventually
         23   have a lateral ligament repair, like he had, has some
         24   kind of lesion on the talus.
         25       Q.  Okay. Can you tell when the scar tissue
```

Page 36

```
15:52:04  1   formed?
          2       A.  No.
          3       Q.  Could it have been there for years?
          4           MR. WEIDNER: Objection: Form of the
          5   question; calls for speculation.
          6           THE WITNESS: It could have been there for
          7   a while, sure.
          8   BY MS. JOHNSON:
          9       Q.  Okay.
         10       A.  Yeah. And I would -- but something that
         11   I would have anticipated Dr. Geitz to have removed,
         12   when he was in there earlier.
         13       Q.  Okay. Did Mr. Grove ever tell you that he
         14   had a prior ankle injury in the year 2000?
15:52:33 15           MR. WEIDNER: Objection: Form of the
         16   question.
         17           THE WITNESS: I don't recall he did.
         18   BY MS. JOHNSON:
         19       Q.  And did you see any documents from a
         20   chiropractor named Ealum, E-a-l-u-m?
         21       A.  No. I have no recollection of that.
         22       Q.  Would you have wanted to see -- if there
         23   was an x-ray from the year 2000, would you have
         24   wanted to see that?
         25           MR. WEIDNER: Objection: Form of the
```

Page 37

```
15:52:52  1   question.
          2           THE WITNESS: Well, I'm thinking out loud.
          3   I'm trying to see if it would have really affected my
          4   treatment for him. And -- no, I don't -- you know,
          5   if he came straight -- if I was his first orthopedic
          6   surgeon, I think I would have wanted to see all his
          7   records. But Dr. Geitz is a very reputable surgeon.
          8   Okay? So him being the first gateway into this whole
          9   specialty, I felt confident that he evaluated
         10   everything up to now, and the information that he was
         11   giving me was current and complete, so...
         12   BY MS. JOHNSON:
         13       Q.  If Dr. Geitz didn't know about the prior
         14   injury, either, would that concern you?
15:53:32 15           MR. WEIDNER: Objection: Form of the
         16   question.
         17           THE WITNESS: Well, it wouldn't necessarily
         18   change what I would do for him medically, okay. Now,
         19   obviously, you know, from his story standpoint, it
         20   could, sure. I could see -- I could see why you're
         21   asking that question.
         22   BY MS. JOHNSON:
         23       Q.  Okay. So you -- you shaved off the scar
         24   tissue. And did you -- did I ask you; did you do
         25   anything else?
```

Page 78

16:41:42
1  A. No.
2  Q. Okay.
3  A. No. It's just a lesion. It's more of an
4  MR -- MRI wording than a radiographic reading.
5  Q. So if they were saying they saw a lesion
6  before, this would be the same lesion?
7  A. Probably, yeah. Same area, yeah.
8  Q. All right. And then the next time you saw
9  him was when?
10  A. Let's see here.
11     July 17th.
12  Q. Okay. Any change in your diagnosis on that
13  day?
14  A. No, same old thing. It's like -- it's like
16:42:15 15 Groundhog's Day.
16  Q. You said that you were going to discontinue
17  Valium and Percocet refills. Why did you say that?
18  A. Ah, it's just, you know, in the last few
19  months -- it's -- yeah, he's a year out from surgery.
20  At some point, you've got to just wean them off of
21  it. This is pretty strong stuff. So every physician
22  has kind of an internal sense of, you know, how much
23  is too much and when they want to quit giving them
24  stuff. So, yeah, everyone -- everyone's got their
25  own little, you know, threshold, and I guess mine was

Page 79

16:42:46
1  met.
2  Q. Okay.
3  A. Yeah.
4  Q. So does Mr. Grove's injury prevent him from
5  running?
6  A. Yeah, it does.
7  Q. Why?
8  A. Well, if he says he's got seven-out-of-ten
9  pain -- and certainly running is something that could
10  really progress the arthritis in his ankle, so it's
11  not something I would recommend. Okay? Does it
12  prevent him from running? Probably not. But would
13  it be something I would recommend for him to do? No,
14  I wouldn't.
16:43:16 15 Q. Okay.
16  A. No.
17  Q. What about walking on tundra or unstable
18  surfaces?
19  A. You know, for a long period of time, it
20  probably wouldn't be a good idea. Yeah. You know,
21  at this point, it's a wear-and-tear deal, so the more
22  he uses it, the more it wears out. It's just like
23  treads on your tire. Okay? Keep it in the garage.
24  Q. Can he actually climb a ladder?
25  A. He probably could a few times. Yeah. I

Page 80

16:43:42
1  mean, repetitively is -- is the issue with him.
2  Yeah.
3  Q. What do you mean by "repetitively"?
4  A. Well, up and down every day, you know,
5  multiple times. Probably not the range of -- you
6  know, he always said that he had trouble going
7  up and down stairs. Okay? And going up a ladder
8  would be the ultimate form of that. So I would
9  imagine it would be hard to go up and down ladders
10  repetitively.
11  Q. Okay. How about squatting?
12  A. Squatting I think would be difficult.
13  Q. Can he turn as he walks?
14  A. Sure.
16:44:08 15 Q. Can he turn and go the other way?
16  A. Yeah, absolutely. Yeah.
17  Q. Okay.
18  A. No, he doesn't.
19     No -- yeah, he can -- he can make turns.
20  Q. He can make turns?
21  A. Yes.
22     No left turns, but just right. No, just
23  kidding.
24  Q. Okay. You got me on that one.
25     What kind of boots can he wear? Anything?

Page 81

16:44:31
1  A. Anything he wants.
2  Q. Okay.
3  A. Yeah. Black, brown, big, small.
4  Q. Would any -- it's getting late, isn't it?
5  A. It is.
6  Q. What about rubber boots; is that any worse
7  than a hiking boot?
8  A. Yeah, less supportive. Less supportive,
9  yeah.
10  Q. If he wears rubber boots, should he wear
11  his brace?
12  A. Should he wear what?
13  Q. Brace?
14  A. I don't think a brace would fit in a rubber
16:44:59 15 boot.
16  Q. Okay.
17  A. Yeah.
18  Q. Did you always -- did you ever notice him
19  limping?
20  A. Early on, after surgery, I did. And to me,
21  I think I've not -- you know, usually when I come in
22  the room, they're sitting down.
23  Q. Okay.
24  A. And when I examine them. Yeah.
25     So I don't really recall him limping. I

Page 106

