Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   LAWRENCE H. GROVE, CYNTHIA        )
     GROVE, SARAH GROVE, and MICHAEL   )
 5   GROVE (DOB 1/21/88) by and        )
     through his father, LAWRENCE H.   )
 6   GROVE,                            )
                                       )
 7              Plaintiffs,            )
                                       )
 8   vs.                               )
                                       )
 9   UNOCAL CORPORATION,               )
                                       )
10              Defendant.             )
                                       )
11   Case No. 3:04-cv-0096-TMB
12
13
     _____
14
15       VIDEOTAPED DEPOSITION OF RICHARD EALUM, D.C.
16   _____
17
18                    Pages 1 - 189
                 Friday, November 3, 2006
19                      11:00 A.M.
20
21                          at
         CLAPP PETERSON VAN FLEIN TIEMESSEN & THORSNESS
22              711 H Street, Suite 620
                  Anchorage, Alaska  99501
23
24
25
```

EXHIBIT P
PAGE 1 OF 15

Page 2

 1                    A-P-P-E-A-R-A-N-C-E-S

 2
     For the Plaintiffs:
 3   Michael Cohn
     WEIDNER & ASSOCIATES
 4   330 L Street, Suite 200
     Anchorage, Alaska   99501
 5   (276-1200)

 6
     For the Defendants:
 7   Linda J. Johnson
     CLAPP PETERSON VAN FLEIN TIEMESSEN & THORSNESS
 8   711 H Street, Suite 620
     Anchorage, Alaska   99501
 9   (272-9272)

10
     Videographer:
11   Sally Blackford

12
     Court Reporter:
13   Diane M. Bondeson
     PACIFIC RIM REPORTING
14   711 M Street, Suite 4
     Anchorage, Alaska   99501

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT P
PAGE 2 OF 15

GROVE v. UNOCAL                                                          RICHARD EALUM, D.C.
                                                                              11/3/2006

Page 4

1  ANCHORAGE, ALASKA; FRIDAY, NOVEMBER 3, 2006
2                  11:06 A.M.
3                     -o0o-
4        THE VIDEOGRAPHER: We're on record at 11:06
5  a.m. This is the videotape deposition of Richard
6  Ealum, D.C., taken by the defendant in the matter of
7  Grove vs. Unocal, Case No. 3:04-cv-0096-TMB.
8        This deposition is being held at the
9  offices of Clapp Peterson Van Flein Tiemessen &
10 Thorsness, LLC, located at 711 H Street, Suite 620,
11 Anchorage, Alaska, on November 3rd, 2006.
12       The court reporter is Diane Bondeson of
13 Pacific Rim Reporting, 711 M Street, Suite 4,
14 Anchorage, Alaska 99501. I'm the videographer, Sally
15 Blackford, also of Pacific Rim Reporting.
16       Would Counsel now please state their
17 appearances for the record.
18       MS. JOHNSON: I'm Linda Johnson from Clapp
19 Peterson, and we represent the defendant, Unocal.
20       MR. COHN: Michael Cohn from the law
21 offices of Phillip Paul Weidner & Associates, and I'm
22 here on behalf of the plaintiffs, Lawrence Grove,
23 Cynthia Grove and their children, Michael Grove and
24 Sarah Grove.
25       THE VIDEOGRAPHER: You may swear in the

Page 5

1  witness.
2              RICHARD EALUM, D.C.
3      witness herein, being sworn on oath was
4         examined and testified as follows:
5                  EXAMINATION
6  BY MS. JOHNSON:
7     Q. Thank you. Dr. Ealum, you're here today
8  because you treated Larry Grove; is that correct?
9     A. Yes. I have treated him in the past, yes.
10    Q. Okay.
11       MR. COHN: Well, technically he's here
12 today because you sent him a notice of deposition.
13       MS. JOHNSON: Thank you. I'm just trying
14 to start, Mike.
15    Q. You gave us a document that looks like your
16 resume. We call it a CV.
17    A. Um-hum.
18    Q. Is this a recent document?
19    A. I typed it up several years ago for a
20 deposition on an unrelated case with a different
21 patient.
22    Q. Does it need any changes that you can think
23 of?
24    A. I don't have any new additional
25 credentials. I don't think so.

Page 6

1        MS. JOHNSON: Okay. I'd like this marked
2  as Exhibit 1.
3        (Exhibit 1 marked.)
4     Q. And I'd like to talk to you a little bit
5  about your education. You listed on here -- let's
6  see. You listed your academic background, your
7  undergraduate studies at UAA; is that right?
8     A. Some. At that point in time it was
9  Anchorage Community College. I did some stuff there,
10 English, mathematics, stuff like that, which was
11 absorbed later by UAA, yes.
12    Q. Okay. Did you graduate from UAA?
13    A. No, I did not.
14    Q. Okay. What years did you go to UAA?
15    A. Wow. Man. Had to be probably '83 or '84
16 through maybe '85, '86, something like that.
17    Q. Okay.
18    A. In that general time frame.
19    Q. All right. Had you been living up in
20 Alaska prior to going to UAA?
21    A. Yeah. I've been a resident here since '71.
22    Q. Okay. You must have graduated from high
23 school up here.
24    A. Yeah, Chugiak High School.
25    Q. What year?

Page 7

1     A. 1983.
2     Q. '83. Okay. And then your resume lists
3  that you went to chiropractic college; is that
4  correct?
5     A. Yeah, Palmer College of Chiropractic West
6  in -- at that time it was Sunnyvale, California. It
7  has since moved to a different location in that same
8  area, but I'm not sure. It's in San Jose now, I
9  think.
10    Q. Okay. And you graduated in 1990; is that
11 correct?
12    A. I believe it was '90. It was '89 or '90,
13 right in there somewhere.
14    Q. Okay. You've listed on here May of 1990.
15 Is that --
16    A. That's probably accurate.
17    Q. Okay.
18    A. I didn't really look at it. I just printed
19 it up and brought it.
20    Q. Okay. And how many years do you have to go
21 to school to graduate with a Doctor of Chiropractic?
22    A. It's basically a four-year degree. Takes a
23 couple years to get in. I did it in three years, I
24 believe. I went through the summers, went
25 continuously.

EXHIBIT P
PAGE 3 OF 15

GROVE v. UNOCAL                                                             RICHARD EALUM, D.C.
                                                                                      11/3/2006

Page 68
1   A. Yes.
2   Q. Who services your machine?
3   A. It's changed. The company that used to do
4   it went out of business. I had them come in and --
5   see, when I moved into my current location where
6   these films were taken, I moved into that location in
7   1998, and I believe that Alaska X-ray Sales and
8   Supply came in and calibrated it at that time. I
9   think that was '98, '99, somewhere in that range.
10  Q. Okay.
11  A. I think they're -- they've change names.
12  I'm not sure who bought them out, but they're on -- I
13  know where their location is. I just can't remember
14  the name of the company that owns them.
