Hal Egbert                                                    3:04-CV-0096-TMB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and MICHAEL
GROVE (DOB 1/21/88) by and through
his father LAWRENCE H. GROVE,

       Plaintiffs,

-vs-

UNOCAL CORPORATION,

       Defendant.
_____/

Case No. 3:04-cv-0096-TMB

RECEIVED BY:
Clapp, Peterson, Van Flein,
Tiemessen & Thorsness, LLC
Date Rec'd/Initials: 11/7/06
62-00-1
Distribution: PPO to VBH
FYI: JBJ, JGG

VIDEO DEPOSITION OF HAL EGBERT, P.T.

VOLUME I

Pages 1 - 101, inclusive

October 18, 2006, 9:53 a.m.

Anchorage, Alaska



Page 1

Hal Egbert                                                                                          3:04-CV-0096-TMB

Page 2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF ALASKA
 3
 4   LAWRENCE H. GROVE, CYNTHIA
     GROVE, SARAH GROVE, and MICHAEL
 5   GROVE (DOB 1/21/88) by and through
     his father LAWRENCE H. GROVE,
 6
 7        Plaintiffs,
 8   -vs-
 9   UNOCAL CORPORATION,
10        Defendant.
11   _____/
     Case No. 3:04-cv-0096-TMB
12
13
14
15
16
17
18       VIDEO DEPOSITION OF HAL EGBERT, P.T.
19   Taken on behalf of the Defendant pursuant to notice, at
20   United Physical Therapy, 701 Sesame Street, Suite 101,
21   Anchorage, Alaska, before Valerie Martinez, Court
22   Reporter for Alaska Stenotype Reporters and Notary
23   Public for the State of Alaska.
24
25
```

Page 3

```
 1            A-P-P-E-A-R-A-N-C-E-S
 2   For the Defendant:
 3   CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS, LLC
     Linda J. Johnson, Attorney at Law
 4   711 H Street, Suite 620
     Anchorage, AK 99501
 5
 6
 7   For the Plaintiff:
 8   PHILLIP PAUL WEIDNER AND ASSOCIATES
     Michael Cohn, Attorney at Law
 9   330 L Street, Suite 200
     Anchorage, AK 99501
10
11
12   Videographer:
13   Eric Cossman
     Alaska Legal Video
14   645 G Street, #892
     Anchorage, AK 99501
15
16
17   Reported By:     Valerie Martinez, Court Reporter
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I-N-D-E-X
 2
 3   EXAMINATION BY:                          PAGE
 4   Ms. Johnson                               6
     Mr. Cohn                                 74
 5
 6   FURTHER EXAMINATION BY:
 7   Ms. Johnson                              92
     Mr. Cohn                                 93
 8
 9
10   EXHIBITS:
11   No. 1                                   101
12
```

Page 5

