Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA

 3      ──────────────────────────────────────────────
        LAWRENCE H. GROVE, CYNTHIA           )
 4      GROVE, SARAH GROVE, and MICHAEL      )   COPY
        GROVE (DOB 1/21/88) by and through   )
 5      his father LAWRANCE H. GROVE,        )
                                             )
 6                     Plaintiffs,           )
                                             )
 7           vs.                             )
                                             )
 8      UNOCAL CORPORATION,                  )
                                             )
 9                     Defendant.            )
                                             )
        ──────────────────────────────────────────────
10      Case No. 3:04-cv-0096-TMB
11
12      ──────────────────────────────────────────────
13      VIDEOTAPED DEPOSITION OF FOROOZ SAKATA, M.S., O.T.R.
        ──────────────────────────────────────────────
14
15
16              Pages 1 - 156; Inclusive
17              Monday, November 13, 2006
18                    10:12 a.m.
19
20
21
22           Taken by Counsel for Defendant
                          at
23      Clapp Peterson Vanflein Tiemessen Thorsness LLC
               711 H Street, Suite 620
24             Anchorage, Alaska 99501-3454
25
```

EXHIBIT 1
PAGE 1 OF 5

**Page 4**

1  ANCHORAGE, ALASKA; MONDAY, NOVEMBER 13, 2006
2              10:12 A.M.
3                -o0o-
4           P-R-O-C-E-E-D-I-N-G-S
5       THE VIDEOGRAPHER: We are on record. It is
6  approximately 12 minutes past 10:00 a.m.
7       This is the deposition of Forooz Sakata,
8  taken by Defendant, in the matter Grove, et al.,
9  versus Unocal Corporation, Case 3:04-cv-0096 TMB.
10 We are in the offices of Clapp Peterson, et al., 711
11 H Street, Anchorage, Alaska, on Monday, November
12 13th, 2006.
13      My name is Eric Baldwin, video operator;
14 the court reporter is Gail Peckham. We are with
15 Pacific Rim Reporting, 711 M Street, Anchorage,
16 Alaska.
17      I will now ask Counsel to please identify
18 themselves, for the record, and state whom they
19 represent.
20      MS. JOHNSON: Linda Johnson, Clapp
21 Peterson, and I represent the Defendant, Unocal
22 Corporation.
23      MR. COHN: Michael Cohn, from the law firm
24 of Phillip P. Weidner & Associates, representing the
25 Plaintiffs, Lawrence H. Grove, et al.

**Page 5**

1       THE VIDEOGRAPHER: Would our reporter
2  please swear the witness.
3              FOROOZ SAKATA,
4       Deponent herein, having been duly sworn,
5       was examined and testified as follows:
6       MS. JOHNSON: Thank you.
7              EXAMINATION
8  BY MS. JOHNSON:
9    Q.  Ms. Sakata, have you ever had your
10 deposition taken before?
11   A.  Yes.
12   Q.  Okay. How many times?
13   A.  Gosh, I don't remember.
14   Q.  Quite a few?
15   A.  Many times, yeah.
16   Q.  So you know that you need to answer out
17 loud?
18   A.  Right.
19       Can you hear?
20   Q.  This is being videotaped and we may use it
21 at trial, the videotape at trial, but you need to say
22 "yes" or "no." If you want to take a break at any
23 time, just let me know.
24   A.  All right.
25   Q.  That's your right, to take breaks and not

**Page 6**

1  be trapped in here with us.
2       And if you don't understand something that
3  I've asked you, please ask me to repeat it.
4    A.  Okay.
5    Q.  Okay. Can you tell us what your education
6  is, please?
7    A.  I have my master's in occupational therapy
8  and a BS in nursing. I have my certification for --
9  from Commission for Case Manager Certification,
10 I have Certified Disability Management Specialist
11 and --
12   Q.  So you gave me a card before we started.
13   A.  Right.
14   Q.  And it has a lot of initials on it. The
15 M.S. is your master's in occupational therapy?
16   A.  Right.
17   Q.  OCR?
18   A.  Occupational therapy license.
19   Q.  RN is registered nurse.
20   A.  Yes.
21   Q.  BSN?
22   A.  Bachelor of Science, Nursing.
23   Q.  CCM?
24   A.  Commission for Case Manager.
25   Q.  And the CDMS?

**Page 7**

1    A.  Certified Disability Management Specialist.
2    Q.  Okay. Good.
3        When did you get your certification for
4  Disability Management Specialist?
5    A.  God, I don't remember. A long time ago.
6    Q.  Okay.
7    A.  Probably eight years ago, if I remember.
8    Q.  Did you ever practice as an RN?
9    A.  Yes.
10   Q.  Where did you get your degree?
11   A.  Texas Women's University.
12   Q.  Texas Women's University?
13   A.  University in Texas.
14   Q.  Okay. Was that your BSN?
15   A.  No. That was my master's in occupational
16 therapy. I got my RN at Oklahoma Baptist University.
