IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

    Plaintiffs,

vs.

UNOCAL CORPORATION,

    Defendant.
_____/
Case No. A04-0096 CV(JKS)

**VIDEOTAPED DEPOSITION OF CYNTHIA GROVE**

Pages 1 - 72, inclusive

Friday, November 12, 2004, 2:42 p.m.

Anchorage, Alaska

EXHIBIT ___V___
PAGE _1_ OF _9_

## Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016



```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3

 4   LAWRENCE H. GROVE, CYNTHIA
     GROVE, SARAH GROVE, and
 5   MICHAEL GROVE (DOB 1/21/88)
     by and through his father
 6   LAWRENCE H. GROVE,

 7              Plaintiffs,

 8        vs.

 9   UNOCAL CORPORATION,

10              Defendant.
                                    /
11   Case No. A04-0096 CV(JKS)

12

13

14        VIDEOTAPED DEPOSITION OF CYNTHIA GROVE,

15   taken on behalf of the Defendant, pursuant to notice,

16   at the offices of Lane Powell Spears Lubersky, 301 West

17   Northern Lights Boulevard, Suite 301, Anchorage, Alaska,

18   before Gary Brooking, Registered Professional Reporter

19   for Alaska Stenotype Reporters and Notary Public for the

20   State of Alaska.

21

22

23
                                          EXHIBIT    V
24                                        PAGE  2  OF  9

25

                                                            2

                    Alaska Stenotype Reporters
```

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3    For Plaintiffs:          LAW OFFICES OF PHILLIP PAUL
                                  WEIDNER & ASSOCIATES
 4                             By:  Michael Cohn
                               330 L Street, Suite 200
 5                             Anchorage, Alaska  99501
                               907/276-1200
 6

 7    For Defendant:           LANE POWELL SPEARS LUBERSKY
                               By:  Shannon W. Martin
 8                             301 W. Northern Lights Blvd.
                               Suite 301
 9                             Anchorage, Alaska  99503
                               907/277-9511
10

