Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA )
GROVE, SARAH GROVE, and )
MICHAEL GROVE (DOB 1/21/88) )
by and through his father )
LAWRENCE H. GROVE, )
  )
                Plaintiffs, )
  )
      vs. )
  )
UNOCAL CORPORATION, )
  )
                Defendant. )
_____ )

Case No. 3:04-cv-0096-TMB

COPY

VIDEOTAPED DEPOSITION OF MICHAEL GEITZ, M.D.

Pages 1 - 143
Tuesday, October 10, 2006
9:12 A.M.

Taken by Counsel for Defendant
at
C Tower, Regional Hospital
2741 DeBarr Road, Suite 415-C
Anchorage, Alaska

Exhibit 1
page 1 of 3

Page 136

1  it's down to 2 1/2, which means it's starting to
2  narrow down and wear itself down on the lateral
3  corner.
4      Q   Okay. If you could just please move a little
5  slower there for the cameraman, show us where on that
6  model.
7      A   It's right here.
8      Q   And is that where the defect was?
9      A   Yes.
10     Q   So the bottom line is, from your professional
11 opinion, that's objective evidence of arthritis?
12     A   Yes.
13     Q   And when you say he has posttraumatic changes
14 both medial and laterally from his original injury,
15 what did you mean by that? The last sentence in that
16 paragraph.
17     A   There's calcification both -- at the top of
18 both malleoli.
19     Q   Okay. And your impression -- and impression
20 is basically a diagnosis; is that right?
21     A   Yes.
22     Q   All right. So given your expertise and your
23 years of experience and your medical training and your
24 observations of this patient on January 3rd, 2005,
25 your diagnosis was posttraumatic arthritis, right

Page 137

1  ankle, secondary to osteochondral fracture?
2      A   Yes.
3      Q   The bottom line is, your medical opinion was,
4  as of that date, as a result of this chip that got
5  broken out of his ankle and all the procedures, he was
6  developing posttraumatic arthritis?
7      A   It's posttraumatic from the -- something
8  starts it, and then everything after that worsens it.
9      Q   Exactly. And that was your medical opinion?
10     A   Yes.
11     Q   And you held that opinion to a reasonable
12 degree of medical certainty?
13     A   Yes.
14     Q   And the opinions you've expressed here today,
15 have they all been to a reasonable degree of medical
16 certainty?
17     A   Yes.
18     Q   And do you still hold that opinion, that he
19 was exhibiting evidence of posttraumatic arthritis in
20 the right ankle, secondary to osteochondral fracture?
21     A   Yes.
22         MR. WEIDNER: I don't have any further
23 questions. Thank you for your time, Doctor.
24         MS. JOHNSON: I just have two.
25 ///

Page 138

1             FURTHER EXAMINATION
2  BY MS. JOHNSON:
3      Q   Your opinion of arthritis conflicts with
4  Dr. Brad Cruz's opinion; is that correct?
5          MR. WEIDNER: Objection. Form of the
6  question. It calls for speculation.
7      A   The x-ray report on the last x-ray and mine,
8  yes. I measured it very carefully, looking in the
9  specific corner where I know the original injury was.
10 He's looking at it, just reading an x-ray, without all
11 the clinical data.
12 BY MS. JOHNSON:
13     Q   Well, did you talk to him about his opinion?
14     A   No.
15     Q   Okay. So you don't actually know exactly
16 what he did when he came to that opinion, do you?
17     A   No.
18         MR. WEIDNER: Objection. Form of the
19 question.
20     A   No.
21 BY MS. JOHNSON:
22     Q   And then also your diagnosis of posttraumatic
23 arthritis is based upon the information that was given
24 to you about -- from Dr. Nolan, from Dr. Laufer, from
25 the x-rays, the MRIs, and your own observations; is

Page 139

1  that correct?
2      A   Yes.
3      Q   And you did not have the ability to go back
4  and look at the 2000 films to detect whether or not
5  there was any injury to the ankle prior to the 2002
6  injury?
7          MR. WEIDNER: Objection. Form of the
8  question. It calls for speculation.
9      A   I did not see previous x-rays. I did measure
10 the joint height on a previous x-ray that was, early
11 in the course, 3 millimeters.
12 BY MS. JOHNSON:
13     Q   But you have no knowledge of whether there
14 was any preexisting condition, correct?
15         MR. WEIDNER: Objection. Form of the
16 question.
17     A   Correct.
18         MS. JOHNSON: Thank you. No other questions.
19         MR. WEIDNER: I've just got a couple of
20 follow-up questions on that, Doctor.
21             FURTHER EXAMINATION
22 BY MR. WEIDNER:
23     Q   If I understand you correctly - and please
24 correct me if I'm wrong - it's your testimony that,
25 given your observations and including the fact that

