GROVE v. UNOCAL                                                          TOM SCANLON
                                                                         4/14/2006

Page 94

1  Q  Now, this platform that you've seen the
2  photos, that you've inspected, would you have
3  considered it a hazardous work platform?
4  A  I'm not going to speculate.
5  Q  Well, there were citations issued for
6  violation of --
7  A  Well, it was hazardous because they did
8  not have any fall protection. From that
9  standpoint, yes. I guess I thought you were
10 talking about the structural integrity.
11 Q  Well -- well, the point I'm getting at
12 is if -- you know, you said, you know, you've
13 managed places and you've had safety techs.
14 A  Right.
15 Q  Safety techs go and do a hazard
16 assessment. If a safety tech -- a
17 properly-trained safety tech does a hazard
18 assessment, should this have been -- would this be
19 considered a hazardous platform?
20 A  In all likelihood, yes. There was no --
21 now, somebody -- and you've got to back up and
22 take all the factors into consideration. I don't
23 know if they required them to use some type of
24 other fall protection, i.e., body harnesses. If
25 that's the -- it still wasn't going to be a great

Page 95

1  one, but if he was using some other type of fall
2  protection, i.e., body harness and lanyard --
3  Q  Well, where would the body harness, from
4  your examination, be attached to?
5  A  The anchor point?
6  Q  Yes.
7  A  Oh, it easily could have -- usually what
8  they're done in this type of situation, they
9  anchor it up in the ceiling.
10 Q  Did anybody point out or tell you that
11 there was any anchor point or --
12 A  No.
13 Q  -- or any fall protection used?
14 A  None, to my recollection.
15 Q  It says -- the next sentence, the
16 paragraph on your Safety Narrative on 749 talks
17 about, "I conducted an opening conference with
18 Roxanne Sinz."
19 A  Right.
20 Q  And we talked about this before, that
21 she had just been assigned the responsibility. It
22 says, "has the responsibility for Unocal office
23 building maintenance. She had just been assigned
24 this responsibility the previous week. Discussed
25 all the items on the pre-inspection checklist and

Page 96

1  inspection guide lists."
2  When they say the pre-inspection
3  checklist, what are we talking about there? Are
4  we talking about the documents on L50 and LG751?
5  A  It's on our written, and it should be in
6  there, the inspection form. We ask them
7  permission. We tell them about taking pictures.
8  We ask them if there's anything confidential.
9  There's eight or ten items. Rather than talking
10 about it, we should just look for it.
11 Q  Right. I think I see something --
12 A  Right there. Go to the page before.
13 That's the people who attended. Right there. You
14 go through this list and then this list
15 (indicating).
16 Q  Well, you were just looking at a
17 document that is LG714 and 715. That was a
18 checklist from the Siemens file.
19 A  I'm sorry. What was the number?
20 Q  LG714 and 715.
21 A  In Siemens, not in --
22 Q  Right, but it will still be in that same
23 packet of material.
24 A  Well, it should be -- it should be in
25 Unocal.

Page 97

1  Q  There should be a separate one in there
2  for Unocal --
3  A  Yeah, right here.
4  Q  -- with the same checklist. L60 on
5  the -- 760. And it's just a standard boilerplate
6  where you check that you showed them your
7  credentials and legal authority. If you have to,
8  you explain to them about the 1970 OSHA Act,
9  purpose of inspection, permission of the name for
10 whoever you have to ask permission to proceed.
11 We explain the camera and equipment. We
12 ask them to declare any trade secrets at this
13 time. We tell them that if somebody is pouring
14 gas out the back door, we're going to call EPA.
15 Just standard routine stuff.
16 Q  Okay. Can you take a look at -- well,
17 let's see. Let's continue on that same document,
18 LG749. It says you conducted an opening
19 conference with Roxanne Sinz.
20 What is the opening conference?
21 A  Just this. What we --
22 Q  Oh, the pre-inspection list.
23 A  Right -- well, we go through and get all
24 this type of information, name, address, mailing
25 address, parent corporation, private sector,

25 (Pages 94 to 97)

GROVE v. UNOCAL                                                          TOM SCANLON
                                                                          4/14/2006

Page 98

1  public sector, legal entity. The type of, you
2  know, we ask them at that point for their 300
3  logs.
4      Q  And then it says you -- further on down
5  you talked about the logs and then further on you
6  said -- it looks like you went back to the
7  penthouse again.
8      A  Yes. Right, we did.
9      Q  It says, "Ms. Sinz and Mr. Crabbe" --
10 that's a misspelling; it's Paul Crapps --
11 "accompanied me to the rooftop mechanical room
12 (penthouse) to take additional pictures.
13 Interviewed Mr. Crabbe." I think his name is with
14 P's, but...
15         Do you recall taking additional pictures
16 when you went back?
17     A  I know we tried. Again, the lighting
18 was extremely poor and the cameras were not --
19 would not just take them with the naked --
20     Q  Right. And it says you interviewed
21 Mr. Crabbe (sic). Do you recall taking any notes
22 in your interview that you might have anywhere?
23     A  I might have. I don't remember doing
24 it. I don't think it was all that -- it was
25 pretty cut and dry.

Page 99

1      Q  And it says, "At this time I requested a
2  current copy of the Unocal Siemens service
3  contract."
4         Why did you do that?
5      A  That is protocol for us.
6      Q  And do you recall receiving a copy of
7  it?
8      A  Yes. I believe it was somewhere in
9  there.
10     Q  We'll look and see. Do you recall
11 seeing a copy of that in there?
12        I'm directing that to Ms. Johnson.
13        Okay. And then, it says --
14     A  Actually, I don't know if Roxanne could
15 find it. I remember maybe Tom Lake provided it,
16 because it -- I believe it stipulates that whoever
17 owns the building has to take care of certain
18 things. I don't remember. But I do know that
19 that was an issue.
20     Q  Actually, that's at the bottom of your
21 narrative, which I'll get to in a second. It says
22 the -- then it has a list of people that you --
23 are these individuals that are listed here, in
24 your best recollection, you interviewed or talked
25 to during your investigation, Brent Davies, Larry

