Page 1

1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
2
3
     LAWRENCE H. GROVE, et al.,        )
4                                      )       RECEIVED
              Plaintiffs,              )
5                                      )       MAY 2 2 2006
     vs.                               )
6                                      )    WEIDNER & ASSOCIATES
     UNOCAL CORPORATION,               )
7                                      )
              Defendant.               )
8    _____)
     Case No. A 04-0096 CV (JKS)
9
10
11   _____
12
             VIDEOTAPED DEPOSITION OF KENNETH BURNS
13
14   _____
15
                     Pages 1 - 146
16                Tuesday, May 9, 2006
                      9:00 A.M.
17
18
                           at
19               WEIDNER & ASSOCIATES
              330 L Street, Suite 200
20               Anchorage, Alaska
21                                          Exhibit  5
22                                          page  1  of  9
23
24
25

Page 2

```
 1         A-P-P-E-A-R-A-N-C-E-S
 2
   For the Plaintiffs:
 3  Michael Cohn
    WEIDNER & ASSOCIATES
 4  330 L Street, Suite 200
    Anchorage, Alaska  99501
 5  (276-1200)
 6
   For the Defendants:
 7  John Thorsness
    CLAPP PETERSON VAN FLEIN TIEMESSEN & THORSNESS
 8  711 H Street, Suite 620
    Anchorage, Alaska  99501
 9  (272-9272)
10
   The Videographer:
11  Eric R. Cossman
    ALASKA LEGAL VIDEO
12  645 G Street, Suite 892
    Anchorage, Alaska  99501
13  (276-8601)
14
   Court Reporter:
15  Diane M. (Preece) Bondeson
    PACIFIC RIM REPORTING
16  711 M Street, Suite 4
    Anchorage, Alaska  99501
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2
   EXAMINATION BY:                    Page
 3
   Mr. Cohn                              5
 4                                      135
 5
   Mr. Thorsness                        129
 6
 7
   EXHIBITS
 8
    1  Burns' Notes of State OSHA Visit (1 pg)   36
 9
    2  Unocal's Ninth Supplement to Initial     55
10     Disclosures (126 pgs)
11
    3  Additional Documents from Initial        56
12     Disclosures (19 pgs)
13
    4  Plaintiffs' Rules 26 (Fifth) Supplemental 77
14     Disclosures (93 pgs)
15
    5  Photocopies of Photographs (5 pgs)       99
16
    6  Siemens Safety Evaluation (14 pgs)      123
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      ANCHORAGE, ALASKA; TUESDAY, MAY 9, 2006
 2                  9:11 A.M.
 3                    -o0o-
 4        THE VIDEOGRAPHER:  Okay.  We're on the
 5  record at 9:11.  This is the video deposition of Ken
 6  Burns, taken by the plaintiffs in the matter of
 7  Grove, et al, vs. Unocal Corp., Case No. A 04-0096 CV
 8  (JKS) in the United States District Court for the
 9  District of Alaska.
10        This deposition is being held in the
11  offices of Weidner & Associates, located at 330 L
12  Street, Suite 200, Anchorage, Alaska, on May 9, 2006.
13        My name is Eric Cossman from Alaska Legal
14  Video, mailing address 645 G Street, No. 892,
15  Anchorage, Alaska 99501.  The court reporter is Diane
16  Bondeson from the firm Pacific Rim Reporters.
17        Will counsel please identify themselves for
18  the record.
19        MR. COHN:  My name is Michael Cohn.  I'm an
20  attorney at the law offices of Weidner & Associates,
21  Inc.  I'm here on behalf of the plaintiffs.
22        MR. THORSNESS:  John Thorsness for
23  defendant Unocal.
24        THE VIDEOGRAPHER:  Thank you.  Would the
25  reporter please swear in the witness.
```

