Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3   _____

4   LAWRENCE H. GROVE, CYNTHIA GROVE,      )
    SARAH GROVE and MICHAEL GROVE (DOB     )
5   1/21/88) by and through his father    )
    LAWRENCE H. GROVE,                     )
6                                          )
                    Plaintiffs,            )
7                                          )
    vs.                                    )
8                                          )
    UNOCAL CORPORATION,                    )
9                                          )
                    Defendants.            )
10  _____)

11  Case No. A04-0096 CV (JKS)

12

13

14  _____

15         VIDEOTAPED DEPOSITION OF CHARLIE ARNETT

16  _____

17              Tuesday, April 26, 2006
                      9:30 a.m.
18

19          Taken by Counsel for Defendant
                         at
20   Clapp, Peterson, Van Flein, Tiemessen & Thorsness
                711 H Street, Suite 620
21                 Anchorage, Alaska

22

23                                          Exhibit 11
                                            page 1 of 6
24

25

Page 4

1   ANCHORAGE, ALASKA; APRIL 25, 2006
2   9:30 A.M.
3   -o0o-
4       VIDEOGRAPHER: We're on record at 9:30.
5   This is the video deposition of Charles Arnett taken by
6   the plaintiff in the matter of Grove, et al. versus
7   Unocal Corp., Case Number A04-0096 CV (JKS), in the
8   United States District Court for the District of Alaska.
9       This deposition is being held in the offices
10  of Clapp, Peterson, Van Flein, Tiemessen & Thorsness,
11  located at 711 H Street, Suite 620, Anchorage, Alaska,
12  on April 25, 2006.
13      My name is Eric Cossman from Alaska Legal
14  Video, mailing address 645 G Street, #892, Anchorage,
15  Alaska 99501. The court reporter is Sonja Reeves from
16  the firm of Pacific Rim Reporters.
17      Will counsel please identify themselves for
18  the record?
19      MS. JOHNSON: Linda Johnson from Clapp
20  Peterson for Unocal.
21      MR. COHN: And Michael Cohn from the Law
22  Offices of Phillip Paul Weidner & Associates on behalf
23  of the plaintiffs.
24      One technical correction, the deposition is
25  being taken by the defendant, just for the record.

Page 5

1                   CHARLIE ARNETT,
2           deponent herein, being sworn on oath,
3           was examined and testified as follows:
4                      EXAMINATION
5   BY MS. JOHNSON:
6   Q. Mr. Arnett, would you be sure and spell your last
7   name?
8   A. A-r-n-e-t-t.
9   Q. Can you tell us what your educational background
10  is, please?
11  A. My educational background?
12  Q. Right. Graduate from high school?
13  A. Yeah, I finished high school, some college.
14  Q. What were you working towards in college?
15  A. Nothing specific, just generalized.
16  Q. Did you do any trade schools, anything like that?
17  A. No.
18  Q. Where are you working now?
19  A. I work for All Star Realty, Inc.
20  Q. When did you start working there?
21  A. I want to say June '03.
22  Q. And what do you do for them?
23  A. I take care of the maintenance department. It's
24  a property management company.
25  Q. How many properties are there?

Page 6

1   A. That I don't know.
2   Q. More than 100?
3   A. There could be.
4   Q. Do you do general maintenance or do you
5   supervise?
6   A. I coordinate any maintenance that needs to be
7   taken care of.
8   Q. So you actually don't do it yourself? You make
9   sure that other people are doing it?
10  A. Correct. I get the job done.
11  Q. Before All Star Realty, where did you work?
12  A. Well, I actually worked for Peak Oilfield
13  Services, but it was at the Unocal building.
14  Q. So you were a Peak employee?
15  A. Yes.
16  Q. How long were you a Peak employee?
17  A. About five years, I think.
18  Q. You left in '02; is that correct?
19  A. November '02, yes.
20  Q. Do you recall what year you started with them?
21  A. '90. Well, with Peak?
22  Q. With Peak, right.
23  A. '97, I think.
24  Q. And then who was your employer before Peak?
25  A. I was with Kelly Services for about six months.

