IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

LAWRENCE H. GROVE, CYNTHIA
GROVE, SARAH GROVE, and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

    Plaintiffs,

vs.

UNOCAL CORPORATION,

    Defendant.
_____/
Case No. A04-0096 CV(JKS)



**VIDEOTAPED DEPOSITION OF LAWRENCE H. GROVE**

Pages 1 - 158, inclusive

Friday, November 12, 2004, 10:42 a.m.

Anchorage, Alaska



Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

EXHIBIT _C_
PAGE _1_ OF _3_

Page 89

1    A.  Depends on the job.
2    Q.  Some have handrails, some don't.  Is that
3  right?
4    A.  Yes.
5    Q.  Okay.  Did the one at Unocal have handrails?
6    A.  No.
7    Q.  Did you -- you have already -- we have
8  already discussed that the -- the only purpose for
9  that scaffolding, in your opinion, was to change air
10 filters, right?
11   A.  (Witness nods head.)
12   Q.  You never --
13      THE REPORTER:  Is that a --
14      MR. COHN:  You got to --
15 BY MR. MARTIN:
16   Q.  Is that a yes?
17   A.  Yes.
18   Q.  Sorry.  Did you ever look at the -- the
19 mechanism that that scaffolding was -- was bolted to
20 the wall?
21   A.  No.  You don't have time to do that on every
22 job.  If you did that, you wouldn't get any work done.
23   Q.  Okay.  Did you -- did you ever have any
24 reason to suspect that that scaffolding was unsafe?
25   A.  No.  Because it's been there for so long, I

Page 90

1  figured that people were using it for years.
2    Q.  Now you have said that once or twice.  Your
3  understanding of the fact that you believe this
4  scaffolding has been there for some time is based on
5  conversations you've had with a number of people since
6  the accident, right?
7    A.  Yes.
8    Q.  Did you have any basis for believing how old
9  this scaffolding was when you first saw it?
10   A.  No.
11   Q.  Did you look at it, for example, and say,
12 man, that thing is old?
13   A.  No.
14   Q.  You didn't look at it and say, wow, that
15 looks shiny and brand-new?
16   A.  I have got a job-specific -- specific task,
17 no.
18   Q.  It was -- it was there.  It appeared to be
19 there for your use --
20   A.  Right.
21   Q.  -- to -- to change air filters?
22   A.  Correct.
23   Q.  That's all you know?
24   A.  That's all I know.
25   Q.  Okay.  And on September 9th, 2002, you were

Page 91

1  on that scaffolding, right?
2    A.  That's correct.
3    Q.  And it collapsed?  Is that what happened?
4    A.  Yes.
5    Q.  Okay.
6    A.  I -- well, I'll tell you what happened.  I
7  changed the bottom rows of filters as high as you can
8  go, and went up, got on the work platform, went to
9  reach out, and it collapsed.
10   Q.  Okay.  Had you ever been on there before
11 that day and felt that scaffolding might be wobbly or
12 anything of that nature?
13   A.  No.
14   Q.  Okay.  So it seemed safe up until that time?
15   A.  Up until that time, yes.
16   Q.  Did you ever have any reason to believe that
17 it was unsafe because it didn't have handrails?
18   A.  No.
19   Q.  Okay.  Did you write a letter to the
20 Department of Labor filing a formal complaint against
21 Siemens?
22      MR. COHN:  Can you show him the letter, and
23 can I see --
24      MR. MARTIN:  I will.
25      MR. COHN:  -- a copy of that.  I would like

Page 92

1  to see a copy of what you're --
2  BY MR. MARTIN:
3    Q.  Did you?
4    A.  Against Siemens?
5    Q.  Yes.
6    A.  I reported the accident, and I just filled
7  out the paperwork as the OSHA officer indicated.
8       MR. COHN:  I would like to see a copy of the
9  letter, please.
10      MR. MARTIN:  I can give you a copy when I'm
11 prepared to give you a copy.
12      MR. COHN:  I want to see a copy now.  If
13 you're going to make --
14      MR. MARTIN:  How do you even --
15      MR. COHN:  -- make that an exhibit --
16      MR. MARTIN:  -- know what I'm looking at?
17      MR. COHN:  Well, you're referring to a
18 letter.  I would like to see the letter.
19      MR. MARTIN:  I'm looking at something, but I
20 haven't decided that I want to enter it in as -- as an
21 exhibit yet.
22      MR. COHN:  Well, as matter of courtesy --
23      MR. MARTIN:  I -- I think you ought to
24 just -- I think you ought to just let me turn it over
25 when I will.  I'm going to do everything professional

