# Condensed Transcript

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE; CYNTHIA
GROVE; SARAH GROVE; and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

   Plaintiffs,

vs.                                      Case No. A04-0096 CV (TMB)

UNOCAL CORPORATION,

   Defendant.

**DEPOSITION OF**

**JOSEPH D. BALSER, Ph.D.**

August 15, 2007
9:13 a.m.

Hilton Oakland Airport
One Hegenberger Road, Suite 1104
Oakland, California

Susan F. Magee, RPR, CLR, CSR No. 11661

Exhibit 3
page 1 of 13



**setdepo**℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**21**

1  so I didn't produce them here today. But if you wish, I
2  will be glad to make a copy of those for you.
3     Q. Yes.
4     A. I have them in my computer.
5     Q. I absolutely need to have a copy of all those.
6     A. I will provide them.
7     Q. And these, then, were photographs of the bolts
8  and nuts and washers taken on February 13th, 2004?
9     A. Yes.
10    Q. I'm curious. And maybe you just have a great
11 memory, but how is it you remember that date so well if
12 you don't have any notes or --
13    A. I don't make that many trips to Anchorage, and
14 I was up there that time on another case and went over
15 to see Mr. Weidner, and he introduced me to this case.
16 And I recall that day because it was the day before
17 Valentine's Day, and I had to get home to see my wife.
18    Q. There you go. Good man. All right.
19       MR. THORSNESS: Mike, I'm going to be
20 contacting you about these photographs.
21       MR. COHN: Okay.
22       BY MR. THORSNESS: Q. And did you take a
23 picture of the envelope too or do you know?
24    A. I may have. I simply honestly don't recall if
25 there was something written on that envelope or not, but

**22**

1  I have a copy -- photograph of the envelope, and if
2  there's writing on there it will show.
3     Q. About how many photos did you take, Dr. Balser?
4     A. I don't have a good recall, but I would say a
5  dozen or two dozen photographs.
6     Q. All right. Thank you. Is that the only
7  occasion you ever spoke to Larry Grove?
8     A. Yes.
9     Q. All right. And you say that was about five
10 minutes?
11    A. Yes, it was. Very brief.
12    Q. All right. What did Mr. Weidner tell you that
13 day about the accident?
14    A. The story was very consistent with what
15 Mr. Grove told me, that Mr. Grove had fallen off of this
16 platform when it collapsed and that he had sustained
17 injuries because he fell something like six, seven feet
18 something like that to the ground, and he described this
19 perforated angle iron construction of this scaffold.
20    Q. Yeah. Did he show you any photographs that
21 Mr. Grove had taken the day after the accident?
22    A. No. I didn't see those photographs until a
23 little bit later when they sent me a copy.
24    Q. Did you look at anything that day besides the
25 assortment of nuts and bolts that were inside that

**23**

1  manila envelope?
2     A. No. That was my introduction was to the actual
3  event.
4     Q. All right. Dr. Balser, have you made any
5  calculations, mathematical calculations in arriving at
6  your opinions in this case?
7     A. No.
8     Q. Have you reviewed the calculations of
9  Dr. Morin, Unocal's metallurgical expert?
10    A. I perused those calculations so that I knew
11 what he had done. I didn't check his calculations or
12 anything like that. I simply observed what he had done.
13    Q. You say you perused his calculations; right?
14    A. Right.
15    Q. Do you have any basis to disagree with any of
16 his calculations?
17    A. No, I do not.
18    Q. They all looked in order and correct?
19    A. They looked in order. I questioned the
20 pertinence of that analysis with regard to what really
21 happened in this accident, but I don't have any real
22 objection to the calculation as he made them.
23       MR. THORSNESS: All right. Would you mark that
24 please, Susan.
25       (Whereupon, Exhibit 1 was marked for

**24**

1  identification.)
2        BY MR. THORSNESS: Q. Dr. Balser, I just
3  handed you some pages from Dr. Morin's report in this
4  matter, all right?
5     A. Yes.
6     Q. And specifically I've handed you page 700102
7  through 700109 inclusive.
8     A. See, I have up through -8, and there's -9 on
9  the back.
10    Q. And for the record, those are double-sided
11 copies; right?
12    A. Yes.
13    Q. All right. You reviewed Dr. Morin's report,
14 didn't you?
15    A. Yes. I said I perused it, yes.
16    Q. All right. And do you recall seeing these
17 pages I've just given you, Exhibit 1?
18    A. Yes. They look familiar.
19    Q. All right. And ask you a general question. In
20 terms of both the accuracy of the statements and
21 calculations, is there anything in these pages that you
22 believe to be incorrect?
23    A. No. I certainly don't believe there's anything
24 incorrect here. The data is what it is.
25    Q. The data is what it is. And you have no reason



Exhibit 3
page 2 of 13

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

29

1  Q. Sure. All right. If these are, in fact, the
2  machine screws and your analysis just happens to be
3  erroneous, then would Dr. Morin's analysis be relevant
4  to the causation of this accident?
5  A. No.
6  Q. Why not?
7  A. Because there weren't any screws in the joint
8  that failed, okay, so all the analysis of screws in
9  terms of its hardness and its strength have no relevance
10 to the cause of this accident.
11 Q. And why weren't there any in there, you say?
12 A. Because the square nuts had vibrated off the
13 screws and the screws had fallen out, and you had
14 nothing but a loose joint there on the plenum side of
15 the corridor where this joint separated and caused the
16 accident.
17 Q. So literally is it your testimony that when
18 Larry Grove stood up on that platform that morning the
19 first time, at that joint there were no nuts?
20 A. There were no bolts or nuts in the joint.
21 Q. No bolts or nuts whatsoever?
22 A. That's correct.
23 Q. And they had fallen out?
24 A. They had already been gone for some time.
25 Q. For some time. So the only thing holding that

