## Condensed Transcript

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE; CYNTHIA
GROVE; SARAH GROVE; and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

      Plaintiffs,

vs.                    Case No. A04-0096 CV (TMB)

UNOCAL CORPORATION,

      Defendant.

### DEPOSITION OF

### LINDLEY MANNING, P.E.

August 14, 2007
8:56 a.m.

Hilton Oakland Airport
One Hegenberger Road
Suite 1104
Oakland, California

Reported by Susan F. Magee, RPR, CLR, CSR No. 11661

Exhibit 4
page 1 of 14



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

## 21

1  evidence, is rarely a help. Sometimes it is. You take
2  it as it comes.
3      But the pictures were fairly definitive. Joe's
4  work helped a little bit but just mainly supportive.
5      Q. All right. Have you conducted any testing in
6  the course of your investigation in this case?
7      A. No. The testing was done the day of the
8  accident. The day before a test. It failed. That's
9  all I need to know.
10     Q. That's all you need to know?
11     A. Well --
12     MR. COHN: Object to the form of the question.
13     THE WITNESS: Well, that is all I really need
14 to know. It did the expected thing that you expect it
15 to do based on what I know of the design, so I don't --
16 or one of the things that you would expect could go
17 wrong and that would be probable to go wrong. And it's
18 pretty obvious what went wrong, so there's really no
19 point to test it.
20     BY MR. THORSNESS: Q. You said it's pretty
21 obvious what went wrong. Share with me your view of
22 what's pretty obvious -- what pretty obviously went
23 wrong.
24     A. Sure. The two bolts on the plenum end fell out
25 of the hole. The horizontal member was sitting on top

## 22

1  of the vertical member, and the movement of the injured
2  man on top of the platform wiggled it enough that it
3  slid off the top and it fell. It no longer was
4  supported on that corner, and gravity took over. And
5  it, in doing so, pushed down the loose -- one end loose
6  horizontal member sheared off a bolt on the other end
7  and left it hanging on the remaining bolt, and he was
8  somewhere on the floor injured in some way or another
9  that I don't deal with.
10     Q. The two bolts on the plenum end that you say
11 fell out, did either of those bolts -- was either of
12 those bolts sheared or fractured in any fashion?
13     A. I would doubt it. Your photographs are not the
14 greatest, but there's no evidence of damage due to a
15 load large enough to break one, so I think it's more
16 likely and more -- more likely than not that they fell
17 out ahead of time. A good deal more likely than not I
18 would say.
19     Q. Do you think --
20     A. They could have rusted through and been weak or
21 something like that or worn and been weak. But we don't
22 have them or the parts they were in to examine to see if
23 that happened, so they just weren't there for whatever
24 reason. They weren't there at least at full strength or
25 anywhere near it.

## 23

1      Q. Had they both fallen out before Mr. Grove got
2  up on the platform that day?
3      A. I don't know, but they were both either falling
4  out or ready to fall out. They were very close to it,
5  whichever.
6      Q. And they wouldn't have fallen out if the nuts
7  had still been on them to any extent, would they?
8      MR. COHN: Objection to the form of the
9  question.
10     THE WITNESS: Well, I'd say "to any extent" is
11 a pretty broad term, but it could have been hanging on
12 the last quarter of the thread and the vibration knocked
13 them loose, but that isn't what we're talking about. If
14 they'd been screwed on anywhere near their normal
15 position, they wouldn't have fallen off that day. It
16 might have been some other day.
17     BY MR. THORSNESS: Q. Sure. My point is, you
18 know, I mean, your hypothesis for the bolts to fall out,
19 the nuts would at some point have to come off?
20     A. They're too big to come out of the hole
21 otherwise. That's not hypothesis. That's reality.
22     Q. All right. In the condition that Mr. Grove
23 found the platform on the morning of the accident, would
24 you believe that the connection point on the plenum side
25 of the horizontal and the vertical pieces was quite

## 24

1  loose?
2      A. I believe so.
3      Q. Do you believe if a man had taken the time to
4  simply reach up, grab hold of the horizontal piece and
5  give it a good shake, that he could have told that that
6  connection was loose?
7      A. Well, now that we're talking hindsight, sure,
8  he could have done that. But if you had any reason to
9  think about doing it, you know, why would a guy do that
10 for a platform that he'd been climbing on for some time
11 and never had a problem. It was in place. It didn't
12 look bad as he walked in. It may have been, as I
13 understand, the far end from where he came in.
14     You know, who knows if he grabbed and inspected
15 the right place, but just about every failure incident
16 that I know of, that's what would have happened if
17 somebody had looked at the right place at the right
18 time, and we wouldn't have been there to analyze what
19 happened but . . .
20     Q. Would you agree with me that that inspection,
21 we'll call it, would have been relatively easy to
22 perform?
23     A. Well --
24     MR. COHN: Objection. Form. Speculation.
25     THE WITNESS: -- physically easy to that

Exhibit 4
page 2 of 14

setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**33**

1 say, instead of down --
2   Q. Right.
3   A. -- if it were intended to lift it off of its
4 support then when it was first installed, if it was
5 properly installed and tightened, then it would have
6 resisted a particular amount of load.
7       Would this have been much? Not really because
8 the bolts were too small and too weak to carry very
9 much, but it would have resisted something.
10  Q. Did you ever --
11  A. I just didn't bother. Didn't matter to me
12 because that wasn't the condition they were in when it
13 happened, when the accident happened.
14  Q. Did you ever calculate or ascertain the shear
15 strength of these machine screws?
16  A. I have never bothered to look it up. It's
17 simply tabulated in a handbook. I don't find it. I
18 didn't care because it didn't enter into the failure.
19  Q. Did you ever calculate or ascertain the
20 clamping strength that could be reasonably afforded this
21 joint by tightening the nuts down onto the bolts?
22  A. Again, I didn't bother because I knew it was
23 zero at the time of the failure.
24  Q. Mr. Manning, what's the basis for your view --
25 well, let me back up a little bit.

**34**

1       Is it your testimony that -- is it your opinion
2 that the horizontal and vertical angle metal that
3 separated from each other, all right, is it your opinion
4 that the bolts that had been holding those two pieces
5 together did not fail in a shear load?
6   A. That is, I believe, a physical necessity.
7   Q. There were bolts found that had been sheared;
8 right?
9   A. No.
10  Q. No?
11  A. Singular.
12  Q. There was only one bolt found that was sheared?
13  A. Yes. The only time other bolts were found that
14 were broken in any way were after the complete
15 disassembly of this where who knows what the people did
16 that were disassembling the platform members. They
17 could have grabbed the end and jerked them down and bent
18 stuff and broken bolts and who knows? But the --
19 immediately after the accident the only thing we have
20 was the injured man himself finding a loose nut and a
21 piece of a bolt that was sheared -- basically sheared
22 off. That Balser will talk about. The details of the
23 metallurgy doesn't make a whole lot of difference to me.
24 It failed almost positively the way I described to you
25 earlier.

