Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT AT ALASKA

---

LAWRENCE H. GROVE, CYNTHIA )
GROVE, SARAH GROVE, and MICHAEL )
GROVE (DOB 1/21/88) by and through )
his father LAWRENCE H. GROVE, )
)
      Plaintiffs, )
)
vs. )
)
UNOCAL CORPORATION, )
)
      Defendant. )
_____ )

Case No. A04-0096 CV (JKS)

---

DEPOSITION OF BOB CARMICHAEL

---

TUESDAY, JULY 31, 2007
10:28 A.M.

Taken by Counsel for Defendant
at
CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
711 H Street, Suite 620
Anchorage, Alaska

EXHIBIT C
PAGE 1 OF 4

Page 64

1  were guardrails in place on this work platform, then
2  do you have an opinion as to whether or not they lived
3  up to that obligation?
4        MR. COHN: Objection. Foundation.
5  Inaccurate. Assuming facts not in evidence.
6        THE WITNESS: Let me go back, please, one
7  question. Should there have been guardrails? In
8  safety practice, there are generally three ways to
9  protect an employee from a fall hazard. One is
10 guardrails, one is a safety harness or some other fall
11 prevention or protection measure and the other is to
12 establish a guard, a person who stands and watches and
13 warns people when they come too close to the edge.
14 It's usually used for roofing work.
15       So my opinion is that in a platform where
16 there's a fall risk, one of those needs to be used.
17 The normal method is to apply a guardrail. Because
18 it's the safest and is the most -- generally, the most
19 effective.
20 BY MR. THORSNESS:
21    Q.  Okay.
22    **A.  Okay. Now, do I know whether Siemens**
23 **supervisors ever inspected the platform? No, I don't.**
24    Q.  If they were supposed to and they didn't,
25 might that indicate that Siemens might bear some

Page 65

1  responsibility for Mr. Grove's injuries?
2        MR. COHN: Objection. Speculation.
3  Foundation.
4        THE WITNESS: It's not usually my position
5  to establish responsibility. What I can do is say who
6  is most likely to have had control over a particular
7  hazard or risk, in this case. My experience is that
8  when a contractor performs work in an owner's
9  location, whether it be inside a building or a drill
10 site or any other spot, it's not usual, in my
11 experience, that the contractor's management inspects
12 the owner's workplace. That's just -- it's just not
13 done very often, in my experience. Does it occur?
14 Yes. Does it occur often? No.
15 BY MR. THORSNESS:
16    Q.  If they assumed that obligation --
17       MR. COHN: Had you finished your answer?
18       THE WITNESS: Yes.
19 BY MR. THORSNESS:
20    Q.  If they'd assumed that obligation by
21 signing a contract to that effect, then they would
22 have that obligation, wouldn't they, to inspect the
23 jobsite?
24    A.  In my --
25       MR. COHN: Objection. Speculation,

Page 66

1  foundation. And what contract are you looking at,
2  John? Who signed that contract?
3        MR. THORSNESS: Mike, you need to keep your
4  objection to form and foundation.
5        MR. COHN: I'm going to object. You're not
6  showing him a document. You're asking him to comment
7  on terms in a document he hasn't seen and he hasn't
8  read and so --
9        MR. THORSNESS: I am showing him a document.
10 I'm showing him a contract. And I'm reading from the
11 contract.
12    Q.  I'd like you to answer my question.
13    **A.  My experience is that if the contractor**
14 **specifically states that a party will perform some**
15 **task, then yes, it's their responsibility to perform**
16 **that task.**
17    Q.  Look at, please, paragraph 13.6 of
18 Exhibit 3.
19    A.  I have it.
20    Q.  And that's another fairly short clause.
21 Would you please read that out loud?
22    **A.  Yes, it is. "13.6. Contractor shall keep**
23 **and maintain equipment furnished by company in good**
24 **condition, at contractor's expense and upon the**
25 **termination of --" I guess that's "the" -- "use of**

