# Condensed Transcript

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE; CYNTHIA
GROVE; SARAH GROVE; and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

      Plaintiffs,

vs.    Case No. A04-0096 CV (TMB)

UNOCAL CORPORATION,

      Defendant.

## DEPOSITION OF

### JOSEPH D. BALSER, Ph.D.

August 15, 2007
9:13 a.m.

Hilton Oakland Airport
One Hegenberger Road, Suite 1104
Oakland, California

Susan F. Magee, RPR, CLR, CSR No. 11661

EXHIBIT E
PAGE 1 OF 4



**setdepo**℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Deposition of Joseph D. Balser, PhD                                August 15, 2007

### Page 53

1   A. Yes.
2   Q. All right. Did you read the entire contract
3   stem to stern?
4   A. No, I did not. I perused it, but I did not. I
5   kind of wanted to know what it entailed, so I perused
6   it, but this to me was the relevant article with regard
7   to what the roles were because I asked him several times
8   who's responsible for this structure being in the
9   building? This thing is a hack job built by some guy
10  who is not even very mechanically savvy and got most of
11  his parts out of the hardware store.
12      MR. THORSNESS: Move to strike the diatribe.
13      MR. COHN: Excuse me. It is not a diatribe.
14      MR. THORSNESS: It's not an answer to my
15  question.
16      BY MR. THORSNESS: Q. It will be helpful,
17  Doctor, if instead of engaging in speaking --
18      A. Well, I don't want to infuriate you --
19      Q. Don't interrupt me, sir. I don't interrupt
20  you.
21      MR. COHN: Yes, you have, John.
22      BY MR. THORSNESS: Q. It would be helpful if
23  you -- instead of engaging in these speeches with this
24  inflammatory language describing my clients that you
25  simply answer my question.

### Page 54

1   A. I'm sorry. Did I disparage your client?
2   MR. THORSNESS: Yeah.
3   MR. COHN: Are you going to make a threat to
4   him like you made to Mr. Carmichael?
5   BY MR. THORSNESS: Q. Let me ask you --
6   A. I'd like to know what I did to insult your
7   client.
8   Q. I'm not going to engage in questions and
9   answers with you, sir. I'm asking you the questions.
10  You can answer them for me.
11      A. I apologize if I insulted your client. I never
12  intended --
13      Q. Don't bother. Don't bother apologizing to me.
14      A. All right.
15      Q. Did Mr. Cohn show you anything else that
16  purported to be a contract pertaining to responsibility
17  for inspection and maintenance of equipment involved in
18  this case?
19      A. No.
20      Q. Other than what you have in front of you?
21      A. No. I believe this is it. From my recall this
22  is the entirety.
23      By the way, did you want to give this an
24  exhibit number?
25      Q. No.

### Page 55

1   Did Mr. Grove have any obligation to take any
2   steps to ensure his own personal safety on the morning
3   of the accident?
4   A. Surely he did.
5   Q. And would those duties include taking basic
6   steps to ensure that the scaffolding -- excuse me, the
7   platform he was about to get up on was intact?
8   A. No.
9   MR. COHN: Objection to form. Speculation.
10  BY MR. THORSNESS: Q. Are you aware that OSHA
11  cited Siemens after this accident, Mr. Grove's employer?
12      A. I knew that OSHA had made some sort of a
13  citation, but I did not understand who it was against.
14      Q. If OSHA cited Siemens in addition to citing
15  Unocal, would that indicate that at least OSHA thought
16  that Siemens bore some responsibility for this accident?
17      MR. COHN: Objection. Foundation.
18  Speculation. Form.
19      BY MR. THORSNESS: Q. Or are you qualified to
20  opine on that?
21      MR. COHN: Same objections.
22      THE WITNESS: I know none of the details of
23  what was in OSHA's mind, so I can't opine there.
24      BY MR. THORSNESS: Q. All right. You're not a
25  safety professional, are you?

### Page 56

1   MR. COHN: Objection to the form of the
2   question.
3   THE WITNESS: No. I have had responsibilities
4   for safety in several buildings in my career, but I
5   really -- I'm not a, quote, safety engineer.
6       BY MR. THORSNESS: Q. Have you ever conducted
7   any tests to determine the presence or extent of
8   vibration that these joints might have been subjected
9   to?
10      A. No, I have not.
11      Q. Do you plan to do any work here in the future
12  on this case?
13      A. I have no immediate plans for doing so. But if
14  Mr. Cohn made some specific request, I would consider
15  it.
16      Q. All right. Is there any work that hasn't been
17  accomplished that you would like to accomplish? And by
18  "work," I'm speaking very broadly.
19      A. I would love to have the actual parts that
20  were -- that have disappeared. I could probably make
21  some more refined opinions if I had the actual evidence
22  to look at so that I could do some microscopic
23  examination and things of that nature, but it's my
24  understanding that the scaffold has been destroyed so
25  it's no longer available.

