Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3   _____
 4   LAWRENCE H. GROVE, CYNTHIA GROVE,        )
     SARAH GROVE and MICHAEL GROVE (DOB       )
 5   1/21/88) by and through his father       )
     LAWRENCE H. GROVE,                       )
 6                                            )
                 Plaintiffs,                  )
 7                                            )
     vs.                                      )
 8                                            )
     UNOCAL CORPORATION,                      )
 9                                            )
                 Defendants.                  )
10   _____)
11   Case No. A04-0096 CV (JKS)
```

VIDEOTAPED DEPOSITION OF CHARLIE ARNETT

Tuesday, April 26, 2006
9:30 a.m.

Taken by Counsel for Defendant
at
Clapp, Peterson, Van Flein, Tiemessen & Thorsness
711 H Street, Suite 620
Anchorage, Alaska

EXHIBIT ___F___
PAGE _1_ OF _4_

Page 6

1    A. That I don't know.
2    Q. More than 100?
3    A. There could be.
4    Q. Do you do general maintenance or do you
5    supervise?
6    A. I coordinate any maintenance that needs to be
7    taken care of.
8    Q. So you actually don't do it yourself? You make
9    sure that other people are doing it?
10   A. Correct. I get the job done.
11   Q. Before All Star Realty, where did you work?
12   A. Well, I actually worked for Peak Oilfield
13   Services, but it was at the Unocal building.
14   Q. So you were a Peak employee?
15   A. Yes.
16   Q. How long were you a Peak employee?
17   A. About five years, I think.
18   Q. You left in '02; is that correct?
19   A. November '02, yes.
20   Q. Do you recall what year you started with them?
21   A. '90. Well, with Peak?
22   Q. With Peak, right.
23   A. '97, I think.
24   Q. And then who was your employer before Peak?
25   A. I was with Kelly Services for about six months.

Page 7

1    Q. Before Kelly Services?
2    A. Professional Business Services.
3    Q. Where was that at? Was that in Anchorage?
4    A. Yes.
5    Q. And how long were you with Professional Business
6    Services?
7    A. From '90 up until '96.
8    Q. And before Professional Business Services?
9    A. You are asking me something that's 15 years ago.
10   Q. I know. I'm sorry. I was just trying to figure
11   out what kind of experience in the industry you have.
12   A. Which industry?
13   Q. Well, especially the maintenance work that you
14   have been doing. What did you do for Professional
15   Business Services?
16   A. I was hired as computer operator for Unocal.
17   Q. So how did you learn to be a computer operator?
18   A. Air Force.
19   Q. When were you in the Air Force?
20   A. '78 to '87.
21   Q. When did you come to Alaska?
22   A. '80.
23   Q. So did you retire from the Air Force in Alaska?
24   A. Yes.
25   Q. So from that, we are only missing three years.

Page 8

1    So what did you do between the Air Force and
2    Professional Business Services?
3    A. Again, computer operator for ATU, and also for
4    another company. I don't quite remember their name, but
5    we worked at the federal building.
6    Q. So you had a contract to work inside the federal
7    building?
8    A. Yes.
9    Q. So as a computer operator for Unocal from, you
10   said, about '90 to '96, is that what you did the entire
11   time?
12   A. No. Actually, '90 to, I want to say, '94,
13   because they centralized their computer. They got rid
14   of their computers.
15   Q. In about '94?
16   A. I believe so.
17   Q. So Unocal centralized its computers about '94,
18   but you were still working for Professional Business
19   Services. What did you do with them?
20   A. Same thing. I was still under the same title.
21   Q. You were still the computer operator?
22   A. Right. It was actually a combination computer
23   operator, part-time actually, because they had installed
24   a new Unex system for plotting their maps and everything
25   and I was heavily involved in that. And then I worked

Page 9

1    part-time for the building manager at the time.
2    Q. Who was that?
3    A. That was Don Acres.
4    Q. What did you do for Don at that time?
5    A. I went around kind of odd-type jobs. I went
6    around -- I handled the mail for the building. I went
7    around and collected mail at certain times and
8    redistributed it.
9       But most of the time, I was in the computer room.
10   Well, part-time actually. Then I would change out light
11   bulbs whenever he needed it.
12   Q. So would you say it was light maintenance work?
13   A. Yes.
14   Q. Do you recall while you were a computer operator
15   whether you ever went upstairs into the mechanical room?
