# Copy of Transcript

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE; CYNTHIA
GROVE; SARAH GROVE; and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

      Plaintiffs,

vs.                      Case No. A04-0096 CV (TMB)

UNOCAL CORPORATION,

      Defendant.

## DEPOSITION OF

## LINDLEY MANNING, P.E.

August 14, 2007
8:56 a.m.

Hilton Oakland Airport
One Hegenberger Road
Suite 1104
Oakland, California

Reported by Susan F. Magee, RPR, CLR, CSR No. 11661

EXHIBIT____G
PAGE___I__OF__4



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

setdepo℠
**Streamlined · Centralized · Standardized**
*The Evolution of Deposition Management*

Lindley Manning, P.E.                                    August 14, 2007

Page 18

1  such, I skip over that kind of thing.
2      MR. THORSNESS: Sure.
3      MR. COHN: I'm just going to state just
4  objection to all. It's -- when you say "all," you mean
5  all the ones that were sent to him.
6      MR. THORSNESS: Yes.
7      THE WITNESS: Whatever I have, yeah.
8      MR. THORSNESS: Q. Right.
9      A. I didn't see any inadequacies --
10     Q. Well --
11     A. -- in what I have for what I believe took
12  place.
13     Q. Well, we're going to catalog those depos during
14  a break or else --
15     A. Whatever you want.
16     Q. Right.
17     A. Your nickel.
18     Q. All right. That's correct.
19         When Mr. Cohn first contacted you, what were
20  you asked to do?
21     A. That first sheet may say something. Does it
22  say file review or something like that? Yeah. File
23  review plus question mark. So he was going to send me
24  some stuff, I guess, and I was going to look at it.
25     Q. Once you looked at the stuff, what were you

Page 19

1  asked to do then?
2      A. I don't know if I ever was formally asked for
3  anything. I generally don't accept limitations, you
4  know. I do what I want pretty much from that point on.
5      Q. What did you intend to do for Mr. Cohn in this
6  case?
7      A. Find out what happened.
8      Q. Did you do everything you wanted to do in order
9  to, as you say, find out what happened?
10     A. Well, short of a trip to Anchorage which I'd
11  always enjoy, but I got the information otherwise,
12  probably -- I didn't actually get to see the site, but
13  other people have and have reported on it, and I think
14  that's been adequate.
15     Q. Did you ask Mr. Cohn to -- did you tell him
16  you'd like to come to Anchorage and actually --
17     A. Well --
18     Q. -- look at the scene?
19     A. There I go.
20         I may or may not have. I may have mentioned if
21  it's something I could do if he wanted and just kind of
22  left it there. I'm not at all sure what was said.
23     Q. You mentioned a narrative from Mr. Cohn. What
24  did Mr. Cohn tell you about the accident?
25     A. We're talking three or four years of phone

Page 20

1  conversations off and on here. I mean, pretty much
2  everything that -- more than I needed to know, so I
3  don't know.
4          He told me all of the details that I guess
5  we're going to go into on what I believe took place
6  here, a lawyer's point of view which unfortunately,
7  other than the few that have gone to engineering school,
8  isn't exactly what I want to hear, and I got to try to
9  interpret things out of it and . . .
10     Q. Did you take any notes during that
11  conversation?
12     A. Probably not. He said I'll send you something,
13  and I'll read it.
14     Q. Can you provide me any detail whatsoever as to
15  the actual accident sequence from what Mr. Cohn told
16  you?
17     A. An injured man went in to change the air
18  filters, climbed up on the platform and -- as he usually
19  did. Something of it let go. He fell down and got
20  hurt.
21     Q. Can you remember any more detail than that?
22     A. Well, as far as accident sequence, no, and
23  that's really all that matters. Basically I'm
24  interested in physical evidence. And what witnesses
25  have to say, unless they can provide a clue to physical

Page 21

1  evidence, is rarely a help. Sometimes it is. You take
2  it as it comes.
3          But the pictures were fairly definitive. Joe's
4  work helped a little bit but just mainly supportive.
5      Q. All right. Have you conducted any testing in
6  the course of your investigation in this case?
7      A. No. The testing was done the day of the
8  accident. The day before a test. It failed. That's
9  all I need to know.
10     Q. That's all you need to know?
11     A. Well --
12         MR. COHN: Object to the form of the question.
13         THE WITNESS: Well, that is all I really need
14  to know. It did the expected thing that you expect it
15  to do based on what I know of the design, so I don't --
16  or one of the things that you would expect could go
17  wrong and that would be probable to go wrong. And it's
18  pretty obvious what went wrong, so there's really no
19  point to test it.
20         BY MR. THORSNESS: Q. You said it's pretty
21  obvious what went wrong. Share with me your view of
22  what's pretty obvious -- what pretty obviously went
23  wrong.
24     A. Sure. The two bolts on the plenum end fell out
25  of the hole. The horizontal member was sitting on top

EXHIBIT____G____

PAGE___2__OF_4___

29d6d5e4-86e4-4eb1-b087-15beb357dc78

Lindley Manning, P.E.                                        August 14, 2007

| Page 42 | Page 44 |
|---|---|

**Page 42**

1    A. Well --

2       MR. COHN: Objection to the form of the

3    question.

