SIEMENS



# UNOCAL

## Technical Support Program Proposal

Presented to:

Charles Arnold
Unocal

Presented by:

Amber Goldberg
Siemens Building Technologies, Inc.

May 31, 2000

(Rev. 1)

EXHIBIT  A
PAGE  1  OF  18

DEF 00001
Grove v. UNOCAL

**SIEMENS**

# UNOCAL

## Technical Support Program
## Index

| Section Title | Section No. |
|---|---|
| Executive Summary | 3 |
| Siemens Building Technologies Capabilities<br>   A. Total Capabilities<br>   B. Local On-Site Maintenance | 4 |
| Business Proposal<br>   A. Project Scope<br>   B. Detailed Description of Service to be Provided<br>   C. Emergency Services | 5 |
| Agreement<br>   Terms and Conditions | 9 |
| List of Maintained and Inspected Equipment | 10 |

**Siemens Building Technologies, Inc.**
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 2 of 10

DEF 00002
*Grove v. UNOCAL*

**SIEMENS**

## Section 1: Executive Summary

*Purpose of This Proposal:*

The intent of this proposal is to provide Unocal with a responsible, reliable and cost effective solution for on-going technical support of the HVAC mechanical equipment and the temperature control system. Siemens Building Technologies is a worldwide company with fifty-eight branch locations located throughout North America. Locally, we have thirty-eight dedicated building professionals with the experience to install, commission and service building controls systems and mechanical equipment systems.

**Sites and Locations:**
Unocal
909 West 9th Ave.
Anchorage, AK 99501

Discussions of a support program were initiated through a desire to work with a vendor who has the capabilities and expertise to maintain the HVAC mechanical equipment and temperature control system. You are also interested in partnering with a vendor who can meet your stated objectives of reliability, continuity and quality of work, and technical support and advice. The purpose of this proposal is to become that vendor and ensure that your substantial investment in your HVAC system is maintained and enhanced throughout the life of your facility. We are proposing to accomplish this by pro-actively maintaining the equipment listed on the attached list of maintained equipment through a customized Technical Support Program.

With a Technical Support Program we will perform maintenance routines on your equipment, designed to increase the life and ensure optimum operation. As part of the Technical Support Program we will also provide annual oil analysis for your chiller.

**Siemens Building Technologies, Inc.**
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 3 of 10

DEF 00003
*Grove v. UNOCAL*

**SIEMENS**

## Section 2: Siemens Building Technologies Capabilities

Siemens Building Technologies proposes to implement a partnered approach to the on-going technical support and maintenance of the HVAC system.

This would entail the purchase of a *Technical Support Program* customized to meet the stated objective of having a partnership with a vendor who can provide reliability, continuity and consistency in quality of service, installation, and technical support. This program will provide Unocal with technical support for the following systems:

- **HVAC Mechanical Equipment**
- **Pneumatic Temperature Control System**
- **DDC Temperature Control System**
- **Generator System**

### A. Total Capabilities:

The purchase of a *Technical Support Program* from Siemens Building Technologies means the confidence of knowing that you are backed by a company dedicated to customer service with over 100 years proven experience. With company-owned branches, Siemens Building Technologies is today providing direct local support to customers throughout the entire world.

Our commitment is to support Unocal as our customer. We have a fully staffed service department for on-going technical support of mechanical equipment and installed pneumatic, electric and automated controls systems and for consultation with our customers on optimal operations and facilities management.

As one of the largest manufacturer, installer and service provider for building HVAC systems in the world, partnering with Siemens Building Technologies also means the confidence of knowing that you are working with a company dedicated to growing with you over the long term. We have provided superior customer support in the form of turn key project implementation and follow-up technical support. For these reasons, we are well positioned to support your current and future activities.

### B. Local On-Site Maintenance

This solution centers on providing Unocal with a technical support program in the following areas of accountability:

- *Scheduled Maintenance and Inspection Intervals*
- *Standardized Task Driven Maintenance Routines*
- *Factory Trained and Certified Technicians*
- *Engineering Consultation*
- *Consistent Pricing Structure*

**Siemens Building Technologies, Inc.**
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 4 of 10

DEF 00004
*Grove v. UNOCAL*

**SIEMENS**

## Section 3: Business Proposal

Following is our solution to meeting your main objective, to form a cost-effective solution to the on-going maintenance and technical support of your mechanical and temperature control equipment.

**A. *Project Scope:***

Siemens Building Technologies will provide Unocal with the following as part of our *Technical Support Program* offering:

**HVAC Mechanical Equipment:**
- Preventive Maintenance and Operating Inspections
- Quarterly Filter Changes

**Pneumatic Temperature Control System:**
- Annual Preventive Maintenance

**Generator System:**
- Quarterly Operating Inspections
- Quarterly Testing

**DDC Temperature Control System:**
- Annual Preventive Maintenance
- Operator/Online Support

**Account Management Support:**
- Dedicated Account Management
- Sole Source Accountability, with our local Branch coordinating all aspects of the program
- Annual performance review

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 5 of 10

DEF 00005
*Grove v. UNOCAL*

**SIEMENS**

### Section 3 Continued:

B. Detail of Services to be Provided:

**Central Cooling Equipment:**

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls, and fluid levels to maximize system efficiency and reliability. One operating inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will provide one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings, and other moving parts. This service will be provided during the spring startup of the Chiller.

**Refrigerant Containment Service.** We will leak test all equipment containing refrigerant. We will keep you informed regarding refrigerant issues and opportunities. We will make recommendations based on equipment age and the business objectives of your facility. This service will be provided during the spring startup visit.

**Refrigerant Oil Analysis.** We will provide one (1) spectrochemical refrigerant oil analysis per year on your chiller to trend oil condition and provide predictive wear analysis. Based on oil analysis results we will make recommendations for any needed repairs or additional service. This service will be provided during the spring startup visit.

**Chiller Startup and Shutdown.** We will provide spring startup of the Chiller and fall shutdown of the Chiller.

**Central Heating Equipment:**

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls and fluid levels to maximize efficiency and reliability. One operating Inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings and other moving parts. This service will be provided during the heating season.

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1256
(907) 563-2242 / FAX (907) 563-6139

Page 6 of 10

DEF 00006
*Grove v. UNOCAL*

**SIEMENS**

## Section 3 Continued:

**Air Handling Units:**

**Operating Inspections.** We will provide two (2) routine scheduled operating inspections to check system performance, equipment operating and safety controls and fluid levels to maximize efficiency and reliability. One operating inspection will be performed in conjunction with the annual service described below.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for motors, bearings and other moving parts. This service will be provided annually.

**Filter Replacement.** We will provide quarterly (4) filter changes. HEPA filters are not included with this service.

**Pneumatic Temperature Control System:**

**Operating Inspections.** We will provide one (1) routine scheduled operating inspections to check system performance and system operation to maximize efficiency and reliability.

**Preventive Maintenance.** We will perform one (1) extensive scheduled maintenance service to check system performance and system condition. This service includes routine tasking for pneumatic temperature controls and calibration of thermostats and receiver controllers.

**DDC Temperature Control System.**

**Preventive Maintenance.** We will provide one (1) extensive scheduled inspection and maintenance of the DDC control system. We will perform database diagnostics of the field panel to check for points in alarm, operator priority and unresolved lines of programming. We will also provide two (2) hours annually of operator/online support.

**Siemens Building Technologies, Inc.**
6333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 7 of 10

DEF 00007
Grove v. UNOCAL

**SIEMENS**

## Section 3 Continued:

**Other Services:**

**Standby Emergency Generator.** We will provide four (4) exercise tests of the standby generator system. Prior to the exercise test the generator fluids and controls will be inspected for proper operation. We will make recommendations for any needed repairs.

**Backflow Preventer Testing.** We will provide annual testing and certification of the backflow preventer.

### C. Emergency Services

We will provide on-site emergency service within four (4) hours. Our on-site emergency service coverage for your facility is twenty-four hours a day, seven days per week. Non-emergency calls, as determined by the Unocal and Siemens Building Technologies, will be incorporated into the next scheduled preventive maintenance visit. Repair or replacement of any and all equipment is not covered under this contract. If emergency service is needed for repairs or system failures you will be billed at our preferred customer rates. See below for our service labor rates and parts discounts.

**Discounted Labor and Material Rates for 2000:**

| Labor Type: | Preferred Hourly Rates (M-F 8 AM to 5 PM) (excl. holidays) | Regular Overtime (M-F 5 PM to 8 AM, & Sat) | Sunday & Holiday |
|---|---|---|---|
| DDC Specialist | $83 | $124.50 | $166 |
| Mechanic | $71 | $106.50 | $142 |
| Electrician | $69 | $103.50 | $138 |
| Fire Technician | $73 | $109.50 | $146 |
| SBT Product Discount | List less 50/20% | | |
| Outside Products | Cost plus 30% | | |

Note: Prices and discounts are subject to change.

