Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT AT ALASKA

LAWRENCE H. GROVE, CYNTHIA         )
GROVE, SARAH GROVE, and MICHAEL    )
GROVE (DOB 1/21/88) by and through )
his father LAWRENCE H. GROVE,      )
                                   )
             Plaintiffs,           )
                                   )
     vs.                           )
                                   )
UNOCAL CORPORATION,                )
                                   )
             Defendant.            )
_____)

Case No. A04-0096 CV (JKS)

DEPOSITION OF BOB CARMICHAEL

TUESDAY, JULY 31, 2007
10:28 A.M.

Taken by Counsel for Defendant
at
CLAPP, PETERSON, VAN FLEIN, TIEMESSEN & THORSNESS
711 H Street, Suite 620
Anchorage, Alaska

EXHIBIT C
PAGE 1 OF 6

Page 70

1  that I'm prepared to answer that question, because I
2  don't know what the arrangement was between the
3  employer and the employee as far as their safety
4  standards go. I don't know if it was expected of the
5  employee to inspect the owner's premises within the
6  conditions of the knowledge of the employee to do such
7  an inspection. I don't have that information. So I
8  don't know what the expectation was of Siemens for
9  Mr. Grove to report or to inspect or examine. I don't
10 know what that --
11     Q. Okay. Aside from these sort of formal
12 responsibilities that you're referring to, didn't
13 Mr. Grove have an obligation to pay attention to the
14 circumstances in his workplace and take reasonable
15 steps to provide for his own personal safety?
16     MR. COHN: Objection to the form of the
17 question.
18     THE WITNESS: The OSHA regulation general
19 duty clause requires two things. One is for the
20 owner, the employer, to -- the employer to provide a
21 safe and healthful workplace. It also requires --
22 BY MR. THORSNESS:
23     Q. And that in this case would be Siemens.
24     MR. COHN: Objection. You interrupted the
25 question. And you're putting words in his mouth.

Page 71

1  BY MR. THORSNESS:
2      Q. Mr. Grove's employer was Siemens.
3      A. Mr. Grove's employer was Siemens. And --
4      Q. Pardon the interruption.
5      A. And for the employee to obey safety rules
6  established by the company.
7      Q. The company would be his employer.
8      A. That's correct.
9      Q. Okay.
10     A. Now, there's other pieces. For instance, in
11 the section on -- couldn't ask me if I told you.
12 There's another section of the OSHA regulations that
13 talks about an owner's responsibility when they're
14 talking about multi-employer worksites and
15 construction areas where the owner has one set of
16 facilities, they bring in the contractor or some other
17 worker and perform work. And the difference is that
18 often the contractor is not fully aware of all of the
19 potential hazards or conditions within the owner's
20 worksite. So there's again an -- in OSHA regulations,
21 there's an expectation that the owner also provides
22 information to the contractor about the condition of
23 the work.
24     Q. And might be -- this contractor's lack of
25 awareness, might that then be one reason why they

Page 72

1  assume an obligation to inspect the worksite?
2      MR. COHN: Objection to the form of the
3  question.
4      THE WITNESS: I'm not sure who -- which is
5  "they"?
6  BY MR. THORSNESS:
7      Q. Why the contractor agrees to inspect the
8  worksite; so they can familiarize themselves with the
9  safety issues that are presented.
10     MR. COHN: Objection. Foundation,
11 speculation, form of the question.
12     THE WITNESS: My experience is that that
13 is -- that there is considerable variation, depending
14 on the nature of the work.
15 BY MR. THORSNESS:
16     Q. Okay. Go back to 13.7 of our -- our
17 contract.
18     A. 13.7.
19     Q. And what I'd like to know is, do you know of
20 any evidence that Siemens complied with the
21 requirements of this contractual language?
22     A. Of the first sentence?
23     Q. Yes, the first sentence.
24     MR. COHN: Objection. Foundation and form
25 of the question. Speculation.

