Joseph S. Balser, Ph.D.                                August 15, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LAWRENCE H. GROVE; CYNTHIA
GROVE; SARAH GROVE; and
MICHAEL GROVE (DOB 1/21/88)
by and through his father
LAWRENCE H. GROVE,

    Plaintiffs,

    vs.                    Case No. A04-0096 CV (TMB)

UNOCAL CORPORATION,

    Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF JOSEPH D. BALSER, Ph.D.

OAKLAND, CALIFORNIA

AUGUST 15, 2007

9:13 a.m.

HILTON OAKLAND AIRPORT

One Hegenberger Road, Suite 1104

OAKLAND, CALIFORNIA

Susan F. Magee, RPR, CLR, CSR No. 11661

EXHIBIT F
PAGE 1 OF 3

30ee076d-3a31-4ade-9e10-ce0ed51ae7c8

Joseph S. Balser, Ph.D.                                                August 15, 2007

Page 38

1  question.
2      THE WITNESS: If there was no concern about
3  knocking the plank down and having it fall on his head
4  he might have been shaking the structure around. That's
5  pretty hard to do from a stepladder. You might be able
6  to do that from the ground if you could reach up that
7  high.
8      BY MR. THORSNESS: Q. Would he have -- if the
9  fastener -- if the bolts were gone and that was just one
10 piece of metal sitting on top of another, would you
11 agree with me that it would have been relatively easy
12 for Mr. Grove to tell by shaking that horizontal piece a
13 little bit that that joint was loose for some reason?
14     MR. COHN: Objection to the form of the
15 question. Speculation.
16     THE WITNESS: I believe that he would have been
17 able to see that the joint separated as he shook it if
18 he had been shaking it.
19     BY MR. THORSNESS: Q. All right. He would
20 feel some play in there?
21     A. He would see --
22     MR. COHN: Objection. Form. Speculation.
23     THE WITNESS: He would see the joint separate
24 if he was shaking it horizontally.
25     BY MR. THORSNESS: Q. And he would -- go

Page 39

1  ahead.
2      A. If he was shaking it vertically, he would also
3  be able to see the joint separating.
4      Q. And he would feel the movement, wouldn't he?
5      A. Yes.
6      MR. COHN: Objection. Form. Speculation.
7      THE WITNESS: He would see the movement.
8      BY MR. THORSNESS: Q. I know, but he would
9  also feel --
10     A. And feel it, yes.
11     Q. Feel the --
12     A. He would feel it give.
13     Q. The looseness?
14     A. Yes.
15     Q. All right. Thank you.
16     A. Only if he was, of course, shaking in the
17 direction that would cause the joint to separate. Not
18 when he pushed the joint tighter together. He would not
19 feel any movement there.
20     Q. But if he was shaking it back and forth a
21 little bit.
22     A. He would have to go in both directions.
23     Q. Right.
24     A. One that would separate the joint and the other
25 to reclose the joint.

Page 40

1      Q. Right. I want to -- I read your report, and I
2  want to ask you some questions about that. Are there
3  any opinions you plan to offer at trial in this matter
4  that are not set forth in your report?
5      A. There are some additional opinions.
6      Q. There are?
7      A. There would be, yes, because I don't believe in
8  my report that I describe the fact that this -- that
9  this joint had missing bolts. That report describes
10 specifically the bolt fracture analysis, okay? But as
11 far as the integrity of the joint goes, the fact that
12 there are no screws in there, that's not alluded to in
13 that report.
14     Q. It's nowhere in your report, is it?
15     A. That's correct.
16     Q. Why not?
17     A. Because that was not the subject of the report.
18 The report was on the bolt fracture analysis.
19     Q. Didn't you understand that any opinions which
20 you plan to give at trial you were supposed to set forth
21 in your report along with the basis for those opinions?
22     A. I did not understand that that was a goal of
23 this report. This report was simply an analysis of the
24 bolt there.
25     Q. Did you ever ask Mr. Cohn if you could

Page 41

1  supplement your report?
2      A. It has not occurred to me to ask him, no.
3      Q. Did Mr. Cohn ever ask you to supplement your
4  report?
5      A. No.
6      Q. Any other opinions which you plan to offer at
7  trial which are not set forth in your report?
8      A. No.
9      MR. COHN: I want a clarification. He also
10 filed an affidavit, and I plan to have him testify as to
11 the affidavit to the extent that's a supplementation of
12 his opinions.
13     BY MR. THORSNESS: Q. All right. Let's talk
14 about that affidavit for a few minutes.
15     Were you recently sent an affidavit to review
16 by Mr. Cohn?
17     A. No.
18     Q. Have you seen an affidavit that's been
19 submitted under your name in this case?
20     A. I wrote an affidavit in this case, yes.
21     MR. THORSNESS: Mark this, please.
22     (Whereupon, Exhibit 3 was marked for
23 identification.)
24     BY MR. THORSNESS: Q. Is that the exhibit that
25 you claim you wrote?