```
17:07:12  1   all the action was. (Indicating.)
          2       Q. Okay. And that's where you saw this
          3   excessive overgrowth of soft tissue and scar?
          4       A. Soft tissue goomba.
          5       Q. Okay. All right. And you go on to say:
          6   An extensive amount of time had to be spent on using
          7   an additional accessory port anterolaterally to shave
          8   out this anterolateral soft tissue.
          9       A. Yes.
         10       Q. That's what you observed?
         11       A. Yes.
         12       Q. And you said usually you can do it in five
         13   or ten minutes?
         14       A. In about five or ten minutes.
17:07:38 15       Q. It took you 45?
         16       A. Yeah. I didn't have my coffee that
         17   morning. No, there was a lot -- a lot of stuff.
         18       Q. Great.
         19       A. Yeah.
         20       Q. And then, in fact, you record it here:
         21   "After about a half an hour to 45 minutes of work,
         22   I" - that's you - "was finally able to clean up the
         23   anterolateral gutter enough to see the fibula and the
         24   gutter."
         25       A. Yup, that's correct.
```

Page 107

```
17:07:55  1       Q. All right. And then, finally, you record
          2   it here: With the ankle plantar flexed, I was able
          3   to appreciate the cartilage damage from his previous
          4   ankle trauma.
          5       A. Yes.
          6       Q. What did you mean by that?
          7       A. That means I was able to see the
          8   chondromalacia on the lateral aspect of his talus, as
          9   reported per Dr. Geitz.
         10       Q. All right.
         11       A. Yes.
         12       Q. And then you go on to say: Grade 2 -- you
         13   went on to say: Grade 2/3 chondromalacia was seen in
         14   the mid portion of his talus laterally.
17:08:22 15       A. Yes, sir.
         16       Q. And you say: His ankle joint was very
         17   tight.
         18           What did you mean by that?
         19       A. It wasn't loose. I mean, it seemed a
         20   little bit fibrotic. You know? Kind of tight. You
         21   know?
         22       Q. All right. And then, Doctor, in terms of
         23   this diagnosis that you -- that I asked you about --
         24   and it appears throughout a number of your
         25   references, you diagnose as ankle post-traumatic
```

Page 108

```
17:08:48  1   arthritis.
          2       A. Uh-huh.
          3       Q. Right?
          4       A. Uh-huh.
          5       Q. Are you confident about your diagnosis?
          6       A. Yes.
          7       Q. And what's your level of certainly on that?
          8       A. 100 percent.
          9           MR. WEIDNER: Okay. I'm going to take a
         10   break now. It may be -- maybe we can avoid having to
         11   call you back. We'll work with you on scheduling.
         12           THE WITNESS: Great.
         13           MR. WEIDNER: And I really appreciate your
         14   time and patience.
17:09:04 15           THE WITNESS: You're very welcome.
         16           MR. WEIDNER: Thank you.
         17           MS. JOHNSON: Thank you, Doctor.
         18           THE WITNESS: You're very welcome.
         19           THE VIDEOGRAPHER: This concludes the
         20   deposition of Eugene Chang, M.D. The time is 5:09.
         21       (Videotaped record of deposition concluded
         22   at 5:09 p.m.)
         23       (Off-the-record discussion.)
         24           MR. WEIDNER: The record shall reflect we
         25   are still at the deposition of Dr. Chang.
```

Page 109

```
17:10:11  1           Counsel and I have agreed -- this is Phil
          2   Weidner speaking. Counsel and I have agreed that
          3   when the doctor provides Ms. Johnson a copy of
          4   Exhibit 1, she, in turn, will provide it to the court
          5   reporter.
          6           And I would like a copy myself.
          7           MS. JOHNSON: Sure.
          8           MR. WEIDNER: Thank you.
          9       (Proceedings concluded at 5:10 p.m.)
         10       (Signature waived.)
         11       (Exhibit 1 to be marked subsequent to the
         12   taking of the deposition.)
         13               -o0o-
```