15  Q. Okay. And then you read your own X-ray; is
16  that correct?
17  A. Um-hum.
18  Q. Okay. So you have no recollection -- or
19  you have no indication, I should say, that Mr. Grove
20  actually received a brace?
21  A. No.
22  Q. Is that your --
23  A. That's correct.
24  Q. Okay.
25  A. It appears that he didn't because I don't

Page 69
1   recall -- when I look through here, I don't recall
2   seeing anything paid for along these lines. Because
3   when I went through and read that letter that it was
4   my intent to give him one, I went looking for it, and
5   it doesn't appear that I gave him one, and I saw no
6   recollection in here.
7   Q. You said that you treated him with
8   ultrasound?
9   A. Um-hum.
10  Q. What does ultrasound do?
11  A. Pulse ultrasound is what you would use in
12  that particular area. Because the tissues are very
13  thin, you don't want to get a periosteal reaction
14  with the bone. Ultrasound helps in the formation of
15  good scar tissue.
16  Q. Okay. So you expected that scar tissue
17  would be formed?
18  A. Yes. That's part -- that's normal, natural
19  part of the healing process. It always happens.
20  Q. Okay. And where would the scar tissue
21  form?
22  A. Within the tendon and ligaments that had
23  been strained.
24  Q. And what tendons and ligaments were those?
25  A. In the area of his complaint, based on my

Page 70
1   notes, I would say the anterior talofibular ligament.
2   Q. I'm sorry. Slow down just a little bit.
3   Say that again. Anterior?
4   A. Anterior talo, T-A-L-O, dash fibular,
5   F-I-B-U-L-A-R, ligament. And I'm saying that because
6   of the description of where his contusion was,
7   because I had no recollection. I'm just taking that
8   from here.
9   Q. Okay.
10  A. Where his contusion was, and that is the
11  most frequently sprain/strained area.
12  Q. Did you make that particular diagnosis in
13  the year 2000?
14  A. With that specific terminology of that
15  specific ligament? No, I don't think I did.
16  Q. Okay.
17  A. I don't recall seeing that in the record.
18  I just diagnosed him with a sprain/strain of the
19  ankle.
20  Q. Okay. So you were -- you were saying that
21  it's the anterior talofibular -- I'm sorry. Fibular
22  ligament?
23  A. Based on what I've read right here, yes.
24  Q. Okay.
25  A. Yeah.

Page 71
1   Q. And the scar tissue, would it have -- or
2   could it have formed in the joint that was tender?
3   You said it was the mortise joint, correct?
4   A. I'm speaking of the same area here.
5   Q. Okay.
6       MR. COHN: Objection. Foundation, form.
7       THE WITNESS: I wouldn't -- I wouldn't
8   utilize ultrasound to treat a mortise joint type
9   injury, within the mortise joint.
10  BY MS. JOHNSON:
11  Q. Okay.
12  A. Okay? Ligaments and everything, not
13  everything is that clean-cut, and the right lateral
14  anterior portion of that joint is where the anterior
15  talofibular ligament is. That's where I would have
16  restricted treatment to. To the best of my
17  knowledge, ultrasound is not contraindicated for any
18  other form of injury, though. So it's not something
19  that I would try to treat with ultrasound.
20  Q. Okay. And you said you were trying to
21  develop good scar tissue?
22  A. Um-hum.
23  Q. When you say good scar tissue, that leads
24  me to believe there might be bad scar tissue.
25  A. There is.

20 (Pages 68 to 71)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT P
PAGE 4 OF 15

Page 80

1  basically --
2  BY MS. JOHNSON:
3  Q. You didn't see him again after that letter,
4  correct?
5  A. Doesn't appear that I did, no.
6  Q. So that was why you probably didn't get to
7  prescribe him a brace?
8      MR. COHN: Objection. Form, foundation.
9      THE WITNESS: Possibly.
10 BY MS. JOHNSON:
11 Q. On 6/26 you suggested that he use ice; is
12 that correct? Or was that in the --
13 A. That would have been an initial RICE
14 therapy, rest, ice, compression, elevation, yes.
15 Normal standard procedure for any kind of
16 inflammatory joint disorder and especially sprains
17 and strains.
18 Q. Okay. So --
19 A. And where --
20 Q. Look at the next page, and see if massage
21 therapist --
22 A. Massage therapist note. Okay.
23 Q. Yeah. And the massage therapist told him
24 to use ice?
25 A. Suggested using ice more frequently is what

Page 81

1  she wrote.
2  Q. Okay.
3  A. When it becomes inflamed.
4  Q. And that's just for the inflammation --
5  A. Um-hum.
6  Q. -- and to decrease the inflammation?
7  A. Right.
8      MR. COHN: Objection. Foundation.
9  BY MS. JOHNSON:
10 Q. Did you prescribe any home exercises for
11 Mr. Grove to perform?
12 A. (Witness shakes head.)
13 Q. No?
14 A. Uh-uh.
15 Q. Do you ever expect your patients to do
16 exercises between visits to you?
17 A. Um-hum, in certain -- in severe enough
18 cases.
19 Q. But this wasn't --
20 A. Particular cases. It doesn't appear in
21 this case that I thought they were necessary.
22 Q. Would you have written them down if you
23 did?
24 A. Yes.
25 Q. Okay. So let's go to the next time that

Page 82

1  you saw Mr. Grove.
2  A. Okay.
3  Q. Is that in 2002?
4  A. That appears to be, yeah. 3/1 of '02.
5  Q. Okay. And what was the chief -- when was
6  the first day that you saw him then?
7  A. First day I saw him on this was 3/1 of '02.
8  Q. What was the chief complaint?
9  A. He was having left low back, lower mid-back
10 pain. He had slipped on the ice and raked his -- the
11 left side of his low back and thorax against the kick
12 panel of his truck.
13 Q. Okay.
14 A. From what the file says.
15 Q. Okay. You don't have a specific memory of
16 it?
17 A. No, I don't.
18 Q. Okay. And do you recall when the initial
19 injury was? Did he tell you that?
20 A. It was on 2/22.
21 Q. Okay. And did he tell you any reason for
22 the delay in getting treatment?
23     MR. COHN: Objection to form of the
24 question.
25     THE WITNESS: I have no recollection to

Page 83

1  anything of that.
2      MS. JOHNSON: Okay.
3      MR. COHN: Foundation.
4  BY MS. JOHNSON:
5  Q. And what was the -- I'm sorry. You said it
6  was March 1st. What exam did you do on him that day?
7  A. Oh, let's see. Looks like we did some
8  lumbar range of motion. Typical exam that I do in my
9  office. And, you know, showed significant
10 restrictions in flexion, in any case. It looks like
11 lateral flexion and rotation appeared to be okay.