```
 1   THEREUPON:
 2        THE VIDEOGRAPHER: We're on the record at 9:53.
 3   This is the video deposition of Hal Egbert, P.T.
 4   taken by the defendant in the matter of Grove
 5   versus Unocal Corporation, case number
 6   3:04-cv-0096-TMB in the United States District
 7   Court for the District of Alaska. This deposition
 8   is being held in the offices of United Physical
 9   Therapy located at 701 Sesame Street, Suite 101,
10   Anchorage, Alaska, on October 18th, 2006.
11        My name is Eric Cossman from Alaska Legal
12   Video, mailing address 645 G Street, #892,
13   Anchorage, Alaska 99501. The court reporter is
14   Valerie Martinez from the firm Alaska Stenotype
15   Reporters.
16        Will counsel please identify themselves for
17   the record.
18        MS. JOHNSON: My name is Linda Johnson. I'm
19   here on behalf of the defendant, Unocal.
20        MR. COHN: Michael Cohn from the law firm of
21   Phillip Weidner and Associates here on behalf of
22   the plaintiffs.
23        THE VIDEOGRAPHER: Thank you. Will the court
24   reporter please swear in the witness.
25
```

EXHIBIT 5
PAGE 2 OF 2

Hal Egbert                                                                                       3:04-CV-0096-TMB

Page 14

1  BY MS. JOHNSON:
2      Q. Okay. And what is that?
3      A. It's an order for physical therapy from Dr.
4  Geitz.
5      Q. And is it signed by Dr. Geitz?
6      A. It has his name written on it, but I don't see
7  a signature.
8      Q. Do you recognize the handwriting on that?
9      A. No, but I presume it's the doctor's
10 handwriting.
11     Q. Okay. And on the back of yours, is there
12 anything on the back of yours, the back side of your
13 document?
14     A. It's a map of how to get here.
15     Q. So does United Physical Therapy give a doctor's
16 office a referral -- a little referral pad like this so
17 that they can refer patients to you?
18     A. Some doctors do those, yes.
19     Q. The top of the little referral pad does not say
20 Dr. Geitz; does it? It says United Physical Therapy.
21     A. No, it doesn't say Dr. Geitz on top.
22     Q. And if you received this particular document,
23 what -- would you review this document before you talked
24 to Mr. Grove?
25     A. Yes. Yes.

Page 15

1      Q. And can you read that handwriting?
2      A. Yes, I can.
3      Q. And what does it -- is it asking you to do
4  anything?
5      A. Yes.
6      Q. What does it ask you to do?
7      A. Evaluation and treatment; therapeutic
8  exercises; home program instructions, work hardening;
9  brace; weightbear as tolerated; phonophoresis as needed;
10 iontophoresis as needed; supervised conditioning -- two
11 times a week for four weeks. Decreased swelling would
12 be the goal.
13     Q. Okay, good. Let's go back to your documents.
14 You referred us to a typewritten letter, and I have that
15 marked DEF0615 produced by plaintiffs. And at the top
16 it says August 19th, 2003; do you see that one?
17     A. Yes.
18     Q. And at the bottom, is that your signature?
19     A. Yes, it is.
20     Q. It says, Hal W. Egbert, P.T.?
21     A. Yes.
22     Q. And do you type these yourself?
23     A. No.
24     Q. How do you get them typed up?
25     A. We have a typing service.

Page 16

1      Q. Do you dictate?
2      A. Yes.
3      Q. And what did you -- when you were drafting this
4  letter, what were you looking at to --
5      A. My handwritten notes of my evaluation.
6      Q. And can you tell us if the handwritten notes
7  are in your packet there?
8      A. Yes, they are.
9      Q. It has the symbol of a person on it. What's
10 the date of that?
11     A. 8/19/03.
12     Q. Okay. So, I have that marked as DEF0616.
13         And can you tell us -- when you're looking at
14 this document, the top part, it talks about history in
15 your handwritten notes.
16     A. Yes.
17     Q. And where did you get the history from?
18     A. From the patient.
19     Q. So you were asking him questions and these were
20 his responses that you wrote down?
21     A. Yes.
22     Q. What about -- what is PH, RX results for the
23 next section? What does that mean, PH, RX results?
24     A. Oh, that's past history, treatment results,
25 other problems.

Page 17

1      Q. Okay. And where did you get the information
2  that you wrote in there?
3      A. From the patient.
4      Q. Did you do anything to double-check this