17   Q.  Was that Oklahoma Baptist University?
18   A.  Yes.
19   Q.  And you said you did practice as an RN.
20 Where did you first practice?
21   A.  Gosh, it's been so many years. Actually, I
22 did practice in Providence, too, on the rehab floor.
23   Q.  Okay. Have you always practiced in Alaska?
24   A.  Yes.
25       MR. COHN: That was a --

Page 52

1   Q. What do you mean by tiptoe?
2   A. He just -- he would say he can't put weight
3   on that heel. So he'd just walk on his toes. Just
4   says, I can't put weight on this foot.
5   Q. And did you -- did you make any conclusions
6   about that behavior?
7       MR. COHN: Objection: Form of the
8   question.
9       THE WITNESS: Other than he was
10  self-limiting, he was not performing at his best.
11  And that's why I -- why I said he -- based on his --
12  what I felt like was submaximum effort, I concluded
13  that he could definitely do that job.
14  BY MS. JOHNSON:
15  Q. Okay. Let's go -- let's talk about some of
16  your --
17      MR. COHN: Objection: Foundation.
18  BY MS. JOHNSON:
19  Q. Let's talk about some of the phrases that
20  you used. What does "self-limiting" mean?
21  A. That means they limit --
22      MR. COHN: Objection to the -- to
23  foundation; form.
24      THE WITNESS: They limit themselves,
25  consistently be submaximal, consistently bend so far

Page 53

1   and say I can't do anymore.
2   BY MS. JOHNSON:
3   Q. Okay. And what are the reasons for a
4   self-limiting behavior? Do you know? Is that
5   something that --
6   A. Number one --
7       MR. COHN: I'm just going to object on
8   foundation; form.
9   BY MS. JOHNSON:
10  Q. Is that something you have observed or
11  studied?
12      MR. COHN: Objection. Same objection.
13      THE WITNESS: Absolutely. That is the main
14  forum for determining whether they are symptom
15  magnifiers or not. Because you, as a therapist, you
16  don't want them to hurt themselves. You observe
17  their posture. If they've reached their maximum
18  lifting, you would -- I'll stop them, if I feel like
19  they have reached their limit and they cannot safely
20  continue.
21  A. A lot of times they anticipate; fear, and
22  they think if they give more effort, that they could
23  bring back the pain that they originally had. So
24  most important, one of the reasons they are
25  self-limiting is fear of pain, fear of reinjuring

Page 54

1   themselves, not really knowing what they can and
2   cannot do.
3   Q. Is there anything else?
4   A. Sometimes monetary in these type of things.
5   They just -- it's to their best interest not to give
6   it their best.
7       MR. COHN: Objection to the -- to the last
8   answer as speculation.
9   BY MS. JOHNSON:
10  Q. What -- when you say they don't know what
11  they can and can't do, what do you mean by that?
12      MR. COHN: Objection: Form; foundation.
13      THE WITNESS: They have -- they have
14  limited themselves for so long, and they haven't been
15  back to doing physical activities, and they don't
16  know what's safe and what's not. They are afraid of
17  hurting themselves, they are afraid of reinjuring
18  themselves, so they feel safer if they limit
19  themselves. If they're able to do 50 pounds, they
20  limit themselves to 20 pounds, to -- not to hurt
21  themselves.
22      And all of the testing -- I always tell all
23  of them they're in control. If they can't do it,
24  don't do it. If they are not able to do it with
25  reasonable comfort and pain tolerance, don't do it.

Page 55

1   Q. Okay. You said that Mr. Grove did not
2   perform at a safe maximum level. What did you
3   observe that led you to believe that?