11    Also Present:            Lawrence H. Grove

12
      Videotaped By:           Professional Business Video
13                             Eric Baldwin

14
      Reported By:             Gary Brooking, Registered
15                             Professional Reporter

16

17

18

19

20

21

22

23
                                           EXHIBIT    V
24                                         PAGE  3  OF  9

25
```

| Cynthia Grove | Deposition | November 12, 2004 |

Page 41

1  gynecological --
2  A. She does tests. She does my routine tests.
3  I've had her forever.
4  Q. She -- she does your annual exams?
5  A. Yes.
6  Q. Okay. Is Dr. Kolb the only doctor you have
7  seen related to these issues?
8  A. Yes.
9  Q. And you -- you have seen no other
10 counselors, psych- -- psychologists, psychiatrists
11 since this accident?
12 A. No.
13 Q. Okay. Has Dr. Kolb prescribed you with any
14 medications to help with these problems that you have
15 been having?
16 A. No.
17 Q. So you have not -- you have not taken
18 anything for heartburn since --
19 A. No.
20 Q. -- since the -- okay. Not -- and -- and no
21 medications for the menstrual problems?
22 A. No.
23 Q. All right. What are the bills you worry
24 about? Do you guys have -- do have any -- do you have
25 a lot of debt?

Page 42

1  A. Well, I don't know what you call a lot of
2  debt. What I basically worry about is if his check
3  ever stops coming, we're not going to make it. We're
4  not going to be able to pay the mortgage or the truck
5  and still survive.
6  Q. You have owned your home since --
7  A. '90.
8  Q. Is it '90? Okay. The home on Dagan?
9  A. Yes.
10 Q. Since 1990. How big is your home?
11 A. 1700 square feet.
12 Q. Okay. Would you be able to pay for that
13 mortgage without your husband's income?
14 A. I would be able to pay for that mortgage,
15 but we wouldn't be able to eat.
16 Q. Okay. Has your husband talked to you about
17 going back to work as an occupational safety and
18 health inspector?
19 A. He's mentioned it, about -- I think that
20 letter that you have.
21 Q. The -- the letter that we -- that we
22 discussed in his deposition?
23 A. Yes. He has shown it to me.
24 Q. Okay. And have -- have you told him that
25 you're supportive of him doing this type of job?

Page 43

1  A. Actually, I let him make his own decisions.
2  Q. Have you offered any advice or insight into
3  what you think he should do?
4  A. No, I have not.
5  Q. Do you want him to go back to work?
6  A. Actually, that's up to him.
7  Q. Okay. Well, you -- you just said that
8  you're stressed about paying your bills and your house
9  payment and so forth.
10 A. Yes, I am.
11 Q. Do you have an opinion or a position on
12 whether he goes back to work?
13 A. I have --
14    MR. COHN: Objection to the form of the
15 question.
16 BY MR. MARTIN:
17 Q. Go ahead and answer, if you understand it.
18 A. My opinion is he can do whatever makes him
19 happy, whatever gets him nonfrustrated so our life can
20 be happy together.
21 Q. Well, have you said, "Look, Larry. I'm
22 stressed because I'm worried about the bills getting
23 paid. You need to go back to work"?
24 A. I would never say that to him.
25 Q. Okay. Have you guys gotten into -- into

Page 44

1  arguments about that?
2  A. No.
3  Q. Does he understand that you're stressed
4  because you're worried about paying the bills?
5  A. Yes.
6     MR. COHN: Objection to foundation.
7  BY MR. MARTIN:
8  Q. Okay. How do you -- how do you think he --
9     MR. COHN: Speculation.
10 BY MR. MARTIN:
11 Q. How do you think -- you live together.
12 A. Yes.
13 Q. He sees your emotions. You agree?
14 A. Yes.
15 Q. Do you think he knows when you're stressed?
16 A. Yes.
17    MR. COHN: Objection.
18 BY MR. MARTIN:
19 Q. Okay. How would -- how does he know that?
20    MR. COHN: Objection. Speculation.
21 BY MR. MARTIN:
22 Q. In your opinion, based on what you observed
23 living with him.
24 A. How does he know that I'm stressed out?
25 Q. How does he know? Does he ask you

EXHIBIT 1  PAGE 4 OF 9

Page 57

1    Q. Okay. What kind of boat do you guys have?
2    A. We have an air boat.
3    Q. Is this one of those rubber boats with --
4    A. No. It's a boat boat.
5    Q. An air boat?
6    A. Yes. It's --
7    Q. Okay. Enlighten me.
8         THE WITNESS: How big is our boat?
9         MR. GROVE: Sixteen and a half feet.
10        THE WITNESS: Sixteen and a half feet,
11   regular boat, but it has the big air boat, like the