Page 140

1  you saw a previous x-ray early in the course of
2  treatment after his injury, which was 3 millimeters,
3  and then you saw this x-ray of 2.5, your diagnosis was
4  posttraumatic arthritis; is that correct?
5      A   Yes.
6      Q   What's your level of certainty on that?
7          MS. JOHNSON:  Objection.  Foundation and
8  form.
9  BY MR. WEIDNER:
10     Q   Are you confident in that opinion?
11     **A   I think it's posttraumatic arthritis.  I**
12 **cannot absolutely date the onset of the trauma.**
13     Q   What do you see the significance of the fact
14 that early in the course of treatment there was
15 3 millimeters and then it went to 2.5?  What's the
16 medical implications of that?
17     **A   There's been wear and tear on the joint.**
18         MR. WEIDNER:  All right.  Nothing further.
19         VIDEOGRAPHER:  Are we concluded, Counsel?
20 Off record --
21         MR. WEIDNER:  Right.
22         VIDEOGRAPHER:  -- at 12:17.
23         (Off the record.)
24         (Back on record - stenographically recorded.)
25         MR. WEIDNER:  The record should reflect that

Page 141

1  we're back on the record of Dr. Geitz's deposition.
2          We had previously agreed - we still are
3  agreeing - that the court reporter can take his
4  original file, which has been marked as an exhibit,
5  and copy it and substitute a copy for the original.
6          The doctor has expressed a concern that the
7  appropriate procedures are followed under the HIPAA
8  Act, so I'm going to address a letter to the doctor,
9  to counsel for the defendants, and the court reporter,
10 enclosing a copy of the appropriate release so he can
11 then allow the court reporter to take the file out of
12 the office and copy it.
13         MS. JOHNSON:  Thank you.
14         (Proceedings concluded at 12:22 p.m.)
15         (Signature reserved.)
16         (Exhibit No. 1 marked.)
17                 -oOo-
18
19
20
21
22
23
24
25

Exhibit 1
page 3 of 3



**Unocal Alaska**
Union Oil Company of California
909 West 9th Avenue, P.O. Box 196247
Anchorage, Alaska 99519-6247
Telephone (907) 276-7600

# UNOCAL 76

March 7, 2003

Mr. Tom Scanlon
Safety Enforcement
OSHA
State of Alaska
Department of Labor
 & Workforce Development
P.O. Box 107022
Anchorage, AK 99510-7022

Dear Mr. Scanlon:

Following our discussion of Thursday, March 6, 2003 the following is provided:

- ~~Safety meeting minutes from Anchorage office from past year: no minutes provided. All safety meetings (with minutes) occur for offshore facilities only.~~ As a result of this, quarterly safety meetings (see attached sample agenda) will be implemented for Anchorage office.
- 200 & 300 logs for past 3 years: provided.
- ~~Periodic safety inspections: nothing provided. A system for the Anchorage office will be implemented.~~
- Siemen's contract: most current provided. The earliest contract we have with them is dated July, 1994.
- Steve Noey's company name: SJA Properties LLC
- Contact for Don Akers': 907/248-1475 (Sterling)

I also provided you with a copy of our Emergency Procedures for the Anchorage office.

Thank you.

Very truly yours

*Roxanne M Sinz*

Roxanne M. Sinz

Exhibit 2
page 1 of 1

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, et al.,           )
                                     )
            Plaintiffs,              )
                                     )
vs.                                  )
                                     )
UNOCAL CORPORATION,                  )
                                     )
            Defendant.               )
_____)

Case No. A 04-0096 CV   (JKS)

---

VIDEOTAPED DEPOSITION OF JOHN STALLONE

---

Pages 1 - 70
Friday, April 14, 2006
3:46 p.m.