Page 100

1  Groves, Dan Hartan --
2      A  Right, either the Siemens or these. I
3  mean, you don't go back and --
4      Q  -- Charles Arnett, Paul Crapps, Archie
5  Cook. And then it says, "The day after the
6  inspection Ms. Sinz directed Paul Crabbe to
7  dismantle the work platform and to remove a
8  stepladder that was used to access the platform."
9         What's the basis of that statement? How
10 do you have knowledge of that?
11     A  I don't remember, but supposition is
12 that Ms. Sinz told me. I think she called me and
13 told me.
14     Q  Yeah, I mean, we're just trying to find
15 out...
16     A  I don't remember.
17     Q  That's fine.
18     A  Roxanne called me a number of times
19 because she was so new to the situation and had
20 never done anything with OSHA, and she was just
21 letting me know that she was very proactive.
22     Q  Okay. And then the next sentence says,
23 "On September 9th, 2002 the work platform had
24 collapsed while a Siemens employee was standing on
25 it while replacing filters. Unocal management

Page 101

1  directed Paul Crabbe, Unocal building maintenance
2  technician, to replace the platform after it had
3  collapsed."
4         Is that where you get the statement that
5  you put into your notes that's in Deposition
6  Exhibit 4 where you say, "After the accident on
7  9/9/2002 Unocal management directed the platform
8  be put back up"?
9      A  Correct.
10     Q  And do you recall -- do you have any
11 recollection of Unocal management telling you that
12 that's what happened?
13     A  No. I believe that that came from
14 either Mr. Grove or Mr. Crabbe himself.
15     Q  But you don't know from who?
16     A  I don't know.
17     Q  Did you discuss this at all with Roxanne
18 Sinz?
19     A  I don't remember.
20     Q  Now, you said it might have come from
21 Larry Grove. But do you recall Larry Grove
22 working in the building after the accident?
23     A  Oh, I think Larry might have told me
24 that.
25     Q  Might have told you that they put it

26 (Pages 98 to 101)

Page 102

1  back up?
2  A  Right, that somebody had directed them
3  to do it. Not that he did it; I think he was
4  injured. To make it easy, I don't remember. I
5  mean, I just -- I don't have a recollection.
6  Q  Well, if Larry Grove had told you that,
7  would you try and confirm whether that actually
8  had happened by talking to the people that would
9  -- from the Unocal management?
10 A  I don't know. That's logical, but,
11 again, you've got to understand the situation -- I
12 go back to the situation. Roxanne was new to the
13 position. The preceding fellow was -- did not
14 have much time for me, so I guess it's not worth
15 it for me to speculate. I don't know.
16 Q  Well, I'm just -- all I'm doing is --
17 A  Right.
18 Q  You just tell me what you know.
19 A  Right.
20 Q  I mean, I'm just taking the statement
21 you put in your report. That's all I have. I
22 have nothing from any other source after three
23 years of litigation. Then the next paragraph we
24 have is, "The Siemens/Unocal service contract
25 dated May 31, 2000 stated in Article 6, Customer

Page 103

1  Responsibilities: Quote, Customer, paren, Unocal,
2  unparen, will be solely responsible for any
3  removal, comma, replacement, comma, or refinishing
4  of the building structure or finishes that may be
5  required to begin access to the equipment."
6      First of all, why would you put -- where
7  did you get that statement? Did you get that
8  statement from the contract or from some --
9  A  From the contract, the document.
10 Q  And did you -- did you consider that
11 significant? Is that -- was that why it's in your
12 Safety Narrative?
13 A  Yes. I mean, you go back to the
14 multi-employer work site and who is the
15 controlling, the creating, et cetera.
16 Q  I'm going to see if I have an extra copy
17 of the document. I want to show you what was
18 Exhibit 3 to the deposition of -- it's called a
19 30(b)(6) deposition of Siemens Technology where I
20 attempted to get their records. And this was --
21 it was a fellow named Doug Schutte that appeared
22 and he presented me with contract documents. And
23 one of the documents that he presented says,
24 Unocal Technical Support Program Proposal, which
25 was signed by Unocal, and it's got under Article

Page 104

1  6.3, if you can read what it says under 6.3 there.
2  And then --
3  A  6.3, "Customer will provide SBTI with
4  reasonable means of access to the equipment and
5  shall make any necessary provisions to reach the
6  equipment and peripheral devices. Customer will
7  be solely responsible for any removal, replacement
8  or refinishing of the building structure or
9  finishes that may be required to gain access to
10 such equipment."
11 Q  Does that appear to be the document --
12 or that last sentence is identical to the sentence
13 in your Safety Narrative.
14 A  Correct.
15 Q  Would that appear to be a document that
16 you might have gotten it out of?
17 A  Right.
18 Q  And what does that convey to you where
19 it says, "SBTI" -- I'll represent that is Siemens
20 Building Technology, Inc. --
21 A  Right.
22 Q  And when it says, "Customer," Unocal --
23 A  -- is the customer.
24 Q  It says, "Will provide reasonable means
25 of access to the equipment."

Page 105

1      What does that convey to you in terms of
2  responsibility for providing means to change the
3  filters in the filter room and who has the
4  responsibility under that provision?
5      MS. JOHNSON: Objection; foundation;
6  calls for legal conclusion. Go ahead.
7  A  Well, you could interpret that as saying
8  that the customer, Unocal, was to provide not only
9  access but any means to do that. Siemens, as a
10 matter of protocol and their procedure, does
11 provide ladders. And I believe there's somewhere
12 in the narrative is they used to carry their
13 ladder up. But, again, what floor were you at the
14 penthouse? I mean, you were at the seventh,
15 eighth, ninth floor? And they banged the walls
16 and they had to go back and repaint the walls. So
17 instead of bringing their ladders up, which they
18 carry on their trucks -- if you look at any of the
19 Siemens trucks, they do have extension ladders --
20 they decided to use what Unocal had provided.
21 Q  (By Mr. Cohn) Can we mark this
22 document, which is Exhibit 3 to the Schutte
23 deposition, as Exhibit 10 to this deposition?
24     (Exhibit 10 marked.)
25 Q  If we go to the next page, which is

Page 106

1  LG750 --
2  A  Right.
3  Q  -- it says, "Discussed closing
4  conference on April 4th with Ms. Sinz and
5  Mr. Burns."
6      Shall we go off record for a second?
7      THE VIDEOGRAPHER: Going off record.
8  The time is 11:47.
9      (Break taken.)
10     THE VIDEOGRAPHER: Back on the record.
11 The time is 11:47.
12  Q  (By Mr. Cohn) And it says -- go back to
13 what we were saying, had the closing conference.
14 "Discussed all of the items on the closing
15 conference checklist. Discussed potential
16 violation for unguarded platform that was four
17 feet or higher from the next level. Gave Ms. Sinz
18 copy CPL 2-0124 multi-employer citation policy."
19      Is that the policy form that you were
20 talking about getting for us?
21  A  Right.
22  Q  "And the copy of OSHA regulations
23 1910.23, paren, little c, unparen, paren, 1,
24 unparen, protection on open-sided floors,
25 platforms and runways. Explained that OSHA