Page 5

```
 1        MR. THORSNESS:  Excuse me.  And
 2  representing the witness as well.
 3              KENNETH BURNS
 4      witness herein, being sworn on oath was
 5        examined and testified as follows:
 6              EXAMINATION
 7  BY MR. COHN:
 8     Q.  Good morning, Mr. Burns.
 9     A.  Good morning.
10     Q.  Are you here pursuant to a deposition
11  notice?  Have you seen the deposition notice in this
12  case?
13     A.  No, I don't recall seeing it.
14     Q.  Well, how did you know you had a deposition
15  today?
16     A.  I was notified by paralegal for Chevron.
17     Q.  Where do you work?
18     A.  For Chevron.
19     Q.  What is your job position?
20     A.  My job position is safety specialist.
21     Q.  And how long have you worked for Chevron?
22     A.  Chevron recently purchased Unocal,
23  approximately six months ago.  I joined Unocal in
24  September 1997, continuous employment till the merger
25  of Chevron and Unocal.
```

Page 46

1  that was in the room?
2     A. No. I observed the scaffold, platform in
3  the room but did not inspect it.
4     Q. Have you ever looked at the bolts that were
5  affixed -- that affixed the platform to the wall?
6     A. Only what is -- only what is shown in the
7  photographs that were taken.
8     Q. Which photographs are you referring to?
9     A. The ones that were attached to the OSHA
10 report. And I have to say, I can't recall if the
11 bolts -- I think there is one picture that shows the
12 bolts, the connection.
13    Q. When you say the photos, did you see the
14 actual photographs or --
15    A. No, I did not.
16    Q. What did you see?
17    A. I saw what looks like a Xerox copy.
18    Q. And when did you see the Xerox copies? Was
19 this some of the documents that you've reviewed
20 before this deposition is what I'm --
21    A. I did review some of those pictures, but I
22 think also I had seen them previously, because when
23 counsel showed them to me yesterday, I didn't really
24 look at them, but I had seen them before so I knew
25 what they were. So if I got those documents

Page 47

1  previously, it was from Tracie Howard.
2     Q. And who is Tracie Howard?
3     A. She's the paralegal for Chevron.
4        MR. THORSNESS: Mike, when you find a good
5  spot, let's take a break.
6        MR. COHN: Yeah, why don't we take a break
7  now, then. This is a good --
8        MR. THORSNESS: Okay.
9        THE VIDEOGRAPHER: Okay. Going off record.
10 The time is 10:11.
11       (Recess held.)
12       (Exhibit 2 marked.)
13       THE VIDEOGRAPHER: Okay. Back on the
14 record. The time is 10:24.
15 BY MR. COHN:
16    Q. Going back to Exhibit 1. Is there a reason
17 why -- why did you put that document together, the
18 notes of --
19    A. I think a habit, just making notes when I'm
20 around OSHA, when I'm on inspections. I didn't know
21 where this was going, but another reason I did it was
22 because I felt that the inspection procedure was not
23 in compliance with OSHA standards.
24    Q. And tell me what you mean by that.
25    A. From my recollection, Mr. Scanlon, the lead

Page 48

1  OSHA inspector, did not do an appropriate closing
2  conference, and I asked him if he was going to do a
3  closing conference, and he said no. And that is the
4  last sentence on the next-to-the-last paragraph.
5  Certain techniques that have to be applied.
6     Q. Where does it say on the next-to-the-last
7  that it wasn't --
8     A. It's the last sentence on the
9  next-to-the-last paragraph. Paragraph starting, "Tom
10 Scanlon, Lee Zhao." The last sentence on that says,
11 "I asked Scanlon if he was going to conduct a
12 closing, and he replied, 'No.'" Quote, unquote.
13    Q. You took that to mean that there would be
14 no closing conference as opposed to that he wouldn't
15 be the one doing the closing?
16    A. He was leaving the premises. Had conducted
17 his investigation and had taken the pictures.
18    Q. Did you ever have -- did you ever take any
19 pictures of that room?
20    A. No, I did not.
21    Q. Did you ask anyone else to take any
22 pictures?
23    A. No.
24    Q. Did you ask anyone to take down the
25 platform?