Page 7

1   Q. Before Kelly Services?
2   A. Professional Business Services.
3   Q. Where was that at? Was that in Anchorage?
4   A. Yes.
5   Q. And how long were you with Professional Business
6   Services?
7   A. From '90 up until '96.
8   Q. And before Professional Business Services?
9   A. You are asking me something that's 15 years ago.
10  Q. I know. I'm sorry. I was just trying to figure
11  out what kind of experience in the industry you have.
12  A. Which industry?
13  Q. Well, especially the maintenance work that you
14  have been doing. What did you do for Professional
15  Business Services?
16  A. I was hired as computer operator for Unocal.
17  Q. So how did you learn to be a computer operator?
18  A. Air Force.
19  Q. When were you in the Air Force?
20  A. '78 to '87.
21  Q. When did you come to Alaska?
22  A. '80.
23  Q. So did you retire from the Air Force in Alaska?
24  A. Yes.
25  Q. So from that, we are only missing three years.

4 (Pages 4 to 7)

Page 96

1  door that appeared to still be intact?
2       MS. JOHNSON: Objection; form of the
3  question.
4    A. I don't remember seeing one.
5    Q. Well, do you recall -- do you recall if there was
6  more than one cross beam or bracket which held up the
7  planks?
8    A. No. I don't remember seeing any. Just because
9  of the angle, this stuck out in my mind because it was
10 like there.
11   Q. Now, you indicated that -- in questioning you
12 said that Larry Grove was obviously hurt. What do you
13 mean by that?
14   A. Well, he was moaning, shortness of breath.
15   Q. Was he -- were you able to see any -- you say you
16 saw some cuts on his --
17   A. Yes. It looked like the shin of one of his legs.
18 He pulled his pant leg up and showed me where maybe the
19 platform had hit to indicate that he was in pain.
20   Q. That was going to be one of my questions, how
21 would you tell, whether he was wearing shorts. He was
22 wearing long pants?
23   A. Yes.
24   Q. Now, you were showed these photos in Exhibit
25 No. 3 and asked some questions about the ladder, but do

Page 97

1  you know when these photos were taken?
2    A. No.
3    Q. So you have no idea whether, at this time,
4  whether that ladder was in the room at the time of the
5  accident?
6    A. I don't know. I just remember seeing the ladder
7  there.
8    Q. But you do recall that cross beam or bracket
9  that's down in this picture?
10   A. Yes.
11   Q. Can you just point that bracket out for the
12 camera that you recall seeing?
13   A. This one here.
14   Q. Can you just hold it there?
15      MR. COHN: Did you get that? Thank you.
16   Q. Now, you indicated that the bolt had been --
17 looked sheared?
18   A. It looked like it was sheared.
19   Q. What does that mean to you?
20   A. The bolt looked rusted and old all the way around
21 it, but the end looked like it was nice and shiny like
22 it had been cut or it wasn't a smooth end, but it was
23 very shiny compared to the rest of them.
24   Q. So from looking at that, did it appear to you
25 that that had sheared off causing the platform to

Page 98

1  collapse?
2    A. It looked like it had been sheared off because,
3  like I say, the area that I saw was not smooth. It was
4  -- it just wasn't smooth. It was kind of --
5    Q. Jagged?
6    A. Yeah.
7    Q. When you -- now, you indicated you helped
8  Mr. Grove get up and leave the room. Did anybody see
9  the two of you together on the way out of the building,
10 to the best of your personal recollection?
11   A. Best of my -- I don't remember seeing anyone in
12 the elevators. If anyone would have seen us, it would
13 have been the receptionist.
14   Q. Do you know the name of the receptionist?
15   A. No, I don't, to be honest with you, because we
16 went through -- back at that time, we had gone through
17 two or three different receptionists.
18   Q. So it would probably be a matter of the time
19 cards for Unocal to see who the receptionist was on duty
20 on September 9th '02?
21   A. (Witness nods head.)
22   Q. Was there one entrance into the building?
23   A. There are actually two entrances to the building,
24 but everyone used the north entrance all the time.
25   Q. When you -- the north entrance, are those glass

Page 99

1  doors?
2    A. Yes.
3    Q. When you enter the north entrance, is the
4  reception area on your right as you come in?
5    A. Yes, through another set of glass.
6    Q. If you keep going straight, do you then instead
7  of turning right into the reception area, you reach the
8  elevators?
9    A. You mean when you first go into the building?
10   Q. Right.
11   A. Yes. You go in through the outside doors and
12 then you got another set of doors where you put your
13 coat in, and then you go through there and then the
14 elevator is on the right-hand side.
15   Q. Is it -- normally would you -- was your office
16 through the reception area?
17   A. My office is located behind the receptionist,
18 yes.
19   Q. Now, you indicated that Mr. Grove had an access
20 code and that --
21   A. I believe so, yes.
22   Q. But that Unocal could tell -- whenever the access
23 code was used, it would be input into some sort of
24 system?
25   A. It was kept on a PC, yes.