**Page 125**

1  Q. You had other concerns?
2  A. Yeah. Get to the hospital.
3  Q. And so did you make a -- did you have a cell
4  phone on you?
5  A. Yes, I did. I called Charles to come give
6  me a hand getting out of there. Charles --
7  Q. Did he come up?
8  A. Yes, he did.
9  Q. Did he help shoulder you out of there?
10 A. Yeah, he helped me out.
11 Q. Okay. And then how did you get to the
12 hospital?
13 A. Drove with one foot.
14 Q. Okay. You drove yourself to the hospital?
15 A. Right.
16 Q. You drove with your right foot, though?
17 A. My left foot.
18 Q. Oh, really?
19 A. Uh-huh.
20 Q. Okay. It must have been kind of hard?
21 A. Well, that's the only one that worked.
22 Q. Yeah.
23     MR. COHN: I know it's unusual, but I think
24 Cynthia had some question about whether you drove to
25 the hospital or not.

**Page 126**

1     THE WITNESS: Well, I drove to the doctor's,
2  attending physician. And I called Cindy at work. And
3  that's when the doctor decided to send me to
4  Providence. And she came down and picked me up and
5  took me to Providence. That's how that took place.
6  BY MR. MARTIN:
7  Q. She picked you up from the attending
8  physician?
9  A. Correct. It was close to -- fairly close
10 to --
11 Q. This is Laufer?
12 A. Yes.
13 Q. Picked you up from Laufer, took you to
14 Providence --
15 A. Right.
16 Q. -- for further care?
17 A. Yeah. I had no idea the injury was that
18 severe so...
19 Q. Okay. Did you talk to Mr. Arnett, after he
20 got to the filter room, about what had happened?
21 A. He just looked at it and said, what
22 happened? I said, the darn thing collapsed, come down
23 on my ankle. He said, let's get you out of here.
24 Q. He didn't say -- I mean, he didn't say
25 anything about the -- the scaffolding?

**Page 127**

1  A. Not at that time, no.
2  Q. Did -- did you talk to any --
3     THE VIDEOGRAPHER: Excuse me, Counsel.
4  Buried our microphone. Thank you.
5     MR. MARTIN: Did you pick up what I had said
6  before that? I'm sorry.
7     THE VIDEOGRAPHER: Right up until your last
8  question.
9  BY MR. MARTIN:
10 Q. Did you talk to anyone else other than
11 Charles about the scaffolding failing, before you left
12 that day to go to the doctor?
13 A. Not that I can remember, no.
14 Q. The next day when you came back,
15 September 10th, to take the pictures, did you talk
16 with anyone, any Unocal employees?
17 A. Charles was not in there. His manager was
18 not in there. So I just used my security access and
19 went upstairs and took the pictures.
20 Q. Did you talk to any Unocal employees about
21 the incident that day?
22 A. No.
23 Q. October 10th?
24    MR. COHN: September 10th.
25 BY MR. MARTIN:

**Page 128**

1  Q. September 10th?
2  A. September 10th, no.
3  Q. Did you talk with any Unocal employees at
4  all after the incident?
5  A. Just Charles once. It was just brief. He
6  asked me how I was doing. And OSHA went down, did an
7  inspection. And after that, nobody really said much
8  about anything after that.
9  Q. Did you talk to your own employer at all
10 about this incident after it happened?
11 A. Yes.
12 Q. Who in particular did you talk with?
13 A. My branch manager and my service department
14 supervisor. Service department supervisor would be
15 Leverette Hoover. Leverette, L-e-v-i-t-t (sic)
16 Hoover. And our branch manager at that time was Ben
17 Sietz, S-i-e-t-z.
18 Q. And did you -- are they both people who work
19 in the Anchorage office?
20 A. The only one there now is Ben Sietz.
21 Mr. Hoover is now an employee of Johnson Controls in
22 Michigan.
23 Q. At the time they worked in -- in the
24 Anchorage office?
25 A. Yes.