30

1  horizontal piece up was the fact that the horizontal
2  angle metal rested on top of the vertical angle metal?
3  A. That's correct, and it was held down by the
4  weight of the wooden plank.
5  Q. I see. Would you agree with me that had
6  Mr. Grove bothered to look up at that joint that morning
7  before he got up on the platform, he could have easily
8  seen that there were no nuts or bolts in that particular
9  joint?
10 MR. COHN: Objection to the form of the
11 question. Speculation.
12 THE WITNESS: My answer would be that that's
13 not a realistic expectation. I'll give you an example.
14 I drive a car every day. And I don't go inspect every
15 nut and bolt to see if it's in place on the automobile
16 before I drive it to make sure that it's safe. There's
17 a presumption that if a structure is there for you to
18 climb on, there's a presumption of safety in that
19 structure.
20 BY MR. THORSNESS: Q. I'm not asking you about
21 Mr. Grove's habits to take care for his own safety. I'm
22 asking you, wouldn't it -- would you agree with me it
23 would have been relatively easy had he desired to do so
24 for Mr. Grove to look up that morning and make sure
25 there were fasteners in place in the joints of these

31

1  horizontal and vertical members?
2  MR. COHN: Objection to the form of the
3  question.
4  THE WITNESS: If that had been foremost on his
5  mind as a priority in his work habits, he might have.
6  If he was concentrating on the job at hand which is to
7  change filters, I think it would be very logical that he
8  may not have bothered to study that structure before he
9  climbed on it.
10 BY MR. THORSNESS: Q. Again, you're
11 misunderstanding my question.
12 A. I'm sorry.
13 Q. What I'm asking is, had he desired to do so --
14 let's get past that for a moment. Let's say had he
15 desired to take the time to inspect these joints, would
16 you agree that that would have been relatively easy for
17 him to accomplish?
18 MR. COHN: Objection to the form of the
19 question and speculation.
20 THE WITNESS: I believe that if that was his
21 specific goal was to inspect these joints for their
22 integrity.
23 BY MR. THORSNESS: Q. Yes.
24 A. Could he have noticed that these nuts and bolts
25 were missing, yes, he could have.

32

1  Q. All right. And certainly given Mr. Grove's
2  long experience as an HVAC technician, isn't that --
3  wouldn't that make it more likely that he would notice
4  had he bothered to look that these nuts and bolts were
5  missing?
6  MR. COHN: Objection. Foundation.
7  Speculation. Form.
8  THE WITNESS: As I understand the role of an
9  HVAC guy, his specialty is air-conditioning systems and
10 so forth. Whether or not he's qualified to examine a
11 joint or look at the structural integrity of a scaffold,
12 I don't believe that that's within the realm of what you
13 would consider to be an HVAC technician.
14 BY MR. THORSNESS: Q. So you don't think he
15 was -- you don't think he was qualified to look up and
16 see if there were nuts and bolts holding that
17 scaffolding together that morning?
18 MR. COHN: Objection. Argumentative.
19 BY MR. THORSNESS: Q. Is that really your
20 testimony?
21 MR. COHN: Form. Speculation.
22 THE WITNESS: I don't believe that's his role,
23 no.
24 BY MR. THORSNESS: Q. But he was certainly
25 able to do that?

Exhibit 3
page 3 of 13



setdepo SM
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 41

1 supplement your report?
2   A. It has not occurred to me to ask him, no.
3   Q. Did Mr. Cohn ever ask you to supplement your
4 report?
5   A. No.
6   Q. Any other opinions which you plan to offer at
7 trial which are not set forth in your report?
8   A. No.
9      MR. COHN: I want a clarification. He also
10 filed an affidavit, and I plan to have him testify as to
11 the affidavit to the extent that's a supplementation of
12 his opinions.
13     BY MR. THORSNESS: Q. All right. Let's talk
14 about that affidavit for a few minutes.
15     Were you recently sent an affidavit to review
16 by Mr. Cohn?
17   A. No.
18   Q. Have you seen an affidavit that's been
19 submitted under your name in this case?
20   A. I wrote an affidavit in this case, yes.
21     MR. THORSNESS: Mark this, please.
22     (Whereupon, Exhibit 3 was marked for
23 identification.)
24     BY MR. THORSNESS: Q. Is that the exhibit that
25 you claim you wrote?

### 42

1      MR. COHN: Objection to the form of the
2 question. He didn't claim. To claim -- I don't like
3 the word claim, John.
4      MR. THORSNESS: How about form and foundation,
5 Michael. I don't want to be lectured to.
6      BY MR. THORSNESS: Q. Is that the affidavit
7 you claim you wrote?
8      MR. COHN: Objection to the form of question.
9      THE WITNESS: This is the affidavit that I
10 wrote in my computer, yes.
11     BY MR. THORSNESS: Q. Did Mr. Cohn send you a
12 draft before you wrote that affidavit?
13   A. No, he did not.
14   Q. So every word in this affidavit is your
15 testimony that you wrote?
16   A. Yes.
17   Q. First draft -- you wrote the entire first
18 draft?
19   A. I wrote this draft.
20   Q. Tell me about the circumstances where you were
21 contacted by Mr. Cohn. Who asked you to write the
22 affidavit?
23   A. Mr. Cohn asked me to write the affidavit.
24   Q. What did he tell you he wanted you to write the
25 affidavit about?

### 43

1   A. He wanted me to write the affidavit with regard
2 to addressing the issue whether or not there was any
3 sort of reckless care with regard to the construction of
4 this scaffold.
5   Q. Did he ask you to do anything else?
6   A. No. He sent me the motion for summary judgment
7 that had been submitted. I reviewed that and then
8 proceeded to write my affidavit. My copy of the motion
9 for summary judgment is in my file.
10   Q. Are you in the habit of describing the design
11 of structures as reckless?
12     MR. COHN: Objection to the form of the
13 question.
14     THE WITNESS: My job for 35, going on 40 years
15 has been critiquing and analyzing designs that fail,
16 okay? That is my area of expertise. I formulate
17 opinions as to whether or not the design is good or bad.
18 Very seldom do I ever get into a situation where I
19 believe that there is a careless disregard for safety in
20 the design and construction of structures.
21     BY MR. THORSNESS: Q. When you were in
22 engineering school, did you take any courses on how to
23 ascertain if a structure rose or fell to the level of
24 where it could be characterized as having a recklessness
25 in the design phase?