**35**

1       Of course, these things weren't found as if --
2 nobody did their job of bothering to find them when
3 somebody had been hurt. It should have been --
4   Q. Right.
5   A. -- looked into --
6   Q. Right.
7   A. -- at the time.
8   Q. Right. You're kind of going a little far
9 astray from my question.
10  A. Yeah, I imagine.
11  Q. And this is just taking a lot of time, but I
12 just ask you to stick to my question.
13      Mr. Cohn --
14  A. If it shortcuts it, if I can get what I --
15  Q. Mr. Cohn can ask you questions if he wants to.
16      So your assumption is that Mr. Grove when he
17 went into the fan room by himself the day after the
18 accident, the day after he'd been injured, your
19 assumption is he picked up all of the machine screws
20 that had been broken?
21      MR. COHN: Objection. Speculation.
22      BY MR. THORSNESS: Q. Is that your assumption?
23      MR. COHN: No foundation.
24      THE WITNESS: He picked up what he picked up.
25 Whether he -- how exhaustive a search he made I have no

**36**

1 way of knowing, so I don't make any assumptions on -- he
2 found that. If he's looking for something, there's a
3 pretty good chance he'll find the stuff that's laying
4 out where it can be seen. There may be stuff hiding in
5 corners that may still be there that we don't know
6 about. So, you know, I can't speculate beyond that.
7       BY MR. THORSNESS: Q. Do you have any work you
8 haven't done that you're going to do?
9   A. Not that I know of at this point. At this
10 point if asked, I'll contemplate whether it's worth the
11 effort or not, tell Mr. Cohn, and if I think so, I'll do
12 it. At this point I don't know what it would be.
13  Q. Have you done any work since you wrote your
14 report dated November 7, 2006?
15  A. Not really. Nothing of substance. I've had
16 conversations whether that constitutes work. I'd drawn
17 that picture last night and was just explaining stuff
18 that I already believed.
19      MR. THORSNESS: All right. Let's mark this
20 next in order, please.
21      (Whereupon, Exhibit 2 was marked for
22 identification.)
23      BY MR. THORSNESS: Q. Have you seen that
24 document before?
25  A. Something similar at least.

Exhibit 4
page 3 of 14



setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Lindley Manning, P.E.                                          August 14, 2007

### Page 61

1  taller than Mr. Grove?
2  A. I don't know.
3  Q. Do you know anything about Mr. Sprinkle and
4  Mr. Grove's personal relationship?
5  A. I have no idea.
6  Q. Do you know whether or not Mr. Sprinkle is a
7  heavier man than Mr. Grove?
8  A. I don't know.
9  Q. Do you know whether or not Mr. Grove was
10 supposed to be wearing a safety harness?
11     MR. COHN: Objection. Speculation.
12     THE WITNESS: Well, I don't know what good it
13 would have done him because there's no place to hook it.
14 So, you know, if he had it strapped around him, it
15 wouldn't have done any good; so it's kind of a pointless
16 question. There was no place provided in the building
17 that I know of to hook the safety harness. No one's
18 ever said there was. The few pictures I've seen didn't
19 show anything, and it's never come up. If there were a
20 place provided for that of adequate strength, then
21 perhaps that would have been the thing to do. A better
22 thing to do would be to have an adequate and properly
23 railed platform that wouldn't require a safety harness.
24 So...
25     BY MR. THORSNESS: Q. Had there been a

### Page 62

1  properly anchored safety harness that Mr. Grove was
2  actually wearing when this platform failed, would that
3  safety harness have caught him and prevented him from
4  hitting the floor?
5     MR. COHN: Objection. Speculation.
6  Foundation.
7     THE WITNESS: May have. That could be then
8  had the building proprietors provided the place for it
9  and required that it be used, but the best solution is
10 build a platform right and so it doesn't fall.
11    That's kind of a -- should you wear a parachute
12 when you're doing roofing? Jeez. Why bother? Just
13 watch where your feet go. This one he didn't step off
14 the edge, although he could have because of the bad
15 railing. But, you know -- so we're talking about stuff
16 that didn't exist.
17    BY MR. THORSNESS: Q. But on certain roofing
18 jobs, you are required --
19 A. You're required to have a harness.
20 Q. A harness.
21 A. Yeah. Not a parachute. You're required to
22 have a harness.
23 Q. And under those circumstances a safety harness
24 can save your life?
25 A. Well, of course. That's what they're for. I

### Page 63

1  do a lot of work with construction equipment. And
2  you're sitting up in that basket, you better have your
3  harness on or the boss won't be very happy with you nor
4  will you if you fall out.
5  Q. Nor your wife. Yeah.
6     Go down to paragraph 5 on your report here,
7  page 1. Platform framework is the beginning.
8  A. Mm-hmm.
9  Q. You've never seen the angle metal in person;
10 right?
11 A. No.
12 Q. And you looked at photos of them; right?
13 A. Yes.
14 Q. And those photos are contained within the
15 manila folder here marked as Exhibit 1; correct?
16 A. Yes. And Joe Balser, I believe, has seen them
17 and told me about them too or whatever it is.
18 Q. Do you have -- do you know of any evidence
19 whatsoever that this angle metal failed to any extent
20 during the accident?
21 A. I'm quite sure it did not from what I have in
22 the way of physical evidence, the photos of the physical
23 evidence.
24 Q. All right.
25 A. Yeah. I don't see nor claim anything in the

### Page 64

1  way of failure for it. I don't think of it as an ideal
2  platform material, but that's -- for this accident that
3  wasn't or this incident that wasn't a consideration.
4  Q. The machine screws, including the nuts and
5  washers, do you know what dimension the machine screws
6  were?
7  A. 1/4-20.
8  Q. And do you know the thread type?
9  A. 1/4-20.
10 Q. Okay.
11 A. That is the thread type.
12 Q. All right. Have you ruled out the possibility
13 that Mr. Grove jumped or fell onto the platform boards
14 or board?
15 A. Yes.
16 Q. And applied a discrete load, overload to the
17 structure?
18 A. There is no evidence of that. In fact, there
19 is evidence that that did not happen. And a number of
20 things. First, where would he jump from unless he
21 played Spider-Man and climbed the wall, which he
22 wouldn't have to do to change those filters. He surely
23 didn't need anything up there to take him any higher
24 than the platform. It was plenty high to do that. And
25 there's no deformation in the joint that failed that