Page 67

1  **such equipment, turn over same to company in as good**
2  **condition as when received, subject, however, to**
3  **ordinary wear and tear."**
4     Q.  All right. And again, "contractor" refers
5  to Landis & Gyr?
6     A.  I believe that's correct.
7     Q.  Okay. And if Siemens took over this
8  contract from Landis & Gyr, then it would refer to
9  Siemens, right?
10    A.  I assume so.
11       MR. COHN: Objection on foundation.
12 Speculation.
13 BY MR. THORSNESS:
14    Q.  And further, "company" refers to Unocal.
15    A.  Yes.
16    Q.  All right. Do you agree that any work
17 platform that might have been in place at the time of
18 Mr. Grove's accident would be that referred to here as
19 equipment furnished by the company here in this
20 clause?
21       MR. COHN: Objection. Speculation,
22 foundation. This is a 1994 document. Accident in
23 2002.
24       THE WITNESS: My experience is no, a
25 platform would not be included as equipment. My

Page 104

1   the vertical perforated angle metal come loose?
2   A.  I don't know.
3       MR. COHN: Objection on foundation.
4   BY MR. THORSNESS:
5   Q.  You don't know?
6   A.  No.
7   Q.  You don't know which one it was.
8   A.  I don't know which part of the system
9   failed.
10  Q.  All right. All right. Wouldn't that be
11  something you'd want to know in rendering your
12  opinions in this case?
13      MR. COHN: Objection to the form of the
14  question.
15      THE WITNESS: Let me think about that. I'm
16  tempted to say no, that it wouldn't make -- it would
17  be an interesting -- it would be a fact, but would not
18  influence my opinion. It's the fact the system failed
19  that's the basis for the opinions I've rendered.
20  BY MR. THORSNESS:
21  Q.  Okay. The attachments between the vertical
22  and the horizontal pieces of perforated angle metal
23  shown on Grove Exhibit 19 --
24  A.  Yeah.
25  Q.  -- do you have any idea about the strength

Page 105

1   of those --
2   A.  No, I do not.
3   Q.  -- attachments?
4   A.  I do not.
5   Q.  And Grove 21, the top picture, if this
6   angled piece of perforated angle metal was roughly --
7   A.  Horizontal.
8   Q.  -- horizontal before the accident, do you
9   have any idea as to the strength of its attachment to
10  any vertical piece?
11  A.  No.
12  Q.  Okay. You discuss screws in your report; is
13  that right?
14  A.  Yes.
15  Q.  Okay. Do you have any idea as to the
16  diameter or length of these screws?
17  A.  I do not.
18  Q.  How about to the shear strength?
19  A.  I do not.
20  Q.  How about to the gauge of the sheetmetal any
21  of these might have been attached to --
22  A.  I never measured it.
23  Q.  -- the gauge or other description of the --
24  A.  Size or specifications of the --
25  Q.  -- of the specifications? How about of the

Page 106

1   perforated angle metal?
2   A.  No. I have no technical information about
3   those items.
4   Q.  And again, you have no idea as to the
5   strength of this connection.
6   A.  That's correct. I do not.
7   Q.  Okay. Would you agree with me that the
8   strength of this connection comprises at least two
9   factors, one being the shear strength of the
10  fasteners, in this case machine screws? Would that be
11  one component of the strength?
12  A.  That would be one component.
13  Q.  And in addition, would you agree with me
14  that the strength would be increased by any clamping
15  force brought to this connection by the torque of the
16  nuts on the machine screws?
17  A.  That is my lay understanding.
18  Q.  Okay. All right. And those are two
19  different measures of strength; is that correct?
20  A.  Again, my lay understanding is that those
21  would be two different components contributing to the
22  strength of that system.
23  Q.  Okay. And they'd each be factors included
24  in the total strength of the --
25  A.  In the total strength of the system.