EXHIBIT __E__
PAGE __2__ OF __4__



setdepo℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Deposition of Joseph D. Balser, PhD                                August 15, 2007

**77**

1. Then the bolts have no relevance.
2. Q. All right. I understand. And in other words,
3. the condition as might have existed as the platform was
4. first designed and constructed?
5. A. Yes.
6. Q. Okay.
7. A. Now, that's one part of the design criteria
8. that you would use would be to look at the load-bearing
9. capability of those bolts. The other, of course, would
10. be to look at the strength of the angle iron itself.
11. For that calculation you would need to know much more
12. about the strength of this material, the thickness of
13. this material, and the stiffness of that angle iron
14. section.
15. Q. Right.
16. A. With regard to how well it would be able to
17. support the load.
18. Q. Yes.
19. A. Because what you're looking for is the weak
20. link. Okay. Which one is the weak link? Is it the
21. bolts that are going to be the weakest, or is it going
22. to be the angle iron that's the weakest?
23. Q. Right. But again, we have no evidence that the
24. angle iron failed or deformed?
25. A. And we have no evidence that the bolts failed.

**78**

1. Q. So you say we have no evidence that the bolts
2. failed?
3. A. That's right. We have -- as a matter of fact,
4. we have evidence to the contrary that there are no bolts
5. in there.
6. Q. Weren't there bolts that were found that had
7. been sheared?
8. A. Only one.
9. Q. Only one?
10. A. That's right. And that is the group that --
11. from the group that Larry Grove picked up on the day of
12. the accident.
13. Q. Okay. But there were bolts picked up in the
14. second collection that also it was determined had failed
15. in shear?
16. A. No, no. Most of those failed by reverse
17. bending.
18. Q. Most of them but some had failed in shear?
19. A. Only one had evidence of shear. The rest
20. failed by reverse bending.
21. Q. Back to this hypothetical about the ratios of
22. load bearing, if we assume one screw, one machine screw
23. instead of two, would you simply -- would that simply
24. reduce the ratios by half?
25. A. That's correct. Then all of a sudden if you

**79**

1. run into a situation where one bolt is actually loaded
2. in shear, then the loads on that shear would, in fact,
3. double.
4. Q. Dr. Balser, would you agree generally that even
5. common 1/4-20 machine screws have significant strength?
6. MR. COHN: Objection to the form of the
7. question.
8. MR. THORSNESS: I'm not finished yet.
9. BY MR. THORSNESS: Q. When they're loaded in
10. shear?
11. MR. COHN: Objection to the form of the
12. question.
13. THE WITNESS: What do you call significant
14. strength?
15. BY MR. THORSNESS: Q. 1,000 to 1,200 pounds.
16. A. That's not the strength of the material.
17. That's the load that you're applying.
18. Q. Right. But they'll sustain 1,000 to
19. 1,200 pounds.
20. A. On most typical 1/4-20 bolts that I know of,
21. especially if they're the higher grade material will
22. hold that. Whether or not any individual bolt of a low
23. grade will hold that load, I can't answer that question.
24. Q. You've not done any testing along to confirm
25. that, have you?

**80**

1. A. No, I have not.
2. Q. And if Mr. Morin has done that testing, do you
3. have any quarrel with his testing results?
4. MR. COHN: Objection. Form. Foundation.
5. Speculation.
6. BY MR. THORSNESS: Q. In terms of this
7. load-bearing capacity?
8. MR. COHN: Same objection.
9. THE WITNESS: As a hypothetical joint in terms
10. of its integrity and strength, I have no objection to
11. the fact that if he's run some tests, I'll accept those
12. tests. I still would question his relevance to this
13. failure.
14. BY MR. THORSNESS: Q. Yes, right. Would you
15. agree that we do not know where Larry Grove was standing
16. precisely along the length of that plank?
17. A. No.
18. MR. COHN: Objection to the form of the
19. question.
20. THE WITNESS: I agree that we do not know where
21. exactly he was standing.
22. BY MR. THORSNESS: Q. Are you familiar with
23. something called a bounding analysis?
24. A. I've heard of it. I've never applied it in
25. particular.