16   A. No, never. The computer room was located on the
17   first floor and that's where I primarily stayed.
18   Q. Do you know whoever did work upstairs in the
19   mechanical room from '90 to --
20      MR. COHN: Objection on lack of foundation.
21   Q. I'm just asking your knowledge, if you know.
22   A. No, I didn't.
23   Q. You didn't know who was working up there?
24   A. No.
25   Q. Did you know Robert Sprinkle from Landis & Gyr a

3 (Pages 6 to 9)

Page 62

1  back inside the building.
2    Q. Then once you were inside the building, what did
3  you do?
4    A. I think I went back to my office.
5    Q. What were you doing in your office, do you
6  recall?
7    A. No.
8    Q. And did you report the accident to anyone at
9  Unocal?
10   A. No.
11   Q. Who was your supervisor at the time?
12   A. Archie Cook.
13   Q. And you do not recall specifically telling Archie
14 Cook about the injury?
15   A. I don't recall it, no.
16   Q. Are you aware whether Unocal had any forms that
17 needed to be filled out when an injury occurred?
18   A. I was vaguely aware of them.
19   Q. Had you ever filled out any forms for any other
20 injury?
21   A. Not for injuries, no.
22   Q. Had you filled them out for any other purpose?
23   A. I can't even remember what they were called now,
24 but, yes, I did.
25   Q. What did you do with those forms after you filled

Page 63

1  them out?
2    A. I gave them to Archie Cook.
3    Q. Did you make a conscious decision not to report
4  Larry Grove's injury?
5        MR. COHN: Objection; form.
6    A. No.
7    Q. Do you recall now why you didn't tell anyone?
8    A. No.
9    Q. Do you know whether it was Unocal's policy that
10 injuries needed to be reported to a supervisor?
11   A. I'm sure it was Unocal's policy. It is most
12 company's policies for that sort of thing, but I didn't
13 know how bad Larry was hurt regardless of that.
14      I tried a couple of times to get ahold of
15 Mr. Cook and never could get ahold of him.
16   Q. About the injury?
17   A. Yeah. And after that, it just -- I continued
18 with other work.
19   Q. How did you try to contact him?
20   A. Cell phone.
21   Q. Did you leave a voice mail message?
22   A. I don't know if I did or not.
23   Q. Did he have a voice mail message on his cell
24 phone?
25   A. Yes, I believe so.

Page 64

1    Q. Did you contact anybody at Siemens to tell them
2  about Larry's injury?
3    A. Huh-uh.
4    Q. Did you contact anybody at Peak to tell them
5  about the injury?
6    A. No.
7    Q. When you tried to contact Archie Cook, what day
8  was it that you tried to contact Archie Cook?
9    A. It was right after the accident.
10   Q. You called his cell phone?
11   A. Yes.
12   Q. Why would --
13   A. I tried his office. I tried his cell phone.
14   Q. But you don't recall leaving a voice mail?
15   A. No, I don't recall.
16   Q. Did you send an e-mail to anyone?
17   A. No.
18   Q. Did you ever go back upstairs to the filter room
19 after the injury?
20   A. I may have. I don't recall it.
21   Q. Do you recall ever instructing Paul Crapps to go
22 back upstairs to the filter room?
23   A. I don't know if I did or not.
24   Q. Do you have any idea what happened to the wooden
25 platform or the wooden piece?

Page 65

1    A. No.
2    Q. What about the metal piece that was hanging down
3  when you saw it, do you recall what happened to that?
4    A. No.
5    Q. Do you recall ever instructing Paul Crapps to
6  repair the platform?
7    A. No, I don't remember if I did or not.
8    Q. Would that have been part of your job duties to
9  do that?
10       MR. COHN: Objection; form.
11   A. I don't know if it would have been or not. My
12 job duties were pretty vague, to say the least. I did
13 what Archie Cook asked me to do.
14   Q. Okay. Well, in this particular case, since
15 Archie didn't know what had happened in this room, he
16 wouldn't have been able to instruct you on anything,
17 correct?
18   A. Correct.
19   Q. Were you worried about leaving the pieces where
20 they were?
21   A. No.
22       MR. COHN: Objection; form.
23   Q. Why not?
24   A. Why would I be worried about leaving them there?
25   Q. Did you think they were a hazard to anyone else?

17 (Pages 62 to 65)

### Page 126

1   for the Siemens technicians to change the filters?