4       THE WITNESS: -- "cavalier" I probably wouldn't

5    use myself. "Irresponsible," maybe yes. That can be

6    used in engineering circumstances where like in this

7    case you have somebody designing something that you know

8    is highly likely to fail in a number of ways. I mean,

9    we're not only talking about this injury. This thing

10   is -- was going to fail one way or another --

11      BY MR. THORSNESS: Q. My question --

12   A. -- sometime.

13   Q. My question was --

14   A. Is that not engineering -- but I'm explaining

15   why it could be engineering terminology. It's

16   irresponsible to design something that you know is going

17   to fail and may hurt someone, cause economic loss,

18   interruption of function, any of the number of reasons

19   the designer has for designing something. If you

20   interfere with those, that's not responsible behavior.

21   Q. Was that part of the verbiage that was

22   presented by Mr. Cohn in the first draft he gave to you?

23   A. Well, I'm sure the word "cavalier" was. As far

24   as "irresponsible," I don't remember.

25   Q. More likely than not he came up with both those

**Page 43**

1    words?

2       MR. COHN: Objection. Speculation.

3       THE WITNESS: Yeah. Precisely. That's

4    speculation. I don't remember. And if I were to try to

5    guess, that's all it would be is a guess, and I know you

6    don't -- you fellows don't like to have guesses.

7       BY MR. THORSNESS: Q. Well, how long ago did

8    you review this affidavit?

9    A. Whenever it was dated. July 23rd, so a little

10   before that. I just --

11   Q. Two or three weeks ago?

12   A. It's just words. I don't remember words. I

13   remember things.

14      MR. THORSNESS: All right, sir. Let's mark

15   this as the next exhibit, please.

16      (Whereupon, Exhibit 3 was marked for

17   identification.)

18      BY MR. THORSNESS: Q. All right, sir. That's

19   a photocopy of a report, is it not?

20   A. Appears to be.

21   Q. And it's a three-page document.

22   A. Yes, sir.

23   Q. Right. Dated November 7, 2006.

24   A. Yes.

25   Q. All right. Referring to paragraph 1 there on

**Page 44**

1    page 1, the accident facts, again, those were provided

2    primarily by Mr. Cohn; is that correct?

3    A. Yes. From Mr. Cohn and --

4       MR. COHN: Objection. Speculation.

5       THE WITNESS: Mr. Cohn and a bunch of paperwork

6    that he provided. So it all came to me from him one way

7    or another.

8       BY MR. THORSNESS: Q. All right. Have you

9    ever talked with Larry Grove yourself?

10   A. No. I try not to talk to witnesses.

11   Q. Is it your understanding that Mr. Grove was

12   working within the scope of his employment at the time

13   of this accident?

14   A. I guess, but that's a guess. I think he was

15   sent there to change air filters. I think I know that

16   much. But whatever the rest of it is, I haven't looked

17   into it. That's not my department.

18   Q. All right. Mr. Manning, you're a professional

19   engineer and licensed in both Nevada and Ohio?

20   A. Correct.

21   Q. Are your licenses current?

22   A. Yes.

23   Q. Are there ethical considerations for a person

24   designating himself or herself on stationery or business

25   cards as an engineer if they're not a licensed

**Page 45**

1    professional engineer?

2    A. Yes.

3    Q. Tell me those ethical -- give me a -- tell me

4    about those ethical issues.

5    A. It goes beyond ethical issues. It is generally

6    a legal statutory thing. They're prevented from doing

7    so. And this is why -- where my signature appears I

8    have P.E., NV, OH.

9    Q. Yes.

10   A. I do not wish to imply that I'm licensed in any

11   other states, and I am in those, and that's a factual

12   presentation.

13   Q. Yes.

14   A. So that's why I do that. I served on the board

15   of ethical review for the National Society of

16   Professional Engineers, so I understand ethics. I've

17   been an officer in the National Academy of Forensic

18   Engineers. I understand that. I've been registered for

19   many years. I have never served on the state board of

20   registration in Nevada, but I've attended many meetings,

21   and I've had former students of mine even serve as

22   chairman of that board; so I'm reasonably attuned to

23   those things. It's a radial discussion about it with

24   them, with the forensic engineering community as well.