**Documentation of All Services Provided.** We will document each on-site service call and furnish you with a copy showing time, date, and a brief description of activity. Work orders for on-site system preventive maintenance will list the inspection date, individual to report to, equipment identification, equipment location, work to be performed, and any special instructions.

**Quality Assurance Program.** We will meet with you once a year to evaluate system performance and your satisfaction with the quality of service that is being provided under your Technical Support Program.

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 8 of 10

DEF 00008
*Grove v. UNOCAL*

**SIEMENS**

## Section 4: Agreement

**Technical Support Program**

By and Between:

Siemens Building Technologies
5333 Fairbanks St. Suite B
Anchorage, AK 99518

Unocal
909 West 9th Ave.
Anchorage, AK 99501

Services shall be provided at the following facilities:
**Unocal Building**
**909 West 9th Ave.**
**Anchorage, AK 99501**

Siemens Building Technologies shall provide the services as outlined in the attached proposal dated May 31, 2000. The following terms and conditions shall apply, but where there is a conflict with the Master Services Contract, the Master Services Contract shall supercede (contract dated 4/18/94, #3282-ONS). Labor for all services under this TSP Agreement is warranted for one (1) year after the work is performed.

**Duration:** This agreement shall remain in effect for an original term of one year beginning June 1st, 2000 and shall end May 31st, 2001. This agreement may be extended at one year intervals, if mutually agreed to in writing by both parties. The agreement may be cancelled upon thirty (30) days written notice by either party.

**Charges:**

| | Year | Dates | Annual Cost | Quarterly Payment |
|---|---|---|---|---|
| | 1 | June 2000 to May 2001 | $16,774 | $4,194 |
| Option: | 2 | June 2001 to May 2002 | $17,361 | $4,340 |
| Option: | 3 | June 2002 to May 2003 | $17,969 | $4,492 |
| Option: | 4 | June 2003 to May 2004 | $18,598 | $4,649 |
| Option: | 5 | June 2004 to May 2005 | $19,249 | $4,812 |

Proposal accepted by:
Unocal

_[signature]_  7-19-00
Signature                    Date

Proposal submitted by:
Amber Goldberg
Service Sales Engineer

_Amber M. Goldberg_  6/28/00
Signature                    Date

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 9 of 10

DEF 00009
*Grove v. UNOCAL*

# SIEMENS BUILDING TECHNOLOGIES, INC.    Landis Division

## TERMS AND CONDITIONS (W/O FLS)

The following terms and conditions are attached to and form an integral part of Siemens Building Technologies, Inc.'s (referred to herein as "SBTI") Technical Support Program Proposal ("Proposal"). The portions of such Proposal relating to "Scope of Work" or any "Proposed Solution" (in either case, referred to herein as the "Proposed Solution"), together with these terms and conditions, are collectively referred to as the "TSP Agreement".

### Article 1: General

1.1 a) The TSP Agreement, when accepted in writing by the Customer and approved by an authorized representative of SBTI shall constitute the entire, complete and exclusive agreement between the parties relating to a technical support program ("Services") for the equipment and software identified in the List of Equipment or the Service Coverage Report attached to the TSP Agreement ("Equipment") and shall supersede and cancel all prior agreements and understandings, written or oral, relating to the subject matter of the TSP Agreement. The TSP Agreement and any rights or obligations thereunder may not be assigned by either party without the advance written consent of the other.

b) The terms and conditions of this TSP Agreement shall not be modified or rescinded except in writing, signed by a corporate officer of SBTI. SBTI's performance under this TSP Agreement is expressly conditioned on Customer's assenting to all of the terms of this TSP Agreement, notwithstanding any different or additional terms contained in any writing at any time submitted or to be submitted to SBTI by Customer relating to this subject matter.

c) The terms and conditions set forth herein shall supersede, govern and control any conflicting terms of the Proposed Solution or the Proposal.

1.2 This TSP Agreement shall automatically renew for successive one (1) year periods beginning on the anniversary date of the original term as set forth in the Proposal, unless stated otherwise in the TSP Agreement.

1.3 Either party may terminate or amend this TSP Agreement at the end of the initial term or at the end of a renewal term by giving the other party at least sixty (60) days prior written notice of such amendments or intent not to renew.

1.4 If, during or within 90 days after the term of this TSP Agreement, Customer engages any SBTI employee who has performed Services under this TSP Agreement, Customer shall pay SBTI an amount equal to the employee's latest annual salary.

1.5 This TSP Agreement shall be governed by and enforced in accordance with the laws of the State of Illinois, or if the Services are provided in Canada, the Province of Ontario. All claims or disputes arising under this TSP Agreement shall be litigated in the State, Commonwealth, or Province in which Services are being provided to Customer hereunder.

1.6 The Services are outlined in the attached Proposal's Proposed Solution provisions, incorporated by reference herein, and shall be performed on the Equipment during SBTI's normal working hours, Monday through Friday inclusive, excluding holidays, unless otherwise set forth herein.

1.7 Customer will at all times designate a contact person with authority to make decisions for Customer regarding the Services. Customer will provide SBTI with information sufficient to contact such person in an emergency. If such representative cannot be reached, any request for Service received from a person located at Customer's premises will be deemed authorized by Customer, and SBTI will, in its discretion, act accordingly.

1.8 SBTI will be permitted to control and/or operate all Equipment necessary to perform the Services.

1.9 SBTI will not be required to conduct safety or other tests, install new devices or equipment or make modifications to any Equipment beyond the Proposed Solution set forth in this TSP Agreement. Any Customer request to change the Proposed Solution or the nature of the Services must be in the form of a mutually agreed change order, effective only when executed by all parties hereto.

1.10 If the Equipment is altered or moved by any person, including Customer, other than SBTI or a person authorized by it, Customer shall immediately notify SBTI in writing, and SBTI reserves the right to perform a reacceptance test on, or if necessary a recommissioning of, the system at Customer's expense.

1.11 After any of the following events, SBTI will have no liability or obligation under this TSP Agreement, whether relating to the testing, inspection, maintenance or operation of any Equipment, and may terminate or suspend services under this TSP Agreement immediately upon giving notice to Customer: Customer fails to (a) authorize a reacceptance test or recommissioning that SBTI deems necessary; (b) notify SBTI of any modifications or changes to the Equipment per Section 1.10; (c) notify SBTI of any conditions, malfunctions or changes per Section 6.2; or (d) provide the access required by Section 6.3.

### Article 2: Equipment Testing, Inspection and Maintenance

2.1 The Customer represents that all Equipment is in satisfactory working condition. By the latter of the first thirty (30) days of this TSP Agreement or the first scheduled inspection, SBTI will have inspected all the Equipment.

2.2 If SBTI determines as a result of such inspection that any Equipment is in need of repair or replacement, the Customer will be so notified and shall take corrective action within thirty (30) days, or such Equipment shall be automatically removed from coverage hereunder. SBTI will not be liable or responsible for the continued testing, maintenance, repair, replacement or operating capabilities of any portion of the Equipment until it has been restored to an acceptable initial condition at Customer's sole expense. Any services provided by SBTI in the course of such restoration will be separately charged, on a time and materials basis, and not included in fees paid hereunder. If individual items of Equipment cannot, in SBTI's sole determination, be properly repaired or replaced due to age, obsolescence, lack of availability of refrigerant gas, halon gas, necessary parts, materials, compatibility or otherwise, or as a result of excessive wear or deterioration, SBTI may, within ten (10) days of such inspection, give written notice that it is withdrawing such items from coverage under this TSP Agreement and adjust the amounts to be paid hereunder accordingly.

2.3 If the Proposed Solution provides for maintenance, any repairs and replacements of Equipment are limited to restoring the proper working condition of such Equipment. SBTI will not be obligated to provide replacement Equipment that represents significant capital improvement compared to the original. Exchanged components become the property of SBTI, except Hazardous Materials, which will under all circumstances remain the property and responsibility of Customer.

### Article 3: Charges, Fees and Invoices

3.1 Payments to be made under this TSP Agreement will provide for, and be in consideration of, only Services specifically included under the Proposed Solution. All other Services, including but not limited to the following, shall be separately billed or surcharged on a time and materials basis: (a) emergency Services performed at Customer's request, if inspection does not reveal any deficiency covered by this TSP Agreement; (b) Services performed other than during SBTI's normal working hours; and (c) Service performed on equipment not covered by this TSP Agreement.

3.2 Invoices are due upon receipt or otherwise as may be set forth therein. If any payment is not received when due, SBTI may deem Customer to be in breach hereof and may enforce any remedies available to it hereunder or at law, including without limitation suspension or termination of Services and acceleration of payments. Any amount not paid within sixty (60) days of the date due shall accrue interest from the date due, until paid, at the rate of ten percent (10%) per annum. In the event of a dispute by Customer regarding any portion or all of an invoiced amount, the undisputed portion shall be paid when due, and interest on the disputed, unpaid portion shall accrue as aforesaid, from the date due until the date of payment, to the extent that such amounts are finally determined to be payable to SBTI.