Page 73

1      THE WITNESS: I do not have any information
2  that says that Siemens complied -- Siemens complied or
3  did not comply with the requirement to examine before
4  using all materials, equipment and supplies.
5      I'm not even sure what materials
6  equipment and supplies may or may not have
7  been provided by Unocal in this case. All I know
8  is that a ladder was there for access to a
9  platform. I don't know if Unocal provided any other
10 tools or equipment other than the replace- -- I don't
11 even know if they had the replacement filters or
12 whether Siemens provided those. I don't have that
13 information.
14 BY MR. THORSNESS:
15     Q. Did -- Mr. Grove had an obligation, didn't
16 he, to take reasonable steps to ensure his own
17 personal safety?
18     A. That is included in the OSHA general duty
19 clause, correct.
20     Q. All right. And that would include that
21 he -- before he gets up on a work platform, that he
22 make reasonable efforts to ascertain whether it's
23 still structurally sound; isn't that correct?
24     MR. COHN: Objection to the form.
25 Speculation, foundation.

19 (Pages 70 to 73)

EXHIBIT  C
PAGE  2  OF  6

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

9a7c59fe-7aca-4a01-b7e9-0c06192eb71c

Page 74

1    THE WITNESS: Depending on the definition of
2 "reasonable," that's correct.
3 BY MR. THORSNESS:
4    Q. Let my give you an example, specific
5 example: It's your understanding, isn't it, that the
6 structure that held up these boards consisted of angle
7 perforated metal, specifically a horizontal piece the
8 board rested on that was attached by means of machine
9 screws to a vertical piece of horizontal perforated
10 metal -- oh, I'm sorry.
11   A. Some kind --
12   Q. (Continuing) -- vertical piece of angle
13 perforated metal?
14   A. Sheetmetal on one side and filter frame on
15 the other side.
16   Q. Isn't that correct?
17   A. That's my understanding.
18   Q. And have you seen photographs taken by
19 Mr. Grove following his accident?
20   A. No.
21   Q. Okay. If the machine screws attaching the
22 horizontal pieces of perforated angle metal to the
23 vertical pieces were attached by means of two or more
24 machine screws with square washers and nuts, would you
25 agree that's something that Mr. Grove should have

Page 75

1 inspected to ensure that, for example, the nuts were
2 still on the bolts?
3    MR. COHN: Objection. Speculation,
4 foundation and form.
5    THE WITNESS: My experience is no.
6 BY MR. THORSNESS:
7    Q. That's not his obligation.
8    A. That's correct.
9    MR. THORSNESS: Let's take a break. I'm
10 going to go get something.
11   MR. COHN: Okay.
12   (Brief recess.)
13 BY MR. THORSNESS:
14   Q. Let's go back on. All right.
15 Mr. Carmichael, I'm handing you Exhibit 19 to Grove
16 depo, 12/15/05, and Exhibit 21 to Grove depo,
17 12/15/05. I'd like you to look at this picture here
18 and then I'd like you to look at this picture right
19 here, the bottom one.
20   A. Okay.
21   Q. All right? Have you seen those photographs
22 before?
23   A. I don't recall seeing these photographs.
24 No, sir.
25   Q. Are you aware that Mr. Grove took pictures

Page 76

1 of the accident site after his accident?
2    A. I don't recall that I've seen that anywhere.
3    Q. Okay. You see the horizontal piece of what
4 I call "perforated angle metal"?
5    A. Yes.
6    Q. Do you see the vertical pieces of perforated
7 angle metal?
8    A. Yes, I do.
9    Q. And you see the machine screws attaching the
10 horizontal to the vertical.
11   A. There's one right there and maybe two there.
12 Yes, sir. I do.
13   Q. There's two in each one, isn't there?
14   A. Yeah. That must be a screw head there.
15   Q. Would you agree, two?
16   A. I agree.
17   Q. All right. My question for you,
18 Mr. Carmichael, is, didn't Mr. Grove, before he
19 climbed up on that platform, have an obligation to at
20 least check to see if there were machine screws with
21 nuts in place holding the horizontal pieces of that
22 platform onto the vertical?
23   MR. COHN: Objection. Form.
24   THE WITNESS: I have no information that
25 says that Siemens made it a requirement for him to do