Joseph S. Balser, Ph.D.                                August 15, 2007

Page 46

1  BY MR. THORSNESS: Q. Did he change a single
2  word?
3     A. Not a one.
4     Q. So it's your testimony that every single word
5  within this affidavit is of your own creation; is that
6  correct?
7     A. That is correct.
8     Q. And not a single word was suggested or added or
9  deleted by Mr. Cohn?
10    A. That's correct.
11       MR. COHN: Objection to the form of the
12 question and also foundation and speculation.
13       BY MR. THORSNESS: Q. Look at paragraph 5
14 here, please, Dr. Balser, of your affidavit.
15       First sentence, the first clause of that
16 sentence you state, Although the improper bolted joints
17 were likely to have been tight at the time of initial
18 installation.
19       Do you see that language?
20    A. Yes.
21    Q. Would that include the joint that failed in
22 this accident?
23    A. Yes.
24    Q. So it's your understanding -- is it your
25 opinion that at the time the scaffolding was first

Page 47

1  built, the platform was first built, the subject joint
2  had at least two bolts with washers and nuts?
3     A. I --
4        MR. COHN: Objection. Speculation.
5        THE WITNESS: I see physical evidence that
6  there clearly was one bolt in there. There is little
7  evidence in that joint that there was a second bolt, but
8  that second bolt had been -- could have been washed much
9  earlier and the area had corroded over, so there's no
10 physical evidence on the joint from the pictures that I
11 have that would indicate that there was a second bolt.
12 I can clearly see that one bolt was clearly in there up
13 until some recent time maybe just prior to the failure.
14       BY MR. THORSNESS: Q. How recent?
15    A. I have no way of qualifying. It depends upon
16 that atmosphere, how corrosive it is, but there is
17 clearly evidence of a washer on the front face going
18 through one of the perforated holes in the angle iron
19 that clearly tells me that one bolt was present in that
20 joint for some time prior to the accident.
21    Q. Do you know of any evidence that suggests that
22 there were not two bolts when the scaffolding -- when
23 this platform was initially built?
24    A. No. I don't have any evidence that is negative
25 that way; correct.

Page 48

1     Q. And likewise it's your belief that all the
2  bolts and nuts were tightened; correct?
3     A. There is a presumption there --
4        MR. COHN: Objection. Speculation.
5        THE WITNESS: -- but there's certainly no
6  evidence to contradict that they were tight initially,
7  and I would not expect that thing to have been put up
8  and left loose. I would have expected it had been tight
9  at the time of initial installation.
10       BY MR. THORSNESS: Q. All right. Later on in
11 that paragraph on the last page of your affidavit there,
12 fourth line down, only intervening maintenance
13 inspections would have detected the loosening joints.
14       Do you see that sentence?
15    A. That's correct.
16    Q. All right. We've already discussed how
17 Mr. Grove might have detected the loose joint; correct?
18    A. Yes.
19    Q. In terms of other people who might have made
20 that assessment, might his employer have been able --
21 would you expect his employer, Siemens Corporation,
22 to -- had they inspected the fan room, had they
23 inspected that work platform --
24    A. No.
25    Q. -- would you have expected that they would have

Page 49

1  been able to detect any loosening of any joints?
2        MR. COHN: Form. Foundation. Speculation.
3        THE WITNESS: If the Siemens Corporation was
4  charged with the responsibility for having maintained
5  that scaffold and had they performed those regular
6  maintenance and inspections, certainly they would have
7  been able to discover that loose joint. However, my
8  belief is that that structure was, you know -- belong to
9  Unocal. It was in the Unocal building attached to
10 Unocal equipment. I would have expected someone from
11 Unocal to be chartered with the responsibility for the
12 safety of structures within the building, and I would
13 have expected them to have found it.
14       BY MR. THORSNESS: Q. Right.
15    A. And the fact that they did not find it or fix
16 this problem --
17    Q. Yeah.
18    A. -- prior to the accident would indicate to me
19 that they were not doing regular maintenance and
20 inspection of this structure.
21    Q. Right, right. Have you reviewed the contract
22 between Siemens and Unocal in this matter?
23    A. I saw a copy of that contract, and from my
24 understanding of that contract it was chartered that
25 between Siemens and Unocal that Unocal would be