12 Q. And what restrictions did he show?
13 A. Just in flexion.
14 Q. Flexion?
15 A. Yeah, by about half.
16 Q. What do you mean by that?
17 A. Bending forward at the waist. I'm sorry.
18 Q. Okay. Okay. And did you make any
19 observations -- did you look at the area and notice
20 anything visually?
21 A. Appears that I made a notation somewhere in
22 here that he did have a slight contusion on his left
23 iliac crest, I believe.
24 Q. Slight contusion being a bruise?
25 A. Yeah. I don't recall where I read that,

GROVE v. UNOCAL                                         RICHARD EALUM, D.C.
                                                        11/3/2006

Page 84

1  but --
2     Q.  And was that consistent with his report of
3  pain?
4     A.  Yeah.
5     Q.  And the area that he was complaining about?
6     A.  Yeah.
7     Q.  Okay.
8     A.  The mechanism of how he injured himself,
9  yeah.
10    Q.  Okay.  And you took an X-ray of him that
11 day?
12    A.  Yeah.
13    Q.  And again, you performed that X-ray,
14 correct?
15    A.  Um-hum.  Yes.
16    Q.  Thank you.
17    A.  Sorry.
18    Q.  And what did you observe on the X-ray?
19    A.  We had a -- the most significant thing we
20 saw on the X-ray was a -- I believe it was an L1 left
21 transverse process fracture.
22    Q.  Okay.  Let's break that down a little.  L1
23 is the --
24    A.  First lumbar vertebra.
25    Q.  Okay.

Page 85

1     A.  Below your rib cage.
2     Q.  Thank you.  So it would be lower middle
3  back?  Would that be a good way to describe it?
4     A.  Upper lower back.  Low low mid back.
5  Splitting hairs here.
6     Q.  Okay.
7     A.  But it's at the junction between the mid
8  back and the low back basically.
9     Q.  Okay.  And when you say a transverse
10 process, what does that mean?
11    A.  Vertebra normally has a vertebral body, and
12 then it has posterior elements, and on the posterior
13 elements, two little ears stick off.  In the mid
14 back, it's where the ribs attach.  They're in the
15 vertebral body, but in the lumbar spine they just
16 stick out, and they serve as attachment points for
17 muscles --
18    Q.  Okay.
19    A.  -- and tendons and ligaments and stuff.
20    Q.  And the transverse process bones, are those
21 those little ears you were talking about?
22    A.  Um-hum.
23    Q.  And so what did you -- you said the left
24 transverse process?
25    A.  Yes.

Page 86

1     Q.  Okay.  Left being his left, correct?
2     A.  Yes.
3     Q.  And you said it was fractured?
4     A.  Yes.
5     Q.  Okay.  Could you tell us where it was
6  fractured?  Towards the tip?  Towards the body of the
7  bone?
8     A.  I have no recollection specifically.
9  Typically when they break, it's about midway down.
10    Q.  Okay.  But you don't --
11    A.  But I have no specific recollection in this
12 case.
13    Q.  Okay.
14    A.  In this instance.
15    Q.  And what would cause a bone like that to
16 fracture?
17    A.  Direct trauma usually.
18    Q.  And what do you -- what do you recommend
19 for treatment when a bone like that fractures?
20    A.  It depends.  In this case I told him -- I
21 believe I told him to go see his physician.  If the
22 pain was too uncomfortable for him to bear, that he
23 was -- I think that's the only reference I have in
24 here to anything along those lines.
25    Q.  Okay.  Is there anything else that he could

Page 87

1  do to --
2     A.  To the best of my knowledge, no.  If there
3  are other signs and symptoms, blood in the urine or
4  anything like that, of course it's a medical
5  emergency, and I would send him to the emergency room
6  right away.  Call an ambulance.  But none of that was
7  present here.
8     Q.  Okay.  And what kind of pain was he
9  reporting at this time, if he was?
10    A.  Oh, let's see.  Doesn't appear -- either I
11 didn't ask or I didn't write it down.
12    Q.  Okay.
13    A.  Just a sec.  Let me look back here.  It
14 doesn't appear there is any reference to mild,
15 moderate or severe.
16    Q.  You have a letter dated March 1, 2002, in
17 your file; is that correct?
18    A.  March 1, '02, yeah.
19    Q.  Okay.  And who were you reporting to?
20    A.  You know, I'm not sure.  When I read
21 that -- I may have written that with the intent and
22 the actual faxing that to his office so they would be
23 aware of that.
24    Q.  Okay.
25    A.  Or I may have written it dual purpose, for

EXHIBIT P
PAGE 6 OF 15

24 (Pages 84 to 87)

Page 96

 1  fracture to heal?
 2       MR. COHN: Objection. Foundation.
 3       THE WITNESS: You know, I would think that,
 4  you know, for the most part, in similar circumstances
 5  in the back -- in the back in other cases, similar,
 6  somewhere between six, four to six to eight weeks,
 7  somewhere in there, you see some really significant
 8  improvement.
 9  BY MS. JOHNSON:
10       Q. Do you normally do follow-up x-rays to
11  double-check?
12       A. No, I don't.
13       Q. Okay. What do you rely on to determine
14  when you would stop treatment with a fracture?
15       A. I don't treat fractures.
16       Q. Oh. So you were just going to allow it to
17  heal itself; is that correct?
18       A. Correct. There is nothing that can be done
19  with a transverse process fracture anyhow.
20       Q. Okay. Does the transverse process fracture
21  itself give a patient pain?
22       MR. COHN: Objection. Foundation, form of
23  the question.
24       THE WITNESS: A fracture of the bone?
25  ////

Page 97

 1  BY MS. JOHNSON:
 2       Q. Yes.
 3       A. I would assume so, yeah. There is a
 4  periosteal covering around it.
 5       Q. Okay.
 6       A. Yes, there is pain.
 7       Q. And would there be ongoing pain after the
 8  actual fracture?
 9       MR. COHN: Objection. Form of the
10  question, foundation.
11       THE WITNESS: Not after it's healed I would
12  think.
13  BY MS. JOHNSON:
14       Q. Okay. But during the healing process,
15  would it remain painful?
16       MR. COHN: Objection. Form, foundation.
17       THE WITNESS: I think that varies case to
18  case. I mean, it's going to be painful for a while,
19  but how long? I don't know. Everybody varies from
20  individual to individual. Some people might be
21  longer, and other people shorter. I don't know.
22  BY MS. JOHNSON:
23       Q. So the pain and stiffness that Mr. Grove
24  has reported to you over the -- during this --
25       A. Um-hum.

Page 98

 1       Q. -- couple weeks that you were treating
 2  him --
 3       A. Um-hum.
 4       Q. -- what was his pain? Did he say what was
 5  causing his pain?
 6       A. It's not specifically related here in the
 7  chart note, and I have no specific recollection.
 8       Q. Okay. When he first hurt himself, he
 9  was -- he was actually tender over the iliac crest;
10  is that correct?