5  particular information that he was giving to you?
6      A. No.
7      Q. What about in the next section? It looks
8  like -- it starts with a PP and then it has an N, and
9  then there's a line drawn through it. Can you read to
10 me what that says?
11     A. The N is nights -- can sleep through the night
12 now and wears brace at night.
13     Q. And where did you get that information?
14     A. From the patient.
15     Q. So his subjective description of what he does
16 at night?
17     A. Yes.
18     Q. The next section down, it says AM. Would that
19 be in the morning?
20     A. In the morning has stiffness.
21     Q. And then AGG?
22     A. Aggravators.
23     Q. So where did you get the information in this
24 section?
25     A. From the patient.

EXHIBIT 5 PAGE 3 OF 7

5 (Pages 14 to 17)

Page 54

1   Q. Okay.
2   A. And no exercises were performed.
3   Q. And that was because of his subjective pain
4   reports?
5   A. No. He had lost range of motion and he was
6   guarded.
7   Q. Do you -- at this point, were you asking him to
8   demonstrate his range of motion for you or were you
9   helping him?
10   A. I don't know. I usually give a little guidance
11   but I don't forcefully produce the motion.
12   Q. Okay. Would you be able to tell if he was not
13   giving you maximum effort?
14      MR. COHN: Objection to the form of the
15      question, its foundation, speculation.
16      THE WITNESS: Would I be able to?
17      MS. JOHNSON: Yes.
18      THE WITNESS: Usually I am able to.
19   BY MS. JOHNSON:
20   Q. How do you tell if somebody is not giving you
21   maximum effort?
22   A. In active movements, there's a difference in
23   the range of motion compared to the end feel of passive
24   range of motion. There's a stiff and muscle guarded end
25   range for active range of motion -- passive -- excuse

Page 55

1   me -- that would be pretty much be his limit that he --
2   you would expect not active to gain more than that
3   passive. And if his active is significantly less than
4   that passive range of motion, then there might be a
5   reason for that. It might be because of pain or fear or
6   guarding or there might be a lack of effort.
7   Q. So you noticed him that he was guarded and you
8   assumed it was from pain; is that correct?
9   A. Yes.
10   Q. Could it -- is it possible that it could have
11   been from something else?
12      MR. COHN: Objection to the -- leading, form of
13      the question, speculation.
14      THE WITNESS: I don't know. Possible is a big
15      word, you know.
16   BY MS. JOHNSON:
17   Q. But you noted it as guarded; is that correct?
18   A. It was more guarded. He had more guarding,
19   yes.
20   Q. And the next time you saw him was when?
21   A. Two days later on 9/12.
22   Q. And his subjective report to you is that he is
23   much better; is that correct?
24   A. Much better. He thought his --
25   Q. You have that in quotes?

Page 56

1   A. Yes.
2   Q. That's him saying that?
3   A. That's him saying that.
4   Q. And underneath that, what does it say?
5   A. The inserts that I made or issued are positive.
6   Q. Okay.
7   A. The tape that I used on the technique of
8   pulling his fibula was positive.
9   Q. And what does it say under the objective?
10   A. Objective, it was less painful in the lateral
11   ankle but I don't know what test I did.
12   Q. And under treatment is that ultrasonic?
13   A. Ultrasonic, pulsed, and retaped.
14   Q. Okay. And then read to me what this next part
15   says.
16   A. Left, a delay of therapy, one to two weeks to
17   go to help his father. I can't --
18   Q. Does it say to move to Florida?
19   A. Maybe. Florida to PA -- I don't know.
20   Q. So he was telling you he was going to help his
21   father in Pennsylvania?
22   A. Maybe, yeah.
23   Q. Or Florida?
24   A. Maybe it was Florida, Pennsylvania, I guess.
25   Q. And why did you write that down?

Page 57

1   A. There was going to be a break in therapy.
2   Q. Did he tell you that he was getting ready to go
3   hunting?
4   A. I don't recall.
5   Q. Would you have written down the fact that he
6   was getting ready to go hunting if you knew?
7   A. Yes.
8   Q. Would that have been significant to you?
9   A. Yes.
10      MR. COHN: Objection to the form of the
11      question, speculation.
12   BY MS. JOHNSON:
13   Q. And if you knew he was going hunting, would you
14   have given him any advice about his ankle?
15   A. Yes.