4       MR. COHN: Objection: Foundation; form.
5       THE WITNESS: Well, while he's doing --
6   right in the middle of it, to start tiptoeing or
7   lifting his leg up and say: Oh, I can't do that; I
8   can't put weight on my foot, and then when you ask
9   him to please continue, then he would. After a
10  pause, or after a few minutes, then he would continue
11  doing what he was asked to do, which two minutes
12  before he says he can't do it.
13  Q. Did he -- after he would begin again, did
14  he give any indication that he was in any pain?
15  A. No.
16      MR. COHN: Objection: Foundation.
17      THE WITNESS: Not at all, no.
18  BY MS. JOHNSON:
19  Q. Do you -- do you --
20  A. Go ahead.
21  Q. Do you watch for pain symptoms?
22  A. We watch for compromised body mechanics, we
23  watch for, you know, trembling. If their muscles --
24  you watch for -- there's a lot of signs. And if they
25  can't do it, again, they won't do it.

EXHIBIT 7
PAGE 3 OF 5

Page 128
1  like you said before, you don't know whether that's
2  something he can do everyday.
3        MS. JOHNSON: Objection: Foundation;
4  form.
5        THE WITNESS: If he did -- if he did what
6  he did that day, he certainly can do medium capacity
7  on a daily basis, yes.
8  BY MR. COHN:
9     Q.  And that's based on - what - on your -- how
10 long did you have him in your office?
11    A.  Four hours.
12    Q.  Four hours. Based on four hours seeing
13 this man, you've made a determination he could go
14 back and do this job; and you don't even know
15 about the pain he was in the next day, or that his
16 ankle swelled up the day after, or that he had
17 surgery shortly thereafter?
18       MS. JOHNSON: Objection: Form.
19       THE WITNESS: No.
20 BY MR. COHN:
21    Q.  I mean, do you know -- you don't know these
22 things?
23    A.  No.
24    Q.  So you made -- you made a decision to
25 categorize this man as a whiner, as a malingerer; is

Page 129
1  that true?
2     A.  No.
3     Q.  You don't consider him a malingerer?
4     A.  He had a lot of verbal complaints that were
5  totally inconsistent with his movement pattern. That
6  only leads me to believe there's inconsistencies.
7     Q.  Even though you found -- on the first page
8  of your report -- that he met the validity --
9  validity presentation on your profile?
10    A.  Yes. Yes.
11    Q.  Now -- have you found in the course of
12 doing your evaluations through the years, whether
13 it's PCE or B.E.A.R., that there are a lot of people
14 that appear to complain and not put out what you
15 consider the maximum effort they can do; would that
16 be fair to say?
17    A.  No, I'm sorry. Repeat that.
18    Q.  Well, have you had, besides Mr. Grove,
19 other individuals that you considered didn't put out
20 maximum efforts on PCE or B.E.A.R. testing?
21    A.  On some people, yes, but really not very
22 many.
23    Q.  Do you -- not very many? Well, what
24 percentage would you say you found they did not do
25 the work to your satisfaction?

Page 130
1     A.  That's -- I -- they don't have to do work
2  to my satisfaction; they just have to follow
3  procedure. And I just record what they do and what
4  they -- that's all I do. I didn't make those numbers
5  up. I just reported and recorded what he did.
6     Q.  Did you testify in the case of -- the
7  workers' comp case of Stewart versus Providence
8  Alaska Medical Center?
9     A.  Stewart? Oh, my God. Do you know how many
10 years ago? You know, it just clicked, so many years
11 ago. What year was that?
12    Q.  1999, it looks like the decision came out.
13    A.  Oh, my goodness.
14    Q.  Well, because in that -- in the decision,
15 at page 13, the board wrote: In evaluating the
16 medical evidence, we find the May 26, 1998, B.E.A.R.
17 PCE report is not credible based on Sakata's
18 mischaracterization and omissions of several physical
19 requirements listed in the applicable Dictionary of
20 Occupational Titles job description for phlebotomist
21 and medical laboratory technician and give it little
22 weight.
23       Do you recall that?
24    A.  Just the name sounds familiar. Nothing --
25 no.

Page 131
1     Q.  Do you recall at any time being overridden
2  by a physician as to whether a person had the
3  physical capacity to do a -- do a job that you
4  indicated they could do?
5     A.  I'm sorry. Repeat that question.
6     Q.  Are you aware of any instances where you,
7  in a physical capacity evaluation, determined that an
8  individual could do a certain job, and then the
9  physician determined contrary to you, that they could
10 not do that work?