12   Everglades boat.
13   BY MR. MARTIN:
14   Q. Oh, okay. One of those.
15   A. One of those.
16   Q. All right. And you use that on the -- on
17   the Kenai River?
18   A. Talkeetna.
19   Q. Talkeetna River.
20   A. Actually, anywhere it wants to go. We
21   can --
22   Q. Anywhere. Where do you keep it?
23   A. In Talkeetna.
24   Q. Do you have a cabin up there or a lodge or
25   something?

Page 58

1    A. We have a cabin and land, so we just keep it
2    up there.
3    Q. Do you still go to that cabin?
4    A. Yes.
5    Q. How long have you had that cabin?
6    A. Fourteen years.
7    Q. Is this --
8    A. That's an estimate.
9    Q. Is this a family cabin?
10   A. Yes.
11   Q. Did you build it?
12   A. No. We bought it. It came with the land.
13   It's a rustic one.
14   Q. Is the cabin on -- on a lake or a river?
15   A. It's right on the river. It basically has a
16   loft, bedroom, living area, no electricity, no
17   plumbing, no water, no bathroom.
18   Q. How often do you go to the cabin?
19   A. We used to go -- I used to go there -- we
20   used to go there together almost every weekend, but I
21   have been working so I haven't gone.
22   Q. Does Larry go to the cabin?
23   A. Yes.
24   Q. How often does he go to the cabin?
25   A. He's been up there in the summer with our

Page 59

1    son, Michael.
2    Q. How often?
3    A. He was up there fishing season.
4    Q. Fishing for what?
5    A. Salmon.
6    Q. What type of salmon?
7    A. Kings, reds.
8    Q. Whatever ran, huh?
9    A. Whatever was in. June, July, August, that
10   run.
11   Q. Was that an every -- was that an
12   every-weekend event, or did they stay up there for an
13   extended period of time?
14   A. They would go up and stay up there for like
15   a couple days, five days, come home --
16   Q. Did he drive?
17   A. -- go back up. Larry? Yes.
18   Q. Your son has a driver's permit, does he?
19   A. No.
20   Q. No. So Larry would drive the whole way?
21   A. (Witness nods head.)
22   Q. And he --
23        THE REPORTER: Is that a yes?
24        THE WITNESS: Yes. I'm sorry.
25   BY MR. MARTIN:

Page 60

1    Q. And this would be -- this would be almost
2    every weekend? Is that what your --
3    A. Almost every other weekend, I would say.
4    Q. Every other weekend. Did they do any
5    hunting up there?
6    A. This season?
7    Q. Yeah.
8    A. Yes.
9    Q. Okay. What kind of hunting?
10   A. I think they were driving around looking for
11   a moose.
12   Q. Did they catch any -- shoot any? Sorry.
13   A. Yes.
14   Q. And how many moose?
15   A. One.
16        MR. GROVE: It wasn't me.
17        THE WITNESS: It wasn't you. That's right.
18        MR. GROVE: It was the other guy.
19        THE WITNESS: He went hunting with some --
20   with one of our friends, John.
21        MR. COHN: Now in terms of this questioning,
22   you know, about what he did or -- I mean, do you have
23   personal knowledge? Is it -- otherwise objection to
24   foundation.
25   BY MR. MARTIN:

Page 61

1  Q. I'm assuming this is your personal knowledge
2  of what your --
3     MR. COHN: Because she's not up there with
4  him, she doesn't know exactly what type of hunting or
5  fishing they did.
6  BY MR. MARTIN:
7  Q. I'm -- I'm assuming this is based on --
8  you're his wife. These are the things that he told
9  you he did.
10  A. Right.
11  Q. Is this your --
12  A. He would go up there fishing, he would come
13  home with fish, so I assumed he went hunting --
14  Q. Okay.
15  A. -- or fishing. Excuse me.
16  Q. Right. Right. So he came home with a
17  moose. Is that right?
18  A. Yes. Him and his friend, John, uh-huh.
19  Q. Okay. Do you know who shot that moose?
20  A. John did.
21  Q. Do you know --
22  A. Our friend did.
23  Q. Okay. Do you know where the moose was shot?
24  A. Yes.
25  Q. Was it near the cabin?

Page 62

1  A. It was down the road.
2  Q. Do you know how they got the moose from the
3  kill site --
4  A. No.
5  Q. -- to the cabin?
6  A. I don't even know if they took it to the
7  cabin.
8  Q. Okay. And other than fishing and hunting,
9  do you know of any other things that your husband and
10  Michael did while at the cabin?
11  A. No.
12  Q. Would -- I mean, would these be the things
13  that you as a family would typically do when you went
14  to the cabin, is hunt and fish?
15  A. We would go fishing, yes, as a family.
16  Q. Any wintertime activities?
17  A. Yeah. We would go up there and go