Taken by Counsel for Plaintiffs
at
The Offices of Department of Labor & Workforce
Development
3301 Eagle Street, Suite 209
Anchorage, Alaska

RECEIVED
MAY 0 9 2006
WEIDNER & ASSOCIATES

COPY

Exhibit 3
page 1 of 2

PACIFIC RIM REPORTING   907-272-4383
www.courtreportersalaska.com

Page 20

1  things in there in the structure and they would be
2  responsible for removal, replacement or
3  refinishing of them.
4    Q  Could you turn to LG756?
5    A  Okay.
6    Q  The second paragraph it says, "OSHA
7  considers the Unocal office building to be a
8  multi-employer work site. Unocal is the creating
9  employer for this citation, period. It is the
10 responsibility and duty to exercise reasonable
11 care to prevent and detect safety hazards and/or
12 violations."
13      As the head of State OSHA, did you agree
14 with this statement in Mr. Scanlon's report?
15   A  Yes.
16   Q  And the next sentence, "According to the
17 March 7th memo from Roxanne Sinz, Unocal did not
18 conduct safety meetings for the office or
19 maintenance staff, nor did they conduct any
20 periodic safety inspections."
21      Would you consider that significant that
22 they didn't have safety meetings or periodic
23 safety inspections?
24      MS. JOHNSON:  Objection; foundation.
25   Q  (By Mr. Cohn)  Well, you can still

Page 21

1  answer.
2    A  No, I wouldn't.  That wouldn't be a
3  major issue for me.  They really are not required
4  to conduct safety meetings with contractors.
5  Periodic safety inspections would be nice, but,
6  again, it's not required by OSHA regulations.  We
7  encourage it obviously.  We encourage safety
8  meetings.  But, really, safety meetings, safety
9  plans, safety inspections are not required under
10 1910, but we do encourage them.
11   Q  So under 1910 -- well, the oil companies
12 on the North Slope, are they under 1910?
13   A  Yeah, they would be under -- they kind
14 of hit both.  If they're building something,
15 obviously then they're under 1926, but the normal
16 operation of a drilling rig is under 1910.
17   Q  So in a normal operation of a drilling
18 rig a company like Unocal or BP is not required to
19 have safety meetings or periodic safety
20 inspections?
21   A  I'd have to go back -- you're taxing --
22 3,000 regulations going through my brain and I
23 don't know them all, believe me.  I'd have to go
24 back to the specific standard of oil drilling and
25 see if there is -- there may be a requirement for

Page 22

1  a written safety plan.  I rather doubt it, though.
2  Do they have one?  Absolutely.  Companies of that
3  size don't go around putting things up like that
4  and not having safety plans.  They're very, very
5  good about that.
6    Q  Now, according to the deposition I took
7  of the former human resource manager, they did
8  conduct safety meetings and they did have periodic
9  safety inspections of the building.  So if
10 Mr. Scanlon was told to the contrary that they
11 didn't have such meetings or periodic safety
12 inspections, is that -- would that be significant
13 to you that he was not told the truth?
14   A  Well, yeah, it would start my wheels
15 turning as to why he wasn't -- now, let me ask you
16 a question:  Who supposedly had these safety
17 meetings then?  Siemens or Unocal?
18   Q  We're talking about Unocal.  It was a
19 Unocal building and it was a Unocal --
20   A  So, did they have safety meetings with
21 their own people or with other contractors as
22 well?
23   Q  Well, they had safety meet -- well --
24   A  I mean, because this is indicating to me
25 they didn't have them with Siemens, which would

Page 23

1  not, like I said, would not exactly be unheard of.
2  I mean, a lot of times people don't have safety
3  meetings with your contractors, although up on the
4  Slope they do a lot of that.  But if they had
5  safety meetings within Unocal family, okay, you
6  know, I kind of would expect that, but...
7    Q  Well, it just says here --
8    A  I don't like it when they don't tell
9  my -- the officers the, you know -- don't want to
10 use the word lie; that seems a little strong here,
11 but misinformation shall we say.
12   Q  Because it says in there Unocal did not
13 conduct safety meetings for the office.  It didn't
14 say with contractors.  It said for the office.
15   A  Okay.
16   Q  But we'll leave the language as it is.
17 I want to get to that informal conference you had.
18   A  Okay.
19   Q  I think that's LG737.
20   A  Isn't that what I've got right in front
21 of me or is it something different?
22      MR. MCKINSTRY:  It's the same thing,
23 just a different page.
24   Q  (By Mr. Cohn)  You know, there was one
25 other document you mentioned.  You said you look

Exhibit 3
page 2 of 2

8 (Pages 20 to 23)

Notes concerning visit by State of Alaska OSHA Inspector as compiled by Ken Burns, Drilling Safety Advisor

03/03/03 – Monday

State OSHA Inspectors Tom Scanlon and Lee Zhao (Trainee) came to the reception desk asking for Siemens. OSHA was advised that Siemens was not at this building. Both inspectors departed.