Page 107

1  considered the work site a multi-employer location
2  and that Unocal Alaska was the creating employer
3  in regards to the citation. And the structure in
4  question was a work platform rather than a
5  scaffold."
6      And I think we've already talked about
7  all that before. And -- I want to just keep going
8  further on here. And it says on 752, which was
9  Evaluation of Employer's Overall Safety and Health
10 program. It says, Employer has a health and
11 safety program on the general industry.
12     Did you see their health and safety
13 program? It's checked off yes?
14  A  Yes, I did see it. Did I look at it
15 with any detail? No. I guess -- actually, it was
16 very copious, as most oil companies are, and
17 I just made the assumption, I believe, that there
18 was multiple three-ring binders with their policy.
19  Q  And on the Closing Conference Notes it
20 said, Any unusual circumstances encountered, and
21 you checked off yes. Why did you check off yes on
22 that?
23  A  Because Mr. Burns was an ex-OSHA
24 employee, and he stated during the closing
25 conference that the citation would not go any

Page 108

1  further. He was telling Roxanne, don't worry
2  about it, it's not going to go anywhere. And he
3  came into the informal conference and his argument
4  was that Lee and I had put ourselves at risk by
5  being on that second floor. He had not done his
6  research to look at the letter of interpretation.
7      We allow construction foremen or
8  whoever, if they're going to go up and -- before
9  they start a job to inspect it, they don't have to
10 have fall protection. We are covered under that
11 same premise, with the idea is that we're aware of
12 the hazards and we're not going to put ourselves
13 in any undue danger.
14  Q  And if you look at LG753, which is the
15 last page on that document; is that your
16 signature?
17  A  Correct.
18  Q  And the date, April 9th, '03. So this
19 is the date you signed this Safety Narrative
20 report?
21  A  I believe so.
22  Q  On LG754, which on the top it says
23 Worksheet and it's got on it, Thursday,
24 April 10th, 2003, it says, "Protection of
25 open-sided floors, platforms and runways." Is

Page 109

1  this the citation that was issued to Unocal 76
2  Incorporated?
3  A  Correct.
4  Q  And that was for violation of a standard
5  having a platform four feet or more above the
6  adjacent floor that was not guarded by a rail or
7  equivalent?
8  A  Correct.
9  Q  And it says, "Employee was exposed to
10 fall hazard due to unguarded open side of
11 platform." Is that what it says there?
12  A  Correct.
13  Q  And there's something -- is it crossed
14 out or you just highlighted? It says, Located 909
15 West 9th Avenue.
16  A  Tom Bernicke was, again, my immediate
17 supervisor at the time and he crossed the address
18 out. Don't ask me why.
19  Q  But TB is --
20  A  Tom Bernicke.
21  Q  Oh, okay. It's with a B. I was
22 spelling it with a V before. Bernicke.
23     On the next page, LG755, under No. 23 it
24 says, "Employer knowledge, colon, yes, comma,
25 Unocal management acknowledged during inspection

Page 110

1  and subsequent conversations with OSHA safety
2  officer" -- would that be you?
3      A   Correct, and/or Lee, but I'm sure it was
4  me.
5      Q   "That the platform had been in place
6  for, quote, years and years, unquote, probably
7  back to the '70s. One employee who had worked for
8  Unocal -- worked for 12 years at Unocal said the
9  platform had been there when he started work."
10         And this is information that Unocal
11 management told you?
12     A   Yes.
13     Q   If Siemens had began this contract less
14 than 12 years before, would that indicate to you
15 that Siemens hadn't built that platform?
16         MS. JOHNSON: Objection; foundation.
17     A   Rephrase the question.
18     Q   (By Mr. Cohn) Let me start over. Do
19 you have any information that Siemens itself built
20 that platform?
21     A   None. I believe Siemens -- when did
22 their contract go into place? Was it '94?
23     Q   Possibly.
24     A   I don't think they could -- they weren't
25 sure that -- there was no current status because

Page 111

1  nobody could find their records on Siemens part or
2  whatever. But somebody speculated it was '94,
3  '96, but it was purely speculation.
4      Q   I forget. What document is the
5  DEF 0027, Leslie? Is it No. 7 possibly. Here it
6  is. No. 7, I just want to show you. This is from
7  Mr. Burns' notes here and in the next-to-last
8  paragraph it said -- three lines from the bottom
9  of that paragraph, "It was obvious from the
10 structure that it had been erected many years
11 ago." That's from Ken Burns' notes.
12     A   Okay.
13     Q   Did that -- is that consistent with what
14 you'd been told by Unocal management, that the
15 structure had been in place for years and years?
16     A   Correct.
17     Q   And on the bottom of 755. We talked
18 about the closing conference. Where it says --
19 after the next-to-last paragraph it said, well,
20 actually before that under Comments. The second
21 paragraph in 24, it says, On September 9th the
22 platform collapsed. And then it says, "Unocal
23 management directed their building maintenance
24 technician to replace the platform after the
25 fall."

Page 112

1          Is that your understanding of what
2  happened?
3      A   Again, yes.n.
4      Q   And then the next paragraph it says,
5  "After the OSHA inspection on March 3rd, 2003,
6  Ms. Sinz and Mr. Burns directed the Unocal
7  building maintenance technician to remove the
8  platform and the stepladder that was being used to
9  access the platform."
10         And was this told to you by Ms. Sinz,
11 you've indicated?
12     A   Again, I'm not sure. Speculation, I
13 think Roxanne called me and told me that. She was
14 extremely proactive, concerned that something like
15 this was happening and she -- I mean, I think
16 Mr. Burns had told her that when you have an OSHA
17 inspection, you do -- be as proactive and
18 responsive as you can.
19     Q   And the last paragraph on there. I just
20 want to talk about this just for a second, because
21 you mentioned -- we were trying to figure out the
22 measurements.
23     A   Right.
24     Q   It looks like it says there -- it says,
25 "There are a total of 52 filters, 24 by 24 by 2,