Page 49

1     A. Either I or a combination of the party
2  there decided it had to be taken down. That would
3  include Roxanne, Paul and myself, after Scanlon left,
4  or it could have even been while Scanlon was there
5  because that would have been immediate abatement of
6  the citation.
7     Q. Did they -- did he tell you right then what
8  the -- what the citations would be for?
9     A. No. He did have a -- no, he did not.
10    Q. Did you yourself see any violations in the
11 way that platform was there, as it was constructed or
12 as it was there?
13    A. I didn't feel it met the standards for a
14 work platform.
15    Q. And how would you know what the standards
16 were for a work platform?
17    A. Because I've dealt with scaffolding works.
18 I've been in the construction industry on
19 scaffolding, I've been to scaffolding schools, I know
20 scaffolding OSHA code very well. But this is not --
21 can't be construed as scaffolding. It has to be
22 construed as a work platform. And it had open sides,
23 it had gaps in the flooring, and obviously there was
24 no fall protection provided.
25    Q. Did you see if the planks on the platform

Page 66

1   certain things that would be unsafe, safe or unsafe.
2       Q.  Did you finish the sentence or --
3       A.  Yes, I did.
4       Q.  Oh. Okay. And did you -- it looks like
5   you start out item No. 1, and did you start in the
6   basement and work your way up to the top?
7       A.  That's correct.
8       Q.  And I guess on the bottom it -- you got
9   different classifications, A, B and C, for whether --
10  how quickly action is required?
11      A.  That's correct.
12      Q.  And did you go through every room and
13  every -- on every floor of the building?
14      A.  Paul had the keys, and there are several
15  doors that belong to Cook Inlet or to an outside
16  organization that we did not enter, but everything
17  under the control of Unocal we did.
18      Q.  So the basement, the -- did you start in
19  the basement?
20      A.  Yes, we did.
21      Q.  And it looks like the basement has a fair
22  number of offices or mechanical equipment in there,
23  air fan rooms, maintenance rooms?
24      A.  That's correct.
25      Q.  Generator room. So did you examine each --

Page 67

1   the basement thoroughly? That was all under the
2   control of Unocal?
3       A.  That's correct.
4       Q.  And then you also went up to the first
5   floor, second floor, third floor, and then it --
6   starting on item No. 30, which is number -- in the
7   DEF 31, it looks like it's -- the first reference to
8   the penthouse is on No. 30.
9       A.  That's correct.
10      Q.  It says -- and then you go further down,
11  No. 31, you wrote inadequate lighting, and you wrote
12  throughout, and then you have in quotes, penthouse
13  area, unquote. Is this -- is this a document that
14  you typed up or is this --
15      A.  That's correct.
16      Q.  Okay. But Paul Crapps assisted you?
17      A.  It was a document that's in our forms
18  section of my computer. No, I made the notes, I
19  typed the report.
20      Q.  There is no reference to the -- the work
21  platform. Had that already been removed?
22      A.  Yes, it had.
23      Q.  And do you recall who removed it?
24      A.  No.
25      Q.  Do you know anything at all about what

Page 68

1   happened to it after it had been dismantled, the
2   platform?
3       A.  No.
4       Q.  And why did you go examine the penthouse?
5       A.  Part of the building we were instructed to
6   do an inspection on.
7       Q.  Now, DEF 28.
8           MR. THORSNESS: So we're going back?
9           MR. COHN: Back one.
10      Q.  Okay. It says from Ken Burns, and it's
11  sent March 6, 2003, to Roxanne Sinz.
12      A.  Um-hum.
13      Q.  This is in response to an original message
14  in regard to the OSHA investigation?
15      A.  Right.
16      Q.  Actually there is some names here. Do you
17  know who Lloyd H. Richardson is?
18      A.  He's a senior safety specialist lead for
19  the HES group, Chevron.
20      Q.  So was he -- is he above you in rank or --
21      A.  Not at that time. We were equals.
22      Q.  And it looks like it -- it's -- if you look
23  at this document, it looks like Roxanne Sinz is
24  requesting information from you and from
25  Mr. Richardson in regard to documents that Tom