27 (Pages 96 to 99)

Page 112
1  A. Yes.
2  Q. When was that?
3  A. It was early the following year, about
4  springtime. That's about the best I can remember. And
5  I was only -- I wasn't actually in the building. I was
6  more like in the reception area.
7  Q. Why were you in the building?
8  A. Well, I went there once just to say hi to some
9  old friends, but no one was around, so I left. They
10 were all out to lunch.
11 Q. Do you recall ever talking to any inspectors from
12 OSHA?
13 A. Yes.
14 Q. Do you recall -- well, tell us what they asked
15 you and what you told them.
16 A. Well, again, this was a long time back.
17 Q. Based on the best of your personal recollection.
18 A. When I talked to them, I didn't talk to them
19 face-to-face. It would be a phone call. And he just
20 asked me background on the room, if I remember Larry, an
21 accident happening with Mr. Grove, and I said yes.
22    He asked me, you know, when the platform -- if I
23 knew about the platform, and, if so, when was it put in.
24 And, of course, I had no knowledge of it. I don't know
25 when it was put in.

Page 113
1    He was asking me who may have known, and I told
2  him, well, the people that I worked for as long as I
3  have been there have been Don Acres, Eddie Barrett,
4  Archie Cook, but prior to that, I don't know.
5  Q. What did you tell him about Don Acres, Eddie
6  Barrett and Archie Cook?
7  A. That Don Acres was the building manager at the
8  time, that he may know something about it.
9  Q. Now, even though you became a Peak employee, did
10 you take your direction from Unocal employees as to what
11 you would do in the building?
12 A. Yes.
13 Q. And when you talked about your time cards, they
14 would go through Archie Cook for him to review before
15 going back to you to be faxed to Peak?
16 A. Correct, because he would have to sign it.
17 Q. I am just going to go through this quickly
18 because there was some questioning here about your
19 records in terms of you indicated that as a building
20 maintenance tech one that your pay was higher, but you
21 were being directed to Exhibit No. 4, page 200614, in
22 which your pay as a building maintenance tech one was
23 the same as a building specialist.
24    And it appears that once you became a building
25 specialist, all the time for building maintenance tech

Page 114
1  was overtime.
2     And you indicated that your pay rate was higher
3  as a maintenance tech after you became a building
4  specialist. Do you recall that testimony?
5  A. Yes, but there are two titles in there for
6  building maintenance tech. One is maintenance tech one.
7  The other one is maintenance tech two.
8     I believe maintenance tech two involved wearing a
9  face mask; thus, that was a higher rate of pay.
10 Q. Well, it looks like they have building
11 maintenance tech one listed, but it looks like starting
12 on page 200616 where it lists building maintenance tech,
13 your pay rate does reflect 32 as opposed to 21.5. Do
14 you see that?
15 A. Yes.
16 Q. So at some point your pay scale went up when you
17 were doing building maintenance tech work; is that
18 correct?
19 A. Correct.
20 Q. Yeah. That was the only point I was going to
21 make in regard to that. Actually, now that we're on
22 Exhibit No. 4, there was some reference to safety
23 awards.
24 A. Right.
25 Q. Do you know if you were singled out for a safety

Page 115
1  award or whether or not this was given to all eligible
2  employees?
3  A. These were given to all Peak employees, because
4  the way I understood it, the company had gone a year
5  without any accidents.
6  Q. Now, in your job, were you a maintenance
7  coordinator at the Unocal building when you were on the
8  Peak payroll?
9  A. No. You mean reference to my job title?
10 Q. Right.
11 A. My job title changed two or three times. God, I
12 want to say -- again, this is my memory, but I want to
13 say I was originally hired as building maintenance one.
14    Maybe it was -- I thought it was building
15 maintenance tech one, building maintenance tech two, and
16 then I don't remember which one, but I thought two was
17 concerning the full face respirator. I may have that
18 backwards.
19    And then later when Eddie Barrett left, retired,
20 it took a while, but I finally got a pay raise because I
21 was taking over some of his duties. And that's when I
22 became building maintenance specialist, and that
23 increased the pay there, too.
24 Q. Now, in terms of the building, if you, let's say,
25 put a new chair in your office, could you just go out