### 44

1      MR. COHN: Objection to the form of the
2 question.
3      THE WITNESS: I guess in -- both in my training
4 and in my experience as a working engineer, I certainly
5 have seen every kind of a variety of design and
6 structure.
7      BY MR. THORSNESS: Q. That wasn't my question.
8   A. Well, I'm using that as a qualification.
9      MR. THORSNESS: Excuse me. You're interrupting
10 his answer.
11     BY MR. THORSNESS: Q. I would like you to
12 answer my question. My question was in the course of
13 your courses when you were studying to be an engineer,
14 was that ever part of the curriculum of any of your
15 courses on when and where to designate a design as
16 careless or reckless?
17   A. Only by inference.
18     MR. COHN: Objection to the form of the
19 question.
20     BY MR. THORSNESS: Q. Only by inference?
21   A. Only by inference.
22   Q. Those are not engineering terms of art, are
23 they, Doctor?
24   A. No, they're not. Those are probably more in
25 the legal realm in terms of whether there's really a

Exhibit 3
page 4 of 13



setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**45**

1 recklessness involved.
2  Q. And you're not a lawyer?
3  A. No, I'm not.
4  Q. You're not trained as a lawyer?
5  A. I do not opine as a lawyer.
6  Q. And you have no qualifications whatsoever to
7 practice or opine as a lawyer; isn't that correct?
8  A. That's correct.
9  Q. All right. The very first draft of this
10 affidavit, did you create that?
11  A. Yes, I did.
12  Q. What did you do with it then?
13  A. I e-mailed a copy to Mr. Cohn.
14  Q. What did he do with it?
15  A. Actually --
16  MR. COHN: Objection to the foundation.
17  THE WITNESS: I believe it went through
18 somebody named Nita that works in their office. She
19 would have been the one that I sent the e-mail to.
20  BY MR. THORSNESS: Q. Did he contact you about
21 your draft affidavit?
22  A. Other than saying --
23  MR. COHN: Objection to the form.
24  THE WITNESS: -- it was fine and to go ahead
25 and print it and sign it and send another copy.

**46**

1  BY MR. THORSNESS: Q. Did he change a single
2 word?
3  A. Not a one.
4  Q. So it's your testimony that every single word
5 within this affidavit is of your own creation; is that
6 correct?
7  A. That is correct.
8  Q. And not a single word was suggested or added or
9 deleted by Mr. Cohn?
10  A. That's correct.
11  MR. COHN: Objection to the form of the
12 question and also foundation and speculation.
13  BY MR. THORSNESS: Q. Look at paragraph 5
14 here, please, Dr. Balser, of your affidavit.
15  First sentence, the first clause of that
16 sentence you state, Although the improper bolted joints
17 were likely to have been tight at the time of initial
18 installation.
19  Do you see that language?
20  A. Yes.
21  Q. Would that include the joint that failed in
22 this accident?
23  A. Yes.
24  Q. So it's your understanding -- is it your
25 opinion that at the time the scaffolding was first

**47**

1 built, the platform was first built, the subject joint
2 had at least two bolts with washers and nuts?
3  A. I --
4  MR. COHN: Objection. Speculation.
5  THE WITNESS: I see physical evidence that
6 there clearly was one bolt in there. There is little
7 evidence in that joint that there was a second bolt, but
8 that second bolt had been -- could have been washed much
9 earlier and the area had corroded over, so there's no
10 physical evidence on the joint from the pictures that I
11 have that would indicate that there was a second bolt.
12 I can clearly see that one bolt was clearly in there up
13 until some recent time maybe just prior to the failure.
14  BY MR. THORSNESS: Q. How recent?
15  A. I have no way of qualifying. It depends upon
16 that atmosphere, how corrosive it is, but there is
17 clearly evidence of a washer on the front face going
18 through one of the perforated holes in the angle iron
19 that clearly tells me that one bolt was present in that
20 joint for some time prior to the accident.
21  Q. Do you know of any evidence that suggests that
22 there were not two bolts when the scaffolding -- when
23 this platform was initially built?
24  A. No. I don't have any evidence that is negative
25 that way; correct.

**48**

1  Q. And likewise it's your belief that all the
2 bolts and nuts were tightened; correct?
3  A. There is a presumption there --
4  MR. COHN: Objection. Speculation.
5  THE WITNESS: -- but there's certainly no
6 evidence to contradict that they were tight initially,
7 and I would not expect that thing to have been put up
8 and left loose. I would have expected it had been tight
9 at the time of initial installation.
10  BY MR. THORSNESS: Q. All right. Later on in
11 that paragraph on the last page of your affidavit there,
12 fourth line down, only intervening maintenance
13 inspections would have detected the loosening joints.
14  Do you see that sentence?
15  A. That's correct.
16  Q. All right. We've already discussed how
17 Mr. Grove might have detected the loose joint; correct?
18  A. Yes.
19  Q. In terms of other people who might have made
20 that assessment, might his employer have been able --
21 would you expect his employer, Siemens Corporation,
22 to -- had they inspected the fan room, had they
23 inspected that work platform --
24  A. No.
25  Q. -- would you have expected that they would have

Exhibit 3
page 5 of 13


setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management


Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 53

1  A. Yes.
2  Q. All right. Did you read the entire contract
3  stem to stern?
4  A. No, I did not. I perused it, but I did not. I
5  kind of wanted to know what it entailed, so I perused
6  it, but this to me was the relevant article with regard
7  to what the roles were because I asked him several times
8  who's responsible for this structure being in the
9  building? This thing is a hack job built by some guy
10 who is not even very mechanically savvy and got most of
11 his parts out of the hardware store.
12     MR. THORSNESS: Move to strike the diatribe.
13     MR. COHN: Excuse me. It is not a diatribe.
14     MR. THORSNESS: It's not an answer to my
15 question.
16     BY MR. THORSNESS: Q. It will be helpful,
17 Doctor, if instead of engaging in speaking --
18  A. Well, I don't want to infuriate you --
19  Q. Don't interrupt me, sir. I don't interrupt
20 you.
21     MR. COHN: Yes, you have, John.
22     BY MR. THORSNESS: Q. It would be helpful if
23 you -- instead of engaging in these speeches with this
24 inflammatory language describing my clients that you
25 simply answer my question.