Exhibit 4
page 4 of 14



**setdepo**<sup>SM</sup>
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 65

1  showed in the photographs. There are only the missing
2  bolts.
3      And there is a deformation or failure of
4  something that wasn't adequately depicted in the
5  photographs on the end of the horizontal bar that
6  remained attached, but it is deflected downward in such
7  a way that could only happen due to it failing the way
8  we talked about before.
9      So, you know, if he jumped up and down, well,
10 he should have been able to if he wanted to, maybe doing
11 his daily exercise up there, but that shouldn't have
12 affected it. And had the platform even been in the
13 shape it was when it was first put up, I can't imagine
14 that it would have caused a failure, and it surely
15 wouldn't have caused this type of failure.
16     Q. Is it your view, Mr. Manning, that as
17 originally constructed and assuming that the nuts were
18 tight on the machine screws --
19     A. As originally constructed.
20     Q. -- as originally constructed with the original
21 materials --
22     A. Yes.
23     Q. -- is it your opinion that this platform was
24 strong enough to hold Mr. Grove's weight?
25     A. Yes. And pretty much anything you do -- and it

### 66

1  isn't really my opinion. This is a proven fact because
2  it lasted and was used for some number of years.
3      Q. Sure.
4      A. So it has done it, and we don't need to worry
5  that the original installation was too weak to support
6  him. Problem is that it didn't stay that way.
7      Q. Right. So what you're saying is that we don't
8  need an engineering analysis to draw that conclusion.
9  We can just look at the historical use of this platform
10 up to the time of the accident, and it never collapsed
11 under anybody else besides Mr. Grove?
12     A. Yeah.
13         MR. COHN: Objection. Foundation.
14         THE WITNESS: Okay.
15         MR. COHN: Speculation.
16         THE WITNESS: Yeah. We can draw the conclusion
17 to the point that it had not yet failed. Okay. That
18 doesn't mean anything good about it or anything other
19 than it had not failed up to the point that Mr. Grove
20 was there.
21         BY MR. THORSNESS: Q. Right. Do you know of
22 any accidents or even complaints about the platform
23 before Mr. Grove's accident?
24     A. I have not been told of any. And if there's
25 anything in any of this material, I either forgot it or

### 67

1  overlooked it, but I think I would have noticed and
2  remembered it had it been there.
3         MR. COHN: Objection on the foundation and
4  speculation.
5         BY MR. THORSNESS: Q. Do you have any
6  information as to how many HVAC technicians in addition
7  to Mr. Grove used this platform to change out these
8  filters?
9      A. I haven't attempted it.
10         MR. COHN: Objection. Speculation.
11         THE WITNESS: I haven't attempted to find a
12 number. I know there are -- or I have heard that there
13 were others. How many I do not know. I believe there's
14 another company before Mr. Grove's employer that
15 maintained it. So over some period of years since the
16 building existed there must been a number of them, but I
17 don't know what that number was.
18         BY MR. THORSNESS: Q. All right. And do you
19 know whether any of these technicians was heavier than
20 Mr. Grove?
21         MR. COHN: Objection. Speculation.
22         THE WITNESS: No idea. No way of knowing
23 obviously.
24         BY MR. THORSNESS: Q. All right. And do you
25 know how many times Mr. Grove himself had used this

### 68

1  platform to change out these filters prior to his
2  accident?
3      A. No. I do recall that he had used it
4  previously, but I do not recall the number. If it was
5  mentioned in any of this paperwork, I just didn't
6  remember it. I didn't think it was some number that
7  would do me any good.
8      Q. All right. Turn to page 2 of your report,
9  please.
10     A. Sure.
11     Q. If a person employed a crescent wrench and a
12 handheld screwdriver, do you know how much torque you
13 could bring to bear on these fasteners, these machine
14 screws?
15     A. Numerically no. I would expect, though, with
16 big enough crescent you could twist them right off.
17     Q. In fact, that's what Mr. Morin did during some
18 of his testing, isn't it?
19     A. I don't recall.
20         MR. COHN: Objection. Foundation.
21         BY MR. THORSNESS: Q. You could -- using a
22 simple crescent wrench and a simple handheld straight
23 screwdriver, though, you could apply a certain degree of
24 torque to these machine screws that would result in a
25 certain degree of clamping force to this joint; isn't

Exhibit 4
page 5 of 14

sd setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Lindley Manning, P.E.                                        August 14, 2007

### 69

1  that true?
2      A. You could probably bring them up and beyond --
3  up to and beyond the yield point of the metal in the
4  screw if you didn't slide off or round off the corners
5  of the nuts and some of the other things that you can do
6  with little square nuts.
7      Q. But if you were careful using a crescent wrench
8  and a screwdriver, you could apply some not
9  insignificant clamping force to this joint?
10     A. I'm sorry. Let me revise that. You probably
11 could not bring the screw up to a tensile strength at
12 its yield point. You would have to involve torsion as
13 well because the thinness of those nuts, they would fail
14 and straight tension sooner than the screw would. They
15 are inadequate height to develop full strength of the
16 screw.
17     Q. All right. But even though they're thinner
18 than they might otherwise be, they being the nuts, you
19 could still with a crescent wrench and a screwdriver
20 apply some not insubstantial clamping force to this
21 joint by tightening them down?
22     MR. COHN: Objection to the form of the
23 question.
24     THE WITNESS: That's a "how high is up"
25 question. What's substantial, what isn't. An engineer,

### 70

1  what you want in a bolted joint is probably to bring --
2  depending on your point of view, bring the tensile load
3  in the fastener up to about 95 percent of the yield
4  point. Some people will actually go to 100 percent and
5  still get good performance because there's hardening and
6  so on. With this 1/4-inch square nut, you could not
7  reach that level of stress in the -- tensile stress in
8  the fastener, so you could not get adequate for the
9  fastener clamping force. You could get a clamping
10 force, but so what?
11     Q. And a clamping force you refer to --
12     A. Yes.
13     Q. -- that would strengthen the joint, wouldn't
14 it?
15     A. As long as it lasted, which wouldn't be too
16 long because, again, of the thin nut, the vibration and
17 people walking on it, load changing, it would yield the
18 nut, and that would release the clamping force which is
19 why square nuts come loose.
20     Q. Let's talk about that, this loosening theory of
21 yours.
22     A. That's not theory. There is -- let's get
23 theory straight.
24     Q. Gravity -- let me finish.
25     A. No. You mentioned a word. Let me do that.