Page 107

1   Q.  Okay. And the strength of the system is how
2   much weight it can hold --
3   A.  Correct.
4   Q.  -- in lay terms.
5   A.  Correct.
6   Q.  Yes. And again, you don't know whether the
7   vertical piece failed or the horizontal piece failed.
8   A.  No, I don't.
9   Q.  You make reference here to -- I'm sorry. In
10  the -- in that same paragraph, there's reference to
11  "wooden planks." See that?
12  A.  Yes.
13  Q.  Do you know the length or dimensions of
14  those planks?
15  A.  No, I do not.
16  Q.  Do you know how -- the distance of the span
17  that they had to span?
18  A.  No. Because I never did see the
19  completed -- the platform as it was installed
20  originally. So I don't know how many spreaders, how
21  many individual supports there were across that.
22  Q.  Okay. Did you attempt to locate where the
23  holes had been --
24  A.  Yes.
25  Q.  -- in the sheetmetal --

29 (Pages 104 to 107)

Page 200

1   MR. COHN: Same objections.
2   THE WITNESS: Well, I can't answer for
3   Mr. Grove. But if I had been there, the answer would
4   be yes. If I had done that, yes, it would have made
5   me suspicious of that connection. Now, whether --
6   BY MR. THORSNESS:
7   Q. What would have made you suspicious, had you
8   reached up there and given that connection a good
9   shake?
10   A. And it would have been loose.
11   MR. COHN: Objection. Foundation,
12   speculation.
13   BY MR. THORSNESS:
14   Q. Please answer.
15   A. Then if it had been loose, then I would have
16   been suspicious.
17   Q. All right. And what would you have done had
18   you found that connection to be loose, had there been
19   some play in that connection?
20   MR. COHN: Objection to the form of the
21   question and speculation.
22   THE WITNESS: Probably -- most probably, I
23   would have reported it to the owner.
24   BY MR. THORSNESS:
25   Q. All right. And would you have seen to it

Page 201

1   that that connection was tightened, otherwise made
2   more secure before you climbed up on that platform?
3   MR. COHN: Objection. Speculation,
4   foundation.
5   THE WITNESS: Generally, yes, I would have.
6   BY MR. THORSNESS:
7   Q. Okay. Mr. Cohn asked you a series of
8   questions concerning Unocal's alleged practices in
9   keeping safety reports. Remember those?
10   A. (Witness nods head.)
11   Q. Does a discussion or reference to that
12   subject appear anywhere within your reports?
13   A. No, it does not.
14   Q. Does -- anywhere in your report, is there
15   any indication you ever reviewed Mr. Burns'
16   deposition?
17   A. No, there's not.
18   Q. When was the first time you were given a
19   copy of Mr. Burns' deposition?
20   A. It was yesterday, which was July the 30th.
21   Q. When was the first time you read Mr. Burns'
22   deposition?
23   A. That would be yesterday, July 30th.
24   Q. Get Mr. Burns' deposition before you and
25   look at page 94, please.

Page 202

1   A. Yes.
2   Q. Line eight through ten, question: "Did you
3   consider that a proper work platform?"
4       Answer: "No."
5       See that?
6   A. Yes, I do.
7   Q. And as I recall, you concurred with
8   Mr. Burns' testimony in that regard; is that right?
9   A. Correct.
10   Q. My question for you specifically,
11   Mr. Carmichael, what about the work platform was not
12   proper, in your view?
13   A. Well, one, it failed. Two, it did not have
14   handrails, toeboards.
15   Q. Okay. Anything else?
16   A. And it did not have a -- apparently, did not
17   have a label indicating the allowable weight limit,
18   loading limit.
19   Q. Okay. So the mere fact of its failure, you
20   conclude that it was not properly -- that it was not a
21   proper work platform.
22   MR. COHN: Objection. Misstates the
23   testimony.
24   THE WITNESS: That is one piece that I used,
25   correct.

Page 203

1   BY MR. THORSNESS:
2   Q. Okay. So do I understand these three things
3   together cause you to conclude that the work platform
4   was not proper?
5   MR. COHN: Objection. Misstates the
6   evidence.
7   THE WITNESS: Those three things together
8   make a more firm decision about the properness of that
9   platform.
10   BY MR. THORSNESS:
11   Q. Anything else about the platform that you
12   think renders it not a proper platform?
13   A. I have lots of questions about the platform.
14   But of the things I know, those are the three.
15   Q. Okay. And those are stated in your report,
16   aren't they?
17   A. They are stated --
18   Q. I said, those are stated in your report,
19   aren't they?
20   A. The safety standards --
21   Q. That's opinion one.
22   A. -- were not applied to construction of the
23   platform.
24   Q. That's opinion one.
25   A. Correct.