EXHIBIT  E
PAGE  3  OF  4



setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

Deposition of Joseph D. Balser, PhD                                August 15, 2007

---

**85**

1  these sheared bolts, do I understand that the fracture
2  surface was also rusted?
3    A. Yes.
4    Q. And does that indicate that following their
5  fracture they were for some reason subjected to a
6  corrosive environment?
7    A. Virtually every piece of steel that sits in an
8  open environment is subject to corrosion.
9    Q. To corrosion?
10   A. From the environment, particularly a fracture
11 surface because during the process of failing, they --
12 there's local deformation of the metal on the surface of
13 the fracture. There's a certain amount of stored energy
14 in that strained metal on the surface. That stored
15 energy leads to an accelerated rate of corrosion on a
16 fractured surface, so in a relatively short period of
17 time a fractured surface can become heavily rusted, and
18 it is not an indication of how long this steel has been
19 exposed to a corrosive atmosphere.
20   Q. Several times during our discussion today
21 you've made reference to clamping force?
22   A. Yes.
23   Q. And you know what that is?
24   A. Absolutely I do, yeah.
25   Q. And would you agree that these machine screws

**86**

1  with these square nuts, they were tightened using a
2  handheld screwdriver on the screw head side?
3    A. Yes.
4    Q. And let's say a crescent wrench on the nut that
5  some clamping force could be brought to bear on this
6  joint?
7    A. Yes. And there is a presumption at the time it
8  was installed. I presume that those were given some
9  qualitative level of preload.
10   Q. And have you ever calculated or demonstrated,
11 tested how much clamping force could be brought to bear
12 with these two hand tools, crescent wrench and a
13 screwdriver?
14   A. I think the limitation would not be how much
15 torque, you know, you could exert but how soon you would
16 strip the threads out of the nut if you were to try to
17 achieve an ever increasing torque.
18   Q. Yes.
19   A. Because it is the limitation of these square
20 nuts that is at the source of this loose joint.
21   Q. But if you were careful not to overdo it and
22 either twist off the bolt or strip the nut, you could
23 apply clamping force using these two hand tools?
24   A. You could, yes.
25   Q. All right. You have not done that, though?

**87**

1    A. No. I've not -- I mean, other than the fact
2  that I've tightened up hardware screws hundreds of times
3  in my life and it becomes simply an instinctive feel for
4  how tight you can turn that thing before you sense that
5  it's going to break.
6    Q. Right.
7    A. And sometimes you miss it and you actually can
8  snap a bolt off just with hand tools.
9    Q. Sure. And when you do that, you knock out the
10 bolt, throw it away?
11   A. Put in a new one and go less.
12   Q. And reset your elbow so it clicks earlier?
13   A. That's right.
14   Q. And clamping force, is that the same or similar
15 to this preload you're talking about?
16   A. Yes. A preload on the bolt is what creates the
17 clamping force in the joint.
18   Q. Is torque a measure of preload?
19   A. Torque is proportional to preload.
20   Q. And just so we're straight, you own a crescent
21 wrench and a screwdriver?
22   A. Absolutely, and a torque wrench.
23   Q. But you never tried to ascertain the clamping
24 force that could be brought to bear with this sort of a
25 machine screw and this sort of a square nut?

**88**

1    A. No, because first of all you'd have to know the
2  grade of the screw in order to be able to estimate how
3  much torque you could apply to that.
4    Q. Hasn't it been determined that this is about an
5  SAE Grade 2 bolt?
6    A. Yes.
7    Q. So you do know that about the bolt?
8    A. I could deduce that from the analysis that we
9  did at the laboratory. I know the chemistry. I know
10 that there are no markings on the head of those bolts,
11 so I know that they're Grade 1 or 2.
12   Q. The square nuts that you looked at --
13   A. Yes.
14   Q. -- did you observe any scientific evidence of
15 damage to those nuts, either their internal threads or
16 the edges of the -- the outside edge of the nuts?
17   A. No.
18      MR. COHN: Just objection. Are you talking
19 about both sets of nuts or --
20      BY MR. THORSNESS: Q. Any nut you looked at.
21   A. On any nut that I looked at, the ones that I
22 look at on the joints that are still in full integrity,
23 of course I can't tell much about the thread condition
24 of those. I can only tell about the ones that separated
25 from the structure. And in those there's no evidence of

EXHIBIT _E_
PAGE _4_ OF _4_

sd  setdepo℠
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com