2        MS. JOHNSON: Objection; foundation, calls
3   for a legal conclusion.
4     A. I would think that it would indicate that, you
5   know, that the customer would have to provide a means to
6   access it, yes.
7     Q. And is that how you interpreted it when you saw
8   this document?
9        MS. JOHNSON: Objection; foundation.
10    A. Well, that's the way I interpret it, yes, but --
11    Q. I know there was an objection to foundation, but
12   since you reviewed it and who else would have a
13   foundation to testify what you yourself thought about
14   the document?
15       MS. JOHNSON: Objection to speaking. You
16   are not the witness here, Mike.
17       MR. COHN: The witness -- it will just speak
18   for itself what he testified about.
19    Q. Now, have you ever had occasion yourself to bring
20   like ladders, take a ladder and go up to the penthouse?
21    A. No.
22    Q. Would it be -- do you know how tall the elevators
23   are in the building?
24    A. Well, if you don't take the level out, they are
25   probably seven or seven and a half maybe. I don't

### Page 127

1   believe they are eight feet.
2    Q. Were you aware that there may have been Siemens
3   technicians, including Larry Grove, that couldn't get
4   the ladder that they had into that elevator?
5       MS. JOHNSON: Objection; form.
6    Q. Did you have any personal knowledge of that?
7    A. No.
8    Q. But in any event, you would have to have a ladder
9   that would be small enough to fit into that elevator;
10   otherwise, you would have to go up the stairs; is that
11   correct?
12    A. That is correct.
13    Q. Even if you fit the ladder into the elevator, you
14   still have to go up a flight of stairs after you get out
15   of the elevator to get up into the mechanical room?
16    A. Correct.
17    Q. Even after you are in the mechanical room, you
18   have to go and keep turning right and going underneath
19   equipment to get in there to the filter room?
20    A. Yeah, you would have to. There would be duct
21   work overhead for air supplies.
22    Q. It would be easier just to maintain a structure
23   inside the building as opposed to having to take an
24   apparatus up into the filter room each time you went to
25   change the filters?

### Page 128

1       MS. JOHNSON: Objection; form.
2    Q. Would that be correct?
3    A. It would make more sense to me to do that, yes.
4    Q. Do you know an individual named Kevin Tabler?
5    A. Yes.
6    Q. How do you know Mr. Tabler?
7    A. Just from working in the building.
8    Q. Did he have any supervisory authority over you?
9    A. Kevin Tabler? Not that I recall. He was in the
10   legal department.
11    Q. And do you know an individual named Mark Bond?
12    A. Yes. He was corporate counsel for Unocal.
13    Q. Did any individuals from Unocal talk to you in
14   regard to the Grove litigation?
15    A. No.
16    Q. No contact at any time?
17    A. I have not had any contact with Unocal personnel
18   since basically I left the building, except for the one
19   time that I met Roxanne Sinz when she had left me a
20   message and I tried to reach her, and it turned out to
21   be concerning the OSHA inspector.
22    Q. I don't have it in front of me, but I'll
23   represent to you that in the response to the third
24   discovery requests that the plaintiff did to Unocal in
25   which the plaintiff asked them -- asked Unocal for the

### Page 129

1   basis of their answers to the responses to the first two
2   discovery requests wherein they said upon information
3   and belief that Siemens built the structure, they
4   indicated in response to interrogatory number one that
5   they had conferred with the following people, and your
6   name was one of the individuals listed in that response.
7      That was with previous counsel. Do you recall
8   talking to somebody by the name of Shannon Martin?
9    A. Yes.
10    Q. And do you recall what he asked you and what you
11   told him?
12    A. It was a fairly short conversation actually. He
13   had stated that he was counsel for Unocal and it was
14   concerning the accident.
15      And he asked me if I knew about the platform, and
16   I replied no, I was not aware of the platform until the
17   actual accident. And he asked if I knew of anyone that
18   may have known, and I believe I told him Eddie Barrett,
19   Don Acres were the only ones I could think of that may
20   have known, because if it was there, it had to have been
21   there for quite a while, as far as I know.
22    Q. What makes you say it had to have been there for
23   quite a while?
24    A. Because I have never seen it, but it was there.
25   It is an assumption on my part.