25   Q. All right. Thank you. And it is your

Lindley Manning, P.E.                              August 14, 2007

| Page 102 |
| --- |

1     Do you have any quarrel with Mr. Morin's
2  calculation of the safety factor presented by this
3  platform as it was originally constructed?
4     MR. COHN: Objection. Form of the question.
5  Speculation.
6     THE WITNESS: I have not reviewed numerically
7  his calculation; so -- however, the man is educated. I
8  have no quarrel. Now, I'm not implying that I'm saying
9  that if he said it was adequate that I agree with that,
10  but that isn't what you asked, but I want to make sure
11  that we don't infer that I am answering that other
12  question too. I'm not.
13     BY MR. THORSNESS: Q. I rarely try to
14  cross-examine witnesses with answers to questions I
15  didn't ask.
16     A. Oh, it's a good technique. A lot of people use
17  it. That's why I answer that way.
18     Q. Look at page 3 of your report, if you will,
19  please.
20     A. Sure.
21     Q. There were two occasions we've discussed when
22  we know people picked up nuts and bolts off the bottom
23  of this fan room; correct?
24     A. Correct.
25     Q. How do you -- do you know as to any individual

| Page 103 |
| --- |

1  bolt -- do you know when that -- can you tell when
2  that -- if it's damaged, can you tell when that damage
3  occurred?
4     A. I have a strong inference on the one that
5  Mr. Grove picked up because I would expect to see a
6  fracture of that sort following the way this member
7  failed and lost its position. And I wouldn't expect
8  that to occur from any other means that I know of
9  existing around that platform, in and around the
10  platform. The rest of the bolts I understand were
11  deformed in ways that would have nothing or likely have
12  nothing to do with the use of the platform, so we can
13  pretty well exclude them as having anything to do with
14  the failure, and they don't match the failure mode that
15  must have taken place.
16     Q. The failure mode that must have taken place,
17  what failure mode is that again?
18     A. That's the one where the one end of the
19  horizontal bar that failed was loose and got to a
20  position where it slipped off the upper end of the
21  upright and would no longer support the load was on it.
22  And when it went down and by going down with Mr. Grove's
23  weight or a percentage of his weight on it, sheared one
24  bolt out of the two that were holding it to the filter
25  wall.

| Page 104 |
| --- |

1     Q. Is it your contention that there was only one
2  bolt that was found that had failed in shear?
3     A. That's what I understand --
4     Q. During --
5     A. -- from Dr. Balser. This is not my
6  determination.
7     Q. Only one?
8     A. That's what I understand. Or there was --
9  completely. Now, it would not surprise me if other
10  bolts had been found failed in shearer because, during
11  the deformation or destruction of this -- and removal of
12  this platform material, that could have easily have been
13  happened by the same means. Somebody grabbed ahold of
14  the end of one bar and pulled it down and shear a bolt.
15  But I --
16     Q. And those bolts could also have failed in shear
17  during the accident, but Mr. Grove just didn't happen to
18  pick those bolts up the day after the accident?
19     A. Oh, no.
20     MR. COHN: Objection. Foundation.
21  Speculation.
22     BY MR. THORSNESS: Q. Why not?
23     A. There's no deformation indication that you can
24  see in the photographs on the free end of that or the
25  upright that supported it. Also, it sat on top of the

| Page 105 |
| --- |

1  upright with a two-inch leg on top of the bar so it had
2  to be two inches out of position before it could fall,
3  and these bolts weren't that long so they had to be gone
4  before it fell. We know that. So the only bolt -- and
5  we know that this bar was hanging down by one fastener
6  at least. And being that far out of position it
7  couldn't have been two fasteners, so we would expect to
8  be able to find, if no one had intervened, a sheared
9  bolt but only one.
10     Q. Is it your assumption that the horizontal piece
11  actually contacted the top of the vertical piece as it
12  was bolted in place?
13     A. No. It's my observation.
14     Q. And what's that observation from?
15     A. Photographs.
16     Q. Anything else?
17     A. That's about all we got. But it would have had
18  to. With these small bolts in those slots, the holes
19  that would line up would let it lie only on top, and the
20  other one that remained was doing that. And it looked
21  to both be the same, the markings on -- as best we can
22  tell from the photographs as poor as they are indicated
23  that so that had to be the position. It would not go
24  together properly otherwise.
25     Q. In any event that's your conclusion and your