3.3 Customer is responsible for paying any present or future sales, use, occupancy, excise or other federal, provincial, or local tax due or owing as a result of this TSP Agreement.

### Article 4: Allocation of Risk

4.1 (a) Until one year from either the date hereof or the date the Equipment is installed, whichever first occurs, all equipment manufactured by SBTI or bearing its nameplate will be free from defects in material and workmanship arising from normal use and service.

(b) Labor for all Services under this TSP Agreement is warranted for 90 days after the work is performed.

(c) Equipment will not fail to function because of errors in processing, providing or receiving date or time data involving dates between January 1, 1999 and March 31, 2001, provided other products and software, including the computer workstation, with which the system interacts properly exchange date and time data with the system.

4.2 (a) The limited warranties set forth in Section 4.1 will be void as to, and shall not apply to, any Equipment (i) repaired, altered or improperly installed by any person other than SBTI or its authorized representative; (ii) subjected to unreasonable or improper use or storage, used beyond rated conditions, operated other than per SBTI's or the manufacturer's instructions, or otherwise subjected to improper maintenance, negligence or accident; (iii) damaged because of any use of the Equipment after Customer has, or should have, knowledge of any defect in the Equipment; or (iv) not manufactured, fabricated and assembled by SBTI or not bearing SBTI's

DEF 00010
*Grove v. UNOCAL*

nameplate. However, SBTI assigns to Customer, without recourse, any and all assignable warranties available from any manufacturer, supplier, or subcontractor of such Equipment.

(b) Any claim under the limited warranty granted above must be made in writing to SBTI within thirty (30) days after discovery of the claimed defect, with respect only to the warranty set forth in Subsection 4.1(c) prior to _____ 1, 2001, unless discovered directly by SBTI. Such limited warranty only extends to Customer and not to any subsequent owner of the Equipment. Customer's sole and exclusive remedy for any Equipment or Services not conforming with this limited warranty is limited to, at SBTI's option, (i) repair or replacement of defective components of covered Equipment, or (ii) reperformance of the defective portion of the Services, or (iii) to the extent previously paid, the issuance of a credit or refund for the original purchase price of such defective component or potion of the Equipment or Services.

(c) SBTI shall not be required to repair or replace more than the component(s) of the Equipment actually found to be defective. SBTI's warranty liability shall not exceed the purchase price of such item. Repaired or replaced Equipment will be warranted hereunder only for the remaining portion of the original warranty period.

4.3 THE EXPRESS LIMITED WARRANTIES PROVIDED ABOVE ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, STATUTORY, EXPRESS, OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXPRESSLY DISCLAIMED. SBTI MAKES NO WARRANTY, EXPRESS OR IMPLIED, THAT ANY EQUIPMENT PROVIDED HEREUNDER WILL PREVENT ANY LOSS, OR WILL IN ALL CASES PROVIDE THE PROTECTION FOR WHICH IT IS INSTALLED OR INTENDED. THE LIMITED EXPRESS WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS TSP AGREEMENT MAY ONLY BE MODIFIED OR SUPPLEMENTED IN A WRITING SIGNED BY A DULY AUTHORIZED CORPORATE OFFICER OF SBTI.

4.4 SBTI will indemnify Customer from and against losses, claims, expenses and damages (including reasonable attorney's fees) for personal injury or physical damage to property, but not loss of use of the property resulting from such damage or from damage to any work performed hereunder. Such indemnification shall be solely to the extent caused by or arising directly from SBTI's or its employees', consultants' or agents' negligent acts or omissions, or willful misconduct in connection with its performance of Services hereunder. SBTI's obligations under this Indemnity provision shall not extend to claims, losses, expenses and damages arising out of or in any way attributable to the negligence of Customer or its agents, consultants, or employees other than SBTI. SBTI's liability to Customer or any third party under this Section 4.5 or otherwise under the TSP Agreement is expressly limited to, and SBTI shall not be liable other than for the direct losses, claims, expenses and damages arising as aforesaid. SBTI shall in no event be responsible under this TSP Agreement for incidental, consequential, punitive, exemplary or special damages, including without limitation lost profits and/or lost business opportunities, whether arising in warranty, late or non-delivery of any Equipment or Services, tort, contract or strict liability, and regardless of whether SBTI has been advised of the possibility of such damages. SBTI reserves the right to control the defense and settlement of any claim for which SBTI has an obligation to indemnify hereunder. The parties acknowledge that the price for which SBTI has agreed to perform its Services and obligations under this TSP Agreement has been calculated based upon the foregoing limitations of liability, and that SBTI has expressly relied on, and would not have entered into this TSP Agreement but for, such limitations of liability.

Article 5: Environmental

5.1 Except as disclosed pursuant to Section 5.3, Customer represents that there is no asbestos or any other hazardous or toxic materials, as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the regulations promulgated thereunder, and other applicable federal, state or local law ("Hazardous Materials"), present at Customer's locations where Services are performed. SBTI will notify Customer immediately if it discovers or suspects the presence of any Hazardous Material. All Services have been priced and agreed to by SBTI in reliance on Customer's representations as set forth in this Section 5.1. The presence of Hazardous Materials constitutes a change in the Proposed Solution equivalent to a change order whose terms must be agreed to by SBTI before its obligations hereunder will continue.

5.2 Customer shall be solely responsible for testing, abating, insulating, removing, remedying or neutralizing such Hazardous Materials, and for the costs thereof. Even if an appropriate change order has been entered into pursuant to Section 5.1 above, SBTI will continue to have the right to stop providing Services until the job site is free from Hazardous Materials. In such event, SBTI will receive an equitable extension of time to complete its Services, and compensation for delays caused by Hazardous Materials remediation.

5.3 Customer warrants that, prior to the execution of the TSP Agreement, it has notified SBTI in writing of any and all Hazardous Materials present, potentially present or likely to become present at Customer's locations and has provided a copy of any jobsite safety policies, including but not limited to lock-out and tag procedures, laboratory procedures, chemical hygiene plan, material safety data sheets, and other items covered or required to be disclosed or maintained by federal, state, or local laws, regulations or ordinances.

5.4 Customer hereby indemnifies and holds harmless SBTI from and against any damages, losses, costs, liabilities or expenses arising from Customer's breach of, or failure to perform its obligations under, Sections 5.1, 5.2 or 5.3 above.

Article 6: Customer Responsibilities

6.1 Customer will operate and maintain all Equipment in accordance with applicable manufacturer's specifications, including those set forth in the manufacturer's operating manuals or instructions, as well as all requirements of applicable law or of authorities having jurisdiction. Such Equipment shall be operated only in the specified operating environment, which shall be supplied by Customer, including without limitation: (a) suitable electrical service, including clean, stable, properly conditioned power, to all Equipment; (b) telephone lines, capacity and connectivity as required by such Equipment; and (c) heat, light, air conditioning or other environmental controls, and other utilities in accordance with the specifications for the Equipment. Failure to so operate the Equipment will terminate immediately any maintenance obligations SBTI may have hereunder.

6.2 Customer will promptly notify SBTI of any unusual operating conditions, system malfunctions or building changes that may affect the Equipment or any Services.

6.3 Customer will provide SBTI with reasonable means of access to the Equipment and shall make any necessary provisions to reach the Equipment and peripheral devices. Customer will be solely responsible for any removal, replacement or refinishing of the building structure or finishes that may be required to gain access to such Equipment.

6.4 Customer shall properly dispose of all ballasts, mercury bulb, thermostats, used oil, contaminated filters, contaminated absorbents, refrigerant and any other Hazardous Materials that at any time are present at Customer's premises, in accordance with all applicable federal, state, and local laws, regulations, and ordinances. At no time and under no circumstances will SBTI be responsible for any such removal or disposal and Customer hereby indemnifies and holds SBTI harmless from and against any liability or claim arising therefrom.

6.5 Customer will, if applicable, provide and pay for a dedicated voice grade dial-up phone line and install a terminal block in a mutually agreed upon location. All on-line service Equipment (not including the phone line) will remain the property of SBTI unless otherwise stated herein.

Article 7: Limitations of Maintenance or Service Obligations

7.1 SBTI will not be responsible for the maintenance, repair or replacement of, or Services necessitated by reason of: (a) non-maintainable, non-replaceable, or obsolete parts of the Equipment, including but not limited to ductwork, shell and tubes, heat exchangers, coils, unit cabinets, casings, refractory material, electrical wiring, water and pneumatic piping, structural supports, cooling tower fill, slats and basins, etc. unless otherwise specifically stated herein; or (b) negligence, abuse, misuse, improper or inadequate repairs or modifications, improper operation, lack of operator maintenance or skill, failure to comply with manufacturer's operating and environmental requirements, Acts of God, or other reasons beyond its control. SBTI assumes no responsibility for any service performed on any Equipment other than by SBTI or its agents.