Page 77

1 that. I have no information that says that Unocal
2 required them to inspect that. And my experience is
3 that few people would have the technical ability to
4 know whether that was correct or not. I would not
5 have the technical ability to tell whether those were
6 correct or not.
7 BY MR. THORSNESS:
8    Q. I didn't say correct or not. I just said
9 something as rudiment- -- did Mr. Grove have an
10 obligation, before he climbed up on that platform, to
11 simply look and see if there were nuts and bolts in
12 place holding that horizontal piece of that platform
13 onto the vertical piece?
14   MR. COHN: Objection. Foundation, form,
15 legal conclusion.
16   THE WITNESS: I've seen nothing where
17 Siemens would have required their employee to perform
18 that kind of inspection.
19 BY MR. THORSNESS:
20   Q. Okay. That wasn't my question, with all
21 respect.
22   A. In my experience, the answer is no.
23   Q. So your testimony is Mr. Grove had no
24 obligation whatsoever to do something as simple as
25 look at that structure and confirm that the nuts and

GROVE v. UNOCAL                                              BOB CARMICHAEL
                                                              7/31/2007

Page 86

1  this, I would not want to put words in Unocal's mouth.
2  However, my experience --
3       MR. COHN: Asks for legal conclusion.
4  Objection on the foundation. Speculation.
5       THE WITNESS: My experience with other
6  contracts where wording similar to this has been used
7  is that Unocal is not going to provide direct
8  supervision for the work being performed; that it is
9  up to Siemens to provide the -- to pick the labor
10 person, provide whatever tools and equipment are
11 required to perform the work, to do the work and
12 whatever else --
13 BY MR. THORSNESS:
14     Q. And as the contract says, it's also
15 Siemens's obligation to direct the performance and
16 safety of the details of the work, correct?
17     A. Correct.
18     Q. Okay. So as far as directing safety, the
19 safe completion of the details of the work, you would
20 agree with me that that would be Siemens's obligation
21 under this contract.
22     A. Well, I'm certainly not a lawyer or
23 experienced in the law. I can tell you my experience,
24 however.
25     MR. COHN: And object on legal conclusion.

Page 87

1       THE WITNESS: I cannot say --
2       MR. COHN: Foundation, speculation.
3       THE WITNESS: -- that that was their --
4  solely their obligation, because I believe there were
5  other factors involved. I believe that the intent is
6  that Siemens will perform the work safely within their
7  ability to control the process.
8  BY MR. THORSNESS:
9       Q. And I'm, of course, focusing on this
10 particular language --
11     A. Yes.
12     Q. -- that I just had you read.
13     A. Yes.
14     Q. And you would agree with me that as
15 contractors, Siemens was obligated to direct the safe
16 performance of the work Mr. Grove was conducting.
17     A. Correct. I agree with that.
18     MR. THORSNESS: All right. Why don't we
19 take our lunch break? Okay?
20     (Lunch recess, 12:52 p.m.)
21     AFTERNOON SESSION -- 2:00 O'CLOCK P.M.
22     EXAMINATION BY MR. THORSNESS (Resumed)
23 BY MR. THORSNESS:
24     Q. Back on. Mr. Carmichael, we've had our
25 lunch break. And we've reconvened here. When you

Page 88

1  worked as a safety person for BP or --
2       A. APC.
3       Q. -- A- --
4       A. APC.
5       Q. -- APC, were there ever any OSHA citations
6  levied against either of your employers concerning
7  on-the-job -- or concerning safety violations?
8       A. APC, yes.
9       Q. Okay. And were those -- did any fines
10 result as a result of those citations?
11     A. Yes, they did. I cannot tell you how much
12 they were, I'd say that.
13     Q. Were those violations -- or the activities
14 that led to those violations, were those within the
15 ambit of your jurisdiction as the safety man?
16     A. No.
17     Q. Have there ever been any injury accidents or
18 incidents involving employees of -- fellow employees
19 of the companies you've worked for while you were the
20 safety man?
21     A. Oh, yes.
22     Q. And in any of those instances, did the
23 employee bear any of the responsibility for the injury
24 to himself or herself or to other fellow employee?
25     MR. COHN: Just going to object on form and

Page 89

1  foundation.
2       THE WITNESS: Yes.
3       MR. COHN: Speculation.
4  BY MR. THORSNESS:
5       Q. Okay. Look at your report, Exhibit 2,
6  please. Go to the paragraph titled "Incident
7  History."
8       A. Yes.
9       Q. Okay. We are already discussed your visit
10 on April 12, '06 to the fan room, correct?
11     A. Correct.
12     Q. Okay. And we also discussed the one page of
13 measurements that you took.
14     A. That I will provide, correct.
15     Q. You'll provide. Okay. Next paragraph,
16 beginning with "The filter bank," do you see that?
17     A. Yes.
18     Q. Okay. You reference a "hatchway from a
19 utility corridor," correct?
20     A. Correct.
21     Q. There's also a door, a man door, so-called
22 man door, you walk into the fan room through, isn't
23 there?
24     A. Into the fan room --
25     Q. Yes.