11       MR. COHN: Objection to form, foundation.
12       THE WITNESS: I believe I said he had a
13  contusion. I don't recall. Let me see. Yup. I
14  mean, it was noted. It says from the crest of the
15  ilium up to T8 or so, up to mid back.
16  BY MS. JOHNSON:
17       Q. Okay. Which one are you reading on that?
18       A. I'm reading on my exam form, the one you're
19  looking at right there.
20       Q. Okay. And does it say extreme tenderness?
21       A. With extreme tenderness at L1 on the left.
22       Q. Okay. So the low back that you were
23  treating, was that the muscles of the low back? When
24  you were -- you were treating his low back with --
25       A. For soft tissue therapy, yes.

Page 99

 1       Q. Okay.
 2       A. Yeah, I may have rendered treatment,
 3  nonrotational type, at the L5 region, very low low
 4  back, but certainly nothing in the area of a
 5  fracture.
 6       Q. When you say nonrotational, what do you
 7  mean by that?
 8       A. Chiropractors adjust people by lots of
 9  different means and methods, and the side posture
10  type adjustment is one where you induce a rotational
11  type force into the low back, which you wouldn't do
12  with a fracture. You would use a Thompson table,
13  which has a pelvic piece that moves up and down, and
14  it does so abruptly. That's what you would use.
15       Q. Okay. Why would you not want to give him a
16  rotational adjustment?
17       A. You wouldn't want to be moving those --
18  that fractured segment around.
19       Q. Okay. Would twisting hurt that fracture?
20       MR. COHN: Objection.
21       THE WITNESS: At what point?
22       MR. COHN: Form, foundation.
23       THE WITNESS: Originally? Sure. After
24  it's healed, no. You know, and there is a spectrum
25  in between. I don't know where in that spectrum

27 (Pages 96 to 99)

EXHIBIT P
PAGE 7 OF 15

GROVE v. UNOCAL                                                RICHARD EALUM, D.C.
                                                                    11/3/2006

Page 100

1  you're speaking of.
2  BY MS. JOHNSON:
3     Q.  During your -- during this couple weeks
4  here that you were treating him, you were avoiding
5  rotational manipulation of him; is that right?
6     A.  Right.  Well, the file does not reflect
7  that, but I'm sure that I would have been.  Knowing
8  there is a fracture there, I would never do that with
9  a fracture.  You know, it's hard to say when I would
10 have -- if I had started adjusting him with a
11 rotational, it's hard to say when in this spectrum
12 that I would have started doing that had I chose to
13 do that.
14    Q.  Okay.
15    A.  And reviewing the record, it's not clear
16 when I would have done it, I don't think.
17    Q.  Had you given him any activity restrictions
18 at this point?
19    A.  Let's see.  We had him off two to three
20 weeks.  Let's see.  Let's see if I did put any
21 activities.  I just -- it looks like I relieved him
22 from work-related activity until March 25th.  That's
23 a letter dated March 11, 2002.  And the reason that
24 that's on letterhead is it was not written at the
25 time that I would have generated the physician's

Page 101

1  report.  Okay?  In case you have that question again.
2     Q.  Well, my question is had he been off work
3  from March 1st through March 11?
4        MR. COHN:  Objection.  Form, foundation.
5        THE WITNESS:  Well, let's see.  Date last
6  worked was 3/1.  It looks like I removed him from
7  work on 3/1.  It says -- under line No. 32 on
8  workers' comp report dated 3/9/02.  See what I'm
9  talking about here?
10 BY MS. JOHNSON:
11    Q.  Let me just check.  3/9/02?
12    A.  Um-hum.
13    Q.  Okay.  And we have that at 302415.  And
14 what line was that?
15    A.  Box No. 32.  It looks like I checked
16 released -- it says, "Released for work?"  I checked
17 the "no" box.  I checked 15 to 21 days in there at
18 that time.
19    Q.  Okay.  So that was a form that you filled
20 out?
21    A.  Yeah.
22    Q.  For his --
23    A.  Yes.
24    Q.  -- workers' comp?
25    A.  Yes.

Page 102

1     Q.  Okay.  And there is no note in your file
2  that specifically tells him that he can be off; is
3  that correct?
4     A.  That he can what?
5     Q.  That he would be off work for --
6        MR. COHN:  Objection to the form.
7  BY MS. JOHNSON:
8     Q.  -- for the first -- for the -- from the --
9     A.  You mean like similar to the letter dated
10 March 11?
11    Q.  Yes.
12    A.  No.  No.  This was probably generated at
13 the request of his employer or something along those
14 lines, meaning, "You know what?  Your report is not
15 good enough.  Let's have you fax a letter over."
16 Something along those lines.  Or maybe the
17 compensation adjuster.  I don't know.
18    Q.  Okay.  So your March 11 letter was a
19 continuation of his -- of his work -- his being off
20 work?
21       MR. COHN:  Objection.  Form, foundation,
22 speculation.
23       THE WITNESS:  I would say the March 11
24 letter reflects the fact that I expected him to be
25 off work from the 1st, and he probably was not at

Page 103

1  work on the 1st, through -- for approximately what?
2  Two to three weeks it says.  Till March 25th.  So --
3  BY MS. JOHNSON:
4     Q.  Okay.  The next time you -- okay.  Did
5  we -- I don't know if I asked you what you did on --
6  for him on the 11th, 3/11.
7     A.  3/11.
8     Q.  He said he was -- he was --
9     A.  Low back --
10    Q.  -- still sore.
11    A.  -- still sore and a little stiff.
12    Q.  Okay.
13    A.  We did -- we did the soft tissue work on
14 his low back again.  I don't believe Verlynn -- I
15 don't know if she did that or not.  No, it looks like
16 she did.  She noted that as -- would you like me to
17 read that?
18    Q.  That's all right.
19    A.  03/11.  Okay.
20    Q.  And you said that her normal length of
21 therapy is at least an hour?
22    A.  Usually, yeah.
23    Q.  Okay.  Okay.  And other than the soft
24 tissue, did you do anything that day that you wrote
25 down?

28 (Pages 100 to 103)

EXHIBIT P
PAGE 8 OF 15

Page 112

1  You wouldn't want a patient -- you release
2  him. I mean, it's not a hard-and-fast rule: Yes, on
3  day 24 you're going to be able to go to your job and
4  you're going to be able to lift a 75-pound weight and
5  you're going to be able to throw a medicine ball 50
6  feet.
7       I mean, it's kind of one of those things.
8  When you send a patient back to work, it's kind of
9  like sticking your toe in the water. Is it hot or is
10 it cold? If it hurts, don't do it.
11      THE VIDEOGRAPHER: I need to change
12 tapes.
13      MS. JOHNSON: Okay.
14      THE VIDEOGRAPHER: This is the end of tape
15 No. 2. We are off record at 1:10 p.m.
16      (Recess held.)
17      THE VIDEOGRAPHER: We are on record at 1:14
18 p.m. This is the start of videotape No. 3 in the
19 deposition of Richard Ealum, D.C., Case No.