16   Q. What would you have told him?
17   A. Wear stiff boots, take small steps, don't carry
18   a lot of weight, don't hike up and down mountains, and
19   be more of a -- you know, a less mobile hunter and don't
20   carry the meat out and be protective.
21   Q. What if he had told you he was hunting on
22   tundra, would you have recommended that he go?
23      MR. COHN: Objection to the form of the
24      question, speculation.
25      THE WITNESS: If he had told me he was going to

EXHIBIT S PAGE 4 OF 7

Hal Egbert                                                                                          3:04-CV-0096-TMB

Page 58

1    go hunt on tundra, I would have recommended he not
2    go hunting on tundra.
3  BY MS. JOHNSON:
4    Q. Why?
5    A. It's uneven ground and it's rough slogging with
6  the weight, a pack, and a gun. If you ever get anything
7  and haul it out, it would be tough.
8    Q. So you didn't know that about a week after he
9  saw you he went hunting for eight days for moose on the
10 tundra?
11   A. I did not know.
12      MR. COHN: Objection to assuming facts not in
13   evidence.
14 BY MS. JOHNSON:
15   Q. Did you see him again in 2003?
16   A. No.
17   Q. And were you -- did you have any communication
18 with Dr. Geitz in the rest of 2003?
19   A. I probably didn't if I don't have it in the
20 chart. I don't typically call the doctor, so, no.
21   Q. So let's turn to the next time that you did see
22 Mr. Grove.
23   A. Okay.
24   Q. Okay. The next time you saw Mr. Grove was
25 when?

Page 59

1    A. It looks like April 19th, 2005.
2    Q. And why did you see him at that time?
3    A. I had a referral from Dr. Chang for physical
4  therapy.
5    Q. And, again, he was post-surgery; is that
6  correct?
7    A. It looks like it, yeah.
8    Q. Between 2003 and two -- between August -- no --
9  I'm sorry -- September 2003 and April 2005 had you seen
10 Mr. Grove --
11   A. No, I had not seen him.
12   Q. You hadn't seen him professionally. Had you
13 seen him in the community at all?
14   A. No.
15   Q. Would you recognize him if you did see him in
16 the community?
17   A. Yes.
18   Q. So what did you observe about Mr. Grove's ankle
19 in April 2005?
20   A. What was my objective exam?
21   Q. Yes.
22   A. Zero degrees of dorsiflexion; 43 degrees of
23 plantar flexion with anterior talar pain with plantar
24 flexion; his girth was 26.0 centimeters; he had 35
25 degrees inversion; and intrinsic power of his foot, 4/5.

Page 60

1    Q. What does that mean "intrinsic power"?
2    A. These are the muscles between your metatarsals
3  that help you stabilize your metatarsals against the
4  floor and to assist in push off and in stabilizing your
5  toes against the bottom of your shoe to walk.
6    Q. And how did you measure that?
7    A. Usually I put Kleenex between each toe and pull
8  the Kleenex and if they tear the Kleenex, that's at
9  least a four.
10   Q. Okay. So you were asking him to pinch his toes
11 together; is that --
12   A. Don't let this Kleenex get out of your toes and
13 he worked like a devil to keep that Kleenex between his
14 toes.
15   Q. That's an unusual but very creative --
16   A. It works, yes.
17   Q. So when you had seen Mr. Grove -- first seen
18 Mr. Grove on August 19, 2003 -- let's put those side by
19 side. Can you -- you recorded that those degrees in
20 your letter to Dr. Chang; correct? Is that the same?
21   A. To Dr. Chang, yes.
22   Q. So let's compare the April 19th, 2005 to your
23 findings on August 19th, 2003.
24   A. Okay.
25   Q. And what do you observe between the two of

Page 61

1  those?
2    A. His dorsiflexion was about the same, it's
3  painful. His plantar flexion was improved but painful.
4  His inversion was about the same, 25 or 23, 22 -- it's
5  very close. His girth was about the same, 26.0.
6    Q. And what was his -- I didn't see it on the
7  other one.
8    A. You'd have to go to the first time I measured
9  his girth, which was 26.0.
10   Q. Oh, you didn't measure it right away; did you?
11   A. No.
12   Q. And did you -- in 2005, did you take an
13 eversion measurement?
14   A. No, not on that typed-up report.
15   Q. Do you see one in your handwritten reports?
16   A. No, I don't.
17   Q. So if you took it, you didn't write it down?
18   A. Right.
19   Q. All right. Underneath -- these documents
20 aren't marked, so the document that we're looking at in