11    A.  I'm sure there has been cases, and vice
12 versa, also - many vice versa cases, too - that I
13 have said they can't do it and the physician says,
14 oh, yes they can.
15    Q.  Now, you write in your report on page 2:
16 Due to his stated report of unfamiliarity with safe
17 maximal effort, all the activities were performed
18 well within comfort level or pain tolerance.
19       Now, with regard to that, if an individual
20 has not been at least diagnosed in whatever their
21 condition is, would that be reasonable for them,
22 to --
23    A.  Yes.
24    Q.  -- slow down or not do --
25    A.  Yes.

EXHIBIT 1
PAGE 4 OF 5

Page 152

1  Q. How does it show validity?
2  A. Well, if it's over 15 percent, then they
3  say not valid, even though I use it. You can
4  consistently be submaximal. You can consistently go
5  up to ten pounds and stop. Then it looks like it's
6  pretty valid, because consistently you were
7  submaximal. That's why I don't put a lot of emphasis
8  on this.
9       And I have to cross-reference it with the
10 dynamic testing, because I have had persons that just
11 stood with the computer and just squeezed their eyes.
12 So each time you're going to get the same number. Am
13 I going to say -- if I didn't have any experience, I
14 can look at these numbers and say, "Boy, he's
15 perfectly consistent." But if you do have the
16 experience, you can look at it and see that this is
17 consistently submaximal and consistently didn't give
18 good effort. Does that mean they're valid? No.
19 Q. Okay. Have you ever testified as an expert
20 witness?
21 A. Yes.
22 Q. And how many times do you think you've done
23 that?
24 A. You know, I need to go back and write...
25 Q. Where would you have testified as an

Page 153

1  expert?
2  A. Gosh, I had one last year. The lawyers,
3  doctors -- the lawyers' offices.
4  Q. Have you testified in a court as an expert?
5  A. No.
6  Q. How about in front of the workers' comp
7  board?
8  A. Many times, yeah.
9  Q. And you have also been hired as an expert.
10 Who hires you as an expert?
11     MR. COHN: Objection: Form of the
12 question.
13     THE WITNESS: Usually the lawyers, the
14 workers' comp.
15 BY MS. JOHNSON:
16 Q. Have you ever been hired by a plaintiff as
17 an expert?
18     MR. COHN: Objection.
19     THE WITNESS: Yes.
20     MR. COHN: Form.
21 BY MS. JOHNSON:
22 Q. How many times do you think?
23     MR. COHN: Objection: Form.
24     THE WITNESS: I remember a couple of times.
25 ///

Page 154

1  BY MS. JOHNSON:
2  Q. If a PCE is -- if you're asked to do a PCE,
3  and it's being paid for by an insurance company, do
4  you just do whatever the insurance company --
5  A. No.
6  Q. -- asks?
7      MR. COHN: Objection to the form of the
8  question.
9      THE WITNESS: All the physicians are paid
10 by insurance companies; the lawyers are paid by
11 insurance companies. That is just really -- no,
12 no.
13 BY MS. JOHNSON:
14 Q. Do you have Dr. Nolan's March 3rd, 2003,
15 chart note in there?
16 A. I'm sorry, but I have got to go.
17 Q. This is the last question.
18 March 3rd, 2003?
19 A. Now, do I? I don't know. Nolan? December
20 11 -- December 11, September -- December -- they're
21 not in order either.
22     Now what are you --
23 Q. I was just checking to see if you had that.
24 It appeared to be the last time that Dr. Nolan --
25 A. March 4th, did you say?

Page 155

1  Q. March 3rd.
2  A. Mine says March 4th in here. What are
3  you -- I don't know.
4  Q. I was just checking to see if you had it.
5  That's where Dr. Nolan said he was going to send
6  Mr. Grove for a PCE.
7      You don't have that in your file?
8  A. No.
9  Q. Okay.
10     MS. JOHNSON: Thank you for your time.
11     THE WITNESS: Thank you.
12     And you want this?
13     THE VIDEOGRAPHER: Mr. Cohn.
14     MR. COHN: No further questions.
15     THE VIDEOGRAPHER: Let's close the record
16 then at 1:38.
17     (Proceedings concluded at 1:38 p.m.)
18     (Signature waived.)
19         -o0o-
20
21
22
23
24
25

EXHIBIT 7
PAGE 5 OF 5

41 (Pages 152 to 155)