18  snow-machining in the winter.
19  Q. Has -- have you, as a family, been to the
20  cabin since the accident to go snow-machining?
21  A. No.
22  Q. Do you have snow machines?
23  A. We have one.
24  Q. Is it at Dagan or is it --
25  A. It's up at the cabin.

Page 63

1  Q. At the cabin, okay. And you keep it there?
2  A. Yes.
3  Q. Has it been used since the accident?
4  A. No.
5  Q. Okay. Any other winter sports that you
6  would do at the cabin?
7  A. No.
8  Q. Snowshoeing, that kind of thing?
9  A. I don't do that.
10  Q. Does your husband?
11  A. Not that I'm aware of.
12  Q. Okay. What is your -- what is your
13  daughter's major?
14  A. She's undeclared.
15  Q. Okay. If this accident hadn't -- hadn't
16  happened, do you -- do you -- do you think it would be
17  any different in terms of who pays for her tuition?
18  A. Yes.
19  Q. In other words, did you have plans to pay
20  for her tuition?
21  A. We had plans to help her pay -- pay tuition,
22  yes.
23  Q. And do you help her pay tuition now?
24  A. No, I do not.
25  Q. You wouldn't have expected her to engage in

Page 64

1  two jobs to pay for tuition --
2  A. No.
3  Q. -- if this accident hadn't happened?
4  A. No, I would not have.
5  Q. The vacation to Vegas in 2003, how long was
6  that?
7  A. I think it was for like five days we were
8  down there.
9  Q. Before the accident, I know you said you
10  vacationed once a year. Is that right?
11  A. Yes. Just about once a year.
12  Q. Did you do a "Larry and Cindy" vacation, or
13  did you do -- did you do a family vacation? Was it
14  one or the other, or was it both?
15  A. It was a mixture. You know, we would do a
16  family vacation. We would do a "Larry and Cindy get
17  away from the kids" vacation.
18  Q. Okay.
19  A. We would do me and kids, him and the kids.
20  We switch around.
21  Q. So it sounds like 2003 you decided to do a
22  Larry and you. No plans to do a bonding vacation
23  anytime soon?
24  A. No.
25  Q. Why is that?

Page 65

1    A.  I'm working.
2    Q.  What were your choices in food and clothing
3  before the accident?  Did you typically buy generic
4  brands, or would you buy name brands?
5    A.  It wouldn't matter to me for that vacation.
6  If I saw something I like, I know I could buy it, so
7  typically if I went to JC Penney's and found a nice
8  outfit, I wouldn't think twice about buying it.  It
9  wouldn't matter.  I go to JC Penney's, I go to
10 Nordstrom, I go to Wal-Mart.  I shop everywhere.
11   Q.  You -- you would buy whatever you wanted,
12 basically?
13   A.  Yes.
14   Q.  Is that what you're saying?
15   A.  Yes.  Within reason.  You know, I'm not
16 going to buy a thousand-dollar shirt.  I never have.
17   Q.  And -- and after the accident --
18   A.  I watch what I buy.
19   Q.  You now watch what you buy?
20   A.  Uh-huh.
21   Q.  And clothes are bought at bargains?
22   A.  Yes, they are.
23   Q.  Okay.  You don't exercise the same freedom
24 of choice that you did before the accident with
25 respect to clothes?

Page 66

1    A.  No, not at all.
2    Q.  You plan to continue working longer than you
3  otherwise would have?
4    A.  Now?
5    Q.  Yeah.
6    A.  Yes.
7    Q.  Okay.  Did you plan -- were your plans to
8  retire at age 59 and a half, before the accident?
9    A.  I wasn't -- we weren't certain.  We were --
10 I was kicking around the idea of quicking -- quitting
11 work when Michael graduated from school and just relax
12 a little bit.  And -- and because we had such a great
13 pension with Larry's job and figure out the income at
14 that point in time, see if we could make it, see if
15 his pension would cover everything.
16   Q.  How much -- I mean, you say you're going
17 to -- you're going to work longer now than you would
18 have otherwise?
19   A.  Right now, as it is, I would have to work
20 till the age of 62.
21   Q.  To get the compensation that you need to
22 survive --
23   A.  Yes.
24   Q.  -- as a family?
25   A.  Because at 59 and a half, you only get a

Page 67

1  small percentage of your retirement.
2    Q.  Okay.  And then for insurance purposes, if
3  you were to retire at age 59 and a half, do you get
4  health insurance?
5    A.  You would have to pay for it.
6    Q.  At 62?
7    A.  At 62, your retirement kicks in, and you
8  would have a percentage covered.
9    Q.  Okay.  Again, your decisions about the "when
10 do I retire," you're -- you're saying have changed
11 since this accident?