After lunch, Paul Crapps received a call from Tome Lake, Siemens Supervisor that State OSHA was at their office investigating a complaint from one of their employees regarding conditions (scaffolding) here at Unocal. Lake further advised that OSHA was on their way to Unocal.

I received a call from Roxanne that she wanted my assistance upon the arrival of OSHA.

At approximately 1440 hrs, I was notified by Paul Crapps that State OSHA was at the reception desk to conduct a Complaint Inspection. Paul further explained that several months ago a Siemens employee fell and hurt himself while working in the penthouse.

I responded to the front desk (reception) and was met by Paul Crapps, Tom Scanlon and Lee Zhao from State OSHA and Tom Lake, Siemens Supervisor. Tom Scanlon presented credentials and business card and explained that he was here to conduct a complaint inspection. He introduced Lee Zhao as a trainee. Mr. Zhao did not have either a business card or credentials. Tom Scanlon presented the complaint form from a confidential source. The complaint alleged that Unocal had improper scaffold erected in the penthouse. I escorted OSHA and others previously mentioned to Roxanne's office. Together we discussed the complaint. Scanlon stated that he wanted to view the location listed on the compliant and to take some photographs of the scaffolding. I asked Tom if he was going to conduct an Opening Conference and he replied that he had some papers but he would do an opening conference later. He made reference that the paper work was too detailed or lengthy to do at that time.

Tom Scanlon, Lee Zhao, Tom Lake, Paul Crapps and I went to the Penthouse and allowed the inspectors to view the area of the complaint. Prior to entering, Paul had to shut the air conditioner down because of the noise and wind velocity in the filter chamber. Tom Scanlon and trainee Lee Zhao entered the chamber and proceeded to take photograph and measurements. Both Tom Scanlon and Lee Zhao climbed the ladder and exposed themselves to the open-sided platform. One significant question was asked. "Who erected this scaffolding?" No one knew the answer. It was obvious from the structure that it had been erected many years ago. At approximately 3:35 pm, the party departed for the reception area. The OSHA inspectors signed out at 3:43 and departed. Prior to departing, I asked Scanlon if he was going to conduct a closing and he replied "No."

Later in the afternoon, after briefing Roxanne, I was requested (e-mail) by the Law Department and Roxanne to

REDACTED


DEPOSITION EXHIBIT 7-14-06 SCANLON

Exhibit 4
page 1 of 1

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3

4    LAWRENCE H. GROVE, CYNTHIA        )
     GROVE, SARAH GROVE, and MICHAEL   )
5    GROVE (DOB 1/21/88) by and        )
     through his father, LAWRENCE H.   )
6    GROVE,                            )
                                       )
7              Plaintiffs,             )
                                       )
8    vs.                               )
                                       )
9    UNOCAL CORPORATION,               )
                                       )
10             Defendant.              )
     _____)
11   Case No. 3:04-cv-0096-TMB

         VIDEOTAPED DEPOSITION OF NOAH LAUFER, M.D.

                       Pages 1 - 67
                 Friday, October 20, 2006
                      12:30 P.M.

                           at
                 MEDICAL PARK FAMILY CARE
        2211 East Northern Lights Boulevard, Suite 101
                     Anchorage, Alaska

Exhibit 5
page 1 of 2

RECEIVED OCT 2 5 2006
COPY

Page 36

1  Q. Okay. Who is Dr. Lanza?
2  A. He's another family doctor who has since
3  left Medical Park.
4  Q. Do you know where he is now?
5  A. He has a new practice. I think it's called
6  Alyeska Family Care or something like that.
7  Q. So he's still in town?
8  A. He's still in town.
9  Q. Okay. And he is doing a follow-up for you;
10 is that correct?
11 A. Well, that's -- I don't know why he saw Dr.
12 Lanza. He had seen Dr. Lanza prior to seeing me.
13 Q. Okay.
14 A. So it may have been preference, or it may
15 have been that I was not available. I don't know.
16 We do see each other's patients, though, fairly
17 frequently.
18 Q. So you cover for each other --
19 A. Yeah.
20 Q. -- when necessary?
21 A. Um-hum.
22 Q. Okay.
23 A. Looks like the next time I saw Lawrence --
24 that was one of your questions, right?
25 Q. Right.