Page 113

1  that were replaced on a regular basis."
2      A   Right.
3      Q   Does that refresh your memory of the
4  size of the filters?
5      A   Right.
6      Q   And do you recall how many -- do you
7  recall if it was six levels up, the filters?
8      A   I don't remember. Lee -- I asked Lee to
9  count them, I remember.
10     Q   Well, if they were six levels up and
11 they're 24 inches high, then would that -- I
12 mean --
13     A   I don't remember.
14     Q   -- just basic math, if it's 24 times --
15     A   I don't --
16         MS. JOHNSON: Objection; foundation;
17 speculation.
18     Q   (By Mr. Cohn) Well, you don't remember
19 how many rows there are?
20     A   No.
21     Q   But assuming there's six rows and each
22 one is two feet long, that's 12 feet high at
23 least.
24         MS. JOHNSON: Objection; foundation.
25     A   My recollection is it was higher than

Page 114

1  that.
2    Q  (By Mr. Cohn) On page LG756 it says,
3  No. 25, "Other Employer Information. The Unocal
4  manager responsible for building maintenance for
5  the previous three-and-a-half years acknowledged
6  that during an interview that he had authorized
7  overtime for the building maintenance coordinator
8  to allow him to oversee the Siemens filter
9  replacement after normal business hours."
10       And I think you indicated before that
11  that individual would be Archie Cook that told you
12  that?
13   A  Whichever was the HR consultant, or HR
14  manager that had just convinced somebody to give
15  up his building maintenance responsibilities.
16   Q  And then the next page -- the next
17  paragraph -- actually, the last sentence in that
18  paragraph. It says, "After an accident, Unocal
19  management directed the Unocal building management
20  technician to replace the work platform.'.
21       We've already talked about that; that's
22  your understanding?
23   A  Correct.
24   Q  And then it says, the next paragraph,
25  "OSHA considers the Unocal office building to be a

Page 115

1  multi-employer work site. Unocal is the creating
2  employer for this citation." And we talked about
3  that before.
4    A  Uh-huh.
5    Q  And then you go on to say -- is this
6  your language? This is what you typed up? This
7  is your report?
8    A  I'm sure it came from the federal
9  guidelines.
10   Q  And then you said, "It has the
11  responsibility and duty to Unocal" -- you said,
12  "Unocal is the creating employer for this
13  citation. It has the responsibility and duty to
14  exercise reasonable care to prevent and detect
15  safety hazards and/or violations."
16       And does that come from the guidelines
17  that you were telling us about?
18   A  I'm sure it does.
19   Q  And is it your understanding that this
20  platform was in the Unocal building?
21   A  Correct.
22   Q  And then you say, "According to the
23  March 7th memo from Roxanne Sinz, Unocal did not
24  conduct safety meetings for the office or
25  maintenance staff nor did they conduct any

Page 116

1  periodic safety inspections."
2    A  Right.
3    Q  And we talked about that before.
4       Now that I see this document, and it's
5  756; is the memo you're referring to the next
6  page, LG757?
7    A  Correct.
8    Q  And then, again, at the end you repeat
9  that part of the contract that we quoted before
10  and that you indicated earlier in the Safety
11  Narrative on Article 6, "Customer, paren, Unocal,
12  end paren, will be solely responsible for any
13  removal, replacement or refinishing of the
14  building structure or finish that may be required
15  to gain access to such equipment."
16       What's the significance of that
17  statement to you?
18   A  Simply that Unocal contractually had the
19  responsibility to provide access and the means to
20  get up there. And there is a conflict because
21  Siemens -- I remember at the time, in fact, we
22  talked about it, and I believe that I referenced
23  it. I said, well, they carry ladders with them.
24  Because if you ever see any of their trucks, they
25  have ladders on the darned things.

Page 117

1       And one of -- either Crabbe or it might
2  have been Larry, said, yeah, I tried carrying the
3  ladder up the stairs because it wouldn't fit in
4  the elevator and I scraped the side and they made
5  me come back on my own time and paint the wall.
6  So that's why he stopped taking his ladder up
7  there and used the Unocal.
8    Q  And do you recall how many levels up it
9  was? At least six flights up?
10   A  Oh, pretty -- yes. You or I would not
11  want to carry that ladder up there.
12   Q  And then even after -- do you recall
13  being in the penthouse room and having to go
14  around corners to get to the filter room?
15   A  Yes, it wasn't --
16   Q  It wouldn't be very -- I mean, would it
17  be kind of difficult to have to bring a ladder up
18  each time you did that?
19   A  Yes. You've been there, right? You
20  understand that, that it would.
21   Q  Well, yeah, we've been in the building
22  to look at it since that.
23      LG739, can you take a look at that?
24   A  I'm sorry. 739?
25   Q  Yes. Actually, before 739 let's go to

Page 206

1  across at the narrow point?
2      MS. JOHNSON: Objection; foundation.
3      A  I don't remember. I do -- will state
4  that when we took the pictures, we usually don't
5  go by estimate. We take pictures of the
6  measurement from a distance perspective and then
7  where we can record -- see there was X number of
8  feet, X number of inches. And for some reason I
9  did not include that, and my assumption is that it
10 was obvious in the pictures or it wasn't relevant.
11     Q  (By Mr. Cohn) It was obvious in the
12 pictures or not relevant -- oh, you mean the fact
13 that you didn't take measurements, you mean it was
14 obvious --
15     A  We did take measurements; I just didn't
16 record them.
17     Q  Oh, I see.
18     A  And I said the reason why it was either,
19 a, they were very clear in the pictures, so they
20 spoke for themselves or I did not think it was
21 necessarily relevant to this situation.
22     Q  It wasn't relevant because we know that
23 they didn't have another board so that there was
24 no side rail; is that what you're saying?
25     A  Right.

Page 207

1      MS. JOHNSON: Objection; foundation.
2      Q  (By Mr. Cohn) Do you know if -- besides
3  more hazardous lighting, do you know if it might
4  make it more difficult to actually remove the
5  filters if you have these completely walled off
6  right in the middle?
7      A  Well, obviously you could not do it that
8  way because if you remember the picture, it was
9  adjacent to the filters, but what you would...
10     Q  I'm sorry. Are you done?
11     A  Well, I mean, again, I'm not here to
12 speculate, but obviously what you would do is, to
13 do the upper ones you would put the platforms in
14 and on the lower ones you would probably take them
15 off.
16     Q  You would take the planks off you mean?
17     A  Right, or at least take the closest one
18 so that you could access it.
19     Q  Do you know how heavy the planks were?
20 Did you --
21     A  No, but by looking at them, you wouldn't
22 just flip -- I mean, they were substantial.
23     Q  Would it take -- do you think it would
24 take two people to actually put the planks in
25 place?