Page 69

1   Scanlon from OSHA wants to see. Would that be fair
2   to say?
3       A.  That's correct.
4       Q.  Do you know when the -- when Roxanne Sinz
5   took over as building manager, if it had just been a
6   few days before the inspection?
7       A.  It was on the departure of Archie Cook, who
8   was the human resources manager who had additional
9   duty of building manager. I do not recall when that
10  was.
11      Q.  I see in her original message she
12  cross-copies to Dale A. Haines who is Dale A. Haines?
13      A.  Operations manager.
14      Q.  For?
15      A.  At that time Unocal. Now Chevron, yes.
16      Q.  Operations manager for all Alaska
17  operations?
18      A.  That's correct.
19      Q.  And in this subject RE, the message you
20  sent back to Roxanne Sinz, you said, "The only safety
21  meetings I know were conducted in cooperation with
22  Archie Cook, and that was several years ago. In
23  regard to inspections, I did two back in 1998/99 with
24  copies to Charles. I would hope Archie has copies as
25  he was the action person."

Page 70

1  Q. Do you recall doing the inspections back in
2  1998/1999?
3  A. Yup.
4  Q. Have you reviewed a copy of those
5  inspections before?
6  A. No, I -- I have no idea where the location
7  of those are.
8  Q. Is it normal practice for Unocal to keep
9  safety inspections?
10 A. Yes, it is.
11 Q. And if you did -- you first worked for
12 Unocal starting in '97; is that correct?
13 A. That's correct, in Kenai.
14 Q. Would you have any knowledge of -- had you
15 ever reviewed any prior safety inspections for the
16 building at 909 --
17 A. No.
18 Q. -- West Ninth Avenue? Do you know if any
19 prior inspections had been done for the building?
20 A. No.
21 Q. And you -- and would it be your assumption
22 that if you did these inspections, that they should
23 have copies of these inspections still in the Unocal
24 records?
25 A. Archie Cook was the action person on this.

Page 71

1  The reports were sent to Archie for his disposition,
2  whatever he wanted to do with those, and I'm sure he
3  had them.
4  Q. Now, in terms of the inspections in '98 and
5  '99, what would the -- what would you -- what were
6  you supposed to do in these inspections, if you
7  recall?
8  A. Basically walk through the building floor
9  by floor as previously stated in the '03 inspection.
10 The building custodian person at the time was a
11 Mr. Charles Arnett. He accompanied on that
12 inspection.
13 Q. And did you start -- would you start in the
14 basement or -- I mean, was there a certain
15 methodology?
16 A. The only -- the only criteria for what I
17 have when I do inspections, I go from left to right
18 whether we start in the penthouse or in the basement,
19 and I don't recall specifically whether we even went
20 into the penthouse. I was not -- I was not familiar
21 with the Anchorage office.
22 Q. Well, if you were not familiar -- did you
23 ask any -- did you expect someone to tell you what
24 was in the building or guide you if you weren't
25 familiar with the office?

Page 72

1  A. That's why I was with Charles Arnett, yes.
2  He was my guide.
3  Q. Would it be fair to say that the inspection
4  was to identify hazardous conditions?
5  A. That's the only purpose.
6  Q. And would it be fair to say that the
7  penthouse with the equipment and the -- that operates
8  up there, the boiler and other faculties, that that
9  would be an important part of the inspection, to
10 examine the penthouse?
11 A. No.
12 Q. Why not?
13 A. Lack of exposure. Employees don't work up
14 there. Lack of exposure, limited exposure.
15 Q. Then why did you examine the penthouse on
16 the March 3rd, 2000 -- March 5th, 2003 inspection?
17 A. An accident happened in 2002 with
18 Mr. Grove.
19 Q. So do you have a specific recollection of
20 not examining the penthouse in your safety
21 inspections in '98 and '99?
22 A. I don't recall going to the penthouse. In
23 fact, I was rather surprised when I went to the
24 penthouse in 2003, what was up there.
25 Q. Why were you surprised? You said --