Page 116

1  and get a new chair?
2      A. No. I would have to get authorization from
3  Archie.
4      Q. To the best of your personal knowledge, given the
5  position you were in while you were working in the
6  Unocal building, would Unocal have to give approval and
7  authorization to build a work platform inside the
8  building?
9      A. Yeah, they would have to give authorization.
10     Q. To the best of your personal knowledge, would
11 Unocal inspect any work that was done by the -- if you
12 built a work platform, would Unocal inspect to make sure
13 that it met specifications?
14         MS. JOHNSON: Objection; foundation.
15     A. I don't know. I would assume they would.
16     Q. Have you seen any work that was done in the
17 building where -- that Unocal employees came and
18 inspected to make sure that it met Unocal's requirements
19 while you were working there?
20     A. I don't recall that, no.
21         MR. COHN: Let's take a break.
22         VIDEOGRAPHER: Off record. The time is
23 1:08.
24         (There was a short break.)
25         VIDEOGRAPHER: Back on the record. The time

Page 117

1  is 1:14.
2      Q. Good afternoon again, Mr. Arnett, and I'll try
3  and make this reasonably brief.
4         You indicated that you had gotten an asbestos
5  certificate. Did you get the asbestos certificate
6  because of the asbestos problem in the Unocal building?
7      A. Yes. I was asked by Don Acres if I wanted to
8  take training for it, and I agreed to it.
9      Q. What type of training did that involve?
10     A. Mostly classroom. Some hands-on.
11     Q. Did they already -- did Mr. Acres already know
12 that there was an asbestos problem in the building?
13     A. Yes.
14     Q. You referenced -- you talked about intranet
15 before. Can you tell me was there like an internal
16 intranet Unocal system?
17     A. Yes. Unocal had its own communications
18 networking systems in the computer room, especially to
19 handle the various PCs in the building.
20     Q. Did you communicate with Mr. Acres or Barrett or
21 Mr. Cook by the intranet?
22     A. No, mostly verbal.
23     Q. Did you get any instructions from them through
24 the intranet?
25     A. I don't recall any specific instructions on

Page 118

1  things. Maybe times for meetings, staff meetings,
2  things like that, through e-mail.
3      Q. You attended staff meetings during your time at
4  the building?
5      A. I attended very few.
6      Q. And can you give me -- did they have like a
7  written handout when you would go to these staff
8  meetings as to what was going to be discussed?
9      A. No. I call them staff meetings because it was
10 actually meetings between myself and Archie Cook on
11 problems that were going on, status updates, things like
12 that.
13     Q. Okay. When you first came on way back and doing
14 the computer work around 1990, did you say?
15     A. Yes.
16     Q. Did you have any orientation as to the building
17 that was given to you by Unocal?
18     A. You know, I don't remember, but I believe there
19 was.
20     Q. And do you recall whether that involved going
21 through safety procedures for the building?
22     A. Yeah. I mean, a lot of it was what to do in case
23 fire alarms went off, different things like that that
24 most buildings have.
25     Q. Now, at that time you were working in the

Page 119

1  computer room mainly. In that orientation, did they
2  ever have you go take a look at the penthouse?
3      A. No.
4      Q. Did there ever come a time when you switched from
5  computer to building maintenance section that you were
6  given an orientation of the penthouse?
7      A. If I did, it would have been done by Don Acres.
8  It would have been more like a walk-through.
9      Q. Can you describe -- would the walk-through entail
10 him showing you everything?
11     A. Basically, you know, he would show me where the
12 boilers were in relation to the building, where the gas
13 alarms were.
14        There was a gas alarm in there, which was tied
15 into the building fire system. Where the air supply
16 room was, radio room.
17     Q. Would he have opened the doors and showed you the
18 inside of the rooms, to the best of your recollection?
19     A. Yeah.
20     Q. You talked about a lot of -- especially in 2001
21 you indicated you had a lot of overtime because there
22 was a lot of work being done in the building?
23     A. Correct. They were going through and doing a
24 couple different reconstruction projects at the same
25 time, and plus we had had furniture shipped up from