### 54

1  A. I'm sorry. Did I disparage your client?
2     MR. THORSNESS: Yeah.
3     MR. COHN: Are you going to make a threat to
4  him like you made to Mr. Carmichael?
5     BY MR. THORSNESS: Q. Let me ask you --
6  A. I'd like to know what I did to insult your
7  client.
8  Q. I'm not going to engage in questions and
9  answers with you, sir. I'm asking you the questions.
10 You can answer them for me.
11 A. I apologize if I insulted your client. I never
12 intended --
13 Q. Don't bother. Don't bother apologizing to me.
14 A. All right.
15 Q. Did Mr. Cohn show you anything else that
16 purported to be a contract pertaining to responsibility
17 for inspection and maintenance of equipment involved in
18 this case?
19 A. No.
20 Q. Other than what you have in front of you?
21 A. No. I believe this is it. From my recall this
22 is the entirety.
23     By the way, did you want to give this an
24 exhibit number?
25 Q. No.

### 55

1  Did Mr. Grove have any obligation to take any
2  steps to ensure his own personal safety on the morning
3  of the accident?
4  A. Surely he did.
5  Q. And would those duties include taking basic
6  steps to ensure that the scaffolding -- excuse me, the
7  platform he was about to get up on was intact?
8  A. No.
9     MR. COHN: Objection to form. Speculation.
10     BY MR. THORSNESS: Q. Are you aware that OSHA
11 cited Siemens after this accident, Mr. Grove's employer?
12 A. I knew that OSHA had made some sort of a
13 citation, but I did not understand who it was against.
14 Q. If OSHA cited Siemens in addition to citing
15 Unocal, would that indicate that at least OSHA thought
16 that Siemens bore some responsibility for this accident?
17     MR. COHN: Objection. Foundation.
18 Speculation. Form.
19     BY MR. THORSNESS: Q. Or are you qualified to
20 opine on that?
21     MR. COHN: Same objections.
22     THE WITNESS: I know none of the details of
23 what was in OSHA's mind, so I can't opine there.
24     BY MR. THORSNESS: Q. All right. You're not a
25 safety professional, are you?

### 56

1     MR. COHN: Objection to the form of the
2  question.
3     THE WITNESS: No. I have had responsibilities
4  for safety in several buildings in my career, but I
5  really -- I'm not a, quote, safety engineer.
6     BY MR. THORSNESS: Q. Have you ever conducted
7  any tests to determine the presence or extent of
8  vibration that these joints might have been subjected
9  to?
10 A. No, I have not.
11 Q. Do you plan to do any work here in the future
12 on this case?
13 A. I have no immediate plans for doing so. But if
14 Mr. Cohn made some specific request, I would consider
15 it.
16 Q. All right. Is there any work that hasn't been
17 accomplished that you would like to accomplish? And by
18 "work," I'm speaking very broadly.
19 A. I would love to have the actual parts that
20 were -- that have disappeared. I could probably make
21 some more refined opinions if I had the actual evidence
22 to look at so that I could do some microscopic
23 examination and things of that nature, but it's my
24 understanding that the scaffold has been destroyed so
25 it's no longer available.

Exhibit 3
page 6 of 13


Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com


setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

**57**

1  Q. Do you have any understanding as to the
2  circumstances under which the scaffolding was disposed
3  of?
4  A. No, I don't know the circumstance under which
5  it was. I understood it was up for some seven months
6  after the accident is my understanding, and it was --
7  and then was taken down.
8  Q. Do you know whether or not OSHA directed that
9  it be taken down?
10      MR. COHN: Foundation. Speculation.
11      THE WITNESS: It was my understanding, yes.
12      BY MR. THORSNESS: Q. That is your
13 understanding?
14  A. That is.
15  Q. Are there any rules or regulations that you
16 relied on in the formation of your opinion?
17  A. Are there any rules?
18  Q. Regulations. Let's focus on regulations.
19  A. Just my general knowledge of OSHA regulations,
20 safety, standards with regard to scaffolds, just general
21 engineering background standards that I'm relying on.
22      MR. THORSNESS: All right.
23      MR. COHN: How long have we been going so far?
24      MR. THORSNESS: A good hour.
25      THE WITNESS: An hour and 15 minutes.

**58**

1      MR. COHN: You want to take a break?
2      THE WITNESS: We can take a break. I'd
3  appreciate it.
4      MR. THORSNESS: Sure, sure.
5      (Recess taken from 10:18 a.m. to 10:37 a.m.)
6      MR. THORSNESS: Let's go back on the record,
7  please, Susan.
8      BY MR. THORSNESS: Q. All right, Dr. Balser.
9  We've had a break here. Let's see. Pick up your copy
10 of your report, will you, please?
11      Do you have a copy of your report with you?
12  A. No. That is my copy.
13      MR. THORSNESS: I'm going to mark it as an
14 exhibit, have you look at one.
15      (Whereupon, Exhibit 4 was marked for
16 identification.)
17      MR. THORSNESS: Mike, do you have a copy?
18      MR. COHN: I have a copy.
19      BY MR. THORSNESS: Q. And, Doctor, is this the
20 report you submitted in this matter?
21  A. Yes, it is.
22  Q. And that's dated November 9, 2006; correct?
23  A. That's correct.
24  Q. All right. Any supplements to this report?
25 Any written supplements that you're aware of?

**59**

1  A. None.
2  Q. Did you read the deposition of Robert Sprinkle?
3  A. Yes.
4  Q. Are you aware that he's a -- do you recall
5  reading that he's a taller man than Mr. Grove?
6  A. Yes.
7  Q. Are you aware -- did you read that he's a
8  heavier man than Mr. Grove?
9  A. Yes.
10  Q. And do you remember his testimony that he got
11 up on a stepladder -- he put a stepladder up on the
12 platform in order to reach the top row of filters?
13  A. Yes.
14  Q. Have you considered that --
15      MR. COHN: I'm going to object to the form of
16 the question and also -- that's it.
17      BY MR. THORSNESS: Q. Have you given any
18 consideration to the possibility that Mr. Grove might
19 have been using a stepladder for a similar purpose while
20 he was changing these filters?
21      MR. COHN: Objection. Form. Assuming facts
22 not in evidence.
23      THE WITNESS: I have no evidence or testimony
24 to go on that would indicate that he was using a
25 stepladder up on the platform. Only to use a stepladder