### 71

1  Gravity is a theory. Relativity is a theory. Evolution
2  is a theory. They've all been -- these are science.
3  We're not -- I'm not doing science here. I am applying
4  previously existing science. Theory is one thing. We
5  have applications, so let's not use "theory."
6      Q. Have you done any testing to determine how long
7  it would take and under what conditions it would require
8  for these bolts, for these nuts to loosen on these
9  bolts?
10     A. Let's say I have at a maximum, and that length
11 of time is the time from when this platform was
12 examined -- erected, I'm sorry, until Mr. Grove fell as
13 a maximum. The screws may have been loose and out of
14 there long before that, but there is physically no way
15 to test time periods and things like that. You have
16 temperature variations, vibrations, differences in
17 individual pieces of material, corrosion, moist air,
18 salt air, impurities in the metal. There's so many
19 things.
20     There is no way anyone can put a time frame on
21 that, the conditions of use, how many times, how much
22 does the air-conditioning system vibrate, at which end
23 of the bar is the fastener located on. Oh, there's no
24 way. Utterly beyond doing how tight was it in the first
25 place, how smooth were the metal surfaces. I could

### 72

1  probably go on for a longer list, but why bother?
2      Q. All right. And in any event, you have not
3  attempted to do any such testing?
4      A. Well, of course not.
5      Q. Likewise, you haven't employed any calculations
6  to ascertain how long it might take for these square
7  nuts to vibrate off these --
8      A. Since there's --
9      Q. -- bolts?
10     A. -- no way to make such a calculation, I
11 wouldn't even contemplate making it. It's ridiculous.
12     Q. All right.
13     A. I know from 50 or 60 years of use of square
14 nuts and stove bolts that they almost always come loose
15 eventually. Boy, now there's about as broad and general
16 a statement you can bet. But yeah, everybody knows they
17 come loose, if it was a good mechanic or an engineer.
18 This is not what you do to long-term support a load.
19     Q. How about a well-trained, well-experienced HVAC
20 technician like Mr. Grove? Isn't this something he'd
21 know?
22     MR. COHN: Objection. Foundation.
23 Speculation.
24     BY MR. THORSNESS: Q. Square nuts vibrate off
25 of machine screws?

Exhibit 4
page 6 of 14



Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

## 73

1  A. He probably would if he'd ever looked to see
2  what was there.
3  MR. COHN: Same objection.
4  BY MR. THORSNESS: Q. Let's see. Let's go to
5  paragraph 2 on page 2. Here you refer to the machine
6  screws as -- well, you call them stove bolts, SAE Grade
7  2; correct?
8  A. Or possibly SAE Grade 2. Really I -- let's
9  see. Might have come close to describing the screw
10 strength, yeah, so that's a big maybe. And it -- as we
11 discussed earlier, they may not be up to that spec.
12 Q. Could they be stronger than an SAE Grade 2?
13 A. I would tend to doubt it. And it isn't just
14 strength we're talking about. It's precision of the
15 threads. One reason these are not good fasteners is the
16 fin under the bottom of the head that's left by the dies
17 that produced the threads which is a very small bearing
18 area, and there's a neat result that comes with that
19 kind of stuff. When you tighten them up, that tends to
20 give.
21 And as the load varies with use, it tends to
22 give even more. And guess what? That loosens up the
23 joint. So that's another reason they're bad. It's just
24 a poor choice of fastener. Very, very bad.
25 Inexcusable.

## 74

1  If that fin happened -- let me continue on that
2  last question. If that fin happens to line up with the
3  slot, it may not hurt much if the thing is not at the
4  end of the slot because it isn't resting on the fin.
5  But if it's 90 degrees to that position, then it is. So
6  you've got randomness thrown in there. Roll the dice as
7  to what you get. This is not a designed joint.
8  Q. You don't know where any such fin might have
9  been resting in this particular joint?
10 A. I could roll the dice. That's it. Who knows?
11 But it's not a good thing to choose that because you
12 can't have that problem exist.
13 Q. Did you ever attempt to determine the shear
14 strength of these machine screws?
15 A. No. No need to.
16 Q. They do have a shear strength, don't they?
17 A. If you test 100 of them, you probably get a
18 pretty broad range of it.
19 Q. It could be calculated and tested?
20 A. If you were going to put them into an
21 application where that mattered, yes. It doesn't matter
22 here because the one that failed, failed after the other
23 joint had failed by the screws coming out. So what
24 difference does the shear strength make? None.
25 Q. So it's your testimony that shear strength of

## 75

1  these machine screws makes no difference whatsoever --
2  A. In this accident.
3  Q. -- in this accident?
4  A. Or this event, this incident. There aren't any
5  accidents really. Everything has a cause.
6  Q. Have you read Mr. Morin's report where he
7  discusses the shear strength of these machine screws?
8  A. Yeah. I guess he works by the hour too.
9  That's fine. He can --
10 Q. Well, I don't --
11 A. -- spend his time as he wishes, you know, but,
12 you know, I at no point -- I didn't wish to spend Mr. --
13 Q. All I wanted to know is if you read that
14 portion of his report.
15 A. Well, I have some time back, and I don't
16 remember the detail.
17 Q. Was there anything about Mr. Morin's analysis
18 about the shear strength of these machine screws that
19 you disagreed with?
20 MR. COHN: Objection. Speculation.
21 THE WITNESS: I did not analyze his analysis or
22 check his numbers at all because to me they were
23 superfluous. They may have been precise and they may
24 not. I just had no interest in whether they were right
25 or wrong because they didn't apply to Mr. Grove falling

## 76

1  down.
2  (Recess taken from 10:29 a.m. to 10:36 a.m.)
3  BY MR. THORSNESS: Q. All right. We had a
4  break here. Mr. Manning, did you ever look at the
5  actual machine screws, machine screw remnants, nuts,
6  washers that were collected either by Mr. Grove the day
7  after the accident or later on in a subsequent
8  inspection?
9  A. You know, I'm not sure. If Dr. Balser had them
10 and I was at his place for something else I may have,
11 but I just don't recall.
12 Q. Do you recall ever seeing any thread
13 deformation on any of these machine screws or on the
14 threads in the square nuts?
15 A. If I ever saw them, I didn't look closely
16 enough to see. It was pretty much Joe's thing. Of
17 course there has to be some. If you were going to shear
18 it off, there would have been a loading transmitted
19 through the threads since these were threaded full
20 length, but it may have been in the thousandth of an
21 inch or less range. So other than micrometer
22 examination you wouldn't know. But then you'd need to
23 know the original size because it was corroded maybe
24 over the years. Who knows?
25 Each screw could be slightly different in size,

Exhibit 4
page 7 of 14



setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www·setdepo·com

## 81

1  them off.
2      Q. But in the course of this case you did not
3  obtain exemplar nuts and bolts and see how much torque
4  could be applied with a simple crescent wrench and a
5  screwdriver?
6      A. Of course not. It didn't apply. There's
7  nothing in this case that involves that, so I wouldn't
8  do that no more than I would weigh them or whatever, you
9  know, see how nice and reflective they were. You know,
10  it doesn't matter. It's irrelevant. It doesn't fit --
11  there's nothing in the case that involves that, so I
12  didn't do it.
13      Q. And whether or not it would be useful because
14  you didn't do it, you have no idea what those values are
15  from your own testing and analysis?
16      MR. COHN: Object to the question --
17      THE WITNESS: That's a long, convoluted
18  sentence. I didn't do it because it wasn't necessary,
19  and it was unrelated to the case, and I don't care what
20  the numbers are. It's going to be as strong as a stove
21  bolt is, period.
22      BY MR. THORSNESS: Q. How strong is a stove
23  bolt?
24      A. I have no idea of the numbers. Not strong
25  enough is the answer.