7.2 SBTI shall not be responsible for loss, delay, injury or damage that may be caused by circumstances beyond its control, including but not restricted to acts or omissions by Customer or its employees or agents, Acts of God, war, civil commotion, acts of government, fire, theft, corrosion, flood, water damage, lightning, freeze-ups, strikes, lockouts, differences with workmen, riots, explosions, quarantine restrictions, delays in transportation, or shortage of vehicles, fuel, labor or materials.

7.3 SBTI is not responsible for repairs, replacements or services to Equipment due to corrosion, erosion, improper or inadequate water treatment by others, electrolytic action, chemical action or other reasons beyond its reasonable control.

7.4 SBTI shall not be responsible for the removal or reinstallation of replacement valves, dampers, waterflow and tamper switches required from pipes and duct work including any venting or draining systems.

DEF 00011
Grove v. UNOCAL

**SIEMENS**

## Section 5: List of Maintained Equipment

| Qty. | Equipment | Manufacturer | Serial/Model #/Size |
|---|---|---|---|
| 1 | Diesel Generator | Cummings | 50kw |
| 1 | Backflow Preventer | | |
| 1 | Exhaust Fan | Century | 5hp |
| 2 | Exhaust Fan | Exhausto | |
| 2 | Circ. Pumps | Reliance | 5hp |
| 1 | Pacomonitor System | Paco | |
| 5 | Unit Heaters | Trane | ¼ hp |
| 2 | Fan Coil Units | Trane | (Lobby) |
| 6 | Boilers | AO Smith | |
| 1 | Air Compressor | JCI | 1 hp |
| 1 | Air Dryer | JCI | |
| 1 | Gas Furnace | Reznor | |
| 3 | Boiler Circ. Pumps | Reliance | ½ hp |
| 1 | AHU Supply Fan | Century | 100 hp |
| 2 | Chiller Pumps | Reliance | 25 hp |
| 1 | Return Fan | Century | 25 hp |
| 1 | Centravac Chiller | Trane | 200 ton |
| 1 | Glycol Cooler | Chandler | 1 hp |
| 1 | Glycol Cooler | Trane | 1 hp |
| 1 | Computer Room A/C | EDPAC | 7.5 ton |
| 1 | Computer Room A/C | Trane | 7.5 ton |
| 2 | Humidifiers | | |
| 1 | Boiler Rm Vent Fan | | |
| 1 | Water Filter (AC) | | |
| | Pneumatic Controls | Various | |
| 1 | MEC Field Panel | Siemens | 2.3 |
| 12 | Filters 20x25x2 Pleated | | |
| 12 | Filters 16x25x2 Pleated | | |
| 42 | Filters 20x20x2 Pleated | | |

Siemens Building Technologies, Inc.
5333 Fairbanks St., Suite B
Anchorage AK 99518-1258
(907) 563-2242 / FAX (907) 563-6139

Page 10 of 10

DEF 00012
*Grove v. UNOCAL*

**Services and Drilling Master Contract**
Unocal North American Oil & Gas Division
Unocal Geothermal Division

| THIS CONTRACT NUMBER MUST APPEAR ON ALL DOCUMENTS |
| --- |
| 3282 ONS |

# UNOCAL 76

This contract is entered into this __18th__ day of __April__, A.D., 199 _4_, between Union Oil Company of California, dba Unocal, with the force and effect of this Agreement limited to Union Oil Company of California's North American Oil and Gas Division excepting Canada, and its Geothermal Division (hereinafter collectively COMPANY), P.O. Box 4531, Houston, Texas, 77210-4531, and _____
__Landis & Gyr Powers Inc.__    Attn: Jim Evers
and any and all of its parent companies, subsidiaries and affiliates (CONTRACTOR) at _____
__5761 Silverado Way Suite P__
__Anchorage, AK 99518__ (address). In exchang
for the mutual covenants and conditions contained herein, COMPANY and CONTRACTOR agree as follows:

### 1. DESCRIPTION OF SERVICE(S) TO BE PERFORMED BY CONTRACTOR
CONTRACTOR, from time to time and upon receipt from COMPANY of instructions specifying the particular service to be performed and/or materials (includin rented equipment) to be supplied, shall:

    provide mechanical services (HVAC)

It is understood between the parties herein that no performance is required hereunder except after receipt by CONTRACTOR of specific instructions fror COMPANY, this Services and Drilling Master Contract (Contract) serving only to establish the terms and conditions of performance pursuant to any suc instructions. Each set of such instructions shall be deemed a separate contract and transaction. If any conflict between such instructions and this Contrac should arise, this Contract shall be controlling.

### 2. TERMS OF PAYMENT
COMPANY shall pay CONTRACTOR at the rates specified in CONTRACTOR'S published rates (including terms of payment) or at rates and terms agreed betwee COMPANY and CONTRACTOR for the above service(s) which rates and terms shall not be changed with less than 10 days written notice.

### 3. TIME OF PAYMENT
CONTRACTOR shall forward three (3) copies of the invoice with the job order ticket to COMPANY at the address of the COMPANY personnel requesting service hereunder who will provide billing information. Payment shall be due hereunder in the city of billing when all the work to be done by CONTRACTOR has bee accepted by COMPANY as being in full compliance with all the terms, conditions, and requirements of this Contract, provided that on request of COMPANY CONTRACTOR shall have satisfied COMPANY that there are no liens or lienable claims on or against COMPANY or its property by reason of the operations c CONTRACTOR hereunder.

CONTRACTOR shall reference all invoices or correspondence to this Contract's number and show the Outer Continental Shelf (OCS) destination for any materia and equipment that will be delivered beyond the territorial waters of any state. Such material and equipment deliveries beyond the State of California territoria waters will be exempt from California sales and/or use tax in accordance with Section 6396 of the California Revenue and Taxation Code.

### 4. DURATION OF CONTRACT
This Contract may be terminated at the option of either party by giving the other party thirty (30) days notice in writing to that effect. For the purpose of givin; this notice, or any notice that may be necessary in the performance of this Contract, the addresses of the parties hereto shall be and remain as shown above unt notice by either party to the other, in writing, of a change of address. Notwithstanding the termination of this Contract, the parties shall continue to be bound b' the provisions of this Contract that reasonably require some action or forbearance after such termination, including, but not limited to, Paragraphs 14, and 15

### 5. PAYMENT OF CLAIMS
CONTRACTOR shall promptly pay all bills for labor and for materials purchased by it, or other indebtedness, involved in or arising out of this Contract, and shall if required, exhibit receipted statements or invoices for all labor and material used.

### 6. INDEMNIFICATION
6.1 **CONTRACTOR'S Indemnity.** CONTRACTOR hereby agrees for itself and its officers, directors, agents, servants, employees and insurers (hereinafte referred to as "CONTRACTOR") to release, defend, and indemnify COMPANY and any of its parent, subsidiary and affiliated companies, its lessors, and it: non-operators, joint venturers, partners, co-owners, or co-lessees (and their lessors) with COMPANY who wholly or partially bear the costs of operations and/o enjoy the benefits hereunder and the respective officers, directors, employees, agents or servants of each as well as the heirs, representatives, successors o assigns of each, if any, (hereinafter collectively referred to as OWNER), and its contractors and subcontractor(s) of any tier to the maximum extent permitted b; the applicable law, in each and every case, irrespective of whether any indemnitee hereunder may be alleged or proven to have been negligent (including but no limited to active, passive, sole, joint, concurrent, comparative, contractual and gross negligence), or otherwise legally liable (with or without fault or whethe strictly liable or in breach of any warranty), and, except in jurisdictions where prohibited, without limitation by reason of any insurance required by this Contrac or maintained by CONTRACTOR, from and against any and all liability arising out of or in connection with the following:

  a. Except with respect to down-hole equipment lost or damaged in the hole, all loss of or damage to CONTRACTOR'S equipment or property, or thi equipment or property of contractors and subcontractors of any tier of CONTRACTOR as well as the property or equipment of the personnel of any of thi foregoing arising out of or in connection with the operations under this Contract, regardless of how, when or where such damage or destruction occurs; ani

  b. All claims, liabilities, demands, actions, damages, losses, and expenses, including but not limited to court costs, reasonable attorney's fees, and othe litigation expenses, arising out of or in connection with personal or bodily injury, illness, disease, or death to CONTRACTOR'S personnel, or the personnel o subcontractors of any tier of the CONTRACTOR, arising out of or in connection with the operations under this Contract, regardless of how, when, or when such injury, illness, disease or death occurs.