23 (Pages 86 to 89)

GROVE v. UNOCAL

BOB CARMICHAEL
7/31/2007

### Page 114

1  difference.
2  Q. All right. And you have no -- strike that
3  question.
4      Do you have any information concerning this
5  collection of factors --
6  A. No.
7  Q. -- incredible factors that you're referring
8  to?
9  A. No. It would all -- in my experience, it's
10 all retrospective based on the incident as it actually
11 occurred. It's very difficult to make those -- in my
12 experience, very difficult to make those kinds of
13 predictions in advance.
14 Q. Okay. Should Mr. Grove have been wearing
15 fall protection?
16     MR. COHN: Objection. Speculation,
17 foundation.
18     THE WITNESS: Some form of fall prevention
19 or protection would have been appropriate if the
20 platform was indeed more than six feet off the lower
21 level. So it should have been either guardrails or a
22 fall protection harness or a guard. Something should
23 have been there.
24 BY MR. THORSNESS:
25 Q. And fall protection harness is a harness

### Page 115

1  that Mr. Grove would have worn?
2  A. Yes. A full -- it's called a full-body
3  harness, yes.
4  Q. And these guys out washing windows, are they
5  wearing that sort of a harness?
6  A. Correct.
7  Q. Certainly, they should be.
8  A. Yes. They should be.
9  Q. And would Mr. Grove's harness be attached to
10 anything?
11 A. Yes.
12 Q. What would it be attached to?
13 A. To an anchor point sufficiently above the
14 middle of his back that it would have prevented him
15 from hitting the floor.
16 Q. And had Mr. Grove been wearing such a safety
17 harness and had it been attached to an anchor as
18 you've just described and the platform fell out
19 beneath him --
20 A. Out from underneath him, correct.
21 Q. -- he should have been suspended by his
22 harness, right?
23 A. Yes.
24     MR. COHN: Objection. Foundation,
25 speculation.

### Page 116

1      THE WITNESS: Should have been, correct.
2  BY MR. THORSNESS:
3  Q. Okay. And would you -- if that had
4  happened, would you have expected him to sustain
5  serious injury?
6      MR. COHN: Objection. Foundation,
7  speculation.
8      THE WITNESS: A properly setup harness,
9  lanyard and anchor point is designed to certainly
10 limit injury. That doesn't mean that you can't be
11 injured, but it certainly is designed to limit the
12 injury. Now, there's lots of factors. And we could
13 discuss fall protection for the rest of the day if you
14 want. But generally, the short answer is I would not
15 have expected him to be injured.
16 BY MR. THORSNESS:
17 Q. And specifically, if designed properly, it
18 should have prevented him from hitting the floor.
19 A. Correct.
20 Q. All right. And that's your understanding as
21 to what did happen to him, right?
22 A. That he --
23     MR. COHN: Objection. Form, foundation.
24 BY MR. THORSNESS:
25 Q. That he hit the floor.

### Page 117

1  A. He hit something at floor level, whether it
2  was a piece of the platform or the deck of the floor,
3  something.
4  Q. Okay. He fell almost eight feet. And
5  however high the platform was --
6  A. And hit something.
7  Q. -- he fell almost that distance and hit
8  something. Okay. Was it his employer's
9  responsibility to see to it that he was provided with
10 and used this fall protection?
11     MR. COHN: Objection. Foundation,
12 speculation.
13     THE WITNESS: That's not a simple question
14 to answer. But I will tell you that in summary is
15 yes, it's the employer's responsibility to provide the
16 employee with training in the safety equipment that
17 they're required to use.
18     What I don't know is whether Siemens
19 expected them to be using -- expected their employees
20 to be using fall protection systems. If Siemens did,
21 in fact, provide safety harnesses to their employees,
22 then there is a requirement for them to train to use
23 them.
24 BY MR. THORSNESS:
25 Q. And likewise, it would be Siemens'