20 3:04-cv-0096-TMB, taken on November 3rd, 2006.
21 BY MS. JOHNSON:
22   Q. We were talking about at what point
23 Mr. Grove would be able to bend or twist. Would you
24 look at your chart and look at the letter dated March
25 9th.

Page 113

1    A. March 9th. Okay.
2    Q. And at this point Mr. Grove was
3  subjectively saying that he was 50 percent better.
4    A. Um-hum.
5       MR. COHN: Objection to the form of the
6  question.
7       MS. JOHNSON: Could you wait till I'm done?
8       MR. COHN: Well, I'm objecting to the last
9  question, and I can't get a chance to get my
10 objections in before the answer. So I'm just making
11 the objection for the record, even if it --
12      MS. JOHNSON: Okay. So you're --
13      MR. COHN: -- does come in before he made
14 his answer.
15      MS. JOHNSON: Got it. Thank you.
16   Q. You stated that he -- "To date, he has
17 subjectively improved over 50 percent." And I think
18 you said before that he had told you that he was 50
19 percent better.
20   A. That's what a subjective rating would be,
21 yes.
22   Q. Okay. And at this point would you have
23 released him to do activities that included bending
24 and twisting?
25   A. No.

Page 114

1    Q. Why not?
2    A. **Fifty percent. I don't think 50 percent**
3  **would have been a high enough rating to do something**
4  **like that.**
5    Q. What does 50 percent mean to you?
6    A. **You know, on a subjective scale. You know,**
7  **you ask a patient, you know, "Do you feel like you're**
8  **capable of doing your job fully?" And, you know, on**
9  **a subjective type scale you have to rely on their**
10 **report of that.** Rephrase your question. I lost it.
11   Q. Fifty percent. What does a 50 percent
12 rating mean to you?
13   A. **That they're halfway back to feeling**
14 **normal.**
15   Q. And so with an injury like Mr. Grove's, at
16 50 percent what activities would you suggest that he
17 refrain from?
18      MR. COHN: I'm going to object.
19 Foundation, form.
20      THE WITNESS: Work-related activities,
21 bending, twisting.
22 BY MS. JOHNSON:
23   Q. Climbing ladders?
24      MR. COHN: Objection. Leading.
25 ////

Page 115

1  BY MS. JOHNSON:
2    Q. What about squatting?
3       MR. COHN: Objection. Leading.
4       THE WITNESS: You know, it's not something
5  that I would have wanted him to be doing, but those
6  type of nontorsional -- climbing a ladder, although
7  reaching with an arm would probably be an irritant.
8  Squatting may not. But in general terms, I would say
9  no, I probably wouldn't want him doing that.
10 BY MS. JOHNSON:
11   Q. How would reaching for a ladder rung and
12 pulling himself up, how would that irritate him?
13   A. **You're stretching your body out. Depends,**
14 **I suppose. If you're climbing like this, it may not**
15 **be too bad, but most people climb ladders like so. I**
16 **assume that's what you're referring to. It would**
17 **seem to me that that would be an irritant to it,**
18 **would cause some discomfort.**
19   Q. Okay. And irritants, is that possible --
20 would it cause -- is it possible for him to reinjure
21 himself if he is not fully back to 100 percent rather
22 than 50 percent?
23      MR. COHN: Objection. Form, foundation.
24      MS. JOHNSON: Yeah, a bad question. Hold
25 on.

EXHIBIT P
PAGE 9 OF 15

31 (Pages 112 to 115)

GROVE v. UNOCAL                                           RICHARD EALUM, D.C.
                                                          11/3/2006

Page 116

1   Q. Is it possible that if he is only 50
2   percent improved and he goes back to do bending,
3   twisting or climbing activities, that he could
4   reinjure himself?
5       MR. COHN: Objection. Form, foundation.
6       THE WITNESS: I suppose the possibility
7   exists.
8   BY MS. JOHNSON:
9   Q. Okay. You said that if --
10  A. I mean, that kind of activity could injure
11  a 100 percent normal, healthy person too. You know,
12  goes back to the concept of the spectrum, you know,
13  that we've referred to several times, and, you know,
14  it's impossible to say for sure.
15  Q. Okay. Well, you said it would be an
16  irritant. What do you mean that it would be an
17  irritant?
18      MR. COHN: Objection. Form, foundation.
19      THE WITNESS: Might cause an increase in
20  pain for a while, muscle spasm for a while.
21  Transverse process fractures, to the best of my
22  knowledge, are pretty stable, and -- because no
23  matter what you do, there is always going to be -- I
24  don't care how careful you are, there is always going
25  to be some motion between those fragments. Okay?

Page 117

1   And the body puts cartilage in there and
2   eventually heals those up, but just about any kind of
3   motion can -- causes those to move, and that prevents
4   the normal, the normal, healing. Okay?
5       And until your body gets that cartilaginous
6   cap in there, to the best of my knowledge it can be a
7   significant source of pain.
8   BY MS. JOHNSON:
9   Q. Okay. On your exam sheet -- do you
10  normally take someone's blood pressure when they come
11  in?
12  A. Not always. Not always.
13  Q. When do you take blood pressure?
14  A. Usually on the day they come in.
15  Q. And what's the purpose of taking somebody's
16  blood pressure?
17  A. Get a baseline, determine if there is any
18  other insidious type issues happening with the
19  patient.
20  Q. What do you mean by that?
21  A. You know, fever. Or that would be more
22  reflected in a heart rate kind of thing, a high fever
23  would. Of course, you would see a temperature also.
24  Anytime you've got a loss in volume of blood, heart
25  rate will increase. Stroke. You know, those types

Page 118

1   of things.
2   Q. Does it -- does the blood pressure -- does
3   blood pressure make any difference in the way you
4   might treat someone?
5   A. I treat patients with high blood pressure
6   and low blood pressure all the time. Usually it's
7   medically managed. But I'm not sure what you mean by
8   your question.
9   Q. If someone has high blood pressure, would
10  it make a difference in how you treat -- in any of
11  your treatment?
12      MR. COHN: Objection to form of the
13  question.
14      THE WITNESS: Sometimes, yes.
15  BY MS. JOHNSON:
16  Q. When would it make a difference?
17  A. Most typically with neck adjusting. I
18  avoid rotation, high rotation, lateral flexion
19  adjustments with those patients.
20  Q. Okay. And during the month that you were
21  treating Mr. Grove, did he inform you that his doctor
22  had diagnosed him with high blood pressure?
23  A. Not to the best of my recollection.
24  Q. Okay. Would you have written that down?
25  A. If he had informed me?

Page 119

1   Q. Um-hum.
2   A. Probably. Let me look at the review of
3   systems and see if he wrote anything down to that
4   effect here. The high or low blood pressure, he
5   circled no.