21 2005 is dated 4/19/05 at the top and it has that -- it
22 still looks like a fish to me.
23   A. It's the same evaluation, right.
24   Q. Underneath that section, can you read to me
25 what that little box says?

16 (Pages 58 to 61)

EXHIBIT S PAGE 5 OF 7

Page 90

1  BY MR. COHN:
2    Q. Climbing stairs or any --
3    A. Climbing stairs might be restricted, maybe not.
4  Depending on his sole of his boot and how strong it is
5  and how often he had to do it.
6    Q. Would you expect this gentleman at 52, would
7  his ankle continue to degenerate from these injuries as
8  he reaches his 60s and 70s?
9        MS. JOHNSON: Form and foundation.
10       THE WITNESS: I would expect him to stiffen up
11   a bit. It may not be a painful stiffness, though.
12 BY MR. COHN:
13   Q. By "stiffen up", do you mean losing range of
14 motion?
15   A. Losing some range of motion, yes, on the
16 ankle -- up an ankle. Down mostly.
17   Q. And it's your understanding that use of the
18 ankle -- the more he uses the ankle, the more he will
19 have pain and swelling?
20   A. If he does a lot in a brief period of time, he
21 might -- I'm just speculating.
22   Q. In regard to his physical condition and what
23 you could expect in regard to his ankle, would you defer
24 to his doctors, Geitz and Chang?
25   A. Yes. You know, I didn't write down

Page 91

1  expectations for -- other than return to work, and on my
2  second assessment it was just return to longer distances
3  but I don't know of his work status at that point.
4    Q. I'm glad you brought that up. When you set
5  goals, those are -- are those hopes that you --
6    A. What we hope to achieve. Something that is,
7  hopefully, measurable and hopefully that the patient can
8  meet in a time frame that we set.
9    Q. But you're not -- when you set those goals,
10 you're not indicating that those goals will be reached?
11   A. Well, they're goals. They're not the outcome.
12   Q. And in some cases even though you'd like those
13 goals to be reached, they just aren't achievable; is
14 that fair to say?
15   A. Some people don't achieve goals, that's true.
16   Q. And sometimes they don't achieve the goals
17 because the injuries are too severe and won't respond as
18 well to treatment as you hoped; would that be fair to
19 say?
20   A. True.
21       MS. JOHNSON: Form.
22       THE WITNESS: That's fair to say.
23       MR. COHN: I don't have any further questions.
24       MS. JOHNSON: Just a couple of questions.
25

Page 92

1        FURTHER EXAMINATION
2  MS. JOHNSON:
3    Q. Did you ever advise Mr. Grove not to return to
4  work?
5        MR. COHN: Objection to the form of the
6    question.
7        THE WITNESS: I doubt that I would. I don't
8    have a record of that.
9  BY MS. JOHNSON:
10   Q. Did you ever tell him that he would never be
11 able to work again?
12   A. I would never have said that either.
13   Q. You said that as Mr. Grove was working hard --
14 let me rephrase that. As Mr. Grove was working hard in
15 2003, he did make some progress with you --
16   A. He did make progress.
17   Q. And if you had continued to see him in 2003,
18 would you have expected that he would continue to make
19 some progress?
20       MR. COHN: Objection. Vague, speculation.
21       THE WITNESS: The progress was at a good pace
22   before I didn't see him anymore. So I would expect
23   a little more progress.
24 BY MS. JOHNSON: --
25   Q. And he had not reached a plateau yet; correct?

Page 93

1    A. No, he had not.
2    Q. So even if a patient has a setback, would you
3  expect that they could go forward and make some more
4  progress?
5    A. Yes.
6        MR. COHN: Objection. Foundation.
7        THE WITNESS: Yes, I would.
8  BY MS. JOHNSON:
9    Q. And in 2005, do you have any measurements of
10 Mr. Grove's range of motion after your first exam?
11   A. No, I don't.
12   Q. If you had continued to see him, do you have
13 any reason to believe that Mr. Grove would not have
14 continued to make progress in 2005?
15       MR. COHN: Objection. Foundation, form,
16   speculation.
17       THE WITNESS: I would have expected him to make
18   some progress from my initial exam.
19       MS. JOHNSON: I don't have any other questions.
20       MR. COHN: Just a couple of follow-ups.
21       FURTHER EXAMINATION
22 BY MR. COHN:
23   Q. While you indicated that you might -- you'd
24 expect him to make some progress, when you say "some"