12   A.  Yes, it has.
13   Q.  Okay.  How have Sarah and Michael suffered
14 as a result of this accident?
15   A.  Well, Michael, he had to grow up really fast
16 in a year.  He has extra duties to perform, not like
17 any 14-year-old.  He has to get things accomplished
18 for his father.  If they go somewhere, he has to do
19 the lifting and helping his dad out a lot around the
20 house.
21       As for Sarah, she doesn't have it easy.  She
22 has to work jobs.  She has to make sure she gets her
23 bills for college and everything straightened out on
24 her own.
25   Q.  So --

Page 68

1    A.  A normal 18-year-old going to college, they
2  can either -- you know, they can slack off a little
3  bit, but between college, work, and then still trying
4  to be 18.
5    Q.  And so for Sarah, is it -- is it mainly that
6  Sarah has to work to pay for tuition?
7    A.  Yes.
8    Q.  And she wouldn't have had to do that
9  otherwise?
10   A.  I would say she would still work, but she
11 wouldn't have to work such long hours and she wouldn't
12 have to worry about coming up with money and -- and --
13 for her tuition and books.  And right now she's
14 worrying that she wants to go out of state next year.
15 She wants to go down to Bel-Rae Institute, become --
16 veterinarian medicine.  And she doesn't know if she's
17 going to make it or not.
18   Q.  Well, I mean, doesn't know if she's going to
19 make it in terms of what?  Grades?
20   A.  How much it's going to cost between the
21 college and finding an apartment and everything like
22 that.
23   Q.  Okay.  Well, would you have been able to
24 afford for her to go to that school if this accident
25 hadn't happened, the veterinary school?

Cynthia Grove                    Deposition                    November 12, 2004

Page 69

1    A.  I think we would be able to help her with at
2    least the rent.  We would help -- be able to help
3    donate some money to going when she leaves.
4          Can I make an extra note on Sarah, also?
5    Q.  Sure.
6    A.  Beside just, you know, focusing in on her
7    college, et cetera, she also has -- you know, she
8    just -- she can't go hunting with her dad anymore.
9    And if they do, it's not as it used to be.  Because
10   when they first went hunting before his accident, you
11   know, she had a great time.  She would come home
12   going, Dad always climbed.  I had to wait forever to
13   climb -- you know, I'm always behind him.  And she was
14   always so proud of her father, because he can lift a
15   deer in one setting and put it on his back and walk
16   away.  And now he can't do that anymore.  So it has
17   affected her in different ways.
18   Q.  And so this would be sort of in the -- in
19   the big experience type of sense?
20   A.  Right.  Right.
21   Q.  She's lost something.
22   A.  She has.  She has lost a -- a very strong
23   man.
24   Q.  Okay.  Has your husband expressed to you any
25   new fears that he didn't have before this accident?

Page 70

1    A.  As in what way?
2    Q.  Fear of heights or anything like that?
3    A.  No.
4          MR. MARTIN:  Okay.  Thank you for coming.  I
5    don't have any further questions.
6          THE WITNESS:  Okay.
7          THE VIDEOGRAPHER:  We'll conclude then and
8    close the record at 3:55.
9                (Proceedings concluded
10                at 3:55 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT V
PAGE 8 OF 9

21 (Pages 69 to 70)

Alaska Stenotype Reporters

```
 1                    REPORTER'S CERTIFICATE
 2
 3          I, GARY BROOKING, RPR, hereby certify:
 4          That I am a Registered Professional Reporter
 5  for Alaska Stenotype Reporters and Notary Public for the
 6  State of Alaska; that the foregoing proceedings were
 7  taken by me in computerized machine shorthand and
 8  thereafter transcribed by me; that the transcript
 9  constitutes a full, true and correct record of said
10  proceedings taken on the date and time indicated therein.
11          Further, that I am a disinterested person to
12  said action.
13          IN WITNESS WHEREOF, I have hereunto
14  subscribed my hand and affixed my official seal this
15  24th day of April, 2005.
16
17
18  _____
                GARY BROOKING
19          Registered Professional Reporter
20          My Commission Expires 5.24.08
21
22
23
24
25
                                                          72
           Alaska Stenotype Reporters
```