Page 37

1  A. Oh, looks like 8/28 of 2002.
2  Q. Okay. So let's go back to Dr. Lanza's just
3  for a minute. Here he's confirming that the patient
4  has a significant alcohol consumption of four or more
5  alcoholic beverages daily. Did you review this note
6  before today?
7  A. I did see it yesterday evening.
8  Q. Okay. Can you tell us why alcohol
9  consumption would be relevant to blood pressure?
10      MR. COHN: Objection to form, foundation.
11      THE WITNESS: Can I answer the question
12 or --
13 BY MS. JOHNSON:
14 Q. Yes, please do.
15 A. One of the causes of high blood pressure is
16 drinking, and it's actually -- it would definitely be
17 relevant.
18 Q. And how does alcohol affect blood pressure?
19 A. That's a good question.
20 Q. Okay.
21 A. But certainly very frequently we'll see
22 elevated blood pressures the day after drinking or in
23 someone who is drinking too much.
24 Q. Are there any studies that you've read on
25 that?

Page 38

1  A. I can't cite a specific study, no.
2  Q. Okay. Where did you -- do you know where
3  you acquired that knowledge?
4      MR. COHN: Objection. Foundation.
5      MS. JOHNSON: That's what I'm looking for
6  is the foundation.
7      MR. COHN: Form.
8      THE WITNESS: I think it's fairly commonly
9  known among doctors. Certainly I heard about it in
10 medical school and saw it in residency and have seen
11 it since.
12 BY MS. JOHNSON:
13 Q. Have you seen that in your own patients,
14 then? You've confirmed that?
15 A. Yes. Yeah.
16 Q. Okay. So what would be a -- to you, what
17 would be an amount of alcohol that might have an
18 effect on someone's blood pressure?
19     MR. COHN: Form, foundation.
20     THE WITNESS: I couldn't tell you that, and
21 it would depend on the person.
22 BY MS. JOHNSON:
23 Q. Okay.
24 A. Yeah. It's not, you know, necessarily a
25 direct correlation. It's just one of these things we

Page 39

1  look for when we're trying to care for people and
2  help them live healthier.
3  Q. So Dr. Lanza has written that the patient
4  told him that there was four or more alcoholic
5  beverages daily and asked him to discontinue alcohol
6  completely.
7  A. Yes.
8      MR. COHN: Objection to the form,
9  foundation.
10     MS. JOHNSON: There is not a question yet,
11 Mike. Let me -- let me finish.
12     MR. COHN: Well, you're --
13     MS. JOHNSON: Hold on. Let me finish.
14     MR. COHN: -- saying what is said. This is
15 what's written down in here. We don't know what was
16 actually said.
17     MS. JOHNSON: Okay. Let me finish.
18     THE WITNESS: That's true.
19 BY MS. JOHNSON:
20 Q. If you saw someone with alcohol consumption
21 of four or more beverages daily, would you recommend
22 discontinuing alcohol --
23     MR. COHN: Objection. Form, foundation.
24 BY MS. JOHNSON:
25 Q. -- if they had high blood pressure?

Hal Egbert                                                                    3:04-CV-0096-TMB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and MICHAEL
GROVE (DOB 1/21/88) by and through
his father LAWRENCE H. GROVE,

    Plaintiffs,

-vs-

UNOCAL CORPORATION,

    Defendant.
_____/
Case No. 3:04-cv-0096-TMB

RECEIVED
NOV 0 9 2006
WEIDNER & ASSOCIATES

VIDEO DEPOSITION OF HAL EGBERT, P.T.

VOLUME I

Pages 1 - 101, inclusive

October 18, 2006, 9:53 a.m.