Page 208

1      A  I wouldn't know.
2      MS. JOHNSON: Objection; foundation.
3      A  I wouldn't know.
4      Q  (By Mr. Cohn) What is your best --
5  well, did you try and move one of the planks on
6  your own?
7      A  I did shove one back to make sure we
8  were protected, but that was sliding it across
9  that beam. It wasn't lifting.
10     Q  Well, would you consider that a
11 hazardous situation where the plank itself is
12 loosely placed on top of the bracket?
13     A  I wouldn't speculate at this point. It
14 would depend on the situation.
15     Q  Well, is it -- would it be safer if the
16 planks have some positive connection so that they
17 can't move?
18     A  Of course.
19     Q  In terms of the lighting, did anybody
20 explain to you why they couldn't have better
21 lighting in the room?
22     A  No. And it was terrible. I mean, it
23 was a major problem.
24     Q  Even using the flashlight, was it still
25 difficult to really see?

Page 209

1      A  Yes, it was difficult. And to my
2  recollection, we ended up using three flashlights
3  just to get the pictures to -- I mean, the cameras
4  to operate.
5      Q  Is it -- normally you carry flashlights
6  with you; is that why you had them?
7      A  Yes, that's standard issue for us.
8      Q  Do you know if Mr. Burns had a
9  flashlight with him at the time?
10     A  I believe either he or Roxanne stepped
11 out and got one.
12     Q  Now, I thought there was some testimony
13 previously that Ken Burns being on site might be a
14 factor to lower -- to affect the -- to be taken
15 into consideration that they had a safety
16 technician on site in terms of penalty or
17 factoring in the good faith?
18     A  It could be a factor, yes. They had
19 somebody -- Ken has strong credentials.
20     Q  But did you ask Ken how often he was at
21 the building site?
22     A  I did ask, and he said he had conducted
23 an -- had conducted an -- I don't know if it was
24 plural or not -- an inspection there, but that his
25 major responsibility was the platforms.

Page 214

1  Q  And I'm assuming many of these involve
2  you going to buildings where there may be
3  violations by the owners of the buildings and the
4  landlords or the building managers.
5  A  Right.
6  Q  Does the manager, owner, landlord of the
7  building have a duty to provide a safe place
8  for --
9      MR. MCKINSTRY: I'm going to object to
10 that. I think it's calling for a legal conclusion
11 on his part. He's not a lawyer. He's not the
12 building representative. If you're talking in
13 terms of employer, that's a whole other issue.
14 Whether it violates OSHA law, that's another
15 issue. If you're talking about the owner of a
16 building providing -- in terms of the liability of
17 the builder -- the owning of the building, that's
18 a different issue. That doesn't have anything to
19 do with employer liability. That's --
20 Q  (By Mr. Cohn) Well, in this case the
21 owner of the building is the employer of Larry
22 Grove's employer. So an -- okay -- an owner of a
23 building has contractors work in their building.
24 Does the owner of the building --
25 A  They hire contractors.

Page 215

1  Q  They hire contractors. And if they
2  supply a work platform or a scaffold or a ladder,
3  do they have a duty to provide these safe devices
4  for the contractors if they're provided by the
5  employer/owner of the building?
6      MS. JOHNSON: Objection; foundation.
7      MR. MCKINSTRY: I'm going to reimpose my
8  objection. If you're talking about liability as
9  an employer under OSHA law --
10     MR. COHN: Yes.
11     MR. MCKINSTRY: -- then I think he can
12 answer. If you're asking for liability as an
13 owner of a building, I think it's a different
14 question.
15 Q  (By Mr. Cohn) Can you answer that
16 question? As the employer --
17 A  Well, you're mixing your issues here.
18 Q  Well, explain to me.
19 A  Are we talking about an owner of a
20 building, or are we talking about a company like
21 Unocal that hires the subcontractor to do work for
22 them?
23 Q  But Unocal is the owner of the building
24 plus the hirer of the contractor. Does that make
25 any difference?

Page 216

1      MR. MCKINSTRY: And we're talking about
2  employer liability here, not landlord liability.
3  That's my point.
4  A  I refer you back to the multi-employer
5  work site policy.
6  Q  (By Mr. Cohn) Well, under the -- when
7  they talk about the general -- well, let's take a
8  look at that if it's in here.
9  A  Look under creating or controlling, to
10 make it easy.
11 Q  Well, if you look under the example for
12 creating employer under, I guess, Exhibit 11.
13 Employer that caused the hazardous condition,
14 which you stated before, that violates an OSHA
15 standard is the creating employer. And the first
16 example they give is someone that operates a
17 factory and they have contractors come in to
18 service machinery. If the company that operates
19 the factory creates a hazard, then they're the
20 creating employer liable for the hazard they have
21 created that impacts the employees of its
22 contractors; is that correct?
23 A  Correct.
24 Q  Now, in this case here we have a work
25 platform that's affixed to the -- bolted to the

Page 217

1  wall in Unocal and there's some -- and your notes
2  indicate that it may have been there since the
3  1970s.
4  A  Right.
5  Q  Now, what does -- does this convey to
6  you that Unocal as the employer or owner of the
7  building is the one responsible for this -- is
8  responsible for this work platform?
9      MS. JOHNSON: Objection; foundation.
10 A  Again, a complex issue. It could depend
11 on a couple of things. Getting back to Step 1 is,
12 they had their own ladders and they were extension
13 ladders. I would think that under the reasonable
14 man concept it might be much more prudent not to
15 use the work platform and use your own ladder just
16 to go all the way up.
17 Q  (By Mr. Cohn) And how do you get the
18 ladder into the building?
19 A  Well, he had gotten it in there several
20 times before, you know.
21 Q  Dragging it up seven flights of stairs?
22     MS. JOHNSON: Objection; argumentative.
23 Q  (By Mr. Cohn) Well, that leads to
24 another question: Your own notes indicate that
25 under the service contract between Unocal and

Page 218

1  Siemens it was the duty of Unocal to provide
2  access to the equipment that they were going to
3  replace.
4     A  Right.
5     Q  Would that indicate to you it was the
6  responsibility of Unocal to supply the ladder or
7  work platform that was to be used by Siemens to
8  access the filters to replace them?
9        MS. JOHNSON: Objection; foundation.
10    A  I'm not in a position to make that
11 judgment.
12    Q  (By Mr. Cohn) You put that down --
13 well, why did you put that down in your Safety
14 Narrative report if it's --
15    A  Because it's --
16    Q  Did you consider it important?
17    A  Yes. And I go back to my previous
18 statement that we are told to ask for the contract
19 to try to determine. It's not a cut and dry
20 situation, but we try to help determine who has
21 the responsibility.
22    Q  Was there anything in any of the
23 contracts you read between Unocal and Siemens that
24 placed the responsibility on Siemens to supply
25 ladders or work platforms to access the equipment?