Page 73

1  A. I had never been in the penthouse before.
2  Q. Do you recall what you saw up there? I
3  mean, can you recall right now what was up in the
4  penthouse?
5  A. Besides the mechanical rooms, air
6  conditioner, there was rooms where certain items were
7  kept but not normally for public view, in the sense
8  of Unocal clothing and so forth. Logo type stuff
9  that was kept pretty well under lock and key.
10 Q. Let's see. Do you know who Patty Bielawski
11 is?
12 A. Patty Bielawski.
13 Q. Bielawski?
14 A. Yes.
15 Q. Who was she?
16 A. She was acting health, environmental,
17 safety office -- safety manager, excuse me. HES
18 manager.
19 Q. Do you know when she was the health and
20 safety manager?
21 A. She was a contract employee, not a direct
22 Unocal employee. She came on board shortly after the
23 reorganization of Unocal, which would have been
24 December -- January -- December '02, January '03.
25 Q. And here on No. 33 where Sinz was asking

19 (Pages 70 to 73)

Page 82

1  procedures or practices at Unocal in regard to
2  records that Unocal creates?
3     A.  Unocal has a record management program.
4     Q.  And are you familiar with the record
5  management program?
6     A.  No.
7     Q.  But what is the record management program?
8     A.  I don't know.
9     Q.  Well, how do you know they have a records
10 management program?
11    A.  Because once I asked about retention of
12 records, and I was told five years. This is a
13 document -- records not related to this incident.
14    Q.  And who was it that told you there is a
15 five-year record retention policy?
16    A.  Back in Kenai, I asked the administrative
17 assistant, who asked someone in Unocal headquarters,
18 and the answer got back to me: Five years for
19 medical records.
20    Q.  Back to 756. When you worked for OSHA,
21 were you familiar with the term "creating employer"?
22    A.  Yes.
23    Q.  And what did -- do you recall what creating
24 employer referred to?
25    A.  Yes. It's the employer or a company that

Page 83

1  creates a hazard that is accessible by other
2  companies or other employees, employees of other
3  companies.
4     Q.  Now, this document indicates that Unocal is
5  the creating employer. Did you take exception with
6  that in your conference with Mr. Scanlon?
7        MR. THORSNESS:  Object to the
8  characterization by counsel of the document. Move to
9  strike.
10       MR. COHN:  Reject.
11    Q.  You can -- you may answer.
12    A.  No.
13    Q.  And was that part of the dispute you had
14 with whether or not Unocal should be cited in this
15 case with Mr. Scanlon?
16       MR. THORSNESS:  Excuse me. I'll object to
17 the question as vague. I don't understand the
18 question.
19       MR. COHN:  Well --
20       MR. THORSNESS:  Mr. Burns, if you
21 understand it, go ahead and answer it.
22       THE WITNESS:  If you'd like to rephrase it,
23 reask it.
24 BY MR. COHN:
25    Q.  Yeah. Let me show you -- well, we'll start

Page 84

1  over. 752. This is a closing conference notes by
2  the OSHA investigator?
3     A.  Right.
4     Q.  And on the bottom it says, "Were any
5  unusual circumstances encountered, such as, but not
6  limited to, abatement problems, expected contest
7  and/or negative employer attitude? If yes, explain
8  below."
9         And there is an X in the yes file that
10 says, "The Unocal safety consultant, Burns, stated
11 during the closing conference that the citation would
12 not go any further than the informal conference."
13       Do you recall that?
14    A.  It's misquoted. What I said is, more than
15 likely, having my experience with OSHA, that if we
16 were cited, we would go to an informal conference
17 rather than contest the violation.
18    Q.  And what is an informal conference?
19    A.  It's where we meet with the -- Mr. Scanlon,
20 who is the lead OSHA person - I don't know his exact
21 title - to discuss the violation, usually in the
22 presence of the safety consultant. In this case
23 Mr. Scanlon -- I mean --
24    Q.  Yeah.
25    A.  Excuse me. I've got the names mixed up.