Page 124

1  Siemens Building Technology and obtained this document.
2      I wanted to just ask you about this. Do you
3  recall this document?
4      A. Yes.
5      Q. And let me ask you, why would it be, to the best
6  of your knowledge, why would it be presented to you?
7      A. Well, the only reason I could think of is because
8  I was taking care of building services. This was a
9  building services function was to get proposals on
10 support for certain systems within the building that we
11 didn't have manpower to take care of or the expertise
12 to.
13     Q. When you get a document such -- so you would have
14 gotten documents such as this from other vendors?
15     A. Yeah, and then I would in turn present them to
16 Archie.
17     Q. Would you have yourself reviewed the document?
18     A. Yeah, I would have reviewed it.
19     Q. I want to show you -- it's not a numbered page,
20 but if you go past page nine of the document, then there
21 is an attachment to it. It says, "Siemens Building
22 Technology, Inc. terms and conditions."
23     And if you go to the second page after the one
24 that's labeled "Article Six, Customer Responsibilities,"
25 and I'll represent that actually it says -- and then

Page 125

1  SBTI presumably stands for Siemens Building Technology,
2  Inc.
3      And is it your understanding that when they say
4  "customer," they are referring to Unocal?
5      A. That is correct.
6      Q. Now, under "customer responsibility, 6.3," can
7  you read what that says?
8      A. Yeah. "Customer will provide SBTI with
9  reasonable means of access to the equipment and shall
10 make any necessary provisions to reach the equipment and
11 peripheral devices. Customer will be solely responsible
12 for any removal, replacement or refinishing of the
13 building structure or finishes that may be required to
14 gain access to such equipment."
15     Q. You indicated that you would have seen this
16 document and reviewed it and then passed it on to Archie
17 Cook?
18     A. Yes.
19     Q. It's been established that there was a work
20 platform in the filter room, and I'll represent to you
21 that that work platform was used by Siemens technicians,
22 such as Larry Grove, to replace the filters that were
23 higher up in the room.
24     The section that you just read, would you
25 interpret that to mean that Unocal was to provide access

Page 126

1  for the Siemens technicians to change the filters?
2      MS. JOHNSON: Objection; foundation, calls
3  for a legal conclusion.
4      A. I would think that it would indicate that, you
5  know, that the customer would have to provide a means to
6  access it, yes.
7      Q. And is that how you interpreted it when you saw
8  this document?
9      MS. JOHNSON: Objection; foundation.
10     A. Well, that's the way I interpret it, yes, but --
11     Q. I know there was an objection to foundation, but
12 since you reviewed it and who else would have a
13 foundation to testify what you yourself thought about
14 the document?
15     MS. JOHNSON: Objection to speaking. You
16 are not the witness here, Mike.
17     MR. COHN: The witness -- it will just speak
18 for itself what he testified about.
19     Q. Now, have you ever had occasion yourself to bring
20 like ladders, take a ladder and go up to the penthouse?
21     A. No.
22     Q. Would it be -- do you know how tall the elevators
23 are in the building?
24     A. Well, if you don't take the level out, they are
25 probably seven or seven and a half maybe. I don't

Page 127

1  believe they are eight feet.
2      Q. Were you aware that there may have been Siemens
3  technicians, including Larry Grove, that couldn't get
4  the ladder that they had into that elevator?
5      MS. JOHNSON: Objection; form.
6      Q. Did you have any personal knowledge of that?
7      A. No.
8      Q. But in any event, you would have to have a ladder
9  that would be small enough to fit into that elevator;
10 otherwise, you would have to go up the stairs; is that
11 correct?
12     A. That is correct.
13     Q. Even if you fit the ladder into the elevator, you
14 still have to go up a flight of stairs after you get out
15 of the elevator to get up into the mechanical room?
16     A. Correct.
17     Q. Even after you are in the mechanical room, you
18 have to go and keep turning right and going underneath
19 equipment to get in there to the filter room?
20     A. Yeah, you would have to. There would be duct
21 work overhead for air supplies.
22     Q. It would be easier just to maintain a structure
23 inside the building as opposed to having to take an
24 apparatus up into the filter room each time you went to
25 change the filters?

34 (Pages 124 to 127)