**60**

1  to get up to the platform.
2      BY MR. THORSNESS: Q. Right. Have you ruled
3  out the possibility that he was using a stepladder up on
4  the platform?
5      MR. COHN: Objection to the form of the
6  question. Speculation.
7      THE WITNESS: I did some estimations of the
8  heights involved and the heights of the filters above
9  the platform with regard to whether or not a man that is
10 5'6" could change the filters up on the top row without
11 the use of a stepladder. And I find it well within the
12 range of his height and reach that he would be able to
13 change those filters without a stepladder, and I think
14 it would be a very hazardous thing to put a stepladder
15 up on that platform with a plank that is not even
16 attached to the structure.
17      BY MR. THORSNESS: Q. And why would it be very
18 hazardous to do that?
19  A. Because the plank, ladders, stepladders in
20 particular rely on the friction between the stepladder
21 and the plank. And if the plank itself is not bound to
22 the structure, the plank could move, and that would
23 make -- climbing a ladder could be quite hazardous in
24 that situation.
25  Q. And if the plank could move, then the ladder

Exhibit 3
page 7 of 13


Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

## 61

1  might also move?
2    A. Yes.
3    Q. And that might then result in a fall off the
4  ladder?
5    A. Absolutely.
6    Q. And if a person fell off the ladder and landed
7  on the plank, they would deliver what's called a dynamic
8  load to the work platform structure, wouldn't they?
9        MR. COHN: Objection to the form of the
10 question.
11       THE WITNESS: As a hypothetical question, yes.
12 I would have to answer that hypothetically and say that
13 you would certainly induce a dynamic load if that were
14 to have occurred. You would probably also bust the
15 plank. You would fracture the plank.
16       BY MR. THORSNESS: Q. What if you landed on
17 the plank right over -- right where the plank rested on
18 where the horizontal supports?
19   A. You would bend the horizontal support, and it
20 would have a big bend in it.
21   Q. You might not break the plank, though?
22   A. No. In that situation it would be right over
23 the support. Then the load would be transferred right
24 into the beam.
25   Q. All right. I think you said you took some

## 62

1  measurements concerning Mr. Grove's ability to reach?
2    A. I estimated measurements based on the fact that
3  there's evidence in that -- in those pictures that they
4  were using 20-inch by 20-inch filters. I can count the
5  number of filters. I can tell how far above the ground
6  the first filter is, and so I can tell what the height
7  of the first plenum top is where the platform was
8  located.
9        And then assuming that you have a 5'6" man
10 standing on that plank, he is certainly able to reach up
11 and hit the upper tiers to change those filters without
12 the use of a ladder.
13   Q. Did you ascertain precisely how high above his
14 head Mr. Grove -- not the hypothetical 5'6" man, but
15 Mr. Grove was able to reach?
16   A. No. Only on the basis of the fact that I
17 understand that he is about 5'6" and that a man can
18 reach about 18 inches over his head, and that is a very
19 feasible reach within which he can put in that top row
20 of filters.
21   Q. And you're not aware of anybody who has had
22 Mr. Grove stand next to a wall and reach up and measure
23 the maximum extent of his reach, have you?
24   A. No. The only uncertainty is to whether or not
25 he's really 5'6". If he's 3'6", I have a problem, okay?

## 63

1    Q. Yes, right. So you've made -- is it fair to
2  say you've made some assumptions based on your
3  understanding that he's 5'6" as to how high he could
4  reach?
5    A. That's correct.
6    Q. All right. But no measurements or --
7    A. No. Simply estimations.
8    Q. My next question is, have you measured how high
9  the technician would have to reach in order to replace
10 the top row of filters?
11   A. He needs -- the top of the uppermost filter is
12 about 83 inches above the working platform height.
13   Q. Did you measure that yourself?
14   A. I estimated that off the size of the filters
15 and the frames in the filter wall into which these
16 filters insert. That gives me an estimated height of
17 about 83 inches.
18   Q. To the top of the top row of filters?
19   A. That's right. Where you would actually have to
20 reach the top of the uppermost filter, and you don't
21 have to change those filters. All you've got to do is
22 grab the filters on the side and slide them up in place,
23 so you do not have to reach all the way up to that
24 83-inch height.
25   Q. Do you have any idea why Mr. Sprinkle was using

## 64

1  as he testified under oath that he used a ladder to
2  change out the top row of filters?
3        MR. COHN: Objection. Foundation.
4  Speculation.
5        THE WITNESS: Simply his preference if he did
6  that, and it's not a very good preference.
7    Q. And is that your -- you say simply his
8  preference. Is that your -- are you aware that he said
9  that?
10   A. I don't know that he said that.
11       MR. COHN: Objection to the form of the
12 question.
13       THE WITNESS: But you have suggested that he
14 said that.
15       BY MR. THORSNESS: Q. I'm not asking a very
16 good question. You say you believe that was his
17 preference and that was the reason that he used the
18 stepladder; is that correct?
19   A. That's correct.
20   Q. What's your basis for saying you believe it was
21 his preference?
22   A. Because I -- on the basis of my estimations of
23 whether or not you could change those filters without a
24 stepladder, I find that to be a very feasible situation.
25 If he used a stepladder, he was simply satisfying his

Exhibit 3
page 8 of 13



Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 65

1  own preference to want to be able to reach them easier.
2  Q. Did this platform consist of one plank or more
3  than one plank, or do you know?
4  A. Based on the photographic evidence that I have
5  seen in these pictures, it's only one plank.
6  Q. And do any of these pictures show the plank?
7  A. Yes.
8  Q. And what did you calculate or estimate the
9  plank's dimensions?
10 A. It is my understanding from the descriptions
11 that I have that it was a 2-by-10 plank, which would
12 make its actual dimensions 1-5/8ths by 9-5/8ths inch
13 wide, and I don't know its length.
14 Q. You believe it was so-called dimensional
15 lumber?
16 A. Yes.
17 Q. And it's called a 2-by-10, but it's actual
18 dimensions are 1-5/8ths by 9-5/8ths.
19 A. That's correct.
20 Q. Did Mr. Grove ever tell you whether there was
21 one plank or two?
22 A. I don't believe that he said one way or the
23 other. He has always simply described it as a plank, so
24 I presume that meant single. And based on the
25 photographic evidence that I see there is only one