## 82

1      Q. Does it matter to you?
2      A. No, because they didn't fail in this accident.
3  They fell out. They weren't there. And the one that
4  sheared was on the other end, so it was probably at
5  least snug. Maybe not tight, but it was there. And the
6  weight out on that long lever arm broke it off.
7      Q. Let's see. Down there at your fourth line on
8  paragraph 4, you refer to a low preload.
9      Do you see that?
10      A. Fourth line?
11      Q. Yeah. On the right side of that line, Low
12  preload.
13      A. Yeah.
14      Q. Is that another way of saying torque value?
15      A. No. Tension.
16      Q. Tension?
17      A. Yes.
18      Q. Tension on the machine screw?
19      A. On the fastener.
20      Q. On the machine screw.
21      A. Not a machine screw. It's a stove bolt, and
22  it's a fastener.
23      Q. Let's just call it the bolt.
24      A. Okay.
25      Q. Tension on the bolt; right?

## 83

1      A. Fine.
2      Q. Is that what --
3      A. We've been through the --
4      Q. I --
5      A. -- could not get adequate preload with a square
6  nut.
7      Q. Yeah, I know. But I want to get my terminology
8  correct because, as you keep pointing out to me quite
9  gleefully, I'm not an engineer. I'm just a damn lawyer.
10      A. We ought to talk about --
11      Q. I'm just a damn lawyer, yeah, so --
12      MR. COHN: Well, in fairness, John, he
13  gleefully points that out to me too.
14      THE WITNESS: It's usually the last thing I
15  point out to him.
16      BY MR. THORSNESS: Q. I feel better. I feel
17  better. I just want to understand what you mean by low
18  preload.
19      A. Preload in an engineering text discussing
20  bolted joints would mean the tension established in the
21  threaded fastener when it was tightened up to the
22  appropriate load, and torque is one way of measuring it.
23  It is probably the poorest way of measuring it. There
24  are much better ways, but most people don't put
25  micrometers over the end of bolts or put string gauges

## 84

1  on them or whatever the other things we sometimes do in
2  aircraft engines or other places.
3      Q. Right. Is torque a relatively easy -- quick
4  and easy way to measure this value?
5      A. It's quick and easy, but just the kind of
6  lubricant you can put on changed the preload two-to-one
7  factor on the same torque rating. So is it a good way?
8  No, but it's quick and easy.
9      Q. Fifth line down you refer to vibration during
10  use.
11      A. Yes.
12      Q. Do you see that? Did you ever calculate or
13  test the vibration that may have been present -- that
14  may have been applied to these joints?
15      A. No. There would be no point to it.
16      Q. Any vibration that you believe was present --
17  strike that question.
18      What's the basis for your view that there was
19  vibration present sufficient to play a role in this
20  accident?
21      A. Well, I don't know about sufficient, but there
22  was present. People walked on it. That's one thing.
23  And the other, it's attached to an air-conditioning
24  machine, and they shake some. How much? I don't know
25  in this case. I don't know whether it was up during the

Exhibit 4
page 8 of 14



### 85

1  big earthquake you had. That might have done something
2  to it too, but that may have been too long ago. I don't
3  know.
4      Q. I don't think so.
5      MR. COHN: It was -- this was built after the
6  earthquake.
7      THE WITNESS: Built after the earthquake, okay.
8  Whatever. The bad earthquake.
9      MR. THORSNESS: Q. The big one, yeah. Okay.
10 Any other factors that might have contributed to
11 vibration?
12     A. No. This is one of the things that does cause
13 these things to come loose, and they did.
14     Q. If these two machine screws, if the nuts on
15 these two machine screws that you contend came loose and
16 fell out, in the course of that happening the nuts would
17 be backing off on the bolts; is that right?
18     A. Yes.
19     Q. And --
20     A. Well, yes in this particular application. I
21 think that's by far the most probable thing. Other
22 applications, you know, relative motion of the parts
23 might tend to wear the nut -- the bolts through, but we
24 don't have the parts to look at to tell that. But the
25 way these rested on each other, I'd give it a much lower

### 86

1  probability. But how much I can't put a number on.
2      Q. Would you expect that there would be any noise
3  attendant with that loosening?
4      A. No, not really.
5      Q. How about any vibration that might be able to
6  be felt or detected?
7      A. Probably not because one is -- the numbers --
8  one is resting on top of the other, so it's being
9  supported, and it's got a continuous weight of its own
10 weight and the board on top of it. So there probably --
11 not any large motion or no slapping back and forth to
12 cause any kind of a perceptible noise.
13     And I don't -- I guess they shut the
14 air-conditioning off when the guy is in there, so he
15 didn't get sucked up against the wall. But so I don't
16 know what other noise is around the building environment
17 at all, but it's -- the noise wasn't a consideration in
18 my view.
19     Q. Would corrosion of the threaded surface of the
20 bolts hasten or retard the rapidity at which the nuts
21 would back off the bolts?
22     MR. COHN: Objection to the form of the
23 question.
24     THE WITNESS: Yes to both possibly. We have --
25 corrosion can take place in a nut and the bolt that are

### 87

1  tight and essentially lock them together so they don't
2  back off. They just rusted solid to use the layman's
3  terminology.
4      BY MR. THORSNESS: Q. Yeah.
5      A. But if there's a little bit of motion going
6  on -- we're talking barely out of the microscopic
7  range -- the load is changing. It would break up this
8  rust material which is rather soft and keep that joint
9  from being solid. And then it would tend to diminish
10 the size of the parts, increase the clearance between
11 them as the rust products fell out, and that would then
12 accelerate the motion.
13     So the bolts weren't there, so they either
14 rusted through or wore through and fell out, or the nuts
15 backed off. And we don't have them to look at or the
16 parts that they connected to look at but one or the
17 other, so it doesn't matter. They weren't there when
18 the accident -- or the incident took place.
19     Q. Do you recall whether rust was observed on the
20 sheared fracture surface of the bolts or on the threads
21 or in both locations?
22     A. I believe in talking with Mr. Balser that there
23 was rust on the sheared surface. It's a moist
24 environment, and it can sometimes happen overnight. How
25 much rust, maybe you can take that up with him. He

### 88

1  would have looked at it in detail, and I have not.
2      Q. Back to what might be detectable if this joint
3  was loose, let's say the nuts had backed off half the
4  length of the machine screw, half the length of the
5  bolt. There would likewise be some looseness in the
6  joint as we discussed before that would be detectable if
7  a person reached up and gave it a good shake, wouldn't
8  there?
9      A. Yes.
10     Q. Once a person was up on the platform and
11 standing and moving on the platform, might that
12 looseness be detectable underfoot?
13     A. Probably not because the weight is bearing down
14 and putting a load primarily on that end of the bar in
15 pressing it down on top of the vertical bar, and the
16 horizontal is pressing it down on the vertical. If it's
17 close enough to falling off, then it will get around to
18 falling off if it has a little bit of wiggle to it. But
19 probably other than that it's not going to be
20 perceptible because it isn't going to tip the board. It
21 might be wiggling sideways, but that isn't going to
22 change your feel or your footing.
23     Maybe go back to your just immediately previous
24 question on the perceptibility of shaking it, yeah,
25 that's why a good inspector in the building ought be up