6.2 **COMPANY'S Indemnity.** COMPANY shall release, defend, and indemnify CONTRACTOR and its contractors or subcontractors to the maximum exten permitted by the applicable law, in each and every case, irrespective of whether CONTRACTOR or its contractors or subcontractors may be alleged or proven t have been negligent (including but not limited to active, passive, sole, joint, concurrent, comparative, contractual and gross negligence), or otherwise legall) liable (with or without fault or whether strictly liable or in breach of any warranty), and without limitation by reason of any insurance maintained by either party from and against any and all liabilities arising out of or in connection with the following:

  a. All loss of or damage to COMPANY'S property or equipment or property or the equipment of COMPANY'S other contractors of any tier as well as thi property or equipment of the personnel of any of the foregoing arising out of or in connection with the operations under this Contract, regardless of how when or where such damage or destruction occurs; and

  b. All claims, liabilities, demands, actions, damages, losses, and expenses, including but not limited to court costs, reasonable attorneys' fees, and othe litigation expenses, arising out of or in connection with personal or bodily injury, illness, disease, or death to COMPANY'S personnel, or the personnel o COMPANY'S other contractors of any tier arising out of or in connection with the operations under this Contract, regardless of how, when, or where suc! injury, disease, or death occurs.

6.3 **Underground Damage.** COMPANY shall indemnify and hold CONTRACTOR harmless, without limit and without regard to the cause and regardless of am negligence of CONTRACTOR, excepting only CONTRACTOR'S gross negligence or willful misconduct, for any and all claims against CONTRACTOR based on an; incident arising out of or occurring during the term of this Contract on account of injury to, destruction of, or loss or impairment of any property rights in or to oil gas or other mineral substance or water, if at the time of the act or omission causing the injury, destruction, loss or impairment, the substances had not beer reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata or reservoir beneath the surface of the earth

6.4 **Pollution.**
  a. CONTRACTOR shall defend, indemnify and save harmless OWNER from and against all claims, demands and liabilities for property damage arising fron pollution, including control and removal thereof, caused by CONTRACTOR'S negligent act or omission, whether active or passive, in performance of

services hereunder; provided, however, such indemnification shall be limited to One Million Dollars ($1,000,000.00) or the dollar amount of the contract for the project upon which CONTRACTOR is working hereunder at the time of any such occurrence, whichever amount is the greater, but such dollar limitation shall not apply when pollution is caused by CONTRACTOR'S gross negligence, willful misconduct or intentional violation of the law.

b. COMPANY shall defend, indemnify and save harmless CONTRACTOR from and against all claims, demands and liabilities for property damage arising from pollution, including control and removal thereof, in connection with services performed hereunder not expressly undertaken by CONTRACTOR in Subparagraph (a) above and in the case of any such claims, demands or liabilities in excess of the above set forth dollar limitation of liability, notwithstanding that same may have been caused or contributed to by the active or passive negligence of CONTRACTOR.

6.5 **Third Party Liability.** With respect to personal or bodily injury, illness, disease, or death resulting therefrom to personnel or loss of or damage to property not covered by other sections of this Paragraph 6, CONTRACTOR and COMPANY mutually agree that each will indemnify the other to the maximum extent permitted by the applicable law from liability arising therefrom, to the extent that such liability is attributable to the negligent or wrongful acts or omission of the indemnifying party.

6.6 **Certified Hauler.** To the extent CONTRACTOR performs service under this Contract as a certified or licensed hauler within the state in which the work contemplated by this Contract is being performed, then this Contract shall be amended only for the performance of such service as a certified or licensed hauler to limit the indemnities requirements in Paragraph 6 and the insurance requirements in Paragraph 8 to only indemnify and hold the other party harmless from and against any and all claims, demands, losses, damages, and liability resulting from any wrongful or negligent act or omission on the part of the indemnifying party, its officers, agents or employees.

## 7. ACCIDENTS TO BE REPORTED

Contractor shall report all accidents. In the event that an accident involving the property, equipment, or personnel of CONTRACTOR, OWNER, or any third party occurs on COMPANY'S premises, or while traveling to or from COMPANY'S premises, which arises out of, results from, or is in any way connected with CONTRACTOR'S work or presence upon COMPANY'S premises pursuant to this Contract, CONTRACTOR shall immediately report such accident to COMPANY'S on-site supervisor or his designated representative. In addition, a written report of such accident must be prepared by CONTRACTOR and delivered to COMPANY'S Regional Vice President or his designated representative within 24 hours of such accident. This report should contain factual information only and should not contain opinion, speculation, or supposition as to fault, liability, or prevention. CONTRACTOR shall also provide COMPANY with a copy of every report of such accident which CONTRACTOR is required to submit, or submits, to any entity other than COMPANY, including without limitation, any governmental agency or body.

## 8. INSURANCE

CONTRACTOR shall provide such minimum coverage as set out on Exhibit "A" for onshore work and Exhibit "B" for offshore work attached hereto and by this reference made a part hereof. Furthermore, should Texas law be applicable to this contract and the activities performed hereunder, then for the purpose of satisfying the Texas Anti-Indemnity Statute for the mutual indemnities contained herein, COMPANY agrees to be self insured for its indemnity obligations up to the maximum dollar limits and extent of insurance coverage (or qualified self insurance) that the CONTRACTOR has agreed to provide COMPANY. If the laws of any other jurisdiction are applicable to this Contract, and such laws have similar provisions to those contained in the Texas Anti-Indemnity Statute as described above, the parties agree to take all steps necessary to receive the benefits of said statute.

## 9. DEFAULT

Time is expressly declared to be the essence of this Contract. In the event of a cessation of labor required by instructions issued hereunder for seventy-two or more consecutive hours or in the event of CONTRACTOR'S failure of performance, COMPANY may take over the work and complete or have the same completed at CONTRACTOR's expense, deducting the cost from the Contract price. These remedies shall not be exclusive, however, and the exercise thereof shall not be deemed to constitute a waiver of any other rights or remedies which the parties may have under applicable law in the event of default.

## 10. FORCE MAJEURE

This contract is subject to all Federal, State and Local laws, orders, rules, ordinances and regulations and neither COMPANY nor CONTRACTOR shall be liable for any delay or damage due, occasioned or caused as a result of such laws, orders, rules, ordinances, or regulations or by strikes, action of the elements or causes beyond the control of the parties, (other than financial distress, inability to pay debts when due, insolvency or bankruptcy). Any delay due to above causes or any of them shall not be deemed to be a breach of or failure to perform this Contract, or any part thereof, but the party hereunder that is rendered unable, wholly or in part, to carry out its obligations under this Contract shall give notice and full particulars of the cause of said delay in writing to the other party; promptly after the occurrence of the cause relied upon and the cause of said delay so far as possible shall be remedied with all reasonable dispatch. The requirement that any force majeure situation shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned. Nothing contained herein shall prohibit COMPANY from being able to terminate the Contract pursuant to Paragraph 4 hereof or in the event a force majeure event continues beyond a reasonable period of time.

## 11. ASSIGNMENT OF CONTRACT

CONTRACTOR shall not assign any portion of the work without written consent of COMPANY. This Contract shall enure to the benefit of and be binding upon the representatives, successors and assigns of the parties hereto.

## 12. WAIVER OR MODIFICATION

This contract constitutes COMPANY'S offer and represents the entire agreement between CONTRACTOR and COMPANY with respect to the matters herein addressed. Goods and services furnished by CONTRACTOR will be received only subject to the terms, conditions, or provisions set forth herein, and COMPANY'S acceptance of such goods and services shall be expressly conditional upon CONTRACTOR'S assent to these terms, conditions, or provisions. Any attempt by CONTRACTOR to delete or modify any term, condition, or provision hereof, or to add any different or conflicting term, shall not prevent the formation of a contract, but such attempted deletion, modification, or addition shall be deemed a Material Alteration, which Alteration is hereby rejected by COMPANY, thereby preventing such Alteration from becoming part of this Contract.

Further, no acceptance, receipt, or acknowledgement by any employee, agent or representative of COMPANY of any work order, service order, invoice, receipt, delivery document, or other document provided by the CONTRACTOR or subcontractor (of any tier) shall be effective to waive, modify, or delete any term, condition, or provision hereto, or to add any different or conflicting term, condition, or provision hereto, or to vary in any way the terms, conditions, or provisions of this Contract. This Contract may be amended only by a separate writing, expressly so stating, and signed by an authorized representative of each party.

## 13. LABOR, EQUIPMENT, MATERIALS, SUPPLIES AND SERVICES

13.1 In the performance of the work herein contemplated, CONTRACTOR is an independent contractor, with the authority to control and direct the performance and safety of the details of the work, COMPANY being interested only in the results obtained, but the work contemplated herein shall meet the approval of COMPANY. Labor and materials are to be the best of kind. CONTRACTOR specifically agrees that all persons employed by CONTRACTOR in performing work covered by this Contract, or by CONTRACTOR'S subcontractors, are not the employees of COMPANY for any purpose whatsoever. However, the foregoing shall not limit or abrogate any defense COMPANY may have under applicable Workers Compensation statutes including, but not limited to, the defense of tort immunity. CONTRACTOR hereby agrees to reimburse COMPANY for all contributions, taxes, interest, and penalties necessarily paid by COMPANY under unemployment compensation or insurance laws covering employees of CONTRACTOR or CONTRACTOR'S subcontractors.