30 (Pages 114 to 117)

GROVE v. UNOCAL

BOB CARMICHAEL
7/31/2007

Page 118

1  obligation to ensure that they, in fact, did use them.
2       MR. COHN: Objection. Speculation.
3  BY MR. THORSNESS:
4    Q. Is that correct?
5       MR. COHN: Calls for legal conclusion.
6       THE WITNESS: In my experience, yes, that's
7  correct. If it is the employer's policy that employee
8  wear a particular piece of safety equipment in certain
9  circumstances, then yes, the employer, in my
10 experience, has an obligation to enforce that policy.
11 BY MR. THORSNESS:
12   Q. What do the OSHA regs say about that in
13 terms of the employer's responsibility?
14   A. The general duty clause says that the
15 employer's responsible to provide a safety and
16 healthful workplace that is as free from recognized
17 safety hazards as possible.
18       In the fall protection standard, OSHA says
19 that the employer is responsible for providing fall
20 protection equipment, if that's what's selected to
21 control hazards, and that the employees must be
22 trained to use it. I don't recall that OSHA goes any
23 farther to say that the employer is responsible for
24 making sure that the employee actually obeys that.
25 I'd have to look.

Page 119

1    Q. If this platform was eight feet above the
2  floor, would it qualify as what you would call an
3  elevated work platform?
4    A. Yes.
5    Q. If Mr. Grove had been instructed by his
6  employer to use a safety harness and he wasn't using
7  one, would he bear some responsibility for his
8  injuries in this case?
9       MR. COHN: Objection. States facts not in
10 evidence. Improper hypothetical, foundation,
11 speculation.
12      THE WITNESS: The employer may hold the
13 employee responsible. My experience is that OSHA
14 almost never does that in spite of the general duty
15 clause.
16 BY MR. THORSNESS:
17   Q. Okay.
18   A. My experience is OSHA never cites the
19 employees, basically never accuses the employee of
20 wrongdoing with respect to the employer.
21   Q. Okay. Let's look at the same page at
22 29 CFR 1910.22(a)(4).
23   A. 21(a)(4)?
24   Q. Yes.
25   A. Definition of "Platform"?

Page 120

1    Q. Yes. No. 28(a)(4), "Scaffolds and their
2  components."
3    A. 28(a)(4), "Scaffolds and their components
4  shall be capable." Okay.
5    Q. Yes. What was the -- first of all, would
6  you from your knowledge of this -- we call it a
7  platform -- would you call it a scaffold or a
8  platform?
9    A. It's a platform.
10   Q. Okay. And did you calculate the maximum
11 intended load --
12   A. No.
13   Q. -- of this platform?
14   A. No.
15   Q. What would you need to know to calculate
16 that?
17   A. I would need to know the total weight of all
18 the components that are used in the construction, the
19 number of employees, workers that will be using the
20 platform at any one time, the weight of any tools and
21 equipment, materials that would be brought on to the
22 platform, and then apply some suitable safety factor
23 that allows for the dynamic loading, such as walking
24 around and stepping from a ladder onto the platform.
25   Q. Okay. And what factor would that be?

Page 121

1    A. Normally, four.
2    Q. Four. Four times.
3    A. Four times.
4    Q. Okay. So you would include the weight of
5  the platform itself.
6    A. Correct.
7    Q. Okay. Do you know any of these values
8  you've just outlined?
9    A. No, I do not.
10   Q. And you've not conducted any static or
11 dynamic load calculations.
12   A. That's correct. I have not.
13   Q. The machine screws shown in these
14 photographs that I've shown you --
15   A. Yes.
16   Q. -- the Grove photographs, you don't know
17 what their shear strength is, do you?
18   A. I do not.
19   Q. And are you able -- is it within your
20 discipline to calculate that shear strength?
21   A. No, no. The only thing that I would have
22 any ability to do is look it up in a standard chart,
23 usually from the manufacturer. This is the size.
24 This is the shear strength.
25   Q. Okay.

31 (Pages 118 to 121)