6   Q. Okay.
7   A. On this chart right here.
8   Q. What document are you looking at?
9   A. (Indicating.)
10  Q. Okay. We don't have that. I don't think
11  we have that document. So who fills this out?
12  A. This is the patient.
13  Q. Okay. And does he put -- did he put a date
14  on this?
15  A. It's not on that page. It's not on that
16  page.
17  Q. Okay. So do you know when he filled that
18  out?
19  A. Usually they do it on the first day that
20  they come in for an injury like that. Somehow it
21  slipped by me.
22  Q. What --
23  A. I would assume that it was on 3/1 of '02.
24  But there is no date reflected here, so I'm not 100
25  percent sure. I didn't get the date on the front or

32 (Pages 116 to 119)

EXHIBIT P
PAGE 10 OF 15

Page 120

1  the back.
2      Q.  Okay.  So if Mr. Grove had actually been
3  diagnosed during the month -- during the month of
4  March of -- what month -- what year we in?  '02.
5  Would you have wanted him to tell you that?
6          MR. COHN:  Objection to the form,
7  foundation.
8          THE WITNESS:  From a health care point of
9  view, sure.  Of course.
10 BY MS. JOHNSON:
11     Q.  Why?
12     A.  You'd always want to know that about a
13 patient.  You're concerned about their health.  You'd
14 want to know what kind of physical ailments they
15 have.  Thank you.
16     Q.  Why would you want to know?
17     A.  To avoid certain circumstances, you know
18 in -- like I said, on the high blood pressure
19 patient, for example, I wouldn't want to do a high
20 rotational, lateral flexion type neck manipulation.
21     Q.  Okay.
22     A.  It would help explain unassociated symptoms
23 like dizziness or nausea, especially if they're
24 taking medication.
25     Q.  Okay.  So you were not told that his

Page 121

1  medical doctor at Family Park -- or Medical Park
2  Family Care diagnosed his blood pressure at 210/118?
3          MR. COHN:  Objection.  Foundation, form,
4  speculation.
5          THE WITNESS:  Unless you see reference to
6  that somewhere in the file that I haven't looked,
7  then no.
8  BY MS. JOHNSON:
9      Q.  Okay.  Would you consider that to be high
10 blood pressure?
11     A.  220/118?
12     Q.  210/118.
13     A.  210/118.  I don't believe high blood
14 pressure should be diagnosed off of a single reading.
15     Q.  Okay.
16     A.  He may have almost gotten in an accident on
17 the way to the office, et cetera.  There is rules for
18 diagnosing high blood pressure.  There is a general
19 rule if that number were repeated time after time, I
20 would say, yeah, that's high blood pressure.
21     Q.  And had he ever disclosed to you that he
22 had a history of consuming four or more alcoholic
23 beverages in one day?
24         MR. COHN:  Objection.  Foundation, form.
25         MS. JOHNSON:  That's all you need.  Thanks.

Page 122

1          MR. COHN:  Speculation.
2          THE WITNESS:  I am aware that Mr. Grove
3  consumes alcohol occasionally.  Not to his -- not
4  to -- I don't have any knowledge as to any
5  significant quantities.  I don't know how much he
6  drinks.  I know he drinks.
7  BY MS. JOHNSON:
8      Q.  How do you know that?
9      A.  How do I know that?  Years ago when I
10 drank, occasionally we'd have a drink together.
11     Q.  So you've seen him drink?
12     A.  Um-hum.  Yes.
13     Q.  Have you ever seen him drink four or more
14 in one day?
15     A.  No.
16     Q.  Okay.
17     A.  I haven't.
18     Q.  Did he ever tell you that he -- that he
19 drank four or more in one day?
20     A.  To the best of my recollection, I don't
21 recall anything to that.
22     Q.  Would you want to know that about him?
23         MR. COHN:  Objection.  Speculation.
24 BY MS. JOHNSON:
25     Q.  From a treatment perspective.

Page 123

1          MR. COHN:  Form.
2          THE WITNESS:  I would want to know if he
3  had a problem with alcoholism, certainly.  But as far
4  as, "Last Tuesday I went and had four beers," I don't
5  know that that's important for me to know.
6  BY MS. JOHNSON:
7      Q.  Sure.  But if that's a daily routine for
8  him, is that something that you would want to know?
9      A.  That would be --
10         MR. COHN:  Objection to foundation, form,
11 assumes facts not true.
12         MS. JOHNSON:  Form and foundation, Mike.
13 It's all encompassed in those.  That's all you
14 need.
15         THE WITNESS:  I think it's possible that
16 that kind of consumption could indicate a more
17 significant problem with alcohol.
18 BY MS. JOHNSON:
19     Q.  And from a treatment perspective, you said
20 you wanted to know as much as possible about your
21 patient?
22     A.  It's always best.
23     Q.  Okay.  If a patient was to go and -- was
24 intending to go on a trip and intended to perform
25 activities on that trip that were possibly --

EXHIBIT P
PAGE 11 OF 15

33 (Pages 120 to 123)

Page 124

1  possibly could irritate their existing injury, is
2  that something that you would want to know about?
3        MR. COHN: Objection to the form of the
4  question, foundation.
5        THE WITNESS: I'm not sure I follow your --
6  I'm not sure I follow your question. I'm sorry.
7  BY MS. JOHNSON:
8     Q. While you're treating somebody --
9     A. Sure.
10    Q. -- if they -- if they know up front that
11 they're going to go and do an activity, would you
12 want them to discuss it with you before they went?
13       MR. COHN: Objection. Vague.
14       THE WITNESS: A specific physical activity?
15 BY MS. JOHNSON:
16    Q. Yes.
17    A. Yeah, I think that would be reasonable, to
18 assume that a patient would say, "I'm going to go do
19 this."
20    Q. Okay.
21    A. "And is this going to hurt me?"
22    Q. What about when they come back? Would you
23 want them to tell you that they had gone and done
24 this activity if they didn't tell you beforehand?
25       MR. COHN: Objection to form. Foundation.

Page 125

1        THE WITNESS: I suppose it would be
2  important in regards to explaining a significant
3  exacerbation if this particular activity that I was
4  unaware of caused -- you know what I mean?
5  BY MS. JOHNSON:
6     Q. Um-hum.
7     A. You know, if I'm not aware they're doing it
8  and they do it, and, you know, there is -- I don't
9  know. It just doesn't seem like it would be
10 necessary if there was -- if there was no
11 exacerbation.
12    Q. Well, if they -- if they went and performed
13 a certain activity and didn't -- and were not
14 exacerbated by it, would that give you a perspective
15 on their level of activity, their ability and
16 activity?
17       MR. COHN: Foundation.
18 BY MS. JOHNSON:
19    Q. If you knew about it.
20       MS. JOHNSON: Form.
21       THE WITNESS: I'm having a problem -- I'm
22 having a hard time following your --
23 BY MS. JOHNSON:
24    Q. Okay.
25    A. I'm sorry.

Page 126

1     Q. Let me go to a more specific example.
2     A. Okay.
3     Q. This is a document that has been marked as
4  Exhibit 2 in another deposition, and I'd like it
5  marked as Exhibit 2 in this one as well.