25 what do you mean by that?

Hal Egbert                                                                3:04-CV-0096-TMB

Page 98

1  less weightbearing such as a bicycle or some sort of
2  pool program or exercises that would be less stressful
3  than a treadmill, such as an elliptical exercise
4  program; watching your vacations and don't go into a
5  situation where you're forced to walk with a group of
6  people; or don't take hikes with long-legged athletes
7  that are trying to get better and better.
8      Q. Once you answered that question, you reminded
9  me of the question that I had been looking for.
10     There was a question in regard to work and
11 talking about work, do you know what the physical
12 requirements were of the job that he was doing in
13 regards to what you are suggesting he doesn't do to
14 lessen the pain?
15     A. I don't recall what his duties were right now.
16     Q. So you don't know whether he could have
17 returned to the job he had before or not?
18     A. I don't recall what his exact duties were right
19 now.
20     Q. Even though the goal might be to return to work
21 in cases --
22     A. The return to work is often a duty that he
23 could accommodate by having a duty that would allow him
24 to return to work without straining his painful part.
25 They usually stagger those on a limited duty for so many

Page 99

1  weeks or months.
2      Q. But that -- since he's an employee, that would
3  also depend on whether the employer would provide
4  such --
5      A. That's correct. The employer has to be
6  helpful.
7      Q. And finally, even though you said it before, in
8  regard to the physical condition of Mr. Grove's ankle
9  you would defer to Dr. Geitz and Dr. Chang?
10     A. Absolutely.
11     MR. COHN: I don't have any further questions.
12     MS. JOHNSON: I don't think I have any other
13 questions either. Thank you.
14     THE VIDEOGRAPHER: This concludes the
15 deposition of Hal Egbert. The time is 11:51.
16     (Off the record.)
17     THE VIDEOGRAPHER: And we are back on the
18 record. The time is 11:52.
19     MR. COHN: We went right back on record just
20 because we haven't marked as an exhibit
21 Mr. Egbert's chart of Larry Grove, which he has
22 provided at this deposition, and counsel for the
23 defendant and I have agreed to mark this as Exhibit
24 1 to his deposition.
25     And is it all right if we just have the court

Page 100

1  reporter make a copy and return the original back
2  to Mr. Egbert? Would that be acceptable to you?
3      THE WITNESS: The chart can't leave the
4  building, but you can do what you want within those
5  constraints.
6      MS. JOHNSON: You made two copies of the
7  right-hand side, but we don't have copies of the
8  left-hand side. Would you be willing to provide us
9  with the left-hand side copy?
10     THE WITNESS: Yes.
11     MR. COHN: So we need to have a copy that's
12 provided to the court reporter of the --
13     MS. JOHNSON: -- of the whole chart.
14     MR. COHN: And on that, you have the right to
15 review this deposition or not.
16     MS. JOHNSON: He certainly should. Review and
17 sign, we'd recommend it.
18     THE WITNESS: Okay.
19     THE VIDEOGRAPHER: Is that it?
20     MR. COHN: Yes, that's the end.
21     THE VIDEOGRAPHER: This concludes, then, the
22 deposition of Hal Egbert. The time is 11:52.
23     (Proceedings adjourned at 11:52 a.m.)
24     (Signature requested.)
25     (Exhibit 1 marked.)

Page 101

1          REPORTER'S CERTIFICATE
2      I, Valerie Martinez, Notary Public in and for the
3  State of Alaska do hereby certify:
4      That the witness in the foregoing proceedings was
5  duly sworn; that the proceedings were then taken before
6  me at the time and place herein set forth; that the
7  testimony and proceedings were reported stenographically
8  by me and later transcribed under my direction by
9  computer transcription; that the foregoing is a true
10 record of the testimony and proceedings taken at that
11 time; that I am not a party to nor have I any interest
12 in the outcome of the action herein contained; and that
13 signature has been requested.
14     IN WITNESS WHEREOF, I have hereunto subscribed my
15 hand and affixed my seal this ____ day of _____,
16 2006.
17
18
19          _____
            Valerie Martinez
            Notary Public for Alaska
20
21
            My Commission Expires: June 22, 2010
22
23
24
25

EXHIBIT 5
PAGE 7 OF 7