Anchorage, Alaska

Exhibit 6
page 1 of 4

Page 1

Hal Egbert                                                          3:04-CV-0096-TMB

Page 82

1      THE WITNESS: Yes, it's significant.
2      MS. JOHNSON: Objection. Foundation.
3  BY MR. COHN:
4      Q. What does that convey to you as a -- with your
5  25 years of experience as a physical therapist?
6      A. He's going to have a stiff ankle.
7      Q. Stiff ankle for how long?
8      A. Probably the rest of his life.
9      Q. And when you say a stiff ankle, do you mean a
10 decreased range of motion?
11     A. Yes.
12     Q. And would you expect that when he uses that
13 ankle, he would have increased swelling?
14     A. Yes.
15     Q. And that's not going away?
16     A. It may not go away.
17     Q. Now, there's some talk about osteoarthritis.
18 Is that a progressive disease?
19     MS. JOHNSON: Objection. Foundation.
20     THE WITNESS: It can be.
21 BY MR. COHN:
22     Q. Well, does osteoarthritis clear up?
23     A. It can improve with loosening up and getting
24 more exercise at times, research shows.
25     Q. In this case, given that he was two and a half

Page 83

1  years post-injury and already having a second ankle
2  surgery and another surgery for his osteoarthritis, does
3  that indicate that it hasn't gotten -- improved?
4      MS. JOHNSON: Objection. Foundation.
5      THE WITNESS: I just saw Mr. Grove five weeks
6  after his second operation and most of what I saw I
7  attributed to his operation.
8  BY MR. COHN:
9      Q. Let's see, it said here on your April 19th,
10 2005 letter to Dr. Chang that he had surgery,
11 approximately, March 8th, 2005 and he was treated for
12 debridement of chronic osteoarthritis. What does the
13 word "chronic" mean?
14     A. Usually more than three months.
15     Q. And in this case, if it's two and a half years
16 that is obviously more than three months.
17     MS. JOHNSON: Objection, foundation, form of
18 the question.
19     THE WITNESS: He has reported to have
20 osteoarthritis -- chronic osteoarthritis, so I
21 don't know where I got that term. If it wasn't
22 from Dr. Chang, it was my interpretation
23 apparently.
24 BY MR. COHN:
25     Q. In Dr. Chang's operative report of March 8th,

Page 84

1  2005, he says --
2      MS. JOHNSON: Where are you reading that?
3      MR. COHN: This is from your defendant's 14
4  supplement to initial disclosure.
5      MS. JOHNSON: So is that Chang or Geitz?
6      MR. COHN: Chang. 302489 is the number.
7      THE WITNESS: I have an order on 4/6/05, is
8  that it?
9      MR. COHN: No, it's not your record but he
10 said --
11     THE WITNESS: I don't have that information.
12     MR. COHN: Right. But the findings of Dr.
13 Chang is heavy soft tissue overgrowth to
14 anterolateral gutter with anterolateral synovitis.
15     THE WITNESS: Synovitis.
16 BY MR. COHN:
17     Q. What is synovitis?
18     A. It's an inflammation of your synovium, which is
19 the inner lining of a joint.
20     Q. And how significant is that for -- in treating
21 an ankle?
22     A. It's very significant.
23     Q. How does it affect the ankle?
24     MS. JOHNSON: Objection. Foundation.
25     THE WITNESS: Well, for any joint that's

Page 85

1  inflamed, for synovium -- synovium imbibes all the
2  house cleaning of the joint. It takes the synovial
3  fluid and cleans it up and filters out normal wear
4  and tear and then imbibes that material and
5  disposes of it. And when the synovium is red or
6  inflamed by diagnosis, that means it's reactive and
7  active. It's doing a hard job in trying to keep
8  the joint clear.
9  BY MR. COHN:
10     Q. In regard to the findings of heavy soft-tissue
11 overgrowth, Dr. Chang said the capsule joint showed
12 there was a tremendous amount of soft tissue in the
13 anterior capsule encroaching into the anterior part of
14 the ankle joint for medial to lateral. Do you know what
15 that means?
16     A. He's got soft tissue blocking his talus from
17 full motion. You know, usually if it's an anterior
18 structure, it blocks plantar flexion at a certain point
19 and you have to have a little bit of separation, a small
20 amount, a couple millimeters to have full dorsiflexion
21 and it might restrict that from separating a bit from
22 the medial to lateral side.
23     Q. Is it significant to you that he's had a second
24 ankle surgery for some of his injuries?
25     A. Yes, it's significant.