Page 219

1     A  I don't remember.
2     Q  And if there was no such requirement in
3  the contract and if in fact the requirement was on
4  Unocal, you wouldn't have -- is that a factor in
5  considering Unocal's liability for the citations?
6     A  Yes.
7        MR. COHN: I don't have any further
8  questions.
9        MS. JOHNSON: Objection to the
10 foundation on the last question.
11       I don't have any other questions. You
12 are free to go. Get out quick.
13       THE VIDEOGRAPHER: This concludes the
14 deposition of Tom Scanlon. The time is 3:30.
15       (Signature waived.)
16       (Proceedings concluded at 3:30 p.m.)
17
18
19
20
21
22
23
24
25

Page 220

1              CERTIFICATE
2
3        I, LESLIE J. KNISLEY, Shorthand
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify that the witness in the
6  foregoing proceedings was duly sworn; that the
7  proceedings were then taken before me at the time
8  and place herein set forth; that the testimony
9  and proceedings were reported stenographically by
10 me and later transcribed by computer transcription;
11 that the foregoing is a true record of the
12 testimony and proceedings taken at that time;
13 and that I am not a party to nor have I any
14 interest in the outcome of the action herein
15 contained.
16       IN WITNESS WHEREOF, I have hereunto set
17 my hand and affixed my seal this _____ day
18 of _____ 2006.
19
20
21       _____
          LESLIE J. KNISLEY
22        Notary Public, State of Alaska
          My Commission Expires 12/31/06
23
24
25

# STATE OF ALASKA

**FRANK H. MURKOWSKI, GOVERNOR**

## DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT

3301 Eagle Street, Suite 305
Anchorage, AK 99503

OCCUPATIONAL SAFETY & HEALTH
LABOR STANDARDS & SAFETY DIVISION

PHONE: (907) 269-4940
FAX:     (907) 269-4950/269-3723

January 19, 2006


Weidner & Associates
Attn: Mr. Michael Cohn
330 L. Street, Suite 200
Anchorage, AK 99501

Re:   Freedom of Information Request
      UNOCAL/Siemens Building Technologies, Inc.
      Inspection Number: 305757510 & 305757577

Dear Mr. Cohn:

- In response to your request enclosed, please find copies of the above referenced files. Employee comments/names may have been withheld in accordance with AS 18.60.087(b). Confidential or privileged information has also been withheld.

Unfortunately, these files have already been prepared for filming, so any photos that may have been included have long since been removed from the file. We apologize for any inconvenience this may cause you.

Standard copy fees are waived.

If you have questions or are in need of further assistance, please do not hesitate to contact me at (907) 269-3727.

Sincerely,

Michelle McNair-Davis
Michelle McNair-Davis
Records Custodian

Enclosures

Cc:  Foir File
     Inspection File



LG00683

Page 2  
Unocal 76 Incorporated

Wed Apr 9, 2003 8:29am  
Inspection Nr. 305757577

| Coverage Information/Additional Comments |
|---|

### SAFETY NARRATIVE

Site Location:   909 W. 9th. Ave Anchorage Ak 99519  
                 Rooftop Mechanical Room (penthouse)

Employer:        Unocal 76 Inc.  
                 909 W. 9th. Ave.  
                 Anchorage, Ak. 99519-6247  
                 Telephone   907-263-7393  
                 Fax         907 263 7393

Roxanne Sinz     Manager, Public Affairs              Unocal  
Paul Crabbe      Building Maintenance Technician,     Unocal  
Ken Burns        Safety Consultant                    Unocal  
Tom Scanlon      OSHA

On Thursday February 27th I was assigned to conduct an inspection at the Unocal Corporate Office Building located at 909 West Anchorage Ave. Anchorage AK by Sue Lynn Hight (acting) Assistant Chief, OSHA Enforcement Section. A formal complaint had been filed by a Siemens Building Technology employee. Siemens is a maintenance service company specializing in HVAC systems. Siemens has serviced the Unocal HVAC system since July 1994. The complaint alleged that Siemens employees were exposed to fall hazards when replacing HVAC filters at the Unocal building. The complaint states that the employees used non-approved scaffolding when replacing filters.

On Monday March 2, 2003 Mr. Lee Zhao, CHSO trainee, and I conducted an opening conference with Siemens management. After a brief opening conference we proceeded to the Unocal building to begin the inspection. At the Unocal office we met Ms. Roxanne Sinz and Mr Ken Burns. Explained the purpose of our visit.

Ms. Sinz and Mr Burns accompanied us to the work site in question. Began inspection, photographed the work site and completed the inspection.

On March 5th OHSA made the following decisions: The work site was to be considered a multi employer location. Unocal Alaska was the creating employer for this complaint. And the structure in question was a work platform and not a scaffold.

On Thursday March 6th I conducted and opening conference with Ms. Roxanne Sinz, Manager, Public Affairs and Communication. Ms. Sinz has the responsibility for Unocal Offices Building Maintenance. She had just been assigned this responsibility the previous week. Discussed all of the items on the pre-inspection check list and inspection guide lists.

Requested copies of the OSHA 200/300 logs for 200, 2001, 2002, safety program and any pertinent safety committee minutes.

Ms. Sinz and Mr. Crabbe accompanied me to the Rooftop Mechanical Room (penthouse) to take additional pictures. Interviewed Mr. Crabbe.

At this time I requested a current copy of the Unocal Siemens Service Contract.

The following individuals were interviewed during the inspection process:  
Brent Davies, Pipefitter,   Siemens  
Larry Groves, Pipefitter,   Siemens  
Dan Hartan, Bldg Maint Tech, Unocal  (former)  
Charles Arnet, Bldg Maint Coordinator, Unocal (former)  
Paul Crapps, Bldg Maint Tech, Unocal   (currently)  
Archie Cook, Uncocal Human Resources Mgr with responsibility for Bldg Maint for the previouse three and a half years.