Page 85

1  With the head of -- with the head of the compliance
2  section, and I don't have those names in front of me.
3  And usually at that conference, also the compliance
4  officer is there. Mr. Scanlon. He was not present
5  during this conference. Marc Bond counsel to Unocal,
6  and myself.
7     Q.  Yeah. I've been going through the records,
8  and I want to show you -- go back. Look at 738.
9  That's dated May 2, 2003.
10    A.  Yes.
11    Q.  At least handwritten in. Is that your --
12    A.  That's correct.
13    Q.  -- signature?
14    A.  Yeah.
15    Q.  And it looks like -- and this is a document
16 in which you're requesting an informal conference to
17 discuss the inspection.
18    A.  That's correct.
19    Q.  And then if you turn back one page to 737,
20 this is some notes in regard to that informal
21 conference. And it says -- it looks like you were in
22 attendance, Roxanne Sinz and Marc Bond, and then
23 there was John Stallone, the chief of OSHA, and Scott
24 Devry, federal OSHA. And underneath, on the
25 conference summary, it says, "Mr. Burns tried to make

22 (Pages 82 to 85)

Page 90

1  complaint as to the reason for the accident?
2     A. No, I don't.
3        MR. COHN: Why don't we go off record now.
4  We'll take our break now. What time is it?
5        MR. THORSNESS: It's 25 to noon.
6        MR. COHN: We'll come back at 12:30, and
7  then we can finish up.
8        MR. THORSNESS: Okay.
9        THE VIDEOGRAPHER: Off record, then?
10       MR. THORSNESS: Let's go off record.
11       THE VIDEOGRAPHER: Going off record. The
12 time is 11:35.
13       (Recess held.)
14       (Exhibit 5 marked.)
15       THE VIDEOGRAPHER: We're back on the
16 record. The time is 12:40.
17 BY MR. COHN:
18    Q. Good afternoon, Mr. Burns.
19    A. Good afternoon.
20    Q. I hope we -- I think we'll be able to get
21 you out in time because --
22    A. That's secondary, so it's whatever it
23 takes.
24    Q. Going back in regard to the safety
25 inspection that you did in 1998 and 1999. When you

Page 91

1  do a -- did the safety inspection, did you have any
2  prior building safety inspections available to you
3  when you conducted your own inspection?
4     A. The building in question?
5     Q. Yes.
6     A. No, I did not.
7     Q. Would that be useful to have prior
8  inspection to see what has been remedied from
9  previous inspections for hazards?
10    A. That's normally the procedure. The
11 procedure I use now when I go out and inspect
12 something, I look at the previous to make sure that
13 the items have been abated, and if they haven't, then
14 it becomes a more serious violation.
15    Q. When did you start that procedure?
16       MR. THORSNESS: Objection. Vague.
17 BY MR. COHN:
18    Q. Well, you said that that's the procedure
19 you use now.
20    A. Yeah.
21    Q. I'm just asking --
22    A. I would say when I joined Unocal in 1997.
23    Q. Okay. But at the time when you conducted
24 your inspections in '98 and '99, you didn't have
25 available -- did you review prior inspections of the

Page 92

1  building?
2     A. No.
3     Q. Did you know if there had been prior
4  inspections of the building?
5     A. I do not know that.
6     Q. Okay. But now if there are available prior
7  inspections, you would review those to see if
8  violations had been abated?
9     A. I have done that, yes.
10    Q. Have done it where? On platforms or other
11 facilities of Chevron?
12    A. We did a building inspection here the first
13 of the year at the request of the business unit
14 manager, and we used the 203 (as spoken) inspection
15 to make sure those were -- everything had in fact
16 been completed.
17    Q. When you say here, do you mean in --
18    A. Yeah.
19    Q. -- 909 West Ninth?
20    A. Right. Right.
21    Q. When you said a tool 3 inspection, what
22 does that mean? Did I --
23    A. I misquoted. The March 5, '03 inspection.
24    Q. Oh, so you --
25    A. That we've reviewed that's a matter of

Page 93

1  record.
2     Q. Oh, I see. You reviewed that when you did
3  an inspection this year?
4     A. In January, that's correct.
5     Q. And did you find that there were certain
6  items on that list that had not been abated?
7     A. Everything had been abated and corrected.
8     Q. Does that include the dim lighting in the
9  penthouse?
10    A. Yes.
11    Q. And when you say dim lighting in the
12 penthouse, would you be referencing -- because there
13 is a lot of rooms in there. Did you check all the
14 rooms for the lighting within each room in the
15 penthouse?
16    A. Yeah, um-hum.
17    Q. When -- do you recall that -- and I think I
18 quoted it from the OSHA records, that you and Roxanne
19 Sinz told Paul Crapps to remove the platform? Do you
20 recall that testimony?
21    A. I do.
22    Q. Did you give him any instructions in how to
23 do it?
24    A. No, I did not.
25    Q. Did you tell him what to do with the parts