### 66

1  plank.
2  Q. All right. So when Mr. Grove referred to the
3  plank, he referred to it in the singular?
4  A. That's correct.
5     MR. COHN: Objection. Form of the question.
6     BY MR. THORSNESS: Q. I want to confirm. Did
7  you ever see any evidence of any failure of the
8  perforated angle metal?
9  A. I had made very specific determinations that
10 there is no deformation or failure of the perforated
11 angle iron.
12 Q. And that would include the holes and slots in
13 the perforated angle metal?
14 A. As well as I can see them in the photographic
15 evidence, yes. I don't know if there might be some
16 microscopic markings within the holes. I would need to
17 see the actual angle iron to be able to make that
18 determination.
19 Q. And you never actually visited the fan room
20 scene of the accident?
21 A. No, I did not.
22 Q. Next is it likewise your belief that as far as
23 you know two bolts with nuts were initially used to
24 secure each horizontal/vertical joint?
25    MR. COHN: Objection. Speculation.

### 67

1     THE WITNESS: Based on the photographic
2  evidence that I have seen each joint that still has
3  bolts in it has two bolts. When I look at the joint
4  that failed, there is very clear evidence that one bolt
5  definitely had been in that joint, but there's no
6  evidence left or observable to indicate that there ever
7  was a second bolt, but there's certainly space for a
8  second bolt if one had desired to put a second bolt in
9  there.
10    BY MR. THORSNESS: Q. All right. So you have
11 no direct evidence that there was only one bolt. Strike
12 that question. I want to confirm.
13    You believe you see evidence of that there was
14 at least one bolt; correct?
15 A. That's right.
16 Q. And at some prior time there might have been a
17 second bolt; is that it?
18 A. That's correct, but it's so badly corroded over
19 since that second bolt fell out that the evidence is
20 totally obscured, so there's no remaining evidence that
21 a second bolt was ever there.
22 Q. And again, this is from review of the
23 photographs?
24 A. That's correct.
25 Q. Would you agree, Dr. Balser, that from your

### 68

1  review of the photographers, it appears that the
2  original design and construction of this platform called
3  for two bolts for each connection?
4  A. The presumption --
5     MR. COHN: Objection. Speculation.
6     THE WITNESS: There is a presumption based on
7  all the other joints that do, in fact, have two bolts
8  that it would be presumed that this failed joint also
9  would have had two bolts to hold it.
10    BY MR. THORSNESS: Q. Is it fair to say that
11 two bolts provide twice the sheer strength as one?
12 A. Yes. If you have a tightly clamped joint, both
13 bolts would shear the load.
14 Q. I asked you about any damage or deformation to
15 the perforated angle metal.
16 A. Yes.
17 Q. Now I'd like to ask you, did you see any
18 forensic scientific evidence that indicated any wear on
19 the perforated angle metal?
20 A. No. There definitely is nowhere there -- if
21 there's any microscopic wear anywhere in that joint it's
22 now obscured by corrosion product and is no longer
23 evident at all. And I am looking specifically at the
24 interfaces between these two members where the wear
25 would take place, and there's no evidence of wear.

Exhibit 3
page 9 of 13

setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 81

1    Q. Because we don't know where Mr. Grove was
2  standing along this plank?
3    A. You have to assume the full range.
4    Q. All right. And would you agree that a bounding
5  analysis is a typical way of addressing such unknowns as
6  presented by the fact that we don't know where he was
7  standing on the plank?
8    A. Yes. That is a standard engineering approach,
9  yes.
10    Q. Assuming for my hypothetical that there were
11  bolts in place in the failed joint when the accident
12  happened --
13    A. Okay.
14    Q. -- and I know you disagree with that.
15    A. That's correct.
16    Q. But let's assume that for a moment.
17    A. All right.
18    Q. And assume they were being loaded in shear.
19    A. Okay.
20    Q. All right.
21    A. Which means the joint was loose.
22    Q. All right.
23    A. Okay.
24    Q. Let's assume the joint was loose, and they were
25  being loaded in shear.

### 82

1    A. Okay.
2    Q. Would you agree that the strength of these
3  joints was much higher than the static weight presented
4  by Mr. Grove and this plank resting on these
5  horizontals?
6    A. Yes.
7       MR. COHN: Objection to the form of the
8  question.
9       BY MR. THORSNESS: Q. Any loosening of these
10  square nuts on these machine screws, would you expect
11  that would take place over a substantial period of time,
12  months or even years?
13       MR. COHN: Objection to the form of the
14  question.
15       THE WITNESS: My opinion would be that the
16  loosening initially of a tight condition would take a
17  while, okay? It would accelerate very rapidly once the
18  preload is gone. At that point the square nut is now
19  free to rotate, and it could spin off in a matter of
20  minutes. If the vibration is right, you can actually
21  watch a screw dance right off the end of the shank of a
22  bolt, so it could only be a matter of minutes. At other
23  times if it's working its way through dirt that's on the
24  screw threads or things of that nature, it can slow down
25  and impede the movement, may even momentarily cease.

### 83

1       BY MR. THORSNESS: Q. Or rust might do that
2  too?
3    A. Rust, yeah. That's right. And sometimes rust
4  will impede. Sometimes the reduction in the dimensions
5  of the screw as a result of the corrosion could actually
6  lead to an accelerated rate at which this bolt can come
7  off because the metal has been consumed, and so there's
8  not as tight a fit anymore.
9    Q. Sure. I have two questions then. One, but you
10  don't have any idea of how much vibration these joints
11  were subjected to?
12       MR. COHN: Objection to the form of the
13  question.
14       BY MR. THORSNESS: Q. Is that true?
15    A. In absolute terms of knowledge of this specific
16  unit, I do not have that information. I certainly have
17  lots of experience of having touched air-conditioning
18  units, and you can feel the vibration. You know the
19  vibration is a very common factor involved in machines
20  like this.
21    Q. All right. Nor have you rigged up an exemplar
22  and subjected it to vibration in an attempt to see how
23  rapidly these nuts might back off?
24    A. You would -- in order to do that, you would
25  have to simulate this unit exactly, and that's virtually