Exhibit 4
page 9 of 14


setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 97

1  3/8ths-inch screws without taking the time to drill or
2  file the slots for such clearance.
3      Do you see that?
4  A. Yes.
5  Q. And you say, Although that would have been a
6  good design.
7      Do you see that?
8  A. Yeah.
9  Q. You've never mentioned -- measured these slots
10 or holes, have you?
11 A. I've been told. I think Joe Balser did measure
12 something on an exemplar. I'm not sure where he got it.
13 He told me they were 3/8ths slots. And looking at it,
14 looking at the bolt heads that I can see in the
15 photographs, that's what they look to be proportioning
16 from a 1/4-20, which I know was their stove bolt. They
17 look like 3/8ths. And if you needed to, you could run
18 the drill through or a rattail file and put a 3/8ths in
19 there.
20 Q. Right, right. Have you seen any evidence that
21 the slotted head of these bolts pulled through, they
22 were so small they pulled through any of these holes?
23 A. No. They were larger than the slot.
24 Q. And larger than the holes that were drilled
25 too?

### 98

1  A. And the holes. The slots and the holes seemed
2  to be the same size.
3  Q. Right. And there's no evidence that they
4  pulled through?
5  A. That's right. And I would say I guess you
6  could get to the place where the heads corrode so thin
7  and small that they pulled through. I've seen that
8  happen in other things, but it didn't appear to here.
9  Q. In the same paragraph you say that the screws
10 were -- screw diameters were smaller than the -- than
11 should have been used with the angle members.
12     Do you see that?
13 A. Yes.
14 Q. Okay. Does that have anything to do with the
15 simple intuitive fact that bigger bolts are stronger
16 than the smaller bolts?
17 A. No.
18     MR. COHN: Objection to the form of the
19 question.
20     THE WITNESS: It's a little more than that.
21 You know, the slots are that size to accommodate larger
22 bolts. Gee, somebody may have thought maybe we could be
23 wanting to put in larger bolts.
24     Secondly when you use an appropriate bolt of an
25 appropriate size, you made the even less likely chance

### 99

1  that even with corrosion or something they'd ever pull
2  through. Besides that, then you would be forced to use
3  something better than that little square nut.
4      And all nuts for larger bolts, except when you
5  buy a jamb nut which is a little harder thing to find,
6  but normal nuts are strong enough that the bolt will
7  fail before the nut in tension, so you can get much
8  better preload, and they will be much more likely to
9  stay tight. It's preload that keeps bolts tight. And a
10 lock washer is good for sheet metal, but I don't think
11 much of them for a mechanical joint of a
12 high-performance joint. Prevailing torque lock nuts are
13 available in the larger sizes. They are in quarter-inch
14 too, but they sure didn't think to use them.
15     BY MR. THORSNESS: Q. Let me ask you this
16 question. I want to make sure I understand your
17 testimony exactly. As I understand your testimony, as
18 constructed, as built in assuming there were two bolts
19 in every joint and these two bolts had washers and
20 square nuts tightened down with a wrench a screwdriver,
21 that structure as I understand your testimony was
22 sufficient to hold Larry Grove's weight?
23     MR. COHN: Objection to the form of the
24 question.
25     BY MR. THORSNESS: Q. Is that correct?

### 100

1  A. Well, that's of course the wrong question.
2  Q. Well, I don't want --
3  A. Of course he could have stood on it.
4  Somebody -- people stood on it for some period of time
5  before it failed, but the implication I'm trying to
6  avoid is that it was an adequate structure. Of course
7  not. It did not fail until the time it did with Larry
8  Grove or it did not fall down until Larry Grove was on
9  it. It may have failed before he even got there. We
10 don't know. But it was surely not an adequate and
11 proper, designed structure, and I don't want to imply
12 that.
13     Yes, it would have carried Larry Grove's
14 weight, but what would the safety factor have been? At
15 1.1? You do better than that in airplanes. Usually
16 1.2. But they got to fly. This didn't have to fly.
17 Q. Have you read Mr. Morin's calculation of the
18 safety factor?
19 A. I probably have, but I mean, he hadn't
20 considered everything, and we don't know. He hasn't
21 considered loose bolts, which of course we have there
22 or very likely would. Who knows?
23     The safety factor would have to be on all modes
24 of failure. And whatever he calculated for strength,
25 that's nice. I'd go to six, eight, maybe ten. OSHA

Exhibit  4
page 10 of 14

setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 101

1  requires six for hoisting hardware, lift stuff up.
2  Here's something, you know, that doesn't have to fly,
3  doesn't have to be lifted. We don't have to worry about
4  weight. I mean, this is, you know, like how many -- how
5  heavy a person can walk on your second-story floor at
6  home without breaking through the floor. Well, probably
7  ten times the weight of your wife. I don't know. Why
8  skimp when a bolt costs pennies?
9      Q. Do you have any quarrel with Mr. Morin's
10 calculation as to the safety factor presented by this
11 platform as it was first constructed?
12     A. Let's say I have no --
13     MR. COHN: Objection to the form of the
14 question. And also Mr. Manning has indicated that he
15 hasn't looked at the --
16     MR. THORSNESS: Just form and foundation,
17 Michael. Let's have an answer to my question. I'd like
18 just an answer to my question. I don't want a speaking
19 objection. I don't want a speech. I want an answer to
20 my question.
21     BY MR. THORSNESS: Q. Can you give me that,
22 Mr. Manning.
23     A. Repeat it so we're clear here after all the
24 speech going on.
25     Q. I'd be happy to.

### 102

1      Do you have any quarrel with Mr. Morin's
2  calculation of the safety factor presented by this
3  platform as it was originally constructed?
4      MR. COHN: Objection. Form of the question.
5  Speculation.
6      THE WITNESS: I have not reviewed numerically
7  his calculation; so -- however, the man is educated. I
8  have no quarrel. Now, I'm not implying that I'm saying
9  that if he said it was adequate that I agree with that,
10 but that isn't what you asked, but I want to make sure
11 that we don't infer that I am answering that other
12 question too. I'm not.
13     BY MR. THORSNESS: Q. I rarely try to
14 cross-examine witnesses with answers to questions I
15 didn't ask.
16     A. Oh, it's a good technique. A lot of people use
17 it. That's why I answer that way.
18     Q. Look at page 3 of your report, if you will,
19 please.
20     A. Sure.
21     Q. There were two occasions we've discussed when
22 we know people picked up nuts and bolts off the bottom
23 of this fan room; correct?
24     A. Correct.
25     Q. How do you -- do you know as to any individual

### 103

1  bolt -- do you know when that -- can you tell when
2  that -- if it's damaged, can you tell when that damage
3  occurred?
4      A. I have a strong inference on the one that
5  Mr. Grove picked up because I would expect to see a
6  fracture of that sort following the way this member
7  failed and lost its position. And I wouldn't expect
8  that to occur from any other means that I know of
9  existing around that platform, in and around the
10 platform. The rest of the bolts I understand were
11 deformed in ways that would have nothing or likely have
12 nothing to do with the use of the platform, so we can
13 pretty well exclude them as having anything to do with
14 the failure, and they don't match the failure mode that
15 must have taken place.
16     Q. The failure mode that must have taken place,
17 what failure mode is that again?
18     A. That's the one where the one end of the
19 horizontal bar that failed was loose and got to a
20 position where it slipped off the upper end of the
21 upright and would no longer support the load was on it.
22 And when it went down and by going down with Mr. Grove's
23 weight or a percentage of his weight on it, sheared one
24 bolt out of the two that were holding it to the filter
25 wall.