13.2 CONTRACTOR guarantees that all tools and equipment used will be furnished, and all work and labor to be performed under the terms of this Contract will be performed in strict accordance with all Federal, State, and Local laws, rules, regulations, orders and ordinances. CONTRACTOR shall also obtain all permits, licenses and approvals necessary for the performance of this Contract. If the services to be rendered under this Contract are licensed by any governmental body, CONTRACTOR must obtain and maintain the license and submit a copy to COMPANY prior to the performance of work covered by this Contract.

13.3 If within one year from completion and acceptance of the work any workmanship furnished by CONTRACTOR or materials manufactured or fabricated by CONTRACTOR under the terms of this Contract prove defective, CONTRACTOR shall, upon receipt of written notice from COMPANY replace or repair the same to COMPANY'S satisfaction, without cost to COMPANY. If the CONTRACTOR fails to begin remedial work within thirty (30) days of written demand from COMPANY, or any shorter period designated by COMPANY in the case of an emergency, and to complete such work within a reasonable time, COMPANY shall have the right to engage the services of another contractor to perform such work, and CONTRACTOR agrees to reimburse COMPANY for the cost of such work and materials. However, this Subparagraph 13.3 does not constitute an election of remedies by COMPANY.

13.4 CONTRACTOR agrees to defend, indemnify, and save COMPANY harmless from and against any and all loss, damage, liability, or expense (including without limitation attorneys' fees and other defense costs) of any kind by reason of any actual or alleged infringement of any patent, copyright, or other proprietary right of a third party, arising out of any work done by CONTRACTOR or any of its subcontractors hereunder or the manufacture, sale and/or use for any purpose for which it is intended of any material supplied to COMPANY hereunder.

13.5 CONTRACTOR agrees that CONTRACTOR will disclose promptly and in writing to the Patent counsel, Union Oil Company of California, P.O. Box 76, Brea, California 92521, any and all inventions which CONTRACTOR, either alone or with others, may conceive or make, which inventions arise out of CONTRACTOR's work for COMPANY, and CONTRACTOR agrees to assign, and hereby assigns, to COMPANY or its nominee all CONTRACTOR's entire right, title and interest in and to said inventions; and CONTRACTOR further agrees that, during the term of this Agreement or at any time thereafter, CONTRACTOR will, at the request and expense of COMPANY, execute all papers and perform all other lawful acts which COMPANY may deem advisable for the purpose of obtaining or maintaining patents in the United States and/or other countries on such inventions. CONTRACTOR's obligations under this Paragraph shall survive termination of this Agreement.

13.6 CONTRACTOR shall keep and maintain equipment furnished by COMPANY in good condition, at CONTRACTOR'S expense and upon the termination of th use of such equipment, turn over same to COMPANY in as good condition as when received, subject, however, to ordinary wear and tear.

13.7 CONTRACTOR shall examine before using all materials, equipment and supplies furnished by COMPANY for performance directed pursuant to thi Contract, and will exercise reasonable diligence to report to COMPANY any defects therein in time to allow COMPANY to replace same without delayin operations. CONTRACTOR shall not exclude or modify any express or implied warranties which would otherwise attach to such materials, equipment, o supplies, or to a product furnished by CONTRACTOR, or waive any remedy available to COMPANY or CONTRACTOR as a consequence of any breach of suci warranties. Materials and equipment to be supplied in federal waters offshore California are to be delivered by CONTRACTOR or its agent to COMPANY at it offshore facility unless directed otherwise by COMPANY'S authorized representative.

13.8 No changes or alterations shall be made from instructions of COMPANY unless first ordered and acknowledged by a properly authorized representative o COMPANY. CONTRACTOR shall not be entitled to payment for changes and/or alterations unless same are made as above provided. Any changes and/o alterations which are made as above provided shall not in any way release any surety on any CONTRACTOR's bond furnished by CONTRACTOR hereunder

14. **CONFIDENTIALITY**

All technical, business or other information which is developed or received by CONTRACTOR in connection with CONTRACTOR's work hereunder, or which i otherwise disclosed to CONTRACTOR by COMPANY either orally or in writing, is the property of COMPANY, and CONTRACTOR agrees to maintain sucl information in strict confidence and not to use such information other than in work for COMPANY. The foregoing obligations of this Paragraph 14 shall not appl) to information which CONTRACTOR can show either (i) is already known to CONTRACTOR other than as a result of work performed hereunder and from som source other than COMPANY or (ii) is or becomes part of the public domain, other than by CONTRACTOR's fault. CONTRACTOR's obligations under thi: Paragraph 14 shall survive termination of this Agreement.

15. **AUDIT**

CONTRACTOR shall maintain a true and correct set of records pertaining to work performed hereunder and all transactions related thereto. CONTRACTOR furthe agrees to retain all such records for a period of not less than three years after completion of the work performed hereunder. COMPANY may require CONTRACTOR at any time within said three year period to furnish sufficient evidence, with documentary support included but not limited to accounts, invoices tickets, and other documents exclusively related to work performed under this Contract, to enable COMPANY to (1) verify the correctness and accuracy o charges from Contractor and (2) verify that CONTRACTOR does not pay any commissions, fees, or grant any rebates to employees or officers of COMPANY no favor employees or officers of COMPANY with gifts or entertainment of significant value nor enter into any business arrangement with employees or officers o COMPANY other than as a representative of COMPANY without COMPANY'S written approval. Within the time limit herein established, COMPANY may examine said documents on CONTRACTOR'S premises.

16. **NONDISCRIMINATION**

CONTRACTOR shall comply, to the extent applicable, with the following Parts of Code of Federal Regulations: Title 48:22.804 Affirmative Action Programs 52.219-9 Small Business and Small Disadvantaged Business Subcontracting Plan, 52.220-4 Labor Surplus Area Concerns Subcontracting Program, 52.222-4 Contract Work Hours and Safety Standards Act - Overtime Compensation, 52.222-21 Certification of Nonsegregated Facilities 52.222-26 Equal Opportunity, 52.222-35 Affirmative Action for Special Disabled and Vietnam Era Veterans, 52.222-36 Affirmative Action for Handicapped Workers, 52.223-2 Clean Air and Water, 52.223-3 Hazardous Material Identification and Material Safety Data, and the Immigration Reform and Control Act Of 1986 and all regulations thereunder.

17. **BOND**

Bond may be required of CONTRACTOR upon COMPANY'S written request.

17.1 If required by COMPANY, CONTRACTOR will furnish COMPANY, prior to the commencement of the applicable work, a contractor's bond with a surety company, acceptable to COMPANY, guaranteeing and conditioned for CONTRACTOR'S full and faithful performance of work under this Contract and also guaranteeing and conditioned for the payment in full of the claims of all persons performing work upon or furnishing materials to be used in said work, the form of said bond and the amount thereof to be approved by COMPANY. If bond is required, CONTRACTOR may invoice COMPANY for the actual bond fee.

17.2 If bond is not required, CONTRACTOR, upon written notice as a condition precedent to any payment by COMPANY hereunder, shall execute and deliver to COMPANY an affidavit stating that CONTRACTOR has paid in full for all labor, materials, rental of equipment, transportation and all other charges in connection with the work performed under this Contract for the period covered by such payment.

18. **APPLICABLE LAW**

This Contract shall be construed, interpreted, and enforced in accordance with the internal laws and jurisprudence of the state in which the work is performed, and without reference to that state's conflict of laws rules. Where this Contract involves work on or related to the Outer Continental Shelf or on water or is otherwise subject to Federal law, the applicable Federal law shall apply. In the event that any provisions or portion of the Contract is determined to be unenforceable or void, then the parties hereto agree that the remainder of the Contract shall be construed, interpreted, and enforced to the maximum extent permitted by law. The captions in this Contract are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Contract.

19. **DRUG ABUSE POLICY**

CONTRACTOR acknowledges that it has been advised and agrees to advise all its employees, subcontractors, agents, business invitees, and the employees of any subcontractor, agent, or business invitee of the following safety regulation or policy concerning illegal drugs:

  a. It is the policy of COMPANY that the use, possession, sale, transfer, purchase, or presence in one's system of illegal drugs on COMPANY property is prohibited;

  b. Entry onto COMPANY property constitutes consent to an inspection of the person (including, but not limited to, the taking of a urine sample) and personal effects when entering or leaving COMPANY property;

  c. Any person who is found in violation of the policy or who refuses to permit an inspection may be removed and barred from COMPANY property, at the discretion of COMPANY;

  d. If testing for the presence of alcohol and/or controlled substances is required by law or regulations with respect to COMPANY property, employees of CONTRACTOR and/or subcontractor shall be subject to such testing as required and directed by COMPANY unless CONTRACTOR and/or its subcontractor provides COMPANY with quarterly reports adequate for COMPANY to determine compliance with such laws and regulations with respect to said employees; and

  e. CONTRACTOR will allow access to its property and records by COMPANY or any governmental representative with appropriate jurisdiction for the purpose of maintaining compliance with COMPANY'S drug policy and relevant laws and regulations.