6        (Exhibit 2 marked.)
7        MR. COHN: I see there is no date on this
8  one, by the way.
9        MS. JOHNSON: You have that document,
10 Mike.
11       MR. COHN: Well, I don't have it in front
12 of me. So what date are we talking about?
13       MS. JOHNSON: I'll get to it.
14    Q. This article came out of a paper in
15 Ketchikan. There is -- we have the entire article if
16 you really wanted to see it. And the article is
17 dated March 12, 2002.
18    A. Okay.
19    Q. But if you read in the caption here, it
20 says -- Saturday afternoon is the reference to when
21 they took this dip.
22    A. Okay.
23    Q. Okay. If you look back at a calendar, it
24 would be -- I believe it would be March 9. Okay.
25    A. March 9.

Page 127

1     Q. March 9.
2     A. Okay.
3     Q. March 9 I believe is the date of your
4  letter when Mr. Grove was reporting that he was 50
5  percent recovered.
6     A. Okay.
7     Q. Is that correct?
8     A. I'll take your word for it. Yeah, that's
9  what it says.
10    Q. So a jump -- a jump into water in Ketchikan
11 in March, did he tell you that he was going to do
12 that before he left?
13    A. To the best of my recollection, no.
14    Q. Okay. And would -- in your common opinion,
15 would the water in Ketchikan in March be cold?
16    A. Yes.
17    Q. Okay. And --
18    A. It's always cold.
19    Q. If Mr. Grove was to jump into cold water,
20 would it cause his back to spasm?
21       MR. COHN: Objection. Foundation.
22       THE WITNESS: I would assume, yes.
23 BY MS. JOHNSON:
24    Q. Okay. How about, would it cause his back
25 to stiffen up?

34 (Pages 124 to 127)

EXHIBIT P
PAGE 12 OF 15

Page 132

1  MR. COHN: Well, you led the witness all
2  the way along.
3      THE WITNESS: I believe I would have
4  requested that he not do it. And given the 9th, you
5  know.
6  BY MS. JOHNSON:
7      Q. Right.
8      A. Given the 9th.
9      Q. Given that he --
10     A. That's the date that it happened, yeah.
11     Q. Right. Given that he was saying he was
12 only 50 percent, right?
13     A. Sure.
14     Q. Okay. We didn't actually finish up with
15 your notes. So let's go back to your notes on
16 3/18/02.
17     A. Which file?
18     Q. This, the same one that we're talking
19 about. Thank you.
20     A. Okay. 3/18. Go ahead.
21     Q. So what was his chief complaint that day?
22     A. He had some tenderness and soreness, a
23 little bit of crepitus, which is just popping and
24 cracking. That's what crepitus is. Area of chief
25 complaint associated with movement.

Page 133

1      Q. Okay. And so what did you do for him that
2  day?
3      A. Looks like we have -- according to this, we
4  did, you know, the soft tissue therapy stuff.
5  Doesn't look like we did muscle stim or ultrasound by
6  the notes, and it looks like I did do some spinal
7  manipulation that day.
8         Looks like I wrote spinal manipulation but
9  I didn't bill for it. The question remains: Did I
10 do it or did I not? I don't know.
11     Q. Okay.
12     A. If I did do it, then I forgot to bill for
13 it. It's possible that I got in a hurry when I wrote
14 my chart notes and just scribbled it in there.
15     Q. Where would you have done a spinal
16 manipulation on that day?
17     A. Again avoiding those areas, possibly at the
18 pelvis, at the base of the lumbar spine, certainly
19 neck and possibly upper mid back. Not lower back,
20 though.
21     Q. You wouldn't have done -- would you have
22 done his neck if you had known about his high blood
23 pressure?
24     A. Yes, but I would have just done it prone.
25     Q. Oh, prone.

Page 134

1      A. In a position that avoided lateral flexion
2  and rotation.
3      Q. Okay.
4      A. High degrees of lateral flexion and
5  rotation.
6      Q. Okay.
7      A. You can adjust with much less in a prone
8  position.
9      Q. Your next chart note, I can't tell the date
10 on that.
11     A. It's 3/26, I believe.
12     Q. Okay. It appears to be a two, but you
13 think -- chronologically it should have been a three,
14 right?
15     A. Well, if you look at my chart notes, you
16 can see there on that.
17     Q. On the original?
18     A. On the original here, you can kind of see
19 the little leg on that three.
20     Q. Okay.
21     A. Probably didn't come through on the
22 photocopy.
23     Q. Okay. Good. So 3/26; is that right?
24     A. That's what it appears to be.
25     Q. And this was not an actual office visit,

Page 135

1  was it?
2      A. No. He called me on the phone, and I did
3  log it down. Or I called him, one or the other. I
4  don't know which. It doesn't say.
5      Q. Why was he -- why -- what was the purpose
6  of the phone call?
7      MR. COHN: Objection. Foundation.
8      THE WITNESS: Upon reading the note, I
9  probably called him to find out how he was doing. No
10 discomfort, zero crepitus. Because I think we were
11 probably at the end of my off work thing, and I
12 needed to verify whether I should send him back or
13 not.
14 BY MS. JOHNSON:
15     Q. Okay.
16     A. 3/26. And on that date, I did write a
17 letter returning him to work.
18     Q. And he reported that he was much improved;
19 is that right?
20     A. I wrote -- let's see. Feeling much
21 improved, with little discomfort and no crepitus.
22 The cracking and popping had totally stopped at that
23 point, by appearances.
24     Q. Okay. So you don't recall who initiated
25 the phone call?

EXHIBIT P
PAGE 13 OF 15

GROVE v. UNOCAL  
RICHARD EALUM, D.C.  
11/3/2006

Page 176

1  Q. And is the transverse vertebra, is that a
2  weight-bearing or nonweight-bearing?
3  A. Nonweight-bearing.
4  Q. And what's, to you, the significance of the
5  fact that it's a nonweight-bearing bone?
6  A. Could you rephrase your question, please?
7  Q. I mean, is there any -- what's the
8  significance of the fact that it's a
9  nonweight-bearing bone as opposed to a weight-bearing
10 bone?
11 A. It was considered a -- I guess it would be
12 what you would consider a stable fracture. You'd
13 probably be better off asking an orthopedic doctor
14 about this. But it's considered stable and doesn't
15 need orthotic support, you know, as in like a body
16 brace or anything like that.
17 Q. Now, you were asked questions about bending
18 and twisting --
19 A. Um-hum.
20 Q. -- when you have such an injury. Now, one
21 of the things that wasn't asked in the question
22 before was, now, there is different degrees of
23 bending and twisting. Would that be fair to say?