Exhibit 6
Page 2 of 4

22 (Pages 82 to 85)

Hal Egbert                                                                   3:04-CV-0096-TMB

Page 86

1  Q. And in your opinion -- I think you stated
2  previously, with your expertise as a physical therapist,
3  expect that even if he had physical therapy that these
4  injuries will remain?
5  A. Yes, that's my impression.
6  Q. And you didn't have any -- in your test, you
7  did not find that Mr. Grove was being untruthful in
8  trying to comply with what you did --
9  A. No.
10 Q. -- when you were treating him?
11 A. No. He never -- he never gave me any
12 indication that he was distrustful.
13 Q. Now, do you know why Mr. Grove did not return
14 to you on both occasions?
15 A. No.
16 Q. Did he ever call you up and talk to you about
17 why he wasn't coming back?
18 A. If he did, I don't recall it. He might have,
19 but I just don't recall if it's not in the record.
20 Q. If he called you, would you have definitely put
21 it in the record?
22 A. No.
23 Q. Have you, on occasion, had patients not return
24 because they feel the therapy, itself, is causing pain?
25    MS. JOHNSON: Objection. Foundation.

Page 87

1     THE WITNESS: There's a certain percentage of
2  patients that don't continue physical therapy for
3  reasons that are beyond what we agree to or what is
4  expected in a course of treatment. It's a pretty
5  high percent.
6  BY MR. COHN:
7  Q. But not all of these people are discontinue --
8  are these people discontinuing physical therapy --
9  strike that -- start over.
10    When Mr. Grove saw you, was it your impression
11 that he was trying?
12 A. Yes. Definitely he was trying.
13 Q. You mentioned the cartilage death and bone
14 death. Was that in regard to the talus removal?
15 A. The talus had some bone that was removed and
16 then the bone was roughened up to bleed and that would
17 facilitate a different kind of cartilage to come in
18 eventually.
19 Q. All right. We didn't go through that but in
20 terms of the -- the talus bone, the effect, would that
21 have an effect on plantar?
22 A. The talus is most of the motion for plantar
23 flexion and dorsiflexion. The talus has almost all that
24 motion, if not all.
25 Q. In terms of the tendon injury, what effect, if

Page 88

1  any, would that have on the ankle?
2     MS. JOHNSON: Objection to the foundation.
3     THE WITNESS: If you had both lateral
4  reconstruction -- which uses the outside peroneal
5  tendon, apparently, in this man -- and the
6  posterior tibialis sheath -- which was an injury,
7  both of those tendons are a checkering for
8  inversion and eversion and stabilization of an arch
9  and the big toe stabilization.
10 BY MR. COHN:
11 Q. Was there any reference at all to chronic
12 posterior tibialis tendon problems; do you recall in
13 your notes?
14 A. Yeah. Well, along the posterior medial
15 malleolus where the posterior tibialis tendon goes,
16 there's a nerve right next to it. And by tapping that
17 area, there was a tingling into his arch and foot, and
18 there was also tenderness along his medial malleolus
19 more than his lateral fibula. So it would appear that
20 his medial-posterior tibialis area was having some
21 problems and his lateral reconstruction was doing better
22 than his medial ankle.
23 Q. I guess the last one was the -- when you're
24 talking about lateral, are you talk -- there was also a
25 lateral ligament reconstruction?

Page 89

1  A. Right. That's my understanding.
2  Q. And what would that affect?
3     MS. JOHNSON: Foundation.
4     THE WITNESS: Usually it will affect range of
5  motion somewhat so that your inversion, your
6  tipping in, would be reduced. Sometimes your
7  eversion is a little bit weaker.
8  BY MR. COHN:
9  Q. Now, in your opinion, is Mr. Grove's ankle
10 going to be as good as it was before his injury?
11    MS. JOHNSON: Objection. Foundation.
12    THE WITNESS: In my opinion, his ankle will not
13 be as good as it was before the surgery -- before
14 his injury.
15 BY MR. COHN:
16 Q. As somebody that's treated people -- Mr. Grove,
17 on April 19th, 2005, he indicated he was a 52-year-old
18 gentleman at that time. What would you expect in terms
19 of his ankle function as he gets older?
20    MS. JOHNSON: Foundation.
21    THE WITNESS: Shortened stride length; not be
22 able to run; difficult time with cross-country
23 skiing, going up and down the mountains; long hikes
24 might be painful; squatting to go down to get
25 something low down would be restricted.