The day after the inspection Ms. Sinz directed Paul Crabbe to dismantle the work platform and to remove a step ladder that was used to access the platform.

On September 9th 2002 the work platform had collapsed while a Siemens employee was standing on it while replacing filters. Unocal Mgt. directed Paul Crabbe, Unocal Building Maintenance Technician to replace the platform after it had collapsed.

The Siemens/Unocal Service Contract, dated May 31, 2000 stated in Article 6, Customer Responsibilities: "Customer (Unocal) will be solely responsible any removal, replacement, or refinishing of the building structure or finishes that may be required to gain access to the Equipment.

Page 3  
Unocal 76 Incorporated

Wed Apr 9, 2003 8:29am  
Inspection Nr. 305757577

Conducted closing conference on April 4th with Ms. Sinz and Mr. Burns. Discussed all of the items on the closing conference checklist. Discussed potential violation for unguarded work platform that was four feet or higher from the next level. Gave Ms. Sinz copy of CPL 2-0, 124 Multi employer citation policy and a copy of OSHA regulation 1910.23(c)(1) Protection of open-sided floors, platforms, and runways. Explained that OSHA considered the worksite a multi employer location and that Unocal Alaska was the creating employer in regards to this citation. And the structure in question was a work platform rather than a scaffold.

Encouraged Ms. Sinz to use the services of OSHA Consultation and Training Section.

Ms. Sinz and Mr. Burns were cooperative and accommodating during the inspection process. Both had positive attitudes towards the inspection.

| Inspection Number | 305757577 |
|---|---|

**COVERAGE INFORMATION**

**NATURE AND SCOPE**

Check Applicable Boxes and Explain Findings:

[x] Complaint Items  
Fall hazards

[ ] Referral Items

[ ] Accident Investigation Summary & Findings

[ ] LEP

[ ] Planned Inspection

**NATURE AND SCOPE -- UNUSUAL CIRCUMSTANCES** (Mark X and explain all that apply:)

[ ] None

[ ] Denial of entry (see denial memo)

[ ] Delays in conducting the inspection

[ ] Strikes

[ ] Jurisdictional Issues

[ ] Trade Secrets

[ ] Other

Comments:

**OPENING CONFERENCE NOTES:**

**RECORDKEEPING PROGRAMS**  
(Other than 29 CFR 1904 requirements)

Does the employer have a recordkeeping program relating to any occupational health issues (monitoring, medical, training, respirator fit tests, ventilation measurements, etc.)?

[ ] Yes    [ ] No

LG00750

Page 4  
Unocal 76 Incorporated

Wed Apr 9, 2003 8:29am  
Inspection Nr. 305757577

Are any programs required by OSHA health standards?

☐ Yes    ☐ No

**COMPLIANCE PROGRAMS**  
(engineering controls, PPE, regulated areas, emergency procedures, compliance plans, etc.)

Address any relevant compliance efforts regarding potential health hazards covered by the scope of the inspection.

**PERSONAL HYGIENE FACILITIES AND PRACTICES**  
(showers, lockers, change rooms, etc.)

Are any required by OSHA health standards?

☐ Yes    ☐ No  
What Standards:

**HAZARD COMMUNICATION PROGRAM**

Written Program (complete)

☐ Yes    ☐ No

MSDS's (all)

☐ Yes    ☐ No

Labeling (adequate)

☐ Yes    ☐ No

Training (complete)

☐ Yes    ☐ No

Copy MSDS's/Program attached

☐ Yes    ☐ No

Comments:

**ACCESS TO EXPOSURE & MEDICAL RECORDS**

**FIRE PROTECTION AND EVACUATION PROCEDURES**

**SYSTEMS SAFETY AND EMERGENCY RESPONSE**

**RESPIRATOR PROGRAM**

**LOCKOUT TAGOUT/ \ELECTRICAL SAFE WORKPRACTICES**

**FIRST AID**

**ELECTRICAL SAFE WORKPRACTICES**

**EXPOSURE CONTROL PLAN**

**LABORATORY STANDARD**

**ERGONOMIC PROBLEMS**

☐ Yes    ☐ No  
If yes, complete the items 1 and 2 below.

1. Lifting (10% or more similarly exposed employees injured)

   a. Total # of employees exposed to job:

   b. Total # of cases for job:

LG00751

2. CTD's (10% or more similarly exposed employees have CTD's; 5% or more CTS cases)

   a. Total # of employees exposed to job:

   b. Total # of cases for job:

   Other significant injury/illness trends

   ☐ Yes   ☐ No
   If yes, explain.

### EVALUATION OF EMPLOYER'S OVERALL SAFETY AND HEALTH PROGRAM

General Industry:

[X] Yes   ☐ No   Employer has a Safety & Health Program

[X] Yes   ☐ No   Written

[X] Yes   ☐ No   Copy Attached

Construction Industry:

☐ Yes   ☐ No   Accident Prevention Program

☐ Yes   ☐ No   Written

☐ Yes   ☐ No   Copy Attached

**Evaluation of Safety and Health Program**
(0=Nonexistent 1=Inadequate 2=Average 3=Above average)

[2] Written S&H Program

[2] Communication to Employees

[2] Enforcement

[2] Safety Training Program

[ ] Health Training Program

[ ] Accident Investigation Performed

[X] Preventive Action Taken

Work platform and ladder was removed on March 7th, 2003
Comments:

### CLOSING CONFERENCE NOTES:

Were any unusual circumstances encountered such as, but not limited to, abatement problems, expected contest and/or negative employer attitude? If yes, explain below.

[X] Yes   ☐ No

The Unocal Safety Consultant, Burns, stated during the closing conference that the citation would not go any further than the informal conference.