Page 94

1  after he was --
2    A. No, I did not.
3    Q. Was there any reason why instead of just
4  destroying or dismantling the platform you couldn't
5  have built side rails and toe kicks?
6    A. A proper work platform could have been
7  constructed, yes.
8    Q. Did you consider that a proper work
9  platform?
10   A. No.
11   Q. Previously you said that you -- that you
12 may not have gone up to the penthouse before when you
13 did your '98 and '99 inspections. If you had, would
14 that be reflected on the '98 and '99 inspection, what
15 areas you inspected?
16   A. Only if there would have been a violation
17 or an item that needed abatement. If we found
18 nothing, then it would not have been mentioned.
19   Q. If you had conducted the '98 and '99
20 inspection and saw that work platform in the filter
21 room, would you have considered that a hazard to be
22 abated?
23   A. Yes.
24   Q. Now, in Exhibit 1 you indicated -- at least
25 in Exhibit 1 you indicated that the platform, the --

Page 95

1  you had stated, quote: It was obvious from the
2  structure that it had been erected many years ago.
3      Do you remember that from your notes, that
4  that's in the next-to-last paragraph?
5    A. Yes.
6    Q. Would you be -- would you be in a position
7  to dispute testimony that the platform had been there
8  for at least 12 years before the accident?
9    A. I would not comment on how long it had been
10 there.
11   Q. I mean, when you put that sentence in
12 your -- in your notes here, did you consider that --
13 why did you consider it significant enough to put
14 into your -- in your notes?
15   A. That there was an oversight on not having
16 that work platform erected properly. Someone in the
17 past years had failed -- or neglected to do their
18 job.
19   Q. Oh, okay.
20   A. Whether it was Unocal or the company that
21 Mr. Grove works for. Because we don't know who
22 erected the scaffolding. The work platform, excuse
23 me.
24   Q. When you say we don't know who, did you
25 have conversations about this with other Unocal

Page 96

1  individuals?
2    A. Paul Crapps.
3    Q. Paul Crapps. And do you know how long Paul
4  Crapps had been working in the building?
5    A. Well, as far as I know, when I first met
6  Paul was back when I went to Kenai the first time in
7  '98, '99 time frame. I can't be sure. And he was
8  the building maintenance supervisor.
9    Q. In previous discovery requests, there have
10 been some indications when defendant has answered
11 that they indicated that information and belief,
12 Siemens Building Technology, Inc., may have been the
13 owner of the building or creator of the platform. Do
14 you have any information as to that?
15   A. No.
16   Q. I think previously -- in your -- in Exhibit
17 1, you indicated that Tom Scanlon had presented the
18 complaint form from it, and I believe in your prior
19 testimony you indicated you might have looked at
20 the -- seen the complaint form.
21      Can you take a look at -- and it's Exhibit
22 4, I believe. And it would be LG 700.
23   A. I have that.
24   Q. Is this the complaint form that you would
25 be referring to? I mean, there is a couple other

Page 97

1  pages to it. Yeah, on the top it has a complaint
2  number, and it lists Siemens Building Technology as
3  the employer, and it says the hazard description,
4  "Using homemade, nonapproved scaffolding, cross
5  support fastener sheared when stepped on, causing
6  ankle injury." Do you recall that?
7     MR. THORSNESS: Mike, I'm sorry, what Bates
8  number?
9     MR. COHN: I'm sorry. It's 700, LG 700.
10    MR. THORSNESS: LG 700. Thank you.
11    THE WITNESS: This is an internal
12 Department of Labor document.
13 BY MR. COHN:
14   Q. That wouldn't be the complaint form --
15   A. No.
16   Q. -- that you said you saw?
17   A. No. This is Notice of Alleged Safety and
18 Health Hazard. That's his worksheet.
19   Q. Okay. That would be -- I'll take a look
20 separately for that document on a break, then.
21      But had you at some point been aware of the
22 fact that the -- that the allegation was that a bolt
23 had sheared, causing the collapse of the platform?
24   A. No. Sheared bolt, first time I heard that
25 was right there.