### 84

1  impossible to do.
2    Q. Whether it's impossible or not, you haven't
3  tried to do that?
4    A. No, I have not.
5    Q. Second question: Do you know whether there was
6  sufficient rust on the threads of these machine screws
7  present before the accident to -- sufficient to reduce
8  the amount of material and thereby lead to an
9  accelerated backing off of these nuts?
10    A. I have no knowledge with regard to how much
11  rust had accumulated at the time these nuts backed off
12  these shanks. These nuts may very well have backed off
13  the shanks of these screws very early on before the
14  corrosion formed. We certainly have evidence on the
15  existing joints that are still there that were
16  photographed. We have photographic evidence that there
17  is a quite significant amount of rust buildup on those
18  bolts.
19    Q. Right. And the longer they were loose, would
20  you agree that the greater the opportunity for someone
21  to discover that these joints were getting loose?
22    A. Yes. If regular maintenance and inspections
23  had been done, they should have been caught; that's
24  correct.
25    Q. When you inspected the fracture surface of

Exhibit 3
page 10 of 13



setdepo(SM)
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 85

1  these sheared bolts, do I understand that the fracture
2  surface was also rusted?
3      A. Yes.
4      Q. And does that indicate that following their
5  fracture they were for some reason subjected to a
6  corrosive environment?
7      A. Virtually every piece of steel that sits in an
8  open environment is subject to corrosion.
9      Q. To corrosion?
10     A. From the environment, particularly a fracture
11 surface because during the process of failing, they --
12 there's local deformation of the metal on the surface of
13 the fracture. There's a certain amount of stored energy
14 in that strained metal on the surface. That stored
15 energy leads to an accelerated rate of corrosion on a
16 fractured surface, so in a relatively short period of
17 time a fractured surface can become heavily rusted, and
18 it is not an indication of how long this steel has been
19 exposed to a corrosive atmosphere.
20     Q. Several times during our discussion today
21 you've made reference to clamping force?
22     A. Yes.
23     Q. And you know what that is?
24     A. Absolutely I do, yeah.
25     Q. And would you agree that these machine screws

### 86

1  with these square nuts, they were tightened using a
2  handheld screwdriver on the screw head side?
3      A. Yes.
4      Q. And let's say a crescent wrench on the nut that
5  some clamping force could be brought to bear on this
6  joint?
7      A. Yes. And there is a presumption at the time it
8  was installed. I presume that those were given some
9  qualitative level of preload.
10     Q. And have you ever calculated or demonstrated,
11 tested how much clamping force could be brought to bear
12 with these two hand tools, crescent wrench and a
13 screwdriver?
14     A. I think the limitation would not be how much
15 torque, you know, you could exert but how soon you would
16 strip the threads out of the nut if you were to try to
17 achieve an ever increasing torque.
18     Q. Yes.
19     A. Because it is the limitation of these square
20 nuts that is at the source of this loose joint.
21     Q. But if you were careful not to overdo it and
22 either twist off the bolt or strip the nut, you could
23 apply clamping force using these two hand tools?
24     A. You could, yes.
25     Q. All right. You have not done that, though?

### 87

1      A. No. I've not -- I mean, other than the fact
2  that I've tightened up hardware screws hundreds of times
3  in my life and it becomes simply an instinctive feel for
4  how tight you can turn that thing before you sense that
5  it's going to break.
6      Q. Right.
7      A. And sometimes you miss it and you actually can
8  snap a bolt off just with hand tools.
9      Q. Sure. And when you do that, you knock out the
10 bolt, throw it away?
11     A. Put in a new one and go less.
12     Q. And reset your elbow so it clicks earlier?
13     A. That's right.
14     Q. And clamping force, is that the same or similar
15 to this preload you're talking about?
16     A. Yes. A preload on the bolt is what creates the
17 clamping force in the joint.
18     Q. Is torque a measure of preload?
19     A. Torque is proportional to preload.
20     Q. And just so we're straight, you own a crescent
21 wrench and a screwdriver?
22     A. Absolutely, and a torque wrench.
23     Q. But you never tried to ascertain the clamping
24 force that could be brought to bear with this sort of a
25 machine screw and this sort of a square nut?

### 88

1      A. No, because first of all you'd have to know the
2  grade of the screw in order to be able to estimate how
3  much torque you could apply to that.
4      Q. Hasn't it been determined that this is about an
5  SAE Grade 2 bolt?
6      A. Yes.
7      Q. So you do know that about the bolt?
8      A. I could deduce that from the analysis that we
9  did at the laboratory. I know the chemistry. I know
10 that there are no markings on the head of those bolts,
11 so I know that they're Grade 1 or 2.
12     Q. The square nuts that you looked at --
13     A. Yes.
14     Q. -- did you observe any scientific evidence of
15 damage to those nuts, either their internal threads or
16 the edges of the -- the outside edge of the nuts?
17     A. No.
18         MR. COHN: Just objection. Are you talking
19 about both sets of nuts or --
20         BY MR. THORSNESS: Q. Any nut you looked at.
21     A. On any nut that I looked at, the ones that I
22 look at on the joints that are still in full integrity,
23 of course I can't tell much about the thread condition
24 of those. I can only tell about the ones that separated
25 from the structure. And in those there's no evidence of

Exhibit 3
page 11 of 13



Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

89

1  damage in those on the ones that I observed. I only
2  observed that, in fact, the nuts are laying on the
3  ground without screws in them. That would be indicative
4  of the fact that they did, in fact, vibrate off the
5  structure and became free nuts falling down to the
6  ground because if they were broken during a bolt
7  failure, the shank of the bolt would still be inside the
8  nut where the shank broke and created that fragment.
9  You would have the nut with the shank of the bolt in it.
10 And we're finding free square nuts with no shanks in
11 them laying on the floor.
12    Q. Yeah.
13    A. Those nuts are clearly vibrating off that
14 structure.
15    Q. Now, you didn't find any nuts free of a shank
16 laying on the floor, did you?
17    A. I did not personally, no. I'm going on the
18 basis of the fact that the first set of samples that
19 Larry Grove picked up on the day after the accident you
20 were finding free square nuts laying on the ground.
21    Q. He says he found free square nuts?
22    A. That's right.
23    Q. Would that be more correct?
24    A. I don't know. Was it three? I'd have to count
25 them.