### 104

1      Q. Is it your contention that there was only one
2  bolt that was found that had failed in shear?
3      A. That's what I understand --
4      Q. During --
5      A. -- from Dr. Balser. This is not my
6  determination.
7      Q. Only one?
8      A. That's what I understand. Or there was --
9  completely. Now, it would not surprise me if other
10 bolts had been found failed in shearer because, during
11 the deformation or destruction of this -- and removal of
12 this platform material, that could have easily have been
13 happened by the same means. Somebody grabbed ahold of
14 the end of one bar and pulled it down and shear a bolt.
15 But I --
16     Q. And those bolts could also have failed in shear
17 during the accident, but Mr. Grove just didn't happen to
18 pick those bolts up the day after the accident?
19     A. Oh, no.
20     MR. COHN: Objection. Foundation.
21 Speculation.
22     BY MR. THORSNESS: Q. Why not?
23     A. There's no deformation indication that you can
24 see in the photographs on the free end of that or the
25 upright that supported it. Also, it sat on top of the

Exhibit 4
page 11 of 14

setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

## 109

1  MR. THORSNESS: Let's mark this as the next
2  exhibit in turn.
3      (Whereupon, Exhibit 5 was marked for
4  identification.)
5      (Lunch recess taken from 11:23 a.m. to
6  1:05 p.m.)
7              --oOo--

## 110

1          AFTERNOON PROCEEDINGS:
2
3      BY MR. THORSNESS: Q. Mr. Manning, we've had
4  our lunch break, and let me hand you Exhibit 5. You
5  have a copy. Your lawyer has a copy of it there. I
6  have a copy of it somewhere.
7      And this was in your manila folder this morning
8  you showed me; right?
9      A. Yeah.
10     Q. And this is an e-mail from you to Mr. Cohn; is
11 that correct?
12     A. Correct.
13     Q. December 26, 2006, and it concerns the Grove
14 case; right? Concerns this case. "Subject: Grove" it
15 says.
16     A. Mm-hmm.
17     Q. Yes? Is that a yes? Are you finished reading
18 it?
19     A. Yeah.
20     Q. All right. Let's talk about the very first
21 paragraph. "The defense reports arrived."
22     Do you see that?
23     A. Yes.
24     Q. Would these be reports authored by Dr. Morin
25 and Mr. Van Bree?

## 111

1      A. I believe so.
2      Q. All right. Then the second paragraph, the
3  first sentence, "The calculations are fine, if you are
4  teaching engineering students how to make that sort of
5  calculations, but they don't apply here."
6      Do you see that?
7      A. Yeah.
8      Q. My question, sir, the calculations which you
9  say are fine, what calculations are you referring to?
10     A. Well, there's really a two-part answer. One is
11 the ones he did on the bolts are the fact that he
12 calculated the strengths and the clamping and all of
13 that.
14     Q. Right.
15     A. And that is I meant they were fine with regard
16 to what they were. I didn't do any numerical
17 verification, so I'm not saying they were fine
18 numerically. I really have no reason to doubt that they
19 were. But as far as this case is concerned, they don't
20 apply.
21     Q. But as far as the calculations go, you have no
22 reason to believe that they're incorrect?
23     A. No. They're just pointless. That's all.
24     Q. Pointless but they do -- do you have any reason
25 to believe that they apply to something else other than

## 112

1  the type of machine screw or bolt that we have involved
2  here in this accident?
3      MR. COHN: Objection. Speculation.
4      THE WITNESS: Apparently done it with that size
5  screw thread in mind. You know, whether the strength of
6  the material matched this or not I haven't checked. I
7  don't know. It doesn't -- you know, they don't apply to
8  this device. That's all.
9      BY MR. THORSNESS: Q. All right. All right.
10     A. We know that quite much as a fact.
11     Q. All right. And I want to go through the basis
12 for your opinion that any calculations as to shear
13 strength or clamping force that Dr. Morin may have done
14 is for some reason irrelevant.
15     Have I stated your --
16     A. Real easily, yeah. I think we've been over it,
17 but I'll be glad to do it again.
18     Q. Let's do it again.
19     A. Very simple, the horizontal bar lay on top
20 directly on top of the vertical, so the load was being
21 carried by direct contact between those two members.
22 The bolts were merely holding them together, okay? The
23 flange that was lying on top was two inches wide, so it
24 couldn't have fallen off until it had moved two inches
25 away from the other member. And the bolts are what?

Exhibit 4
page 12 of 14

setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### 113

1   Either three-quarters or one inch long, I forget. But
2   they're sure not two inches long, so they had to have
3   been unattached in order for that top bar to move the
4   two inches for it to fall over.
5           They aren't carrying any load, and so the bolts
6   are loose for some other reason than their strength
7   unless a mechanic twisted them off putting them in. Who
8   knows whether they were damaged in installation, and who
9   knows really when this platform was last put in or even
10  if this is an original platform. We have no history of
11  it at all. Either maintenance, repair, installation of
12  this one, installation of a different one. There are
13  some oddball holes in the pictures that don't line up.
14  They might just have been drilled wrong during the
15  installation of this one, but we don't know.
16          But it couldn't -- you know, the strength
17  calculations don't apply because the bolts were long
18  gone before it fell and -- well, long. I mean, they
19  just weren't -- you know, until -- that thing couldn't
20  have moved until the bolts quit holding it, and they had
21  to move twice as far or more as the bolts were long, so
22  they don't apply. They're just not involved. Their
23  strength doesn't matter.
24      Q.  The very last sentence of this paragraph,
25  quote, "Figures don't lie, but liars figure."