20. **SPILL PREVENTION CONTROL**

It is COMPANY'S policy to conduct its operations so as to prevent pollution, including without limitation the discharge of oil or hazardous substances on land or into State waters or OCS waters.

CONTRACTOR performing work at any and all of COMPANY'S locations shall have the responsibility to conduct its operation in a manner so as to prevent a spill event from occurring. Any spill of oil or any hazardous substance shall be promptly reported to COMPANY'S authorized representative. In addition to this general precaution, CONTRACTOR shall adhere to all specific rules for pollution control and safety that are made a part of any specific job instruction. COMPANY'S authorized representative may interrupt any work in progress, as necessary, to prevent an oil spill or pollution.

CONTRACTOR'S responsibilities shall include, but not be limited to, the following:

  a. Cutting into existing lines: No line containing hydrocarbon (oil or gas) shall be cut, burned, welded, removed, or relocated without prior approval of COMPANY'S authorized representative.

  b. Pressure Testing: All new oil and/or gas lines shall be pressure tested with water, prior to placement into service. Such test must be witnessed by COMPANY'S authorized representative.

  c. Placement Into Service: No oil or gas system shall be placed into service by CONTRACTOR without prior approval of COMPANY'S authorized representative.

21. **SAFETY**

CONTRACTOR agrees to perform its activities under this Contract in a safe manner and will have and enforce a set of safety and loss prevention standards which complies with all laws and that will meet or exceed COMPANY'S safety procedures and policies.

22. **HAZARD COMMUNICATION PROGRAM**

COMPANY'S written Hazard Communications Program for each facility is located in the respective facility field offices. Unless exempt, CONTRACTOR shall have its own written Hazard Communication Program meeting requirements of the OSHA Hazard Communication Standard which shall be available to COMPAN\ immediately on request. A list of hazardous materials produced or used by COMPANY and material safety data sheets (MSDS) for each are located in respectiv

DEF 00015
*Grove v. UNOCAL*

facility field offices. Prior to bringing any hazardous material on-site, CONTRACTOR shall provide the COMPANY on-site supervisor a list of hazardous materials he intends to use on COMPANY facilities and a copy of the MSDS for each containing all information required by the Hazard Communication Standard. CONTRACTOR and CONTRACTOR'S employees may review COMPANY'S written Hazard Communications Program and any MSDS during working hours. Arrangements should be made by the CONTRACTOR on-site supervisor with the COMPANY on-site supervisor. Before performing any work for COMPANY or work on COMPANY property, the CONTRACTOR must contact the COMPANY on-site supervisor for instructions on safe procedures, protective equipment or other precautionary measures required with respect to possible exposure to hazardous materials or other hazards. Prior to beginning work the CONTRACTOR shall train his employees in accordance with the Hazard Communications Standard, including but not limited to COMPANY Safety Rules, appropriate COMPANY operations and safe procedures, protective equipment, and other precautionary information made available to the CONTRACTOR by COMPANY. Training will cover both normal operations and forseeable emergencies, and include information with respect to the use and availability of MSDS's and all labeling systems used by CONTRACTOR or COMPANY.

23. **DRILLING CONTRACT**

This paragraph 23 and its Subparagraphs apply to CONTRACTOR if CONTRACTOR is engaged by COMPANY to drill, complete, deepen, workover, repair, maintain or plug and abandon a well or wells set forth in a Bid Sheet and Drilling Order, hereinafter called "Drilling Order", which has been or will be submitted to it by COMPANY. CONTRACTOR shall complete the Drilling Order, setting forth the prices it proposes to charge for its services, and properly execute the Drilling Order in triplicate originals and return same to COMPANY. If COMPANY is satisfied with CONTRACTOR'S proposals, COMPANY shall execute the Drilling Order and return one original to CONTRACTOR. When the Drilling Order has been agreed to and executed in the manner hereinabove provided, that Drilling Order, including the terms and conditions of this Services and Drilling Master Contract, shall govern and control the work described thereon for COMPANY by CONTRACTOR.

23.1 *Commencement of Operations.* If and when the Drilling Order has been executed by the parties hereto, CONTRACTOR agrees to commence the operation specified at this time or on the date set forth in the Drilling Order, and to drill, complete, deepen, workover, repair, maintain or plug and abandon a well or wells as specified, with due diligence and without undue delays or interruptions, the well or wells covered thereby for the production of oil, gas, geothermal resources and/or other minerals or other service as specified by COMPANY, at the location, in the manner, to the depth, and in accordance with all of the provisions and specifications of this Contract and the Drilling Order.

23.2 *Labor, Equipment and Materials.* Material, equipment special tools, supplies, and services necessary or proper to the drilling and completion of the well shall be furnished at the drillsite by the party designated in the Drilling Order.

Should CONTRACTOR purchase for COMPANY at COMPANY'S request any materials, supplies, or equipment which COMPANY is obligated to furnish under the terms of this Contract or any Drilling Order, COMPANY agrees to pay CONTRACTOR within thirty (30) days after date of receipt of CONTRACTOR'S invoice the actual cost of such materials, supplies, or equipment, less any cash discounts thereon to which CONTRACTOR may be entitled.

23.3 *Operational Requirements.* CONTRACTOR further agrees to:

a. Keep an accurate record of work performed in an I.A.D.C. Daily Drilling Report book provided by CONTRACTOR, recording therein the nature, depth, and thickness of formation encountered. Such log shall at all times be subject to inspection by COMPANY or its representative; and, upon completion or abandonment of the well to which it pertains, shall become the exclusive property of COMPANY. All invoices are paid on the basis of these tour reports and each copy is to be signed by a COMPANY representative and CONTRACTOR'S representative.

b. Promptly notify COMPANY whenever any oil and/or gas-bearing formation is found. COMPANY shall be afforded sufficient time to examine said information to determine whether or not the well should be completed in same, and for such time consumed CONTRACTOR shall be paid applicable day work rates.

c. Use all possible care and diligence to keep fence gates open or closed as found, to avoid pollution of water bodies and courses and damage to any land by reason thereof, to avoid injury to any crops, fences, livestock, structures, and other property.

d. Have drill pipe, drill collars, subs, kelly and swivel furnished by CONTRACTOR inspected as specified in the Drilling Order.

e. Use the utmost diligence and highest degree of care to discover defects in materials and equipment supplied by CONTRACTOR and used by CONTRACTOR.

f. Turn in all delivery tickets covering any materials or supplies furnished by COMPANY or furnished by vendors for which COMPANY is obligated to reimburse CONTRACTOR as specified in the Drilling Order.

23.4 *Default.* In the event of default by CONTRACTOR, COMPANY shall have the right at its option either:

a. To terminate this Contract and do and cause to be done no further work on said drilling operation, other than that which may be required under applicable federal, state, or local authority, in which case COMPANY shall not be indebted to CONTRACTOR in any amount whatsoever, under this Contract, or

b. To take over the hole and itself do the work contracted to be done by the CONTRACTOR, or in good faith procure some other contractor to do the same, in which event COMPANY shall have the entire control of such work with the right to proceed with same or abandon as it sees fit, and to take and use or permit the use of CONTRACTOR'S tools and drilling equipment. In such event, the accounts between the parties shall be settled as follows:

All costs incurred by COMPANY, including expenditures on a second and subsequent hole in the event of the loss of any hole or holes, in doing or causing to be done, the work contracted hereunder to be done by CONTRACTOR, shall be at CONTRACTOR'S expense; accurate record of such costs shall be kept and the CONTRACTOR shall be credited thereon with the amount which would have been due CONTRACTOR for the performance of the work hereunder, after deduction of indebtedness or liens, if any, paid for CONTRACTOR by COMPANY. The accounts shall be settled by payment by one party to the other as the facts may require. For the protection of amounts due to COMPANY hereunder, it shall have a lien on all machinery, drilling equipment, and supplies of CONTRACTOR used or held for use in connection with the work hereunder. The costs incurred by COMPANY and charged to CONTRACTOR pursuant to this paragraph shall not in any event exceed the amount which would have been due CONTRACTOR for the performance of the work hereunder and which is to be credited against costs incurred by COMPANY as aforesaid; any excess costs shall be borne by COMPANY. All risks with respect to personal injury, death, property damage or other damage arising out of work performed by or for COMPANY pursuant to this paragraph shall be borne solely by COMPANY and COMPANY shall indemnify CONTRACTOR therefor.

In the event of conflict between this Subparagraph 23.4 and Paragraph 9 or Subparagraph 13.3, this Subparagraph 23.4 shall prevail.

23.5 *COMPANY Access to Premises.* The actual performance and superintendence of all work hereunder shall be by CONTRACTOR, but COMPANY or its representatives shall have unlimited access to the premises to determine whether work is being performed by CONTRACTOR in accordance with all of the provisions of this Contract and the Drilling Order.