24 A. Yes.
25 Q. So in regard to bending and twisting, just

Page 177

1  as a matter of walking, you're going to be doing a
2  little bit of movement with your back, even with a
3  transverse vertebra fracture. Would that be fair to
4  say?
5  A. Yes.
6  Q. So in terms of -- and in addition,
7  especially in regard to the question of the
8  photograph that was shown, does it make a difference
9  to you whether somebody is going to be doing a job
10 where they may have to be continuously or frequently
11 bending and twisting as opposed to where they may
12 occasionally be bending and twisting?
13     MS. JOHNSON: Objection. Form,
14 foundation.
15 BY MR. COHN:
16 Q. In regard to this type of injury.
17 A. To this specific injury?
18 Q. Yes.
19 A. Boy. I would say I would try to eliminate
20 those activities altogether if -- to the extent that
21 it was possible. Okay? You know, whether it was
22 repetitive or just occasionally, I mean, if it could
23 be minimized and not done, then that's what I would
24 have recommended.
25 Q. Now, do you -- however, the more frequently

Page 178

1  you do it and if you're doing it on a job eight hours
2  a day, that would exacerbate the injury?
3  A. I would think more so than just doing it
4  once, for example.
5  Q. Now, you wrote just -- in many of the
6  other times you've apparently treated him, there was
7  no time lost from work. In this one period of time,
8  apparently you had him off work for about 25 days?
9  A. I think the record reflects that, yes.
10 Q. And do you recall if at the end of that
11 time -- apparently the last conversation you had,
12 Mr. Grove told you that he had returned to work?
13 A. I believe I sent him to work on March 26,
14 and I saw him one additional time, which was the 5th,
15 where I dismissed him from the case.
16 Q. You know, in terms of period of time where
17 he said he felt improved in regard to the back
18 injury, could that make -- could it make a difference
19 if he had been -- was on pain medication?
20 A. Of course.
21     MS. JOHNSON: Object to foundation.
22     THE WITNESS: Of course.
23 BY MR. COHN:
24 Q. And why would you know that pain medication
25 would have an effect on pain?

Page 179

1  A. I'm sorry?
2  Q. Well, there was an objection on foundation,
3  that somehow you wouldn't know that pain medication
4  might help make somebody feel better if they have an
5  injury that causes pain. How would you know that?
6  A. That pain would block a pain signal -- or
7  that medication would block a pain signal?
8  Q. Yes.
9  A. Through my experience in the past with
10 other patients that have been on it.
11 Q. And -- okay.
12 A. Did I answer your question?
13 Q. Yes.
14 A. Okay.
15 Q. And this experience is based on -- is it
16 based on your now 16 years as a chiropractor?
17 A. Yes. I've had a number of patients in the
18 past that have had to take pain medication for
19 different complaints.
20 Q. In your view, is Larry Grove a malingerer?
21 A. No.
22 Q. Is Larry Grove truthful when he came in to
23 see you as a patient?
24     MS. JOHNSON: Object to form.
25     THE WITNESS: To the best of my knowledge,

47 (Pages 176 to 179)

GROVE v. UNOCAL                                          RICHARD EALUM, D.C.
                                                              11/3/2006

Page 184
1  BY MR. COHN:
2    Q.  And in regard to this allegation of four
3  drinks a day, would it matter to you -- does it make
4  a difference, for example, the alcohol content of
5  each of these four drinks as to the total quantity of
6  alcohol someone would drink in a day?
7        MS. JOHNSON:  Objection.  Form.
8        THE WITNESS:  You're -- was there a
9  question there?
10 BY MR. COHN:
11   Q.  Yes.
12   A.  I missed it.
13   Q.  If you drink four shots of hard liquor
14 versus four light beers --
15   A.  Okay.
16   Q.  -- would there be a difference in the
17 alcohol content?
18       MS. JOHNSON:  Objection.  Foundation.
19       THE WITNESS:  I wouldn't think so.  I don't
20 know that for a fact, but I would think not.
21 BY MR. COHN:
22   Q.  And did at any time Larry Grove -- was
23 there any indication to you that Larry Grove's
24 treatment was in any way compromised by his alleged
25 alcohol consumption?

Page 185
1    A.  No, I've never -- no.
2    Q.  And did you have any inkling anywhere that
3  Larry Grove has an alcohol problem?
4    A.  No.
5    Q.  And in terms of your treatment of
6  Mr. Grove, did Mr. Grove cooperate with the treatment
7  that you rendered to him?
8    A.  To the best of my recollection, yes.  It
9  appears in the -- you know, in the record that there
10 were a few dates missed.  I didn't write down why.
11 Perhaps that was for work, perhaps he was sick,
12 perhaps he was on vacation, maybe he forgot.  I don't
13 know.
14   Q.  He's not the only patient of yours that's
15 ever missed an appointment?
16   A.  Definitely not.
17       MR. COHN:  Can we go off record for a
18 moment?
19       THE VIDEOGRAPHER:  Off record.  2:57 p.m.
20       (Off record.)
21       THE VIDEOGRAPHER:  On record.  2:59 p.m.
22 BY MR. COHN:
23   Q.  In regard to the transverse vertebra
24 fracture which you diagnosed after your x-ray on
25 March 1st, 2002, following Mr. Grove's report that he

Page 186
1  slipped on ice on, I believe, February 21st, 2002, it
2  appears you took him off work for about 25 days and
3  then he returned to work.
4    A.  Yes.
5    Q.  Now, you indicated the length of time for
6  recovery from a transverse vertebra fracture, what
7  was -- what was the length of time you indicated?
8    A.  I don't treat fractures, but to the best of
9  my knowledge, six to eight weeks.  You know, I mean,
10 that's going to -- that can fluctuate one way or the
11 other.
12   Q.  So if Mr. Grove was able to go back to work
13 a little over four weeks later, does that indicate
14 that he recovered rather quickly?
15   A.  With my limited experience and knowledge
16 of -- concerning fractures, I would say yeah.  I
17 would say that would be the lower end of -- of a
18 normal time.
19   Q.  And just to -- I might have asked this
20 before.  In regard to your treatment of Mr. Grove,
21 you found him to be cooperative in the treatment that
22 you were giving?
23   A.  For the most part, he was a very compliant
24 patient.
25   Q.  And you found him to be -- and you didn't

Page 187
1  find any evidence that he was a malingerer?
2    A.  No.  No.
3    Q.  And did you find that if he could go work,
4  even though he had these injuries you treated him
5  for, he would?
6    A.  Yes.
7        MR. COHN:  I don't have any further
8  questions.
9        MS. JOHNSON:  No questions.
10       THE VIDEOGRAPHER:  The deposition is
11 concluded.  We are off record at 3:00 p.m.
12       (Proceedings concluded at 3:00 p.m.)
13       (Signature reserved.)
14             * * * * *

EXHIBIT P
PAGE 15 OF 15

49 (Pages 184 to 187)