Exhibit 6
page 3 of 4

23 (Pages 86 to 89)

Page 90

1  BY MR. COHN:
2      Q. Climbing stairs or any --
3      A. Climbing stairs might be restricted, maybe not.
4  Depending on his sole of his boot and how strong it is
5  and how often he had to do it.
6      Q. Would you expect this gentleman at 52, would
7  his ankle continue to degenerate from these injuries as
8  he reaches his 60s and 70s?
9      MS. JOHNSON: Form and foundation.
10     THE WITNESS: I would expect him to stiffen up
11  a bit. It may not be a painful stiffness, though.
12  BY MR. COHN:
13     Q. By "stiffen up", do you mean losing range of
14  motion?
15     A. Losing some range of motion, yes, on the
16  ankle -- up an ankle. Down mostly.
17     Q. And it's your understanding that use of the
18  ankle -- the more he uses the ankle, the more he will
19  have pain and swelling?
20     A. If he does a lot in a brief period of time, he
21  might -- I'm just speculating.
22     Q. In regard to his physical condition and what
23  you could expect in regard to his ankle, would you defer
24  to his doctors, Geitz and Chang?
25     A. Yes. You know, I didn't write down

Page 91

1  expectations for -- other than return to work, and on my
2  second assessment it was just return to longer distances
3  but I don't know of his work status at that point.
4      Q. I'm glad you brought that up. When you set
5  goals, those are -- are those hopes that you --
6      A. What we hope to achieve. Something that is,
7  hopefully, measurable and hopefully that the patient can
8  meet in a time frame that we set.
9      Q. But you're not -- when you set those goals,
10  you're not indicating that those goals will be reached?
11     A. Well, they're goals. They're not the outcome.
12     Q. And in some cases even though you'd like those
13  goals to be reached, they just aren't achievable; is
14  that fair to say?
15     A. Some people don't achieve goals, that's true.
16     Q. And sometimes they don't achieve the goals
17  because the injuries are too severe and won't respond as
18  well to treatment as you hoped; would that be fair to
19  say?
20     A. True.
21     MS. JOHNSON: Form.
22     THE WITNESS: That's fair to say.
23     MR. COHN: I don't have any further questions.
24     MS. JOHNSON: Just a couple of questions.
25

Page 92

1       FURTHER EXAMINATION
2  MS. JOHNSON:
3      Q. Did you ever advise Mr. Grove not to return to
4  work?
5      MR. COHN: Objection to the form of the
6  question.
7      THE WITNESS: I doubt that I would. I don't
8  have a record of that.
9  BY MS. JOHNSON:
10     Q. Did you ever tell him that he would never be
11  able to work again?
12     A. I would never have said that either.
13     Q. You said that as Mr. Grove was working hard --
14  let me rephrase that. As Mr. Grove was working hard in
15  2003, he did make some progress with you --
16     A. He did make progress.
17     Q. And if you had continued to see him in 2003,
18  would you have expected that he would continue to make
19  some progress?
20     MR. COHN: Objection. Vague, speculation.
21     THE WITNESS: The progress was at a good pace
22  before I didn't see him anymore. So I would expect
23  a little more progress.
24  BY MS. JOHNSON:
25     Q. And he had not reached a plateau yet; correct?

Page 93

1      A. No, he had not.
2      Q. So even if a patient has a setback, would you
3  expect that they could go forward and make some more
4  progress?
5      A. Yes.
6      MR. COHN: Objection. Foundation.
7      THE WITNESS: Yes, I would.
8  BY MS. JOHNSON:
9      Q. And in 2005, do you have any measurements of
10  Mr. Grove's range of motion after your first exam?
11     A. No, I don't.
12     Q. If you had continued to see him, do you have
13  any reason to believe that Mr. Grove would not have
14  continued to make progress in 2005?
15     MR. COHN: Objection. Foundation, form,
16  speculation.
17     THE WITNESS: I would have expected him to make
18  some progress from my initial exam.
19     MS. JOHNSON: I don't have any other questions.
20     MR. COHN: Just a couple of follow-ups. Exhibit 6
21     FURTHER EXAMINATION       page 4 of 4
22  BY MR. COHN:
23     Q. While you indicated that you might -- you'd
24  expect him to make some progress, when you say "some"
25  what do you mean by that?