19. Closing Conference Checklist ("x" as appropriate)
   ☐ No Violations Observed

LG00752

Page 6
**Unocal 76 Incorporated**

Wed Apr 9, 2003 8:29am
Inspection Nr. 305757577

- [X] Gave Copy Employer Rights
- [X] Reviewed Hazards & Standards
- [X] Discuss Employer Rights/Obligations
- [X] Encouraged Informal Conference
- [ ] Offered Abatement Assistance
- [X] Discussed Consultation Programs
- [ ] Employer/Employee Questionnaires

**Closing Conference Held with Employee Representative**

- [ ] Jointly   [X] Separately

| CSHO Signature | *[signature]* | Date | 4/09/03 |
|---|---|---|---|
| Accompanied By | | | |

LG00753

# Alaska Department of Labor
Occupational Safety and Health

# Worksheet

Thu Apr 10, 2003 10:40am

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Inspection Number | | 305757577 |
| | | | | Opt. Insp. Number | | 022-03 |
| Establishment Name | Unocal 76 Incorporated | | | | | |
| Type of Violation | S Serious | Citation Number | 01 | Item/Group | | 001 |
| Number Exposed | 1 | No. Instances | 1 | REC | | |
| Std. Alleged Vio. | 1910.0023( c)( 1) | | | | | |

| Abatement Period | MultiStep Abatements | | | Final Abatement | Action Type/Dates |
|---|---|---|---|---|---|
| | PPE Period | Plan | Report | | |
| 15 | | | | | |
| Abatement Documentation Required | | | | Date Verified | |

| Substance Codes | |
|---|---|
| | |

| AVD/Variable Information | |
|---|---|
| | |

Protection of open-sided floors, platforms, and runways.
1910.23(c)(1)
(1) Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a toeboard wherever, beneath the open sides,
STD 1-1.5

EXAMPLE: A Siemens Building Techologies Inc employee was working at the Unocal Office located at 909 W. 9th Ave  TB Anchorage Ak. on a work platform that was four feet or more about adjacent floor or ground level that was not guarded by a rail or equivalent. The employee had changed the filters at Unocal for the past four years, once every three months. Employee was exposed to fall hazard due to the unguarded open side of platform.

| Penalty Calculations | | | | Adjustment Factors | | | Proposed Adjusted Penalty |
|---|---|---|---|---|---|---|---|
| Severity | Probability | Gravity | GBP | Size | Good Faith | History | |
| L Low | L Lesser | 01 | 1500.00 | 0 | 15 | 10 | 1125.00 |
| Repeat Factor | | 0 | | | | | |

| Employee Exposure: | | | | | |
|---|---|---|---|---|---|
| Occupation | Maintenance | | Employer | Unocal Alaska | |
| Nr of Employees | 1 | | Duration | 4 days | Frequency | 6 hours a day |
| Employee Name | Paul Crapps | | | | |
| Address | | | Phone | | |
| Occupation | Pipefitter | | Employer | Siemens Building Technologies | |
| Nr of Employees | 1 | | Duration | 4 days | Frequency | 6 hours a day |
| Employee Name | Larry Grove | | | | |
| Address | | | Phone | | |
| Occupation | Pipefitter | | Employer | Siemens Building Technologies | |
| Nr of Employees | 1 | | Duration | 4 days | Frequency | 6 hours a day. |
| Employee Name | Brent Davies | | | | |

| Unocal 76 Incorporated | ● | Thu Apr 10, 2003 10:40am<br>Inspection Nr. 3●57577 Citation Nr. 01 Item/Group 001 |
|---|---|---|

| Address | | Phone | |
|---|---|---|---|

Instance Description:   A. Hazard   B. Equipment   C. Location   D. Injury/Illness   E. Measurements

| 4. Date/Time |
|---|
| 3/06/03 |

20. Instance Description - Describe the following:
    a) Hazards-Operation/Condition-Accident:
       Employee was working on a work platform that was more than four feet or more above adjacent floor or ground without any rail or guard protecting the open side.
    b) Equipment: Work platform
    c) Location 909 W. 9th Ave, Anchorage Ak
       Rooftop Mechanical Room (penthouse)
    d) Injury/Illness
       Bruises, contusions, fractures, broken bones, death
    e) Measurements
       7 feet 2 inches

| 21. Photo Number | Location on Video |
|---|---|
| Pix 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15 | |

23. Employer Knowledge : Yes, Unocal management acknowledged during inspection and subsequent conversations with OSHA Safety Officer that the platform had been in place for "years and years" probably back to the 70's. One employee who had worked for twelve years at Unocal said that the platform had been there when he started work. During employee interview employee stated that the Unocal Building Maintenance Coordinator had visited the mechanical room on "several" occasions. And in fact had "handed" filters to a Siemens employee while he was standing on the platform.

24. Comments (Employer, Employee, Closing Conference) : Employees acknowledged during employee interviews that the work platform in Pix's 1 thru 15 were used on a regular basis ( for at least four years) to change the filters the HVAC filers.

On September 9th 2002 the work platform collapsed while a Siemens employee was standing on the platform and replacing filters. Unocal Management directed their Building Maintenance Technician to replace the platform after the fall.

After the OSHA inspection on March 3, 2003, Ms. Sinz and Mr. Burns directed the Unocal Building Maintenance Technician to remove the platform and a step ladder that was being used to access the platform.

The Siemens Technician changed the filters once every three months. It would take 5-6 hours to replace all 52 filters. There are a total of 52 filters, 24x24x2 that were replaced on a regular basis.

25. Other Employer Information : The Unocal Manager responsible for Building Maintenance for the previous three and a half years acknowledged during an interview that he had authorized over time for the Building Maintenance Coordinator to allow him to oversee the Siemens filter replacement after normal business hours.. After an accident on September 9th, 2002 when the platform had fallen, Unocal management directed the Unocal building maintenance technician to replace the work platform.

OSHA considers the Unocal office building to be a multi-employer worksite. Unocal is the creating employer for this citation. It has the responsibility and duty to exercise reasonable care to prevent and detect safety hazards and or violations. According to the March 7th memo from Roxanne Sinz Unocal did not conduct safety meetings for the office or maintenance staff nor did they onduct any periodic safety inspections. Siemens Building Technologies Inc. has serviced the Unocal HVAC system since July 1994.

Per the Siemens Unocal Service Contract Article 6, dated May 31, 2000: Customer Responsibilities: "Customer (Unocal) will be solely responsible any removal.replacement, or refinishing of the building structure or finish that may be required to gain access to such equipment.

| 26. Classification: | | | | |
|---|---|---|---|---|
| Serious | Knowledge | S or O | Repeat? | Willful? |
| Serious | Yes | S | No | No |

| First Repeat | Second Repeat | Repeat Penalty |
|---|---|---|
| No | No | No |

| Event Date: | Event Code | Action Code | Citation Type | Penalty | Abate Date | Final Order |
|---|---|---|---|---|---|---|
| | Z Add transaction | A Add | S Serious | 1125.00 | | |

LG00756