25 (Pages 94 to 97)

**Page 102**

1  A. It appears that way, yes.
2  Q. And do you see what look like cross beams
3  in the top picture?
4  A. Yes, I do.
5  Q. And do those appear to be the beams upon
6  which the plank is placed for access to the filters?
7  A. Appears to be, yes.
8  Q. Do you recall how high up the filters went
9  in that room?
10  A. From the photographs, it looks like they --
11  one of those, probably -- one, two, three, four.
12  Maybe 24 more inches, but without a picture depicting
13  the roof, I can't tell you.
14  Q. Well, there are some other pictures I don't
15  know if we need to show you, but I'll represent that
16  there's some testimony that may have been 13, 14,
17  feet high from the floor up to the ceiling or even
18  higher.
19  A. Eight, nine, ten, 11, 12, 13. That's
20  correct. That's just one -- 12 inches less than I
21  stated.
22  Q. Does that appear from the pictures that
23  you've seen to be kind of a rudimentary, makeshift
24  platform?
25  A. Yes.

**Page 103**

1  MR. THORSNESS: Objection to form of the
2  question. It's argumentative.
3  MR. COHN: Counsel, before I forget, do you
4  recall if we've been provided the safety inspections
5  that have been done previously, or they haven't been
6  able to be located?
7  MR. THORSNESS: They have not -- the
8  '98-99, to the extent those were written down, we
9  have not located those.
10  MR. COHN: I think my request is not just
11  simply for '98-9 -- for Mr. Burns.
12  MR. THORSNESS: Well, any prior
13  inspections.
14  MR. COHN: Okay.
15  MR. THORSNESS: We've just not located
16  them.
17  MR. COHN: I think Mr. Burns referenced an
18  inspection in January of this year. Could we get a
19  copy of that one too?
20  MR. THORSNESS: Well, you'll have to give
21  us a request for production to do that.
22  MR. COHN: Okay. It's the January --
23  Q. You did that one in January of this year?
24  A. I think that's correct, yeah, first part of
25  the year.

**Page 104**

1  MR. COHN: All right.
2  MR. THORSNESS: Then we'll decide, you
3  know, whether it's --
4  MR. COHN: Okay.
5  MR. THORSNESS: -- discoverable or not.
6  MR. COHN: That's fair enough.
7  MR. THORSNESS: Sure.
8  BY MR. COHN:
9  Q. Do you know how long Mr. Richardson had
10  been -- had he been an employee of Unocal before you
11  came on board?
12  A. Yes, but at different locations and not in
13  a safety position.
14  Q. Do you know who would have been conducting
15  any safety inspections in the building before you?
16  A. There were no safety specialists,
17  technicians or managers in that building prior to our
18  arrival in December '03 -- '02, January '03.
19  Q. You mean prior to your arrival, there was
20  nobody permanently stationed there?
21  A. That's right.
22  Q. My question had to do more with whether or
23  not there were people -- maybe it wasn't a good
24  question, but would there have been people, safety
25  specialists that you were aware of that in your --

**Page 105**

1  that had your position prior to you coming onto
2  Unocal that we can maybe find out who they are to
3  find out if they conducted any safety inspections?
4  A. The drilling safety manager, which --
5  excuse me. That's correcting a previous statement.
6  The drilling safety manager, who had
7  responsibilities only for drilling, was in that
8  building for a number of years till he got reassigned
9  to Indonesia.
10  Q. Do you know what his name was?
11  A. Lucien Abernathy.
12  Q. Do you know if he's still in Indonesia
13  right now?
14  A. No. He retired about three, four years
15  ago.
16  Q. That leads me to a question. You indicated
17  you're 69 now?
18  A. That's correct.
19  Q. Do you have any intention of retiring or
20  are you just going to --
21  A. Not before you.
22  Q. That's --
23  A. Lawyers retire early, I understand, so
24  that's why I say that.
25  Q. Well, I would like to, but I don't -- I