90

1     Q. I said he says he found free square nuts.
2  Not --
3     A. Well, he didn't say he found free. He simply
4  says I found these parts, and among these parts are free
5  nuts.
6     Q. Right. And you first saw these nuts and parts
7  when they were in the bottom of a manila envelope that
8  was presented to you by Mr. Weidner, Mr. Grove's lawyer
9  at Mr. Weidner's office; correct?
10    A. That's correct. On February 13th, 2004.
11    Q. And they were just loosely sitting in the
12 bottom of this envelope, weren't they?
13    A. Yes.
14    Q. If when they were found there were nuts on
15 remnants of the bolts, could they be easily just backed
16 off with a finger, removed?
17    A. That's hard to answer. Sometimes yes, you can
18 thread that extra piece out. Other times there's enough
19 damage created during the fracture that they don't come
20 out.
21    Q. And likewise if they're sitting in the bottom
22 of an envelope that's being moved around from place to
23 place, could there be sufficient is it vibration so they
24 could back off -- they could back off those remnants by
25 themselves?

91

1     A. No, because they're constrained in the paper
2  envelope. They're not going to be free to rotate.
3     Q. No matter how they were --
4     A. Boy, you'd really have to go through some
5  gyration. I've never seen that happen.
6     Q. Did you see any evidence of the square nut
7  threads -- did you see any evidence that they had been
8  stripped to any extent due to overtightening?
9     A. The answer is no.
10    Q. Did you see evidence of any deformation to the
11 threads of any of the machine bolts, whether they were
12 sheared or not?
13    A. No.
14    Q. If Dr. Morin says you can apply 50-inch pounds
15 of clamping force to this --
16    A. Clamping force or torque?
17    Q. Torque. I'm sorry. Torque to this machine
18 screw and nut, would you disagree with that?
19    A. That seems about right.
20    Q. All right. Likewise if Dr. Morin has
21 calculated that this would result in a clamping load of
22 1,000 pounds, would you disagree with that?
23    A. No, I have no reason to doubt that.
24    Q. All right. And if a wrench was used in
25 addition to the screwdriver, would you agree that the

92

1  resultant clamping force would be substantially higher
2  than 1,000 pounds?
3     MR. COHN: Objection to the form of the
4  question.
5     THE WITNESS: It depends on whether the wrench
6  is being used to tighten the nut while the screwdriver
7  is simply being used to hold the head from rotating.
8     BY MR. THORSNESS: Q. And that's what I want
9  you to assume.
10    A. Okay.
11    Q. A screwdriver is being used to keep the screw
12 stationary, and you're turning the nut with the wrench?
13    A. If you have enough friction, okay, underneath
14 the head to hold the head from rotating and as an
15 assistant to what you're holding with the screwdriver,
16 then your crescent wrench on a square nut should be able
17 to snap the shank of the bolt. You can keep increasing
18 the torque until you snap the shank of the bolt.
19    Q. Could you achieve in excess of 1,000 pounds of
20 clamping force?
21    A. Yes.
22    Q. Could you achieve as much as 3,600 pounds of
23 clamping force for one screw?
24    A. I'd have to run the calculation to tell.
25    Q. So depending on what you found from your

Exhibit 3
page 12 of 13



### 113

1  Q. Look at paragraph 4 of your affidavit, please.
2  A. Okay.
3  Q. And about -- well, one, two, three lines from
4  the bottom you refer to a careless and irresponsible
5  act.
6     Do you see that?
7  A. Yes.
8  Q. Is it correct to say that you obtained this
9  verbiage after reading this motion?
10     MR. COHN: Objection to the form of the
11  question.
12     THE WITNESS: As an engineer I do not believe
13  that it's my realm to render any sort of a legal
14  opinion. Whether this is reckless indifference or not
15  I'm not able to say. I understand that that is a legal
16  matter that needs to be resolved by the parties in the
17  court, okay? So I choose words that I am comfortable
18  with.
19     Okay. I don't know if this is irresponsible or
20  not or really reckless. I know that it's careless and
21  it is irresponsible from the looks of the structure
22  itself. This is not a structure that should be
23  considered a man-safe structure.
24     BY MR. THORSNESS: Q. Right, okay. You're
25  going a little beyond my question again.

### 114

1  A. Okay. I'm sorry. I tend to lecture. I'm
2  sorry.
3  Q. Yeah. I thought earlier we had agreed that
4  this verbiage that I just -- essentially I just pointed
5  out, those were lawyer's words, not engineering terms of
6  art?
7  A. And I understand that, yes.
8     MR. THORSNESS: All right. Leave it there.
9  And as for Exhibit 8 I'm just going to tab the cover
10  letter, and that's it. So just copy the cover letter,
11  please.
12     THE REPORTER: Okay.
13     MR. THORSNESS: That's explanatory enough for
14  my purposes.
15     BY MR. THORSNESS: Q. Oh, one more thing. You
16  read the motion before you drafted your affidavit,
17  didn't you?
18  A. Absolutely, yes.
19  Q. Fine. And you drafted the affidavit. It's
20  your understanding it might be utilized in opposition to
21  that motion?
22  A. Yes.
23     MR. THORSNESS: Let's go off the record.
24     (Discussion held off the record.)
25     MR. THORSNESS: All right, Dr. Balser. Thank

### 115

1  you. Those are all the questions I have.
2     THE WITNESS: Okay.
3     MR. COHN: No questions.
4     MR. THORSNESS: We're done. Thanks.
5     (Whereupon, the deposition of JOSEPH D. BALSER,
6  Ph.D. was concluded at 1:11 p.m.)

### 116

1  DECLARATION UNDER PENALTY OF PERJURY
2
3  I, JOSEPH D. BALSER, Ph.D., do hereby certify
4  under penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on August 15, 2007;
6  that I have made such corrections as appear noted
7  herein; that my testimony as contained herein, as
8  corrected, is true and correct.
9
10  DATED this _____ day of _____ 2007, at
11  _____, California.
12
13
14
15
16  _____
17  JOSEPH D. BALSER, Ph.D.

Exhibit 3
page 13 of 13



setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www-setdepo·com