### 114

1   Do you see that?
2       A.  Yeah. That's a cliche.
3       Q.  You're not suggesting that Dr. Morin or
4   Mr. Van Bree are lying to anybody?
5       A.  No. I wouldn't think so, but I think what
6   they're doing is either they didn't see what was going
7   on or they deliberately chose to ignore it and put
8   something else forward. And whether they're just
9   turning the crank to spend your money so they make some
10  I don't know, but that's -- I would have no way of
11  knowing what's in their mind, but it's either they blew
12  it or they're turning the crank and providing fluff for
13  whatever reason they might have. But -- and I have no
14  way of knowing that they're actually doing that.
15      Q.  You just -- is it fair to say you disagree with
16  their opinions, but you don't contend that they're being
17  dishonest?
18      A.  Oh, no. No. I have no way of knowing that.
19  And if I had outright proof, then of course I would
20  state it. And I don't and I clearly want to state that
21  I have no such, and so I don't mean to imply at this
22  sitting that there's anything there. I can babble to my
23  client as I wish, but that's the whole point of it. It
24  just...
25      Q.  Let's see. Where is his -- no, I have the

### 115

1   report. What percentage of your work is for plaintiff,
2   and what percentage for defense?
3       A.  Best I can ever do is say about 50/50. I got
4   two clients in Reno. One a plaintiff's attorney and one
5   a defense attorney, and I have about 100 cases for each
6   of them. So one week it's -- or one year it's more one
7   way, and the next year it's more the other, and that
8   isn't my basis of taking a case. I try to look for the
9   facts, and I've been at it 40-something years, and I can
10  be working for both of these attorneys at the same time
11  for different cases and nobody complains. So, you know,
12  I'm looking for the facts.
13      Q.  Good. Have you ever in any of your court cases
14  defended a manufacturer of a product, chain saw,
15  automobile, airplanes?
16      A.  Oh, yeah.
17      Q.  In any of those cases have you ever opined that
18  the operator was at fault for the accident?
19      A.  I'm trying to think back. Yeah, I get more
20  lately. It's easier to think of the more recent cases
21  where I've been working for a defendant who was, let's
22  say, an equipment rental company rather than
23  manufacturer. But thinking back to manufacturers, there
24  was a Ford school bus that had a wreck one time. It's
25  been quite a few years ago. And I was -- I found

### 116

1   nothing wrong with it, and I felt it had to have been
2   operator error on a mountain road. I saw nothing else.
3   Probably that was it. I'm sure there are others. It's
4   just that after 40 years of doing this they kind of all
5   look like one big case.
6       Q.  Any cases come to memory that concerned
7   whether -- whatever side you were on that concerned
8   construction equipment?
9       A.  Sure.
10      Q.  In any of those cases do you ever remember
11  opining that the operator was at fault at least to some
12  extent?
13      A.  Yeah, there is -- there's one. One of my
14  defenses of an equipment rental company.
15      Q.  Yes.
16      A.  The contentions of the plaintiff were that both
17  the rental company and the manufacturer were at fault.
18  I found no fault with really either of them and that the
19  operator and the man that was killed by a piece that a
20  machine knocked off were at fault on that. They
21  improperly moved and -- the machine. Guy is standing on
22  the ground instead of sitting in it where he should have
23  been and had to stretch to reach things.
24      Q.  Oh, I see.
25      A.  A variety of stuff --



Exhibit 4
page 13 of 14



Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Lindley Manning, P.E.                                August 14, 2007

**121**

1  driver was at fault in that accident at all?
2      A. In that accident, oh, yeah. The cause of the
3  accident, I believe, was the driver and/or the passenger
4  maybe more than the driver.
5      Q. Who grabbed the steering wheel?
6      A. Who grabbed the steering wheel.
7          MR. THORSNESS: Right, right. Well, that
8  concludes my questioning then, I believe. I'll turn the
9  floor over to Mr. Cohn.
10         MR. COHN: I just have a couple of questions.
11  Did you mark his affidavit as an exhibit?
12         MR. THORSNESS: I don't remember. I don't
13  think I did, Michael. I don't know.
14  Yes, 2.
15
16         EXAMINATION BY MR. COHN
17
18      Q. Mr. Manning, my name is Michael Cohn. I'm an
19  attorney at the Phillip Paul Weidner and Associates.
20      Mr. Manning, in regard to it says affidavit of
21  Lindley Manning, Exhibit 2 to your deposition, do you
22  stand by the opinions that have been expressed in this
23  affidavit?
24         MR. THORSNESS: Objection. Form.
25         THE WITNESS: Surely. I have no reason to

**122**

1  disagree now and don't want to imply this says
2  everything. We covered a whole lot more in more detail
3  here than is expressed there, but basically this is, you
4  know, I have no disagreement with what's put down here.
5          BY MR. COHN: Q. And you had your chance to
6  review and approve this affidavit?
7      A. Right. The history of it was you wanted an
8  affidavit, and I said, "I'm not a lawyer. I don't write
9  affidavits. Write me a form of what you think, and I'll
10  correct it as need be," and that's what happened.
11      Q. So as corrected this -- this expresses your
12  opinions?
13         MR. THORSNESS: Objection. Form.
14         THE WITNESS: Yes.
15         MR. COHN: I don't have any further questions.
16
17         FURTHER EXAMINATION BY MR. THORSNESS
18
19      Q. Mr. Manning, do you have any information as to
20  who may have originally designed and constructed this
21  work platform?
22      A. Unfortunately no. I don't even know if this is
23  the original platform or whether there was one before it
24  in a different place, whether this has been repaired, or
25  I'm not -- its past history. There's really no -- other

**123**

1  than the evidence we've gone over.
2      Q. Look at paragraph 7 of your affidavit, will you
3  please, sir.
4      A. Okay.
5      Q. I'd like you to actually have you look at 7 and
6  8. And my question, focusing for a moment on 7, but I
7  also want to in the context of 8 if that makes any
8  sense. In 7, in paragraph 7, you say "structural
9  failure inevitable at a time that could not be predicted
10  and without prior warning," do you see that?
11      A. Yes.
12      Q. And then in 8 you say it's "important that
13  periodic inspections and maintenance occur"?
14      A. I say this in turn makes it.
15      Q. Even more important?
16      A. Without the design defect, then that changes
17  character entirely. That's like expecting the floor to
18  fall out of your building. You don't really inspect
19  that.
20      Q. And one reason for these inspections and
21  maintenance is to ascertain any weakening of the
22  structure --
23      A. Yes.
24      Q. -- right? And my question for you is had these
25  nuts been backing off these bolts such that the

**124**

1  connection was loosening, this of course would weaken
2  the structure?
3      A. Yes.
4      Q. All right. In part because there would be no
5  clamping force at that location?
6      A. In part, yes.
7      Q. And secondly is this a danger that could have
8  been ascertained during periodic inspections and
9  maintenance?
10      A. Yes.
11      Q. And so to that extent, had there been periodic
12  inspections and maintenance they might have discovered
13  this problem?
14      A. They might have.
15      Q. And that would have in turn provided prior
16  warning to the user that this platform was in peril of
17  collapsing?
18         MR. COHN: Objection to the form of the
19  question.
20         THE WITNESS: I say it could have.
21         MR. COHN: Speculation.
22         BY MR. THORSNESS: Q. It could have.
23      A. They found it, and then had they chosen or in a
24  timely fashion passed it on to the appropriate people.
25      Q. All right. In your experience is it fair to

Exhibit 4
page 14 of 14



Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management