23.6 *Ingress and Egress to Location.* COMPANY shall secure for CONTRACTOR rights of ingress and egress to the tract of land on which the well is to be drilled. COMPANY shall advise CONTRACTOR of any limitations or restrictions affecting ingress and egress, and CONTRACTOR shall abide by and shall have its employees, agents, or subcontractors abide by such limitations or restrictions. Should CONTRACTOR be denied free access to the location for any reason not within the control of CONTRACTOR, time lost by such denial shall be paid for at a reasonable rate in keeping with the stage of operations at the time.

23.7 *Cancellation of Drilling Contract.* This Contract may be cancelled by either party at any time upon thirty (30) days written notice to the other party as provided in Paragraph 4. However, the operations conducted under a Drilling Order may be terminated as provided therein.

23.8 *Conflicts.* In the event there is a conflict between the provisions of this Paragraph 23 and its Subparagraphs and any papers or documents, including the Drilling Order, which may have been executed or passed between the parties hereto in connection with the subject matter hereof, it is understood and agreed that the provisions of this Paragraph 23 and its Subparagraphs shall be controlling. If there is a conflict between the provisions of this Contract or any fully executed amendment of the Contract, and any such other documents, this Contract or amended Contract shall be controlling.

IN WITNESS WHEREOF, the parties have executed this AGREEMENT in duplicate as of the day and year first above written.

| CONTRACTOR | Union Oil Company of California, dba Unocal |
|---|---|
| LANDIS & GYR POWERS, INC. *[signature]* | Unocal North American Oil & Gas Division (excepting Canada) Unocal Geothermal Division |
| BY R. W. BLODGETT | BY *[signature]* David E. Clay |
| TITLE SECRETARY AND DIRECTOR, CONTRACT ADMINISTRATION | TITLE Financial Accounting Manager |
| CONTRACTOR'S LICENSE NO. AND EXPIRATION DATE | WITNESS FOR COMPANY *[signature]* |

Grove v. UNOCAL

## AMENDMENT

The following provisions shall amend the Services and Drilling Master Contract between __Landis & Gyr Powers Inc.__ and Union Oil Company of California dated __April 18, 1994__. All other provisions of the Services and Drilling Master Contract shall continue in full force and effect.

1. Paragraph 3. Insert the following language after line eight of the paragraph.

"Any tangible personal property that will be furnished by CONTRACTOR under the Contract which is to be used exclusively in the exploration for or production of oil, gas, sulphur or other minerals offshore and outside the territorial limits of the State of Texas shall be exempt from Texas sales and/or use tax in accordance with Texas Tax Code #151.324 (a) (1), (a) (2), (c) and (d) and 34 TAC Sec. 3.332. COMPANY shall present to CONTRACTOR an exemption certificate covering such purchases. Any material and equipment that will be furnished by CONTRACTOR under this Contract which shall be first utilized exclusively beyond the territorial limits of the State of Louisiana on the OCS shall be exempt from Louisiana sales and/or use tax in accordance with Louisiana Revised Statutes # 47:305.10. Contractor shall reference all invoices or correspondence to this Contract's number and shall show the OCS destination if determined. If COMPANY has determined the location of the first use of the materials and/or equipment at the time of purchase, COMPANY shall present to CONTRACTOR an exemption certificate LGST 9-D. If COMPANY does not know the exact location of the first use of the materials and/or equipment at the time of purchase it shall present an exemption certificate LGST 9-O/S to CONTRACTOR."

Provide mechanical services as per attachments:  A pages 1,2,3 & 4
                                                B pages 1 & 2

In the event of a conflict between any provisions of this Contract and attachments A & B, the provisions of the Contract shall be controlling with respect to the provisions in conflict.

| LANDIS & GYR POWERS INC. | Union Oil Company of California |
|---|---|
| BY: _[signature]_ | BY: _David E. Olgin_ |
| P. W. BLODGETT  SECRETARY AND DIRECTOR, CONTRACT ADMINISTRATION | Manager Financial Accounting  Title |

DEF 00017

Exhibit "A"
**Minimum Insurance Requirements
For Contractor - Onshore**
Unocal North American Oil & Gas Division (Except Canada)
Unocal Geothermal Division

# UNOCAL⓻

CONTRACTOR shall purchase and maintain in full force and effect at all times during the term of this Contract, in Companies acceptable to COMPANY, policies providing the following types of insurance, which shall be regarded as a minimum and be primary as to any other existing, valid, and collectible insurance or self insurance, and which name OWNER as an Additional Insured with a Cross Liability Clause, with respect to the CONTRACTOR'S indemnity obligations to OWNER contained in Paragraph 6.

CONTRACTOR shall, in addition, promptly following execution of the Contract and before the performance of work hereunder, secure from its insurers and subcontractors a Waiver of Subrogation against OWNER in all of the insurance policies applicable to the work. This right of subrogation shall be expressly waived. Such minimum insurance shall include, but not be limited to:

A. **WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE:**
   1. Coverage A. - Workers Compensation - statutory limits in accordance with the laws of the states in which operations are covered under this Contract.
   2. Coverage B. - Employers Liability Insurance with a minimum limit of $ __1,000,000.00__ per occurrence.
   3. Alternate Employer Endorsement.
   4. Waiver of Subrogation on Workers Compensation and Employers Liability Insurance. CONTRACTOR may substitute an Additional Insured endorsement in lieu of Waiver of Subrogation with respect to liability arising out of injuries to CONTRACTOR'S employees during the performance of this Contract.

B. **COMPREHENSIVE GENERAL LIABILITY INSURANCE OR COMMERCIAL GENERAL LIABILITY INSURANCE (OCCURRENCE FORM) OR THE EQUIVALENT:**
   1. Limits of Liability:  $ __1,000,000.00__ Combined Single Limit per occurrence,
      $ __2,000,000.00__ Aggregate.
   2. The Amendment-Aggregate Limits of Insurance (Per Project) Endorsement CG25031185. Modifies the general aggregate limits to apply separately to each of the CONTRACTOR'S projects.
   3. Contractor's Protective - work let or sublet.
   4. Products - Completed Operations.
   5. Contractual Liability specifically insuring Contract between COMPANY and CONTRACTOR.
   6. Endorsement naming OWNER as an Additional Insured with a Severability Of Interest Clause (Cross Liability).
   7. Waiver of Subrogation against OWNER.

C. **AUTOMOBILE LIABILITY INSURANCE:**
   1. Limits of Liability: $ __1,000,000.00__ Combined Single Limit per occurrence,
      $ __n/a__ Aggregate.
   2. Automobiles covered: Owned, Non-Owned, and Hired Automobiles.
   3. Endorsement naming OWNER as an Additional Insured with a Severability of Interest Clause (Cross Liability).
   4. Waiver of Subrogation against OWNER.

D. **UMBRELLA OR EXCESS LIABILITY INSURANCE:**
   Minimum Limits of Liability $ __5,000,000.00__ each occurrence, in excess of all primary liability coverage.

Maintenance of said minimum insurance shall be a condition precedent to the payment of CONTRACTOR of the compensation for the work or services herein provided. If CONTRACTOR employs subcontractors to perform any work hereunder, then CONTRACTOR agrees to require such subcontractors to obtain, carry, maintain, and keep in force during the time in which they are engaged in performing any work hereunder, policies of insurance which comply with the requirements as set forth above and to furnish copies thereof to CONTRACTOR and/or COMPANY. Subcontractors must also obtain Waivers of Subrogation from their insurers protecting OWNER. Failure to maintain said insurance, as required herein, shall constitute a material breach and shall be sufficient grounds for immediate cancellation or suspension of this Contract by COMPANY. Any failure on the part of COMPANY to insist upon strict adherence by CONTRACTOR to the insurance requirements hereunder shall in no event be construed to be a waiver of any of said requirements.

Certificate(s) of Insurance for all of those policies set forth are to be provided to COMPANY by the Insurer(s) and are to be received prior to CONTRACTOR'S entry upon the premises or property of COMPANY or the performance by the CONTRACTOR of work covered by this Contract. Such Certificate(s) shall state that the minimum coverages required by this Exhibit "A" have been provided and are in effect, that the contractually assumed obligation in this Contract is covered, and that no policy or policies will be cancelled or materially changed for any reason without a 30 day advance written notice by Insurer(s) to COMPANY. No deductible amount shall be used by CONTRACTOR to meet these minimum insurance requirements without the express prior written approval of COMPANY. All policies shall be endorsed to provide that there will be no recourse against COMPANY for payment of premium.

The insurance to be carried and the minimum amounts as set forth herein shall in no way be construed to limit CONTRACTOR'S obligations pursuant to this Contract. Any deductible amounts or self-insured retention are the sole responsibility of CONTRACTOR.

FORM 4-3C112 (REV. 12-90) PRINTED IN U.S.A.

DEF 00018
*Grove v. UNOCAL*